Rosa J. Evergreen, DC Bar No. 500227
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
rosa.evergreen@arnoldporter.com
        --and --

Matthew J. Pavlides, DC Bar No. 424573
Eduardo S. Garcia, DC Bar No. 1028040
Stein Sperling Bennett De Jong Driscoll PC.
1101 Wotton Parkway, Suite 700
Rockville, MD 20852
(301) 340-2020
MPavlides@steinsperling.com

*Counsel for Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br><br>OLYMPIA INVESTMENTS, INC.<br>TSINTOLAS INVESTMENTS, INC.<br><br><br><br><br>Debtors. | Case No. 24-00158-ELG<br>Case No. 24-00159-ELG<br>(Chapter 11)<br>Pending Request for Joint Administration<br>Under 24-00158 |

### CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN THE ALTERNATIVE, ABSTAIN

The Movants (defined below), through counsel, file this *Motion to Dismiss the*

*Bankruptcy Cases, or in the Alternative, Abstain* (the "Motion to Dismiss"), and state as follows:

# <u>OVERVIEW</u>[1]

The bankruptcy filing by Olympia Investments, Inc. and Tsintolas Investments, Inc. represents their continued efforts to harm and oppress Chris Tsintolas, Deborah Tsintolas, and the Fotini Tsintolas Economides Revocable Trust, and to impede and interfere with the Superior Court litigation, by moving to this venue on the eve of a critical hearing in a litigation that began on October 24, 2019 in the Superior Court.  In that regard, a May 8, 2024 hearing was scheduled (after the Debtors and the Interested Parties requested the prior scheduled February 29, 2024 hearing to be adjourned multiple times) to address issues of first impression as to how D.C. Code § 29-312.24 operates when it is not strictly complied with.

As more fully described below, the Superior Court's decision would likely be determinative of the import of the Debtors' and the Interested Parties' failure to comply with the orders of the Superior Court and D.C. Code, including whether or not Chris Tsintolas, Deborah Tsintolas, and the Fotini Tsintolas Economides Revocable Trust were still shareholders of Olympia Investments, Inc. and Tsintolas Investments, Inc., or whether they were exclusively secured creditors with a security interest in the Debtors, and the other rights and remedies available to them in the Superior Court proceeding in light of the Debtors' and Interested Parties' failure to comply.  Chris, Deborah and Fotini contend that that due to Olympia Investments, Inc. and Tsintolas Investments, Inc.'s failure to strictly comply with the requirements of D.C. Code § 29-312.24, the Final Order issued on October 5, 2023 is still in effect, thereby rendering them to be secured with a judgment in the amount of nearly ten million dollars ($10,000,000).[2]  This

---

[1] Capitalized terms used but not otherwise defined in this overview have the meanings ascribed to them elsewhere in this Motion to Dismiss.

[2] The Superior Court also granted award of attorneys' fees and litigation costs in favor of Chris, Deborah, and Fotini due to the Court's determination that the manager of Olympia Investments, Inc. and Tsintolas Investments, Inc.,

award provides them a security interest in the Debtors and makes them a secured creditor, however that does not mean that the Debtors and the Interested Parties alleged "ouster" of them from the Board of Directors was proper at the time and manner it was done; rather, those are issues that need to be addressed in the Superior Court.[3]

At present, there is significant ambiguity as to who has authority to authorize decisions for the Debtors, such as the filing for bankruptcy and retaining of counsel, among other decisions, and whether the Interested Parties had authority to modify members of the Board of Directors in the midst of the Superior Court litigation while they were in non-compliance with the D.C. Code and/or orders of the Superior Court, which are all issues currently pending in the Superior Court. Simply put, there is no reason that these complicated and fact-intensive issues which have been subject to ongoing litigation for years in the Superior Court should be before this Court and certainly not at this juncture.

First, the bankruptcy filings should be dismissed for cause in the first instance because the bankruptcy filings were not properly authorized as the requisite statutory requirements were not and could not be met to file for bankruptcy.  To the extent there is any ambiguity about whether the bankruptcy filings were properly authorized, that is an issue that should be decided

---

Efstratios Tsintolas, "failed to adequately manage the Corporations," engaged in "illegal, oppressive [or] fraudulent" behavior. However the Superior Court has not yet determined the amount of the attorneys' fees and litigation costs that Chris, Deborah, and Fotini are entitled to.

[3] The Debtors in their bankruptcy petitions list Chris Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust as shareholders of the Debtors, yet they also seem to contend by the bankruptcy resolutions that somehow only the Interested Parties are Directors of the Board.  As will be discussed more fully below, Olympia Investments, Inc. and Tsintolas Investments, Inc. have taken both sides of this issue and asserted in the Superior Court that Chris Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust are and are not shareholders.

by the Superior Court as it implicates the issues that have been pending before the Superior Court for the last four years, all as more fully discussed below.

Second, even assuming *arguendo* that the filings were properly authorized—which they were not—the bankruptcy cases should still be dismissed because they were not filed in good faith, do not serve a valid bankruptcy purpose, and were filed to obtain a tactical litigation advantage against the Movants that have been litigating with the Debtors for many years, culminating in the State Proceedings and the Superior Court's final purchase order and the Debtors' unilateral election thereto wherein the Debtors gave notice of the intent to file articles of dissolution.  In filing this bankruptcy, the Debtors, Efstratios Tsintolas, Suzanne Tsintolas, and Cassandra Tsintolas are forum shopping and are knowingly and intentionally trying to interfere with and avoid the Superior Court's orders and paying Chris, Deborah, and Fotini their rightful amounts awarded pursuant to final orders by the Superior Court in the State Proceeding and/or dissolving in accordance with their statutory obligations.

Bankruptcy is not—and this Court should not sanction it here—a refuge to avoid long-standing two-party litigation (here, pending in the Superior Court for the District of Columbia) or for shareholders to evade court ordered obligations to make proper disbursements under the Code of the District of Columbia and/or to dissolve in accordance with their statutory obligations.

For the reasons discussed below, these bankruptcy cases should be dismissed for cause or, in the alternative, this Court should abstain from hearing the cases pursuant to section 305 of the Bankruptcy Code.

## BACKGROUND

### A.    The Parents of the Parties

1.      Demetrios and Helen Tsintolas (the "Parents") had four (4) children, Fotini ("Fotini"), Cassandra ("Sandy"), Efstratios ("Steve"), and Christofilos ("Chris").  In 1955, the Parents started Tsintolas Realty Company as a real estate management company.  At that time, Demetrios Tsintolas was approximately 42 years old and Helen Tsintolas was 33 years old.

2.      In 1955 the Parents also started Olympia Investments, Inc. which came to own many multiple multi-family residential properties. Later, in 1961, the Parents started Tsintolas Investments, Inc. which owns one multifamily residential complex that has three buildings on the same property.

3.      As the Parents entered their 80s, the Parents decided, for purposes of estate and trust planning that while they were both alive they wanted to gift their interests in Olympia and Tsintolas to their children. The Parents decided they wanted their children to receive equal inheritance.

4.      In 2002, Demetrios Tsintolas was 89 years old and Helen Tsintolas was 80 years old.  The Parents formally made the decision to treat their children equally for purposes of their inheritance and gifted 25% of Olympia and 25% of Tsintolas to each child.  Each child was made a Board Member of each company and was also made an officer of each company.

### B.    The Current Parties

5.      Olympia Investments, Inc. ("Olympia") remains a District of Columbia corporation and maintains an office at 3520 Connecticut Avenue, NW, Washington, D.C. 20008.

6.      Tsintolas Investments, Inc. ("Tsintolas," and together with Olympia, the "Debtors," or individually, a "Debtor")[4] also is a District of Columbia corporation and maintains an office at 3520 Connecticut Avenue, NW, Washington, D.C. 20008.

7.      Neither of the Debtors have any mortgages or secured debts (other than the debts of the Movants, which will be described below) on any of the multi-family residential properties which comprise over 140 multi-family units that generate over a million dollars a year in gross receipts.[5]

8.      As a part of their own estate and trust planning, Chris and Deborah Tsintolas ("Deborah"), who are husband and wife, now jointly hold Chris' 25% ownership interest in each of the Debtors.

9.      Fotini (and, together with Chris and Deborah, the "Movants"),[6] as a part of her estate and trust planning, transferred her interests into the Fotini Tsintolas Economides Revocable Trust ("Fotini's Trust").  Fotini's Trust is a revocable trust established for the benefit of Fotini.[7]  Fotini holds a 25% ownership interest in each of the Debtors.

10.     As a part of their own estate and trust planning, Steve and Suzanne Tsintolas ("Suzanne"), who are husband and wife, now jointly hold Steve's 25% ownership interest in each of the Debtors.

---

[4] There are frequent references to Olympia and Tsintolas throughout the State Proceedings as the "Defendant Corporations."  For the sake of brevity, Olympia and Tsintolas in their capacities as Debtors in these Chapter 11 cases and Defendants under the State Proceedings are referenced synonymously herein as the "Debtors."

[5] *See generally* Exhibit 1 (attaching Plaintiff's Exhibit 221 of corporate records used in Valuation Trial showing income and expense by property from 2016-2020).

[6] There are frequent references to Chris, Deborah, and Fotini in the State Proceedings collectively as the "Plaintiffs." For the sake of brevity, Chris, Deborah, and Fotini in their capacities as Movants in for this Motion and Plaintiffs in the State Proceedings are referenced synonymously herein as the "Movants."

[7] For the sake of brevity, both the individual and her trust are referenced synonymously herein as "Fotini."

6

11.     Sandy (and, together with Steve, the "Interested Parties"),[8] as a part of her estate and trust planning, transferred her interests into the Cassandra Tsintolas Johnson Revocable Trust ("Sandy's Trust").  Sandy's Trust is a revocable trust established for the benefit of Sandy.[9] Sandy holds a 25% ownership interest in each of the Debtors.

12.     On May 7, 2024, following many years of litigation with the Movants in the Superior Court of the District of Columbia (the "Superior Court") more fully described below, the Interested Parties directed the Debtors to file unauthorized petitions for bankruptcy.

**B.      Superior Court Litigation History Leading Up to the Bankruptcy Filing**

   i.     Initial Filing of the Lawsuits, Election to Purchase Shares, and Judicial Determination of the Fair Value of Plaintiffs' Shares

13.     On October 24, 2019, the Movants filed actions in the Superior Court for judicial dissolution of two closely-held corporations, inspection of their corporate records, and the appointment of a receiver for each of the Debtors.[10]

14.     Collectively, the Movants each own a 25% share of each Debtor for a cumulative total of 50% of each Debtor.  The Movants' siblings, the Interested Parties, each own a 25% share of each Debtor for a cumulative total of 50% of each Debtor.  The Debtors were and still are deadlocked at the Board and Shareholder level.

---

[8] There are frequent references to Seve and Sandy in the State Proceedings collectively as the "Interested Parties," and collectively with the Debtors, the "Defendants."

[9] For the sake of brevity, both the individual and her trust are referenced synonymously herein as "Sandy."

[10] *See Christofilos Tsintolas, et al v. Tsintolas Investments, Inc.*, Case No. 2019 CA 007057 (D.C. Super. Ct.) ("Tsintolas Proceeding") and *See Christofilos Tsintolas, et al v. Olympia Investments, Inc.*, Case No. 2019 CA 007059 (D.C. Super. Ct.) ("Olympia Proceeding," and together with the Tsintolas Proceedings, the "State Proceedings").  The Complaint for the Tsintolas Proceeding has been attached as Exhibit 2 and the Complaint for the Olympia Proceeding has been attached as Exhibit 3.

15.    On January 21, 2020, pursuant to D.C. Code § 29-312.24 the Debtors elected to purchase the Movants' shares in lieu of dissolving the corporations.[11] This election to purchase rather than to contest the dissolution set in motion a very specific set of statutory procedures that guided the Superior Court.

16.    Between October 2019 and March 2020, pursuant to D.C. Code § 29-312.24(c), the Parties had 60 days from the date of the filing of the first election to see if the parties could reach agreement as to the fair value and terms of purchase of the petitioner's shares.  Unable to resolve their differences regarding the fair value of the shares, Movants then elected a judicial determination of the fair value of Movants' shares pursuant to D.C. Code § 29-312.24(d).

17.    On September 26-27, 2022, November 14-15, 2022, and January 9-10, 2023, the Superior Court held a Non-Jury Trial ("Valuation Trial") for the fair valuation of the Debtors pursuant to the Debtors' election to purchase the Movants' shares.

18.    On May 22, 2023, after listening to the arguments and testimony provided at the Valuation Trial, the Superior Court entered a 59 page Trial Order ordering, among other things: (i) that the fair value of Olympia was adjudged to be $13,851,614.57; and (ii) that the fair value of Tsintolas was adjudged to be $1,722,642. The Superior Court took under advisement the issues of pre and post judgment interest, attorney's fees, security interest for the judgment, and payment plan.  *See* Exhibit 4 (attaching the "Trial Order").

---

[11] *See Christofilos Tsintolas, et al v. Tsintolas Investments, Inc.*, Case No. 2019 CA 007057 (D.C. Super. Ct.), Notice of Election to Purchase Shares Pursuant to D.C. Code 29-312.24, submitted 01/21/202 17:16 by Benjamin S. Boyd on behalf of Efstratios Tsintolas.

19.     On October 5, 2023, after listening to the arguments and testimony provided at the Addendum hearing, the Superior Court entered a 13 page Final Order ordering, among other things:

     a.  Prejudgment interest from October 24, 2019 to the date of the Order;

     b.  Attorney's Fees and costs in favor of the Movants to be submitted within 30 days;

     c.  An expansive security interest in favor of the Movants;

     d.  A payment plan; and

     e.   That the Debtors' 10-day period to elect to dissolve or continue with the purchase of Movants' shares under D.C. Code § 29.312.24(g) was triggered.

*See* Exhibit 5 (attaching the "Final Order").

20. In justifying its award for attorney fees to the Movants in the Final Order, the Superior Court found that:

> There is ample evidence that Efstratios ("Steve") Tsintolas failed to adequately manage the Corporations. Much of the Parties' disputes as to the value of the corporate assets arose from different assessments of net operating income.  Defendants consistently testified and argued that the Corporations have negative cash flow; that maintenance expenses exceed or barely equal rental income; and that Steve has not been paid for his prior work. At the time Plaintiffs initiated this action to dissolve the Corporations, Steve was asserting that the Corporations owed him hundreds of thousands of dollars. Expert witnesses on both sides acknowledged that OI's and TI's net operating incomes were far below industry standards. Defendants' own expert, Mr. Tangney, testified that a commercial lender would be willing to loan the Corporations money only if the properties were going to change ownership and be run such that NOI would be closer to the industry standard. Defendants' own evidence shows that the Corporations have been grossly mismanaged. If Steve were to use his position as President of the Corporations to pay himself hundreds of thousands of dollars – as he planned to do – that

would constitute a further gross mismanagement or waste of funds.
On this basis alone, the Court can award attorney fees to Plaintiffs.

*See* <u>Exhibit 5</u> at II.b, page 6 – 7. (Footnote omitted).

21.    The Superior Court also found that Movants had probable grounds for relief under

D.C. Code § 29-312.20(a)(2)(B), which prohibits corporate officers or directors from engaging in

"illegal, oppressive, [or] fraudulent" behavior.  The Superior Court found that:

> Both Corporations operated unlawfully when they consistently
> failed to hold shareholder meetings over the course of several years
> and falsified records of meetings that never existed. Furthermore,
> Steve, in his capacity as President, unlawfully refused to allow
> Fotini and Chris, who were both corporate officers, to review
> corporate financial documents or learn the details of Steve's
> exclusive and lucrative property management agreement with both
> Corporations. Both Steve and Fotini testified that Steve became
> angry with Fotini when he learned that she went behind his back to
> request financial documentation from the Corporations' accountant
> after Steve denied her access to those documents. Plaintiffs
> reasonably expected that this conduct would have entitled them to
> seek dissolution of the Corporations.

*See* <u>Exhibit 5</u> at II.b, page 7.

22.    The Superior Court further found that Steve had "oppressively used his powers as

President," and determined that:

> There was undisputed testimony that Steve withheld Chris' dividend
> check in 2019 until Chris would acquiesce to meeting with Steve in
> person and approve certain corporate actions. Steve did not deny
> withholding the check and said that he did it because he felt that Chris
> needed to meet with him about corporate business. This is textbook
> oppression. Steve used his corporate power to try to leverage how Chris
> exercised his rights as a shareholder and officer. Steve's misuse of his
> role as President gave Plaintiffs probable grounds for dissolution.

*See* <u>Exhibit 5</u> at II.b, page 7-8.

   ii. <u>Debtors' Conduct After the Superior Court's Orders and Debtors' Failure
to Strictly Comply with D.C. Code § 29-312.24(g)</u>

23. D.C. Code § 29-312.24(g) provides a two-part process should the Debtors no

longer desire to go through with the purchase of the Movants' shares after the Final Order.

> The purchase ordered pursuant to subsection (e) of this section shall be
> made within 10 days after the date the order becomes final **unless before
> that time the corporation files with the Superior Court a notice of its
> intention to adopt articles of dissolution pursuant to §§ 29-312.02 and
> 29-312.03, which articles shall then be adopted and filed within 50 days
> thereafter. Upon filing of such articles of dissolution,** the corporation is
> dissolved in accordance with §§ 29-312.05 through 29-312.07, and the
> order entered pursuant to subsection (e) of this section shall no longer be of
> any force or effect, except that the court may award the petitioning
> shareholder expenses in accordance with the last sentence of subsection (e)
> of this section and the petitioner may continue to pursue any claims
> previously asserted on behalf of the corporation.

D.C. Code § 29-312.24(g). (Emphasis added).

24. On October 16, 2023, the Debtors filed the Notice of Intention to Adopt Articles

of Dissolution (the "Notice of Intention to Dissolve"), thereby expressing their intentions to

adopt articles of dissolution pursuant to §§ 29-312.02 and 29-312.03 within 50 days (i.e., by

December 5, 2023) rather than purchase Movants' shares pursuant to the Final Order. *See* D.C.

Code § 29-312.24(g).

25. D.C. Code §§ 29-312.02 provides, in pertinent part, as follows:

(b) For a proposal to dissolve to be adopted:
  (1) The board of directors shall recommend dissolution to the shareholders
  . . .
  (2) The shareholders entitled to vote must approve the proposal to dissolve
  as provided in subsection (e) of this section.
(c) The board of directors may condition its submission of the proposal for
dissolution on any basis.
(d) The corporation shall notify each shareholder, whether or not entitled to vote,
of the proposed shareholders' meeting. The notice shall also state that the purpose,
or one of the purposes, of the meeting is to consider dissolving the corporation.
(e) Unless the articles of incorporation or the board of directors acting pursuant to
subsection (c) of this section require a greater vote, a greater number of shares to

be present, or a vote by voting groups, **adoption of the proposal to dissolve requires the approval of the shareholders at a meeting at which a quorum consisting of at least a majority of the votes entitled to be cast exists**.

(Emphasis added).

26.     Thereafter, at 11:47 a.m. on Friday, December 1, 2023, Steve sent an email to, among others, Movants, stating: "Attached is a notice to Shareholders of [Tsintolas] and [Olympia], given by orders of the Board of Directors of such corporations."[12] The email contained two PDF attachments titled "Notice to Shareholders [Tsintolas]" and "Notice to Shareholders [Olympia]."[13]

27.     The body of both notices stated identically as follows:

NOTICE OF ACTION WITHOUT A MEETING OF SHAREHOLDERS BY WRITTEN CONSENT

Proposed to be taken on December 1, 2023

TO THE SHAREHOLDERS OF [Tsintolas OR Olympia] (the "***Corporation***"):

NOTICE IS HEREBY GIVEN pursuant to Section 29-312.02 of the District of Columbia Business Corporation of 2010 (the "***Act***") that an action without a meeting by written consent is proposed to be taken on December 1, 2023 to adopt a Plan of Dissolution and Distribution for the dissolution of the Corporation and the liquidation and winding up of its affair[s] (the "***Written Action***").

Section 29-312.02 of the Act requires that notice of a proposed meeting to consider dissolving the Corporation be given to all shareholders of the Corporation, whether or not entitled to vote.

---

[12] These documents are included in the Judicial Determination of Non-Compliance with D.C. § 29-312.24(g) (attaching as <u>Exhibit 6</u> the "Judicial Determination Motion").  *See* Exhibit 2 of the Judicial Determination Motion.

[13] The delivery of the "notice to shareholders" to the Movants by Steve was consistent with the fact that the Movants became shareholders again by operation of law once the notice was filed. This admission by Steve that the Movants were shareholders of the Debtors should foreclose him and/or the Debtors from ever disputing that from the period of time between the filing of the notice and the deadline for the adoption of articles of dissolution, the Movants were indisputably shareholders of the Debtors.

Only shareholders of the Corporation entitled to vote on December 1, 2023 will be signing the Written Action.

28.　　At 3:42 p.m. on the same day, counsel for Movants' emailed counsel for

Defendants, stating as follows:

My clients are in receipt of your office's email of December 1, 2023 at 11:52 AM.

My clients object to the surprise of the communication mid-day on a Friday; misplaced allegations both factual and legal; alleged timing asserted therein in all respects; generally and specifically lack of proper notice; lack of proper and full disclosure as to what alleged 'Plan of Dissolution and Distribution' is being reference as it is undisclosed; and overall improper attempt to take unilateral action in this matter.

As you know, my clients remain Shareholders, Officers and Directors of Tsintolas Investments, Inc. and Olympia Investments, Inc. As Shareholders and Directors and in light of the rulings of the Court in the pending litigation and other associated proceedings, any and all action taken by the Corporations is categorically improper. We intend to bring to Judge Williams' attention this attempt at further improper action and the continuing pattern of oppression.[14]

29.　　Then on the very same day, on December 1, 2023, Steve improperly signed and

submitted the Inaccurate Articles of Dissolution to the government of the District of Columbia.[15]

To be clear, there was *no* proper call for a shareholders' meeting to vote for the filing of articles

of dissolution and *no* "approval of the shareholders at a meeting at which a quorum consisting of

at least a majority of the votes entitled to be cast exists." *See* D.C. Code § 29-312.02(e).

30.　　In both Inaccurate Articles of Dissolution, Steve incorrectly and falsely

represented that "[t]he date dissolution was authorized" was December 1, 2023 and in a

misleading fashion stated that "[t]he proposal to dissolve was duly approved by the shareholders

---

[14] *See* Exhibit 2 of the Judicial Determination Motion.

[15] A copy of the Inaccurate Articles of Dissolution for Tsintolas and Olympia are attached as Exhibit 1 of the Judicial Determination Motion.

in the manner required by § 29-312.03 and by the articles of incorporation." *See* Exhibit 1 of the Judicial Determination Motion.

31.     Further, in the Inaccurate Articles of Dissolution for Tsintolas, Steve lists Chris, Fotini, and himself under "Name of the Governor or Authorized Person" and inaccurately represented that the Articles of Dissolution for Tsintolas were signed by the "Governor or Authorized Person" listed. *See* Exhibit 1 of the Judicial Determination Motion. To be clear, Chris and Fotini did not authorize their signatures on the Articles of Dissolution for Tsintolas.

iii.   <u>Superior Court Repeatedly Agrees that Debtors have Exceeded Their Authority After the Issuance of the Final Order.</u>

32.     One of the other issues that arose in the Superior Court proceeding was the Debtors' unauthorized hiring of the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. ("Shulman Rogers") as corporate counsel for the purpose of multiple motions for reconsideration and unwarranted appeals.[16]

33.      Not only was the hiring of Shulman Rogers lacking notice of a meeting of the Board of Directors to hire new counsel, a quorum for a meeting to hire new counsel, and a vote of approval from a majority of Board Members, as well as, presenting a conflict of interest as Shulman Rogers had previously represented Steve in the litigation, but the hiring also did not comply with D.C. Code § 29-312.05, <u>Effect of dissolution</u>, which states that a "dissolved corporation continues its corporate existence but shall not carry on any activities except that appropriate to wind up and liquidate its business and affairs..."

---

[16] Shulman Rogers filed a cascade of motions, motions for reconsideration and even a request for an advisory opinion along with several appeals, as well as other tactics to delay the proceedings, but the Superior Court ultimately determined that their retention was invalid and the Corporations had not authorized the retention.  These efforts were detailed in part by the Superior Court.  *See* <u>Exhibit 10</u> at III.a.

34.     On November 6, 2023, the Movants filed a motion to disqualify the law firm of Shulman Rogers citing, among other things, that Shulman Rogers had a conflict of interest due to past representations of Steve, the Debtors lacked corporate authority to retain Shulman Rogers, and Shulman Rogers was taking actions inconsistent with the Debtors' Notice of Intent to Dissolve. *See* Exhibit 7 (attaching the "Disqualification Motion").

35.     On February 7, 2024, the Superior Court found for the Movants, concluding that: "the Corporations currently lack the authority to retain the Shulman Rogers Attorneys given that: (i) Plaintiffs' instant Motion constitutes an objection by the boards of the Corporations; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the Shulman Rogers Attorneys." *See* Exhibit 8 (attaching the "Disqualification Order").

36.     On February 27, 2024, the Debtors filed a motion for reconsideration of the Superior Court's Disqualification Order, in a brazen attempt to relitigate the issue of Shulman Rogers' retention.  *See* Exhibit 9 (attaching the "Reconsideration Motion").

37.     On April 9, 2024, the Superior Court denied the Reconsideration Motion.  *See* Exhibit 10 (attaching the "Reconsideration Order").  In denying the Reconsideration Motion, the Superior Court noted that this was the Debtors' fifth attempt to "reconsider or reverse its interpretation of D.C. Code § 29.312.24." *See* Exhibit 10, at p. 6. The Superior Court found that (i) members of the Board (meaning just Steve and Sandy) could not unilaterally retain counsel for the Debtors in the face of the other members of the Board's opposition (e.g., the Movants' opposition), (ii) the Board was deadlocked, and (iii) members of the Board of the Debtors could not simply elect to retain counsel of their choice when a deadlock existed.  *See* Exhibit 10, at fn. 1.

15

38.     In the Superior Court proceeding as part of their motion for reconsideration and request for revision of the Superior Court's order disqualifying the law firm—which motion was denied—the Debtors alleged for the first time that on October 13, 2023, the Interested Parties only passed resolutions of the Shareholders for each Debtor to, among other things, remove Chris and Fotini from the Board of Directors of each Debtor. *See* Exhibit 11  (attaching the "Unauthorized Olympia Resolution") and Exhibit 12 (attaching the "Unauthorized Tsintolas Resolution," and together with the Unauthorized Olympia Resolution," the "Unauthorized Resolutions").[17]

39.     The Unauthorized Resolutions were passed pursuant to an unauthorized board resolution, the alleged "Written Consent of the Shareholders" (the "Unauthorized Consent"). There was no notice of a meeting as required under D.C. law, no quorum for a vote, no proper vote and likewise none of the requisite requirements for an Unauthorized Consent.[18]

40.     At that time, the Interested Parties alone could not elect to engage in a "written consent" and pass unauthorized resolutions and then hold that such resolutions control who can make decisions for the Debtors, including using those same resolutions as a basis to allege that they have authority to file these bankruptcy proceedings.

41.     Simply put, in order to take any action of either the Board of Directors or Shareholders, there must be notice to all Board Members and Shares; there must be a quorum of more than 50% of the Board Members or Shares present to be able to hold a vote; there must be

---

[17] Along with improperly seeking to remove Chris and Fotini from the Board, the shareholders who participated—which consisted of only Steve and the Casandra Trust (who incidentally were also the only directors other than Chris and Fotini) — appointed Suzanne, Steve's wife, to the Board.  Such that the Board— if one accepts the Unauthorized Consent which Movants assert are improper— instead of being a Board comprised of the four siblings, became a Board unilaterally comprised of two siblings and one spouse.

[18] *See* D.C. § 29-305.01-29; D.C. § 29-406.20-25.

at more than 50% of the Shares voted in favor of the matter before the Shareholders.  Because

there was no notice, quorum, or proper vote, as to all Board Members and Shares, then it follows

there can be no proper action by either the Board or the Shares.

    iv.  <u>The Superior Court Schedules a Hearing to Address the Debtors and Interested Parties</u>
                <u>Non-Compliance with D.C. § 29-312.24(g).</u>

42.      On February 8, 2024, the Superior Court scheduled a hearing for February 29,

2024 to address Movants' motions:  (1) for appointment of a receiver because the Debtors had

continued to oppress Movants by providing no financial information, tax returns, financials,

check register, income/expense statements by property or other data, as well as, having made no

effort to sell any asset or winddown the affairs of the business;[19] and (2) for Judicial

Determination of Non-Compliance with D.C. § 29-312.24(g) and set a hearing on May 3, 2024.[20]

43.      The hearing was moved several times after the Debtors and Interested Parties

requested a number of continuances. The hearing was ultimately rescheduled for May, 8, 2024.[21]

Rather than facing this hearing, the Debtors filed these Chapter 11 cases on May 7, 2024.

44.      As part of the petitions for Chapter 11 relief, the Debtors attached resolutions

from an alleged special meeting of the Board of Directors (the "Unauthorized Special Meeting").

This Unauthorized Special Meeting was unbeknownst to the Movants.  The purpose of the

meeting appears to have been to draft unauthorized resolutions in support of the Debtors' (i)

filing the instant Chapter 11 cases; (ii) authorizing Steve to execute and file the petitions in

---

[19] Attaching the "Receiver Motion" as <u>Exhibit 13</u>.

[20] *See* <u>Exhibit 6</u>.

[21] The hearing was initially scheduled on the following dates: February 29, 2024, April 15, 2024, April 25, 2024 and May 3, 2024, but the Debtors and Interested Parties kept requesting continuances. The Superior Court outlined this history in a scheduling order (attaching "Scheduling Order" as <u>Exhibit 14</u>").

support of the Debtors' bankruptcy filings; and (iii) retaining the law firm of Offit Kurman, P.A.

to represent the Debtors as bankruptcy counsel. *See* Case No. 24-00159, Docket No. 3

("Unauthorized Tsintolas Bankruptcy Resolution") Case No. 24-00158, Docket No. 3

("Unauthorized Olympia Bankruptcy Resolution," and together with the Unauthorized Tsintolas

Bankruptcy Resolution, the "Unauthorized Bankruptcy Resolutions").

45.    For all of the reasons set forth above and below, these Chapter 11 cases were filed

based on improper authority and should be dismissed.  Even if this Court were to find that the

filings were not unauthorized, the Chapter 11 cases should still be dismissed as they were filed in

bad faith as set forth below, or in the alternative, the Court should abstain.

## **RELIEF REQUESTED**

## I.    **It Is Unclear Whether the Interested Parties and the Debtors Had Actual Authority to File the Chapter 11 Cases**

46.    "Under longstanding Supreme Court precedent, state law dictates the procedures a

corporation must follow to authorize a bankruptcy filing." *In re Franchise Servs. of N. Am., Inc.*,

891 F.3d 198, 202 (5th Cir. 2018). Bankruptcy cases begin when either an eligible debtor files a

voluntary petition or creditors file an involuntary petition against the debtor. *In re Franchise

Servs. of N. Am. Inc.*, 891 F.3d at 206.  A voluntary case begins when an "entity that may be a

debtor" files a bankruptcy petition.  11 U.S.C. § 303(a). Corporations are entities that may be

debtors and may file voluntary petitions for relief under chapters 7 or 11 of the Bankruptcy

Code. 11 U.S.C. § 109(a)-(b), (d).  Although a corporation may be an eligible debtor under the

Bankruptcy Code, the corporation cannot act on its own and can act only if authorized by

appropriate agents. *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d at 206 (referencing *W.G.

Yates & Sons Const. Co. Inc. v. Occupational Safety & Health Review Comm'n*, 459 F.3d 604,

607 (5th Cir. 2006)).  The Bankruptcy Code does not provide instruction on who may authorize a

18

corporate entity's petition filing; it merely provides that only an entity that may be a debtor may initiate a voluntary bankruptcy case. 11 U.S.C. § 301(a).

47.    In the absence of federal incorporation, state law determines who has the authority to file a voluntary petition on behalf of a corporation. *Price v. Gurney*, 324 U.S. 100, 106-07 (1945). A bankruptcy court must dismiss a corporate entity's petition if the corporation acted without proper authorization under state law. *In re Franchise Servs. of N. Am. Inc.*, 891 F.3d. at 206-07 (citing *Price*, 324 U.S. at 106). The Supreme Court underscores that "[i]t is not enough that those who seek to speak for the corporation may have the right to obtain that authority," but rather, those seeking to act for the corporation in filing a bankruptcy petition must have the actual authority at the time of filing. *Price*, 324 U.S. at 106-07.  In the absence of a duly filed petition, the bankruptcy court must dismiss the petition because it lacks power "to shift the management of a corporation from one group to another, to settle intracorporate disputes, and to adjust intracorporate claims." *Id*.

48.    As detailed above, it is unclear whether the Interested Parties had actual authority to act for the Debtors in filing the Debtors' bankruptcy petitions, and the ability of the Interested Parties to act <u>alone</u> on behalf of the Debtors remains a contested issue in the Superior Court.

49.    At present, the Superior Court has made clear that at least for a period of time and possibly through the date of this filing that the Movants retained their status as shareholders.[22] In fact, that is the position Debtors have taken in their Voluntary Petition when they listed the

---

[22] To be clear, Movants maintain that due to Debtors' failure to strictly comply with D.C. Code § 29-312.24(g), the Final Order is in full force and effect and they are secured and have a security interest as set forth in the Final Order. However, no judicial determination has yet been made to confirm Movants' contention and it has been disputed by the Debtors in the Superior Court. Moreover, the fact that Movants contend that they have a security interest as set forth in the Final Order does not moot or limit their other rights and Movants reserve all rights, claims and arguments.

Movants as shareholders. If that is the case, then the Movants and the Interested parties are in a deadlock as it pertains to the Debtors.  The deadlock is well documented in the Superior Court's findings.[23]  Despite the Superior Court's findings outlined in the Trial Order and Final Order, and despite the deadlock facing the Debtors, the Interested Parties attempted to pass the Unauthorized Consent for the purpose of ousting the Movants as Board Members of the Debtors without any authority to do so.[24]  Proper notice was not provided of the Unauthorized Consent and there was not a quorum.  The only parties to the Unauthorized Consent were the Interested Parties, who alone only represented 50% of the shares for each Debtor and were not sufficient to create a quorum. After providing no notice and there being no quorum, the Interested Parties allege that they passed the Unauthorized Resolutions on October 13, 2023 to remove the Movants from the Board of Directors. Without notice nor a quorum, the Interested Parties now alleged ouster of the Movants was clearly improper. Parties locked in a deadlock cannot simply unilaterally remove the other parties to a deadlock as a way to seize control—such an act clearly violates corporate law and policy.

50.      The Superior Court has already found that the Interested Parties cannot act unilaterally.  As discussed above, the Interested Parties maintained they had sole authority to act when attempting to retain Shulman Rogers as corporate counsel.  The Superior Court saw

---

[23] *See generally* <u>Exhibit 5</u>, <u>Exhibit 8</u>, and <u>Exhibit 10</u>.

[24] *See generally* <u>Exhibit 4</u> and <u>Exhibit 5</u>.

through this ruse not once, but twice, and ruled to disqualify Shulman Rogers on a motion by the

Movants[25] and then affirmed that ruling on a motion to reconsider.[26]

51.     Having no success persuading the Superior Court, the Interested Parties now

attempt to ask this Court to bless their improper actions with these sham Chapter 11 cases.  The

Unauthorized Bankruptcy Resolutions filed with these Chapter 11 cases do not set forth this

complicated history between the parties, which plainly demonstrates that the Chapter 11 cases

were not properly authorized.  Instead, the resolutions suggest that "all of the directors" adopt the

resolutions.  As has been stated above, the Interested Parties cannot unilaterally make themselves

"all of the directors" unless and until the Superior Court has determined whether or not the

Interested Parties alone can make such decisions.  For the same reasons the Debtors and the

Interested Parties were unable to retain Shulman Rogers, the Interested Parties should not be

found to have the actual authority to authorize Steve to file the instant Chapter 11 cases or

unilaterally retain bankruptcy counsel.

52.     The Interested Parties filed the Unauthorized Bankruptcy Resolutions allegedly

evidencing the Unauthorized Special Meeting on April 27, 2024, whereby the Interested Parties

allegedly acted by unanimous written consent to pass the Unauthorized Bankruptcy Resolutions.

The Unauthorized Bankruptcy Resolutions carry no legal weight.  There was not proper notice of

the Unauthorized Special Meeting. The only parties present at the Unauthorized Special Meeting

---

[25] The Superior Court found that "the Corporations currently lack the authority to retain Shulman Rogers Attorneys given that: (i) Plaintiffs' instant Motion is an objection by the boards of the Corporations; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the Shulman Rogers Attorneys." *See* Exhibit 8, at p. 4.

[26] The Superior Court notes that "[f]rom the Court's perspective, the Corporations remain deadlocked as to the hiring of the Shulman Rogers Attorneys. Should the Parties provide evidence that they have agreed to the retainer of counsel for the Corporations, the deadlock would be broke[n].  Defendants, however, may not unilaterally retain counsel for the Corporations in the face of Plaintiffs' opposition."  *See* Exhibit 10, at fn. 1.

were the Interested Parties, who alone only represent 50% of the shares for each Debtor and are

not sufficient to create a quorum.  Given that the Interested Parties passed the Unauthorized

Bankruptcy Resolutions without notice, and that they did so without quorum, the Unauthorized

Bankruptcy Resolutions could not have conferred Steve with the authority to file the bankruptcy

petitions.  Further, any argument that the Movants are no longer members of the board of the

Debtors are similarly unavailing, given that the Movants were never properly removed as

described above.

53.     For these reasons, this Court should dismiss the instant Chapter 11 cases for lack

of corporate authority to file.  *See In re Polish-Am. Citizens Club Inc. of Willimansett*

*Massachusetts*, 642 B.R. 204, 208 (Bankr. D. Mass. 2022), *aff'd sub nom. Polish-Am. Citizen's*

*Club Inc.*, No. BAP MS 22-033, 2023 WL 4259266 (B.A.P. 1st Cir. June 27, 2023) (finding that

an improperly elected board of directors were not a properly constituted board and the filing of

the debtor's bankruptcy case was therefore not authorized) *In re Mid-S. Bus. Assocs., LLC*, 555

B.R. 565, 578 (Bankr. N.D. Miss. 2016) (finding that a bankruptcy filing was not authorized

because no membership vote was taken as required by the operating agreement).

## II.   <u>Debtors' Chapter 11 Cases Should Be Dismissed for Cause</u>

54.     Chapter 11 cases are "subject to dismissal under 11 U.S.C. § 1112(b) unless filed

in good faith, and the burden is on the bankruptcy petitioner to establish [good faith]."

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,*

*Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004)); *see also In re Franklin Mortg. & Inv. Co., Inc.*, 143

B.R. 295 (Bankr. D.D.C. 1992) (dismissing Chapter 11 case for cause under section 1112(b) of

the Bankruptcy Code).  Whether the good faith requirement has been satisfied is a "fact intensive

inquiry" in which the court must examine "the totality of facts and circumstances" and determine

where a "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999); *see also Franklin Mortg.*, 143 B.R. at 299 ("[B]ad faith may be inferred from the surrounding circumstances. The court's evaluation of the debtor's motive in filing its petition is central to the determination of good faith."). Courts "focus[] on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose . . . and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom Express*, 384 F.3d at 119.

55.    The factual record is replete with examples of the bad faith actions of the Debtors and their puppeteers, the Interested Parties. Consistent with this general course of dealing, the instant Chapter 11 cases bear all the hallmarks of a bad faith Chapter 11 filing. First, these Chapter 11 cases lack a valid bankruptcy purpose because the Debtors are plainly not in financial distress. The Debtors' own petitions demonstrate that they are balance sheet solvent and otherwise financially solvent, with minimal debt, other than that owed to the Movants,[27] further highlighting these cases are nothing more than a two-party dispute and were filed by the Interested Parties on behalf of the Debtors in an attempt to impede or interfere with the Superior Court litigation. To the extent the Debtors suggest that such debts are straining the Debtors, the Movants submit that by the Debtors' own admission the Debtors should be realizing at least $761,722 in net income.[28]

---

[27] Pursuant to the Final Order, the Movants were "granted a lien on both [Debtors] for the value of any reward (including fair value and all interest, fees, and expenses) which shall be senior to any interest held by the [Debtors] themselves or by [the Interested Parties]." *See* Exhibit 5 at II.c. The Movants reserve all rights to dispute the Debtors' election to treat these cases as small business Debtor cases and/or single asset real estate cases, but reserve on that issue as the Movants think that these cases should be dismissed outright, making those designations moot.

[28] This was summarized in Plaintiffs' expert's chart contrasting the difference in each appraiser's position, but both illustrating hundreds of thousands of dollars of Net Income. *See* Plaintiffs' Trial Exhibit 34, page 76, Schedule E.1

56.     Second, the commencement of these Chapter 11 cases represents an overt attempt by the Debtors and the Interested Parties to obtain a tactical litigation advantage over proceedings in the Superior Court.  This is not speculation, the Interested Parties, by and through the Debtors, have tried to drown the Movants and Superior Court in frivolous litigation to wrest control of the Debtors from the Movants without abiding by the Superior Court's ruling to compensate the Movants for their 50% share in each Debtor.  This Court should reject such a result and should dismiss these Chapter 11 cases for cause.

A.     **Debtor's Chapter 11 Case Lacks a Valid Bankruptcy Purpose**

57.     A debtor filing for Chapter 11 must demonstrate good faith by establishing that its Chapter 11 case serves a valid bankruptcy purpose.  *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828-29 (9th Cir. 1994) ("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state."); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) ("[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre . . . .*").  Put another way, the central inquiry is whether the filing "preserv[es] a going concern" or "maximiz[es] the values of the Debtor's estate."  *15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 619 (3d Cir. 2009) (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)); *see also In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 383 (Bankr. D. Del. 2018) ("One of the purposes of chapter 11 is to 'maximize property *available to satisfy creditors*.'  The good faith inquiry, therefore, is 'particularly sensitive' where the 'petition seeks

_____

(attached as <u>Exhibit 15</u>) illustrating net income available to pay buy-out of shares of Plaintiffs expert of $892,472 of net operating income available and Debtors' expert of $761,722.

to distribute value directly from a creditor to a company's shareholders.'") (emphasis in original) (quoting *Integrated Telecom Express*, 384 F.3d at 129).

58.     A Chapter 11 filing, therefore, is ordinarily not justified in the context of a financially solvent company because there is generally no bankruptcy purpose to be accomplished.  *See SGL Carbon*, 200 F.3d at 166 ("[C]ourts have recognized that if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."); *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities.").

59.     Even a company with significant debts may be found to be proceeding in bad faith in filing bankruptcy, however, if it cannot identify how taking that drastic step will add to or preserve value for the estate that would not otherwise be available to creditors outside of bankruptcy.  In *15375 Mem'l*, for instance, the Third Circuit Court of Appeals rejected the debtor's proffered justifications for its filing as they were all benefits that could equally have been achieved outside of bankruptcy and without incurring the added burdens of a bankruptcy filing.  589 F.3d at 620-25.  The Third Circuit therefore concluded that the debtor's Chapter 11 case was commenced in bad faith as an attempt to obtain a tactical advantage over its creditors. *Id.*  Thus, where a company that is fully capable of meeting its obligations does choose to file for bankruptcy and incur those additional—and unnecessary—costs and burdens, there is a strong presumption that it is doing so in order to try to obtain some form of impermissible tactical litigation advantage.

60. Such a strategy is the quintessential form of bad faith filing. *See 15375 Mem'l*, 589 F.3d at 625 ("[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws"); *see also In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (explaining that benefits of Chapter 11 should only be given to debtors with "clean hands").

61. Accordingly, courts regularly dismiss bankruptcy cases filed by financially solvent companies that have no real need to avail themselves of the protections and associated costs of Chapter 11. *See SGL Carbon*, 200 F.3d at 166 ("Courts, therefore, have consistently dismissed Chapter 11 petitions filed by financially solvent companies with no need to reorganize under the protection of Chapter 11."); *Furness*, 35 B.R. at 1011-13 ("There must be real debt and real creditors; otherwise the basic purposes of Chapter 11 would be thwarted"). A debtor need not wait until it is in the last throes of its operational survival, but that does not open the door to a premature filing where there are no current reorganizational needs. *See In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir. 1983) ("One [basic bankruptcy] principle is that a person in bankruptcy, while not necessarily insolvent, see 11 U.S.C. § 109, must at least owe debts.").

62. The Debtors in the instant case are clearly solvent and not in financial distress. During the Valuation Trial, the Debtors' own expert indicated that a "normalized" stewardship of the assets would result in annual income of $761,722 or more.[29]

63. Moreover, to the extent the Debtors were to argue to the contrary and suggest the Debtors are in financial distress, the evidence makes clear that such financial distress is of the

---

[29] This was summarized in Plaintiffs' expert's chart contrasting the difference in each appraiser's position, but both illustrating hundreds of thousands of dollars of Net Income. *See* Exhibit 15, page 76, Schedule E.1 illustrating net income available to pay buy-out of shares of Plaintiffs expert of $892,472 of net operating income available and Debtors' expert of $761,722.

Interested Parties' own making. In fact, the Superior Court based its award of attorneys' fees on Steve's gross mismanagement of the Debtors,[30] including Steve's abuse of his position as President of the Debtors to funnel hundreds of thousands of dollars to himself.[31]  The Debtors' own petitions are a reflection of Steve's malfeasance.  The largest debt that each of the Debtors report in their petitions is $102,950 for "legal fees" provided by Shulman Rogers.  But that is arguably not even a debt of the Debtors as the Superior Court denied the Debtors the ability to retain the law firm and disqualified them.  As discussed above, the Interested Parties retained Shulman Rogers on an unauthorized basis and the Superior Court disqualified Shulman Rogers for that reason.[32]

64.     Upon information and belief, the Debtors' true goal in these Chapter 11 cases is a stalling tactic to further frustrate the Movants' from receiving fair compensation for their shares as has already been decided by the Superior Court. Indeed, the Superior Court recognized Steve's repeated attempts to dodge compensating the Movants by granting the Movants a security interest in the Debtors.[33] Such an overt attempt to interfere with the Superior Court

---

[30] The Superior Court stated in the Final Order that "[t]here is ample evidence that Efstratios [] Tsintolas [Steve] failed to adequately manage the Corporations." *See* <u>Exhibit 5</u> at II.b.  The Superior Court further found that "Defendants' own evidence shows that the Corporations have been grossly mismanaged." *See* <u>Exhibit 5</u> at II.b.

[31] The Superior Court highlighted that "[i]f Steve were to use his position as President of the Corporations to pay himself hundreds of thousands of dollars – as he planned to do – that would constitute a further gross mismanagement or waste of funds." *See* <u>Exhibit 5</u> at II.b.

[32] *See generally* <u>Exhibit 8</u>.

[33] The Superior Court granted the Movants' a security interest in the Debtors on the following basis:

> "A security interest is necessary here because Defendants have failed to make any plans for completing the purchase of Plaintiffs' shares. The Court may, at its discretion, require a 'security' to assure payment of the purchase price and any additional expenses as may have been awarded. D.C. Code § 29-312.24(e). At Trial, Defendants asserted that the two Corporations had a combined fair value of just over $11 million. It was undisputed that Plaintiffs owned 50% of the shares of each Corporation. Even in Defendants' ideal outcome, Defendants still would have been required to pay Plaintiffs over $5 million. At the August 21, 2023, Hearing, the Court asked Defendants what their plan was to complete the purchase. They had none. Defendants elected to purchase Plaintiffs' shares over three years ago. They

litigation cannot be countenanced and is not a valid bankruptcy purpose, and would represent a manifestly unjust conclusion to this matter for the Movants, who Steve, Sandy, and the Debtors (by the actions of Steve and Sandy) have already wronged greatly.  The bad faith on display in the case is apparent here, and this Court should therefore dismiss the Debtors' Chapter 11 cases for cause.

**B.      Debtors' Chapter 11 Cases Were Filed to Obtain a Tactical Litigation Advantage**

65.      Dismissal of a Chapter 11 case for lack of good faith is warranted where "the purpose of the petition [is] not primarily to reorganize or respond to financial crisis but instead [is] to gain unfair advantage" in litigation.  *In re Antelope Techs.*, Inc., 431 F. App'x. 272, 275 (5th Cir. 2011) (affirming dismissal of petition that was "filed to gain an advantage in . . . shareholder litigation rather than for reorganization").  Numerous courts have recognized that "it constitutes bad faith to file bankruptcy to impede, delay, forum shop, or obtain a tactical advantage regarding litigation ongoing in a nonbankruptcy forum—whether that nonbankruptcy forum is a state court or a federal district court."  *In re Silberkaus*, 253 B.R. 890, 905 (Bank. C.D. Cal. 2000) (collecting cases), *aff'd*, 336 F.3d 864 (9th Cir. 2003).  Courts have further

---

should have been preparing to have at least $5 million ready to complete the purchase and a plan to further liquidate assets as necessary based on the Court's finding of fair value. Once the Court enters a final order, each Corporation may elect to dissolve within 10 days instead of going through with its election to purchase. D.C. Code § 29-312.24(g). The Court is greatly concerned that after forcing Plaintiffs to litigate an election to purchase is lieu of dissolution, Defendants will simply choose to dissolve. A security is therefore necessary to ensure that Plaintiffs are paid fair value and all of the expenses awarded herein. Therefore, Plaintiffs are hereby granted a lien on both Corporations for the value of any award (including fair value and all interest, fees, and expenses) which shall be senior to any interest held by the Corporations themselves or by the Interested Parties. In the event of dissolution or bankruptcy, Plaintiffs' entitlement to payment under this order shall be senior to Defendants'."

Exhibit 5 at II.c.

recognized that the timing of a debtor's petition and related circumstances may provide important context as to whether a Chapter 11 case has been commenced as a litigation tactic. *See In re HBA East, Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) (Where "the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

66.     At the same time, it is clear that "a bankruptcy case filed for the purpose of avoiding a regulatory scheme is not filed in good faith and should be dismissed." *See In re Outta Control Sportfishing, Inc.*, 642 B.R. 180, 186 (Bankr. S.D. Fla. 2022) (dismissing case on grounds that it was filed in bad faith and constituted a two-party dispute where a debtor filed bankruptcy to forum shop and circumvent procedural hurdles in district court). *In re NRA of Am.*, 682 B.R. 262, 277-78, 280-82 (Bankr. N.D. Tex. 2021) (dismissing case that the NRA concededly filed in response to regulatory actions by New York Attorney General seeking its dissolution; debtor had no financial need to file bankruptcy but saw case as way to obtain a "fair, level playing field;" court held that using bankruptcy to take that remedy off the table was an attempt to obtain unfair litigation advantage).

67.     In commencing the instant Chapter 11 cases, the Debtors are seeking to obtain an inappropriate tactical litigation advantage by frustrating legitimate efforts of the Movants to enforce their rights.  It is no accident that the Debtors chose to file these Chapter 11 cases now, when the Superior Court frustrated by their actions had a pending motion before it to appoint a receiver and was set to hold a hearing on May 8, 2024 (which had been rescheduled from multiple times, including most recently May 3, 2024 at the request of the Debtors and the Interested Parties). The Interested Parties and Debtors have tried at every juncture to deprive the

Movants of the value of their shares in the Debtors, including at least five attempts to push the

Superior Court to reconsider or reverse its interpretation of the corporate dissolution statute.[34]

Unable to persuade the Superior Court, the Debtors turn to Bankruptcy Court asking this

honorable Court to "bless" its forum shopping of what is a two party, familial, dispute.

      68.    Here the Debtors' issue revolves wholly around the resolution of Steve and

Sandy's dispute with the Movants. *See In re Richard Eric Serfass*, 325 B.R. 901, 906 (Bankr.

M.D. Fla. 2005) ("courts do not condone the use of Chapter 11 to resolve two-party disputes in

the bankruptcy court when such litigation is still pending in a non-bankruptcy forum prior to the

commencement of the case."). The Interested Parties found themselves no longer able to avoid

the Superior Court's mandate to compensate the Movants for the value of their shares through

dissolution or by purchasing shares, and after litigating in the Superior Court for years, after

losing all of their motions for reconsideration, they seek to request the Bankruptcy Court to

authorize this blatant forum shopping.  This is not a good faith reason to file for bankruptcy. *See

In Outta Control Sportfishing, Inc.*, 642 B.R. at 185 (finding bad faith when a debtor chose the

bankruptcy court forum to avoid paying the expense of a bond); *see also In re Richard Eric

Serfass*, 325 B.R. at 905–06 (The "hallmarks of bad faith filing" include a two-party dispute and

an absence of a sincere desire to reorganize the financial affairs of the debtor, with the real test

being "the presence of the honest intention of the debtor, the actual need, and the ability to

effectuate the aim of the reorganization." (citation omitted)); *In re Schultz*, 436 B.R. 170, 179

(Bankr. M.D. Fla. 2010) (finding bankruptcy was not filed in good faith where "[t]he

---

[34] The Superior Court gives a detailed account of the Interested Parties' attempts to frivolously challenge the Superior Court's findings, recognizing that "[b]y the Court's count, this is Defendants' fifth request that the Court reconsider or reverse its interpretation of D.C.C Code § 29.312.24." *See* Exhibit 10 at III.a.

circumstances of the case demonstrate that the Debtor did not seek Chapter 11 relief with the

intent or ability to reorganize his finances under the bankruptcy laws"); *see also In re Outta*

*Control Sportfishing Inc.* 642 B.R. at 185 (dismissing the bankruptcy case on the grounds that it

was a clear attempt to "forum shop").

69.     The Debtors' Chapter 11 strategy even goes beyond this, as noted above. The

Debtors' petitions demonstrate that the Debtors are only carrying *de minimis* debt.  And of those

debts, upon information and belief, Movants believe that they are ordinary course payables.[35] In

short, it is not apparent what valid business justification the Debtors have to file these Chapter 11

cases beyond seeking to halt and interfere with the Superior Court litigation.

70.     This Court should reject the Debtors and the Interested Parties' attempt to shirk

responsibility and avoid the Superior Court orders, which were entered after years of litigation,

and should dismiss these Chapter 11 cases for cause.  The bankruptcy filings are nothing more

than a blatant attempt by the Interested Parties to maintain control over the properties, after the

Superior Court has already ruled on these issues.  *In re Cedar Short Resort, Inc.*, 235 F.3d 375,

379 (8th Cir. 2000); *see also In re Rognstad*, 121 B.R. 45, 50 (Bankr. D. Hawaii 1990)

("Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or

cunning individual."); *see also In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 462

(Bankr. N.D. Fla. 2011) ("Chapter 11 was not designed for the purpose of protecting assets and

interests of non-debtor parties under the guise of a legitimate plan of reorganization.").

---

[35] The Debtors' in their motion to retain bankruptcy counsel [Docket No. 6] provide that a retainer in the amount of $150,000 was given to Offit Kurman — which for the reasons set forth herein, the Movants assert was not authorized—highlighting that the Debtors have funds to pay these debts.

III.    **Under Section 305 of the Bankruptcy Code, the Court Should Abstain from Hearing this Case and Grant the Motion to Dismiss**

71.    Alternatively, the Court should exercise its discretion to abstain from exercising its jurisdiction over this matter.  Even if dismissal is not warranted under section 1112(b) of the Bankruptcy Code — which it is— abstention and dismissal is appropriate under section 305(a)(1) of the Bankruptcy Code.  Federal Court abstention from hearing cases which are pending in State Court is well accepted.  Abstention recognizes that the United States operates on the basis of Federalism, that the federal and state governments have overlapping powers and jurisdictions, and that it is important that each constituent part work to avoid needless and inefficient conflicts.  It is based on the notion of comity and a respect for state functions, and a belief that our federal system works best if the states are able to perform their functions in their own way without collisions of authority.

72.    Here, if the Court does not dismiss for all of the reasons set forth above, in the alternative, the Court should grant the Motion to Dismiss under section 305 of the Bankruptcy Code, which provides that the court "may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if … the interest of creditors and the debtor would be better served by such dismissal or suspension[.]"  *See In re First Plus Fin. Enters., Inc*., 99 B.R. 751, 755 (Bankr. W.D. Tex. 1989) (abstention warranted where purpose was to do indirectly what debtor could not do directly; *i.e.*, to defeat the imposition of regulatory receivership).  The legislative history recognizes "that there are cases in which it would be appropriate for the court to decline jurisdiction."  *Id.* at 754 (internal citations omitted). This is such a case. *See In re Weakley Bayou, Inc.*, 2022 WL 17824218 (N.D. Bankr. Fla. Dec. 20, 2022) (dismissing bankruptcy case that was filed as part of state court litigation on the basis of both bad faith and abstention).

32

73.    Courts that consider abstention typically look to seven factors: "(1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought." *In re Korean Radio Broad., Inc.*, No. 19-46322-ESS, 2020 WL 2047990, at *7 (Bankr. E.D.N.Y. Mar. 31, 2020). "In addition, if the bankruptcy court is being used as a forum to resolve what is essentially a two-party dispute, this factor may also be considered in deciding whether to apply § 305(a)." *In re Argus Grp. 1700, Inc.*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996), *aff'd sub nom. Argus Grp. 1700, Inc. v. Steinman*, 206 B.R. 757 (E.D. Pa. 1997).

74.    These are simply factors, that do not carry equal weight.  Therefore, the decision "must be made on a case-by-case basis." *In re Skymark Properties II, LLC*, 597 B.R. 391, 398 (Bankr. E.D. Mich. 2019) ("The decision to dismiss under § 305 is discretionary[.]"); *see also Matter of Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983).

**A.    Whether Another Forum is Available, Whether Federal Proceedings are Necessary, and Whether There is an Alternative Means of Achieving the Equitable Distribution of Assets**

75.    Courts have grouped the analysis of the second, third, fourth, fifth, and sixth factors, "because they touch upon the availability of an alternate forum to efficiently achieve an equitable distribution." *In re Newbury Operating LLC*, No. 20-12976-JLG, 2021 WL 1157977,

33

at *11 (Bankr. S.D.N.Y. Mar. 25, 2021).  Here, the appropriate relief may be sought in Superior

Court, where several years of litigation have already ensued for purposes of either dissolving the

Debtors or allowing for the Interested Parties to buyout the Movants' shares.

76.    In other words, the federal bankruptcy proceeding is unnecessary.  The Superior

Court has the means to authorize the equitable distribution of assets.  Indeed that process has

been underway for a number of years in the Superior Court already and the Superior Court has

ruled in this matter on the process for the purchase of the shares and/or dissolution.  *See In re*

*Newbury Operating LLC*, 2021 WL 1157977, at *11  ("A suitable alternate forum will be

deemed to exist if in that forum 'there are pending arrangements that will equitably satisfy the

creditors and not be unduly burdensome or prejudicial to the debtor, so that continuation of the

bankruptcy proceeding will be 'duplicitous and uneconomical.'" (quoting *In re Navient*

*Solutions*, LLC, Case No. 21-10249, 2021 WL 857114, at *14 (Bankr. S.D.N.Y. March 8,

2021)).

77.    Here, the Superior Court has already ruled and was prepared to either oversee the

dissolution of the Debtors or facilitate the Interested Parties purchasing the Movants' shares.

However, given the instant filing, these efforts are temporarily halted.  The bankruptcy filing has

only served to delay the Movants realizing value for their shares, which just furthers the game

that the Interested Parties have been playing for years and were finally enjoined from doing by

the Superior Court.

### B.    Abstention Serves the Interests of Economy and Efficiency

78.    In deciding whether to dismiss a petition under section 305(a), "efficiency and

economy of administration are primary considerations."  *In re Michael S. Starbuck, Inc.*, 14 B.R.

134, 135 (Bankr. S.D.N.Y. 1981); *see also In re Century/ML Cable Venture*, 294 B.R. 9, 38

(Bankr. S.D.N.Y 2003) ("Of these, at least in this district, the first is a primary consideration."). Relevant for our purposes, the Superior Court has already presided over a multi-year trial for purposes of either dissolving the Debtors or allowing for the Interested Parties to buyout the Movants' shares. In presiding over the Debtors' state court cases, the Superior Court has spent countless hours reviewing discovery and hearing testimony relating to the fair valuation of the Debtors.  Indeed, the Superior Court has already provided a valuation of the Debtors in the Final Order. It would not make sense at this juncture for the Debtors to effectuate a restructuring or liquidation when there is no proper bankruptcy purpose and the Superior Court was poised to resolve the disputes regarding distribution of the Debtors' assets at the May 8 hearing.

### C.    <u>Purpose of the Bankruptcy Proceeding</u>

79.    As for the seventh and final factor, the Debtors filed for bankruptcy as a litigation tactic. As noted above, the Debtors filed their Chapter 11 cases in bad faith solely to avoid compensating the Movants for the value of their shares and/or impede and interfere with the Superior Court litigation.  As a result, the purpose for which the bankruptcy cases were filed is an improper attempt to gain a tactical advantage over the already long-pending dissolution process and an improper attempt to evade the Superior Court's rulings.  Here, the Superior Court has already ruled that the Movants are entitled to a security interest because of the Interested Parties' repeated failure to compensate the Movants.[36]

80.    It is therefore plain that the Debtors' intent and goal of the bankruptcy is to frustrate the Superior Court proceeding and the Movants from realizing the value of their shares,

---

[36] *See* <u>Exhibit 5</u> (ordering "[a] security is necessary here because Defendants have failed to make any plans for completing the purchase of Plaintiff's shares. … A security is therefore necessary to ensure that Plaintiffs are paid fair value and all expenses awarded herein.").

and the Court should not allow or sanction such behavior.  *See In re First Financial Enterprise, Inc.*, 99 B.R. 751, 755 (Bankr. W.D. Tex. 1989) (bankruptcy court, under section 305 abstained from retaining jurisdiction where the debtor's and sole shareholder's obvious purpose in filing for Chapter 11 protection was an attempt to halt a state court receivership and conservatorship).

81.     Under like circumstances, courts do not hesitate to dismiss and abstain where the obvious purpose of the Chapter 11 case is to interfere with state court proceedings or regulatory process. *See, e.g.*, *In re Sunshine Grp.*, LLC, No. 2:19-BK-12760-ER, 2020 WL 1846940, at *7 (B.A.P. 9th Cir. Apr. 10, 2020) (unpublished) (". . . Debtor filed the case as a litigation tactic to avoid the state court rulings."); *Matter of Win-Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr. D. Conn. 1981) (dismissing action under section 305 where debtor was "seeking to use the bankruptcy court as an alternate approach to state court procedures to resolve intra-company" dispute); *In re Silver Spring Ctr.*, 177 B.R. 759, 760 (Bankr. D.R.I. 1995) ("Because the Debtor thinks it would be happier in the Bankruptcy Court, does not entitle it to be here.").

82.     Finally, dismissal under section 305 is also warranted where the case is essentially a two-party dispute where adequate state court remedies are already available outside the bankruptcy context. This factor alone strongly militates in favor of dismissing this case under section 305(a)(1) of the Bankruptcy Code.  *See In re Macke Intern. Trade, Inc.*, 370 B.R. 236, 247 (B.A.P. 9th Cir. 2007) (focusing on the totality of the circumstances and finding that the fact that the bankruptcy was essentially a two-party dispute supporting dismissal); *In re Spade*, 258 B.R. 221, 229 (Bankr. D. Colo. 2001) (dismissing the case and recognizing it was "little more than a two-party" dispute between the creditor and debtor).

83.     At bottom, the instant case is just "the most recent 'battlefield,' and the bankruptcy court the current venue, in a long-running, two-party dispute." *In re Korean Radio*

*Broad., Inc.*, 2020 WL 2047990, at *8.  On one hand, we have the Movants who have tried for years to realize the fair share of their shares in the Debtors, and, on the other, the Debtors (by the actions of the Interested Parties) and the Interested Parties seeking to evade their responsibility to do so at every turn.

84.    For all the reasons set forth above, this Court should exercise its discretion and abstain under section 305 of the Bankruptcy Code.  If for any reason this Court does not believe it should dismiss or abstain in full, at the very least it should abstain and allow the Superior Court to hold the hearing it had previously scheduled to address the Debtors' non-compliance with D.C. § 29-312.24(g) and the import of such non-compliance, or in the alternative, whether an independent receiver should be appointed in the Superior Court to conduct the dissolution.

**WHEREFORE**, for the reasons set forth herein, Movants' requests that this Court dismiss the Chapter 11 cases, or in the alternative, abstain.

Dated:  May 21, 2024                    Respectfully submitted,


                                        */s/ Rosa J. Evergreen*
                                        Rosa J. Evergreen, DC Bar No. 500227
                                        Arnold & Porter Kaye Scholer LLP
                                        601 Massachusetts Avenue NW
                                        Washington, DC 20001
                                        (202) 942-5000
                                        rosa.evergreen@arnoldporter.com
                                              --and --

                                        */s/ Matthew J. Pavlides*
                                        Matthew J. Pavlides, DC Bar No. 424573
                                        Eduardo S. Garcia, DC Bar No. 1028040
                                        Stein Sperling Bennett De Jong Driscoll PC.
                                        1101 Wotton Parkway, Suite 700
                                        Rockville, MD 20852
                                        (301) 340-2020
                                        MPavlides@steinsperling.com


                                        *Counsel for Christofilos Tsintolas, Deborah
                                        Tsintolas, and Fotini Tsintolas Economides
                                        Revocable Trust*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic
Filing System on May 21, 2024 on all parties requesting notice in this proceeding.


   */s/ Rosa J. Evergreen*   
Rosa J. Evergreen, DC Bar No. 500227

# EXHIBIT 1

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN ALTERNATIVE, ABSTAIN**

0810 KENNEDY STREET NW — Inc & Exp

Period: MAR 21 17
Page: 2

| Account | December (DEC 1 16 to DEC 31 16) | Year-to-Date (JAN 1 16 to DEC 31 16) | 2016 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 0.00 | 375.00 | 375.00 |
| RENT | 7,000.00 | 3,740.00 | 3,740.00 |
| OPERATING INCOME | 7,000.00 | 110,297.00 | 114,293.56 |
| ACCOUNTING | 0.00 | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | 0.00 |
| CONDO/MGMT FEE | 0.00 | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 | 0.00 |
| BOILER INSURANCE | 0.00 | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 2,250.00 | 0.00 |
| HEALTH INSURANCE | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 1,600.00 | 6,500.00 |
| WORKMENS COMP | 0.00 | | |
| JANITORIAL MATERIALS | 550.00 | 550.00 | 850.00 |
| JANITORIAL SERVICES | 0.00 | | |
| EVICTION EXPENSE | 550.00 | 440.00 | 440.00 |
| LEGAL FEES | 0.00 | | |
| LICENSE | 1,520.00 | 1,520.00 | 1,520.00 |
| CLEANING | 1,520.00 | | |
| AIR CONDITIONING | 0.00 | 0.00 | 0.00 |
| APPLIANCE REPAIRS | 495.57 | 1,039.54 | |
| CARPENTRY MATERIALS | 0.00 | 1,840.00 | |
| CARPENTRY WORK | 0.00 | 132.00 | |
| DRAIN WORK | 0.00 | 89.99 | |
| ELECTRIC MATERIALS | 0.00 | 2,610.40 | |
| ELECTRIC WORK | 0.00 | 0.00 | |
| ELEVATOR | 0.00 | 0.00 | |
| EXTERMINATION | 0.00 | 59.25 | |
| FIRE EXTINGUISHERS | 3,286.51 | | |
| FLOOR WORK | 0.00 | 546.00 | |
| FLOORING MAT | 0.00 | 120.00 | |
| GLASS AND MIRRORS | 0.00 | 681.47 | |
| HARDWARE | 0.00 | 0.00 | |
| HARDWARE/... | 0.00 | 158.74 | |
| HEATING MATERIALS | 0.00 | 0.00 | |
| HEATING WORK | 0.00 | 0.00 | |
| LANDSCAPE & EXTERIOR WK | 389.00 | 589.00 | |
| MISCELLANEOUS MAINT | 2,440.00 | 428.88 | |
| PAINT MATERIAL | 0.00 | 7,000.00 | |
| PAINTING & PLASTER | 132.43 | 868.02 | |
| PAST MAINTENANCE | 875.00 | 5,215.00 | |
| PEST CONTROL | 228.59 | 300.59 | |
| PLASTERING | 4,460.00 | 4,460.00 | |
| PLUMBING MATERIAL | 0.00 | 0.00 | |
| PLUMBING WORK | 0.00 | 0.00 | |
| ROOF WORK | 0.00 | 0.00 | |
| ROOFING MATERIALS | 252.74 | 668.24 | 34,030.44 |
| TRASH CLEANUP | | | |
| VENETIAN BLINDS | | | |
| MANAGEMENT FEE | 0.00 | 0.00 | |
| MISCELLANEOUS EXP | 0.00 | 760.00 | |

| Account | December (DEC 1 16 to DEC 31 16) | Year-to-Date (JAN 1 16 to DEC 31 16) | 2016 |
|---|---|---|---|
| SALARY MANAGER | 0.00 | | 790.00 |
| ADMINISTRATION EXP | 0.00 | 0.00 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 0.00 | 0.00 |
| POSTAGE | 0.00 | 0.00 | 0.00 |
| MISC PAYROLL TAXES | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | 0.00 |
| TAX MARYLAND WITHOLDING | 0.00 | 0.00 | 0.00 |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | | | 0.00 |
| SALARIES | 0.00 | 0.00 | 0.00 |
| TAX INCOME | 0.00 | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| TAX INSURANCE | 0.00 | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 9,151.02 | 9,151.02 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 | 4,076.72 |
| TRASH COLLECTION | 1,600.00 | | |
| ELECTRICITY | 105.95 | 1,061.70 | 15,868.59 |
| FUEL OIL | 0.00 | 0.00 | |
| GAS | 1,482.29 | 3,264.27 | |
| PHONE | 96.27 | 128.81 | |
| WATER & SEWER | 1,004.69 | 11,034.74 | |
| WAGES | 5,595.20 | | 73,590.71 |
| OPERATING EXPENSE | 14,278.31 | | 44,631.23 |
| OPERATING PROFIT | -4,339.21 | | |
| INTEREST 1ST | 0.00 | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 | 0.00 |
| NET OPERATING PROFIT | -4,339.21 | | 43,031.22 |
| AUTO LOAN | 0.00 | 0.00 | |
| BANK LOAN | 0.00 | 0.00 | |
| DEPOSIT REFUND | 0.00 | 0.00 | |
| INTER-COMPANY LOAN | 0.00 | 0.00 | |
| INTER-COMPANY LOAN/AH | 0.00 | 0.00 | |
| OWNER WITHDRAWALS | 0.00 | 0.00 | |
| PRINCIPAL 1ST | 0.00 | 0.00 | |
| PRINCIPAL 2ND | 0.00 | 0.00 | |
| REFUND | 0.00 | 0.00 | |
| SUSPENSE | 0.00 | 0.00 | |
| TRANSFER | 0.00 | 0.00 | |
| NON OP INC & EXP | 0.00 | 0.00 | 0.00 |
| NET CASH FLOW | -4,339.21 | | 44,031.23 |

03208

**EXHIBIT**
221
tabbies

829 ROCK CREEK CHURCH ROAD, N.W.

MAR 2 1 17   Page   2

INC & EXPENSE STATEMENT
1010 G STREET, NE
1010

Printed: MAR 21 17
Page: 2

| | December DEC 1 16 to DEC 31 16 | Year-to-Date JAN 1 16 to DEC 31 16 | 2016 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 62.00 | 425.00 | |
| RENT | 18,560.00 | 222,236.00 | 135.37 |
| **OPERATING INCOME** | 18,648.00 | 222,842.00 | |
| ACCOUNTING | 0.00 | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM | 0.00 | 0.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | 0.25 |
| **INSURANCE** | | | 0.02 |
| BOILER INSURANCE | 0.00 | 2,500.00 | |
| FIRE/LIABILITY | 0.00 | 0.00 | 0.00 |
| HEALTH INSURANCE | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 1,800.00 | 13,145.14 |
| UMBRELLA INSURANCE | | | 4,955.00 |
| WORKERS COMP | 0.00 | 1,791.00 | |
| **JANITORIAL EXPENSE** | | | |
| JANITORIAL MATERIALS | 0.26 | 0.00 | 566.55 |
| JANITORIAL SERVICES | 0.00 | 1,396.30 | 7,877.98 |
| **LEGAL EXPENSE** | | | 564.55 |
| EVICTION EXPENSE | 1,086.30 | 1,086.30 | 6,453.45 |
| LEGAL FEES | 0.00 | 313.37 | |
| LICENSE | 1,086.30 | 1,400.17 | |
| | | 100.00 | |
| **MAINTENANCE** | | | |
| CLEANING | 0.00 | 0.00 | |
| AIR CONDITIONING | 0.00 | 2,756.99 | |
| APPLIANCE REPAIRS | 130.11 | 4,520.37 | |
| CARPENTRY MATERIALS | 1,720.00 | 4,300.00 | |
| CARPENTRY WORK | 284.00 | 764.00 | |
| DRAIN WORK | 0.00 | 5,770.23 | |
| ELECTRIC MATERIALS | 0.00 | 2,667.52 | |
| ELECTRIC WORK | 0.00 | 0.00 | |
| ELEVATOR | 0.00 | 0.00 | |
| EXTERMINATOR | 0.00 | 684.00 | |
| FIRE EXTINGUISHERS | 0.00 | 480.00 | |
| FLOOR WORK | 0.00 | 0.00 | |
| FIXTURES/PAINT | 700.00 | 1,833.73 | |
| GLASS AND MIRRORS | 0.00 | 395.51 | |
| HARDWARE | 0.00 | 759.65 | |
| HARDWARE WORK | 0.00 | 0.00 | |
| HEATING MATERIALS | 1,687.00 | 2,706.00 | |
| HEATING WORK | 27.00 | 1,460.00 | |
| LANDSCAPE & EXTERIOR WK | 3,010.00 | 3,010.00 | |
| MISCELLANEOUS MAINT | 397.75 | 397.75 | |
| PAINT MATERIAL | 2,800.00 | 2,800.00 | |
| PLASTERING & PLASTER | 0.00 | 0.00 | |
| PAST MAINTENANCE | 0.00 | 660.00 | |
| PEST CONTROL | 0.00 | 1,380.00 | |
| PLUMBING | 0.00 | 1,122.38 | |
| PLUMBING MATERIALS | 0.00 | 0.00 | |
| ROOF WORK | 0.00 | 0.00 | |
| ROOFING MATERIALS | 0.00 | 0.00 | |
| TRASH CLEANUP | 0.00 | 146.94 | |
| VENETIAN BLINDS | 0.00 | 0.00 | |
| **MANAGEMENT EXPENSE** | 17,256.56 | 40,903.88 | |
| MANAGEMENT FEE | 0.00 | 0.00 | |
| MISCELLANEOUS EXP | 0.00 | 335.37 | |

| | December DEC 1 16 to DEC 31 16 | Year-to-Date JAN 1 16 to DEC 31 16 | 2016 |
|---|---|---|---|
| SALARY MANAGER | | | 135.37 |
| **OFFICE EXPENSE** | 0.00 | 0.00 | |
| ADMINISTRATION EXP | | | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | 0.00 |
| **PAYROLL TAXES** | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | 0.00 |
| TAX MARYLAND WITHOLDING | 0.00 | 0.00 | 0.00 |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 | 0.25 |
| TAX SOCIAL SEE EMPLOYER | 0.00 | 0.30 | 0.25 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.02 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| SALARIES | 0.00 | 0.00 | 0.00 |
| **TAXES** | | | |
| TAX INCOME | 0.00 | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| TAX INSURANCE | 0.00 | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 0.00 | 13,145.14 |
| TAX SPECIAL ASSESS | 0.00 | 800.00 | 4,955.00 |
| TRASH COLLECTION | | | |
| **UTILITIES** | | | |
| ELECTRICITY | 223.13 | | 566.55 |
| FUEL OIL | 2,793.49 | | 7,877.98 |
| GAS | 547.00 | | 564.55 |
| PHONE | 79.85 | | 79.85 |
| WATER & SEWER | 1,991.46 | | 6,453.45 |
| WAGES | | 5,970.37 | 5,240.38 |
| OPERATING EXPENSE | | 14,867.53 | 14,762.23 |
| OPERATING PROFIT | | +237.94 | 141,568.77 |
| **INTEREST** | | | |
| INTEREST 1ST | 0.00 | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 | 0.00 |
| NET (OPERATING) PROFIT | | +237.94 | 141,568.77 |
| AUTO LOAN | 0.00 | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 | 0.00 |
| INTER-COMPANY LOAN 2nd | 0.00 | 0.00 | 0.00 |
| OWNER/WITHDRAWALS | 0.00 | 0.00 | 0.00 |
| PRINCIPAL 1ST | 0.00 | 0.00 | 0.00 |
| PRINCIPAL 2ND | 0.00 | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 | 0.00 |
| NON INCOME & EXP | 0.00 | 0.00 | 0.05 |
| NET CASH FLOW | | +237.93 | 141,568.77 |

03210

Income & Exp Statement

1521 E STREET, S.E.
1521

Print:   MAR 21 17
Page:    2

| | December DEC 1 16 to DEC 31 16 | Year-to-Date 2016 JAN 1 16 to DEC 31 16 |
|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 0.00 | 125.00 |
| RENT | -4,357.00 | 57,421.61 |
| OPERATING INCOME | -4,357.00 | 57,546.61 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| COMMISSION FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| INSURANCE | | |
| BOILER INSURANCE | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 2,100.00 |
| HEALTH INSURANCE | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 0.00 |
| WORKMENS COMP | 0.00 | 1,750.04 |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 0.00 |
| LEGAL EXPENSE | | |
| EVICTION EXPENSE | 0.00 | 0.00 |
| LEGAL FEES | 0.00 | 26.88 |
| LICENSE | 0.00 | 100.00 |
| MAINTENANCE | | |
| CLEANING | 0.00 | 0.00 |
| AIR CONDITIONING | 0.00 | 1,328.86 |
| APPLIANCE REPAIRS | 70.13 | 1,475.26 |
| CARPENTRY MATERIALS | 420.00 | 3,760.00 |
| CARPENTRY WORK | 0.00 | 744.00 |
| DRAIN WORK | 61.14 | 173.29 |
| ELECTRIC MATERIALS | 0.00 | 660.00 |
| ELECTRIC WORK | 0.00 | 0.00 |
| ELEVATOR | 0.00 | 52.50 |
| EXTERMINATION | 0.00 | 960.00 |
| FIRE EXTINGUISHERS | 0.00 | 717.00 |
| FLOOR WORK | 0.00 | 0.00 |
| FLOORING MAT | 0.00 | 0.00 |
| GLASS AND MIRRORS | 0.00 | 524.00 |
| HARDWARE | 324.00 | 1,325.00 |
| HARDWARE WORK | 0.00 | 215.43 |
| HEATING MATERIAL | 0.00 | 350.00 |
| HEATING WORK | 0.00 | 3,500.00 |
| LANDSCAPE & EXTERIOR WK | 2,650.00 | 0.00 |
| MISCELLANEOUS MAINT | 0.00 | 0.00 |
| PAINT MATERIAL | 0.00 | 680.00 |
| PAINTING & PLASTER | 0.00 | 0.00 |
| PAST MAINTENANCE | 0.00 | 0.00 |
| PEST CONTROL | 0.00 | 0.00 |
| PLUMBING | 4,521.17 | 5,783.71 |
| PLUMBING MATERIAL | 0.00 | 0.00 |
| ROOF WORK | 0.00 | 0.00 |
| ROOFING MATERIALS | 0.00 | 0.00 |
| TRASH CLEAN-UP | 0.00 | 0.00 |
| VENETIAN BLINDS | 0.00 | 0.00 |
| MANAGEMENT EXPENSE | 8,246.44 | 16,566.44 |
| MANAGEMENT FEE | 0.00 | 0.00 |
| MISCELLANEOUS EXP | 0.00 | 0.00 |

| | December DEC 1 16 to DEC 31 16 | Year-to-Date 2016 JAN 1 16 to DEC 31 16 |
|---|---|---|
| SALARY MANAGER | 0.00 | 0.00 |
| OFFICE EXPENSE | | |
| ADMINISTRATION EXP | 0.00 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 |
| OFFICE SURPLUS | 0.00 | 0.00 |
| POSTAGE | 0.00 | 0.00 |
| PAYROLL TAXES | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 |
| SALARIES | 0.00 | 0.00 |
| TAXES | | |
| TAX INCOME | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 |
| TAX NUISANCE | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 6,115.98 |
| TAX SPECIAL ASSESS | 6,115.98 | |
| TRASH COLLECTION | 0.00 | 7,093.25 |
| UTILITIES | 5,500.00 | |
| ELECTRICITY | 133.84 | 603.81 |
| FUEL OIL | 0.00 | 0.00 |
| GAS | 0.00 | 0.00 |
| PHONE | 0.00 | 0.00 |
| WATER & SEWER | 474.77 | 1,361.85 |
| WAGES | 655.51 | 1,565.51 |
| OPERATING EXPENSE | 3,667.05 | 34,365.04 |
| OPERATING PROFIT | -5,450.56 | 22,930.60 |
| INTEREST | 0.00 | 0.00 |
| INTEREST 1ST | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 |
| NET OPERATING PROFIT | -5,450.56 | 22,930.63 |
| AUTO LOAN | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| INTER-COMPANY LOAN# | 0.00 | 0.00 |
| OWNER WITHDRAWALS | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 |
| NET CASH FLOW | -5,450.56 | 22,930.63 |

C3211

Printed: MAR 21 17
Page: 2

5400 - 7TH STREET, N.W.   5401

| | December DEC 1 16 to DEC 31 16 | Year-to-Date JAN 16 to DEC 31 16 | 2017 |
|---|---|---|---|
| SALARY MANAGER | 0.00 | 0.00 | 0.00 |
| OFFICE EXPENSE | | | |
| ADMINISTRATION EXP | 0.00 | 0.00 | |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | 0.00 |
| MISC. PAYROLL TAXES | | | |
| TAX FEDERAL UNEMPLOYMNT | 0.00 | 0.00 | |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| SALARIES | 0.00 | 0.00 | |
| TAXES | | | |
| TAX INCOME | 0.00 | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| TAX NUISANCE | 0.00 | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 11,993.26 | 11,993.26 |
| TAX SPECIAL ASSESS | 0.00 | 6,346.34 | 6,346.34 |
| TRASH COLLECTION | 0.00 | | |
| UTILITIES | 1,800.00 | | |
| ELECTRICITY | 328.41 | 1,186.29 | |
| FUEL OIL | 0.00 | 0.00 | |
| GAS | 2,630.99 | 7,663.12 | |
| PHONE | 0.00 | 94.75 | |
| WATER & SEWER | 1,071.17 | 3,826.72 | 22,710.01 |
| WAGES | 0.00 | | 0.00 |
| OPERATING EXPENSE | 79,812.04 | | 186,428.63 |
| OPERATING PROFIT | -14,434.04 | | 31,596.13 |
| INTEREST | 0.00 | | 0.00 |
| INTEREST 1ST | 0.00 | | 0.00 |
| INTEREST 2ND | 0.00 | | 0.00 |
| INTEREST EXPENSE | 0.00 | | 0.00 |
| NET OPERATING PROFIT | -14,434.04 | | 31,596.13 |
| AUTO LOAN | 0.00 | | 0.00 |
| BANK LOAN | 0.00 | | 0.00 |
| DEPOSIT REFUND | 0.00 | | 0.00 |
| INTER-COMPANY LOAN | 0.00 | | 0.00 |
| INTER-COMPANY LOAN# | 0.00 | | 0.00 |
| OWNER WITHDRAWALS | 0.00 | | 0.00 |
| PRINCIPLE 1ST | 0.00 | | 0.00 |
| PRINCIPLE 2ND | 0.00 | | 0.00 |
| PRINCIPLE 3RD | 0.00 | | 0.00 |
| REFUND | 0.00 | | 0.00 |
| SURCHARGE | 0.00 | | 0.00 |
| TRANSFER | 0.00 | | 0.00 |
| NON CAP ACs EXP | 0.00 | | 0.00 |
| NET CASH FLOW | -14,434.04 | | 31,596.13 |

| | December DEC 1 16 to DEC 31 16 | Year-to-Date JAN 1 16 to DEC 31 16 | 2017 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | |
| MISCELLANEOUS INCOME | 25.00 | 825.00 | |
| RENT | 30.00 | 2,300.00 | |
| OPERATING INCOME | -14,583.00 | 197,076.75 | |
| | -14,636.00 | -200,006.75 | |
| ACCOUNTING | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM | 0.00 | 0.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 0.00 | |
| FIRE/LIABILITY | 0.00 | 2,488.25 | |
| HEALTH INSURANCE | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 0.00 | 850.00 |
| UMBRELLA INSURANCE | | | |
| WORKMENS COMP | 0.00 | 1,500.00 | 4,838.25 |
| JANITORIAL EXPENSE | | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | |
| JANITORIAL SERVICES | 1,250.00 | 5,100.00 | 5,100.00 |
| LEGAL EXPENSE | | | |
| LEGAL FEES | 0.00 | 621.26 | 621.26 |
| | 0.00 | 100.00 | |
| LICENSE | | | |
| MAINTENANCE | 2,450.00 | 2,450.00 | 2,450.00 |
| CLEANING | | | |
| | 2,400.00 | 0.00 | |
| AIR CONDITIONING | 0.00 | 569.99 | |
| APPLIANCE REPAIRS | 20.16 | 2,740.00 | |
| CARPENTRY MATERIALS | 0.00 | 2,990.90 | |
| CARPENTRY WORK | 0.00 | 317.20 | |
| DRAIN WORK | 0.00 | 345.83 | |
| ELECTRIC MATERIALS | 1,280.00 | 3,300.00 | |
| ELECTRIC WORK | 0.00 | 0.00 | |
| ELEVATOR | 0.00 | 323.31 | |
| EXTERMINATION | 0.00 | 12,583.20 | |
| FIRE EXTINGUISHERS | 4,725.00 | 7,694.00 | |
| FLOOR WORK | 473.22 | 1,962.82 | |
| PLUMBING | 1,950.00 | 1,509.00 | |
| GLASS AND MIRRORS | 0.00 | 124.77 | |
| HARDWARE | 39.71 | 346.67 | |
| HARDWARE WORK | 0.00 | 810.00 | |
| HEATING MATERIALS | 0.00 | 665.00 | |
| PAINT MATERIAL | 780.00 | 1,450.00 | |
| PAINT MAINTENANCE | 1,460.00 | 1,750.93 | |
| MISCELLANEOUS MAINT | 655.54 | 3,565.40 | |
| LANDSCAPE & EXTERIOR WK | 5,240.00 | 6,850.00 | |
| PAINT MATERIAL | 0.00 | 0.00 | |
| PEST CONTROL | 189.84 | 0.00 | |
| PLUMBING MATERIAL | 1,290.00 | 0.00 | |
| PLUMBING WORK | 0.00 | 0.00 | |
| ROOFING MATERIALS | 0.00 | 0.00 | |
| TRASH CLEAN-UP | 0.00 | 165.70 | |
| VENETIAN BLINDS | 0.00 | 0.00 | 52,706.51 |
| MANAGEMENT EXPENSE | 0.00 | 0.00 | |
| MANAGEMENT FEE | 0.00 | 0.00 | |
| MISCELLANEOUS EXP | | | |

03212

Inc & Exp Statement
ARCADIAN HOUSE
3901

Printed: OCT 23 '9
Page: 2

| Account | December DEC 1 16 to DEC 31 16 | Year-to-Date 2016 JAN 1 16 to DEC 31 16 | | December DEC 1 16 to DEC 31 16 | Year-to-Date 2016 JAN 1 16 to DEC 31 16 |
|---|---|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | | | |
| MISCELLANEOUS INCOME | 0.00 | 1,011.51 | | | |
| RENT | 7,700.00 | 76.00 | | | |
| | | 192,233.15 | | | |
| OPERATING INCOME | 7,700.00 | 193,320.66 | | | |
| | | | VENT VAN FUNDS | 0.00 | 277.07 |
| ACCOUNTING | 0.00 | 0.00 | MANAGEMENT EXPENSE | 20,579.75 | 91,428.62 |
| ADVERTISING | 0.00 | 0.00 | MANAGEMENT FEE | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 | MISCELLANEOUS EXP | 0.00 | 75.00 |
| ANNUAL REPORT | 0.00 | 0.00 | SALARY MANAGER | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 0.00 | | | |
| AUTO EXPENSE | 0.00 | 0.00 | OFFICE EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 | ADMINISTRATION EXP | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 | OFFICE EXPENSE | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | OFFICE SUPPLIES | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 | POSTAGE | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 | | | |
| CONTRIBUTIONS | 0.00 | 0.00 | PAYROLL TAXES | | |
| | | | MISC PAYROLL TAXES | 0.00 | 0.00 |
| INSURANCE | | | TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| BOILER INSURANCE | 4,324.50 | 4,324.50 | TAX FEDERAL WITHHOLDING | 0.00 | 0.00 |
| FIRE/LIABILITY | 2,700.00 | 2,700.00 | TAX ANY/AND DISABILITY | 0.00 | 0.00 |
| HEALTH INSURANCE | 0.00 | 0.00 | TAX ANY/AND WITHHOLDING | 0.00 | 0.00 |
| MISCELLANEOUS INS | 106.28 | 106.28 | TAX MEDICARE | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 0.00 | TAX MEDICARE EMPLOYER | 0.00 | 0.00 |
| WORKMEN'S COMP | 0.00 | 1,918.44 | TAX SOCIAL SECURITY | 0.00 | 0.00 |
| | 0.00 | | TAX SOCIAL SEC/EMPLOYER | 0.00 | 0.00 |
| JANITORIAL EXPENSE | 0.00 | 11,006.02 | | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | PROFESSIONAL SERVICE | 0.00 | 0.00 |
| JANITORIAL SERVICES | 1,950.00 | 10,950.00 | SALARIES | 0.00 | 0.00 |
| | | | TAXES | | |
| | | | TAX MISCELLANEOUS | 0.00 | 0.00 |
| LEGAL EXPENSE | 0.00 | 0.00 | TAX NUISANCE | 0.00 | 0.00 |
| EVICTION EXPENSE | 0.00 | 0.00 | TAX PERSONAL | 0.00 | 0.00 |
| LEGAL FEES | 168.00 | 526.50 | TAX PROPERTY | 0.00 | 21,766.96 |
| | | 2,000.00 | TAX SPECIAL ASSESS | 0.00 | 0.00 |
| LICENSE | 0.00 | 0.00 | | | |
| | | | TRASH COLLECTION | 0.00 | 0.00 |
| MAINTENANCE | 0.00 | 8,496.31 | UTILITIES | | |
| CLEANING | 0.00 | 0.00 | ELECTRICITY | 863.34 | 5,532.17 |
| | | | FUEL OIL | 0.00 | 0.00 |
| A/R CONDITIONING | 0.00 | 0.00 | GAS | 3,290.72 | 8,865.30 |
| APPLIANCE REPAIRS | 3,569.48 | 3,569.48 | PHONE | 179.70 | 654.16 |
| CARPENTRY MATERIALS | 314.25 | 5,243.14 | WATER & LEAVES | 1,353.37 | 4,706.92 |
| CARPENTRY WORK | 2,230.00 | 6,940.00 | | | |
| CONCRETE AND BRICK WORK | 0.00 | 0.00 | WAGES | 7,804.43 | 33,320.15 |
| | 0.50 | 1,091.00 | OPERATING EXPENSE | 0.00 | 0.00 |
| ELECTRIC MATERIALS | 0.00 | 2,382.78 | OPERATING PROFIT | 32,355.32 | 100,000.51 |
| ELECTRIC WORK | 1,940.00 | 6,121.21 | | -25,355.32 | 94,594.44 |
| ELEVATOR | 6,783.00 | 9,013.00 | INTEREST | 0.00 | 0.00 |
| EXTERMINATION | 0.00 | 0.00 | INTEREST 1ST | 0.00 | 0.00 |
| FIRE EXTINGUISHERS | 0.00 | 6,410.00 | INTEREST 2ND | 0.00 | 0.00 |
| FLOOR WORK | 2,460.00 | 4,110.00 | INTEREST EXPENSE | 0.00 | 0.00 |
| GLASS AND MIRRORS | 0.00 | 456.77 | NET OPERATING PROFIT | -25,355.32 | 94,594.44 |
| HARDWARE | 0.00 | 1,501.76 | | | 0.00 |
| HEATING MATERIALS | 329.49 | 1,303.94 | AUTO LOAN | 0.00 | 0.00 |
| HEATING WORK | 0.00 | 0.00 | BANK LOAN | 0.00 | 0.00 |
| IRON AND STEEL WORK | 0.00 | 0.00 | DEPOSIT REFUND | 0.00 | 0.00 |
| LANDSCAPE & EXTERIOR WK | 7,321.88 | 7,321.88 | INTERCOMPANY LOAN | 0.00 | 0.00 |
| MISCELLANEOUS MAINT | 2,170.00 | 2,170.00 | INTERCOMPANY TRANSFER | 0.00 | 0.00 |
| PAINT MATERIAL | 0.00 | 1,187.24 | OWNER WITHDRAWALS | 0.00 | 0.00 |
| PAINTING & PLASTER | 18,280.00 | 18,280.00 | PRINCIPLE 1ST | 0.00 | 0.00 |
| PAST MAINTENANCE | 0.00 | 0.00 | PRINCIPLE 2ND | 0.00 | 0.00 |
| PEST CONTROL | 78.70 | 0.00 | REFUND | 0.00 | 0.00 |
| PLUMBING | 1,840.00 | 1,295.70 | SUPPLIES | 0.00 | 0.00 |
| PLUMBING MATERIAL | 493.24 | 6,470.00 | TRANSFER | 0.00 | 0.00 |
| PREVENT MAINTENANCE | 0.00 | 1,752.35 | | | |
| ROTOR REPAIR & MAINTENANCE | 0.00 | 0.00 | NON OP INC & EXP | 0.00 | 0.00 |
| ROOFING MATERIALS | 0.00 | 0.00 | NET CASH FLOW | -25,355.32 | 24,906.84 |
| SNOW REMOVAL | 0.00 | 0.00 | | | |
| TRASH CLEAN-UP | 0.00 | 0.00 | | | |

032213

Inc & Exp Statement
FLOWER HOUSE
8212

Printed: OCT 23 19
Page: 2

| | December DEC 1 16 to DEC 31 16 | Year-to-Date JAN 1 16 to DEC 31 16 / 2016 |
|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 12.00 | 431.25 |
| RENT | 452.45 | 6,654.64 |
| OPERATING INCOME | 10,471.19 | 166,401.15 |
| | 10,935.64 | 167,487.04 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| INSURANCE | | |
| BOILER INSURANCE | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 2,734.50 |
| HEALTH INSURANCE | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 0.00 |
| WORKMANS COMP | 0.00 | 1,000.00 |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | 0.00 | 112.07 |
| JANITORIAL SERVICES | 0.00 | 112.07 |
| LEGAL EXPENSE | | |
| EVICTION EXPENSE | 40.75 | 2,860.17 |
| LEGAL FEES | 1,008.00 | 2,771.34 |
| LICENSE | | |
| MAINTENANCE | | |
| CLEANING | 690.00 | 2,340.00 |
| AIR CONDITIONING | 0.00 | 0.00 |
| APPLIANCE REPAIRS | 562.57 | 823.27 |
| CARPENTRY MATERIALS | 896.06 | 4,121.28 |
| CARPENTRY WORK | 490.00 | 4,095.00 |
| CONCRETE AND BRICK WORK | 0.00 | 0.00 |
| DRAIN WORK | 0.00 | 381.00 |
| ELECTRIC MATERIALS | 562.38 | 1,932.53 |
| ELECTRIC WORK | 1,434.65 | 4,336.65 |
| ELEVATOR | 0.00 | 0.00 |
| EXTERMINATION | 0.00 | 330.00 |
| FIRE EXTINGUISHERS | 1,370.00 | 4,295.00 |
| FLOOR WORK | 0.00 | 0.00 |
| FLOORING MAT | 1,470.00 | 1,788.52 |
| GLASS AND WINDOWS | 0.00 | 676.61 |
| HARDWARE | 1,495.00 | 1,495.00 |
| HARDWARE WORK | 0.00 | 8.84 |
| HEATING MATERIALS | 480.00 | 480.00 |
| HEATING WORK | 0.00 | 0.00 |
| IRON AND STEEL WORK | 0.00 | 0.00 |
| LANDSCAPE & EXTERIOR WK | 325.00 | 4,417.75 |
| MISCELLANEOUS MAINT | 2,859.00 | 3,435.00 |
| PAINT MATERIAL | 228.51 | 1,410.43 |
| PAINTING & PLASTER | 1,580.00 | 6,300.00 |
| PEST CONTROL | 0.00 | 0.00 |
| PEST MAINTENANCE | 0.00 | 0.00 |
| PLUMBING | 1,940.00 | 5,201.00 |
| PLUMBING MATERIAL | 0.00 | 243.77 |
| PREVENT MAINTENANCE | 0.00 | 0.00 |
| ROOF REPAIR & MAINTENANCE | 0.00 | 5,600.00 |
| ROOFING MATERIALS | 0.00 | 37.21 |
| SNOW REMOVAL | 0.00 | 0.00 |
| TRASH CLEAN-UP | 0.00 | 0.00 |

| VENETIAN BLDGS | December DEC 1 16 to DEC 31 16 | Year-to-Date JAN 1 16 to DEC 31 16 / 2016 |
|---|---|---|
| MANAGEMENT EXPENSE | | |
| MANAGEMENT FEE | 0.00 | 0.00 |
| MISCELLANEOUS EXP | 250.00 | 150.00 |
| SALARY MANAGER | 0.00 | 0.00 |
| OFFICE EXPENSE | | |
| ADMINISTRATION EXP | 0.00 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 0.00 |
| POSTAGE | 0.00 | 0.00 |
| PAYROLL TAXES | | |
| USER PAYROLL TAXES | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 |
| TAX FEDERAL AND UNEMPLOY | 0.00 | 0.00 |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | | |
| SALARIES | | |
| TAXES | | |
| TAX INCOME | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 |
| TAX NUISANCE | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 |
| TAX PROPERTY | 13,866.45 | 27,212.97 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 |
| TRASH COLLECTION | 1,566.45 | 97,733.97 |
| UTILITIES | 838.50 | 3,524.38 |
| ELECTRICITY | 955.35 | 5,129.83 |
| FUEL OIL | 0.00 | 0.00 |
| GAS | 5,124.63 | 7,666.84 |
| PHONE | 308.85 | 1,270.00 |
| WATER & SEWER | 1,093.53 | 16,534.77 |
| WAGES | | |
| OPERATING EXPENSE | 40,515.96 | 130,093.05 |
| OPERATING PROFIT | -29,580.32 | 37,464.19 |
| INTEREST | | |
| INTEREST 1ST | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 |
| NET OPERATING PROFIT | -29,580.32 | 37,464.19 |
| AUTO LOAN | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| INTER-COMPANY DEBT LOAN | 0.00 | 0.00 |
| OWNER WITHDRAWALS | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 |
| NET CASH FLOW | -29,580.32 | 37,464.19 |

03214

|  | December | | Year-to-Date 2015 | |
|---|---|---|---|---|
|  | %Dollar | %Sales | %Dollar | %Sales |
| LATE & LEGAL FEES | 25.00 | .0% .0% | 885.00 | .5% .5% |
| MISCELLANEOUS INCOME | -305.50 | -5.1% -6.1% | -613.00 | -.4% -.3% |
| RENT | 6,293.00 | 104.7% 104.7% | 171,415.98 | 99.8% 99.8% |
| OPERATING INCOME | 6,011.50 | | 171,687.98 | |
| ACCOUNTING | .00 | .0% .0% | 855.00 | .5% .5% |
| PRE-LIABILITY | .00 | .0% .0% | 9,565.00 | 5.5% 5.6% |
| MISCELLANEOUS INS | 305.50 | 1.3% 5.1% | 3,371.50 | 1.9% 2.0% |
| WORKMENS COMP | 123.00 | .5% 2.0% | 123.00 | .1% .1% |
| JANITORIAL SERVICES | 800.00 | 3.4% 13.3% | 1,600.00 | .9% .9% |
| LEGAL FEES | 264.00 | 1.1% 4.4% | 3,938.37 | 2.3% 2.3% |
| AIR CONDITIONING | .00 | .0% .0% | 1,316.17 | .8% .8% |
| APPLIANCE REPAIRS | 1,692.47 | 7.2% 28.2% | 6,962.36 | 4.0% 4.1% |
| CARPENTRY MATERIALS | .00 | .0% .0% | 2,985.16 | 1.7% 1.7% |
| DRAIN WORK | 130.00 | .6% 2.2% | 1,525.00 | .9% .9% |
| ELECTRIC WORK | .00 | .0% .0% | 1,325.85 | .8% .8% |
| ELECTRIC MATERIALS | 244.21 | 1.0% 4.1% | 4,012.65 | 2.3% 2.3% |
| FIRE EXTINGUISHERS | 85.86 | .4% 1.4% | 85.86 | .0% .0% |
| LANDSCAPE & EXTERIOR WK | .00 | .0% .0% | 1,550.00 | .9% .9% |
| GLASS AND MIRRORS | .00 | .0% .0% | 1,206.11 | .7% .7% |
| PAINTING & PLASTER | .00 | .0% .0% | 4,050.00 | 2.3% 2.4% |
| PEST CONTROL | .00 | .0% .0% | 1,121.18 | .6% .7% |
| PLUMBING | .00 | .0% .0% | 5,050.14 | 2.9% 2.9% |
| PLUMBING MATERIAL | 235.19 | 1.0% 3.9% | 365.56 | .2% .2% |
| ROOF WORK | 4,560.00 | 19.9% 78.0% | 15,000.00 | 8.7% 8.9% |
| ROOFING MATERIALS | .00 | .0% .0% | 557.03 | .3% .3% |
| WINETIAN BLINDS | .00 | .0% .0% | 302.43 | .2% .2% |
| MANAGEMENT FEE | 4,500.00 | 19.1% 74.9% | 54,000.00 | 30.9% 31.5% |
| MISCELLANEOUS EXP | 55.00 | .1% .8% | 207.72 | .1% .1% |
| TAX INCOME | .00 | .0% .0% | 250.00 | .1% .1% |
| TAX PROPERTY | .00 | .0% .0% | 8,798.86 | 5.0% 5.1% |
| TRASH COLLECTION | 984.65 | 4.1% 16.0% | 4,380.18 | 2.5% 2.6% |
| ELECTRICITY | 1,192.32 | 5.1% 19.9% | 4,266.60 | 2.4% 2.5% |
| GAS | 2,450.21 | 10.4% 40.8% | 12,451.81 | 7.1% 7.3% |
| ZONE | 154.19 | .7% 2.6% | 820.83 | .5% .5% |
| WATER & SEWER | 5,674.64 | 24.1% 94.4% | 22,700.40 | 13.0% 13.2% |
| OPERATING EXPENSE | 23,541.55 | | 175,006.77 | |
| OPERATING PROFIT | -17,530.05 | | -3,318.79 | |

03215



Printed: MAR 16 16
Page: 2

829 ROCK CREEK CHURCH ROAD, N.W., ... Statement
829

| | December<br>DEC 1.17 to DEC 31.17 | Year-to-Date 2017<br>JAN 1.17 to DEC 31.17 |
|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | -40.00 | 186.00 |
| RENT | 35.00 | 165.00 |
| | 4,168.00 | 64,900.00 |
| OPERATING INCOME | 4,263.00 | 44,574.06 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS & OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| INSURANCE | | |
| BOILER INSURANCE | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 1,600.00 |
| HEALTH INSURANCE | 0.00 | 0.00 |
| MISCELLANEOUS INSURANCE | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | |
| WORKERS COMP | 0.00 | -700.00 | 2,000.00 |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 6.00 |
| LEGAL EXPENSE | | |
| LEGAL FEES | 0.00 | 0.00 |
| | 0.00 | 827.10 |
| LICENSE | 0.00 | 0.00 |
| MAINTENANCE | | |
| CLEANING | 0.00 | 560.00 |
| | 0.00 | 0.00 |
| AIR CONDITIONING | 0.00 | 0.00 |
| APPLIANCE REPAIRS | 255.40 | 708.67 |
| CARPENTRY REPAIRS | 450.00 | 690.00 |
| CARPENTRY WORK | 0.00 | 0.00 |
| DRAIN WORK | 0.00 | 255.41 |
| ELECTRICAL MATERIALS | 0.00 | 670.00 |
| ELECTRIC WORK | 0.00 | 0.00 |
| ELEVATOR | 52.25 | 103.64 |
| EXTERMINATION | 350.00 | 960.00 |
| FIRE EXTINGUISHER | 0.00 | 0.00 |
| FLOOR WORK | 0.00 | 0.00 |
| FLOORING MAT | 0.00 | 0.00 |
| GLASS AND MIRRORS | 155.37 | |
| HARDWARE | 0.00 | 130.00 |
| HEATING WORK | 0.00 | 0.00 |
| HEATING MATERIALS | 0.00 | 60.00 |
| HEATING WORK | 90.00 | 505.50 |
| LANDSCAPE & EXTERIOR WK | 0.00 | 4,050.00 |
| MISCELLANEOUS MAINT | 0.00 | 2,260.00 |
| PAINT MATERIAL | 0.00 | -400.00 |
| PAINTING & PLASTER | 450.00 | 2,530.00 |
| PAST MAINTENANCE | 0.00 | 729.63 |
| PAST MAINTENANCE | 0.00 | 0.00 |
| PEST CONTROL | 0.00 | 0.00 |
| PLUMBING | 0.00 | 0.00 |
| PLUMBING MATERIAL | | |
| PROPERTY MAINTENANCE | 0.00 | |
| ROOF REPAIR & MAINTENANCE | 0.00 | 0.00 |
| ROOFING MATERIALS | 0.00 | 0.00 |
| SNOW REMOVAL | 0.00 | 0.00 |
| TRASH CLEAN-UP | 0.00 | 137.44 |
| VENETIAN BLINDS | | |
| MANAGEMENT EXPENSE | 1,617.75 | 14,840.13 |

| | December<br>DEC 1.17 to DEC 31.17 | Year-to-Date 2017<br>JAN 1.17 to DEC 31.17 |
|---|---|---|
| MANAGEMENT FEE | 0.00 | 0.00 |
| MISCELLANEOUS EXP | 0.00 | 0.00 |
| SALARY MANAGER | 0.00 | 0.00 |
| OFFICE EXPENSE | | |
| ADMINISTRATION EXP | 0.00 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.02 |
| OFFICE SUPPLIES | 0.00 | 5.08 |
| POSTAGE | 0.00 | 5.04 |
| PAYROLL TAXES | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 |
| TAXABLE EMPLOYER | | |
| TAX MEDICARE | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | | |
| SALARIES | | |
| TAXES | | |
| TAX INCOME | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 |
| TAX INSURANCE | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 3,410.44 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 |
| TRASH COLLECTION | 0.00 | 3,410.44 |
| UTILITIES | | 3,666.58 |
| ELECTRICITY | 0.00 | 683.18 |
| FUEL OIL | 0.00 | 0.00 |
| GAS | 0.00 | 0.00 |
| PHONE | 0.00 | 0.00 |
| WATER & SEWER | 0.00 | 2,796.90 |
| WAGES | 0.00 | 0.00 |
| OPERATING EXPENSE | 1,603.75 | 28,474.71 |
| OPERATING PROFIT | 2,645.25 | 34,287.67 |
| INTEREST | | |
| INTEREST 1ST | 0.00 | 0.00 |
| INTEREST 2NC | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 |
| NET OPERATING PROFIT | 2,645.25 | 34,287.67 |
| AUTO LOAN | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| OWNER WITHDRAWALS | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 |
| NET CASH FLOW | 2,645.25 | 34,287.67 |

C3217

INC & EXP Statement

1010 G STREET, N.E.

Printed:   MAR 16 10
Page:      2

| | December DEC 1 17 to DEC 31 17 | Year-to-Date JAN 1 17 to DEC 31 17 | 2017 |
|---|---|---|---|
| LATE & LEGAL FEES | -0.00 | 0.00 | |
| MISCELLANEOUS INCOME | 0.00 | 515.00 | |
| RENT | 18,629.00 | 2,800.00 | |
| | | 21,790.00 | |
| OPERATING INCOME | 18,629.00 | 25,105.00 | |
| ACCOUNTING | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM | 0.00 | 0.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 1,563.26 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS BILL | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 0.00 | |
| FIRE/HAZARD | 0.00 | 5,391.00 | |
| HEALTH INSURANCE | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 0.00 | |
| UMBRELLA INSURANCE | 0.00 | 0.00 | |
| WORKMEN'S COMP | 0.00 | 0.00 | |
| | 0.00 | 0.00 | |
| JANITORIAL EXPENSE | | 8,381.00 | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | |
| JANITORIAL SERVICES | 0.00 | 1,250.00 | |
| | 0.00 | 1,250.00 | |
| LEGAL EXPENSE | | | |
| EVICTION EXPENSE | 0.00 | 0.00 | |
| LEGAL FEES | 0.00 | 0.00 | |
| | 0.00 | 1,000.00 | |
| LICENSE | | 1,465.50 | |
| MAINTENANCE | | | |
| CLEANING | 0.00 | 540.00 | |
| | 0.00 | 540.00 | |
| AIR CONDITIONING | 210.00 | 482.99 | |
| APPLIANCE REPAIRS | 0.00 | 543.16 | |
| CARPENTRY MATERIALS | 0.00 | 8,260.00 | |
| CARPENTRY WORK | 1,150.00 | 138.00 | |
| DRAIN WORK | 0.00 | 785.17 | |
| ELECTRIC MATERIALS | 0.00 | 2,446.65 | |
| ELECTRIC WORK | 600.00 | 0.00 | |
| ELEVATOR | 0.00 | 66.00 | |
| EXTERMINATION | 0.00 | 1,890.00 | |
| FIRE EXTINGUISHERS | 460.00 | 0.00 | |
| FLOOR WORK | 180.00 | 69.57 | |
| FLOORING MAT | 0.00 | 160.00 | |
| GLASS AND MIRRORS | 121.23 | 633.84 | |
| HARDWARE | 0.00 | 1,070.00 | |
| HARDWARE WORK | 0.00 | 931.82 | |
| HEATING MATERIALS | 0.00 | 1,130.00 | |
| HEATING WORK | 210.00 | 468.00 | |
| LANDSCAPE & EXTERIOR WK | 0.00 | 0.00 | |
| MISCELLANEOUS MAINT | 0.00 | 1,489.15 | |
| PAINT MATERIAL | 0.00 | 7,400.00 | |
| PAINTING & PLASTER | 0.00 | 3,410.00 | |
| PEST MAINTENANCE | 0.00 | 1,029.00 | |
| PEST CONTROL | 1,340.00 | 7,557.40 | |
| PLUMBING | 0.00 | 5,436.00 | |
| PLUMBING MATERIAL | 0.00 | 0.00 | |
| PREVENT MAINTENANCE | 0.00 | 0.00 | |
| ROOF REPAIR & MAINTENANCE | 0.00 | 0.00 | |
| ROOFING MATERIALS | 0.00 | 0.00 | |
| SNOW REMOVAL | | | |
| TRASH CLEAN-UP | 0.00 | 0.00 | |
| VENETIAN BLINDS | 350.00 | 502.76 | |
| MANAGEMENT EXPENSE | 4,700.25 | 42,118.96 | |

| | December DEC 1 17 to DEC 31 17 | Year-to-Date JAN 1 17 to DEC 31 17 | 2017 |
|---|---|---|---|
| MANAGEMENT FEE | 0.00 | 0.00 | |
| MISCELLANEOUS EXP | 710.00 | 710.00 | |
| SALARY MANAGER | 0.00 | 0.00 | |
| OFFICE EXPENSE | 710.00 | 916.21 |
| ADMINISTRATION EXP | | | 916.21 |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | |
| | 0.00 | 0.00 | |
| PAYROLL TAXES | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | |
| TAX MEDICARE | | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | |
| *TAX SOCIAL SECURITY | 0.00 | 0.00 | |
| PROFESSIONAL SERVICE | | | |
| SALARIES | 0.00 | 0.00 | |
| TAXES | 0.00 | 0.00 | |
| TAX INCOME | 0.00 | 0.00 | |
| TAX MISCELLANEOUS | 0.00 | 0.00 | |
| TAX INSURANCE | 0.00 | 0.00 | |
| TAX PERSONAL | 0.00 | 0.00 | |
| TAX PROPERTY | 0.00 | 18,465.52 | |
| TAX SPECIAL ASSESS | 0.00 | 3,706.16 | |
| TRASH COLLECTION | | | |
| UTILITIES | | | |
| ELECTRICITY | 0.00 | 1,072.02 | |
| FUEL OIL | 0.00 | 1,477.59 | |
| GAS | 0.00 | 2,340.95 | |
| PHONE | 31.11 | 245.18 | |
| WATER & SEWER | 427.82 | 4,546.17 | |
| WAGES | | | 13,181.91 |
| OPERATING EXPENSE | -0.00 | 0.00 | |
| OPERATING PROFIT | 5,534.18 | 145,471.78 | |
| INTEREST | 13,014.82 | | 88,613.23 |
| INTEREST 1ST | | | 145,471.78 |
| INTEREST 2ND | 0.00 | | |
| INTEREST EXPENSE | 0.00 | 0.00 | |
| NET OPERATING PROFIT | 0.00 | 145,471.78 | |
| AUTO LOAN | -13,014.82 | 0.00 | |
| BANK LOAN | 0.00 | 0.00 | |
| DEPOSIT REFUND | 0.00 | 0.00 | |
| INTER-COMPANY LOAN | 0.00 | 0.00 | |
| INTER-COMPANY LOANS | 0.00 | 0.00 | |
| OWNER WITHDRAWALS | 0.00 | 0.00 | |
| PRINCIPLE 1ST | 0.00 | 0.00 | |
| PRINCIPLE 2ND | 0.00 | 0.00 | |
| REFUND | 0.00 | 0.00 | |
| SUSPENSE | 0.00 | 0.00 | |
| TRANSFER | 0.00 | 0.00 | |
| NON OPER EXP | 0.00 | 0.00 | |
| NET CASH FLOW | 13,014.82 | 145,471.78 | |

03218



03219

Protect:  MAR 16 18
Page:     2

5400 - 7TH STREET, N.W.
5401

|  | December DEC 1 17 to DEC 31 17 | Year-to-Date JAN 1 17 to DEC 31 17 | 2018 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | | |
| MISCELLANEOUS INCOME | 80.00 | 860.00 | |
| RENT | 102.00 | 5,188.13 | |
| OPERATING INCOME | 13,297.00 | 212,543.87 | |
| | 13,249.00 | 218,592.00 | |
| ACCOUNTING | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM | 0.00 | 0.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | 0.00 |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 0.00 | |
| FIRE/LIABILITY | 300.00 | 5,300.00 | |
| HEALTH INSURANCE | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 0.00 | |
| UMBRELLA INSURANCE | 0.00 | 0.00 | |
| WORKMENS COMP | 0.00 | 1,250.00 | 6,550.00 |
| JANITORIAL EXPENSE | | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | |
| JANITORIAL SERVICES | 350.00 | 4,550.00 | 4,550.00 |
| LEGAL EXPENSE | | | |
| EVICTION EXPENSE | 1,119.60 | 1,119.60 | 1,319.10 |
| LEGAL FEES | 100.00 | 192.50 | 1,142.90 |
| LICENSE | | | |
| MAINTENANCE | | | |
| CLEANING | 1,319.60 | 2,300.00 | 2,300.00 |
| | 18.00 | | 830.00 |
| AIR CONDITIONING | 0.00 | 2,177.04 | |
| APPLIANCE REPAIRS | 1,251.11 | 2,075.82 | |
| CARPENTRY MATERIALS | 1,265.00 | 4,530.00 | |
| CLEAN UP/ENTRY WORK | 0.00 | 270.00 | |
| DRAIN WORK | 0.00 | 296.78 | |
| ELECTRIC MATERIALS | 1,160.00 | 5,506.55 | |
| ELECTRICAL WORK | 0.00 | 0.00 | |
| ELEVATOR | 0.00 | 148.84 | |
| EXTERMINATION | 0.00 | 4,020.00 | |
| FIRE EXTINGUISHERS | 680.00 | 130.00 | |
| FLOOR WORK | 0.00 | 403.23 | |
| FLOORING MAT | 100.00 | 440.00 | |
| GLASS AND MIRRORS | 548.99 | 1,300.00 | |
| HARDWARE | 0.00 | 0.00 | |
| HARDWARE WORK | 170.00 | 641.00 | |
| HEATING MATERIALS | 0.00 | 800.00 | |
| HEATING WORK | 0.56 | 96.56 | |
| LANDSCAPE & EXTERIOR WK | 200.00 | 700.00 | |
| MAINTENANCE MAINT | 0.00 | 2,860.00 | |
| PAINT MATERIAL | 0.00 | 1,619.10 | |
| PAINTING & PLASTER | 1,180.00 | 4,455.00 | |
| PEST CONTROL | 0.00 | 9,720.53 | |
| PLUMBING | 43.28 | 48,140.00 | |
| PLUMBING MATERIAL | 16,436.00 | 21,140.00 | |
| PREVENT MAINTENANCE | 480.00 | 176.29 | |
| ROOF REPAIR & MAINTENANCE | 0.00 | | |
| ROOFING MATERIALS | | | 0.00 |
| SNOW REMOVAL | | | |
| TRASH CLEAN-UP | 0.50 | | |
| VENETIAN BLINDS | 0.00 | | |
| MANAGEMENT EXPENSE | ±5,297.38 | 120,655.17 | |

|  | December DEC 1 17 to DEC 31 17 | Year-to-Date JAN 1 17 to DEC 31 17 | 2018 |
|---|---|---|---|
| MANAGEMENT FEE | 716.00 | | 173.52 |
| MISCELLANEOUS EXP | | | 773.52 |
| SALARY MANAGER | 0.00 | | 0.00 |
| OFFICE EXPENSE | | | |
| ADMINISTRATION EXP | 0.00 | 0.00 | |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | | 0.00 |
| PAYROLL TAXES | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | |
| TAX MEDICARE EMPLOYEE | 0.00 | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 | |
| SALARIES | | | |
| TAXES | | | |
| TAX INCOME | 0.00 | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| TAX INSURANCE | 0.00 | 0.00 | |
| TAX PERSONAL | 0.00 | 0.00 | |
| TAX PROPERTY | 0.00 | 14,541.42 | |
| TAX SPECIAL ASSESS | 0.00 | | 4,360.83 |
| TRASH COLLECTION | | | |
| UTILITIES | | | |
| ELECTRICITY | 0.00 | 1,560.25 | |
| FUEL OIL | 0.00 | 6,930.40 | |
| GAS | 0.00 | 346.17 | |
| PHONE | 0.00 | 12,067.24 | |
| WATER & SEWER | 0.00 | | 72,833.01 |
| WAGES | 24,136.39 | | 160,338.15 |
| OPERATING EXPENSE | ±12,887.39 | | 24,272.84 |
| OPERATING PROFIT | | | |
| INTEREST | 0.00 | | |
| INTEREST 1ST | 0.00 | | 0.00 |
| INTEREST 2ND | 0.00 | | |
| INTEREST EXPENSE | 0.00 | | 0.00 |
| NET OPERATING PROFIT | ±12,887.39 | | 24,272.84 |
| AUTO LOAN | 0.00 | | 0.00 |
| BANK LOAN | 0.00 | | 0.00 |
| DEPOSIT REFUND | 0.00 | | 0.00 |
| INTERCOMPANY LOAN | 0.00 | | 0.00 |
| INTERCOMPANY LOAN IN | 0.00 | | 0.00 |
| OTHER WITHDRAWALS | 0.00 | | 0.00 |
| PRINCIPLE 1ST | 0.00 | | 0.00 |
| PRINCIPLE 2ND | 0.00 | | 0.00 |
| REFUND | 0.00 | | 0.00 |
| SUSPENSE | 0.00 | | 0.00 |
| TRANSFER | 0.00 | | 0.00 |
| NON OP INC & EXP | 0.00 | | 0.00 |
| NET CASH FLOW | ±12,887.39 | | 24,272.84 |

03220

ARCADIAN HOUSE   3501
Inc & Exp Statement   2017

Printed:
Page: 2
MAR 16 18

| | December<br>DEC 1 17 to DEC 31 17 | Year-to-Date<br>JAN 1 17 to DEC 31 17 | 2017 |
|---|---|---|---|
| MANAGEMENT FEE | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS EXP | 0.00 | 200.00 | 200.00 |
| SALARY MANAGER | 0.00 | 0.00 | |
| | | | |
| OFFICE EXPENSE | | | |
| ADMINISTRATION EXP | 0.00 | 0.00 | |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | 0.00 |
| | | | |
| PAYROLL TAXES | | | |
| USED PAYROLL TAXES | 0.00 | 0.00 | |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | |
| | | | |
| PROFESSIONAL SERVICE | | | |
| SALARIES | 0.00 | 0.00 | |
| | | | |
| TAXES | | | |
| TAX INCOME | 0.00 | 0.00 | |
| TAX MISCELLANEOUS | 0.00 | 0.00 | |
| TAX INSURANCE | 0.00 | 0.00 | |
| TAX PERSONAL | 0.00 | 0.00 | |
| TAX PROPERTY | 0.00 | 21,707.62 | 11,707.62 |
| TAX SPECIAL ASSESS | 0.00 | 5,018.32 | 5,018.32 |
| | | | |
| TRASH COLLECTION | | | |
| | | | |
| UTILITIES | | | |
| ELECTRICITY | 0.00 | 3,756.33 | |
| FUEL OIL | 0.00 | 0.00 | |
| GAS | 3,444.31 | 10,290.25 | |
| PHONE | 0.00 | 562.14 | |
| WATER & SEWER | 2,587.88 | 16,870.74 | |
| | | | |
| WAGES | 8,547.19 | 23,351.36 | |
| OPERATING EXPENSE | | 149,674.98 | |
| OPERATING PROFIT | -7,238.79 | 94,773.24 | |
| INTEREST | 0.00 | 0.00 | |
| INTEREST (E) | 0.00 | 0.00 | |
| INTEREST 3N) | 0.00 | 0.00 | |
| INTEREST EXPENSE | 0.00 | 0.00 | |
| NET OPERATING PROFIT | -7,238.79 | 94,773.24 | |
| AUTO LOAN | 0.00 | 0.00 | |
| BANK LOAN | 0.00 | 0.00 | |
| DEPOSIT REFUND | 0.00 | 0.00 | |
| INTER-COMPANY LOAN | 0.00 | 0.00 | |
| INTER-COMPANY DAMAGE | 0.00 | 0.00 | |
| OWNER WITHDRAWALS | 0.00 | 0.00 | |
| PRINCIPLE 1ST | 0.00 | 0.00 | |
| PRINCIPLE 2ND | 0.00 | 0.00 | |
| REFUND | 0.00 | 0.00 | |
| SUSPENSE | 0.00 | 0.00 | |
| TRANSFER | 0.00 | 0.00 | |
| HOM OP INC & EXP | 0.00 | 0.00 | 0.00 |
| NET CASH FLOW | -7,238.79 | 94,773.24 | |

| | December<br>DEC 1 17 to DEC 31 17 | Year-to-Date<br>JAN 1 17 to DEC 31 17 | 2017 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | |
| MISCELLANEOUS INCOME | -42.00 | 1,462.75 | 0.00 |
| RENT | 0.00 | 50.50 | |
| | 8,649.04 | 241,597.82 | |
| OPERATING INCOME | 8,649.04 | 247,097.88 | |
| | | | |
| ACCOUNTING | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM | 0.00 | 0.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 130.35 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS MOTOR VEHICLE | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | |
| | | | |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 1,757.64 | |
| FIRE/LIABILITY | 0.00 | 2,734.00 | |
| HEALTH INSURANCE | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 1,111.00 | |
| WORKMANS COMP | 0.00 | 5,592.64 | |
| | | | |
| JANITORIAL EXPENSE | | | |
| JANITORIAL MATERIALS | 560.00 | 10,850.00 | |
| JANITORIAL SERVICES | 650.00 | 10,650.00 | |
| | | | |
| LEGAL EXPENSE | | | |
| LEGAL FEES | 0.00 | 1,007.00 | 1,007.00 |
| | 316.00 | 1,007.00 | 786.80 |
| | | | |
| LICENSE | 0.00 | 1,130.00 | 1,130.00 |
| | | | |
| MAINTENANCE | 316.00 | 1,130.00 | |
| CLEANING | 0.00 | 0.00 | 100.00 |
| | | | |
| AIR CONDITIONING | 0.00 | 2,075.53 | |
| APPLIANCE REPAIRS | 220.44 | 4,385.60 | |
| CARPENTRY MATERIALS | -1,300.00 | 9,350.00 | |
| CARPENTRY WORK | 0.00 | 525.65 | |
| DRAIN WORK | 0.00 | 525.65 | |
| ELECTRIC MATERIALS | -1,350.00 | 6,825.00 | |
| ELECTRIC WORK | 150.00 | 3,375.00 | |
| ELEVATOR | 0.00 | 0.00 | |
| EXTERMINATION | 212.00 | 212.00 | |
| FIRE EXTINGUISHERS | 0.00 | 7,330.00 | |
| FLOOR WORK | 320.00 | 687.27 | |
| FLOORING MAT | 580.00 | 632.00 | |
| GLASS AND MIRRORS | 310.25 | 1,255.03 | |
| HARDWARE | 0.00 | 150.00 | |
| HARDWARE WORK | 0.00 | 204.89 | |
| HEATING MATERIALS | 360.00 | 360.00 | |
| HEATING WORK | 84.25 | 4,844.40 | |
| LANDSCAPE & EXTERIOR WK | 0.00 | 3,800.00 | |
| MISCELLANEOUS MAINT | 200.00 | 200.00 | |
| PAINT MATERIAL | 480.00 | 7,586.00 | |
| PAINTING 1 PLASTER | 0.00 | 3,310.00 | |
| PAVING MAINTENANCE | 0.00 | 1,767.60 | |
| PEST CONTROL | 21.65 | 11,048.62 | |
| PLUMBING | 1,230.00 | 1,174.23 | |
| PLUMBING MATERIAL | 0.00 | 0.00 | 500.86 |
| PROPERT MAINTENANCE | 0.00 | 1,450.00 | |
| ROOF REPAIR & MAINTENANCE | 560.00 | 0.00 | |
| ROOFING MATERIALS | 0.00 | 72.47 | |
| | | | |
| SNOW REMOVAL | | | |
| TRASH CLEAN-UP | 0.00 | 521.97 | |
| VENETIAN BLINDS | 530.00 | | 76,307.20 |
| | | | |
| MANAGEMENT EXPENSE | 7,965.59 | | |

03221

INC & EXP Statement
FLOWER HOUSE
8212

Printed:  MAR 16 18
Page:     2

| Account | December DEC 1 17 to DEC 31 17 | Year-to-Date 2018 JAN 1 17 to DEC 31 17 |
|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 429.73 | 6,504.51 |
| RENT | 11,398.27 | 146,824.99 |
| OPERATING INCOME | 11,828.00 | 153,386.26 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| CLEAN | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| CONGRESSIONAL FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| INSURANCE | | |
| BOILER INSURANCE | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 4,500.00 |
| HEALTH INSURANCE | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 306.50 |
| UMBRELLA INSURANCE | 0.00 | 0.00 |
| WORKMANS COMP | 0.00 | 642.00 |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 0.00 |
| LEGAL EXPENSE | | |
| EVICTION EXPENSE | 0.00 | 520.00 |
| LEGAL FEES | 0.00 | 1,354.49 |
| LICENSE | | |
| MAINTENANCE | | |
| CLEANING | 0.00 | 0.00 |
| AIR CONDITIONING | 0.00 | 0.00 |
| BOILER/HEATING REPAIRS | 0.00 | 4,294.28 |
| CARPENTRY MATERIALS | 0.00 | 3,335.00 |
| CARPENTRY WORK | 0.00 | 1,125.00 |
| DRAIN WORK | 99.22 | 961.00 |
| ELECTRIC MATERIALS | 0.00 | 3,692.30 |
| ELECTRIC WORK | 0.00 | 0.00 |
| ELEVATOR | 0.00 | 0.00 |
| EXTERMINATION | 0.00 | 134.50 |
| FIRE EXTINGUISHERS | 0.00 | 0.00 |
| FLOOR WORK | 0.00 | 2,544.45 |
| FLOORING MAT | 0.00 | 831.36 |
| GLASS AND MIRRORS | 0.00 | 173.25 |
| HARDWARE | 0.00 | 440.00 |
| HARDWARE WORK | 0.00 | 0.00 |
| HEATING MATERIALS | 0.00 | 0.00 |
| HEATING WORK | 0.00 | 5,453.00 |
| UNFINISHED EXTERIOR WK | 0.00 | 9,780.00 |
| MISCELLANEOUS MAINT | 0.00 | 61.47 |
| PAINT MATERIAL | 115.67 | 1,576.06 |
| PAINTING & PLASTER | 0.00 | 0.00 |
| FAST MAINTENANCE | 0.00 | 0.00 |
| PEST CONTROL | 0.00 | 4,683.14 |
| PLUMBING | 0.00 | 1,041.48 |
| PLUMBING MATERIAL | 0.00 | 0.00 |
| PREVENT MAINTENANCE | 0.00 | 0.00 |
| ROOF REPAIR & MAINTENANCE | 0.00 | 0.00 |
| ROOFING MATERIALS | 0.00 | 440.00 |
| SNOW REMOVAL | | |
| TRASH CLEANUP | 0.00 | 0.00 |
| VENETIAN BLINDS | 0.00 | 465.36 |
| MANAGEMENT EXPENSE | 215.91 | 64,933.97 |

| Account | December DEC 1 17 to DEC 31 17 | Year-to-Date 2018 |
|---|---|---|
| MANAGEMENT FEE | 0.00 | 0.00 |
| MISCELLANEOUS EXP | 0.00 | 2,292.32 |
| SALARY MANAGER | 0.00 | 0.00 |
| OFFICE EXPENSE | | |
| ADMINISTRATION EDP | 0.00 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 0.00 |
| POSTAGE | 0.00 | 0.00 |
| PAYROLL TAXES | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 |
| SALARIES | | |
| TAXES | | |
| TAX MISCELLANEOUS | 0.00 | 0.00 |
| TAX NUISANCE | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 25,216.70 |
| TAX SPECIAL ASSESS | 0.00 | 2,564.60 |
| TRASH COLLECTION | | |
| UTILITIES | | |
| ELECTRICITY | 3,021.61 | 3,021.61 |
| FUEL OIL | 0.00 | 0.00 |
| GAS | 6,373.26 | 6,373.26 |
| PHONE | 788.04 | 788.04 |
| WATER & SEWER | 2,497.50 | 8,971.89 |
| WAGES | | 13,541.55 |
| OPERATING EXPENSE | 2,712.29 | 24,472.47 |
| OPERATING PROFIT | 9,315.61 | 0.00 |
| INTEREST | 0.00 | 0.00 |
| INTEREST 1ST | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 |
| NET OPERATING PROFIT | 9,315.61 | 0.00 |
| AUTO LOAN | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| OWNER WITHDRAWALS | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SURPRISE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 24,472.47 |
| NET CASH FLOW | 9,315.61 | |

03222

Page:

| | December | | | Year-to-Date 2018 | | |
|---|---|---|---|---|---|---|
| | | % Category | % | | % Category | % |
| LATE & LEGAL FEES | 40.00 | .5% | .5% | 1,830.00 | .5% | .5% |
| MISCELLANEOUS INCOME | .00 | 0% | 0% | 3,982.50 | 1.9% | 1.9% |
| RENT | .00 | 0% | 0% | 9,550.00 | 97.2% | 97.2% |
| OPERATING INCOME | 7,623.00 | 99.5% | 99.5% | 189,660.20 | 97.2% | 97.2% |
| | | | | | | |
| ACCOUNTING | .00 | 0% | 2% | 925.00 | .5% | .5% |
| GAS AND OIL | .00 | 0% | 0% | 311.08 | .2% | .2% |
| RELIABILITY | .00 | 0% | 0% | 9,550.00 | 4.7% | 4.9% |
| MISCELLANEOUS INS | 306.50 | 2.7% | 4.0% | 3,065.00 | 1.5% | 1.5% |
| JANITORIAL SERVICES | 1,200.00 | 10.5% | 15.7% | 1,200.00 | .6% | .6% |
| EVICTION EXPENSE | .00 | 0% | .0% | 490.00 | .2% | .2% |
| LEGAL FEES | 168.50 | 1.5% | 2.2% | 2,461.10 | 1.2% | 1.2% |
| LICENSE | .00 | 0% | 0% | 3,027.60 | 1.5% | 1.5% |
| CLEANING | .00 | 0% | 0% | 1,660.00 | .8% | .8% |
| APPLIANCE REPAIRS | 245.58 | 2.1% | 3.2% | 2,807.82 | 1.4% | 1.4% |
| CARPENTRY WORK | 3,360.00 | 29.3% | 43.8% | 7,120.00 | 3.5% | 3.5% |
| CARPENTRY MATERIALS | .00 | 0% | 0% | 5,039.75 | 2.5% | 2.5% |
| DRAIN WORK | 130.00 | 1.1% | 1.7% | 1,150.00 | .6% | .6% |
| ELECTRIC WORK | .00 | 0% | .0% | 317.20 | .2% | .2% |
| ELECTRIC MATERIALS | 339.77 | 3.0% | 4.4% | 3,580.50 | 1.8% | 1.8% |
| FIRE EXTINGUISHERS | 135.00 | 1.2% | 1.8% | 491.00 | .2% | .2% |
| FLOOR WORK | .00 | 0% | 0% | 2,575.00 | 1.3% | 1.3% |
| FLOORING MAT | .00 | 0% | 0% | 2,828.28 | 1.4% | 1.4% |
| LANDSCAPE & EXTERIOR WK | .00 | 0% | 0% | 3,441.00 | 1.7% | 1.7% |
| HARDWARE | .00 | 0% | 0% | 970.13 | .5% | .5% |
| HEATING WORK | .00 | 0% | 0% | 322.00 | .2% | .2% |
| PAINT MATERIAL | .00 | 0% | 0% | 768.70 | .4% | .4% |
| PAINTING & PLASTER | .00 | 0% | 0% | 19,430.00 | 9.7% | 9.5% |
| PEST CONTROL | .00 | 0% | 0% | 1,153.30 | .6% | .6% |
| PLUMBING | 1,910.00 | 18.7% | 24.9% | 8,054.80 | 4.0% | 3.9% |
| PLUMBING MATERIAL | 798.34 | 7.0% | 10.4% | 2,077.30 | 1.0% | 1.0% |
| WINDOW BLINDS | .00 | 0% | 0% | 426.35 | .2% | .2% |
| MANAGEMENT FEE | .00 | 0% | 0% | 66,140.00 | 33.0% | 32.3% |
| MISCELLANEOUS EXP | 70.00 | .6% | .9% | 376.55 | .2% | .2% |
| INCOME | .00 | 0% | 0% | 250.00 | .1% | .1% |
| PROPERTY | .00 | 0% | 0% | 9,194.36 | 4.6% | 4.5% |
| TRASH COLLECTION | .00 | 0% | 0% | 3,283.55 | 1.6% | 1.6% |
| ELECTRICITY | .00 | .0% | .0% | 2,808.32 | 1.4% | 1.4% |
| PHONE | 2,538.17 | 22.2% | 33.1% | 11,226.00 | 5.6% | 5.5% |
| WATER & SEWER | 256.81 | 2.2% | 3.3% | 1,231.63 | .6% | .6% |
| | .00 | .5% | .0% | 20,743.68 | 10.4% | 10.1% |
| | | | | | | |
| OPERATING EXPENSE | 11,456.47 | | | 200,373.23 | | |
| OPERATING PROFIT | -3,793.47 | | | 4,939.48 | | |

03223

## 0310 Kennedy Street NW — 0810

MAR 2019  Page:

Inc & Exp Statement

| | December DEC 1.18 to DEC 31.18 | Year-to-Date JAN 1.18 to DEC 31.18 | 2018 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 83.00 | 720.00 | |
| RENT | 8,055.60 | 543.00 | |
| OPERATING INCOME | 8,134.04 | 106,050.26 | 184,283.26 |
| | | | |
| ACCOUNTING | 0.00 | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 2,946.42 | 3,755.50 |
| CONTRIBUTIONS | 0.00 | 0.00 | 0.00 |
| INSURANCE | | | |
| RENTERS INSURANCE | 0.00 | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 0.00 | 0.00 |
| HEALTH INSURANCE | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 750.00 | 750.00 |
| WORKMENS COMP | 0.00 | 0.00 | 0.00 |
| JANITORIAL EXPENSE | | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 0.00 | 0.00 |
| LEGAL EXPENSE | | | |
| EVICTION EXPENSE | 0.00 | 633.37 | 633.37 |
| LEGAL FEES | 0.00 | 0.00 | 0.00 |
| LICENSE | 0.00 | 0.00 | 0.00 |
| MAINTENANCE | 0.00 | 0.00 | 0.00 |
| CLEANING | 0.00 | 1,540.00 | 1,540.00 |
| AIR CONDITIONING | 0.00 | 0.00 | 0.00 |
| APPLIANCE REPAIRS | 302.04 | 875.42 | |
| CARPENTRY MATERIALS | 0.00 | 2,647.33 | |
| CARPENTRY WORK | 1,410.00 | 3,700.00 | |
| CONCRETE AND BRICK WORK | 0.00 | | |
| DRAIN WORK | 760.00 | 2,100.00 | |
| ELECTRIC MATERIALS | 0.00 | 2,147.55 | |
| ELECTRIC WORK | 0.00 | 3,090.00 | |
| EXTERMINATION | 0.00 | 0.00 | |
| FIRE EXTINGUISHERS | 0.00 | 63.39 | |
| FLOOR WORK | 1,200.00 | 5,928.10 | |
| FLOORING MAT | 0.00 | 0.00 | |
| GLASS AND MIRRORS | 0.00 | 1,420.00 | |
| HARDWARE | 171.89 | 171.89 | |
| HARDWARE WORK | 0.00 | 0.00 | |
| HEATING MATERIALS | 0.00 | 0.00 | |
| HEATING WORK | 0.00 | 1,421.59 | |
| IRON AND STEEL WORK | 0.00 | 0.00 | |
| LANDSCAPE & EXTERIOR WK | 0.00 | 1,523.84 | |
| MISCELLANEOUS MAINT | 480.00 | 809.44 | |
| PAINT MATERIAL | 1,080.00 | 6,320.00 | |
| PAINTING & PLASTER | 0.00 | 0.00 | |
| PEST CONTROL | 560.00 | 769.87 | |
| PLUMBING | 0.00 | 7,271.02 | |
| PLUMBING MATERIAL | 0.00 | 5.81 | |
| PREVENT MAINTENANCE | 0.00 | 0.00 | |
| ROOF REPAIR & MAINTENANCE | 240.00 | 240.00 | |
| ROOFING MATERIALS | 0.00 | 0.00 | |
| SNOW REMOVAL | | | |
| TRASH CLEAN-UP | 0.00 | 0.00 | 0.00 |
| VENETIAN BLINDS | 0.00 | 1,127.61 | |
| MANAGEMENT EXPENSE | | | |
| MANAGEMENT FEE | 3,069.73 | 44,387.86 | |
| MISCELLANEOUS EXP | 0.00 | 0.00 | |

## 0510 Kennedy Street NW — 0810

MAR 2019  Page: 2

Inc & Exp Statement

| | December DEC 1.18 to DEC 31.18 | Year-to-Date JAN 1.18 to DEC 31.18 | 2018 |
|---|---|---|---|
| SALARY MANAGER | 0.00 | 0.00 | 0.00 |
| OFFICE EXPENSE | | | |
| ADMINISTRATION EXP | 0.00 | 0.25 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | |
| PAYROLL TAXES | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 | |
| TAX FICA/AND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | |
| TAX MEDICAL EMPLOYER | 0.00 | 0.00 | |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | |
| PROFESSIONAL SERVICE | 0.00 | 0.00 | |
| SALARIES | 0.00 | 0.00 | |
| TAXES | | | |
| TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| TAX NUISANCE | 0.00 | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 1,296.76 | 1,296.76 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 | 0.00 |
| TRASH COLLECTION | 2,444.01 | 0.00 | 12,584.76 |
| UTILITIES | | | 7,904.63 |
| ELECTRICITY | 0.00 | 1,111.42 | |
| FUEL OIL | 0.00 | 0.00 | |
| GAS, OIL | 1,564.22 | 6,398.44 | |
| PHONE | 0.00 | 0.00 | |
| WATER & SEWER | 2,911.92 | 12,281.14 | |
| WAGES | 2,486.14 | 19,791.11 | 19,791.11 |
| GLASS | 0.00 | 0.00 | 0.00 |
| OPERATING EXPENSE | 14,059.88 | 96,083.33 | 96,083.33 |
| OPERATING PROFIT | -5,925.84 | 48,934.13 | 48,934.13 |
| INTEREST | | | |
| INTEREST 1ST | 0.00 | 0.00 | |
| INTEREST 2ND | 0.00 | 0.00 | |
| INTEREST EXPENSE | 0.00 | 0.00 | 0.00 |
| NET OPERATING PROFIT | -5,925.84 | 48,934.13 | 48,934.13 |
| AUTO LOAN | 0.00 | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 | |
| DEPOSIT REFUND | 0.00 | 0.00 | |
| INTER-COMPANY LOAN | 0.00 | 0.00 | |
| INTER-COMPANY LOAN IN | 0.00 | 0.00 | |
| OWNER WITHDRAWALS | 0.00 | 0.00 | |
| PRINCIPLE 1ST | 0.00 | 0.00 | |
| PRINCIPLE 2ND | 0.00 | 0.00 | |
| REFUND | 0.00 | 0.00 | |
| SUSPENSE | 0.00 | 0.00 | |
| TRANSFER | 0.00 | 0.00 | |
| NON OP INC & EXP | 0.00 | 0.00 | 0.00 |
| NET CASH FLOW | -5,925.84 | 48,934.13 | 48,934.13 |

03224

Printed: MAR 2019
Page: 2

Inc & Exp Statement
829 ROCK CREEK CHURCH ROAD N W

| Account | December DEC 1 18 to DEC 31 18 | Year-to-Date JAN 1 18 to DEC 31 18 | 2018 | | December DEC 1 18 to DEC 31 18 | Year-to-Date JAN 1 18 to DEC 31 18 | 2018 |
|---|---|---|---|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | 0.00 | OFFICE EXPENSE | | | |
| MISCELLANEOUS INCOME | -0.00 | 0.00 | 500.00 | ADMINISTRATION EXP | 0.00 | 0.00 | 61.55 |
| RENT | 0.00 | 0.00 | 500.00 | OFFICE EXPENSE | 0.00 | 0.00 | 0.00 |
| OPERATING INCOME | -3,560.00 | 66,300.00 | 66,335.00 | OFFICE SUPPLIES | 0.00 | 0.00 | 0.00 |
|  |  |  |  | POSTAGE | 0.00 | 0.00 | 0.00 |
| ACCOUNTING | 0.00 | 0.00 | 0.00 | | | | |
| ADVERTISING | 0.00 | 0.00 | 0.00 | PAYROLL TAXES | | | |
| A-PAR | 0.00 | 0.00 | 0.00 | WAGE/PAYROLL TAXES | | | 2.00 |
| ANNUAL REPORT | 0.00 | 0.00 | 0.00 | TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| APPLIANCE PARTS | 0.00 | 0.00 | 0.00 | TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 0.00 | 0.00 | TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | 0.00 | TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | 0.00 | TAX MEDICARE EMPLOYER | 0.00 | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | 0.00 | TAX MEDICARE | 0.00 | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 | 0.00 | TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 | 0.00 | TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 | 0.00 | | | | |
| INSURANCE | | | | PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| BOILER INSURANCE | 0.00 | 0.00 | | SALARIES | 0.00 | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 1,356.00 | | TAXES | | | |
| HEALTH INSURANCE | 0.00 | 0.00 | | TAX INCOME | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 33.00 | | TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| UMBRELLA INSURANCE | | | | TAX NUISANCE | 0.00 | 0.00 | 0.00 |
| WORKMENS COMP | 0.00 | 500.00 | 1,845.00 | TAX PERSONAL | 0.00 | 0.00 | 0.00 |
|  |  |  |  | TAX PROPERTY | 0.00 | 2,541.24 | 2,541.24 |
| JANITORIAL EXPENSE | | | | TAX SPECIAL ASSESS | 0.00 | 0.00 | 4,327.01 |
| JANITORIAL MATERIALS | 0.00 | 0.00 | 0.00 | | | | |
| JANITORIAL SERVICES | 0.00 | 0.00 | 0.00 | TRASH COLLECTION | 0.00 | 0.00 | 0.00 |
|  |  |  |  | UTILITIES | | | |
| LEGAL EXPENSE | | | | ELECTRICITY | 55.62 | 200.01 | |
| EVICTION EXPENSE | 0.00 | 0.00 | 0.00 | FUEL OIL | 0.00 | 0.00 | 0.00 |
| LEGAL FEES | 0.00 | 0.00 | 0.00 | GAS | 0.00 | 0.00 | 0.00 |
|  |  |  |  | PHONE | 0.00 | 0.00 | 0.00 |
| LICENSE | 0.00 | 0.00 | 180.00 | WATER & SEWER | 502.12 | 3,653.53 | 3,653.54 |
| MAINTENANCE | | | | | | | |
| CLEANING | 0.00 | 180.00 | 180.00 | WAGES | 0.00 | 0.00 | 0.00 |
| AIR CONDITIONING | 0.00 | 0.00 | 0.00 | OPERATING EXPENSE | 0.00 | 1,457.04 | 26,467.47 |
| APPLIANCE REPAIRS | 78.16 | 662.66 | | OPERATING PROFIT | 1,538.35 | 43,384.13 | 43,384.13 |
| CARPENTRY MATERIALS | 0.00 | 1,500.00 | | INTEREST | | | |
| CARPENTRY WORK | | | | INTEREST 1ST | 0.00 | 0.00 | 0.00 |
| CONCRETE/BRICK WORK | 0.00 | 740.00 | | INTEREST 2ND | 0.00 | 0.00 | 0.00 |
| DRAIN WORK | 0.00 | 865.40 | | INTEREST EXPENSE | 0.00 | 0.00 | 0.00 |
| ELECTRICAL MATERIALS | 0.00 | 830.00 | | NET OPERATING PROFIT | 1,538.35 | 43,384.13 | 43,384.13 |
| ELECTRIC WORK | 0.00 | 0.00 | | AUTO LOAN | 0.00 | 0.00 | 0.00 |
| EXTERMINATION | 96.23 | 96.23 | | BANK LOAN | 0.00 | 0.00 | 0.00 |
| FIRE EXTINGUISHERS | 0.00 | 0.00 | | DEPOSIT REFUND | 0.00 | 0.00 | 0.00 |
| FLOORING MAT | 0.00 | 1,290.00 | | INTER-COMPANY LOAN | 0.00 | 0.00 | 0.00 |
| FLOORING WORK | 149.12 | 149.12 | | INTER-COMPANY LOAN | 0.00 | 0.00 | 0.00 |
| GLASS AND MIRRORS | 72.08 | 72.08 | | OTHER WITHDRAWALS | 0.00 | 0.00 | 0.00 |
| HARDWARE | 41.86 | 240.00 | | PRINCIPLE 1ST | 0.00 | 0.00 | 0.00 |
| HAULING WORK | 0.00 | 41.86 | | PRINCIPLE 2ND | 0.00 | 0.00 | 0.00 |
| HEATING MATERIALS | 0.00 | 610.00 | | REFUND | 0.00 | 0.00 | 0.00 |
| HEATING WORK | 0.00 | 0.00 | | SURPLUS | 0.00 | 0.00 | 0.00 |
| IRON AND STEEL WORK | 0.00 | 0.00 | | TRANSFER | 0.00 | 0.00 | 0.00 |
| LANDSCAPE & EXTERIOR WK | 0.00 | 972.00 | | NON OP INC & EXP | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS MAINT | 0.00 | 23.04 | | NET CASH FLOW | 1,538.35 | 43,384.13 | 43,384.13 |
| PAINT MATERIAL | 0.00 | 135.00 | | | | | |
| PAINTING & PLASTER | 0.00 | 0.00 | | | | | |
| PEST CONTROL | 0.00 | 0.00 | | | | | |
| PLUMBING | 0.00 | 4,740.00 | | | | | |
| PLUMBING MATERIAL | 0.00 | 1,612.24 | | | | | |
| PREVENT MAINTENANCE | 0.00 | 0.00 | | | | | |
| ROOF REPAIR & MAINTENANCE | 0.00 | 0.00 | | | | | |
| ROOFING MATERIALS | 0.00 | 0.00 | | | | | |
| SNOW REMOVAL | | | | | | | |
| TRASH CLEAN-UP | 0.00 | 0.00 | 13,915.00 | | | | |
| VENETIAN BLINDS | 0.00 | 0.00 | | | | | |
| MANAGEMENT EXPENSE | | | | | | | |
| MANAGEMENT FEE | 266.31 | 65.69 | | | | | |
| MISCELLANEOUS EXP | | | | | | | |

03225

Inc & Exp Statement
1010 G STREET, N.E.
1010

MAR 2019

Printed:
Page:    2

| | December DEC 1/18 to DEC 31/18 | Year-to-Date JAN 1/18 to DEC 31/18 2018 | December DEC 1/18 to DEC 31/18 | Year-to-Date JAN 1/18 to DEC 31/18 2018 |
|---|---|---|---|---|
| LATE & LEGAL FEES | | | | |
| MISCELLANEOUS INCOME | | | | |
| RENT | | | | |
| OPERATING INCOME | | | | |
| ACCOUNTING | | | | |
| ADVERTISING | | | | |
| ALARM | | | | |
| ANNUAL REPORT | | | | |
| APPLIANCE PARTS | | | | |
| AUTO EXPENSE | | | | |
| AUTO INSURANCE | | | | |
| GAS AND OIL | | | | |
| BANK CHARGE | | | | |
| CARPETING | | | | |
| CONDOMINIUM FEE | | | | |
| CONTRIBUTIONS | | | | |
| INSURANCE | | | | |
| BOILER INSURANCE | | | | |
| FIRE/LIABILITY | | | | |
| HEALTH INSURANCE | | | | |
| UMBRELLA INSURANCE | | | | |
| WORKMENS COMP | | | | |
| JANITORIAL EXPENSE | | | | |
| JANITORIAL MATERIALS | | | | |
| JANITORIAL SERVICES | | | | |
| LEGAL EXPENSE | | | | |
| EVICTION EXPENSE | | | | |
| LEGAL FEES | | | | |
| LICENSE | | | | |
| MAINTENANCE | | | | |
| CLEANING | | | | |
| AIR CONDITIONING | | | | |
| APPLIANCE REPAIRS | | | | |
| CARPENTRY MATERIALS | | | | |
| CARPENTRY WORK | | | | |
| CONCRETE AND BRICK WORK | | | | |
| DRAIN WORK | | | | |
| ELECTRIC MATERIALS | | | | |
| ELECTRIC WORK | | | | |
| ELEVATOR | | | | |
| EXTERMINATION | | | | |
| FIRE EXTINGUISHERS | | | | |
| FLOOR WORK | | | | |
| FLOOR/CARPET MAT | | | | |
| GLASS AND MIRRORS | | | | |
| HARDWARE | | | | |
| HARDWARE WORK | | | | |
| HEATING MATERIALS | | | | |
| HEATING WORK | | | | |
| IRON AND STEEL WORK | | | | |
| LANDSCAPING & EXTERIOR WK | | | | |
| MISCELLANEOUS MAINT | | | | |
| PAINT MATERIAL | | | | |
| PAINTING & PLASTER | | | | |
| PEST MAINTENANCE | | | | |
| PEST CONTROL | | | | |
| PLUMBING | | | | |
| PLUMBING MATERIAL | | | | |
| PREVENT MAINTENANCE | | | | |
| ROOF REPAIR & MAINTENANCE | | | | |
| ROOFING MATERIALS | | | | |
| SNOW REMOVAL | | | | |
| TRASH CLEANUP | | | | |
| VENETIAN BLINDS | | | | |
| MANAGEMENT EXPENSE | | | | |
| MANAGEMENT FEE | | | | |
| MISCELLANEOUS EXP | | | | |
| SALARY MANAGER | | | | |
| OFFICE EXPENSE | | | | |
| ADMINISTRATION EXP | | | | |
| OFFICE EXPENSE | | | | |
| OFFICE SUPPLIES | | | | |
| POSTAGE | | | | |
| PAYROLL TAXES | | | | |
| MISC PAYROLL TAXES | | | | |
| TAX FEDERAL UNEMPLOYMNT | | | | |
| TAX FEDERAL WITHHOLDING | | | | |
| TAX MARYLAND UNEMPLOY | | | | |
| TAX MARYLAND WITHHOLDING | | | | |
| TAX MEDICARE EMPLOYER | | | | |
| TAX MEDICARE | | | | |
| TAX SOCIAL SEC EMPLOYER | | | | |
| TAX SOCIAL SECURITY | | | | |
| PROFESSIONAL SERVICE | | | | |
| SALARIES | | | | |
| TAXES | | | | |
| TAX INCOME | | | | |
| TAX MISCELLANEOUS | | | | |
| TAX NUISANCE | | | | |
| TAX PERSONAL | | | | |
| TAX PROPERTY | | | | |
| TAX SPECIAL ASSESS | | | | |
| TRASH COLLECTION | | | | |
| UTILITIES | | | | |
| ELECTRICITY | | | | |
| FUEL OIL | | | | |
| GAS | | | | |
| PHONE | | | | |
| WATER & SEWER | | | | |
| WAGES | | | | |
| OPERATING EXPENSE | | | | |
| OPERATING PROFIT | | | | |
| INTEREST | | | | |
| INTEREST 1ST | | | | |
| INTEREST 2ND | | | | |
| INTEREST EXPENSE | | | | |
| NET OPERATING PROFIT | | | | |
| AUTO LOAN | | | | |
| BANK LOAN | | | | |
| DEPOSIT REFUND | | | | |
| INTER-COMPANY LOAN | | | | |
| INTER-COMPANY LOAN-AN | | | | |
| OWNER WITHDRAWALS | | | | |
| PRINCIPLE 1ST | | | | |
| PRINCIPLE 2ND | | | | |
| REFUND | | | | |
| SURPRISE | | | | |
| TRANSFER | | | | |
| NEW OP INC & EXP | | | | |
| NET CASH FLOW | | | | |

03276

Inc & ... Statement
1521 E STREE... S.E.    1521

Period: MAR 2019
Page: 2

| | December DEC 1 18 to DEC 31 18 | Year-to-Date JAN 1 18 to DEC 31 18 2018 | | | December DEC 1 18 to DEC 31 18 | Year-to-Date JAN 18 to DEC 31 18 2018 |
|---|---|---|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | SALARY MANAGER | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 0.00 | 355.00 | | | | |
| RENT | 1,991.00 | 370.00 | OFFICE EXPENSE | | | |
| OPERATING INCOME | 1,991.00 | 59,077.00 | ADMINISTRATION EXP | 0.00 | 0.00 | |
| | | 59,477.00 | OFFICE EXPENSE | 0.00 | 0.00 | 0.00 |
| | | | OFFICE SUPPLIES | 0.00 | 0.00 | |
| ACCOUNTING | 0.00 | 0.00 | POSTAGE | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | | | | |
| ALARM | 0.00 | 0.00 | PAYROLL TAXES | | | |
| ANNUAL REPORT | 0.00 | 0.00 | MISC PAYROLL TAXES | 0.00 | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 0.00 | TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 | TAX FEDERAL WITHOLDING | 0.00 | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 | TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | TAX MARYLAND WITHOLDING | 0.00 | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 | TAX MEDICARE EMPLOYER | 0.00 | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 | TAX MEDICARE | 0.00 | 0.00 | 0.00 |
| CONTRACT LABOR | 0.00 | 0.00 | TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| | | | TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| INSURANCE | | | | | | |
| BOILER INSURANCE | 0.00 | 1,300.50 | PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 0.00 | SALARIES | 0.00 | 0.00 | 0.00 |
| HEALTH INSURANCE | 0.00 | 0.00 | TAXES | | | |
| MISCELLANEOUS | 0.00 | 551.75 | TAX INCOME | 0.00 | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 1,852.25 | TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| WORKMENS COMP | | | TAX NJSE... | 0.00 | 0.00 | 0.00 |
| | | | TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| JANITORIAL EXPENSE | | | TAX PROPERTY | 0.00 | 0.00 | 0.00 |
| JANITORIAL MATERIALS | 0.00 | 0.00 | TAX SPECIAL ASSESS | 0.00 | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 150.00 | | | | |
| | | 150.00 | TRASH COLLECTION | 0.00 | 0.00 | 0.00 |
| LEGAL EXPENSE | | | UTILITIES | | | |
| EVICTION EXPENSE | 0.00 | 882.40 | ELECTRICITY | 0.00 | 324.67 | 3,302.25 |
| LEGAL FEES | 0.00 | 0.00 | FUEL OIL | 0.00 | 0.00 | 3,337.24 |
| | | 882.40 | GAS | 0.00 | 0.00 | |
| | | | PHONE | 0.00 | 0.00 | |
| LICENSE | 0.00 | 0.00 | WATER & SEWER | 1,223.54 | 2,282.56 | 2,697.33 |
| MAINTENANCE | | 0.00 | | | | 0.00 |
| CLEANING | 0.00 | | WAGES | 1,223.54 | | 26,170.55 |
| | | | OPERATING EXPENSE | 1,878.44 | | 24,090.17 |
| AIR CONDITIONING | 0.00 | 1,260.03 | OPERATING PROFIT | 82.34 | | 0.00 |
| APPLIANCE REPAIRS | 0.00 | 1,493.64 | INTEREST | 0.00 | | |
| CARPENTRY MATERIALS | 0.00 | 1,740.00 | INTEREST 1ST | 0.00 | | 24,090.17 |
| CARPENTRY WORK | 0.00 | 204.84 | INTEREST 2ND | 0.00 | | |
| CONCRETE AND BRICK WORK | | 600.00 | INTEREST EXPENSE | 0.00 | | 0.00 |
| DRAIN WORK | 0.00 | 0.00 | NET OPERATING PROFIT | 82.34 | | 24,090.17 |
| ELECTRIC MATERIALS | 0.00 | 1,543.03 | AUTO LOAN | 0.00 | | |
| ELECTRIC WORK | 0.00 | 700.00 | DEPOSIT REFUND | 0.00 | | |
| ELEVATOR | 0.00 | 1,074.52 | INTER-COMPANY LOAN | 0.00 | | |
| EXTERMINATING | 0.00 | 0.00 | INTER-COMPANY LOAN-M | 0.00 | | |
| FIRE EXTINGUISHERS | 0.00 | 59.52 | OWNERS WITHDRAWLS | 0.00 | | |
| FLOOR WORK | 0.00 | 480.00 | PRINCIPLE 1ST | 0.00 | | |
| FLOORING MAT | 0.00 | 878.07 | PRINCIPLE 2ND | 0.00 | | |
| GLASS AND MIRRORS | 0.00 | 0.00 | REFUND | 0.00 | | |
| HARDWARE | 0.00 | 0.00 | SUSPENSE | 0.00 | | |
| HARDWARE WORK | 0.00 | 0.00 | TRANSFER | 0.00 | | |
| HEATING MATERIALS | 0.00 | 0.00 | NON OP CF & EXP | 0.00 | 82.34 | 0.00 |
| HEATING WORK | 0.00 | | NET CASH FLOW | 82.34 | | 24,090.17 |
| IRON AND STEEL WORK | 0.00 | | | | | |
| LANDSCAPE & EXTERIOR WK | 0.00 | | | | | |
| MISCELLANEOUS MAINT | 0.00 | | | | | |
| PAINT MATERIAL | 0.00 | | | | | |
| PAINTING & PLASTER | 0.00 | | | | | |
| PEST MAINTENANCE | 0.00 | | | | | |
| PEST CONTROL | 0.00 | | | | | |
| PLUMBING | 0.00 | | | | | |
| PLUMBING MATERIAL | 0.00 | | | | | |
| PREVENT MAINTENANCE | 0.00 | | | | | |
| ROOF REPAIR & MAINTENANCE | 0.00 | 0.00 | | | | |
| ROOFING MATERIALS | 0.00 | 0.00 | | | | |
| SNOW REMOVAL | 0.00 | 0.00 | | | | |
| TRASH CLEAN-UP | 150.00 | 300.45 | 11,963.86 | | | |
| VENETIAN BLINDS | | | | | | |
| MANAGEMENT EXPENSE | | | | | | |
| MANAGEMENT FEE | 150.00 | 0.00 | | | | |
| MISCELLANEOUS EXP | | 0.00 | | | | |

03227

Inc & Exp Statement

5401 - 17TH STREET, N.W.                                    5401

Printed:   MAR 2019
Page:      2

| | December DEC 1 18 to DEC 31 18 | Year-to-Date 2018 JAN 1 18 to DEC 31 18 |
|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 0.00 | 580.00 |
| RENT | 50.00 | 2,412.17 |
| | 13,326.00 | 217,507.83 |
| OPERATING INCOME | 13,369.09 | 220,499.00 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| ALARM | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 0.00 |
| AUTO REPAIRS | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| INSURANCE | | |
| BOILER INSURANCE | 474.00 | 474.00 |
| FIRE/LIABILITY | 0.00 | 3,596.00 |
| HEALTH INSURANCE | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 |
| UMBRELLA INSURANCE | | |
| WORKMANS COMP | 0.00 | 1,400.00 |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 700.00 |
| LEGAL EXPENSE | | |
| EVICTION EXPENSE | 0.00 | 0.00 |
| LEGAL FEES | 0.00 | 1,413.22 |
| LICENSE | 0.00 | 0.00 |
| MAINTENACE | 0.00 | 2,500.00 |
| CLEANING | 0.00 | 0.00 |
| AIR CONDITIONING | 628.96 | 1,504.51 |
| APPLIANCE REPAIRS | 0.00 | 4,916.87 |
| CARPENTRY MATERIALS | 450.00 | 5,590.02 |
| CONCRETE AND BRICK WORK | 0.00 | 0.00 |
| DRAIN WORK | 140.00 | 940.00 |
| ELECTRICAL MATERIALS | 0.00 | 4,883.10 |
| ELECTRIC WORK | 360.00 | 7,437.85 |
| ELEVATOR | 0.00 | 0.00 |
| EXTERMINATION | 0.00 | 0.00 |
| FIRE EXTINGUISHERS | 0.00 | 10,333.22 |
| FLOOR WORK | 610.00 | 2,092.00 |
| FLOORING MAT | 0.00 | 2,094.56 |
| GLASS AND MIRRORS | 330.00 | 778.42 |
| HARDWARE | 480.00 | 2,849.66 |
| HARDWARE WORK | 0.00 | 0.00 |
| HEATING MATERIALS | 0.00 | 1,310.00 |
| HEATING WORK | 0.00 | 0.00 |
| IRON AND STEEL WORK | 0.00 | 0.00 |
| LANDSCAPE & EXTERIOR WK | 0.00 | 1,200.00 |
| MISCELLANEOUS MAINT | 0.00 | 1,320.00 |
| PAINT MATERIAL | 2,286.00 | 10,345.80 |
| PAINTING & PLASTER | 0.00 | 0.00 |
| PAST MAINTENANCE | 0.00 | 1,747.62 |
| PEST CONTROL | 480.00 | 7,560.00 |
| PLUMBING | 0.00 | 0.00 |
| PLUMBING MATERIALS | 0.00 | 0.00 |
| PREVENT MAINTENANCE | 0.00 | 1,250.00 |
| ROOF REPAIR & MAINTENANCE | 0.00 | 0.00 |
| ROOFING MATERIALS | 0.00 | 0.00 |
| SNOW REMOVAL | 0.00 | 0.00 |
| TRASH CLEANUP | 0.00 | 1,888.65 |
| VENETIAN BLINDS | 0.00 | 0.00 |
| MANAGEMENT EXPENSE | | |
| MANAGEMENT FEE | 0.00 | 0.00 |
| MISCELLANEOUS EXP | 3,398.96 | 79,818.88 |

| | December DEC 1 18 to DEC 31 18 | Year-to-Date 2018 JAN 1 18 to DEC 31 18 |
|---|---|---|
| SALARY MANAGER | 0.00 | 0.00 |
| OFFICE EXPENSE | | |
| ADMINISTRATION EXP | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 0.00 |
| POSTAGE | 0.00 | 0.00 |
| PAYROLL TAXES | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 |
| TAX MARYLAND WITHOLDING | 0.00 | 0.00 |
| TAX MEDICAL EMPLOYER | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 |
| SALARIES | 0.00 | 0.00 |
| TAXES | | |
| TAX INCOME | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 15,572.10 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 |
| TRASH COLLECTION | 0.00 | 15,572.10 |
| UTILITIES | | |
| ELECTRICITY | 1,940.00 | 7,654.44 |
| FUEL OIL | 0.00 | 84.53 |
| GAS | 3,266.89 | 9,464.38 |
| PHONE | 0.00 | 58.16 |
| WATER & SEWER | 2,004.59 | 12,199.90 |
| WAGES | 0.00 | 0.00 |
| OPERATING EXPENSE | 3,590.48 | 23,003.35 |
| OPERATING PROFIT | 170.00 | 104,679.24 |
| INTEREST | | |
| INTEREST 1ST | 13,753.44 | 63,541.69 |
| INTEREST 2ND | -344.44 | 0.00 |
| NET OPERATING PROFIT | 0.00 | 0.36 |
| AUTO LOAN | 0.00 | 43,841.09 |
| BANK LOAN | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| INTER-COMPANY CASH IN | 0.00 | 0.00 |
| OWNER WITHDRAWLS | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | -344.44 | 0.00 |
| NET CASH FLOW | -344.44 | 43,841.09 |

03228



TSINTOLAS REALTY COMPANY
Printed:  OCT 23 19
Page:  2

FLOWER HOUSE
8212

Inc & Exp Statement

FLOWER HOUSE
8212

| | December<br>DEC 1.18 to DEC 31.18 | Year-to-Date<br>JAN 1.18 to DEC 31.18 2018 | | | December<br>DEC 1.18 to DEC 31.18 | Year-to-Date<br>JAN 1.18 to DEC 31.18 2018 |
|---|---|---|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | | | | |
| MISCELLANEOUS INCOME | 79.75 | 556.50 | | | | |
| RENT | 568.83 | 7,000.02 | | | | |
| OPERATING INCOME | 9,900.17 | 146,540.73 | VENETIAN BLINDS | 360.00 | 300.00 | 55,603.15 |
| | 10,543.75 | 157,217.25 | | | | |
| | | | MANAGEMENT EXPENSE | 0.00 | 0.00 | 0.00 |
| ACCOUNTING | 0.00 | 0.00 | MANAGEMENT FEE | 0.00 | 75.01 | |
| ADVERTISING | 0.00 | 0.00 | MISCELLANEOUS EXP | 0.00 | 0.00 | 73.01 |
| ALARM | 0.00 | 0.00 | SALARY MANAGER | | | |
| ANNUAL REPORT | 0.00 | 0.00 | | | | |
| APPLIANCE PARTS | 0.00 | 0.00 | OFFICE EXPENSE | 0.00 | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 | ADMINISTRATION EXP | 0.00 | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 | OFFICE EXPENSE | 0.00 | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 | OFFICE SUPPLIES | 0.00 | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 | POSTAGE | 0.00 | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 | | | | |
| CONDOMINIUM FEE | 0.00 | 0.00 | PAYROLL TAXES | | | |
| CONTRIBUTIONS | 0.00 | 0.00 | ADD'L PAYROLL TAXES | 0.00 | 0.00 | 0.00 |
| | | | TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | 0.00 |
| INSURANCE | | | TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | 0.00 |
| BOILER INSURANCE | 500.00 | 500.00 | TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 4,500.00 | TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | 0.00 |
| HEALTH INSURANCE | 0.00 | 0.00 | TAX MEDICARE | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 | TAX MEDICAL EMPLOYER | | | |
| UMBRELLA INSURANCE | 0.00 | 0.00 | TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | 0.00 |
| WORKMENS COMP | 0.00 | 0.00 | TAX PERSONAL | | | |
| | 500.00 | | TAX PROPERTY | | | |
| | | | TAX SOCIAL SECURITY | | | |
| JANITORIAL EXPENSE | 0.00 | 562.50 | | | | |
| JANITORIAL MATERIALS | 0.00 | 195.08 | PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 195.08 | SALARIES | | | |
| | | | | | | |
| LEGAL EXPENSE | 0.00 | 0.00 | TAXES | | | |
| EVICTION EXPENSE | 0.00 | 0.00 | TAX INCOME | 0.00 | 0.00 | 0.00 |
| LEGAL FEES | 0.00 | 2,206.00 | TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| | | 2,206.00 | TAX INSURANCE | 0.00 | 0.00 | 0.00 |
| LICENSE | 0.00 | 0.00 | TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| | | | TAX PROPERTY | 26,054.56 | 26,054.56 | 26,054.02 |
| MAINTENANCE | 210.00 | 1,170.00 | TAX SPECIAL ASSESS | 0.00 | 0.00 | 3,845.56 |
| CLEANING | 210.00 | 1,170.00 | | | | |
| | | | TRASH COLLECTION | | | |
| AIR CONDITIONING | 0.00 | 778.34 | | | | |
| APPLIANCE REPAIRS | 0.00 | 3,514.08 | UTILITIES | | | |
| CARPENTRY MATERIALS | 0.00 | 4,155.00 | ELECTRICITY | 643.96 | 2,738.19 | |
| CARPENTRY WORK | 1,935.00 | | FUEL | 0.00 | 0.00 | |
| CONCRETE AND BRICK WORK | 0.00 | | GAS | 708.05 | 2,206.42 | |
| DRAIN WORK | 505.00 | PHONE | 0.00 | 0.00 | 3,141.34 |
| ELECTRIC MATERIALS | 3,255.19 | WATER & SEWER | 1,761.83 | 9,105.64 | |
| ELECTRIC WORK | 315.00 | 3,120.49 | | 3,113.83 | 14,427.79 |
| ELEVATOR | 0.00 | WAGES | | | |
| EXTERMINATION | 0.00 | OPERATING EXPENSE | 78,144.05 | 108,348.35 |
| FIRE EXTINGUISHERS | 0.00 | 0.00 | OPERATING PROFIT | -9,282.33 | 44,921.45 |
| FLOOR WORK | 780.00 | 7,200.00 | | | | |
| FLOORING MAT | 1,570.00 | 1,883.02 | INTEREST | 0.00 | 0.00 | |
| GLASS AND MIRRORS | 560.00 | 2,151.19 | INTEREST 1ST | 0.00 | 0.00 | |
| HARDWARE | 0.00 | 532.70 | INTEREST 2ND | 0.00 | 0.00 | |
| HARDWARE WORK | 0.00 | 840.00 | | | | |
| HEATING MATERIALS | 0.00 | 0.00 | INTEREST EXPENSE | -9,282.33 | 44,921.45 |
| HEATING WORK | 0.00 | 4,056.92 | NET OPERATING PROFIT | 0.00 | | |
| IRON AND STEEL WORK | 0.00 | 0.00 | AUTO LOAN | 0.00 | 0.00 | |
| LANDSCAPE & EXTERIOR WK | 0.00 | 0.00 | BANK LOAN | 0.00 | 0.00 | |
| MISCELLANEOUS MAINT | 2,460.00 | 6,324.29 | DEPOSIT REFUND | 0.00 | 0.00 | |
| PAINT MATERIAL | 0.00 | 722.50 | INTER-COMPANY LOAN | 0.00 | 0.00 | |
| PAINTING & PLASTER | 3,660.00 | 7,450.00 | PRINCIPLE 1ST | 0.00 | 0.00 | |
| PAST MAINTENANCE | 2,380.00 | 2,280.00 | PRINCIPLE 2ND | 0.00 | 0.00 | |
| PEST CONTROL | 0.00 | 134.00 | REFUND | 0.00 | 0.00 | |
| PLUMBING | 460.00 | 4,581.69 | SUSPENSE | 0.00 | 0.00 | |
| PLUMBING MATERIAL | 32.47 | 668.25 | TRANSFER | 0.00 | 0.00 | |
| PREVENT MAINTENANCE | 0.00 | 0.00 | | | | |
| ROOF REPAIR & MAINTENANCE | 0.00 | 2,185.00 | NON OP INC & EXP | 0.00 | 0.00 | 0.00 |
| ROOFING MATERIALS | 0.00 | 170.19 | NET CASH FLOW | -9,282.33 | 44,921.45 |
| SNOW REMOVAL | 0.00 | 0.00 | | | | |
| TRASH CLEAN-UP | -498.62 | 625.62 | | | | |

03230

FYINEDC
Pag:
MAR 20 19

| | December | | | Year-to-Date 2018 | | |
|---|---|---|---|---|---|---|
| | Amount | %Compn | %Var | Amount | %Compn | %Var |
| TE & LEGAL FEES | .00 | .0% | .0% | 1,602.00 | .8% | .8% |
| CELLANEOUS INCOME | -306.50 | -6.4% | -6.4% | -66.50 | -.0% | -.0% |
| EST | 5,110.00 | 106.4% | 106.4% | 203,816.01 | 99.3% | 99.3% |
| | 4,803.50 | | | 205,351.53 | | |
| OPERAT...G INCOME | | | | | | |
| COUNTING | .00 | .0% | .0% | 1,330.00 * | .6% | .6% |
| LER INSURANCE | 106.26 | 1.0% | 2.2% | 1,934.26 | .9% | .9% |
| ...ABILITY | .00 | .0% | .0% | 9,853.01 * | 4.7% | 4.7% |
| CELLANEOUS INS | .00 | .0% | .0% | 3,371.50 | 1.6% | 1.6% |
| NITORIAL SERVICES | 750.00 | 7.2% | 15.6% | 750.00 * | .4% | .4% |
| CTION EXPENSE | .00 | .0% | .0% | 800.00 * | .4% | .4% |
| GAL FEES | 114.59 | 1.1% | 2.4% | 1,928.75 | .9% | .9% |
| EANING | 2,137.50 | 20.6% | 44.5% | 2,997.50 * | 1.5% | 1.5% |
| CONDITIONING | .00 | .0% | .0% | 790.00 * | .4% | .4% |
| PLIANCE REPAIRS | .00 | .0% | .0% | 5,327.98 * | 2.6% | 2.6% |
| PENTRY WORK | .00 | .0% | .0% | 1,400.00 * | .7% | .7% |
| PENTRY MATERIALS | 140.00 | 1.3% | 2.9% | 6,570.41 | 3.2% | 3.2% |
| AIN WORK | .00 | .0% | .0% | 815.00 * | .4% | .4% |
| ECTRIC WORK | .00 | .0% | .0% | 230.00 | .1% | .1% |
| ECTRIC MATERIALS | .00 | .0% | .0% | 669.86 | .3% | .3% |
| TERMINATION | .00 | .0% | .0% | 3,737.50 * | 1.8% | 1.8% |
| E EXTINGUISHERS | .00 | .0% | .0% | 330.00 | .1% | .1% |
| OOR WORK | .00 | .0% | .0% | 3,723.20 * | 1.8% | 1.8% |
| OORING MAT | .00 | .0% | .0% | 737.67 * | .4% | .4% |
| ASS AND MIRRORS | .00 | .0% | .0% | 442.02 * | .2% | .2% |
| RDWARE | -461.15 | .0% | 9.6% | 1,743.31 | .8% | .8% |
| KEYING WORK | .00 | .0% | .0% | 102.90 | .1% | .1% |
| N AND STEEL WORK | .00 | .0% | .0% | 1,200.00 * | .6% | .6% |
| INT MATERIAL | .00 | .0% | .0% | 800.29 | .4% | .4% |
| INTING & PLASTER | 2,040.00 | 19.6% | 42.5% | 27,120.00 * | 13.2% | 13.2% |
| ST CONTROL | .00 | .0% | .0% | 2,268.53 * | 1.1% | 1.1% |
| UMBING | .00 | .0% | .0% | 1,850.00 * | .9% | .9% |
| UMBING MATERIAL | 455.04 | 4.4% | 9.5% | 1,185.99 * | .6% | .6% |
| OF REPAIR & MAINTENANCE | .00 | .0% | .0% | 2,500.00 * | 1.2% | 1.2% |
| NAGEMENT FEE | .00 | .0% | .0% | 60,000.00 * | 29.2% | 29.2% |
| CELLANEOUS EXP | .00 | .0% | .0% | 100.00 * | .0% | .0% |
| X INCOME | .00 | .0% | .0% | 250.00 | .1% | .1% |
| PROPERTY | .00 | .0% | .0% | 10,144.58 * | 4.9% | 4.9% |
| ASH COLLECTION | 650.25 | 8.3% | 13.5% | 4,536.04 * | 2.2% | 2.2% |
| ECTRICITY | 312.73 | 3.0% | 6.5% | 2,863.79 | 1.3% | 1.3% |
| S | 1,278.40 | 12.3% | 26.6% | 10,960.97 * | 5.3% | 5.3% |
| TER & SEWER | 59.67 | .6% | 1.2% | 561.89 * | .3% | .3% |
| | 1,882.33 | 18.2% | 39.4% | 29,747.54 * | 14.5% | 14.5% |
| OPERATING EXPENSE | 10,388.33 | | | 205,759.45 | | |
| OPERATING PROFIT | -5,584.88 | | | -407.98 | | |

03231

03256



Inc & Exp Statement
0810 KENNEDY STREET NW

Printed: MAR 20 20
Page: 1 / 2

| Item | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 2019 |
|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 0.00 | 180.00 |
| RENT | 11,232.00 | 160,866.00 |
| OPERATING INCOME | 11,232.00 | 161,046.00 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| ALARM & SECURITY | 0.00 | 0.00 |
| ANNUAL REPORT | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 518.00 |
| AUTO EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| DEFERRED COMPENSATION | | |
| INSURANCE | | |
| BOILER INSURANCE | 0.00 | 948.00 |
| HEALTH INSURANCE | 0.00 | 3,540.00 |
| MISCELLANEOUS INS | 0.00 | 0.00 |
| UMBRELLA INSURANCE | 0.00 | 0.00 |
| WORKMANS COMP | 0.00 | 450.00 |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 |
| JANITORIAL SERVICES | 0.00 | 4,898.00 |
| LEASING EXPENSE | | |
| EVICTION EXPENSE | 0.00 | 0.00 |
| LEGAL FEES | 0.00 | 828.98 |
| LICENSE | | 1,593.20 |
| LITIGATION RELATED EXP | 0.00 | 0.00 |
| MAINTENANCE | | |
| CLEANING | 180.00 | 2,555.00 |
| AIR CONDITIONING | 1,366.70 | 4,185.24 |
| ADVANCE REPAIRS | 0.00 | 383.84 |
| CARPENTRY MATERIALS | 0.00 | 2,390.00 |
| CARPENTRY WORK | 0.00 | 0.00 |
| CONCRETE AND BRICK WORK | 180.00 | 1,150.00 |
| DEMOLITION | 0.00 | 273.44 |
| DRAIN WORK | 420.00 | 4,422.00 |
| ELECTRIC MATERIALS | 0.00 | 0.00 |
| ELECTRIC WORK | 0.00 | 0.00 |
| ELEVATOR | 0.00 | 0.00 |
| ENVIRONMENTAL TESTING | 0.00 | 175.00 |
| EXTERMINATION | 180.00 | 2,060.00 |
| FIRE EXTINGUISHERS | 0.00 | 179.14 |
| FLOOR WORK | 240.00 | 1,040.00 |
| FLOORING MAT | 0.00 | 0.00 |
| GLASS AND MIRRORS | 480.00 | 2,423.00 |
| HARDWARE | 0.00 | 0.00 |
| HARDWARE WORK | 0.00 | 0.00 |
| HEATING MATERIALS | 0.00 | 1,050.00 |
| HEATING WORK | 0.00 | 0.00 |
| IRON AND STEEL WORK | 0.00 | 3,500.00 |
| LANDSCAPE & EXTERIOR WK | 720.00 | 8,760.00 |
| MISCELLANEOUS MAINT | 0.00 | 0.00 |
| PAINT MATERIAL | 0.00 | 560.11 |
| PAINTING & PLASTER | 0.00 | 0.00 |
| ROOFING MAINTENANCE | | |
| PEST CONTROL | 1,620.00 | 9,310.00 |
| PLUMBING | 0.00 | 585.32 |
| PLUMBING MATERIAL | | |

| Item | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 2019 |
|---|---|---|
| PRESENT MAINTENANCE | | |
| ROOF REPAIR & MAINTENANCE | 315.00 | 430.00 |
| ROOFING MATERIALS | 0.00 | 0.00 |
| SNOW REMOVAL | 0.00 | 0.00 |
| TRASH CLEAN-UP | 0.00 | 0.00 |
| VENETIAN BLINDS | 0.00 | 320.00 |
| MANAGEMENT EXPENSE | | |
| MANAGEMENT FEE | 3,753.70 | 45,287.15 |
| MISCELLANEOUS EXP | | 84.33 |
| SALARY MANAGER | | 85.33 |
| OFFICE EXPENSE | | |
| ADMINISTRATION EXP | 0.00 | 0.00 |
| OFFICE EXPENSE | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 0.00 |
| POSTAGE | 0.00 | 0.00 |
| PAYROLL TAXES | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 |
| TAX MARYLAND WITHOLDING | 0.00 | 0.00 |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 |
| TAX MEDICARE | 0.00 | 0.00 |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 |
| TAX SOCIAL SECURITY | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | | |
| SALARIES | | |
| TAXES | | |
| TAX INCOME | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 |
| TAX INSURANCE | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 |
| TAX PROPERTY | 13,690.00 | 13,690.02 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 |
| TRASH COLLECTION | 1,094.14 | 6,578.15 |
| UTILITIES | | |
| ELECTRICITY | 0.00 | 857.88 |
| FUEL OIL | 0.00 | 0.00 |
| GAS | 902.10 | 2,460.98 |
| PHONE | 0.00 | 0.00 |
| WATER & SEWER | 1,528.30 | 11,142.24 |
| WAGES | | |
| OPERATING EXPENSE | 2,451.40 | 84,636.34 |
| OPERATING PROFIT | 1,782.76 | 61,209.69 |
| INTEREST | | |
| INTEREST 1ST | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 |
| NET EXTRORDINARY | 0.00 | 0.00 |
| NET OPERATING PROFIT | 1,792.76 | 61,209.69 |
| AUTO LOAN | 0.00 | 0.00 |
| BANK LOAN | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 |
| INTER-COMPANY LOAN-HN | 0.00 | 0.00 |
| OWNER WITHDRAWALS | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 |
| NET CASH FLOW | 1,792.76 | 61,209.69 |

Inc & Exp Statement

829 ROCK CREEK CHURCH ROAD, N.W.

| | December DEC 1 19 to: DEC 31 19 | Year-to-Date JAN 1 19 to: DEC 31 19 |
|---|---|---|
| LATE & LEGAL FEES | | |
| MISCELLANEOUS INCOME | | |
| RENT | | |
| OPERATING INCOME | 2,050.00 | 2,050.00 |
| ACCOUNTING | 0.00 | 0.00 |
| ADVERTISING | 0.00 | 0.00 |
| ALARM & SECURITY | 180.00 | |
| ANNUAL REPORT | 0.00 | 0.00 |
| APPLIANCE PARTS | 0.00 | 0.00 |
| AUTO EXPENSE | 0.00 | 0.00 |
| AUTO INSURANCE | 0.00 | 0.00 |
| GAS AND OIL | 0.00 | 0.00 |
| BANK CHARGE | 0.00 | 0.00 |
| CARPETING | 0.00 | 0.00 |
| CONDOMINIUM FEE | 0.00 | 0.00 |
| CONTRIBUTIONS | 0.00 | 0.00 |
| DEFERRED COMPENSATION | 0.00 | 0.00 |
| INSURANCE | | |
| BOILER INSURANCE | 0.00 | 0.00 |
| FIRE/LIABILITY | 0.00 | 2,400.00 |
| HEALTH INSURANCE | | |
| MISCELLANEOUS INS | | |
| UMBRELLA INSURANCE | | |
| WORKMENS COMP | 200.00 | |
| JANITORIAL EXPENSE | | |
| JANITORIAL MATERIALS | | |
| JANITORIAL SERVICES | 0.00 | 0.00 |
| LEASING EXPENSE | | |
| LEGAL EXPENSE | | |
| EVICTION EXPENSE | 0.00 | 0.00 |
| LEGAL FEES | 0.00 | 0.00 |
| LICENSE | | |
| LITIGATION RELATED EXP | | |
| MAINTENANCE | | |
| CLEANING | 0.00 | 700.00 |
| AIR CONDITIONING | | |
| APPLIANCE REPAIRS | 875.90 | |
| CARPENTRY REPAIRS | 433.61 | |
| CARPENTRY MATERIALS | 100.00 | 2,620.00 |
| CONCRETE AND BRICK WORK | | |
| DEMOLITION | 0.00 | 0.00 |
| DRAIN WORK | 200.00 | 200.00 |
| ELECTRIC MATERIALS | 1,830.00 | |
| ELECTRIC WORK | 0.00 | 0.00 |
| ELEVATOR | 0.00 | 0.00 |
| ENVIRONMENTAL TESTING | 0.00 | 0.00 |
| EXTERMINATING | 0.00 | 0.00 |
| FIRE EXTINGUISHERS | 59.36 | 59.36 |
| FLOOR WORK | 0.00 | 1,350.00 |
| FLOORING MAT | 0.00 | 0.00 |
| GLASS AND MIRRORS | 150.00 | 150.00 |
| HARDWARE | 0.00 | 42.37 |
| HARDWARE WORK | 385.00 | 1,090.00 |
| HEATING MATERIALS | 0.00 | 0.00 |
| HEATING WORK | 0.00 | 489.80 |
| IRON AND STEEL WORK | 0.00 | 1,175.00 |
| LANDSCAPE & EXTERIOR WK | 240.00 | 240.00 |
| MISCELLANEOUS MAINT | 270.00 | 3,010.00 |
| PAINT MATERIAL | 0.00 | 0.00 |
| PAINTING & PLASTER | 0.00 | 5,040.00 |
| PAST MAINTENANCE | 0.00 | 14,551.00 |
| PEST CONTROL | 270.00 | 3,350.00 |
| PLUMBING | 0.00 | 183.85 |
| PLUMBING MATERIAL | | |



**Inc & Exp Statement — 1521 E STREET, S.E.**

LATE & LEGAL FEES
MISCELLANEOUS INCOME
RENT
OPERATING INCOME

ACCOUNTING
ADVERTISING
ALARM SECURITY
ANNUAL REPORT
APPLIANCE PARTS
AUTO EXPENSE
AUTO INSURANCE
GAS AND OIL
BANK CHARGE
CARPETING
CONDOMINIUM FEE
CONTRIBUTIONS
DEFERRED COMPENSATION
INSURANCE
BOILER INSURANCE
FIRE/LIABILITY
HEALTH INSURANCE
MISCELLANEOUS INS
UMBRELLA INSURANCE
WORKMANS COMP
JANITORIAL EXPENSE
JANITORIAL MATERIALS
JANITORIAL SERVICES
LEASING EXPENSE
LEGAL EXPENSE
EVICTION EXPENSE
LEGAL FEES
LICENSE
LITIGATION RELATED EXP
MAINTENANCE
CLEANING
AIR CONDITIONING
APPLIANCE REPAIRS
CARPENTRY MATERIALS
CARPENTRY WORK
CONCRETE AND BRICK WORK
DEMOLITION
DRAIN CLEANING
ELECTRIC MATERIALS
ELECTRIC WORK
ELEVATOR
ENVIRONMENTAL TESTING
EXTERMINATION
FIRE EXTINGUISHERS
FLOOR WORK
FLOOR MAT
GLASS AND MIRRORS
HARDWARE
HARDWARE WORK
HEATING MATERIALS
HEATING WORK
IRON AND STEEL WORK
LANDSCAPE & EXTERIOR WK
MISCELLANEOUS MAINT
PAINT MATERIAL
PAINTING & PLASTER
PEST CONTROL
PLUMBING
PLUMBING MATERIAL
PREVENT MAINTENANCE
ROOF REPAIR & MAINTENANCE
ROOFING MATERIALS
SNOW REMOVAL
TRASH CLEANUP
VENETIAN BLINDS
MANAGEMENT EXPENSE
MANAGEMENT FEE
MISCELLANEOUS EXP
SALARY MANAGER
OFFICE EXPENSE
ADMINISTRATION EXP
OFFICE EXPENSE
OFFICE SUPPLIES
POSTAGE
PAYROLL TAXES
MISC PAYROLL TAXES
TAX FEDERAL UNEMPLOYMENT
TAX FEDERAL WITHHOLDING
TAX MARYLAND UNEMPLOY
TAX MARYLAND WITHHOLDING
TAX MEDICARE EMPLOYER
TAX MEDICARE
TAX SOCIAL SEC EMPLOYER
TAX SOCIAL SECURITY
PROFESSIONAL SERVICE
SALARIES
TAXES
TAX INCOME
TAX MISCELLANEOUS
TAX NUISANCE
TAX PERSONAL
TAX PRI PRPTY
TAX SPECIAL ASSESS
TRASH COLLECTION
UTILITIES
ELECTRICITY
FUEL OIL
GAS
PHONE
WATER & SEWER
WAGES
OPERATING EXPENSE
OPERATING PROFIT
INTEREST
INTEREST 1ST
INTEREST 2nD
INTEREST EXPENSE
NET OPERATING PROFIT
AUTO LOAN
BANK LOAN
DEPOSIT REFUND
INTERCOMPANY LOAN
INTERCOMPANY LOAN/AN
OWNERS WITHDRAWALS
PRINCIPLE 1ST
PRINCIPLE 2ND
REFUND
SUSPENSE
TRANSFER
NOI OP & EXP
NET CASH FLOW

Inc & Exp Statement

Printed: MAR 20 20
Page: 1

5400 - 7TH STREET, N.W.
5401

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | 0.00 | 782.75 | |
| RENT | 14,896.60 | 315.36 | |
| OPERATING INCOME | 14,896.60 | 228,657.24 | 228,972.76 |
| ACCOUNTING | 0.00 | 0.00 | 0.00 |
| ADVERTISING | 120.00 | 120.00* | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| ALARM & SECURITY | 0.00 | 6.00 | |
| APPLIANCE REPAIRS | 0.00 | 244.60 | |
| AUTO EXPENSE | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CARPETING | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 2,065.27* | |
| CONTRIBUTIONS | 0.00 | 0.00 | |
| DEFERRED COMPENSATION | 0.00 | 0.00 | |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 800.00 | |
| FIRE INSURANCE/LIABILITY | 0.00 | 6,850.00 | |
| HEALTH INSURANCE | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 0.00 | |
| UMBRELLA INSURANCE | 0.00 | 0.00 | |
| WORKMENS COMP | 0.00 | 945.50 | 7,825.00* |
| JANITORIAL EXPENSE | | | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | |
| JANITORIAL SERVICES | 240.00 | 240.00* | 240.00 |
| LEASING EXPENSE | 0.00 | 0.00 | |
| LEGAL EXPENSE | | | |
| EVICTION EXPENSE | 0.00 | 180.00 | |
| LEGAL FEES | 336.67 | 1,043.24 | 1,223.24* |
| LICENSE | 335.67 | 315.24* | |
| LITIGATION RELATED EXP | | 0.00 | 0.00 |
| MAINTENANCE | | | |
| CLEAN-UP | 1,460.00 | 1,830.00 | 1,830.00 |
| AIR CONDITIONING | 300.00 | 600.00 | 600.00 |
| APPLIANCE REPAIRS | 198.58 | 3,251.72* | |
| CARPENTRY MATERIALS | 378.00 | 1,786.35* | |
| CARPENTRY WORK | 0.00 | 5,675.00* | |
| CONCRETE AND BRICK WORK | 1,200.00 | 419.35* | |
| DEMOLITION | 285.00 | 1,000.00* | |
| DRAIN WORK | 0.00 | 1,617.33* | |
| ELECTRIC MATERIALS | 2,033.00 | 7,471.00* | |
| ELECTRIC WORK | 0.00 | 0.00 | |
| ELEVATOR | 0.00 | 300.00 | |
| ENVIRONMENTAL TESTING | 0.00 | 188.00* | |
| EXTERMINATION | 0.00 | 1,080.00* | |
| FIRE EXTINGUISHERS | 0.00 | 604.00* | |
| FLOOR WORK | 0.00 | 605.53* | |
| FLOORING MAT | 0.00 | 1,450.00* | |
| GLASS AND MIRRORS | 0.00 | 0.00 | |
| HARDWARE | 0.00 | 1,826.50* | |
| HARDWARE WORK | 0.00 | 0.00 | |
| HEATING MATERIALS | 450.00 | 5,932.00* | |
| HEATING WORK | 207.25 | 3,335.27* | |
| IRON AND STEEL WORK | 6,600.00 | 17,070.00* | |
| LANDSCAPE & EXTERIOR WK | 0.00 | 1,070.00* | |
| MISCELLANEOUS MAINT | 0.00 | 844.72 | |
| PAINT MATERIAL | 847.69 | 11,075.63* | |
| PAINTING & PLASTER | 12.23 | 1,416.64 | |
| PAST MAINTENANCE | | | |
| PEST CONTROL | | | |
| PLUMBING MAT | | | |
| PLUMBING MATERIAL | | | |

Printed: MAR 20 20
Page: 2

5400 - 7TH STREET, N.W.
5401

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 |
|---|---|---|---|
| PREVENT MAINTENANCE | 0.00 | 0.00 | 0.00 |
| ROOF REPAIR & MAINTENANCE | 0.00 | 24.00 | |
| ROOFING MATERIALS | 0.00 | 0.00 | |
| SNOW REMOVAL | 0.00 | 100.00 | |
| TRASH CLEAN-UP | 0.00 | 0.00 | |
| VENETIAN BLINDS | 0.00 | 405.24 | |
| MANAGEMENT EXPENSE | | | 71,133.38 |
| MANAGEMENT FEE | 0.00 | 0.00 | |
| MISCELLANEOUS EXP | 180.00 | +30.00 | |
| SALARY MANAGER | 180.00 | 430.00 | 430.00 |
| OFFICE EXPENSE | | | |
| ADMINISTRATION EXP | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | 0.00 |
| PAYROLL TAXES | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| TAX FEDERAL WITHHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHHOLDING | 0.00 | 0.00 | |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 | |
| SALARIES | 0.00 | 0.00 | |
| TAXES | | | |
| TAX INCOME | 0.00 | 135.00 | |
| TAX MISCELLANEOUS | 0.00 | 135.00 | |
| TAX INSURANCE | 0.00 | 0.00 | |
| TAX PERSONAL | 0.00 | 266.70 | |
| TAX PROPERTY | 16,420.32 | 13,704.15 | 16,555.32 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 | 7,424.29 |
| TRASH COLLECTION | 1,824.42 | | |
| UTILITIES | | | |
| ELECTRICITY | 0.00 | 1,589.45 | |
| FUEL OIL | 0.00 | 0.00 | |
| GAS | 4,797.76 | 8,593.87 | |
| PHONE | 0.00 | 0.00 | |
| WATER & SEWER | 2,264.10 | 3,521.13 | |
| WAGES | 7,061.86 | | 25,04.23 |
| OPERATING EXPENSE | 0.00 | | 136,481.53 |
| OPERATING PROFIT | -8,896.21 | | 92,271.23 |
| INTEREST | | | |
| INTEREST 1ST | 0.00 | 0.00 | |
| INTEREST 2ND | 0.00 | 0.00 | |
| INTEREST EXPENSE | 0.00 | 0.00 | 0.00 |
| NET OPERATING PROFIT | -8,896.31 | | 92,271.23 |
| AUTO LOAN | 0.00 | 0.00 | |
| BANK LOAN | 0.00 | 0.00 | |
| DEPOSIT REFUND | 0.00 | 0.00 | |
| INTER-COMPANY LOAN | 0.00 | 0.00 | |
| INTER-COMPANY LOAN/H | 0.00 | 0.00 | |
| OWNERS WITHDRAWALS | 0.00 | 0.00 | |
| PRINCIPLE 1ST | 0.00 | 0.00 | |
| PRINCIPLE 2ND | 0.00 | 0.00 | |
| REFUND | 0.00 | 0.00 | |
| SURPRISE | 0.00 | 0.00 | |
| TRANSFER | 0.00 | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 | |
| NET CASH FLOW | -8,896.31 | | 92,271.23 |

TSINTOLAS REALTY COMPANY

Printed:
Page: 1

| Account | December $ | Year-to-Date MAR 20 20 / 2019 $ |
|---|---|---|
| LATE & LEGAL FEES | 125.00 | 2,405.01 |
| MISCELLANEOUS INCOME | .00 | 1,410.00 |
| RENT | 8,320.00 | 249,797.51 |
| OPERATING INCOME | 8,445.00 | 253,612.52 |
| ACCOUNTING | .00 | 1,200.00 |
| ALARM & SECURITY | .00 | 900.00 |
| ANNUAL REPORT | .00 | 900.00 |
| APPLIANCE PARTS | .00 | 803.67 |
| BOILER INSURANCE | .00 | 1,974.00 |
| FIRE/LIABILITY | .00 | 8,772.24 |
| MISCELLANEOUS INS | 308.60 | 5,612.50 |
| WORKMENS COMP | .00 | 338.25 |
| JANITORIAL SERVICES | 750.00 | 920.00 |
| EVICTION EXPENSE | .00 | 420.00 |
| LEGAL FEES | .00 | 6,898.30 |
| LICENSE | .00 | 3,266.30 |
| LITIGATION RELATED EXP | 3,130.00 | 6,130.00 |
| CLEANING | .00 | 582.30 |
| AIR CONDITIONING | 270.00 | 4,920.00 |
| APPLIANCE REPAIRS | 690.00 | 740.00 |
| CARPENTRY WORK | 1,450.00 | 5,288.08 |
| CARPENTRY MATERIALS | .00 | 4,428.00 |
| CONCRETE AND BRICK WORK | .00 | 2,454.02 |
| DRAIN WORK | 540.00 | 160.00 |
| ELECTRIC WORK | 2,700.00 | 1,963.60 |
| ELECTRIC MATERIALS | .00 | 7,084.00 |
| FIRE EXTINGUISHERS | .00 | 383.30 |
| FLOOR WORK | 180.00 | 485.08 |
| FLOOR MAT | .00 | 3,453.74 |
| LANDSCAPE & EXTERIOR WK | .00 | 480.00 |
| GLASS AND MIRRORS | 690.00 | 780.00 |
| HARDWARE | .00 | 1,190.00 |
| HARDWARE WORK | 585.00 | 1,778.58 |
| HEATING WORK | .00 | 2,615.00 |
| MISCELLANEOUS MAINT | 1,740.00 | 2,857.78 |
| PAINT MATERIAL | .00 | 7,868.41 |
| PAINTING & PLASTER | .00 | 534.15 |
| PAST MAINTENANCE | 11,000.00 | 31,290.00 |
| PEST CONTROL | 180.00 | 1,997.84 |
| PLUMBING | 766.00 | 5,737.50 |
| PLUMBING MATERIAL | .00 | 540.42 |
| PREVENT MAINTENANCE | 855.00 | 865.00 |
| ROOF REPAIR & MAINTENANCE | .00 | 5,550.00 |
| ROOFING MATERIALS | .00 | 3,251.40 |
| VENETIAN BLINDS | 160.00 | 1,228.36 |
| MANAGEMENT FEE | .00 | 60,000.00 |
| MISCELLANEOUS EXP | .00 | 155.00 |
| TAX INCOME | .00 | 250.00 |
| TAX PROPERTY | .00 | 10,691.64 |
| TRASH COLLECTION | 681.76 | 4,059.03 |
| ELECTRICITY | 18.40 | 4,020.04 |
| GAS | .00 | 15,768.79 |
| PHONE | .00 | 855.21 |
| WATER & SEWER | .00 | 28,477.11 |

TSINTOLAS REALTY COMPANY

Printed:
Page: 2

| | December $ | Year-to-Date 2019 $ |
|---|---|---|
| OPERATING EXPENSE | 26,709.66 | 271,447.38 |
| OPERATING PROFIT | -18,264.66 | -17,834.86 |
| REFUND | 5,000.00 | 5,000.00 |
| NON OP INC & EXP | 5,000.00 | 5,000.00 |
| NET CASH FLOW | -13,264.66 | -12,834.86 |

SANTINI REALTY COMPANY
03/26 Printed: SEP 14 20
Page: 1

## Inc & Exp Statement 8212 — FLOWER HOUSE

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 8212 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | |
| MISCELLANEOUS INCOME | 47.50 | 618.75 | |
| RENT | 86.00 | 2,291.64 | |
| OPERATING INCOME | 11,414.00 | 190,230.51 | |
| | 11,546.50 | 193,140.90 | |
| ACCOUNTING | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM & SECURITY | 380.00 | 3,250.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | |
| DEFERRED COMPENSATION | 0.00 | 0.00 | |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 0.00 | |
| FIRE/LIABILITY | 0.00 | 3,250.00 | |
| HEALTH INSURE REIMBURSEMENT | 0.00 | 0.00 | |
| MISCELLANEOUS INS | 0.00 | 0.00 | |
| UMBRELLA INSURANCE | 0.00 | 0.00 | |
| WORKMENS COMP | 0.00 | 400.00 | |
| JANITORIAL EXPENSE | 0.00 | 4,750.00 | |
| JANITORIAL MATERIALS | 0.00 | 0.00 | |
| JANITORIAL SERVICES | 640.00 | 840.00 | |
| LEASING EXPENSE | 0.00 | 0.00 | |
| LEGAL EXPENSE | 0.00 | 0.00 | |
| LITIGATION EXPENSE | 0.00 | 81.50 | |
| LEGAL FEES | 81.50 | 2,640.00 | |
| LICENSE | 450.00 | 660.00 | |
| LITIGATION EXPENSE | 1,000.00 | 2,955.34 | |
| MAINTENANCE | | | |
| CLEANING | 0.00 | 252.13 | |
| AIR CONDITIONING | 828.73 | 2,278.09 | 0.00 |
| APPLIANCE PARTS | 43.82 | 2,472.84 | |
| BUILDING FACILITIES | 660.00 | 3,120.00 | 0.00 |
| APPLIANCE REPAIRS | | | |
| CARPENTRY MATERIALS | 320.00 | 3,720.00 | |
| CARPENTRY WORK | 0.00 | 285.00 | |
| CARPETING | 333.70 | 1,367.40 | |
| CONCRETE AND BRICK WORK | 0.00 | 525.82 | |
| DECORATION | 1,650.00 | 5,558.00 | |
| DRAIN WORK | | | |
| ELECTRIC MATERIALS | | | |
| ELECTRIC WORK | | | |

Printed: SEP 14 20
Page: 2

## Inc & Exp Statement 8212 — FLOWER HOUSE

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 8212 |
|---|---|---|---|
| ELEVATOR | 0.00 | 0.00 | 0.00 |
| EMERGENCY MAINTENANCE | 0.00 | 0.00 | |
| ENVIRONMENTAL TESTING | 0.00 | 0.00 | |
| EXTERMINATION | 480.00 | 280.00 | |
| FIRE EXTINGUISHERS | 0.00 | 0.00 | |
| FLOOR WORK | 0.00 | 76.00 | |
| FLOORING MAT | 225.00 | 1,300.00 | |
| GLASS AND MIRRORS | 0.00 | 1,313.15 | |
| HARDWARE | 630.00 | 875.56 | |
| HARDWARE WORK | 0.00 | 2,615.00 | |
| HEATING MATERIALS | 0.00 | 0.00 | |
| HEATING WORK | 0.00 | 0.00 | |
| IRON AND STEEL WORK | 180.00 | 700.00 | |
| LANDSCAPE & EXTERIOR WK | 0.00 | 929.04 | |
| MISCELLANEOUS MAINT | 0.00 | 2,150.00 | |
| PAINT MATERIAL | 0.00 | 200.00 | |
| PAINTING & PLASTER | 0.00 | 15,250.00 | |
| PAST MAINTENANCE | 0.00 | 230.00 | |
| PERSONAL PROTECT EQUIP | 0.00 | 0.00 | 0.00 |
| PEST CONTROL | 0.00 | 0.00 | |
| PLUMBING | 1,110.00 | 7,640.00 | |
| PLUMBING MATERIAL | 0.00 | 982.35 | |
| PREVENT MAINTENANCE | 0.00 | 0.00 | |
| PUNCH OUT WORK | 0.00 | 0.00 | |
| ROOF REPAIR & MAINTENANCE | 480.00 | 1,435.00 | |
| ROOFING MATERIALS | 0.00 | 0.00 | |
| SCREEN REPAIR | 0.00 | 0.00 | |
| SNOW REMOVAL | 0.00 | 1,428.79 | |
| TRASH CLEANUP | 300.00 | 1,320.68 | |
| VENETIAN BLINDS | 9,022.35 | 62,013.95 | |
| MANAGEMENT EXPENSE | | | |
| MANAGEMENT FEE | 0.00 | 0.00 | |
| MISCELLANEOUS EXP | 0.00 | 100.00 | 100.00 |
| SALARY MANAGER | 0.00 | 0.00 | |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| ADMINISTRATION EXP | 0.00 | 0.00 | |
| OFFICE EXPENSE | 0.00 | 0.00 | 0.00 |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | |
| PAYROLL TAXES | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | 0.00 |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHOLDING | 0.00 | 0.00 | |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | |



Inc & Exp Statement
FLOWER HOUSE

Date Printed: SEP 14 20
Page: 3

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 |
|---|---|---|---|
| PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| SALARIES | 0.00 | 0.00 | 0.00 |
| TAXES | | | |
| TAX INCOME | 0.00 | 0.00 | 0.00 |
| TAX MISCELLANEOUS | 0.00 | 0.00 | 0.00 |
| TAX NUISANCE | 0.00 | 0.00 | 0.00 |
| TAX PERSONAL | 0.00 | 0.00 | 0.00 |
| TAX PROPERTY | 0.00 | 26,224.74 | 26,224.74 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 | 0.00 |
| TRASH COLLECTION | 0.00 | | |
| UTILITIES | 689.24 | | 3,654.76 |
| ELECTRICITY | 837.36 | 2,456.86 | |
| FUEL OIL | 6.00 | 0.00 | |
| GAS | 1,233.80 | 2,770.92 | |
| PHONE | 0.00 | 478.75 | |
| WATER & SEWER | 0.00 | 10,638.14 | |
| WAGES | 2,060.16 | | 14,359.77 |
| OPERATING EXPENSE | 0.00 | | 0.00 |
| OPERATING PROFIT | 12,655.27 | | 117,215.38 |
| INTEREST | -1,057.27 | | 41,338.34 |
| INTEREST 1ST | 0.00 | 0.00 | 0.00 |
| INTEREST 2ND | 0.00 | 0.00 | 0.00 |
| INTEREST EXPENSE | 0.00 | 0.00 | 0.00 |
| NET OPERATING PROFIT | 0.00 | 0.00 | 0.00 |
| AUTO LOAN | -1,057.27 | | 41,338.34 |
| BANK LOAN | 0.00 | 0.00 | 0.00 |
| DEPOSIT REFUND | 0.00 | 0.00 | 0.00 |
| INTER-COMPANY LOAN | 0.00 | 0.00 | 0.00 |
| INTER-COMPANY LOAN-IN | 0.00 | 0.00 | 0.00 |
| OWNER WITHDRAWALS | 0.00 | 0.00 | 0.00 |
| PPP LOAN | 0.00 | 0.00 | 0.00 |
| PRINCIPLE 1ST | 0.00 | 0.00 | 0.00 |
| PRINCIPLE 2ND | 0.00 | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 | 0.00 |
| SBA LOAN | 0.00 | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 | 0.00 |
| NET CASH FLOW | -1,057.27 | | 41,338.34 |

DOUGLAS REALTY COMPANY

SEP 14 20
Page: 1

ARCADIAN HOUSE
Inc. & Exp Statement
3901

Printed:   SEP 14 20
Page:   2

ARCADIAN HOUSE
Inc. & Exp Statement
3901

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 |
|---|---|---|---|
| LATE & LEGAL FEES | 0.00 | 0.00 | |
| MISCELLANEOUS INCOME | 0.00 | 1,336.50 | |
| RENT | 12,990.00 | 266,129.28 | |
| **OPERATING INCOME** | **12,990.00** | **267,465.78** | |
| | | | |
| ACCOUNTING | 0.00 | 0.00 | |
| ADVERTISING | 0.00 | 0.00 | |
| ALARM & SECURITY | 0.00 | 0.00 | |
| ANNUAL REPORT | 0.00 | 0.00 | |
| AUTO EXPENSE | 0.00 | 0.00 | |
| AUTO INSURANCE | 0.00 | 0.00 | |
| GAS AND OIL | 0.00 | 0.00 | |
| BANK CHARGE | 0.00 | 0.00 | |
| CONDOMINIUM FEE | 0.00 | 0.00 | |
| CONTRIBUTIONS | 0.00 | 0.00 | |
| DEFERRED COMPENSATION | | | |
| INSURANCE | | | |
| BOILER INSURANCE | 0.00 | 800.00 | |
| FIRE/LIABILITY | 4,620.00 | 4,620.00 | |
| HEALTH INS/NURSE REHABILITATION | | | |
| MISCELLANEOUS INS | 0.00 | 0.00 | |
| UMBRELLA INSURANCE | 0.00 | 0.00 | |
| WORKMANS COMP | 0.00 | 0.00 | |
| JANITORIAL EXPENSE | 400.00 | 4,700.00 | |
| JANITORIAL MATERIALS | | | |
| JANITORIAL SERVICES | 900.00 | 12,547.00 | |
| LEASING EXPENSE | 0.00 | 0.00 | |
| EVICTION EXPENSE | 0.00 | 0.00 | |
| LEGAL FEES | 8,692.83 | 8,692.83 | |
| LICENSE | 187.50 | 584.50 | |
| LITIGATION EXPENSE | 0.00 | 0.00 | |
| MAINTENANCE | | | |
| CLEANING | 960.00 | 6,300.00 | |
| AIR CONDITIONING | 960.00 | | |
| APPLIANCE PARTS | 1,320.00 | 2,220.00 | |
| APPLIANCE REPAIRS | 823.76 | 2,663.12 | 676.15 |
| BUILDING FACILITIES | | | |
| CARPENTRY MATERIALS | 584.05 | 4,903.54 | |
| CARPENTRY WORK | 1,490.00 | 4,435.00 | |
| CONCRETE AND BRICK WORK | | | |
| DEMOLITION | 320.00 | 4,820.00 | |
| DRAIN WORK | 840.00 | 840.00 | |
| ELECTRIC MATERIALS | 270.00 | 2,155.60 | |
| ELECTRIC WORK | 185.33 | 1,924.50 | |
| ELEVATOR | 1,300.00 | 5,717.00 | |
| EMERGENCY MAINTENANCE | 1,604.00 | 10,121.00 | |
| ENVIRONMENTAL TESTING | 0.00 | 0.00 | |
| EXTERMINATION | 0.00 | 0.00 | |
| FIRE EXTINGUISHERS | 0.00 | 220.00 | |
| FLOORS | 2,700.00 | 2,700.00 | |
| FLOORING MAT | 0.00 | 0.00 | |
| GLASS AND MIRRORS | 240.00 | 240.00 | |
| HARDWARE | 195.96 | 195.96 | |
| HARDWARE WORK | 0.00 | 0.00 | |
| HEATING MATERIALS | 0.00 | 0.00 | |
| HEATING WORK | 2,616.56 | | |
| IRON AND STEEL WORK | 820.00 | | |
| LANDSCAPE & EXTERIOR WK | 7,154.41 | | |
| MISCELLANEOUS MAINT | 7,170.00 | | |
| PAINTING | 658.24 | | |
| PAINT MATERIAL | 123.00 | | |
| PAINTING & PLASTER | 680.00 | 16,796.00 | |
| PEST MAINTENANCE | | | |
| PERSONAL PROTECT EQUIP | 330.00 | 330.00 | |

| | December DEC 1 19 to DEC 31 19 | Year-to-Date JAN 1 19 to DEC 31 19 | 2019 |
|---|---|---|---|
| PEST CONTROL | 0.00 | 366.21 | |
| PLUMBING | 2,196.00 | 7,228.00 | 1,264.18 |
| PLUMBING MATERIAL | 45.41 | 1,530.56 | |
| PREVENT MAINTENANCE | 0.00 | 0.00 | |
| PUNCH OUT WORK | 0.00 | 0.00 | |
| ROOFING MATERIALS | 0.00 | 1,560.00 | |
| ROOFING REPAIR | 0.00 | 165.81 | |
| SCREEN REPAIR | 0.00 | 0.00 | |
| SNOW REMOVAL | 0.00 | 240.00 | |
| TRASH CLEANUP | 0.00 | 0.00 | |
| VENETIAN BLINDS | -1,197.47 | 1,555.43 | 52,673.67 |
| MANAGEMENT EXPENSE | 0.00 | 0.00 | |
| MANAGEMENT FEE | 0.00 | 129.93 | |
| MISCELLANEOUS EXP | 0.00 | 0.00 | 128.93 |
| SALARY MANAGER | | | |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| ADMINISTRATION EXP | 0.00 | 566.28 | |
| OFFICE EXPENSE | 0.00 | 0.00 | |
| OFFICE SUPPLIES | 0.00 | 0.00 | |
| POSTAGE | 0.00 | 0.00 | 966.28 |
| PAYROLL TAXES | | | |
| MISC PAYROLL TAXES | 0.00 | 0.00 | |
| TAX FEDERAL UNEMPLOYMENT | 0.00 | 0.00 | |
| TAX FEDERAL WITHOLDING | 0.00 | 0.00 | |
| TAX MARYLAND UNEMPLOY | 0.00 | 0.00 | |
| TAX MARYLAND WITHOLDING | 0.00 | 0.00 | |
| TAX MEDICARE EMPLOYER | 0.00 | 0.00 | |
| TAX MEDICARE | 0.00 | 0.00 | |
| TAX SOCIAL SEC EMPLOYER | 0.00 | 0.00 | |
| TAX SOCIAL SECURITY | 0.00 | 0.00 | 0.00 |
| PROFESSIONAL SERVICE | 0.00 | 0.00 | 0.00 |
| TAXES | | | |
| TAX INCOME | 0.00 | 0.00 | |
| TAX MISCELLANEOUS | 0.00 | 0.00 | |
| TAX INSURANCE | 0.00 | 0.00 | |
| TAX FEDERAL | 0.00 | 0.00 | |
| TAX PROPERTY | 0.00 | 24,729.16 | 24,729.16 |
| TAX SPECIAL ASSESS | 0.00 | 0.00 | 7,404.20 |
| TRASH COLLECTION | -1,356.00 | 0.00 | |
| UTILITIES | | | |
| ELECTRICITY | 871.54 | 3,877.07 | |
| FUEL OIL | 0.00 | 0.00 | |
| GAS | 3,731.86 | 10,983.86 | |
| PHONE | 40.66 | 588.49 | |
| WATER & SEWER | 2,642.04 | 15,749.68 | 31,198.11 |
| WAGES | 0.00 | 0.00 | |
| OPERATING EXPENSE | 21,336.04 | 191,091.68 | |
| **OPERATING PROFIT** | **-4,273.34** | **76,174.10** | |
| INTEREST | 0.00 | 0.00 | |
| INTEREST 1ST | 0.00 | 0.00 | |
| INTEREST 2ND | 0.00 | 0.00 | |
| INTEREST EXPENSE | 0.00 | 0.00 | |
| **NET OPERATING PROFIT** | **-4,273.34** | **76,174.10** | 76,174.10 |
| AUTO LOAN | 0.00 | 0.00 | |
| BANK LOAN | 0.00 | 0.00 | |
| DEPOSIT REFUND | 0.00 | 0.00 | |
| INTER-COMPANY LOAN | 0.00 | 0.00 | |
| INTER-COMPANY LOAN-N | 0.00 | 0.00 | |
| OWNER WITHDRAWLS | 0.00 | 0.00 | |
| PPP LOAN | 0.00 | 0.00 | |
| PRINCIPLE 1ST | 0.00 | 0.00 | |

DAVISON REALTY (COMPANY)
Select: SEP 14 20
Page: 3

ARCADIAN HOUSE
Inc & Exp Statement
3901

| | December DEC 1 19 to DEC 31 19 | Year-to-Date 2019 JAN 1 19 to DEC 31 19 |
|---|---|---|
| PRINCIPLE 2ND | 0.00 | 0.00 |
| REFUND | 0.00 | 0.00 |
| SBA LOAN | 0.00 | 0.00 |
| SUSPENSE | 0.00 | 0.00 |
| TRANSFER | 0.00 | 0.00 |
| NON OP INC & EXP | 0.00 | 0.00 |
| NET CASH FLOW | -8,275.84 | 76,344.10 |

# EXHIBIT 2

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

D.C. Superior Court
10/24/2019 18:55PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### (Civil Division)

| | |
|---|---|
| **CHRISTOFILOS TSINTOLAS** | : |
| 8415 Rapley Ridge Lane | : |
| Potomac, Maryland 20854 | : |
| | : |
| And | : |
| | : |
| **DEBORAH TSINTOLAS** | : |
| 8415 Rapley Ridge Lane | : |
| Potomac, Maryland 20854 | :     Case No. |
| | : |
| And | : |
| | : |
| **FOTINI TSINTOLAS ECONOMIDES** | : |
| **REVOCABLE TRUST** | : |
| 6265 Clearwood Road | : |
| Bethesda, Maryland 20817 | : |
| | : |
| Plaintiffs | : |
| | : |
| v. | : |
| | : |
| **TSINTOLAS INVESTMENTS, INC.** | : |
| 3520 Connecticut Avenue, NW | : |
| Washington, D.C. 200008 | : |
| | : |
| Defendant | : |
| | : |
| And | : |
| | : |
| **EFSTRATIOS TSINTOLAS** | : |
| 14724 Westbury Road | : |
| Rockville, Maryland 20853 | : |
| | : |
| Interested Party | : |
| And | : |
| | : |
| **CASSANDRA TSINTOLAS JOHNSON** | : |
| **REVOCABLE TRUST** | : |
| 13321 Query Mill Road | : |
| Potomac, Maryland 20878 | : |
| | : |
| Interested Party | : |

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

1

## COMPLAINT FOR JUDICIAL DISSOLUTION AND OTHER RELIEF

Plaintiffs, Christofilos Tsintolas ("Chris"), Deborah Tsintolas ("Deborah"), and Fotini Tsintolas Economides Revocable Trust ("Fotini") (collectively, the "Plaintiffs") by and through their attorneys, Matthew J. Pavlides, Micah L. Kanters, and Stein Sperling Bennett De Jong Driscoll P.C., hereby sue Defendant, Tsintolas Investments, Inc. (the "Corporation"), for judicial dissolution, inspection of corporate records, and appointment of a receiver, and as grounds therefor, state as follows:

### INTRODUCTION

This case arises from oppressive conduct, failure to provide corporate documents, deadlock, irreparable injury, misapplication and wasting of corporate assets, as well as the disintegration of communication and trust between the parties

### PARTIES

1.    Plaintiffs Christofilos Tsintolas ("Chris") and Deborah Tsintolas ("Deborah") are husband and wife.  They are adult residents of Montgomery County, Maryland.  They hold a 25% ownership interest in the Corporation.

2.    Plaintiff Fotini Tsintolas Economides Revocable Trust ("Fotini") is a revocable trust established for the benefit of Fotini Tsintolas Economides, who is an adult resident of Montgomery County, Maryland.  Plaintiff Fotini Tsintolas Economides Revocable Trust holds a 25% ownership interest in the Corporation.[1]

3.    Defendant Tsintolas Investments, Inc. (the "Corporation") is a District of Columbia corporation maintaining an office at 3520 Connecticut Avenue, NW, Washington, D.C. 20008.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

---

[1] For the sake of brevity, both the individual and her trust are referenced synonymously herein as "Fotini."

2

6845564_10

4.     Interested Party Efstratios Tsintolas ("Steve") is an adult resident of Montgomery County, Maryland and holds a 25% ownership interest in the Corporation.

5.     Interested Party Cassandra Tsintolas Johnson Revocable Trust ("Sandy") is a revocable trust established for the benefit of Cassandra Tsintolas Johnson, who is an adult resident of Montgomery County, Maryland.  Plaintiff Cassandra Tsintolas Johnson Revocable Trust holds a 25% ownership interest in the Corporation. [2]

6.     Chris, Fotini, Steve, and Sandy are the children of Mr. and Mrs. Demetrios Tsintolas.

7.     Chris, Fotini, Steve, and Sandy currently are each members of the Board of Directors of the Corporation.

8.     Steve currently serves as President of the Corporation.

9.     Sandy currently serves as Secretary of the Corporation.

<u>JURISDICTION</u>

10.     Jurisdiction is proper pursuant to D.C. Code Ann. §11-921 and D.C. Code Ann. §13-423.

<u>FACTUAL BACKGROUND</u>

11.     The Corporation was established in 1955 by Mr. and Mrs. Demetrios Tsintolas for the purpose of owning, operating, and managing real property for profit (the "Corporate Business").

12.     After the Corporation's establishment, Demetrios Tsintolas ran the Corporation.

13.     In or around October 2002, upon information and belief, Steve assumed the role of President of the Corporation.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

---

[2] For the sake of brevity, both the individual and her trust are referenced synonymously herein as "Sandy."

3

14. In or around 2002, Chris, Fotini, Steve, and Sandy each received 25% of the shares of the Corporation.

15. In or around July 2006, Chris transferred his shares to himself and Deborah as tenants by the entirety.

16. As the years went by, from 2002 to the present, Steve began to treat the Corporation more and more as if he were the sole shareholder and Director.

17. Steve began taking an undisclosed salary from the Corporation, as well as an undisclosed management fee.

18. Steve also began making undisclosed contracts with legal entities that he owned personally.

19. Overall, Steve began to disregard his legal obligations to act in conjunction with the Board of Directors. Steve engaged in abusive and oppressive practices, unilaterally dictating the Corporation's actions without the necessary legal transparency and/or input from the Board of Directors and/or shareholders, including, but not limited to, the following:

    a. Refusing to provide responses to lawful business and financial information requests;

    b. Refusing to provide lawful responses to statutory books and records requests;

    c. Entering into certain compensation agreements for himself and his personally-owned companies, which included undisclosed self-dealing;

    d. Attempting to conduct Board of Director meetings without the requisite quorum;

    e. Attempting to conduct shareholder meetings without the requisite quorum;

    f. Purporting to take action on behalf of the Board of Directors based upon null and void Board of Director meetings;

    g. Purporting to take action on behalf of the shareholders based upon null and void shareholder meetings;

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

4

h. Failing to hold annual elections for member of the Board of Directors;

i. Failing to hold annual elections for officers of the Corporation;

j. Purporting to adopt improper Board of Directors' Resolutions, which attempted to ratify past conduct of the officers of the Corporation based upon a null and void Board of Director meeting;

k. Purporting to adopt improper Shareholder Resolutions, which attempted to ratify past conduct of the officers of the Corporation based upon a null and void Shareholder meeting;

l. Purporting to adopt an improper Board of Directors' Resolution, which attempted to represent a "unanimous agreement not to distribute financial records at this time, or in the near future";

m. Purporting to adopt an improper Shareholder Resolution, which attempted to represent a "unanimous agreement not to distribute financial records at this time, or in the near future";

n. Failing to keep proper minutes reflecting the actual meetings of the Board of Directors;

o. Failing to keep proper minutes reflecting the actual meetings of the Shareholders of the Corporation;

p. Acting in a hostile and berating manner towards Fotini and Chris; and

q. Creating an atmosphere such that the Corporation is in a deadlock regarding its affairs.

20.    Steve's behavior became particularly flagrant in 2018.

21.    Fotini, as a member of the Board of Directors and a shareholder, on March 8, 2018 at 7:48am, specifically expressed her concern and requested detailed financial data from the Corporation regarding its ongoing operations, profitability, income, and expenses. (*See* Exhibit 1 attached hereto and incorporated by reference.)

22.    Steve's response to Fotini's request was a single word email on March 8, 2018 at 8:21am – "No." (*See* Ex. 1, Steve's response)

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

5

23.     Since March 2018, Steve has not been transparent or willing to furnish full and complete financial information to the members of the Board of Directors and shareholders regarding the Corporation.

24.     On or about March 30, 2019, Steve, as President of the Corporation, held a meeting of the Board of Directors and Shareholders.

25.     Neither the Board of Directors meeting nor the Shareholder meeting had the requisite quorum necessary for voting.  The Board of Directors meeting only had two (2) of the four (4) Directors in attendance, which does not constitute a majority.  Likewise, the Shareholder meeting only had representatives for 50% of the outstanding shares present, which does not constitute a majority.

26.     At the Board of Directors and Shareholder meetings, Steve unilaterally declared that there was a "unanimous agreement not to distribute financial records at this time, or in the near future."

27.     On July 22, 2019, Chris and Deborah, through counsel, sent correspondence to Steve requesting basic corporate and financial information from the Corporation pursuant to D.C. Code Ann. §29-313.01(e) and §29-313.02.  (*See* Exhibit 2 attached hereto and incorporated by reference.)

28.     Exhibit 2 reflects Chris and Deborah's lawful demand of this information in their capacity as a shareholder (albeit Chris would also be entitled to review this information in his capacity as a Director).

29.     In Exhibit 2, Chris and Deborah lawfully demanded the following:

    a.  Articles of Incorporation. including any amendments and restatements thereto;

    b.  Bylaws, including any amendments thereto;

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

6

c.  Minutes of all shareholders' meetings and any resolutions or actions by the shareholders in lieu of a meeting during the last three (3) years;

d.  Financial statements from the last three (3) years, including balance sheets, profit and loss statements, and income statements;

e.  All other accounting records for the Corporation from the last five (5) years, including, but not limited, to accounting ledgers, bank statements, and income/expense statements for each property owned by the Corporation;

f.  A list of the names and addresses of the current Directors and officers of the Corporation; and

g.  The most recent biennial report filed by the Corporation with the District of Columbia Department of Consumer and Regulatory Affairs.

30.  Rather than comply with the requests set forth in Exhibit 2, Steve refused to produce complete records.

31.  Steve's refusal is documented in his response set forth in Exhibit 3 (attached hereto and incorporated by reference), wherein he also stated: "Feel free to file an action in the D.C. Superior Court to challenge the corporations' decision."

32.  On August 21, 2019, Chris and Deborah, through counsel, sent a follow-up letter to Steve reiterating, among many other things, that the limited documents provided were not sufficient to comply with Steve's statutory obligations on behalf of the Corporation, and that his behavior had produced a deadlock in the affairs of the Corporation, its Board of Directors, and its shareholders. (*See* Exhibit 4, which is attached hereto and incorporated by reference.)

COUNT I
(Judicial Dissolution – Tsintolas Investments, Inc.)

33.  Paragraphs 1-32, inclusive, are incorporated as if fully set forth herein.

34.  The Corporation has four (4) Directors.

35.  Two of the four Directors are Plaintiffs in this lawsuit, which readily demonstrates a deadlock among the Directors of the Corporation.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
15 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301 340 2020

7

6845564_10

36.    The deadlock among the Directors cannot be broken and threatens irreparable injury to the Corporation.

37.    Fifty percent (50%) of the shareholders of the Corporation are Plaintiffs in this lawsuit, which readily demonstrates a deadlock among the shareholders of the Corporation.

38.    The deadlock among the shareholders cannot be broken and threatens irreparable injury to the Corporation.

39.    On March 8, 2018, Fotini issued a good faith request for basic financial information. (*See* Exhibit 1.)

40.    Despite the Corporation's statutory obligations pursuant to D.C. Code Ann. §29-313.02 and §29-313.05, and the Corporation's obligations to Fotini as a member of the Board of Directors, to provide such information, Steve refused with a one-word answer – "No."

41.    On March 30, 2019, Steve initiated a shareholders' meeting for the Corporation. Despite lacking the necessary quorum, Steve unilaterally declared that there was a "unanimous agreement not to distribute financial records at this time, or in the near future." Such purported action is void and a nullity, and threatens irreparable injury to the Corporation.

42.    Likewise, on March 30, 2019, Steve initiated a Board of Director's meeting. Despite lacking the necessary quorum, Steve unilaterally declared that there was a "unanimous agreement not to distribute financial records at this time, or in the near future." Such purported action is void and a nullity, and threatens irreparable injury to the Corporation.

43.    Steve, on behalf of the Corporation, has refused to comply with Chris and Deborah's lawful request for basic corporate and financial information, despite the Corporation's statutory obligations pursuant to D.C. Code Ann. §29-313.02 and §29-313.05, and the Corporation's obligations to Chris as a member of the Board of Directors, to provide such

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

8

information. Such purported action is improper and threatens irreparable injury to the Corporation.

44.    It is readily apparent that Steve views the Corporation as his personal fiefdom, where he is free to exercise undue, inappropriate, and oppressive control not only over the operation of the Corporation, but over the conduct of his siblings as well.

45.    Steve's inappropriate conduct is inconsistent with his fiduciary duties as President of the Corporation, and has resulted in deadlock among the Directors and shareholders such that the Corporation's Business and affairs can no longer be conducted to the advantage of the shareholders.

46.    As set forth *supra* (¶ 19), Steve's conduct has evolved into abusive and oppressive practices as he seeks to unilaterally dictate the Corporation's actions without the necessary legal transparency and/or input from the Board of Directors and/or shareholders.

47.    Under the circumstances, Plaintiffs are entitled to a judicial dissolution of the Corporation pursuant to D.C. Code Ann. § 29-312.20.

WHEREFORE, Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust request that this Court:

A.  Direct the judicial dissolution of the Corporation;

B.  Impose upon the Corporation the procedures for judicial dissolution;

C.  Direct that the procedures for judicial dissolution be implemented by the Corporation, with the involvement of a Receiver;

D.  Award attorney's fees and costs; and

E.  Award such other and further relief as the nature of their cause may require.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

9

6845564_10

<u>COUNT II</u>
(Inspection of Corporate Records -- Tsintolas Investments, Inc.)

48.    Paragraphs 1- 47, inclusive, are incorporated as if fully set forth herein.

49.    As both shareholders and directors, Plaintiffs Chris and Fotini are entitled to full access to the Corporation's accounting records pursuant to D.C. Code Ann. §29-313.02 and §29-313.05.

50.    On March 8, 2018, Fotini issued a good faith request for basic financial information. (*See* <u>Exhibit 1</u>.)

51.    On July 22, 2019, Chris and Deborah, through counsel, issued a good faith request for basic corporate records and financial information. (*See* <u>Exhibit 2</u>.)

52.    Steve unilaterally refused to produce records to Fotini, giving no explanation.

53.    Likewise, in July 2019, Steve unilaterally refused to produce complete records, claiming that Chris and Deborah's request was not issued in good faith, based upon Steve's unilateral determination, and therefore the Corporation was not obligated to comply.

54.    To date, Steve and the Corporation have failed and refused to provide the requested corporate records and financial information to Plaintiffs.

WHEREFORE, Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust request that this Court:

A. Order that Plaintiffs be permitted to inspect and copy the complete corporate records, at the expense of the Corporation;

B. Order that the Corporation pay Plaintiffs' expenses, including attorneys' fees, in obtaining an order compelling production of the corporate records pursuant to D.C. Code Ann. § 29-313.04; and

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-7033

10

C.  Award such other and further relief as the nature of their cause may require.

## COUNT III
### (Appointment of Receiver – Tsintolas Investments, Inc.)

55.    Paragraphs 1- 54, inclusive, are incorporated as if fully set forth herein.

56.    Steve, as President of the Corporation, has failed to comport himself appropriately in that role, and has further violated his fiduciary duties by engaging in oppressive actions that threaten irreparable injury to the Corporation.

57.    Due, in large part, to Steve's actions, the Directors/shareholders of the Corporation are deadlocked in the management of corporate affairs.

58.    As a result, the Corporate Business has been frustrated, and the Corporation's assets are at risk of dissipation and depreciation while the Directors/shareholders remain in deadlock.

59.    Under these circumstances, pursuant to D.C. Code Ann. § 29-312.22, the law permits the appointment of a Receiver to take control of the Corporation, as well as its funds and assets, such that they may preserve the remaining assets and arrange for the orderly liquidation and dissolution of the Corporation.

WHEREFORE, Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust request that this Court:

A.  Appoint a third-party as Custodian on behalf of the Corporation, with all fees and costs to be paid by the Corporation, to be responsible for the winding up of the Corporation's operations, including the sale of all corporate assets and the distribution of all proceeds to the Corporation's shareholders;

B.  Award attorney's fees and costs; and

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

11

C. Award such other and further relief as the nature of their cause may require.

Respectfully submitted,

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

By:    _/s/ Matthew J. Pavlides_
Matthew J. Pavlides (D.C. Bar #424573)
Micah L. Kanters (D.C. Bar #198563)
25 West Middle Lane
Rockville, Maryland 20850
Direct: 301-340-2020
Fax: 301-354-8113
mpavlides@steinsperling.com
mkanters@steinsperling.com

*Attorneys for Plaintiffs*

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301 340 2020

12

6845564_10

# EXHIBIT 1

## 4cet@comcast.net

| | |
|---|---|
| **From:** | Fo <feconomides51@aol.com> |
| **Sent:** | Thursday, March 08, 2018 8:37 AM |
| **To:** | tsintolas@aol.com |
| **Cc:** | cassandra.t.johnson.civ@mail.mil; 4cet@comcast.net |
| **Subject:** | Re: K-1 update |

Unacceptable response  There are four shareholders not one

Sent from my iPhone

On Mar 8, 2018, at 8:21 AM, tsintolas@aol.com wrote:

No

-----Original Message-----
From: feconomides51 <feconomides51@aol.com>
To: tsintolas <tsintolas@aol.com>; cassandra.t.johnson.civ <cassandra.t.johnson.civ@mail.mil>; 4cet <4cet@comcast.net>
Sent: Thu, Mar 8, 2018 7:48 am
Subject: Re: K-1 update

Steve--

Thank you for your email, but I am concerned about a few things:

1. Our checks should not be held hostage until 3/31--**please include checks with the K1 forms**.
2. I know that I have personally requested a yearly meeting for over 8 years to discuss each building and plan for the future--you have rebuffed each request. Sandy and Chris have also asked for a meeting, and they have been rebuffed.
3. For the past 7 years, I have asked you to include a detailed profit/loss ledger with all expenses and receipts for each building along with the end of year profit/loss statement and tax returns for both Tsintolas Investments and Olympia Investments. You have promised to send us a copy. Request never honored. We cannot make informed decisions without documentation.
4. Please include the ledgers with all 2017 expenses and receipts and the tax returns for OI and TI with our K1 statements.
5. At our meeting, please have a copy for all shareholders of OI and TI of all ledgers and tax returns for the past 8 years so we can review and discuss future plans.

Fotini

-----Original Message-----
From: tsintolas <tsintolas@aol.com>
To: feconomides51 <feconomides51@aol.com>; cassandra.t.johnson.civ <cassandra.t.johnson.civ@mail.mil>; 4cet <4cet@comcast.net>
Sent: Thu, Mar 8, 2018 4:34 am
Subject: K-1 update

Your 2017 K-1 forms will be mailed out today. At Mom's request, I will hold a meeting on Saturday afternoon, March 31st at Beverly Road to go over a few things. Distribution checks will be provided at that time.

# EXHIBIT 2

# STEIN SPERLING

BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

**MILLARD S. BENNETT**
ATTORNEY AT LAW
PRINCIPAL

25 West Middle Lane
Rockville, Maryland 20850

301-838-3203 direct
301-340-2020 main
301-354-8103 direct fax

mbennett@steinsperling.com
www.steinsperling.com

July 22, 2019

VIA OVERNIGHT MAIL
Tsintolas Investments Incorporated
Attn: Efstratios Tsintolas, President
3520 Connecticut Avenue, NW
Washington, DC 20008

File Number: 2141114.02

**Re:    REQUEST FOR CORPORATE RECORDS**

Dear Mr. Tsintolas:

This law firm represents Christofilos and Deborah Tsintolas (the "Tsintolases") in matters related to their ownership of stock in Tsintolas Investments Incorporated ("TII").

As shareholders in TII, and pursuant to Sections 29-313.02 and 29-313.01(e) of the District of Columbia Code (the "Code"), the Tsintolases are entitled to inspect and copy the corporate records of TII upon providing notice of demand to the corporation. Accordingly, the Tsintolases hereby demand that TII either provide copies of the following corporate records to my office by recognized overnight courier within seven (7) days from the date of this letter or advise of a date and time, during normal business hours, that the Tsintolases and/or their representatives may inspect and copy such records at TII's office:

1. Articles of Incorporation, including any amendments and restatements thereto;

2. Bylaws, including any amendments thereto;

3. Minutes of all shareholders' meetings and any actions taken by the shareholders in lieu of a meeting during the last three (3) years;

4. Financial statements from the last three (3) years, including balance sheets, profit and loss statements, and income statements;

5. All other accounting records for TII from the last five (5) years, including, but not limited to, account ledgers, bank statements, and income/expense statements for each property owned by TII;

6. A list of the names and addresses of the current directors and officers; and

7. The most recent biennial report filed with the District of Columbia Department of Consumer and Regulatory Affairs.

6689889_1



STEIN SPERLING

BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

Page 2

Efstratios Tsintolas
July 22, 2019

The Tsintolases are hereby making this demand so they may investigate why TII has consistently underperformed financially despite the substantial value of its underlying real estate resulting in lower returns on the Tsintolases' investment in TII.

Be advised that your failure to timely comply with the record requests set forth herein may result in the Tsintolases obtaining a court order to enforce their shareholder rights. In such event, and pursuant to Section 29-313.04(c) of the Code, TII may be required to pay the Tsintolases' legal expenses incurred in obtaining such order.

We look forward to timely receipt of the requested records.

Sincerely,

Millard S. Bennett

MSB:jas
cc:    Christofilos and Deborah Tsintolas

# EXHIBIT 3

July 29, 2019

Mr. Millard Bennett
Stein Sperling PC
25 West Middle Lane
Rockville, Maryland 20850

*Delivered via Facsimile 301-354-8103*

Dear Mr. Bennett,

On behalf of Tsintolas Investments, Inc. and Olympia Investments, Inc., this correspondence is in response to your letters dated July 22, 2019, in which your clients, shareholder Dr. and Mrs. C. Tsintolas request the inspection and duplication of various corporate documents pursuant to D.C. Code §§ 29-313.01 and 29-313.02.

D.C. Code § 29-313.01(e)(1-7) specifies the documents to which shareholders are entitled to inspect and/or duplicate and, pertinent to your clients' request, include:   corporate articles of incorporation; corporate by-laws; minutes of all shareholders' meetings and records of all action(s) taken by shareholders without a meeting for the past 3 years; financial statements for the past 3 years, as defined under § 29-313.07 (…"a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of changes in shareholders' equity for the year unless that information appears elsewhere in the financial statements." § 29-313.07(a)); a list of the names and business addresses of its current directors and officers; and, a copy of the most recent biennial report delivered to the Mayor under § 29-102.11.

In addition, your clients have requested, pursuant to D.C. Code § 29-313.02(b)(2), "[a]ccounting records of the corporation." In your correspondence, accounting records for the past five years for both corporations are requested to conduct an "investigation," "including but limited to: account ledgers, bank statements, and income/expense statements for each property owned by [each company]." The purpose of this "investigation" is for the Tsintolases (sic) to determine why Tsintolas Investments, Inc. and Olympia Investments, Inc. have "consistently underperformed financially despite the substantial value of its underlying real estate resulting in lower returns" on your clients' "investment in" the two companies. Accounting records are made available pursuant to D.C. Code § 29-313.02(c) only if:

> (1) The shareholder's demand is made in good faith and for a proper purpose;
> (2) The shareholder describes with reasonable particularity the shareholder's purpose and the records the shareholder desires to inspect; and,
> (3) The records are directly connected with the shareholder's purpose.

page 2

All records and documents available responding to your clients' requests are attached hereto. Please note: the Articles of Incorporation date back to 1955 for Olympia and 1961 for Tsintolas Investments. My parents solely ran the companies for decades; both with little-to-no formal business education. The business moved no less than twice over the years, and early recordkeeping was manual. To date, no original By-Laws have been found. The list of names and business addresses of the Directors and Officers is provided in the most recent biennial report delivered to the Mayor pursuant to D.C. Code § 29-102.11 attached hereto.

The shareholder's request to inspect and duplicate the accounting records of both corporations, pursuant to D.C. Code § 29–313.02(b)(2), is denied, as it fails to comply with D.C. Code § 29–313.02(c). Dr. and Mrs. Tsintolas' demand is not made in good faith, nor for a proper purpose. First, during Dr. Tsintolas' initial tenure as a Board member of both corporations for +10 years (1990-2001), neither company was financially sound, stable or solvent enough to declare a single dollar in dividends in any year, as evidenced by his own signature on the Corporate Minutes. He knows full-well of the businesses' dire financial state and that since becoming President, I turned both companies around from near bankruptcy to a break-even corporation (Tsintolas Investments), and to a profitable company (Olympia) that has consistently distributed dividends each year, totaling approximately $339,000 per shareholder (2006-2018). Had I not intervened, Dr. Tsintolas knows that, at the very least, the City would likely have foreclosed on some of my parents' properties due to unpaid taxes/utilities, and there would be no distribution checks. Further, neither Dr. nor Mrs. Tsintolas "invested in" either company by expending an ounce of sweat or a single dollar into either entity. Their financial interests arise singularly and solely from the shares gifted to Dr. Tsintolas by his parents. Since their actual financial investment in the companies is zero dollars, their rate of return to date is incalculable.

Second, to suggest Dr. or Mrs. Tsintolas are suddenly so concerned about alleged under-performance of either corporation that it was necessary to hire an attorney and make a formal demand for an "investigation" is laughable, as neither has shown a scintilla of interest in attending a single annual meeting in the past; either personally or by telephone, including the recent March 2018 or March 30, 2019 meeting, as evidenced by the attached Meeting Minutes. In over 30 years, he has never asked to visit an apartment building, about maintenance or government regulation issues related to the apartment buildings, nor has he asked to discuss the operation of the business(es). Dr. Tsintolas' exclusive interest has consistently and solely been the timing of the annual K-1 and the distribution check(s).

Third, Dr. and Mrs. Tsintolas' demand is a thinly veiled attempt to intimidate my family, particularly my son, and to discourage him from filing a dental malpractice suit against Dr. Tsintolas' dental practice.

page 3

Your clients are very much aware of my son's, Dr. Tsintolas' nephew, devastating physical injury and the financial costs borne as a result of Dr. Tsintolas' negligence. He is further aware of the college scholarship and professional career opportunities lost to my son as direct result of said dental negligence. It is well known that family members shared with Dr. Tsintolas that various people suggested to my son that he, as well as other like college Division-1 athletes suffering the same ailment due to negligent orthodontics, possess facts sufficient to support a dental malpractice case. My son formally requested a full copy of his dental records from Dr. Tsintolas' office in late June 2019, and his records were mailed, dated July 1, 2019. Within 3 weeks, the Dr. Tsintolas' present demand arrived alleging business mismanagement of the two family-owned companies I manage, and asserting a need to "investigate" these businesses for "consistent under-performance."

The timing of Dr. Tsintolas' demand suggesting business mismanagement which comes directly on the heels of my son's request for his full dental records (an action any lawyer recognizes as a precursor to a malpractice action) is not lost here, Mr. Bennett. It is a blatant, tit-for-tat, harassment tactic and beneath an attorney of your stature. Your clients' attempt to indirectly coerce my son—Dr. Tsintolas' nephew, in this manner will not dissuade him from whatever choice he makes regarding all legal options available to justly compensate him for his losses; nor will it support the Tsintolas' D.C. Code § 29–313.02(b)(2) demand, due to a failure to meet the statutory elements required in D.C. Code § 29–313.02(c).

It is abundantly clear that the demand to inspect and duplicate the accounting records for each corporation for the purpose of "investigating" possible business mismanagement and "consistent underperformance" is not made in good faith. Dr. and Mrs. Tsintolas made no financial "investment in" either company and have only reaped an incalculable rate of return since 2006, as opposed to that which he gained prior to my assuming the role as President of the companies and, notably never sought any such "investigation." [1] Neither of your clients has shown any interest in either company to date, including, but not limited to, the Annual Meetings of both corporations in March 2018 and 2019. And, given that Dr. and Mrs. Tsintolas' interest in the "underperformance" of the family companies did not arise until immediately after the President's son formally requested a copy of his full dental records, it is clear the present demand is not for a proper purpose but, rather to harass, and intimidate and coerce the family of and a potential plaintiff in a dental malpractice case against Dr. Tsintolas' practice. Therefore, your clients' request is denied.

Feel free to file an action in the D.C. Superior Court to challenge the corporations' decision. If necessary, this matter can be decided in open court and on the public record. I will advise you shortly as to where and to whom to forward the service of process.

page 4

Respectfully,

Efstratios D. Tsintolas
President, Olympia Investments, Inc.
President, Tsintolas Investments, Inc.

Encl.

c: File

---

[1] Notably, despite decades of financial instability and consistent failure to distribute dividends, Dr. and Mrs.
Tsintolas did not complain or seek an "investigation" of "underperformance" of any family-owned company until the
President's son requested a full copy of his dental records and Dr. Tsintolas foresaw a dental malpractice claim on the
near horizon affecting his practice.

# EXHIBIT 4

# STEIN SPERLING

BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

**MILLARD S. BENNETT**
ATTORNEY AT LAW
PRINCIPAL

25 West Middle Lane
Rockville, Maryland 20850

301-838-3203 direct
301-340-2020 main
301-354-8103 direct fax

mbennett@steinsperling.com
www.steinsperling.com

August 21, 2019

VIA FEDERAL EXPRESS & EMAIL (tsintolas@aol.com)
Tsintolas Investments Incorporated
Attn: Efstratios Tsintolas, President
3520 Connecticut Avenue, NW
Washington, DC 20008

File Number: 2141114.02

### RE:    TSINTOLAS INVESTMENTS INCORPORATED

Dear Mr. Tsintolas:

Please be advised that this law firm represents Christofilos and Debbie Tsintolas (the "Tsintolas") and Fotini Economides ("Economides") in matters related to their interests in Tsintolas Investments Incorporated ("TII").

As you know, the Tsintolas' and Economides are each twenty-five percent (25%) shareholders of TII, and together constitute two (2) of the four (4) directors on the Board of Directors of TII.

It has become abundantly clear from the actions you have taken and decisions you have made that there are serious and fundamental disagreements and division among the shareholders and directors relating to TII's current operations and its direction moving forward. For far too long, you have operated TII as essentially your own company, without transparency and without regard for the Board of Directors' oversight responsibilities. As just one example, you have repeatedly failed to provide the shareholders and directors of TII with financial and business information that they are legally entitled to review.

I will not go into detail in responding to the letters and limited documents you have provided, other than to say that what you provided was not sufficient and did not comply with your statutory obligations.

Our clients believe that TII's real estate assets are grossly underperforming when compared to their underlying values, and may likely require substantial capital investment in the near future to cover routine capital improvement expenditures, deferred maintenance,

# STEIN SPERLING

### BENNETT · DE JONG · DRISCOLL PC

#### ATTORNEYS AT LAW

as well as the matters set forth in the purported 2018[1] meeting minutes you provided, which note the following:

> [A]fter a brief discussion as to the meaning of the "C" classification and the age of the Company's apartment buildings; the increasingly oppressive nature of D.C.'s legislative and regulatory control in residential real estate; and failing, stagnant and discounted rents; it was unanimously agreed to discuss potential sales of Corporation-owned apartment building(s) during next year's meeting ....

In light of the above, my clients, as combined fifty percent (50%) shareholders and fifty percent (50%) of the directors sitting the Board of Directors of TII, hereby demand that:

A.  You confirm within seven (7) days from the date of this letter that our clients, and their representatives, will be provided with full access to all business financial records of TII, including access to all information in the possession of TII's accounting firm, upon our clients' request; and

B.  All of the real estate owned by TII be sold and, thereafter, that TII be liquidated.

To effectuate the sale of the real estate, our clients propose that an agreement be entered into by the shareholders and directors that would include the following items:

(i)  The appraisal of the real estate by an independent appraiser to be agreed upon and named in the agreement;

(ii)  The selection and hiring of an independent broker to be agreed upon and named in the agreement, who will be tasked with marketing and selling the properties;

(iii)  The minimum sales price of each piece of real estate, taking into account the appraisals and recommendations by the broker;

(iv)  The presentation of any contracts for sale to all four (4) stockholders for consideration;

(v)  The vote of at least two (2) out of the four (4) stockholders to move forward with the sale of any of the underlying real estate in the event

---

[1] Any actions taken at the March 30, 2019 meeting are null and void due to no quorum of the stockholders and directors being present.

6751395_1

# STEIN SPERLING

### BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

Tsintolas Investments Incorporated
August 21, 2019

that the proposed sale price is within an agreed upon percentage of the minimum price;

(vi)    A mechanism that would provide to lower the prices by certain percentages in the event that any property has not been sold within an agreed upon period;

(vii)   An agreement that the four (4) stockholders work in good faith and in a timely manner to liquidate the real estate;

(viii)  That upon the sale of the real estate, TII be dissolved in accordance with the laws of the District of Columbia; and

(ix)    Any other provisions the shareholders may agree upon.

In the event that you do not agree to proceed in accordance with the proposed plan and/or the shareholders and directors are unable to promptly reach an agreement as contemplated above, our client will have little alternative but to seek the intervention of the Court, including an action to appoint a receiver to sell the real estate and liquidate TII.

Finally, please also be advised that under District of Columbia law you lack the unilateral authority to hire legal counsel on behalf of TII. Decisions to hire legal counsel for a corporation in anticipation of litigation are reserved for the corporation's Board of Directors. *See* District of Columbia Code, §29-306.01(b). Accordingly, you are hereby put on notice that in the event you desire to hire legal counsel on behalf of TII such action must be presented to and approved by a majority of the Board of Directors prior to the engagement of any such legal counsel.

I would request that you respond to this letter by Wednesday, August 28, 2019.

Respectfully,

Millard S. Bennet, Esq.

cc:    Christofilos and Deborah Tsintolas
       Fotini Economides
       Cassandra Johnson

6751395_1

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Christofilos Tsintolas, et al.          Case Number: _____

vs                          Date: October 23, 2019

Tsintolas Investments, Inc., et al. ☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Matthew J. Pavlides <br> Firm Name: <br> Stein Sperling Bennett De Jong Driscoll PC <br> Telephone No.:          Six digit Unified Bar No.: <br> (301) 340-2020          #424573 | Relationship to Lawsuit <br> ☒ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury     ☐ 6 Person Jury     ☐ 12 Person Jury

Demand: $ _____          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____     Judge: _____     Calendar #: _____

Case No.: _____     Judge: _____     Calendar#: _____

---

NATURE OF SUIT:     *(Check One Box Only)*

**A. CONTRACTS**                    COLLECTION CASES

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent     ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent      ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                  ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                Over $25,000 Pltf. Grants Consent           Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation                  ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees           Under $25,000 Pltf. Grants Consent          Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                     Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile          ☐ 03 Destruction of Private Property     ☐ 05 Trespass
☐ 02 Conversion          ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process             ☐ 10 Invasion of Privacy               ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection      ☐ 11 Libel and Slander                      Not Malpractice)
☐ 03 Assault and Battery          ☐ 12 Malicious Interference            ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury  ☐ 13 Malicious Prosecution            ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)   ☐ 14 Malpractice Legal                ☐ 20 Friendly Suit
☐ 06 False Accusation             ☐ 15 Malpractice Medical (Including Wrongful Death)  ☐ 21 Asbestos
☐ 07 False Arrest                 ☐ 16 Negligence- (Not Automobile,     ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                             Not Malpractice)                 ☐ 23 Tobacco
                                                                        ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

**C. OTHERS**

- ☒ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☒ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

Matthew J. Pavlides
_____
Attorney's Signature

October 23, 2019
_____
Date

CV-496/ June 2015

Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Christofilos Tsintolas, et al.
_____
                                          Plaintiff
                        vs.
                                                            Case Number  _____
Tsintolas Investments, Inc.
_____
                                          Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Pavlides, DC Bar #424573
_____        *Clerk of the Court*
Name of Plaintiff's Attorney

25 West Middle Lane, Rockville, MD 20850
_____     By _____
Address                                              Deputy Clerk

(301) 838-3213
_____       Date _____
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오.    ፍላጎ፦ ትርጉም አማርኛ (202) 879-4828    

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                           Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____
                                              Subsecretario

_____
Dirección

Fecha _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828로 연락주십시오.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Christofilos Tsintolas, et al.
_____
                                        Plaintiff
                        vs.
                                                        Case Number _____

Efstratios Tsintolas
_____
                                        Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Pavlides, DC Bar #424573                     _Clerk of the Court_
_____
Name of Plaintiff's Attorney

25 West Middle Lane, Rockville, MD 20850          By _____
_____
Address                                                    Deputy Clerk

(301) 838-3213                                          Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요   ያማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                         Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
_____ Demandante

contra

Número de Caso: _____

_____
_____ Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                                      Subsecretario

_____

Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
만약에 번역을 원하시면 (202) 879-4828 로 전화해 주십시오.     ፕዮ፥ጐ፱ ፕርጥዎ፱ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                      Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Christofilos Tsintolas, et al.
_____
                                        Plaintiff

                    vs.
                                                        Case Number  _____

Cassandra Tsintolas Johnson Recovable Trust
_____
                                        Defendant

## SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Pavlides, DC Bar #424573                    *Clerk of the Court*
_____
Name of Plaintiff's Attorney

25 West Middle Lane, Rockville, MD 20850               By _____
_____
Address                                                              Deputy Clerk

(301) 838-3213                                          Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                                                     Demandante

              contra

                                                     Número de Caso: _____

_____
                                                     Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                     *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                        Por: _____
_____
Dirección                                                          Subsecretario

_____
                                        Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Dé có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 전화주십시오.        ፖ\ማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                          Super. Ct. Civ. R. 4

# EXHIBIT 3

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN ALTERNATIVE, ABSTAIN**

D.C. Superior Court
10/24/2019 19:03PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### (Civil Division)

**CHRISTOFILOS TSINTOLAS**         :
8415 Rapley Ridge Lane             :
Potomac, Maryland 20854            :
                                   :
And                                :
                                   :
**DEBORAH TSINTOLAS**              :
8415 Rapley Ridge Lane             :
Potomac, Maryland 20854            :    Case No.
                                   :
And                                :
                                   :
**FOTINI TSINTOLAS ECONOMIDES**    :
**REVOCABLE TRUST**                :
6265 Clearwood Road                :
Bethesda, Maryland 20817           :
                                   :
        Plaintiffs                 :
                                   :
        v.                         :
                                   :
**OLYMPIA INVESTMENTS, INC.**      :
3520 Connecticut Avenue, NW        :
Washington, D.C. 200008            :
                                   :
        Defendant                  :                    :
                                   :
And                                :
                                   :
**EFSTRATIOS TSINTOLAS**           :
14724 Westbury Road                :
Rockville, Maryland 20853          :
                                   :
        Interested Party           :
                                   :
And                                :
                                   :
**CASSANDRA TSINTOLAS JOHNSON**    :
**REVOCABLE TRUST**                :
13321 Query Mill Road              :
Potomac, Maryland 20878            :
                                   :
        Interested Party           :

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-9000

1

6845542_13

## COMPLAINT FOR JUDICIAL DISSOLUTION AND OTHER RELIEF

Plaintiffs, Christofilos Tsintolas ("Chris"), Deborah Tsintolas ("Deborah"), and Fotini Tsintolas Economides Revocable Trust ("Fotini") (collectively, the "Plaintiffs"), by and through their attorneys, Matthew J. Pavlides, Micah L. Kanters, and Stein Sperling Bennett De Jong Driscoll P.C., hereby sue Defendant, Olympia Investments, Inc. (the "Corporation"), for judicial dissolution, inspection of corporate records, and appointment of a receiver, and as grounds therefor, state as follows:

### INTRODUCTION

This case arises from oppressive conduct, failure to provide corporate documents, deadlock, irreparable injury, misapplication and wasting of corporate assets, as well as the disintegration of communication and trust between the parties.

### PARTIES

1.      Plaintiffs Christofilos Tsintolas ("Chris") and Deborah Tsintolas ("Deborah") are husband and wife.  They are adult residents of Montgomery County, Maryland.  They hold a 25% ownership interest in the Corporation.

2.      Plaintiff Fotini Tsintolas Economides Revocable Trust ("Fotini") is a revocable trust established for the benefit of Fotini Tsintolas Economides, who is an adult resident of Montgomery County, Maryland.  Plaintiff Fotini Tsintolas Economides Revocable Trust holds a 25% ownership interest in the Corporation. [1]

3.      Defendant Olympia Investments, Inc. (the "Corporation") is a District of Columbia corporation maintaining an office at 3520 Connecticut Avenue, NW, Washington, D.C. 20008.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

---

[1] For the sake of brevity, both the individual and her trust are referenced synonymously herein as "Fotini."

2

6845542_13

4.      Interested Party Efstratios Tsintolas ("Steve") is an adult resident of Montgomery County, Maryland and holds a 25% ownership interest in the Corporation.

5.      Interested Party Cassandra Tsintolas Johnson Revocable Trust ("Sandy") is a revocable trust established for the benefit of Cassandra Tsintolas Johnson, who is an adult resident of Montgomery County, Maryland.  Plaintiff Cassandra Tsintolas Johnson Revocable Trust holds a 25% ownership interest in the Corporation. [2]

6.      Chris, Fotini, Steve, and Sandy are the children of Mr. and Mrs. Demetrios Tsintolas.

7.      Chris, Fotini, Steve, and Sandy currently are each members of the Board of Directors of the Corporation.

8.  Steve currently serves as President of the Corporation.

9.  Sandy currently serves as Secretary of the Corporation.

<u>JURISDICTION</u>

10.      Jurisdiction is proper pursuant to D.C. Code Ann. §11-921 and D.C. Code Ann. §13-423.

<u>FACTUAL BACKGROUND</u>

11.      The Corporation was established in 1955 by Mr. and Mrs. Demetrios Tsintolas for the purpose of owning, operating, and managing real property for profit (the "Corporate Business").

12.      After the Corporation's establishment, Demetrios Tsintolas ran the Corporation.

13.      In or around October 2002, upon information and belief, Steve assumed the role of President of the Corporation.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

---

[2] For the sake of brevity, both the individual and her trust are referenced synonymously herein as "Sandy."

6845542_13

14.    In or around 2002, Chris, Fotini, Steve, and Sandy each received 25% of the shares of the Corporation.

15.    In or around July 2006, Chris transferred his shares to himself and Deborah as tenants by the entirety

16.    As the years went by, from 2002 to the present, Steve began to treat the Corporation more and more as if he were the sole shareholder and Director.

17.    Steve began taking an undisclosed salary from the Corporation, as well as an undisclosed management fee.

18.    Steve also began making undisclosed contracts with legal entities that he owned personally.

19.    Overall, Steve began to disregard his legal obligations to act in conjunction with the Board of Directors. Steve engaged in abusive and oppressive practices, unilaterally dictating the Corporation's actions without the necessary legal transparency and/or input from the Board of Directors and/or shareholders, including, but not limited to, the following:

    a.   Refusing to provide responses to lawful business and financial information requests;

    b.   Refusing to provide lawful responses to statutory books and records requests;

    c.   Entering into certain compensation agreements for himself and his personally-owned companies, which included undisclosed self-dealing;

    d.   Making inappropriate decisions to issue distributions only to select shareholders and Directors, while refusing to issue distributions to the others unless inappropriate demands were met;

    e.   Attempting to conduct Board of Director meetings without the requisite quorum;

    f.   Attempting to conduct shareholder meetings without the requisite quorum;

    g.   Purporting to take action on behalf of the Board of Directors based upon null and void Board of Director meetings;

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

4

h. Purporting to take action on behalf of the shareholders based upon null and void shareholder meetings;

i. Failing to hold annual elections for member of the Board of Directors;

j. Failing to hold annual elections for officers of the Corporation;

k. Purporting to adopt improper Board of Directors' Resolutions, which attempted to ratify past conduct of the officers of the Corporation based upon a null and void Board of Director meeting;

l. Purporting to adopt improper Shareholder Resolutions, which attempted to ratify past conduct of the officers of the Corporation based upon a null and void Shareholder meeting;

m. Purporting to adopt an improper Board of Directors' Resolution, which attempted to represent a unanimous agreement "not to distribute financial records at this time or in the near future";

n. Purporting to adopt an improper Shareholder Resolution, which attempted to represent a unanimous agreement "not to distribute financial records at this time or in the near future";

o. Failing to keep proper minutes reflecting the actual meetings of the Board of Directors;

p. Failing to keep proper minutes reflecting the actual meetings of the Shareholders of the Corporation;

q. Acting in a hostile and berating manner towards Fotini and Chris; and

r. Creating an atmosphere such that the Corporation is in a deadlock regarding its affairs.

20.    Steve's behavior became particularly flagrant in 2018.

21.    Fotini, as a member of the Board of Directors and a shareholder, on March 8, 2018 at 7:48am, specifically expressed her concern and requested detailed financial data from the Corporation regarding its ongoing operations, profitability, income, and expenses. (*See* Exhibit 1 attached hereto and incorporated by reference.)

22.    Steve's response to Fotini's request was a single word email on March 8, 2018 at 8:21am – "No." (*See* Ex. 1, Steve's response)

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

5

23.     Since March 2018, Steve has not been transparent or willing to furnish full and complete financial information to the members of the Board of Directors and shareholders regarding the Corporation.

24.     On or about March 30, 2019, Steve, as President of the Corporation, held a meeting of the Board of Directors and Shareholders.

25.     Neither the Board of Directors meeting nor the Shareholder meeting had the requisite quorum necessary for voting.  The Board of Directors meeting only had two (2) of the four (4) Directors in attendance, which does not constitute a majority.  Likewise, the Shareholder meeting only had representatives for 50% of the outstanding shares present, which does not constitute a majority.

26.     At the Board of Directors and Shareholder meetings, Steve unilaterally declared that there was unanimous agreement "not to distribute financial records at this time, or in the near future[,]" and further declared that there would be a dividend to each of the shareholders of the Corporation in the amount of $45,872.00.

27.     Unbeknownst to any of the other Directors/shareholders, Steve had, prior to the meeting, caused funds in the amount of $183,488 to be drawn from the Corporation's corporate account bank account and then exchanged for four (4) cashier's checks in the amount of $45,872.00, made payable to each of the shareholders.

28.     Steve distributed one cashier's check to himself and one to Sandy during the meeting; and then later distributed the third cashier's check to Fotini.

29.     Steve then took Chris and Deborah's cashier's check to his home.

30.     Steve took Chris and Deborah's cashier's check to his home so he could deprive Chris of the cashier's check until Chris agreed to come to Steve's home for a personal meeting. Steve's intent in retaining Chris and Deborah's cashier's check was to improperly assert his

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

6

sense of primacy and family dominance as the eldest son, while forcing a future personal meeting between just Steve and Chris to psychologically, emotionally, and verbally abuse his younger brother.

31.     Chris, on behalf of himself and Deborah, engaged in extensive efforts through email to obtain the cashier's check without agreeing to meet with Steve.

32.     Steve refused to provide the cashier's check in response to their email communication.

33.     On July 22, 2019, Chris and Deborah, through counsel, sent correspondence to Steve requesting basic corporate and financial information from the Corporation pursuant to D.C. Code Ann. §29-313.01(e) and §29-313.02. (*See* Exhibit 2 attached hereto and incorporated by reference.)

34.     Exhibit 2 reflects Chris and Deborah's lawful demand of this information in their capacity as a shareholder (albeit Chris would also be entitled to review this information in his capacity as a Director).

35.     In Exhibit 2, Chris and Deborah lawfully demanded the following:

   a.   Articles of Incorporation, including any amendments and restatements thereto;

   b.   Bylaws, including any amendments thereto;

   c.   Minutes of all shareholders' meetings and any resolutions or actions by the shareholders in lieu of a meeting during the last three (3) years;

   d.   Financial statements from the last three (3) years, including balance sheets, profit and loss statements, and income statements;

   e.   All other accounting records for the Corporation from the last five (5) years, including, but not limited, to accounting ledgers, bank statements, and income/expense statements for each property owned by the Corporation;

   f.   A list of the names and addresses of the current Directors and officers of the Corporation; and

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

7

g.  The most recent biennial report filed by the Corporation with the District of Columbia Department of Consumer and Regulatory Affairs.

36.     Rather than comply with the requests set forth in Exhibit 2, Steve refused to produce complete records.

37.     Steve's refusal is documented in his response set forth in Exhibit 3 (attached hereto and incorporated by reference), wherein he also stated: "Feel free to file an action in the D.C. Superior Court to challenge the corporations' decision."

38.     On August 21, 2019, Chris and Deborah, through counsel, sent a follow-up letter to Steve, reiterating, among many other things, that the limited documents provided were not sufficient to comply with Steve's statutory obligations on behalf of the Corporation, and that his behavior had produced a deadlock in the affairs of the Corporation, its Board of Directors, and its shareholders. (*See* Exhibit 4 attached hereto and incorporated by reference.)

<u>COUNT I</u>
(Judicial Dissolution – Olympia Investments, Inc.)

39.     Paragraphs 1-38, inclusive, are incorporated as if fully set forth herein.

40.     The Corporation has four (4) Directors.

41.     Two of the four Directors are Plaintiffs in this lawsuit, which readily demonstrates a deadlock among the Directors of the Corporation.

42.     The deadlock among the Directors cannot be broken and threatens irreparable injury to the Corporation.

43.     Fifty percent (50%) of the shareholders of the Corporation are Plaintiffs in this lawsuit, which readily demonstrates a deadlock among the shareholders of the Corporation.

44.     The deadlock among the shareholders cannot be broken and threatens irreparable injury to the Corporation.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301.340.2020

6845542_13

45.    On March 8, 2018, Fotini issued a good faith request for basic financial information. (*See* Exhibit 1.)

46.    Despite the Corporation's statutory obligations pursuant to D.C. Code Ann. §29-313.02 and §29-313.05, and the Corporation's obligations to Fotini as a member of the Board of Directors, to provide such information, Steve refused with a one-word answer – "No."

47.    On March 30, 2019, Steve initiated a shareholders' meeting for the Corporation. Despite lacking the necessary quorum, Steve unilaterally declared that there was unanimous agreement "not to distribute financial records at this time, or in the near future." Such purported action is void and a nullity, and threatens irreparable injury to the Corporation.

48.    Likewise, on March 30, 2019, Steve initiated a Board of Director's meeting. Despite lacking the necessary quorum, Steve unilaterally declared that there was unanimous agreement "not to distribute financial records at this time, or in the near future." .   Such purported resolutions are each void and a nullity, and such action threatens irreparable injury to the Corporation.

49.    Steve, on behalf of the Corporation, has refused to comply with Chris and Deborah's lawful request for basic corporate and financial information, despite the Corporation's statutory obligations pursuant to D.C. Code Ann. §29-313.02 and §29-313.05, and the Corporation's obligations to Chris as a member of the Board of Directors, to provide such information. Such purported action is improper and threatens irreparable injury to the Corporation.

50.    It is readily apparent that Steve views the Corporation as his personal fiefdom, where he is free to exercise undue, inappropriate, and oppressive control not only over the operation of the Corporation, but over the conduct of his siblings as well.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

9

51.    Steve's inappropriate conduct is inconsistent with his fiduciary duties as President of the Corporation, and has resulted in deadlock among the Directors and shareholders such that the Corporation's Business and affairs can no longer be conducted to the advantage of the shareholders.

52.    As set forth *supra* (¶ 19), Steve's conduct has evolved into abusive and oppressive practices as he seeks to unilaterally dictate the Corporation's actions without the necessary legal transparency and/or input from the Board of Directors and/or shareholders.

53.    Under the circumstances, Plaintiffs are entitled to a judicial dissolution of the Corporation pursuant to D.C. Code Ann. § 29-312.20.

WHEREFORE, Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust request that this Court:

A.   Direct the judicial dissolution of the Corporation;

B.   Impose upon the Corporation the procedures for judicial dissolution;

C.   Direct that the procedures for judicial dissolution be implemented by the Corporation, with the involvement of a Receiver;

D.   Award attorney's fees and costs; and

E.   Award such other and further relief as the nature of their cause may require.

## COUNT II
(Inspection of Corporate Records – Olympia Investments, Inc.)

54.    Paragraphs 1- 53, inclusive, are incorporated as if fully set forth herein.

55.    As both shareholders and directors, Plaintiffs Chris and Fotini are entitled to full access to the Corporation's accounting records pursuant to D.C. Code Ann. §29-313.02 and §29-313.05.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

10

6845542_13

56.     On March 8, 2018, Fotini issued a good faith request for basic financial information. (*See* <u>Exhibit 1</u>.)

57.     On July 22, 2019, Chris and Deborah, through counsel, issued a good faith request for basic corporate records and financial information. (*See* <u>Exhibit 2</u>.)

58.     Steve unilaterally refused to produce records to Fotini, giving no explanation.

59.     Likewise, in July 2019, Steve unilaterally refused to produce complete records, claiming that Chris and Deborah's request was not issued in good faith, based upon Steve's unilateral determination, and therefore the Corporation was not obligated to comply.

60.     To date, Steve and the Corporation have failed and refused to provide the requested corporate records and financial information to Plaintiffs.

WHEREFORE, Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust request that this Court:

A.  Order that Plaintiffs be permitted to inspect and copy the complete corporate records, at the expense of the Corporation;

B.  Order that the Corporation pay Plaintiffs' expenses, including attorneys' fees, in obtaining an order compelling production of the corporate records pursuant to D.C. Code Ann. § 29-313.04; and

C.  Award such other and further relief as the nature of their cause may require.

<u>COUNT III</u>
(Appointment of Receiver – Olympia Investments, Inc.)

61.     Paragraphs 1- 60, inclusive, are incorporated as if fully set forth herein.

62.     Steve, as President of the Corporation, has failed to comport himself appropriately in that role, and has further violated his fiduciary duties by engaging in oppressive actions that threaten irreparable injury to the Corporation.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

6845542_13

63.   Due, in large part, to Steve's actions, the Directors/shareholders of the Corporation are deadlocked in the management of corporate affairs.

64.   As a result, the Corporate Business has been frustrated, and the Corporation's assets are at risk of dissipation and depreciation while the Directors/shareholders remain in deadlock.

65.   Under these circumstances, pursuant to D.C. Code Ann. § 29-312.22, the law permits the appointment of a Receiver to take control of the Corporation, as well as its funds and assets, such that they may preserve the remaining assets and arrange for the orderly liquidation and dissolution of the Corporation.

WHEREFORE, Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust request that this Court:

A.   Appoint a third-party as Custodian on behalf of the Corporation, with all fees and costs to be paid by the Corporation, to be responsible for the winding up of the Corporation's operations, including the sale of all corporate assets and the distribution of all proceeds to the Corporation's shareholders;

B.   Award attorney's fees and costs; and

C.   Award such other and further relief as the nature of their cause may require.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

6845542_13

Respectfully submitted,

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

By:  /s/ Matthew J. Pavlides

Matthew J. Pavlides (D.C. Bar #424573)
Micah L. Kanters (D.C. Bar #198563)
25 West Middle Lane
Rockville, Maryland 20850
Direct: 301-340-2020
Fax: 301-354-8113
mpavlides@steinsperling.com
mkanters@steinsperling.com

*Attorneys for Plaintiffs*

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

13

6845542_13

# EXHIBIT 1

4cet@comcast.net

| | |
|---|---|
| **From:** | Fo <feconomides51@aol.com> |
| **Sent:** | Thursday, March 08, 2018 8:37 AM |
| **To:** | tsintolas@aol.com |
| **Cc:** | cassandra.t.johnson.civ@mail.mil; 4cet@comcast.net |
| **Subject:** | Re: K-1 update |

Unacceptable response  There are four shareholders not one

*Sent from my iPhone*

On Mar 8, 2018, at 8:21 AM, tsintolas@aol.com wrote:

> No

> -----Original Message-----
> From: feconomides51 <feconomides51@aol.com>
> To: tsintolas <tsintolas@aol.com>; cassandra.t.johnson.civ <cassandra.t.johnson.civ@mail.mil>; 4cet <4cet@comcast.net>
> Sent: Thu, Mar 8, 2018 7:48 am
> Subject: Re: K-1 update

> Steve--

> Thank you for your email, but I am concerned about a few things:

> 1.  Our checks should not be held hostage until 3/31--**please include checks with the K1 forms**.
> 2.  I know that I have personally  requested a yearly meeting for over 8 years to discuss each building and plan for the future--you have rebuffed  each request. Sandy and Chris have also asked for a meeting, and they have been rebuffed.
> 3.  For the past 7 years, I have asked you to include a detailed profit/loss ledger with all expenses and receipts for each building along with the end of year profit/loss statement and tax returns for both Tsintolas Investments and Olympia Investments.  You have promised to send us a copy. Request never honored. We cannot make informed decisions without documentation.
> 4. Please include the ledgers with all 2017 expenses and receipts and the tax returns for OI and TI with our K1 statements.
> 5. At our meeting, please have a copy for all shareholders of OI and TI of all ledgers and tax returns for the past 8 years so we can review and discuss future plans.

> Fotini

> -----Original Message-----
> From: tsintolas <tsintolas@aol.com>
> To: feconomides51 <feconomides51@aol.com>; cassandra.t.johnson.civ <cassandra.t.johnson.civ@mail.mil>; 4cet <4cet@comcast.net>
> Sent: Thu, Mar 8, 2018 4:34 am
> Subject: K-1 update

> Your 2017 K-1 forms will be mailed out today. At Mom's request, I will hold a meeting on Saturday afternoon, March 31st at Beverly Road to go over a few things. Distribution checks will be provided at that time.

# EXHIBIT 2

# STEIN SPERLING
### BENNETT · DE JONG · DRISCOLL PC
ATTORNEYS AT LAW

**MILLARD S. BENNETT**
ATTORNEY AT LAW
PRINCIPAL

25 West Middle Lane
Rockville, Maryland 20850

301-838-3203 direct
301-340-2020 main
301-354-8103 direct fax

mbennett@steinsperling.com
www.steinsperling.com

July 22, 2019

**BY OVERNIGHT MAIL**
Olympia Investments, Inc.
Attn: Efstratios Tsintolas, President
3520 Connecticut Avenue, NW
Washington, DC 20008

File Number: 2141114.02

**Re:    REQUEST FOR CORPORATE RECORDS**

Dear Mr. Tsintolas:

This law firm represents Christofilos and Deborah Tsintolas (the "Tsintolases") in matters related to their ownership of stock in Olympia Investments, Inc. ("Olympia").

As shareholders in Olympia, and pursuant to Sections 29-313.02 and 29-313.01(e) of the District of Columbia Code (the "Code"), the Tsintolases are entitled to inspect and copy the corporate records of Olympia upon providing notice of demand to the corporation. Accordingly, the Tsintolases hereby demand that Olympia either provide copies of the following corporate records to my office by recognized overnight courier within seven (7) days from the date of this letter or advise of a date and time during normal business hours that the Tsintolases and/or their representatives may inspect and copy such records at Olympia's office:

1. Articles of Incorporation, including any amendments and restatements thereto;

2. Bylaws, including any amendments thereto;

3. Minutes of all shareholders' meetings and any actions taken by the shareholders in lieu of a meeting during the last three (3) years;

4. Financial statements from the last three (3) years, including balance sheets, profit and loss statements, and income statements;

5. All other accounting records for Olympia from the last five (5) years, including, but not limited to, account ledgers, bank statements, and income/expense statements for each property owned by Olympia;

6. A list of the names and addresses of the current directors and officers; and

7. The most recent biennial report filed with the District of Columbia Department of Consumer and Regulatory Affairs.



## STEIN SPERLING
BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

Page 2

Efstratios Tsintolas
July 22, 2019

The Tsintolases are hereby making this demand so they may investigate why Olympia has consistently underperformed financially despite the substantial value of its underlying real estate resulting in lower returns on the Tsintolases' investment in Olympia.

Be advised that your failure to timely comply with the record requests set forth herein may result in the Tsintolases obtaining a court order to enforce their shareholder rights. In such event, and pursuant to Section 29-313.04(c) of the Code, Olympia may be required to pay the Tsintolases' legal expenses incurred in obtaining such order.

We look forward to timely receipt of the requested records.

Sincerely,

Millard S. Bennett

MSB:jas
cc:    Christofilos and Deborah Tsintolas

6674825_4

# EXHIBIT 3

July 29, 2019

Mr. Millard Bennett
Stein Sperling PC
25 West Middle Lane
Rockville, Maryland 20850

*Delivered via Facsimile 301-354-8103*

Dear Mr. Bennett,

On behalf of Tsintolas Investments, Inc. and Olympia Investments, Inc., this correspondence is in response to your letters dated July 22, 2019, in which your clients, shareholder Dr. and Mrs. C. Tsintolas request the inspection and duplication of various corporate documents pursuant to D.C. Code §§ 29-313.01 and 29-313.02.

D.C. Code § 29-313.01(e)(1-7) specifies the documents to which shareholders are entitled to inspect and/or duplicate and, pertinent to your clients' request, include: corporate articles of incorporation; corporate by-laws; minutes of all shareholders' meetings and records of all action(s) taken by shareholders without a meeting for the past 3 years; financial statements for the past 3 years, as defined under § 29-313.07 (..."a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of changes in shareholders' equity for the year unless that information appears elsewhere in the financial statements." § 29-313.07(a)); a list of the names and business addresses of its current directors and officers; and, a copy of the most recent biennial report delivered to the Mayor under § 29-102.11.

In addition, your clients have requested, pursuant to D.C. Code § 29-313.02(b)(2), "[a]ccounting records of the corporation." In your correspondence, accounting records for the past five years for both corporations are requested to conduct an "investigation," "including but limited to: account ledgers, bank statements, and income/expense statements for each property owned by [each company]." The purpose of this "investigation" is for the Tsintolases (sic) to determine why Tsintolas Investments, Inc. and Olympia Investments, Inc. have "consistently underperformed financially despite the substantial value of its underlying real estate resulting in lower returns" on your clients' "investment in" the two companies. Accounting records are made available pursuant to D.C. Code § 29-313.02(c) only if:

  (1) The shareholder's demand is made in good faith and for a proper purpose;
  (2) The shareholder describes with reasonable particularity the shareholder's purpose and
      the records the shareholder desires to inspect; and,
  (3) The records are directly connected with the shareholder's purpose.

page 2

All records and documents available responding to your clients' requests are attached hereto. Please note: the Articles of Incorporation date back to 1955 for Olympia and 1961 for Tsintolas Investments. My parents solely ran the companies for decades; both with little-to-no formal business education. The business moved no less than twice over the years, and early recordkeeping was manual. To date, no original By-Laws have been found.  The list of names and business addresses of the Directors and Officers is provided in the most recent biennial report delivered to the Mayor pursuant to D.C. Code § 29-102.11 attached hereto.

The shareholder's request to inspect and duplicate the accounting records of both corporations, pursuant to D.C. Code § 29-313.02(b)(2), is denied, as it fails to comply with D.C. Code § 29-313.02(c). Dr. and Mrs. Tsintolas' demand is not made in good faith, nor for a proper purpose. First, during Dr. Tsintolas' initial tenure as a Board member of both corporations for +10 years (1990-2001), neither company was financially sound, stable or solvent enough to declare a single dollar in dividends in any year, as evidenced by his own signature on the Corporate Minutes. He knows full-well of the businesses' dire financial state and that since becoming President, I turned both companies around from near bankruptcy to a break-even corporation (Tsintolas Investments), and to a profitable company (Olympia) that has consistently distributed dividends each year, totaling approximately $339,000 per shareholder (2006-2018). Had I not intervened, Dr. Tsintolas knows that, at the very least, the City would likely have foreclosed on some of my parents' properties due to unpaid taxes/utilities, and there would be no distribution checks. Further, neither Dr. nor Mrs. Tsintolas "invested in" either company by expending an ounce of sweat or a single dollar into either entity. Their financial interests arise singularly and solely from the shares gifted to Dr. Tsintolas by his parents. Since their actual financial investment in the companies is zero dollars, their rate of return to date is incalculable.

Second, to suggest Dr. or Mrs. Tsintolas are suddenly so concerned about alleged under-performance of either corporation that it was necessary to hire an attorney and make a formal demand for an "investigation" is laughable, as neither has shown a scintilla of interest in attending a single annual meeting in the past; either personally or by telephone, including the recent March 2018 or March 30, 2019 meeting, as evidenced by the attached Meeting Minutes. In over 30 years, he has never asked to visit an apartment building, about maintenance or government regulation issues related to the apartment buildings, nor has he asked to discuss the operation of the business(es). Dr. Tsintolas' exclusive interest has consistently and solely been the timing of the annual K-1 and the distribution check(s).

Third, Dr. and Mrs. Tsintolas' demand is a thinly veiled attempt to intimidate my family, particularly my son, and to discourage him from filing a dental malpractice suit against Dr. Tsintolas' dental practice.

page 3

Your clients are very much aware of my son's, Dr. Tsintolas' nephew, devastating physical injury and the financial costs borne as a result of Dr. Tsintolas' negligence. He is further aware of the college scholarship and professional career opportunities lost to my son as direct result of said dental negligence. It is well known that family members shared with Dr. Tsintolas that various people suggested to my son that he, as well as other like college Division-1 athletes suffering the same ailment due to negligent orthodontics, possess facts sufficient to support a dental malpractice case. My son formally requested a full copy of his dental records from Dr. Tsintolas' office in late June 2019, and his records were mailed, dated July 1, 2019. Within 3 weeks, the Dr. Tsintolas' present demand arrived alleging business mismanagement of the two family-owned companies I manage, and asserting a need to "investigate" these businesses for "consistent under-performance."

The timing of Dr. Tsintolas' demand suggesting business mismanagement which comes directly on the heels of my son's request for his full dental records (an action any lawyer recognizes as a precursor to a malpractice action) is not lost here, Mr. Bennett. It is a blatant, tit-for-tat, harassment tactic and beneath an attorney of your stature. Your clients' attempt to indirectly coerce my son — Dr. Tsintolas' nephew, in this manner will not dissuade him from whatever choice he makes regarding all legal options available to justly compensate him for his losses; nor will it support the Tsintolas' D.C. Code § 29–313.02(b)(2) demand, due to a failure to meet the statutory elements required in D.C. Code § 29–313.02(c).

It is abundantly clear that the demand to inspect and duplicate the accounting records for each corporation for the purpose of "investigating" possible business mismanagement and "consistent underperformance" is not made in good faith. Dr. and Mrs. Tsintolas made no financial "investment in" either company and have only reaped an incalculable rate of return since 2006, as opposed to that which he gained prior to my assuming the role as President of the companies and, notably never sought any such "investigation." [1] Neither of your clients has shown any interest in either company to date, including, but not limited to, the Annual Meetings of both corporations in March 2018 and 2019. And, given that Dr. and Mrs. Tsintolas' interest in the "underperformance" of the family companies did not arise until immediately after the President's son formally requested a copy of his full dental records, it is clear the present demand is not for a proper purpose but, rather to harass, and intimidate and coerce the family of and a potential plaintiff in a dental malpractice case against Dr. Tsintolas' practice. Therefore, your clients' request is denied.

Feel free to file an action in the D.C. Superior Court to challenge the corporations' decision. If necessary, this matter can be decided in open court and on the public record. I will advise you shortly as to where and to whom to forward the service of process.

page 4

Respectfully,

Efstratios D. Tsintolas
President, Olympia Investments, Inc.
President, Tsintolas Investments, Inc.

Encl.

c: File

---

[1] Notably, despite decades of financial instability and consistent failure to distribute dividends, Dr. and Mrs. Tsintolas did not complain or seek an "investigation" of "underperformance" of any family-owned company until the President's son requested a full copy of his dental records and Dr. Tsintolas foresaw a dental malpractice claim on the near horizon affecting his practice.

Jul 29 2019 03:34PM HP Fax 2022442210

# EXHIBIT 4

# STEIN SPERLING

BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

**MILLARD S. BENNETT**
ATTORNEY AT LAW
PRINCIPAL

25 West Middle Lane
Rockville, Maryland 20850

301-838-3203 direct
301-340-2020 main
301-354-8103 direct fax

mbennett@steinsperling.com
www.steinsperling.com

August 21, 2019

VIA FEDERAL EXPRESS & EMAIL(tsintolas@aol.com)
Olympia Investments, Inc.
Attn: Efstratios Tsintolas, President
3520 Connecticut Avenue, NW
Washington, DC 20008

File Number: 2141114.02

**RE:    OLYMPIA INVESTMENTS, INC.**

Dear Mr. Tsintolas:

Please be advised that this law firm represents Christofilos and Debbie Tsintolas (the "Tsintolas") and Fotini Economides ("Economides") in matters related to their interests in Olympia Investments, Inc. ("Olympia").

As you know, the Tsintolas' and Economides are each twenty-five percent (25%) shareholders of Olympia, and together constitute two (2) of the four (4) directors on the Board of Directors of Olympia.

It has become abundantly clear from the actions you have taken and decisions you have made that there are serious and fundamental disagreements and division among the shareholders and directors relating to Olympia's current operations and its direction moving forward. For far too long, you have operated Olympia as essentially your own company, without transparency and without regard for the Board of Directors' oversight responsibilities. As just one example, you have repeatedly failed to provide the shareholders and directors of Olympia with financial and business information that they are legally entitled to review.

I will not go into detail in responding to the letters and limited documents you have provided, other than to say that what you provided was not sufficient and did not comply with your statutory obligations.

Our clients believe that Olympia's real estate assets are grossly underperforming when compared to their underlying values, and may likely require substantial capital investment in the near future to cover routine capital improvement expenditures, deferred

# STEIN SPERLING

BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

Page 2

Olympia Investments, Inc.
August 21, 2019

maintenance, as well as the matters set forth in the purported 2018[1] meeting minutes you provided, which note the following:

> [A]fter a brief discussion as to the meaning of the "C" classification and the age of the Company's apartment buildings; the increasingly oppressive nature of D.C.'s legislative and regulatory control in residential real estate; and failing, stagnant and discounted rents; it was unanimously agreed to discuss potential sales of Corporation-owned apartment building(s) during next year's meeting ....

In light of the above, my clients, as combined fifty percent (50%) shareholders and fifty percent (50%) of the directors sitting on the Board of Directors of Olympia, hereby demand that:

A.  You confirm within seven (7) days from the date of this letter that our clients, and their representatives, will be provided with full access to all business financial records of Olympia, including access to all information in the possession of Olympia's accounting firm, upon our clients' request; and

B.  All of the real estate owned by Olympia be sold and, thereafter, that Olympia be liquidated.

To effectuate the sale of the real estate, our clients propose that an agreement be entered into by the shareholders and directors that would include the following items:

(i)    The appraisal of the real estate by an independent appraiser to be agreed upon and named in the agreement;

(ii)   The selection and hiring of an independent broker to be agreed upon and named in the agreement, who will be tasked with marketing and selling the properties;

(iii)  The minimum sales price of each piece of real estate, taking into account the appraisals and recommendations by the broker;

(iv)   The presentation of any contracts for sale to all four (4) stockholders for consideration;

(v)    The vote of at least two (2) out of the four (4) stockholders to move forward with the sale of any of the underlying real estate in the event

---

[1] Any actions taken at the March 30, 2019 meeting are null and void due to no quorum of the stockholders and directors being present.

# STEIN SPERLING

BENNETT · DE JONG · DRISCOLL PC

ATTORNEYS AT LAW

Page 3

Olympia Investments, Inc.
August 21, 2019

that the proposed sale price is within an agreed upon percentage of the minimum price;

(vi)  A mechanism that would provide to lower the prices by certain percentages in the event that any property has not been sold within an agreed upon period;

(vii)  An agreement that the four (4) stockholders work in good faith and in a timely manner to liquidate the real estate;

(viii) That upon the sale of the real estate, Olympia be dissolved in accordance with the laws of the District of Columbia; and

(ix)  Any other provisions the shareholders may agree upon.

In the event that you do not agree to proceed in accordance with the proposed plan and/or the shareholders and directors are unable to promptly reach an agreement as contemplated above, our client will have little alternative but to seek the intervention of the Court, including an action to appoint a receiver to sell the real estate and liquidate Olympia.

Finally, please also be advised that under District of Columbia law you lack the unilateral authority to hire legal counsel on behalf of Olympia. Decisions to hire legal counsel for a corporation in anticipation of litigation are reserved for the corporation's Board of Directors. *See* District of Columbia Code, §29-306.01(b). Accordingly, you are hereby put on notice that in the event you desire to hire legal counsel on behalf of Olympia such action must be presented to and approved by a majority of the Board of Directors prior to the engagement of any such legal counsel.

I would request that you respond to this letter by Wednesday, August 28, 2019.

Respectfully,

Millard S. Bennet, Esq.

cc:   Christofilos and Deborah Tsintolas
      Fotini Economides
      Cassandra Johnson

6739410_4

Respectfully submitted,

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

By:      /s/ Matthew J. Pavlides
Matthew J. Pavlides (D.C. Bar #424573)
Micah L. Kanters (D.C. Bar #198563)
25 West Middle Lane
Rockville, Maryland 20850
Direct: 301-340-2020
Fax: 301-354-8113
mpavlides@steinsperling.com
mkanters@steinsperling.com

*Attorneys for Plaintiffs*

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

6845542_13

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Christofilos Tsintolas, et al.      Case Number: _____

vs            Date: __October 23, 2019_____

Olympia Investments, Inc., et al.    ☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Matthew J. Pavlides <br> Firm Name: <br> Stein Sperling Bennett De Jong Driscoll PC <br> Telephone No.:    Six digit Unified Bar No.: <br> (301) 340-2020    #424573 | Relationship to Lawsuit <br> ☒ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury     ☐ 6 Person Jury     ☐ 12 Person Jury

Demand: $_____     Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar#:_____

---

NATURE OF SUIT:    *(Check One Box Only)*

**A. CONTRACTS**

COLLECTION CASES

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property |     Over $25,000 Pltf. Grants Consent |     Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees |     Under $25,000 Pltf. Grants Consent |     Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration <br>     Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander |     Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 19 Wrongful Eviction |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 20 Friendly Suit |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 21 Asbestos |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, | ☐ 22 Toxic/Mass Torts |
| ☐ 08 Fraud |     Not Malpractice) | ☐ 23 Tobacco |
| | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE     IF USED

# Information Sheet, Continued

**C. OTHERS**

- ☒ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☒ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

Matthew J. Pavlides

Attorney's Signature

October 23, 2019

Date

CV-496/ June 2015



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Christofilos Tsintolas, et al.
_____
Plaintiff

vs.                                                         Case Number _____

Olympia Investments, Inc.
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Pavlides, DC Bar #424573
_____
Name of Plaintiff's Attorney                              *Clerk of the Court*

25 West Middle Lane, Rockville, MD 20850
_____
Address                                                   By _____
                                                               Deputy Clerk

(301) 838-3213
_____
Telephone                                                 Date _____

如需翻译, 请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화해 주십시오.         የአማርኛ  ትርጉም  ለማግኘት  (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                   Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                    Demandante
        contra
                                                    Número de Caso: _____

_____
                    Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                        *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                Por: _____
_____
Dirección                                                Subsecretario

_____
                                Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202)879-4828 로 전화주십시오.      ያለፍላጎትዎ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                        Super. Ct. Civ. R. 4



Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Christofilos Tsintolas, et al.
_____
                                                    Plaintiff
                                vs.

                                                              Case Number _____

Efstratios Tsintolas
_____
                                                    Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Pavlides, DC Bar #424573
_____          *Clerk of the Court*
Name of Plaintiff's Attorney

25 West Middle Lane, Rockville, MD 20850
_____          By _____
Address
                                                              Deputy Clerk

(301) 838-3213
_____          Date _____
Telephone
如需翻譯請打電話 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                                              Demandante

contra

                                                          Número de Caso:  _____

_____
                                              Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                       *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                              Por: _____
_____
Dirección                                                    Subsecretario

                                              Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202)879-4828 로 전화주십시오        ያማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Christofilos Tsintolas, et al.
_____
Plaintiff
vs.                                                          Case Number _____

Cassandra Tsintolas Johnson Revocable Trust
_____
Defendant

**SUMMONS**

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Pavlides, DC Bar #424573
_____        *Clerk of the Court*
Name of Plaintiff's Attorney

25 West Middle Lane, Rockville, MD 20850
_____        By _____
Address                                              Deputy Clerk

(301) 838-3213
_____        Date _____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오    ያማርኛ ትርጉም አማፕኛት (202) 879-4828 .ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                              Super. Ct. Civ. R. 4



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                                    Demandante
                contra

                                    Número de Caso: _____

_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                    Por: _____
_____
Dirección                                              Subsecretario

_____

                                    Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Dể có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202)879-4828 로 연락주십시오      ዝርዝር ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                    Super. Ct. Civ. R. 4

# **EXHIBIT 4**

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

|  |  |
|---|---|
| **CHRISTOFILOS TSINTOLAS**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**TSINTOLAS INVESTMENTS, INC.**, *et al.*,<br>Defendants. | **2019  CA  007057 B**<br><br>**2019  CA  007059B**<br><br>**Judge Yvonne Williams** |
| **CHRISTOFILOS TSINTOLAS**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**OLYMPIA INVESTMENTS, INC.**, *et al.*,<br>Defendants. |  |

## <u>TRIAL ORDER</u>

These consolidated matters appeared before the Court for a Non-Jury Trial ("Trial") on September 26-28, 2022, November 14-15, 2022, and January 9-10, 2023. Upon review of the evidence and arguments presented at Trial and in Post-Trial Briefing, the Court makes the following findings of fact and conclusions of law.

### I.    FACTUAL AND PROCEDURAL HISTORY

This is a case arising under D.C. Code § 29.312.20 *et seq.* for dissolution of two closely-held family corporations: Tsintolas Investments ("TI"); and Olympia Investments ("OI") (collective, "the Corporations"). Plaintiffs Christofilos ("Chris") Tsintolas and Deborah Tsintolas ("Deborah") collectively own 25% of the shares of each Corporation. Plaintiff Fotini Tsintolas Economides ("Fotini") also owns 25% of the shares of each Corporation. Their siblings, Efstratios D. Tsintolas ("Steve"), and Cassandra Tsintolas Johnson through the Cassandra Tsintolas Johnson

1

Revocable Trust ("Cassandra") intervened as Interested Parties (collectively, the Corporations and Interested Parties are the "Defendants").

In October 2019, Plaintiffs filed these two actions to dissolve each Corporation. Pursuant to D.C. Code § 29-312.24(a), the Corporations elected to purchase the shares in lieu of dissolving. The Court's role is to determine the fair value of each Corporation and order the Corporations to purchase Plaintiffs' shares at fair value. D.C. Code § 29-312.24.

### a. History of Tsintolas Investments and Olympia Investments

#### 1. Historical Background

We begin with a history of two Corporations and Plaintiffs' roles as shareholders. In the 1950s, Demetrios and Helen Tsintolas ("the Parents") formed OI. OI owned and operated residential apartment complexes in Washington, D.C., and Maryland. Around the same time, the Parents formed Tsintolas Realty Company ("TRC"), which overtook management of the apartment complexes. In the 1960s, the Parents formed TI, which also owned and operated residential apartment complexes.

The Parents had four children: Plaintiff Fotini, Cassandra, Steve, and Plaintiff Chris (collective, the "Children"). Each child performed odd jobs for the two Corporations in their teenage and young adult years but it was Steve who had an affinity for the real estate, construction, and renovation industries. Relevant to this case, Steve owned and operated four other companies: Hercules Decorating and Remodeling ("Hercules I") from 1975 to 1983; Hercules and Company, Ltd. ("Hercules II") from 1983 to 1987; Acardian Construction Company ("Acardian" or "ACC") from 1987 to the present; and D.E. Nicholas, Inc., ("D.E. Nicholas") from 1987 to present. Beginning in 1990, the Parents turned to Steve to manage OI and TI. In 1995, Steve and TI entered into a formal Property Management Agreement ("1995 PMA") which outlined how Steve would

be compensated for his work as the property manager. *See* Defendants' Trial Exhibit ("D.Ex") 12. The 1995 PMA would remain in effect until December 31, 2004 and would automatically renew for a term of ten years and successive like periods of time unless formally terminated. *Id.* at ¶ 1. The 1995 PMA remained in effect as of the date of Trial.

On March 1, 1997, Steve Tsintolas executed a PMA with Olympia Investments ("1997 PMA"). D.Ex. 11. Like the 1995 PMA, the 1997 PMA promises Steve payment for prior services and agrees to compensate him for future management services. The 1997 PMA promises Steve 75% of all first month's rent from new tenants and 8% of OI's gross revenue. D.Ex. 11 ¶ 5.

## 2. Transfer to Current Ownership

In 2002, the Parents decided that they wanted to begin transferring their assets to the Children. The Parents called a family meeting at which they transferred 25% of the shares of both TI and OI to all four of the Children equally. The Parents dictated that Steve would be the President of both Corporations, Chris would serve as Vice President ("VP"), Fotini would serve as Secretary, and Sandy would serve as Treasurer. Steve would continue to operate the business as the Property Manager pursuant to the PMA. All four children agreed to the arrangement. Functionally, little changed.

From 2002 to 2010, the Corporations operated informally. When the Parents, the Children, and their families would convene for Christmas or other holidays, Steve would gather the Officers and discuss the Corporations. At each annual meeting from 2002 to 2010, Steve would present a draft of the previous years' minutes and the Officers would sign them. *See*, D.Ex. 49 at DEF 512-538 (Minutes and Waivers of Notice of Annual Meeting of Stockholders and Directors of Olympia Investments, December 2002 to December 2010). The Minutes for each year contain boilerplate language and offer no insight into the operations of the Corporations. From 2010 to the present,

the Corporations held no meetings. Steve would present draft "minutes" for Chris to sign from time to time, and Chris acquiesced. From 2010 to 2016, no one raised any written concerns about these processes or formally demanded a meeting. For many of these years, the Corporations were not profitable and did not issue dividends to shareholders. In 2016 or 2017, Chris, later joined by Fotini, requested and received copies of the Corporations' tax returns from 2005 to 2016 from the Corporations' accountant.

### 3.   Controversies Leading to This Lawsuit

In 2017, Fotini began to have concerns about the operation of the Corporations. On or about January 27, 2017, Fotini drafted a letter to Steve ("2017 Letter") stating that:

> [f]or the past seven years, we have been trying to set up a meeting with the [Children] to discuss Olympia Investments and Tsintolas Investments. In addition, as 25% owners of each, we have not received a monthly or yearly accounting of our investments.

D.Ex. 64. More specifically, Fotini sought information regarding: the real estate owned by the Corporations; financial information including bank accounts, escrow accounts, and security deposit accounts; rental income information; information on the units and gross profits from residential rents; monthly expenses including maintenance, upkeep, taxes, loans, and insurance costs; the number of vehicles owned by the Corporations and related expenses; the number of employees and their wages, salaries, and benefits; other professional fees; any minutes or other corporate filings with the governments of D.C. or Maryland; the Corporations' relationships with TRC; and information about who was in control of their mother's, Helen Tsintolas, assets. *Id*. On or about June 2017, Fotini asked Chris and Cassandra to sign the 2017 Letter but both refused. The letter was never actually sent to Steve.

By March 2018, Steve learned that Fotini had concerns about the operation of the Corporations. On March 8, 2018, Steve emailed the Children to call a meeting for March 31, 2018.

D.Ex. 47. He also stated that he had shareholders' dividend checks for each shareholder which he would provide at the meeting. *Id*. Fotini requested that Steve provide at the meeting "a detailed profit/loss ledger with all expenses and receipts for each building along with the end of year profit/loss statement and tax returns for both Tsintolas Investments and Olympia Investments" covering the past eight years. *Id*. Steve, Cassandra, and Fotini all testified that on or about March 31, 2018, Steve, Chris, Cassandra, and Helen met in Helen's house ("2018 Meeting"). *See* D.Ex. 49 at DEF 539-42. Chris was not present due to an illness. Steve presented multiple cardboard boxes which he stated were full of corporate documents and countless unpaid invoices. Steve asserted that the Corporations were unable to fulfill their obligations, including obligations to him pursuant to the PMAs. The Minutes reference construction and maintenance debts going back to the 1970s owed to Steve's companies but do not identify amounts. D.Ex. 49 at DEF 539-42. Steve represented at the meeting that the Corporations owed him approximately $800,000. Fotini testified that she vehemently opposed Steve being paid that money and it was her belief that his demand for payment was a based on a sense of entitlement as the eldest son and the one who had run the Corporations. Steve maintains that the sum was an accurate demand based on the PMAs and other services provided by his companies: Hercules I and II; Acardian; and D.E. Nicholas. The 2018 Meeting concluded without a resolution. Fotini did not review the records Steve presented at the meeting. Cassandra signed the Minutes, and only Cassandra and Steve signed the Waiver of Notice for the 2018 Meeting. D.Ex. 49 at DEF 542-43.

The next formal meeting occurred on March 30, 2019 ("2019 Meeting"). Only Steve and Cassandra attended. D.Ex. 49 at DEF 544-46. Fotini testified that she chose not to attend because she felt she had been mistreated at the 2018 Meeting and Chris testified that he chose not to attend in solidarity with Fotini. Steve and Cassandra discussed the possibility selling some of the

5

Corporations' real estate because of mounting debts and the potential for future high maintenance and upkeep expenses. *Id*. Again, the Corporation issued shareholder dividends. *Id*. at DEF 546. Steve distributed his check and Cassandra's check personally at the 2019 Meeting. *Id*. After the 2019 Meeting, Steve withheld Fotini's and Chris' checks until they would meet with him in person. Chris and Fotini refused to meet with Steve and repeatedly requested financial and other Corporate information. In 2019, Fotini and Chris filed suit in Montgomery County, MD, against the Corporations to recover their distribution checks. That issue was resolved between the Parties in December 2019. *See* Joint Pretrial Statement ("JPS") 10.

### b. Procedural History

#### 1. Pretrial

On October 24, 2019, Fotini, Chris, and Chris' wife, Deborah, filed the instant suits seeking judicial dissolution of TI and OI (case numbers 2019 CA 007057 and 2019 CA 007059, respectively). The Plaintiffs stated three Counts in each Complaint: (I) judicial dissolution; (II) inspection of corporate records; and (III) appointment of a receiver. In January 2020, Steve and the Cassandra Tsintolas Johnson Revocable Trust entered appearances as Interested Parties. On January 21, 2020, both Corporations elected to purchase the shares instead of dissolving pursuant to D.C. Code § 29-312.24. On March 30, 2020, the Court granted a Consent Motion to Consolidate the cases.

Between October 2019 and March 2020, Plaintiffs negotiated with the Corporations to buy out Plaintiffs' shares. The Corporations retained an expert, Alfred Riley, to conduct a business valuation, and used the valuation to negotiate the buyout. Defendants' last offer was for $69,000 per 25% share of TI and $2,703,304 per 25% of OI. JPS 10. Plaintiffs' last demand was for 4,050,000 per 25% share of both Corporations. *Id*. at 11. Defendants declined an offer to participate

6

in private mediation and did not make any further written offers. On September 15, 2022, the Parties participated in Multidoor mediation but did not reach an agreement.

From 2020 through May 2022, the Parties engaged in a contentious discovery process which included numerous motions to compel. On September 12, 2022, the Court held a Pretrial Conference. At the Pretrial Conference, the Court granted Defendants' Motion in *Limine* and granted in part Plaintiffs' Partially Opposed and Partially Consented to Motion in *Limine*. Both motions in *limine* sought to clarify whether the Trial would address only the fair value of the Corporations or whether it would also determine the payment schedule and whether Plaintiffs are entitled to attorney fees or other expenses. The Court held that both Parties should present evidence and argument related to all matters at Trial but that the Court would bifurcate its decision such that the Trial Order would only address fair value. *See* Pretrial Order at 3. The Court further held as a matter of law that the date of business valuation must be October 23, 2019 – one day before Plaintiffs initiated these two lawsuits. *Id*.

### 2. Trial

The Trial in this matter convened on September 26, 2022. The Trial was originally scheduled to last three days but continued on to November 14 and November 15, 2022, and January 9 and 10, 2023. During the Trial, the Court heard testimony from the following fact witnesses: Chris Tsintolas; Fotini Tsintolas; Cassandra Tsintolas Johnson; Steve Tsintolas; and Andrew Cooper, the Corporations' accountant since 2019. The Court also heard expert testimony from the following expert witnesses: Joseph Estabrook, Plaintiffs' business valuation expert; Gary Lee Sapperstein, Plaintiffs' real estate appraisal expert; Walter Pennington, Defendants' business valuation expert; and Alfred B. Riley, Defendants' real estate appraisal expert. Based upon their testimonies and the information in their expert reports, the Court certified all four as experts in

7

their respective fields. At the close of Trial, the Court ordered the Parties to submit Post-Trial

Briefs summarizing the evidence and testimony at Trial and presenting legal argument. Both sides

filed their Post-Trial Briefs on February 24, 2023. On March 3, 2023, Defendants filed a Motion

to Strike Plaintiffs' Post-Trial Brief for failure to comply with the Rules, the General Order, Judge

Williams' Supplement to the General Order, and the Court's Orders. The Court granted

Defendants' Motion in part and allowed Defendants to file a ten-page Supplement by April 21,

2023. On April 21, 2023, Defendants filed a Supplemental Post-Trial Brief ("D. PTB Supp").

### c.   Evidence of the Value of Tsintolas Investments (TI)

Rather than recount the testimony chronologically, this case is best understood by focusing

on one Corporation at a time and by one asset or liability at a time. Both sides' business valuation

experts, Mr. Estabrook for the Plaintiffs and Mr. Pennington for the Defendants, agreed that the

fair value of a corporation is a function of the corporation's assets minus its liabilities. For

corporations in the business of owning residential apartment complexes, their greatest assets are

their real estate holdings. Smaller assets may include cash on hand, automobiles and other

machinery, and any debts owed to the corporation. Liabilities commonly include mortgages, other

loans or financing, unpaid maintenance or labor costs, or any deferred expenses.

### 1.   TI's Assets

#### A.   Real Estate

Tsintolas Investments' primary asset is its one apartment complex located at 4020-4030-

4040 Livingston Road, SE, Washington, DC 20032 ("the Livingston Property"). The Livingston

Property contains 31 residential units and approximately 30,000 square feet of gross building area

situated on approximately 41,000 feet of land zoned RA-1 (urban residential development). D.Ex.

5H; P.Ex. 30. Plaintiffs' real estate appraisal expert, Mr. Sapperstein, valued the Livingston

Property at $2,047,000. Defendants' expert valued the Livingston Road Property at $2 million even. Both experts acknowledged that they appraised the Livingston Property using similar methods which yielded similar results. Nonetheless, the Court will explain their methodologies so as to frame the discussion of other real estate appraisals.

There are three common approaches to measuring the value of real estate: (1) the sales comparison approach; (2) the income approach; and (3) the cost approach. The cost approach was not relied upon by either expert and will therefore not be discussed. The sales comparison approach measures value by comparing the subject property with similarly-situated properties in the same market which have recently sold on the open market. *See* P.Ex. 30, p. 40. This method relies upon similar properties ("comparators") being on the market and upon the availability and accuracy of sales data for those properties. *Id.* For the Livingston Property, this means finding other multi-family apartment buildings of a similar location, size, and condition which are old enough to be subject to DC's rent control statute. A comparator need not perfectly match. For example, a building that is similarly-situated but has more or fewer units can be a comparator because the property's valuation can be normalized by price per unit. *See id.* The process of deciding which properties are comparable to a subject property is how reasonable experts may arrive at two different appraisals. One expert may prioritize the type, size, and condition of a building while another may prioritize location.

The income approach measures value based on a property's expected profitability. In simple terms, the more a residential apartment building is anticipated to generate in rent and the less there is expected to be spent on maintenance and other costs, the higher a property's value will be. There are two methods for calculating value under the income approach. The direct capitalization method takes the expected net annual profit and capitalizes it based upon a market-

9

derived capitalization rate ("cap rate"). *See* P.Ex. 30, p. 40; D.Ex. 5H, p. 19. The cap rate has an inverse relationship to value, meaning that a lower cap rate will result in a higher valuation and a higher cap rate will result in a lower valuation. In general, cap rate is determined by dividing a property's net operating income by its value, ideally the sale price. The second method, the discounted cash flow method, takes the annual cash flow and discounts it based on the holding period and reversion subject to a predetermined yield rate. *See* P.Ex. 30, p. 40. The drawbacks of the income approach are that calculating net income depends upon the accuracy of the underlying data and capitalization rate varies by property and time. The income approach is not as dependent upon comparator information as the sales comparison method but having accurate comparator data is still important, particularly to cap rates.

Under both the incomes and sales comparison approaches, appraisers assume that a buyer will put a property to its "highest and best use." D.Ex. 5H, p. 18; P.Ex. 30, p. 37-38. A highest and best use is one that is physically possible, legally permissible, economically feasible, and maximally productive such that it would give the owner the greatest possible return over the economic life of the improvement to the property. For residential apartment buildings, the highest and best use in Washington, DC, depends on whether the property is vacant or occupied. Both real estate experts agree that if the Livingston Property were vacant, its highest and best use would demolition or remodeling for use as townhomes or similar multifamily dwellings. D.Ex. 5H, p. 18; P.Ex. 30, p. 38. They also agree that because it is occupied and generally conforms to D.C. building and rental laws, its highest and best use is to continue operating as an apartment complex. D.Ex. 5H, p. 119; P.Ex. 30, pp. 38-39. Mr. Sapperstein noted that the rents were below market value and because the building is subject to rent control, rents in 2019 could only be increased 4.3% on a tenant or 2.3% on an elderly or disabled tenant. P.Ex. 30, pp. 38-39. However, TI had only

increased rent 0.37% in that year, meaning that the property was not being used optimally as of
October 2019 and that it would depress the valuation under the income approach. P.Ex. 30, p. 39.

Plaintiffs' expert appraised the Livingston Property using both the sales comparison and
income approaches. Under the sales comparison approach, Mr. Sapperstein appraised the property
at $2,165,000. Under the income approach, he appraised it at $1,989,000. P.Ex. 30, p. 56. He then
took a weighted average of the two approaches and appraised the Livingston Property at
$2,047,000. He assigned a two-thirds weight to the income approach because "income generating
capacity is the driving force for value for an income producing property." *Id*.

Defendants' expert, Mr. Riley, also used both approaches. Under the sales comparison
approach, he valued the Livingston Property at $2.5 million. D.Ex. 5H, p. 35. Under the income
approach, he valued the property at $1,950,000. Like Mr. Sapperstein, Mr. Riley reconciled these
two approaches and gave substantially more weight to the income approach. Mr. Riley appraised
the value of the Livingston Property at $2 million. *Id*. at 61-62.

At trial, the experts were questioned about the differences in their appraisals. In general,
Mr. Riley criticized Mr. Sapperstein for failing to choose properties in the same neighborhoods,
particularly under the sales comparison approach. Mr. Sapperstein defended his choice by
explaining that whereas laypersons who are familiar with the real estate market for single family
homes may think that location is the most important factor, finding a property of comparable size
and condition is more important when appraising multifamily apartment buildings which are
purchased for their capacity to produce revenue. Mr. Sapperstein criticized Mr. Riley's approach
for not meeting Uniform Standards of Professional Appraisal Practice ("USPAP") standards by
failing to pick properties with similar numbers, types, and sizes of units. Mr. Riley also testified
that it is impossible to make a perfect appraisal so value is best expressed in a range. If you asked

11

ten experienced appraisers to appraise a residential apartment building, you could expect an error rate between five and ten percent.

In his testimony, Mr. Riley also criticized Mr. Sapperstein's reliance on a database called Costar. Costar is a database used by real estate appraisers which contains data on recent sales including sale price and cap rates. The data is generally reliable but can be inaccurate and should be verified if possible. Mr. Riley said he always tries to contact the broker or agent in a sale to verify the purchase price and confirm that it was an arms-length transaction before including it in an appraisal. A transaction that is not at arms-length or not a sale, such as a refinance, may not yield accurate data about the value of a property.

### B.  Other Assets

Defendants assert that TI has no assets other than the Livingston Property. Plaintiffs assert that TI has the following additional assets: $11,932.35 in cash; $3,140 in accounts receivable; $5,000 in prepaid expenses; and $21,126 in accounts receivable from Steve Tsintolas.

#### i.  Cash

Plaintiffs' business valuation expert, Joseph Estabrook, reviewed TI's bank account information to evaluate how much cash it had on hand as of October 23, 2019 (the "Valuation Date"). Based on its bank statements, TI had $11,932 as of the Valuation Date. P.Ex. 2, p. 9. Defendants dispute that TI's cash on hand should be included in the business valuation but did not produce any evidence showing that Mr. Estabrook's assessment was incorrect. TI does not have a general ledger which can provide a more accurate accounting of its cash balance.

#### ii.  Accounts receivable

Plaintiffs presented letters sent by TI to tenants in October 2019 notifying the tenants of unpaid rent balances totaling $3,140. P.Ex. 7. Plaintiffs assert that the unpaid rent should be

included as an asset. Defendants dispute this issue but did not produce any evidence to the contrary or refute the authenticity of the letters.

### iii.    Prepaid expenses

Plaintiffs presented evidence that in October 2018, TI prepaid $5,000 to its attorneys into a trust account. P.Ex. 8. Plaintiffs argue that because the money was being held in trust as of the Valuation Date, the money is an asset. Defendants dispute this issue but did not produce any evidence to the contrary or refute the authenticity of the document.

### iv.    Accounts Receivable – Steve Tsintolas

Plaintiffs argue that Steve Tsintolas personally owes TI $21,125.65 based on "improper credit card charges and checks" dating between 2014 and 2019. P.Ex. 9. Plaintiffs introduced copies of checks and charges through Chris Tsintolas, who testified that each was not related to the functioning of the business and for the personal benefit of Steve Tsintolas or Steve's spouse or children. *See* P.Ex. 11-27. More notable charges include:

- $201 to cover Steve's and his family's auto insurance premiums, P.Ex. 11;

- $521.75 for the repair of Steve's home garage door, P.Ex. 12;

- Payments to independent contractors or other business for maintenance and gardening work, P.Ex. 17, 19;

- Security and fire alarm installation and repair, P.Ex. 26-27; and

- The purchase of a refrigerator from Sears. P.Ex. 25.

On cross examination, Chris admitted that he was not familiar with the day-to-day operations of TI and was often uncertain of who a business or contractor was or for what they were being paid. On direct and cross examination, Steve Tsintolas provided testimony about these charges. He provided credible explanations for many of the charges. For example, he credibly testified that he

13

paid Felipe Sanchez $1400 to perform work on the ceramic tile floor of a unit in the Livingston Property. *See* P.Ex. 17. He also testified that he paid an individual, Marvin Vail, on a roughly annual basis to perform gardening work outside the Livingston property. *See* P.Ex. 19. He also testified that money paid to Vector Security was for work on the fire and security alarms in the building. *See* P.Ex. 26-27.

One of the largest allegedly improper expenses was for payments to an attorney, Robert Fitzpatrick. Mr. Fitzpatrick represented TRC and Steve in a civil case in D.C. Superior Court captioned *Equal Rights Center v. Tsintolas Realty Company et al.*, 2013 CA 002575 B. *See* P.Ex. 22. The case involved tenants suing TRC and Steve Tsintolas personally for alleged violations of the D.C. Human Rights Act ("DCHRA"). On February 3, 2014, TI paid Mr. Fitzpatrick $7,300. P.Ex. 9. Plaintiffs assert that this money was improperly paid by TI because TRC and Steve, not TI, was the Defendant in the lawsuit. Steve Tsintolas admitted that he used corporate funds from both OI and TI to pay the legal fees and the cost of the eventual settlement. Steve maintained that he informed his siblings about the payments at the time and there was no objection. Chris and Fotini testified that they had no knowledge at the time that Steve used corporate funds to pay for the lawsuit. Defendants argue that TI's obligation to pay these legal fees arose from the 1995 PMA. *See* D.Ex. 11, ¶ 9 (stating that OI "shall indemnify, defend, and save the Agent harmless from and against all legal fees…incurred in a suit by a tenant related to the tenancy").

### 2. Liabilities

The disparity between the Parties' valuations of TI is most attributable to their respective assessments of its liabilities. Plaintiffs argue that TI does not have any significant liabilities while Defendants argue that TI has $1,725,731 in liabilities. Defendants' proffered liabilities generally

pertain to long overdue payments purportedly owed to Steve personally or Steve's companies. The Court will recount the evidence regarding each.

A.  Acardian Construction Company Maintenance Debts ("ACC Maintenance")

Defendants allege that between June 2006 and February 2019, Acardian performed 4,783 tasks for TI for which TI did not pay Acardian. The tasks, time, hourly rate, and total charge are summarized in Defendant's Exhibit 25. Defendants argue that Exhibit 25 reflects work Arcadian actually performed which was never paid and is still owed. Defendants calculate that TI owes Acardian $591,150 for the unpaid work. Defendants also produced a summary showing payments from TI to Acardian for maintenance from 2001 to 2019. Between 2005 and 2019, TI paid Acardian $74,952. D.Ex. 26. Based on the Livingston Property's 31 units, that equate to $172.70 per unit per year. *See id*.

Plaintiffs raised both factual and legal issues with the payments to Acardian being included as assets and with the admission of Defense Exhibit 25. On cross examination, Mr. Pennington admitted that he created his business valuation based on Defense Exhibit 25 but had not seen the underlying job tickets. Plaintiffs cross examined Steve with copies of several job tickets which included incorrect dates, were duplicates of other entries, or which were inconsistent with the information in Defense Exhibit 25. *See* P.Ex. 235-36, 239. Steve admitted that there may be mistakes but averred that the document as a whole was accurate. At trial, Plaintiffs objected to the admission of Defense Exhibit 25 on the basis that it was not a business record but rather a document created for use at trial and on the basis that it was inaccurate and unreliable. The Court admitted Defense Exhibit 25 over Plaintiffs' objections and noted that it would review the document for its accuracy and may partially or totally discredit it on the merits.

15

Plaintiffs also contend that payments to Acardian should not be included because the alleged liabilities to Acardian did not appear in any of TI's corporate records until the prospect of litigation arose. TI did not maintain any general ledgers tracking liabilities and these liabilities do not appear on TI's tax returns. P.Ex. 219 (TI's tax returns, 2014-2019). Other than Steve's testimony, there is no evidence showing that TI owes Acardian money for any past expenses. Defendants did not produce any demands for payment from Acardian or other evidence from TI promising payment.

B.  Deferred Compensation for Steve Tsintolas

Defendants presented evidence that pursuant to the 1995 PMA, TI owed Steve $4,000 per month, increasing 1% annually beginning in 1996, and 75% of all first month's rent collected from new tenants ("rental commission"). D.Ex. 12, ¶ 5(A). The PMA also memorializes that Steve had performed property management services since 1990 and had not yet been paid. *See id*. at 1. Defendants asserts that the vast majority of this sum has never been paid because of TI's financial issues and the overdue sum now equals $260,274. Defendants presented a summary of payments made by TI to Steve between 1988 and 2020 which also lists deferred compensation. D.Ex. 28. Defendants calculate the amount of $260,274 based on the deferred compensation entries between 1990 and 2019. With the exception of 2004, the deferred compensation for each year between 1996 and 2019 is less than $10,000 and often only a few hundred dollars – or negative. *See id*. The vast majority of deferred compensation arises from the years 1990 to 1993. For each year in that period, the deferred compensation was $48,000 based on an unpaid salary of $4,000 per month. *See id*. As with debts owed to Acardian, Defendants' summary in Exhibit 28 is based on figures asserted by Steve and not reviewed by Mr. Pennington. Defendants could not provide complete documentation in support of Exhibit 28.

16

Plaintiffs did not dispute the authenticity of the 1995 PMA and did not dispute that it was extended in 2004 and 2014 for periods of ten years; however, they do dispute the amount of deferred compensation and the premise that TI owes Steve any deferred compensation at all. Plaintiffs argue that Steve forfeited any claims for deferred compensation which he did not raise within three years of the sum becoming due. Plaintiffs therefore argue that, at most, TI can only owe Steve deferred compensation within the three-year statute of limitations (compensation owed for services between 2017 and 2019). Based on that argument, Plaintiffs argue that if any deferred compensation is considered as a liability, it should be limited to $3,537. *See* Plaintiffs' Post-Trial Brief ("Pl. PTB") at 18.

### C.  Rental Commission Owed to Steve Tsintolas

Defendants argue that in addition to the unpaid salary under the 1995 PMA, TI owes Steve $95,228 in unpaid rental commission. *See* D.Ex. 12, ¶ 5(A). The 1995 PMA requires Steve to "maintain business records, including receipts, and disbursements" and empowers him to collect rent on behalf of TI. *Id*. at ¶¶ 2-3. Defendants presented a spreadsheet documenting when each unit was leased to a new tenant between 1990 and 2018, what the first month's rent was, and what Steve's 75% rental commission should have been. D.Ex. 35. Defendants were not able to present any contemporary records of new leases or payments to Steve because no such records were kept or contemporaneously compiled. Plaintiffs argue that long overdue rental commissions should not be paid because of this lack of documentation and because the statute of limitations has passed. *See* Pl. PTB at 20.

### D.  D.E. Nicholas Maintenance Debts ("DEN Maintenance")

Defendants assert that TI owes D.E. Nicholas debts for maintenance in the same way that TI owes Acardian. Defendants assert that between November 2008 and July 2015, D.E. Nicholas

performed over 300 tasks and was not reimbursed for $161,280. As with the ACC Maintenance liability, Defendants have included a summary of job tickets identifying tasks, time, hourly rate, and total charge. D.Ex. 29. Defendants also presented a table of payments from TI to D.E. Nicholas between 2001 and 2019. D.Ex. 30. From 2006 to 2019, TI paid D.E. Nicholas $113,849. That equates to $262.32 per housing unit per year. As with ACC Maintenance, Mr. Pennington did not review the underlying job tickets, and Plaintiffs raised valid questions on cross examination of Mr. Pennington and Steve regarding the accuracy of the summary. In response, Plaintiffs raised similar arguments against inclusion of these costs as liabilities for TI as they did against the ACC Maintenance debts.

### E.  H&C Roof Payable

Defendants assert that in 1988, Hercules II paid a third party, Crowley Roofing & Sheet Metal ("Crowley"), $18,499.44 to install roofing at a property located at 315 H St., NW, for TI. Defendants presented a handwritten contract proposal between Crowley and "Tsintolas Real Estate" dated September 15, 1988 detailing the contract price of $19,500. D.Ex. 32. The proposal was signed on the same date by both parties. *Id*. Defendants also presented copies of six checks written by Hercules II to Crowley for a total of $$18,499.44 dated between September and November 1988. *Id*. There are no documents evidencing an agreement between TI and Hercules II to reimburse Hercules II for the payment. As TI kept no general ledgers, there is no corroboration of whether this was listed as a liability since 1988 or whether TI ever paid Hercules II. There is also no evidence that TI owned the property at 315 H St., NW, in 1988.

### F.  HD&R Loan Payable

Defendants assert that in 1981, Hercules I loaned TI $20,000. D.Ex. 33. TI agreed to repay the loan on an unspecified timeline subject to a 5% per annum. *Id*. at 3. Defendants assert that TI

18

has never made a payment on this debt and that as of May 15, 2019, TI owes Hercules II $127,709.55. *Id.* at 4. Prorated to account for the partial year between May 15, 2019, and October 23, 2019, the amount due on the loan is $131,855.

Plaintiffs raise two arguments against the inclusion of the Hercules II loan as a liability for TI. First, the promissory note was made in exchange for Hercules II providing TI with collateral to be held by Maryland National Bank. D.Ex. 33 at 3. There is no evidence regarding what that collateral was, whether Maryland National Bank still holds the collateral, or whether Hercules II has made any effort to seize the collateral. Second, Plaintiffs assert that the ten-year statute of limitations for demanding repayment of a loan has long passed. *See* Pl. PTB 19.

### G.  Legal Fees for the Instant Lawsuit

Defendants seek to include a liability of $180,000 to account for the legal fees they anticipated to pay for this lawsuit. Steve Tsintolas testified that the number was an estimate. No documentation supports the inclusion of this liability. Plaintiffs argue that as of the Valuation Date, these fees were purely speculative and were not actually incurred until after the Valuation Date.

### H.  Loan from Helen Tsintolas

Defendants assert that sometime before or during 2005, Helen Tsintolas loaned TI $48,304 and the loan was never repaid. Defendants did not present a promissory note or any other evidence of the loan. On cross-examination, Steve testified that he had no evidence of the debt or any demand for repayment, nor could he recall any demand for repayment. Plaintiffs argue that without any evidence of the liability other than Steve's testimony and considering that the ten-year statute of limitations has long passed, the liability should not be included. *See* Pl. PTB 20.

### I.  Metropolitan Life Debt

19

On June 3, 1995, TI and Steve signed an Agreement acknowledging that TI owes Steve $207,123.16 for "monies advanced and paid by him and/or his business entities from December 1981 to May 1993 to the benefit of [the Parents]" ("Life Insurance Agreement") D.Ex. 14. TI and Steve agreed that to reimburse Steve for this loan, TI would "pay the debt over an extended period of time" by purchasing a life insurance policy for Steve through Metropolitan Life Insurance Company. *Id.* TI agreed to "make timely premium payments on Policy No. 952906121A" from May 25, 1995 until Steve either terminates the policy or dies. *Id.* There is no evidence or assertion that TI has ever failed to perform its duty to make premium payments.

The Parties disagree about how the Life Insurance Agreement paid down the debt. According to Defendants, each payment TI made towards the life insurance premium reduced the initial debt by the same amount. According to Defendants' calculations, TI paid nearly $100,000 between June 1995 and 2019. D.Ex. 14 at 3. Defendants calculate that TI still owes Steve a debt of $116,706 as of the Valuation Date. Plaintiffs contend that the liability is zero. They argue that the life insurance policy and promise to make premium payments until Steve's death was consideration for eviscerating the debt.

J.   Cash Overdraft

Based on TI's December 31, 2019, financial statement, Mr. Pennington calculated that TI had over-drafted its bank accounts by $19,742.00. D.Ex. 8B at 3. Plaintiffs argue that because the financial statement is from December 2019 and not the Valuation Date, there is no way to determine whether the bank overdraft was a liability as of the Valuation Date.

K.   Withdrawn Liabilities

The Court notes three liabilities which appear in the Joint Pretrial Statement but were not presented at Trial or were withdrawn. Defendants withdrew consideration of a loan to TI made

20

before 1990 with a present value of $24,811. Defendants also withdrew $15,034 in mortgage notes.

Defendants did not present evidence at Trial of a liability of $62,848 related to maintenance of the

Livingston Property Roof in 2015.

### d.  Evidence of the Value of Olympia Investments

The Parties relied upon the same experts and same methodologies to value OI as they did

to value TI: subtracting liabilities from assets. OI, like TI, is in the business of owning residential

apartment complexes. Its value is primarily derived from its real estate holdings and its liabilities

generally pertain to maintenance and upkeep expenses. The Court will again go through the

evidence asset by asset and liability by liability.

### 1.  Assets[1]

### A.  Real Estate

Whereas TI owns one apartment complex, OI owns seven: 5400 7th St., NW, Washington,

DC 20011; 810 Kennedy St., NW, Washington, DC 20011; 829 Rock Creek Church Rd., NW,

Washington, DC 20002; 1010 G St., NE, Washington, DC 20002; 1521 E St., SE, Washington,

DC 20003; 8212 Flower Ave., Takoma Park, MD 20912; and 3901 53rd St., Bladensburg, MD,

20710. Facts about each property are detailed below.

### i.    5400 7th St., NW, Washington, DC 20011

5400 7th St. is a three-story, 22-unit residential apartment building with approximately

16,000 square feet of gross building space situated on approximately 7,000 square feet of land

zoned RF-1. D.Ex. 5E. Using the sales comparison approach, Defendant's real estate expert, Alfred

Riley, appraised the property at $2.2 million. *Id*. at 69. Under the income approach, he appraised

it at $2.15 million. *Id*. Mr. Riley averaged the two and provided a final appraisal of $2,175,000.

---

[1] The Court's valuation of each piece of real estate can be found in Appendix C.

*Id.* at 70. Plaintiffs' real estate expert, Gary Sapperstein, appraised the property at $2.93 million under the income approach, $3,097,500 under the sales comparison approach, and reconciled the appraisals at $2.986 million. P.Ex. 148, p. 57. The two sides' appraisals differ by approximately $800,000. Mr. Riley testified that approximately a third of the difference is attributable to the difference in cap rates used. Mr. Riley used a cap rate of 5.5% and Mr. Sapperstein used a cap rate of 5%. The remaining difference stems from calculations of different net operating incomes and estimates of annual tenant turnover.

As is the case with every real estate appraisal for OI, the Parties disagree about how to measure net operating income. In each case, Plaintiffs have adjusted net operating income to discount alleged inefficiencies with how OI manages the properties. Both sides utilized the same data: OI's rent rolls and tax and assessment data. P.Ex. 148 at 44 (noting that Plaintiffs' calculations are based off the same data which Defendants used). Whereas Mr. Riley generally calculates the actual net operating income with minimal adjustments, Mr. Sapperstein made substantial adjustments. For example, Plaintiffs discount effective gross income to account for a 7% management fee, whereas TRC's management fee is anywhere from 8% to as high as 30%. *See, e.g.*, P.Ex. 148 at 46. Mr. Riley made conflicting statements during his direct and cross examinations as to whether OI pays above-market management fees to TRC. Mr. Sapperstein also assumes a maintenance fee of $2,000 per unit per year on average whereas Mr. Riley asserts that the real cost of maintenance at OI's properties are as high as $3650 per unit per year based on the data provided by Steve. Mr. Sapperstein often also discounted the cost of having an on-site property manager at many locations. He testified that a live-in property manager is generally only needed in buildings approaching one-hundred residential units. OI's properties are smaller than one-hundred units, making the caretaker fees excessive in his opinion. The two sides also used

different estimates of turnover rates. The more tenants move in and out, the more a landlord can raise the rent. Looking to the long-term history of the properties and market trends, Mr. Sapperstein estimated turnover to be about 40% per year. Mr. Riley contended that when looking at actual turnover recent turnover data, the turnover rate is closer to 10% on average.

With respect to 5400 7th Street, NW, the Parties did not identify any glaring errors in each other's real estate appraisals. Neither expert's data points were clearly inaccurate or inappropriate. Whereas both experts had specific criticisms of the other's selection of comparable properties with respect to other OI properties, neither testified at Trial to glaring issues regarding the appraisal of 5400 7th Street, NW.

### ii.    810 Kennedy St., NW, Washington, DC 20011

OI's property at 810 Kennedy St., NW, Washington, DC 20011 is a 14-unit residential apartment complex containing approximately 12,000 square feet of gross building space on a 7,000 square foot lot zoned MU-4. D.Ex. 5A. Mr. Riley appraised 810 Kennedy Street, NW at $1,675,000 using the income approach and $1,680,000 using the sales comparison approach. *Id.* at 69. His final appraisal was $1,675,000 after weighing the approaches equally and rounding down. *See id.* at 69-71. Mr. Riley calculated effective gross income at $201,326, net operating income at $92,185, and applied a cap rate of 5.5%. *Id.* at 4, 69. Mr. Sapperstein appraised 810 Kennedy St., NW at $2,079,000 using the sales comparison approach and $2,306,000 using the income approach. P.Ex. 130, p. 58. He reconciled the two approaches at $2,230,000. Mr. Sapperstein calculated an effective gross income of $202,035 and a net operating income of $115,309. *Id.* at 51. He applied a cap rate of 5%.

Plaintiffs presented Mr. Sapperstein's review of Mr. Riley's Report. P.Ex. 174. Mr. Sapperstein claimed that the Riley Report contained numerous errors as it pertained to 810

Kennedy Street, NW. Most importantly, he claims that Mr. Riley's calculation of net operating income includes an expense-to-income ratio ("expense ratio") of 54.2% whereas the market average for similar buildings is about 37%. *Id*. at 4. This indicates that OI is not managing the property at market average efficiency. Mr. Sapperstein also criticized the Riley Report's cap rate for being artificially high based on the erroneous inclusion of outlier cap rates in the pool of comparable properties. *Id*. at 4-5. Finally, Mr. Sapperstein criticized the Riley Report for failing to consider the potential income from DC's Housing Choice Voucher Program ("HCVP" or "Section 8"), which pays above-market rent and would make the property more valuable. *Id*. at 6.

     *iii. 829 Rock Creek Church Rd., NW, Washington, DC 20011*

   The value of the property at 829 Rock Creek Church Rd., NW, is not substantially disputed. The property contains a 6-unit apartment building with approximately 4,200 square feet of building area on a 2,450 square foot lot which is zoned RF-1. D.Ex. 5B, p. 2. Mr. Riley appraised the property at $910,000 using the sales comparison approach and $895,000 using the income approach. *Id*. at 64. He reconciled the approaches at $900,000. *Id*. at 65. He calculated an effective gross income of $72,668 and a net operating income of $40,254 and applied a cap rate of 4.5%. *Id*. at 64. Mr. Sapperstein appraised 829 Rock Creek Church Rd., NW lower than Mr. Riley. Mr. Sapperstein appraised the property at $942,000 using the sales comparison approach and $854,000 using the income approach. P.Ex. 133, p. 57. He reconciled the approaches at $883,000. *Id*. Mr. Sapperstein calculated effective gross income to be $73,46, net operating income to be $42,708, and applied a cap rate of 5%. *Id*. at 51. Because the difference in appraisals is only $7,000, neither expert provided testimony criticizing the other's appraisal.

     *iv. 1010 G St., NE, Washington, DC 20002*

The property at 1010 G Street NE, Washington, DC 20002 is a 14-unit apartment building with approximately 11,800 square feet of building space on a 7,000 square foot lot zoned RF-1. D.Ex. 8D, p. 2. Mr. Riley appraised the property at $3 million using the sales comparison approach and $2,770,000 using the income approach. *Id*. at 66. He reconciled the approaches at $2.8 million. *Id*. at 67. Mr. Riley calculated an effective gross income of $239,994 and a net operating income of $124,694. *Id*. at 66. He applied a cap rate of 4.5%. Mr. Sapperstein appraised the property at $3,290,000 using the sales comparison approach and $2,849,000 using the income approach. P.Ex. 136, p. 56. He reconciled the approaches at $2,996,000. *Id*. Mr. Sapperstein calculated an effective gross income of 239,907 and a net operating income of $142,470. *Id*. at 50. He applied a cap rate of 5%. *Id*.

Mr. Riley had specific criticisms about the comparator properties used in the Sapperstein Report noting that while the property is in the Capitol Hill neighborhood of Washington, D.C., all of the comparators were in other neighborhoods. There were also errors in how each comparator property was described. He testified that the comparator in Columbia Heights, 1125 Clifton Street, NW was not an apt comparator because it had on-site parking whereas 1010 G Street NE does not. *See* P.Ex 136, p. 55 (stating no information about on-site parking for Sale #1). Comparator sale #2 was a boarding house which Mr. Sapperstein improperly characterized it as an apartment building. *Id*. Sale #3 was reported as having 12 efficiency (studio) apartments whereas they are in fact one-bedroom units. *Id*. The building was also largely vacant at the time of sale. Sale #4 was vacant when purchased, changing its highest and best use. *See id*. Mr. Sapperstein defended his use of the sale comparables by noting that they are not required to be located in the same area as the subject property.

25

*v.    1521 E. St., SE, Washington, DC 20003*

The property at 1521 E Street, SE, Washington, DC 20003 was not appraised substantially differently by the opposing sides. Mr. Riley appraised the property at $925,000, D. Ex. 5D, and Mr. Sapperstein appraised it slightly lower at $897,000. Neither expert identified substantial errors in the others' appraisal. The appraisals are within the acceptable five to ten percent margin of error.

*vi.    8212 Flower Ave., Takoma Park, MD 20912*

The property at 8212 Flower Ave., Takoma Park, MD 20912 is a 20-unit apartment building with approximately 15,846 square feet of building space on an approximately 20,700 square foot lot which is zoned R-10/R-40. D.Ex. 5G, p. 2. Mr. Riley appraised the property at $1.71 million using the sales comparison approach and at $1,585,000 using the income approach. *Id*. at 52. He calculated an effective gross income of $209,975 and a net operating income of $87,042. *Id*. He applied a cap rate of 5.5%. *Id*. He reconciled the approaches at $1.6 million. *Id*. at 53. Mr. Sapperstein appraised the property at $1,875,000 using the sales comparison approach and $1,995,000 using the income approach. P.Ex. 145, p. 52. He reconciled the approaches at $1,955,000. *Id*. He calculated an effective gross income of 241,845 and a net operating income of 119,681. *Id*. at 46. He applied a cap rate of 6%. *Id*.

The greatest difference between the two appraisals are the two experts' income approaches. Mr. Riley's income approach was $125,000 lower than his own sales comparison approach whereas Mr. Sapperstein's income approach was $120,000 higher than his sales comparison approach. There are two main reasons for their divergent results: the disparate effective gross incomes, net operating incomes, and expense ratios as are disputed in other appraisals; and Mr. Sapperstein's assumption that rent could be raised. In other appraisals, Mr. Sapperstein consistently states that OI and TI have failed to raise rents as high as allowed by D.C. rent control

26

laws and builds into his income approach an assumption that a prospective buyer would raise the rents upon purchase. He makes a different assumption with respect to 8212 Flower Ave. This property is located in Takoma Park, Maryland, which has different rent control statutes than D.C. Mr. Sapperstein believed that a property manager could reasonably increase effective gross income by 18% through rent increases on both new and existing tenants. At Trial, Mr. Riley criticized Mr. Sapperstein's assumption, stating that such a large increase in effective gross income could only be achieved through rent increases which violate Takoma Park rent control limits – an issue not addressed in the Sapperstein Report. *See generally* P.Ex. 145. Mr. Sapperstein responded during his testimony that based on the character of the building and the current rents, it is reasonable to expect that OI could file a successful "hardship application" with Takoma Park to raise rents higher than what would otherwise be allowed. Defendants argue that the assumption that OI would be allowed an exception to rent control laws is speculative and Mr. Sapperstein's income approach for 8212 Flower Ave. should be discredited. *See* Defendants' Post-Trial Brief ("D. PTB") 12.

Mr. Sapperstein's assumptions about the ability to raise rents at 8212 Flower Ave. also rely on a tenant turnover rate of 40%. P.Ex. 145, p. 46. Defendants argue that this number is far too high and inconsistent with historical data at the property, which indicates that the 5-year average turnover up to the Valuation date was 11%. *See* D. PTB 12 (citing D.Ex. 7E, p. 4). Defense Exhibit 7E does not identify a source for its data. *See* D.Ex. 7E, pp. 3-4. Defense Exhibit 7E does contain data from the Institute of Real Estate Management ("IREM") stating that for low rise apartments buildings with 12-24 units like 8212 Flower Ave., the annual turnover rate between 2014 and 2018 (the last full year with available data before the Valuation Date) was between 25 and 39.1%. *Id.* at 4.

27

vii.      *3901 53rd St., Bladensburg, MD 20710*

The property at 3901 53rd St., Bladensburg, MD 20710 is a 28-unit apartment building with approximately 27,000 square feet of building space on an approximately 33,600 square foot lot which is zoned R-10. D.Ex. 5F, p. 2. Mr. Riley appraised the property at $2,355,000 using the sales comparison approach and $2.4 million using the income approach. *Id*. at 44. He reconciled the appraisals at $2,375,000. *Id*. at 45. He calculated an effective gross income of $288,922 and a net operating income of $132,178. *Id*. at 44. He applied a cap rate of 5.5%. *Id*. Mr. Sapperstein appraised the property at $3.21 million using the sales comparison approach and $2,897,000 using the income approach. P.Ex. 142, p. 56. He reconciled the approaches at $3,001,000. *Id*. He calculated the effective gross income to be $371,243 and the net operating income to be $173,807. *Id*. at 49. The cap rate was 6%. *Id*. In the Pretrial Statement, Plaintiffs stated that they seek a discounted valuation of the property of $2,889,000. *See* JPS 39.

In addition to the repeating critiques regarding cap rates, expense ratios, turnover rate, and other assumptions affecting the net operating income, the Court heard rebuttal testimony from Mr. Sapperstein criticizing the Riley Report for using the same comparables for 3901 53rd Street as it used for 8212 Flower Ave. The two properties are separated by twelve miles and are in different counties. Mr. Sapperstein criticized Mr. Riley's decision to conduct a "qualitative analysis" in his sales comparison approach for 3901 53rd St, which differs from the quantitative approach that both experts use for all the other properties. *See* D.Ex. 5F, p. 29 (stating "[r]ecognizing the imperfect nature of real estate markets, I will apply the qualitative (rather than quantitative) analysis techniques of relative comparison and ranking").

28

### B.  Other Assets – Olympia Investments

Plaintiffs assert that Olympia Investments has approximately $900,000 in non-real estate assets. Defendants assert that OI only has $262,505 in assets.

#### i.    Cash

Based on OI's SunTrust bank account records, Sandy Springs bank account records, and check records, Plaintiffs calculate that OI had $199,362 in cash as of the Valuation Date. P.Ex. 36-39. Defendants did not present any testimony contradicting these records nor did they challenge the authenticity of the records. Defendants calculate that OI only has $34,445 in cash. D.Ex. 8A (Accountant's Compilation Report of Lobel, Cooper & Associates). Defendants did not articulate what documents undergird this calculation. Notably, the Compilation Report states that Lobel, Cooper & Associates "did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management." *Id*. at 5. On the cover page, they state that "we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements." *Id*. at 1.

Another issue is that Defendants' reports were generated to reflect OI's valuation as of the end of 2019 – not the Valuation date. *See* D.Ex. 8A. Defendants did not submit documentation reconciling their financial statements with any changes to OI's circumstances between October 23, 2019, and December 31, 2019.

#### ii.    Certificates of Deposit

Certificates of Deposits ("CDs") are low-risk investment assets. The Parties agree that as of the Valuation Date, OI held CDs worth approximately $154,000. P.Ex. 40, p. 4; D.Ex. 8A.

#### iii.    Accounts Receivable

29

As with TI, Plaintiffs contend that OI was owed rent as of the Valuation Date. Based on Past Due Reminders sent in October 2019, Plaintiffs calculate that these accounts receivable amount to $2,433. P.Ex. 41. Defendants did not present any opposition to this calculation.

### iv.   Prepaid Expenses

On October 10, 2019, OI paid $5,000 into a trust account for legal fees related to this lawsuit. P.Ex. 42. Plaintiffs contend that these prepaid legal fees should be counted as an asset for the same reasons as TI's prepayment of similar fees is an asset.

### v.   Security Deposits/Reserve

As required by law, OI held tenant security deposits in separate, interest-earning accounts. P.Ex. 43-44. As of the valuation date, these security deposits totaled $51,192. P.Ex. 43-44.

### vi.   Steve Tsintolas Receivable

Plaintiffs assert that Steve Tsintolas owes $481,537 to OI based on use of corporate monies and assets for personal gain. P.Ex. 49. The basis for the alleged assets is largely the same as already discussed with respect to TI. In addition to payments to individuals and independent contractors, there are numerous charges for auto insurance premiums, auto repair, gasoline for vehicles, and payments to Verizon for Steve's family's phone bill. *See id.*

The Court heard lengthy testimony from the Parties regarding the allegedly improper purchases. The Court first heard from Chris Tsintolas regarding most of OI's allegedly improper charges and why he believed them to be improper. *See* P.Ex. 51-128. Chris testified that OI did not own any automobiles so any expenses related to automobile maintenance must have been for Steve's personal benefit rather than any business purpose. He also testified that OI owned no cell phones. On cross-examination, however, Chris admitted that he lacked knowledge about much of OI's daily operations.

The Court next heard from Steve Tsintolas. He credibly testified that many of the expenses were for legitimate business purposes, such as buying materials from Home Depot for maintenance projects or purchasing office supplies for business purposes. He explained the role of the various independent contractors or individuals who were paid for services to OI such as gardening, live-in caretaker services, gutter cleaning, painting, snow removal, janitorial work, or other consulting services. Steve testified that OI owns one vehicle, an Oldsmobile, which was his father's, but admitted that it was not often used and when it was used it was primarily for personal use by himself or his siblings. He contended that auto insurance premiums paid to AAA Mid-Atlantic were for automobiles owned by D.E. Nicholas and Acardian which OI pays for as part of its agreement with the companies to provide maintenance services. He also explained that charges for gift cards and meals, such as a $185 charge for Popeyes chicken, P.Ex. 99, were fringe benefits for OI's employees, independent contractors, or live-in caretakers.

### vii.    Property, Equipment, and Land

In the year-end 2019 financial statement, Defendants list $770,795 in assets for "buildings," depreciated by $768,815. D.Ex. 8A. Defendants also list unspecified "land" worth $71,639 as an asset. *Id*. Together, the buildings and land are listed as being assets worth $71,639. *Id*. Defendants did not offer testimony explaining these assets, nor did they include separate line items for their various real estate holdings. Therefore, these items will not be considered as assets.

### 2.    Liabilities – Olympia Investments

As with TI, Defendants assert that OI has significant liabilities whereas Plaintiffs assert far fewer. Defendants calculate that OI has liabilities totaling $1,820,292 whereas Plaintiffs calculate only $49,673.

### i.    Liabilities to Hercules II ("8116 H&C")

31

Defendants assert that OI owes Hercules II $53,023 for payments Hercules II made to vendors on OI's behalf in 1986 and 1987. D.Ex. 16. At Trial, the Court ruled that Defense Exhibit 16 was inadmissible because it was not a business records of OI. There is no other evidence of this liability.

> ii.    *Deferred Compensation and Rental Commission – Steve Tsintolas*

The 1997 PMA between Steve Tsintolas and OI stipulated that OI would pay Steve 8% of gross revenue each month plus 75% of all first month's rent from new tenants. D.Ex. 11 ¶ 5(A). The 1997 PMA was in effect from March 1997 to February 2007 and was extended in 2007 and 2017. *See id.* at ¶ 1 (stating that the agreement would automatically renew for periods of 10 years unless terminated). Defendants assert that, pursuant to the 1997 PMA, OI owes Steve $835,658 in deferred compensation. *See* D.Ex. 8A. OI's documentation of the alleged deferred compensation is the same as presented by TI. Defense Exhibit 17 contains a summary of information provided by Steve Tsintolas of compensation and deferred compensation from 1983 to 2020. There is no underlying documentation in evidence of the payments from OI to Steve or of deferred compensation. There were no demands for payment. For each year between 1990 and 2019, the summary asserts that OI deferred payment to Steve between $4,658 and $45,680. D.Ex. 17. Steve testified that for six years straight, OI ended the year with no cash on hand. *See id.* (denoting an ending cash balance of $0 for each year between 1997 and 2002). Plaintiffs argue that the documentation is insufficient to establish any liability, and, even if it was, with the exception of $46,481 in debt incurred between 2016 and 2019, recovery of the past due debt is far past any statute of limitation. *See* Pl. PTB 22.

OI also asserts that it owes Steve $341,667 for rental commission under the 1997 PMA. *See* D.Ex. 22. The documentation supporting this liability is in the same format as for the rental

32

commission TI allegedly owed Steve. There is only a summary of when each unit at each property obtained a new tenant and the new rent price. *See id*. Plaintiffs' opposition to this liability is the same as it was for TI's unpaid rental commission.

### iii.    *Hercules II Roof Payable*

Defendants assert that in 1988, Hercules II paid Crowley Roofing & Sheet Metal $25,938 for work on the roof of 810 Kennedy Street NW. *See* D.Ex. 18. Defense Exhibit 18 contains copies of checks paid by Hercules II to Crowley in 1988. *Id*. The Court admitted Defense Exhibit 18 insofar as it contains business records but did not admit handwritten notes made throughout the exhibit. Plaintiffs argue that this debt recovery is well past the three-year statute of limitations. *See* Pl. PTB 22.

### iv.    *Hercules I Loan Payable*

Defendants allege that in 1981, Hercules I made four loans to OI for $19,932, $12,500, $2,885.73, and $2,091.73 at various interest rates. Defendants presented written promissory notes for each loan. D.Ex. 19 at DEF 245-51. Each promissory note states that the note would be due in one year. *Id*. Defendants assert that none of the loans were paid and that with interest, the loans are worth $151,689. Again, Plaintiffs argue that these forty year old loans are well past the statute of limitations for debt recovery and cannot be considered a present obligation. Pl. PTB 23.

### v.    *Legal Fees for the Instant Lawsuit*

Defendants seek to include a liability of $180,000 to account for anticipated legal fees for this lawsuit. Steve Tsintolas testified that the number was an estimate. No documentation supports the inclusion of this liability. Plaintiffs argue that as of the Valuation Date, these fees were purely speculative and were not actually incurred until after the Valuation Date.

### vi.    *Legal Fees - Suzanne Tsintolas*

33

Defendants assert that OI owes Steve's wife, Suzanne Tsintolas, for unpaid legal fees incurred between 2001 and 2019. D.Ex. 20-21. The exhibits include itemized time entries identifying the date of each task, the task performed, the case which the task is related to, the time spent on the task, and the hourly rate. *Id*. Invoices from 2012 state that payment is due within 30 days of the invoice. *Id*. at DEF 417-23. Invoices before and after do not state a due date. The total cost of all legal fees invoiced by the Law offices of Suzanne M. Tsintolas to OI are $83,443. *See* D.Ex. 20-21.

Within that $83,443, $26,477 of that is attributable to Suzanne Tsintolas' work on the appeal in *Tsintolas Realty Company v. Mendez*, 984 A.2d 181 (D.C. 2009). D.Ex. 21. Defense Exhibit 21 contains an invoice, a copy of the decision, and demand letters from December 30th of every year between 2010 and 2019 except 2011 demanding payment for fees related to the appeal. *See id*. at DEF 449-57. For fees not related to the *Mendez* appeal, the firm sent separate demand letters on December 30th of each year from 2013 to 2019. *Id*. at 462-69. Plaintiffs do not dispute the accuracy of these records generally although they do claim that some indeterminate number of entries represent inflated fees or unnecessary work. *See* Pl. PTB 23.

### vii.    *Payroll Advanced by D.E. Nicholas and Acardian*

Defendants assert that between 1990 and 1994, D.E. Nicholas and Acardian financially assisted OI by paying wages to an OI employee, Baltazar Ortiz. Defendants presented W-2s from 1990 to 1994 showing that Acardian, D.E. Nicholas, and OI all paid wages to Mr. Ortiz. D.Ex. 24. There are no documents explaining the arrangement of payment to Mr. Ortiz or detailing what duties he performed for each company between 1990 and 1994. There are also no demands for payment from D.E. Nicholas or Acardian to OI.

### viii.    *Payroll Taxes*

34

Plaintiffs asserted in the Joint Pretrial Statement that OI owes payroll taxes of $3,192. JPS 28. *See* P.Ex. 33. Plaintiffs did not expound in this liability at Trial beyond presenting the exhibit. Defendants did not object to its inclusion as a liability.

### e.  Overall Proposed Valuations

#### 1.  Tsintolas Investments

Considering all assets and liabilities presented or withdrawn at trial, Plaintiffs value Tsintolas investments as having $2,104,503 in assets including $2,047,000 in real estate. *See* Appendix A (chart of proposed valuations of Tsintolas Investments by both parties and the Court's final valuation). Plaintiffs assert that TI has no liabilities. *Id*. Plaintiffs therefore calculate that TI's fair value as of October 23, 2019, was $2,104,503.

Defendants assert that TI has assets of $2 million, all of which are real estate. Appendix A. Defendants assert that TI has liabilities of $1,623,038. *Id*. Defendants therefore calculate that TI's fair value as of the Valuation Date was $376,962.

#### 2.  Olympia Investments

Plaintiffs assert that OI has assets of $15,660,674, including real estate assets of $14,767,000. Appendix B (a chart of proposed valuations of Olympia Investments by both parties and the Court's final valuation). With their concession of at least $46,481 in deferred compensation to Steve Tsintolas, Plaintiffs assert that OI's liabilities total $49,673. *Id*.  Plaintiffs therefore calculate the OI's fair value is $15,611,001.

Defendants assert that OI has assets worth $12,673,060, including real estate assets of $12,445,000. Appendix B. Defendants assert that OI has liabilities of $1,806,061. *Id*. Defendants therefore calculate that OI's fair value is $10,866,999.

## II.    DISCUSSION

When a group of shareholders brings an action under D.C. Code § 29-312.20(a)(2) to dissolve a corporation, the corporation may elect to purchase the shareholder-plaintiffs' shares at fair value instead of dissolving. D.C. Code § 29-312.24(a). This is called an "election to purchase in lieu of dissolution." Such an election is irrevocable. *Id*. If the parties cannot reach an agreement as to the value of the shares in question within 60 days, the court shall determine the fair value of the shares. There are five steps in any election to purchase in lieu of dissolution case: (1) determine the date of valuation; (2) determine the fair value of the shares in question; (3) determine the appropriate interest rate and period in which interest accrued; (4) determine whether expenses should be awarded to the plaintiff; and (5) determine a payment plan for the purchase, which includes: (a) the duration of the payment plan; (b) the post judgment interest rate associated with the payment plan; and (c) any security interest in Defendant corporations' properties during the payment plan. *See* D.C. Code § 29-312.24. Pursuant to the Court's Pretrial Order, the Court has bifurcated the determination of fair value from any determination of expenses, payment plan, post-judgment interest rate, or security interest. This decision shall therefore only discuss steps one and two in this Order.

The Parties agree that the Valuation Date is October 23, 2019. By statute, the date of valuation is of one day before the § 29-312.20(a)(2) petition was filed. D.C. Code § 29-312.24(d). This Complaint was filed on October 24, 2019. Therefore, the Valuation Date is October 23, 2019.

"Fair value" is the measure of a corporation's value. Fair value is calculated "using the customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal." D.C. Code § 29-311.01(4)(B). "Valuing a closely held corporation is not an exact science." *In re Seagroatt Floral Co*., 78 N.Y.2d

439, 445 (N.Y. 1991). To value a closely held corporation whose shares are not bought and sold on the open market, the Court must look to various methods and sources to provide its best estimate of what the corporation is worth. *See generally id*. The Court heard testimony from two business valuation experts, Joseph Estabrook for the Plaintiffs and Walter Pennington for the Defendants. Each expert testified that a corporation's value is a function of its assets and liabilities. Both experts submitted reports based upon the available records from OI and TI and upon each sides' respective real estate appraisal expert. *See* D.Ex. 1-4; P.Ex. 2. Both business valuation experts are well-qualified, have served as experts in their field in numerous other cases, and presented credible testimony in support of their respective reports in this case. Likewise, both real estate appraisal experts, Mr. Sapperstein for the Plaintiffs and Mr. Riley for the Defendants, are well-qualified and provided credible testimony. Above, the Court has recounted in detail the evidence of each Corporations' assets and potential liabilities. Below, the Court will address the Corporations' real estate assets, non-real estate assets, and liabilities.

### a. Real Estate Assets

#### 1. Tsintolas Investments' Real Estate Assets

The Parties agree that Tsintolas investments has one real estate asset: 4020-4030-4040 Livingston Rd. Using both the sales comparison approach and income approach, the experts for Plaintiffs and Defendants appraised the Livingston Road Property at $2,047,000 and $2 million, respectively. In percentage terms, the two appraisals are nearly identical. Both experts supported their appraisals with evidence and explanations. Neither side identified any glaring errors in the others' appraisal which would persuade the Court to discredit either. As Mr. Riley testified, appraisals are not an exact science and are best expressed "in a range." The Court views the two parties' appraisals as data points evidencing the true range of the Livingston Road Property's

value. Therefore, the Court will equally weight the appraisals and find the value of the Property to be $2,023,500.

### 2. Olympia Investment's Real Estate Assets

#### A. 5400 7th Street, NW, Washington, DC 20011

As with the Livingston Road Property, neither expert raised significant issues with the other's methodologies or review of comparable properties. Mr. Sapperstein valued the property at $2,986,000 and Mr. Riley valued the property at $2,175,000. In reviewing each expert's written assessment of the other's methodologies, there is no clear basis to discredit either expert's approach. Mr. Riley identified instances where he believed Mr. Sapperstein's comparator properties were too far from the subject property, D.Ex. 7A, p. 2, but no comparator property was further than 3.3 miles away. Further, Mr. Riley did not explain how these distances materially affected the per unit value. Mr. Riley also identified what he believed to be errors in the reported cap rates in Costar but there is no independent evidence of what the "correct" cap rate is. *See id*. at 7-9. Mr. Sapperstein took issue with Mr. Riley's high cap rate and unwillingness to account for higher (but still legal) rent increases, P.Ex. 173, pp. 2-4, but Mr. Riley's rates are not inconsistent with comparator properties. *See* D.Ex. 7A, p. 7. The Court has no information upon which to determine which appraisal is more supported. Both are reasonable. Therefore, the Court finds that 5400 7th St. is valued at $2,580,500, the average of the two proposed expert valuations.

#### B. 810 Kennedy St., NW, Washington, DC 20011

Plaintiffs' appraisal of 810 Kennedy St., NW is more accurate than Defendants'. Both experts testified that appraisals of real estate are taken from the perspective of an informed buyer. Defendants' income approach assumes a net operating income which is much lower than what a reasonably informed buyer would expect. Defendants' income approach relies on a net operating

income of $92,185 compared to $201,326 in effective gross income. D.Ex. 5A. This creates an expense ratio of 54.2%, which is far higher than the industry average of 37%. There is insufficient evidence in the record to establish why a potential buyer of 810 Kennedy St., NW should anticipate high future maintenance or repair costs such that they would experience an expense ratio above 50%. Mr. Riley's improperly low estimate of net operating income depresses the value of the property and must be discredited. Therefore, the Court will take a weighted average of Mr. Riley's sales comparison approach and Mr. Sapperstein's sales comparison and income approaches, giving 75% weight to Mr. Sapperstein's appraisal. Mr. Sapperstein appraised the property at $2,230,000 and Mr. Riley appraised it at $1,680,000. The Court therefore values 810 Kennedy St., NW at $2,092,500.

### C.   829 Rock Creek Church Rd., NW, Washington, DC 20011

The Parties do not substantively dispute the value of 829 Rock Creek Church Rd., NW. Mr. Sapperstein appraised the property at $883,000 and Mr. Riley appraised it at $900,000. The Court values the property at the average of the two appraisals, $891,500.

### D.   1010 G St., NE, Washington, DC 20002

The Court adopts Defendants' appraisal of 1010 G St., NE in full. Both the sales comparison approach and income approach rely on having accurate data about similar properties. Mr. Riley testified about each of Mr. Sapperstein's four comparator properties which contained stark differences to the subject property that made them incomparable. Comparator Sale #1 was more valuable because it had on-site parking; Sale #2 was a boarding house and not an apartment building; Sale #3 was misreported as a building of all studio apartments when it actually has one-bedroom apartments; and Sale #4 was more valuable because it was vacant at the time of sale. Including these erroneous comparators skewed Mr. Sapperstein's appraisal. Once these

39

comparators are removed, there is inadequate information in the Sapperstein Report to support the appraisal. Therefore, the Court adopts Defendants' valuation of $2,800,000.

### E.    1521 E. St., SE, Washington, DC 20003

The Parties did not substantially dispute the value of 1521 E St., SE. Mr. Sapperstein appraised the property at $897,000 and Mr. Riley appraised it at $925,000. The Court takes the average of the two appraisals and values the property at $911,000.

### F.    8212 Flower Ave., Takoma Park, MD 20912

The Court values 8212 Flower Avenue at $1,671,500 based on a weighted average in favor of Defendants' appraisal. Mr. Sapperstein appraised the property at $1,886,000 and Mr. Riley appraised it at $1,600,000. As Mr. Riley explained in his testimony, Mr. Sapperstein's income approach for 8212 Flower Ave. relies on an assumption that a buyer could file a successful hardship application with the city of Takoma Park, MD, which would allow the owner to increase rents beyond what would otherwise be legal. *See* D.Ex. 7E, p. 3. Such an assumption is too speculative to credit Mr. Sapperstein's income approach. Sapperstein's sales comparison approach remains valid. Based on a weighted average of the two experts' appraisals excluding Mr. Sapperstein's income approach, the Court values  the property at $1,671,500.

### G.    3901 53rd St., Bladensburg, MD 20710

The Court adopts Plaintiffs' appraisal of 3901 53rd St. in full. Mr. Riley failed to obtain and quantitively analyze comparator properties for this appraisal. Whereas Mr. Riley regularly criticized Mr. Sapperstein's sales comparables for being more than two miles away from the subject property, Mr. Riley's comparables for this appraisal are in some instances more than 10 miles away and not in the same county. Mr. Riley also did not do a quantitative analysis to normalize the comparable properties to obtain an adjusted per-unit value. Mr. Riley's analysis does

not rise to the standard set by his other appraisals or by Mr. Sapperstein's appraisal for the same property. The Court therefore adopts Mr. Sapperstein's appraisal in full at $2,889,000.

In sum, the Court values OI's real property in total at $13,835,500.

### b.   Non-Real Estate Assets

A party asserting the existence of an agreement, obligation, or asset bears the burden of proof. *See, e.g., Bingham v. Goldberg, Marchesano, Kohlman, Inc*., 637 A.2d 81, 93-94 (D.C. 1994) (stating that the party asserting the existence of a contract bears the burden of proof); *In re Estate of Reilly*, 933 A.2d 830, 837-40 (D.C. 2007) (stating that a party seeking to establish the existing of an asset – there, a trust – bears the burden of proof). If an asset appears on a corporation's general ledger or other documents kept in the ordinary course of business, that can be sufficient to show the existence of the asset. *E.g., Johnson v. District of Columbia*, 144 A.3d 1120, 1129 (D.C. 2016). Neither TI nor OI maintained general ledgers but Plaintiffs presented tax returns, check ledgers, and other documents demonstrating the existence of financial assets for both companies. Defendants did not dispute the authenticity of these documents. Why Defendants did not include well-documented assets such as cash and CDs in its business valuations is inexplicable. Based upon those documents, the Court finds that TI held $11,932 in cash and CDs as of the Valuation Date and that OI held $199,362 in cash and $154,150 in CDs.

Debts owed to a company or individual which are lawfully recoverable are also assets. *E.g., Dennis v. Jackson*, 258 A.3d 860, 863-64 (D.C. 2021) (stating that assets include "bank accounts, [] household goods, jewelry real estate, and more" including the expected payout of a lawsuit). In October 2019, TI was owed $3,140 in unpaid rent by tenants and OI was owed $2,433. The Corporations may not have held the monies in their accounts as of the Valuation Date but they were legally entitled to them. The Corporations knew this; both Corporations sent letters notifying

41

tenants of past due rent and regularly pursued legal action against tenants whose rent was past due. Likewise, the $5,000 prepayments of legal fees to DLA Piper by both Corporations were assets because the payments entitled each Corporation to $5,000 worth of future legal services.

OI's security deposits were not an asset. A landlord may choose to collect a security deposit as a condition of a residential lease. D.C. Code § 42-3502.17(a) (2023 Repl.); 14 D.C.M.R. § 309. Landlords may hold this money for the duration of the tenancy but the money does not belong to the landlord. The landlord must hold the money in a separate, interest-bearing account and return the deposit to the tenant within 45 days of the conclusion of the tenancy unless the landlord becomes entitled to some or all of the deposit because of damage to the property for which the tenant is responsible. 14 D.C.M.R. §§ 309, 311. OI held $51,192 in security deposits as of the Valuation Date. Regardless, this was not yet OI's property and there is no way to determine what portion of it would later become OI's property. Therefore it cannot be considered an asset.[2]

The final purported assets are the accounts receivable from Steve Tsintolas. Plaintiffs argue that Steve owes money to both Corporations for using Corporate money for personal gain over the past several years. Payments which are wrongfully made to an individual or entity, including where payment is obtained based on false claims of business-related expenses, are recoverable. *See Eagle Maint. Servs. v. D.C. Contract Appeals Bd.*, 893 A.2d 569, 581-83 (D.C. 2006). Corporations are generally entitled to the benefit of the doubt that their decisions were taken for a legitimate, stated business purpose. *See, e.g., Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006). However, such deference does not apply to "interested party transactions" – transactions where a corporation's directors are on both sides of a transaction. *Id.* When "the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be

---

[2] The possibility exists that the interest which accrued on the account would be an asset. No party made this argument and any sum would likely be *de minimis* in comparison to the value of the corporations.

attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably," the Court is free to find that the decisions were taken for reasons other than those stated by the corporation. *Id*. Directors have fiduciary duties to their corporation. *E.g., Willens v. 2720 Wis. Ave. Coop. Ass'n*, 844 A.2d 1126, 1136-37 (D.C. 2004). Directors may not appear on both sides of a transaction between the corporation and themselves as individuals unless the benefits reaped from the transaction are enjoyed by the other shareholders. *Id*. at 1136 (internal quotations and citations omitted). This is particularly complicated where Steve Tsintolas acts as the President and 25% shareholder of both Corporations and is the head of TRC which provides property management services for both Corporations. Any payments or covered expenses to Steve's benefit could be related to the legitimate duties he performs in the Corporations' interests or they could be improper benefits which exceed mere fringe benefits. Where Plaintiffs are asserting that an expense actually incurred by TI or OI was improper and seek to include an account receivable as an asset, Plaintiffs bear the burden of showing that the expense was not for a legitimate business purpose and was rather for Steve's personal benefit.

Plaintiffs largely failed to demonstrate that the purported improper charges were ill-gotten gains arising from conversion, embezzlement, or interested party transactions. While testifying about each purportedly improper charge, Chris Tsintolas often testified that he did not know why TI or OI would pay a certain individual or incur a certain expense. The implication was that if Chris did not understand the necessity of an expense, the Court should infer a nefarious purpose. That is not the standard. It is not the Defendants' burden to justify every expense in the Corporations' history. Despite being a shareholder and Officer, Chris admitted that he did not know much about the day-to-day operation of the company. In contrast, Steve Tsintolas credibly

testified about many of the expenses. He explained what services certain individuals performed for the company and why they were paid. The knowledge that Steve demonstrated about the Corporations leads the Court to believe that where Steve's and Chris' testimonies conflict about individual expenses, the Court is inclined not to find that any expense was improper. Charges that the Court finds to be legitimate include all monies paid to individuals and independent contractors, all charges at Sears and other department stores for materials, all petty sums for gift cards and food which were provided to employees, contractors, and caretakers as fringe benefits, and gasoline purchased in or near the District of Columbia and Takoma Park, Maryland for automobiles travelling between the Corporations' real estate properties. These expenses are not included as assets in the fair value calculation.

Costs related to OI's Oldsmobile are not recoverable from Steve. Benefits available to all shareholders are not improper. *See Willens*, 844 A.2d at 1136-37. Steve testified that OI owns one vehicle, his father's Oldsmobile. Although it is often used for personal matters rather than business, it is used by various members of the family. Plaintiffs did not contend that Steve excluded others from using the Oldsmobile. Therefore, the cost of maintaining the Oldsmobile will not be counted as an asset which OI can recover from Steve. Plaintiff's exhibits evidence numerous vehicle maintenance expenses. Plaintiffs assert that these expenses were incurred to maintain the Oldsmobile and other vehicles owned by Acardian or D.E. Nicholas. The Court agrees that maintenance expenses related to Acardian's or D.E. Nicholas' vehicles would be improper. However, apart from one entry for truck maintenance, it is impossible to determine which expenses were for the Oldsmobile and which were for other vehicles.

The Corporations also cannot demand repayment of legal fees paid to Mr. Fitzpatrick on Steve's behalf. The 1995 and 1997 PMAs each contain indemnity clauses stating that "The Owner

44

shall indemnify…the Agent… from and against all legal fees incurred by Agent… including but not limited to legal fees incurred in a suit by a tenant related to the tenancy." D.Ex. 11, ¶ 9; D.Ex. 12, ¶ 9. Mr. Fitzpatrick's fees were related to lawsuits by tenants against TRC and Steve. These fees fall squarely under the PMAs' indemnity clauses. The Court need not determine whether Steve notified his siblings that the Corporations were paying these legal fees or not. Either way, the Corporations were obligated to pay them.

For TI, the only "Steve Tsintolas Receivable" assets are the amounts paid for Steve's family's car insurance from AAA Mid-Atlantic, totaling $201 from 2019, and the cost to repair Steve's garage door, $521.75. *See* P.Ex. 11-12. For OI, the Steve Tsintolas Receivable assets are: $1697.19 for payments to AAA Mid-Atlantic, P.Ex. 51; $75 for a payment to the City of New Carrollton, Maryland, P.Ex. 64; $100 for a payment to Washington, D.C. for a parking ticket not at any of OI's properties, P.Ex. 72; $59.98 for a payment to "Trick Trucks," P.Ex. 122; and $192.99 for waste removal at a property not owned by TI or OI. P.Ex. 127.

### c. Liabilities

#### 1. Former Liabilities Beyond the Statute of Limitations

An alleged debt is not a liability if the corporation could not be legally compelled to pay it. A corporations' duties to its shareholders prevents it from paying off stale obligations which would undermine its profitability. *See Willens*, 844 A.2d at 1136-38. D.C. imposes temporal limitations on various civil actions. The statute of limitations is three years to recover personal property, D.C. Code § 12-301(a)(2); three years to enforce a contractual obligation, D.C. Code § 12-301(a)(7); and six years after the due date on a promissory note, D.C. Code § 28:3-118(a). "The purpose of statutes of limitation is to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed." *Hobson v. District of Columbia*, 686 A.2d 194, 198

(D.C. 1996) (internal quotations and citations omitted). If a creditor allows the statute of limitations to expire, the creditor can no longer enforce an obligation. *See generally id*. Defendants assert that TI and OI have a myriad of liabilities based on decades old promises and contracts, all of which would now be interested party transactions between the Corporation and either Steve personally or one of Steve's other companies including Hercules I, Hercules II, Acardian, and D.E. Nicholas. These obligations arose in the 1980s and 1990s. No demands for payment were made nor is there any documentation that the companies agreed to defer payment. For example, TI's "H&C Roof Payable" liability arises from work performed in 1988. The deadline to make a claim for this sum expired in 1991. Defendants have no colorable argument that if this were an arms-length transaction, a creditor could make a legally enforceable demand for payment. Defendants have not presented any legal authority showing that the statute of limitations is waived just because this transaction was arguably not at arms-length.[3] The same conclusion could be made with respect to the wages payable to Mr. Ortiz or the loans from Hercules I. The Corporations' obligations to make these payments are long expired.

The statute of limitations also applies to deferred compensation and rental commissions from before October 2016. For an installment contract, the deadline to bring an action is three years from the date of a missed payment, and each missed payment creates its own separate deadline. *Keefe Co. v. Americable Int'l Inc.*, 755 A.2d 469, 478 (D.C. 2000). The 1995 and 1997 PMAs created monthly obligations for TI and OI to make payments to Steve. The PMAs stipulate that TI would pay Steve $4,000 a month and OI would pay Steve 8% of gross revenue. In addition, each would pay Steve 75% of the first month's rent from any new tenants ("rental commission").

---

[3] In 1988, Steve Tsintolas had no formal role in TI or OI. Steve did not begin providing property management services to the Corporations on an informal basis until 1990 and did not assume his role as President until 2002. Though the transaction between Hercules I and TI was between a company he controlled and one his parents controlled, it could be characterized as an arms-length transaction.

The PMAs stipulate that Steve was obligated to keep contemporaneous records and make monthly demands for payment. He did not do so. Now, in 2019, is far too late to demand payment. TI and OI would be betraying their shareholders to Steve's benefit if it were to make these payments.

Defendants and Interested Parties' only defense against the application of the statute of limitations is an assertion that Plaintiffs lack standing to argue that any statute of limitations would apply to any liability. *See* D. PTB 21-22 (citing to Defendants' Opposition to Summary Judgment ("DOSJ") 11-12). Defendants argue that "the statute of limitations is an affirmative defense that must be pled and proven by a defendant in response to a [lawsuit]." DOSJ 11 (citing *Radbod v. Moghim*, 269 A.3d 1035, 1045 (D.C. 2022)). The Court is unpersuaded by this argument. In similar proceedings in other jurisdictions, courts regularly adjudicate whether a statute of limitations or other legal doctrine applies to derivative claims which impact the calculation of fair value. *Ramunno v. Capano*, 2006 Del. Ch. LEXIS 40, *27 (Del. Ch. Feb. 10, 2006); *Zelouf Intl. Corp. v. Zelouf*, 47 Misc. 3d 346, 347-49 (N.Y. Sup. Ct. 2014); *Ross v. Candles*, 2021 Minn. App. Unpub. LEXIS 730, *7-16 (Minn. Aug. 30, 2021). Defendants provide no authority stating a contrary rule. To determine whether the Corporations have assets or liabilities based on amounts owed to them or amounts they owe to the Interested Parties or third parties, the Court has to legally analyze these derivative claims. If the Court were to adopt Defendant's position, the Court would have to include in its fair value calculation any asset or liability which had a basis in fact without applying any legal scrutiny. Such an approach would lead to an erroneous and unjust outcome.

### 2.  Deferred Compensation Predating the PMAs: 1990 to 1997

In both the 1995 PMA between TI and Steve Tsintolas, and the 1997 PMA between OI and Steve Tsintolas, the corporations agreed to pay Steve for services rendered between 1990 and the date each PMA was signed. D.Ex. 11, ¶ 6; D.Ex. 12, ¶ 6. The 1995 PMA stipulates that on the date

it terminates, TI will owe Steve $4,000 per month for each month between January 1990 and January 1995. D.Ex. 12, ¶ 6. The 1997 PMA stipulates that on the day it terminates, OI will owe Steve 8% of the gross revenue from the period between January 1990 and March 1, 1997. D.Ex. 11, ¶ 6. Both PMAs have automatically renewed every ten years, meaning that TI and OI's obligations are still pending. *See* D.Ex. 11, ¶ 7; D.Ex. 12, ¶ 7. These are current liabilities which affect the value of each corporation.

For TI, the amount of deferred compensation is definite: $4000 per month ($48,000 per year) for 1990, 1991, 1992, 1993, and 1994. TI asserts that it has already paid Steve part of this deferred compensation. In 1994, TI paid Steve $39,800. D.Ex. 28. Neither Steve Tsintolas as an Interested Party nor Plaintiffs dispute this fact. Therefore, TI will owe Steve the difference, $200,200.

The amount OI owes Steve is a function of its revenue. From 1990 to 1996, OI's income was between $442,000 and $571,000. D.Ex. 17. OI did not compensate Steve in any of those years. *Id*. In 1997, OI's revenue was 482,000 and it compensated Steve $8,000. *Id*. Plaintiffs did not introduce any testimony or exhibits which demonstrate different revenues. The Court finds it more likely than not that these records accurately reflect OI's income over this period. Considering OI's revenue from 1990 to 1996, and pro-rating OI's revenue and Steve's partial compensation from 1997, the Court finds that OI will owe Steve $292,293.33 when the 1997 PMA terminates.

### 3. Deferred Compensation and Rental Commission: October 2016 to October 2019

The Court does not find any liabilities for deferred compensation or rental commission from October 2016 to October 2019 because there is a lack of reliable documentation of the proffered liabilities. Unpaid rental commissions and deferred compensation under the 1995 and 1997 PMAs which relate to work performed between October 2016 and October 2019 are not barred by the three-year statute of limitations because all of the work occurred less than three years

48

before the Valuation Date. *See* D.C. Code § 12-301(a)(7). Deferred compensation and unpaid rental commission can therefore be included as a liability if the Corporations meet their burden of proof to establish the value of the liabilities. Business records may be admitted as evidence if the records "were made at or near the time by … someone with knowledge"; the record was ordinarily kept in the course of the business; the keeping of that record was a "regular practice," and the record is introduced through a "custodian or other qualified witness." Fed. R. Evid. 803(6). Such business records can be in the form of summaries which condense voluminous records into a format which the court may "conveniently examine[]," provided that the underlying documents are made available. Fed. R. Evid. 1006.

The Court admitted some documents which are probative of the Corporations' alleged debts to Steve for deferred compensation and unpaid rental commissions between October 2016 and February 2019. The 1995 PMA establishes that TI is obligated to pay Steve $4000 per month (increasing 1% per year beginning in January 1996) plus 75% of all first month's rent paid from new tenants. D.Ex. 12, ¶ 5. OI is obligated to pay Steve 8% of gross revenue plus 75% of all first month's rent paid from new tenants. D.Ex. 11, ¶ 5. Steve is obligated under both PMAs to maintain business records and make monthly requests for payment. D.Ex. 11, ¶¶ 3, 5; D.Ex. ¶¶ 3, 5. Any amount that the owner does not pay is subject to an unspecified interest rate which begins accruing after 30 days. D.Ex. 11, ¶ 5(C); D.Ex. 12, ¶ 5(C). The Court also conditionally admitted four other documents over Defendants' objections: summaries of each Corporations' annual revenue and amounts paid to Steve, D.Ex. 17, 28; and summaries purporting to catalog first months' rent at the Corporations' properties dating back to 1990. D.Ex. 22, 35. The Court stated on the record that it would admit the documents but scrutinize their credibility and reliability.

Whether a document is admissible and whether it is sufficient to meet a party's burden of proof are two different questions. The Court may, within its discretion, assess the credibility of purported business records. *See, e.g., Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 206-07 (D.C. 2017). Where a party holds the burden of proof and fails to submit records which should have existed and would have satisfied its burden, the absence of that documentation undermines the proponent's case. *See, e.g., District of Columbia Public Employee Relations Bd. v. District of Columbia Metro. Police Dep't*, 593 A.2d 641, 643 (D.C. 1991); *cf. Williams v. Washington Hosp. Center*, 601 A.2d 28, 31 (D.C. 1991) (permitting adverse inferences where a party fails to preserve evidence within its exclusive control even where the destruction of evidence was not intentional spoliation). The issue in *District of Columbia Public Employee Relations Bd. v. District of Columbia Metro. Police Dep't* was whether the Metropolitan Police Department ("MPD") had filed a timely appeal of an arbitration award ("the Award"). *Id.* at 642. Whether the appeal was timely depended on when MPD received notice of the Award. *Id.* MPD had twenty days from the date it received notice of the Award to file an appeal. *Id.* MPD filed its appeal on April 1, 1987. *Id.* MPD claimed that it had received notice of the Award on March 12, 1987, rendering its appeal timely. *Id.* at 643. The Fraternal Order of Police/MPD Labor Committee ("Union") argued that the appeal was untimely because it had received notice on March 6, 1987. *Id.* The only evidence of the date of mailing was the date on the cover letter of the Award, which was March 5, 1987. *Id.* at 642-43. The Court of Appeals held that while the cover letter was admissible, it was insufficient to establish the date of mailing. AAA's Award should have included a certificate of service which would have definitively proved the mailing date. The absence of that evidence was held against the party proffering that MPD's appeal was untimely. *Id.* at 643.

50

The Corporations have submitted some evidence of their annual revenue, amount of first month's rent, and payments to Steve but have failed to produce underlying documentation which should have existed and would have proved the issue. The PMAs required Steve to keep contemporaneous records. D.Ex. 11-12. He did not do so. The Corporations did not keep general ledgers or maintain any organized recordkeeping system. Steve's testimony provided just enough information to admit the summaries but not enough to satisfy the Corporation's burden to prove both the existence and the amount of any present liabilities. The Court cannot reliably determine each Corporations' revenue, the amount of revenue from first month's rent, or how much each Corporation paid Steve from October 2016 to February 2019. It is therefore impossible to determine the amount of each Corporations' present liability to Steve.

The reason the Court credited the summaries with respect to deferred compensation between 1990 and 1997 but not with respect to deferred compensation and rental commission from 2016 and 2019 is that the former had other evidence in support of the liabilities, the Plaintiffs did not substantially dispute the accuracy of those records, and there is a lesser expectation of other records surviving since the 1990s. Both PMAs, the authenticity of which are not in dispute, state that Steve was not compensated for work between 1990 and the effective date of each PMA. D.Ex. 11-12. TI's liability to Steve for deferred compensation was based on a flat monthly rate from 1990 to 1995, of which the 1995 PMA asserted that $0 was paid. D.Ex. 12. OI's payments to Steve were dependent upon OI's revenue but Plaintiffs did not conduct any meaningful cross-examination of Steve or question the accuracy of the summaries with respect to those years.

The lack of documentation for the underlying receipts or other documents from 1990 to 1997 does not undermine the Corporations' assertions of liability to the same extent it does for the period of 2016 to 2019. It is reasonable for a family business not to retain "receipts, cancelled

checks, or other documents" for decades in anticipation of future litigation. *See Gray v. Washington*, 612 A.2d 839, 843 (D.C. 1992) (citing *Gray v. Gray*, 412 A.2d 1208, 1210 (D.C. 1980)). The absence of such documentation may still be held against the party bearing the burden of proof but not necessarily so. *See Washington*, 612 A.2d at 843. Whereas Steve had no obligation to keep records of the Corporations' business between 1990 and the effective date of each PMA; whereas the alleged liability is decades old but not barred by the statute of limitations; whereas the liability and amount thereof is corroborated in part by the PMAs; and whereas the amount was not meaningfully disputed, the summaries are sufficient to establish deferred compensation between 1990 and 1997.

### 4. Legal Fees – Suzanne Tsintolas

The statute of limitations has run on some but not all of the OI' liabilities to the Law Office of Suzanne M. Tsintolas. Breach of contract and unjust enrichment claims both have three-year statute of limitations. D.C. Code §§ 12-301(7)-(8). For services, the statute of limitations begins to run after the services are rendered, after one party has been afforded a reasonable amount of time to demand payment, and after the other party has been afforded a reasonable amount of time to respond. *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 80 (D.C. 2017). The issue here is that whereas Suzanne Tsintolas provided legal services on a variety of cases over the course of 18 years, does the statute of limitations begin to run with each bill, each case, or is the statute of limitations reset every time new services are performed and there is a renewed demand for payment? Analogizing to installment contracts, each bill triggers a separate statute of limitations. *See Keefe Co. v. Americable Int'l, Inc.*, 755 A.2d 469, 472 (D.C. 2000) (stating "each installment due is a separate obligation as to which the statute runs separately") (citing 4 CORBIN ON CONTRACTS § 948 (1951 ed. & Supp.1999)). A plaintiff cannot "unilaterally extend" a statute of

limitations by "making a new demand for payment when initial demands for payment have been unsuccessful." *Cunningham & Assocs. v. Dugan*, 909 A.2d 1001, 1003, n.3 (D.C. 1996). Aside from cases involving fraud or misrepresentation, the statute of limitations is only tolled where the parties agree to do so in writing after the demand for payment or where the obligor acknowledges the debt by making partial payment. *Feldman v. Gogos*, 628 A.2d 103, 105 (D.C. 1993).

Analogizing to installment contracts is consistent with D.C.'s limited adoption of the "continuation of services" doctrine. Maryland common law allows the statute of limitations for an unjust enrichment claim to toll as to all services rendered by one party to another as long as the services are ongoing. *See Van Yerrell v. EMJ Realty Co*., 281 A.3d 594, 597 (D.C. 2022). Once the services are completed, the final bill triggers the statute of limitations as to all payments. *Id*. D.C. has only adopted the continuation of services doctrine in legal and medical malpractice cases. *Id*. Notwithstanding their argument that Plaintiffs lack standing to assert that any statutes of limitations apply, Defendants have not made any argument that obligations predating October 2016 are not barred by the statute of limitations.

Applying this rule, only liabilities from October 2016 through the Valuation Date can be counted as liabilities for OI. The $26,476.76 related to legal fees for *Tsintolas Realty Company v. Mendez*, 984 A.2d 181 (D.C. 2009) are far too old to be included as liabilities. Suzanne Tsintolas' last bill from this case is dated October 15, 2009. D.Ex. 21. In addition to the bill, Suzanne Tsintolas sent OI a demand for payment on January 18, 2013, December 30, 2013, and on December 30 of every year thereafter through 2019. D.Ex. 21 at DEF 463-69. The three-year statute of limitations on this claim began to run shortly after October 15, 2009. Suzanne Tsintolas' annual renewed demands for payment did not renew, extend, or toll the limitation. See *Cunningham & Assocs. v. Dugan*, 909 A.2d 1001, 1003, n.3 (D.C. 1996). If Suzanne Tsintolas

53

were to bring suit for these fees, OI would be able to assert an affirmative defense that the statute of limitations had run. Therefore, the fees related to the appeal of *Tsintolas Realty Company v. Mendez* are not present liabilities for OI.

The same analysis can be applied to every bill from Suzanne Tsintolas through September 23, 2016.[4] Upon review of the bills, time entries, and hourly rate of $250/hr., the Court finds that each of the bills issued between October 30, 2016 and May 8, 2019, relate to legal services which a reasonable company in OI's industry may need. The fact that Suzanne Tsintolas is married to the President of the Corporations and may therefore be an interested party does not outweigh the fact that the tasks she performed were legitimate and her hourly rate was reasonable. Therefore, the Court finds that as of the Valuation Date, OI had a liability to the Law Office of Suzanne Tsintolas of $24,993.26.

### 5.  ACC Maintenance

Defendants claim that TI owes Acardian $591,150 for uncompensated maintenance work performed between 2005 and 2019 ("ACC Maintenance"). The statute of limitations bars recovery for breach of contract after three years. D.C. Code § 12-301(a)(7). Only work for which the first demand for payment was reasonably made within 37 months (three years and thirty additional days) prior to the Valuation Date can be considered as a potential liability. ACC maintenance work from 2005 to 2016 is therefore not a liability.

ACC Maintenance work from September 2016 to the Valuation Date is a liability. Transactions between TI and Acardian are interested party transactions because Steve Tsintolas

---

[4] The Court is including bills up through September 23, 2016, because the statute of limitations does not begin to run until after the obligor has a reasonable amount of time to respond to a demand for payment. *Boyd v. Kilpatrick Townsend & Stockton*, 164 A.3d 72, 80 (D.C. 2017). Some of Suzanne Tsintolas' bills indicate that payment is due within 30 days. *E.g.*, D.Ex. 21 at DEF 422. Others do not indicate a due date at all. The Court finds that 30 days is a reasonable amount of time for OI to have responded to a demand for payment. Therefore, the three-year statute of limitations began for each bill 30 days after the bill was issued to OI.

controls both companies. However, a transaction is not illegitimate simply because it is an interested party transaction. An interested party transaction only means that the Court need not defer to a corporation's business judgments. *See, e.g., Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006). Based on the summary of the job tickets provided by Defendants, and Steve's testimony about Acardian's services to TI, the Court finds that Acardian performed work which was necessary to the maintenance of the Livingston property. The purported value of Acardian's services from September 2016 to February 2019 is $114,514. *See* D.Ex. 25. At trial, Plaintiffs cross-examined Steve regarding items in the summary which were duplicative or erroneous. Steve's cross-examination testimony established that a minority of entries were erroneous but did not completely undermine the probative value of records. Plaintiffs' cross-examination did not provide sufficient information to audit the entries line-by-line. Therefore, contemplating that estimating fair value is both an art and a science, the Court applies a 10% deduction to the proffered liability. The total value of the ACC Maintenance liability for TI is $103,062.60.

### 6. Metropolitan Life Debt

The Life Insurance Agreement between TI and Steve obligates TI to continue to pay the premiums for Steve's life insurance policy until Steve voluntarily terminates the policy or dies. D.Ex. 14. Defendants argue that the Court should find a liability of $116,706. Defendants reach this number by subtracting the total paid by TI up to the Valuation Date from the $207,123.16 debt it recognized in the Life Insurance Agreement. Plaintiffs argue that the Life Insurance Agreement erased the debt and that no present liability should be found. The truth lies in the middle. Defendants' calculation has no basis in fact. The Life Insurance agreement provides that in exchange for relinquishing his ability to enforce the debt, TI would purchase a life insurance policy for Steve and pay the premiums in perpetuity. D.Ex. 14. The Life Insurance Agreement does not

state or imply that if Steve chose to unilaterally terminate the Agreement, Steve could then demand

payment of a debt equal to $207,123.16 minus any amounts TI had paid towards the life insurance

policy to date. Likewise, if Steve does not terminate the Life Insurance Agreement and lives long

enough such that TI ends up paying more than $207,123.16, TI will not be free of its obligation.

Therefore, TI owes no fixed sum to Steve but has an ongoing obligation to pay $306.50 per month.

The best way to calculate the amount of this liability would be to use actuarial data to estimate

how many months Steve is expected to live and determine the present value of those payments.

No such evidence in the record. In recognition that this is a liability but without any precise tool

to quantify its value, the Court will apply the cost of the premiums for five years as a liability. The

Court therefore finds a liability of $18,390.

### 7.  Lawsuit Contingency

The amount of legal fees the Corporations may have to pay as a result of this lawsuit are

not a liability. Potential gains or losses from a lawsuit can be an asset or liability. *See, e.g., Dennis

v. Jackson*, 258 A.3d 860, 864 (D.C. 2021). However, the potential of having to pay attorney fees

in the future should not be considered in this type of proceeding. Fair value is calculated as of one

day before the petition to dissolve a corporation. D.C. Code § 29-312.24(d). The code is designed

such that the potential cost of a lawsuit is not cognized nor is a corporation allowed to knowingly

act to artificially devalue its shares after learning of a dissolution suit. Moreover, the Corporations

elected to litigate the issue rather than dissolve. *See* D.C. Code § 29-312.24(a) (granting a

corporation the right to purchase a shareholder's shares at fair value rather than dissolve). It is not

proper to discount the value of a corporation based on its intent to litigate aggressively. Neither

Corporation will be considered to have liabilities based on projected legal fees incurred after the

Valuation Date.

### d.  Fair Value

Based upon the Court's findings of fact and conclusions of law, the Court holds that the fair value of Tsintolas Investment, Inc., is $1,722,642.00. A pro-rata 25% share is $430,660.50. The cost of purchasing Plaintiffs' shares (50% of the shares) is $861,321.00. Appendix A.

The fair value of Olympia Investments, Inc., is $13,851,614.57. A pro-rata 25% share is $3,462,903.64. The cost of purchasing Plaintiffs' shares (50% of the shares) is $6,925,807.29. Appendix B.

### e.  Interest, Attorney Fees and Payment Plan

The Court is allowed to order that interest be paid from the Valuation Date to the date of judgment. D.C. Code § 29-312.24(e). The Court may decide an interest rate which is "equitable." *Id*. The only circumstance in which interest is not allowed is if the petitioning shareholder rejected a good-faith offer from the corporation to purchase the shares at or near fair value. *Id*. The default post-judgment interest rate in the District of Columbia is 6% per annum. D.C. Code § 28-3302(a).

The Court may institute any payment plan it deems equitable. D.C. Code § 29-312.24(e). There is no precedent from the D.C. Court of Appeals constraining or guiding the Court's decision. The Court also has discretion to determine whether to attach a "security to assure payment." *Id*. The Court should consider: the defendants' ability to pay the fair value; the mortgages or other debts the defendants may need to incur to make payments; and the defendants' anticipated future earnings. The Court will hold in abeyance its factual findings regarding the solvency of the Corporations and the likelihood of bankruptcy following the purchase in lieu of dissolution.

The Court may award attorney fees to Plaintiffs "[i]f the court finds that the petitioning shareholder had probable grounds for relief under D.C. Code §§ 29-312.20(a)(2)(B) or (D)." D.C. Code § 312-24(e). Subsections (B) and (D) grant a plaintiff the right to dissolve a corporation if the corporation is acting, or has acted, in a manner that is "illegal, oppressive, [or] fraudulent" or

57

if "corporate assets are being misapplied or wasted." D.C. Code §§ 29-312.20(a)(2)(B), (D). The Code does not allow for an award of fees if the petition for dissolution is based in mere disagreement between shareholders about corporate affairs. D.C. Code § 312-24(e); D.C. Code § 29-312.20(a)(2)(A).

In the Court's Pretrial Order, it ordered the Parties to present evidence and argument on these issues but stated that its decision on these issues would be bifurcated. Pretrial Order 3. The Parties both make arguments in their Post-Trial Briefs regarding payment plans, interest, attorney fees, and which party should bear the costs, taxes, and fees associated with liquidizing the Corporation's assets such that they can purchase Plaintiffs' shares in cash. *See* P. PTB 25-35; D. PTB 25-35. As stated in the Pretrial Order, the Court is taking these issues under advisement.

Accordingly, it is this 22nd day of May, 2023, hereby,

**ORDERED** that the Fair Value of Tsintolas Investments, Inc., is adjudged to be $1,722,642; and it is further

**ORDERED** that the Fair Value of Olympia Investments, Inc., is adjudged to be $13,851,614.57; and it is further

**ORDERED** that from this date until May 26, 2023, Defendants are **ENJOINED** from selling, transferring, encumbering, or otherwise granting a right to purchase, any real property in its possession or taking any action with the intent of devaluing either Corporation; and it is further

**ORDERED** that the Parties shall appear in Courtroom 212 at 10:30 a.m. on May 26, 2023, for a Remote Status Hearing to schedule further proceedings.

**IT IS SO ORDERED**.

Judge Yvonne M. Williams

Date:  May 22, 2023

Copies to:

Matthew J. Pavlides
*Counsel for Plaintiffs*

Benjamin S. Boyd
*Counsel for Defendant Efstratios "Steve" Tsintolas*

Richard S. Basile
*Counsel for Defendants Tsintolas Investments, Inc. and Olympia Investments, Inc.*

### Appendix A - Tsintolas Investments, Inc.

| | Court's Valuation | Plaintiffs' Position | Defendants' Position |
|---|---|---|---|
| **Assets** | | | |
| Real Property | $ 2,023,500.00 | $ 2,047,000.00 | $ 2,000,000.00 |
| Cash and CDs | $ 11,932.35 | $ 28,237.00 | $ - |
| Accounts Receivable | $ 3,140.00 | $ 3,140.00 | $ - |
| Prepaid Expenses | $ 5,000.00 | $ 5,000.00 | $ - |
| Steve Tsintolas Receivable | $ 722.25 | $ 21,126.00 | $ - |
| **Total Assets** | **$ 2,044,294.60** | **$ 2,104,503.00** | **$ 2,000,000.00** |
| | | | |
| **Liabilities** | | | |
| ACC Maintenance | $ 103,062.60 | $ - | $ 591,150.00 |
| Deferred Compensation | $ 200,200.00 | **$ -** | $ 260,274.00 |
| DEN Maintenance | $ - | $ - | $ 161,280.00 |
| H&C Roof Payable | $ - | $ - | $ 18,499.00 |
| HD&R Loan Payable | $ - | $ - | $ 131,855.00 |
| Lawsuit Contingency | $ - | $ - | $ 180,000.00 |
| Loan - HD Tsintolas | $ - | $ - | $ 48,304.00 |
| Metropolitan Life Debt | $ 18,390.00 | $ - | $ 116,706.00 |
| Rental Commission | $ - | $ - | $ 95,228.00 |
| Cash Overdraft | $ - | $ - | $ 19,742.00 |
| **Total Liabilities** | **$ 321,652.60** | **$ -** | **$ 1,623,038.00** |
| | | | |
| **Fair Value** | **$ 1,722,642.00** | **$ 2,104,503.00** | **$ 376,962.00** |
| | | | |
| **Pro Rata (25%)** | **$ 430,660.50** | **$ 526,125.75** | **$ 94,240.50** |
| **Pro Rate (50%)** | **$ 861,321.00** | **$ 1,052,251.50** | **$ 188,481.00** |

### Appendix B - Olympia Investments, Inc.

| | Court's Valuation | | Plaintiffs' Position | | Defendants' Position |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Real Property | $ | 13,835,500.00 | $ | 14,767,000.00 | $ 12,445,000.00 |
| Cash | $ | 199,362.00 | $ | 199,362.00 | $ - |
| CDs | $ | 154,150.00 | $ | 154,150.00 | $ 154,441.00 |
| Accounts Receivable | $ | 2,433.00 | $ | 2,433.00 | $ - |
| Prepaid Expenses | $ | 5,000.00 | $ | 5,000.00 | $ - |
| Security Deposits/Reserve | $ | - | $ | 51,192.00 | $ - |
| Steve Tsintolas Receivable | $ | 2,125.16 | $ | 481,537.00 | $ - |
| Buildings & Land | $ | - | $ | - | $ 73,619.00 |
| **Total Assets** | $ | **14,198,570.16** | $ | **15,660,674.00** | $ **12,673,060.00** |
| | | | | | |
| **Liabilities** | | | | | |
| 8116 H&C | $ | - | $ | - | $ 53,023.00 |
| Deferred Compensation -EDT | $ | 292,293.33 | $ | 46,481.00 | $ 835,658.00 |
| H&C Roof Payable | $ | - | $ | - | $ 25,953.00 |
| HD&R Loan Payable | $ | - | $ | - | $ 151,689.00 |
| Lawsuit Contingency | $ | - | $ | - | $ 180,000.00 |
| Legal fees payable | $ | 24,993.26 | $ | - | $ 56,966.00 |
| Legal Fees Payable/Appeal | $ | 26,477.00 | $ | - | $ 26,477.00 |
| Rental Commission | $ | - | $ | - | $ 341,667.00 |
| Wages Payable - Ortiz | $ | - | $ | - | $ 114,886.00 |
| Payroll Taxes | $ | 3,192.00 | $ | 3,192.00 | $ - |
| | | | $ | - | |
| **Total Liabilities** | $ | **346,955.59** | $ | **49,673.00** | $ **1,786,319.00** |
| | | | | | |
| **Fair Value** | $ | **13,851,614.57** | $ | **15,611,001.00** | $ **10,886,741.00** |
| | | | | | |
| **Pro Rata (25%)** | $ | **3,462,903.64** | $ | **3,902,750.25** | $ **2,721,685.25** |
| **Pro Rata (50%)** | $ | **6,925,807.29** | $ | **7,805,500.50** | $ **5,443,370.50** |

### **Appendix C -Real Property Valuation**

| Property | Court's Valuation | | Plaintiffs' Position | Defendants' Position |
|---|---|---|---|---|
| 4020-4040 Livingston Rd., SE (TI) | $ 2,023,500 | | $ 2,047,000 | $ 2,000,000 |
| 5400 7th St., NW | $ 2,580,000 | | $ 2,986,000 | $ 2,175,000 |
| 810 Kennedy St., NW | $ 2,092,500 | | $ 2,230,000 | $ 1,680,000 |
| 829 Rock Creek Church Rd., NW | $ 891,500 | | $ 883,000 | $ 900,000 |
| 1010 G St, NE | $ 2,800,000 | | $ 2,996,000 | $ 2,800,000 |
| 1521 E St. SE | $ 911,000 | | $ 897,000 | $ 925,000 |
| 8212 Flower Ave. | $ 1,671,500 | | $ 1,886,000 | $ 1,600,000 |
| 3901 53rd St. | $ 2,889,000 | | $ 2,889,000 | $ 2,375,000 |
| | | | | |
| Real Estate Value (TI) | $ 2,023,500 | | $ 2,047,000 | $ 2,000,000 |
| Real Estate Value (OI) | $ 13,835,500 | | $ 14,767,000 | $ 12,455,000 |
| **Total Real Estate Value** | **$ 15,859,000** | | **$ 16,814,000** | **$ 14,455,000** |

# EXHIBIT 5

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **CHRISTOFILOS TSINTOLAS,** *et al.*, | **2019 CA 007057 B** |
| **Plaintiffs,** | |
| **v.** | **2019 CA 007059B** |
| **TSINTOLAS INVESTMENTS, INC.,** *et al.*, | **Judge Yvonne Williams** |
| **Defendants.** | |
| **CHRISTOFILOS TSINTOLAS,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | |
| **OLYMPIA INVESTMENTS, INC.,** *et al.*, | |
| **Defendants.** | |

<u>**ORDER**</u>

Pursuant to D.C. Code § 29.312.24 *et seq*. (2023 Repl.), the Court hereby enters this Final Order establishing the fair value of Plaintiffs', Christofilos Tsintolas, Deborah Tsintolas, and the Fotini Tsintolas Economides Revocable Trust, shares in Defendant Corporations, Tsintolas Investments ("TI"), and Olympia Investments ("OI"), and awarding pre- and post-judgment interest, attorney's fees and costs, setting a security for payment in full, and assigning a schedule for payments.

### I.    BACKGROUND

#### a.  Prior Procedural History

This is an action for dissolution of two closely-held corporations: Tsintolas Investments ("TI"); and Olympia Investments ("OI") (collective, "the Corporations"). Plaintiffs Christofilos ("Chris") Tsintolas and Deborah Tsintolas ("Deborah") collectively own 25% of the shares of each Corporation. Plaintiff Fotini Tsintolas Economides ("Fotini"), through the Fotini Tsintolas

1

Economides Revocable Trust, also owns 25% of the shares of each Corporation. Their siblings, Efstratios D. Tsintolas ("Steve"), and Cassandra Tsintolas Johnson ("Cassandra"), through the Cassandra Tsintolas Johnson Revocable Trust intervened as Interested Parties (collectively, the Corporations and Interested Parties are the "Defendants"). In October 2019, Plaintiffs filed these two actions to dissolve each Corporation. Pursuant to D.C. Code § 29-312.24(a), the Corporations elected to purchase Plaintiffs' shares in lieu of dissolving. On September 26-27, 2022, November 14-15, 2022, and January 9-10, 2023, the Court held a Non-Jury Trial ("Trial"). On May 22, 2023, the Court entered a Trial Order. The Court held the fair value of Tsintolas Investments, Inc. to be $1,722,642 and the fair value of Olympia Investments, Inc. to $13,851,614.57. The Court reserved the issues of pre- and post-judgment interest, expenses, as security, and a payment plan to be resolved in subsequent proceedings.

On August 21, 2023, the Court held an Addendum Hearing ("Hearing"). The Court heard testimony from Plaintiffs' business valuation expert, Joseph Estabrook; Defendants' commercial real estate expert, Kyle Tangney; and Defendants' accounting and business valuation and taxation expert, Walter Pennington. The Court had previously heard testimony from Mr. Estabrook and Mr. Pennington at the Trial.

### b.  Joseph Estabrook's Testimony

On August 21, 2023, Mr. Estabrook testified that he had updated his evaluation of potential payment plans based upon the Trial Order. *See* Plaintiffs' Exhibit ("P.Ex.") 259. Mr. Estabrook provided calculations for the value of any final order based upon whether the Court awards attorney fees and other expenses and prejudgment interest. He testified that under any scenario, TI should be able to obtain commercial or private financing to finalize the purchase. OI should also be able to afford the purchase with private financing unless the Court awards full attorney fees,

prejudgment interest, and OI experiences lower income than expected. He conceded that he had concerns about the availability of commercial lending for OI. His ultimate opinion was that TI could be ordered to pay prejudgment interest only for one year while it obtained financing and then pay full fair value. OI would have to pay interest only for three to five years before it would have the funds to pay the full fair value of Plaintiffs' shares.

### c. Kyle Tangney's Testimony

Mr. Tangney specializes in the sale and finance of commercial properties. He testified that TI cannot obtain commercial financing because TI has negative cash flow despite its real estate assets. Any financing of TI's real estate would likely lead to default and foreclosure. OI would be able to obtain financing, but any loan would likely be a "bridge loan," meaning that a lender would only provide a loan if the OI's real estate changed ownership. As noted in the Trial Order, OI's net operating income ("NOI") is far below expected NOI because OI is not being adequately managed. A lender might be willing to make a loan on the assumption that a new owner would obtain an NOI nearer to the industry average. If either Corporation takes out commercial loans, it would likely take 180 days to complete the paperwork and necessary inspections. Financing would cost around $100,000 in fees per building.

Alternatively, the Corporations could sell their real estate assets. Selling a large residential building in Takoma Park, Maryland, can take up to 420 days and can take up to 500 days in D.C. because of the time it takes to list a property for sale, the time it takes a buyer to obtain financing, and the time for tenants to consider their purchasing rights. A sale would incur an approximate 6% commission and other fees. Plaintiffs do not contest these facts.

Mr. Tangney raised the prospect of the Corporations deeding properties to Plaintiffs in lieu of financing or sale. He testified that deeding properties would be the fastest and cheapest option.

3

It would take approximately three months and would just require paying legal fees and not any commission. He could not testify with certainty what the tax implications of deeding properties would be.

### d. Walter Pennington's Testimony

Mr. Pennington testified that based on the NOI noted on both Corporations' tax returns, they will not be able to obtain commercial financing. Lenders make decisions based on actual NOI, not any NOI normalized to the industry average. Based on OI and TI's actual NOIs, commercial lenders would likely not provide financing. He also testified that because OI and TI are "S Corporations," the taxes on any finance or sale will be borne by the owners, meaning that Plaintiffs are not sharing any tax burden related to this action.

Mr. Pennington also raised the possibility of a "divisive reorganization" in which OI and TI would create subsidiaries of themselves and transfer real estate assets to the subsidiaries. Plaintiffs would then be paid with stock in the new subsidiaries. If done correctly, a divisive reorganization would be tax-free. He was not certain that a divisive reorganization would work and admitted that it would require legal fees. If it failed, it would result in normal taxes. If Plaintiffs then wanted to sell their shares, Plaintiffs would incur capital gains taxes just as they might incur if the Court orders OI and TI to pay Plaintiffs in cash.

## II.    DISCUSSION

When a group of shareholders brings an action under D.C. Code § 29-312.20(a)(2) to dissolve a corporation, the corporation may elect to purchase the shareholder-plaintiffs' shares at fair value instead of dissolving. D.C. Code § 29-312.24(a). This is called an "election to purchase in lieu of dissolution." Such an election is irrevocable. *Id*. If the parties cannot reach an agreement as to the value of the shares in question within 60 days, the court shall determine the fair value of

the shares. There are five steps in any election to purchase in lieu of dissolution case: (1) determine

the date of valuation; (2) determine the fair value of the shares in question; (3) determine the

appropriate interest rate and period in which interest accrued; (4) determine whether expenses

should be awarded to the plaintiff; and (5) determine a payment plan for the purchase, which

includes: (a) the duration of the payment plan; (b) the post judgment interest rate associated with

the payment plan; and (c) any security interest in Defendant corporations' properties during the

payment plan. *See* D.C. Code § 29-312.24. The Court has already completed steps one and two.

Based upon the evidence and argument presented at Trial and the August 21, 2023, Hearing, the

Court hereby finds awards prejudgment interest, attorney fees and costs, and sets forth the

following payment plan and security interest.

### a. Prejudgment Interest

The Court is allowed to order that interest be paid up to the date of judgment. D.C. Code §

29-312.24(e). The Court may decide an interest rate which is "equitable." *Id*. The only

circumstance in which interest is not allowed is if the petitioning shareholder(s) rejected a good-

faith offer from the corporation(s) to purchase the shares at or near fair value. *Id*. Absent any

contractual provision, prejudgment interest is set at 6% per annum. D.C. Code § 28-3302(a). There

is no evidence that Plaintiffs rejected a good faith offer. Defendants repeatedly objected to

evidence of the Parties' settlement discussions, meaning that there is no evidence that they offered

Plaintiffs any sum near the Court's determination of fair value. The Court therefore may award

prejudgment interest. When Defendants elected to pursue a purchase in lieu of dissolution, they

did so with knowledge that it would delay Plaintiffs' ability to collect the value of their shares until

litigation was complete. From 2019 to 2023, Plaintiffs did not enjoy the benefit of the shareholder

dividends they collected prior to 2019. Prejudgment interest therefore remedies the delay caused

by this litigation. Absent any contractual or other rate, the Court will apply the statutory rate of 6% per annum.

### b. Attorney Fees and Costs

The Court may award attorney fees to petitioner shareholders "[i]f the court finds that the petitioning shareholder had probable grounds for relief under D.C. Code §§ 29-312.20(a)(2)(B) or (D)." D.C. Code § 29-312.24(e). Subsections (B) and (D) grant a plaintiff the right to dissolve a corporation if the corporation is acting, or has acted, in a manner that is "illegal, oppressive, [or] fraudulent" or if "corporate assets are being misapplied or wasted." D.C. Code §§ 29-312.20(a)(2)(B), (D). If shareholders are merely "deadlocked in the management of the corporate affairs," petitioner shareholders are not entitled to attorney fees. *See* D.C. Code § 29-312.20(a)(2)(A).

Plaintiffs reasonably expected that they had a right to dissolve both corporations because of mismanagement. D.C. Code § 29-312.20(a)(2)(D) permits a shareholder to force dissolution of a corporation if "corporate assets are being misapplied or wasted." There is ample evidence that Efstratios ("Steve") Tsintolas failed to adequately manage the Corporations. Much of the Parties' disputes as to the value of the corporate assets arose from different assessments of net operating income. Defendants consistently testified and argued that the Corporations have negative cash flow; that maintenance expenses exceed or barely equal rental income; and that Steve has not been paid for his prior work. At the time Plaintiffs initiated this action to dissolve the Corporations, Steve was asserting that the Corporations owed him hundreds of thousands of dollars.[1] Expert witnesses on both sides acknowledged that OI's and TI's net operating incomes were far below

---

[1] At Trial, Defendants asserted that OI owed Steve Tsintolas personally $835,658 and that TI owed him $260,274. That does not include hundreds of thousands of dollars' worth of other unpaid expenses allegedly owed to three companies wholly owned by Steve. The Court held that TI and OI owe Steve about $300,000 each.

industry standards. Defendants' own expert, Mr. Tangney, testified that a commercial lender would be willing to loan the Corporations money only if the properties were going to change ownership and be run such that NOI would be closer to the industry standard. Defendants' own evidence shows that the Corporations have been grossly mismanaged. If Steve were to use his position as President of the Corporations to pay himself hundreds of thousands of dollars – as he planned to do – that would constitute a further gross mismanagement or waste of funds. On this basis alone, the Court can award attorney fees to Plaintiffs.

Plaintiffs also had probable grounds for relief under D.C. Code § 29-312.20(a)(2)(B), which prohibits corporate officers or directors from engaging in "illegal, oppressive, [or] fraudulent" behavior. Both Corporations operated unlawfully when they consistently failed to hold shareholder meetings over the course of several years and falsified records of meetings that never existed. Furthermore, Steve, in his capacity as President, unlawfully refused to allow Fotini and Chris, who were both corporate officers, to review corporate financial documents or learn the details of Steve's exclusive and lucrative property management agreement with both Corporations. Both Steve and Fotini testified that Steve became angry with Fotini when he learned that she went behind his back to request financial documentation from the Corporations' accountant after Steve denied her access to those documents. Plaintiffs reasonably expected that this conduct would have entitled them to seek dissolution of the Corporations.

There is also evidence that Steve oppressively used his powers as President. "Oppression" is the use of one's corporate power to leverage how or whether another exercises their rights within the corporation. *Topper v. Park Sheraton Pharmacy, Inc*., 107 Misc. 2d 25, 35 (N.Y. Sup. Ct. 1980); *see Riden v. Philadelphia, B. & W. R. Co*., 182 Md. 336, 346 (Md. 1943). There was undisputed testimony that Steve withheld Chris' dividend check in 2019 until Chris would

7

acquiesce to meeting with Steve in person and approve certain corporate actions. Steve did not deny withholding the check and said that he did it because he felt that Chris needed to meet with him about corporate business. This is textbook oppression. Steve used his corporate power to try to leverage how Chris exercised his rights as a shareholder and officer. Steve's misuse of his role as President gave Plaintiffs probable grounds for dissolution.

Defendants argue that the Court cannot find oppression unless a majority shareholder(s) exercises power over a minority shareholder. There is no authority in support of this bright-line rule. The statute allows for a finding of oppression by "[t]he directors or those in control of the corporation." D.C. Code § 29-312.20(a)(2)(B). An oppressor could be a majority stakeholder, director, or officer. Steve's *de jure* position as President of both Corporations with *de facto* control of all Corporate functions gave him the opportunity to oppress Plaintiffs. Steve controlled all corporate revenue and expenses; Steve had an exclusive property management contract with both Corporations; and Steve signed each shareholders' dividend checks. The power of the purse is indeed powerful. Given the clear oppression in this case, the Court sees no reason to adopt a rule limiting oppression only to majority shareholders.

Although Mr. Estabrook provided numbers for Plaintiffs' legal fees and costs, including expert costs, the Court does not have access to the documents underlying Plaintiffs' calculations. The Court will withhold a final determination of the amount of attorney fees and costs pending review of fee affidavits and itemized time entries which shall be filed within 30 days of this Order. Oppositions and replies may be filed pursuant to Rule 12-I.

### c. Security Interest

A security interest is necessary here because Defendants have failed to make any plans for completing the purchase of Plaintiffs' shares. The Court may, at its discretion, require a "security

to assure payment of the purchase price and any additional expenses as may have been awarded."
D.C. Code § 29-312.24(e). At Trial, Defendants asserted that the two Corporations had a combined fair value of just over $11 million. It was undisputed that Plaintiffs owned 50% of the shares of each Corporation. Even in Defendants' ideal outcome, Defendants still would have been required to pay Plaintiffs over $5 million. At the August 21, 2023, Hearing, the Court asked Defendants what their plan was to complete the purchase. They had none. Defendants elected to purchase Plaintiffs' shares over three years ago. They should have been preparing to have at least $5 million ready to complete the purchase and a plan to further liquidate assets as necessary based on the Court's finding of fair value. Once the Court enters a final order, each Corporation may elect to dissolve within 10 days instead of going through with its election to purchase. D.C. Code § 29-312.24(g). The Court is greatly concerned that after forcing Plaintiffs to litigate an election to purchase is lieu of dissolution, Defendants will simply choose to dissolve. A security is therefore necessary to ensure that Plaintiffs are paid fair value and all of the expenses awarded herein. Therefore, Plaintiffs are hereby granted a lien on both Corporations for the value of any award (including fair value and all interest, fees, and expenses) which shall be senior to any interest held by the Corporations themselves or by the Interested Parties. In the event of dissolution or bankruptcy, Plaintiffs' entitlement to payment under this order shall be senior to Defendants'.

### d.  Payment Plan

The Court, in its discretion, may order that the purchase be paid in installments. D.C. Code § 29-312.24(e). A payment plan which allows the Corporations adequate time to mortgage or sell its real estate is necessary. Each Corporation shall have two years from the date of this Order to pay the full value of all relief, including pre- and post-judgment interest. One year from the date of this Order (365 days), each Corporation shall pay each Plaintiff for the value of post-judgment

interest as calculated under D.C. Code § 28-3302(c). 2 years from the date of this Order (730 days), each Corporation shall pay each Plaintiff the fair value plus any expenses and fees and including post-judgment interest for the second year.

Each Corporation is free to decide how it wishes to obtain the necessary funding. The statute requires a party electing to purchase shares in lieu of dissolution to pay the petitioner shareholders "fair value." D.C. Code § 29-312.24(a) *et seq*. The statute's consistent use of the terms "sale" and "purchase" indicate that fair value should be paid in U.S. currency, not in assets that can be converted to currency. *See generally id*. The statute does not explicitly authorize courts to micromanage how a corporation obtains purchasing funds. Even if the statute's broad grant of discretion could be construed as authorizing courts to order that certain assets be mortgaged or sold, doing so would be fraught with error. Fair value is assessed as of one day before a petition for dissolution is filed. D.C. Code § 29-312.24(d). Here, that is October 23, 2019. The value of each property in 2023 is different than in 2019. Both sides' experts also conceded that real estate appraisal is both an art and a science and that a property's true value is likely in a range of plus or minus a few percentage points. If the Court were to dictate which properties should be mortgaged or sold, it is likely that the Corporations would either not raise enough money or that they would leverage themselves more than necessary. Each Corporation is in the best position to decide how to manage their own assets.

This Order does not offset or reallocate any fees or tax liability. The statute provides for an arms-length purchase of a petitioner's shares for fair value. *See* D.C. Code § 29-312.24(a) *et seq*. The statute has no provisions permitting a court to offset tax liability. *Id*. Defendants argue that because they will control 100% of each Corporation, the fees and taxes related to selling or mortgaging assets will unfairly fall upon them and not Plaintiffs. Defendants therefore requested

that the Court include some offset for the brokerage fees or taxes. Such an offset is not only not provided for in the statute; it would be inequitable. Defendants *elected* to purchase Plaintiffs' shares in lieu of dissolution. Defendants knew or should have known when they made the election that they did not have the money to buy Plaintiffs' shares and that acquiring the purchase money would require the mortgage or sale of real estate. In an arm's length transaction, a seller would not be responsible for financing a buyer's costs of obtaining purchase money. Furthermore, Plaintiffs are likely going to incur capital gains taxes related to the sale of their shares. The Court is not going to order Plaintiffs to pay the costs or taxes incurred in the finance or sale of the Corporations' assets. Taxes and incidental fees will lie where they may.

Defendants may not unilaterally transfer assets to Plaintiffs in lieu of paying money. The statute mandates that the shares be purchased with money, not with assets that may be monetized. *See* D.C. Code § 29-312.24(a) *et seq.* Plaintiffs did not express any interest in owning or managing any residential properties in lieu of being paid in cash. If the Parties wish to negotiate the transfer of real estate to offset the price of this Order, they may. Otherwise, Defendants may not offset their liability by transferring real property without Plaintiffs' agreement.

In sum, the fair value of each Plaintiff's shares in Tsintolas Investments, Inc., is $430,66.50. TI shall make the following payments to each group of Plaintiffs:

| Deadline | Amount |
|---|---|
| 365 Days From the Date of This Order | Post-judgment interest under D.C. Code § 28-3302(c) on the Fair Value (inclusive of prejudgment interest) from Day 1 to Day 365. |
| 730 Days From the Date of This Order | Post-judgment interest under D.C. Code § 28-3302(c) on the Fair Value (inclusive of prejudgment interest) from Day 366 to 730; Fair Value (inclusive of prejudgment interest); and all attorney's fees and costs. |

11

There shall be no penalty for payment ahead of schedule. If payment is made in full before day 730, post-judgment interest shall be prorated.

The fair value of each Petitioner's shares in Olympia Investments, Inc., is $3,462,903.64. OI shall make the following payments to each group of Petitioners:

| Deadline | Amount |
|----------|--------|
| 365 Days From the Date of This Order | Post-judgment interest under D.C. Code § 28-3302(c) on the Fair Value (inclusive of prejudgment interest) from Day 1 to Day 365. |
| 730 Days From the Date of This Order | Post-judgment interest under D.C. Code § 28-3302(c) on the Fair Value (inclusive of prejudgment interest) from Day 366 to 730; Fair Value (inclusive of prejudgment interest); and all attorney's fees and costs. |

There shall be no penalty for payment ahead of schedule. If payment is made in full before day 730, post-judgment interest shall be prorated.

Accordingly, it is this 5th day of October, 2023, hereby,

**ORDERED** that the Fair Value of Tsintolas Investments, Inc., is adjudged to be $1,722,642; and it is further

**ORDERED** that the Fair Value of Olympia Investments, Inc., is adjudged to be $13,851,614.57; and it is further

**ORDERED** that within 30 days of this Order, Plaintiffs shall file evidence and argument demonstrating the value of their reasonable attorney's fees and costs; and it is further

**ORDERED** that oppositions and replies to Plaintiffs' demands for attorney's fees may be filed pursuant to Rule 12-I; and it is further

**ORDERED** that pre- and post-judgment interest and a security interest are **GRANTED** as described above; and it is further

**ORDERED** that the above payment plan shall be in effect; and it is further

**ORDERED** that this Order triggers Defendants' 10-day deadline under D.C. Code §

29.312.24(g).

**IT IS SO ORDERED**.


Judge Yvonne Williams

Date: October 5, 2023

Copies to:

Matthew J. Pavlides
*Counsel for Plaintiffs*

Benjamin S. Boyd
*Counsel for Defendant Efstratios "Steve" Tsintolas*

Richard S. Basile
*Counsel for Defendants Tsintolas Investments, Inc. and Olympia Investments, Inc.*

Joseph Creed
Virginia Grimm
*Counsel for Defendant Cassandra Tsintolas Johnson Revocable Trust*

# EXHIBIT 6

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

Filed
12/22/2023 11:14:12 AM
Superior Court
of the District of Columbia

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, and FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST, | |
| Plaintiffs, | C.A. No.:  2019 CA 007057 B |
| v. | Judge Yvonne M. Williams |
| TSINTOLAS INVESTMENTS, INC., et. al, | |
| Defendants/Interested Parties. | |
| CHRISTOFILOS TSINTOLAS et al, | Consolidated Case No.: 2019 CA 007059 B |
| Plaintiffs, | Next event: None |
| v. | |
| OLYMPIA INVESTMENTS, INC., et al., | |
| Defendants. | |

**MOTION FOR JUDICIAL DETERMINATION OF NON-COMPLIANCE WITH D.C. CODE § 29-312.24(G) AND RESULTING REINSTITUTION OF OCTOBER 5, 2023 FINAL ORDER FOR PURCHASE OF PLAINTIFFS' SHARES**

Plaintiffs Christofilos Tsintolas ("Chris"), Deborah Tsintolas ("Debbie") and Fotini Tsintolas Economides Revocable Trust ("Fotini") (collectively "Plaintiffs"), by and through their attorneys, respectfully submit this Motion for Judicial Determination of Non-Compliance with D.C. Code § 29-312.24(g) and Resulting Reinstitution of October 5, 2023 Final Order for Purchase of Plaintiffs' Shares (the "Motion"), stating as follow:

## I.    INTRODUCTION

On December 1, 2023, after filing the Notice of Intention to Adopt Articles of Dissolution (the "Notice") in lieu of purchasing Plaintiffs' shares, Defendants Tsintolas Investments, Inc. ("TI") and Olympia investments, Inc. ("OI") (collectively "Defendant Corporations") and Interested Party Efstratios Tsintolas ("Steve") attempted to improperly dissolve Defendant

STEIN SPERLING BENNETT DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

20540838_3

Corporations without following the necessary statutory steps, and filed materially misleading Articles of Dissolution of Domestic For-Profit Corporation (the "Inaccurate Articles of Dissolution") for TI and OI to the Department of Licensing and Consumer Protection of the government of District of Columbia. Because a proper, lawful dissolution of Defendant Corporations did not take place as required under D.C. Code § 29-312.24(g) in order to undo the force or effect of this Court's final purchase Order dated October 5, 2023 (the "Final Order"), the Final Order remains in full force and effect.

## II.    **PERTINENT FACTS**

1.    On October 24, 2019, Plaintiffs filed the instant suits seeking, *inter alia*, judicial dissolution of Defendant Corporations and included Steve and Cassandra Tsintolas Johnson through the Cassandra Tsintolas Johnson Revocable Trust as Interested Parties (collectively, Defendant Corporations and Interested Parties are "Defendants").

2.    On January 21, 2020, pursuant to D.C. Code § 29-312.24(a), Defendant Corporations elected to purchase Plaintiffs' shares at fair value in lieu of dissolving.

3.    After a contentious discovery process and unsuccessful negotiations and mediation between Plaintiffs and Defendants to buy out Plaintiffs' shares, the Court held a non-jury trial on September 26-27, 2022, November 14-15, 2022, and January 9-10, 2023.

4.    On May 22, 2023, the Court entered a Trial Order, wherein it held the fair value of TI to be $1,722,642 and the fair value of OI to be $13,851,614.57.[1]

5.    On October 5, 2023, the Court entered the Final Order, establishing the fair value of Plaintiffs' shares in Defendant Corporations, awarding pre-and post-judgment interests and attorney's fees and costs, setting a security for payment in full, and assigning a schedule for

---

[1] Pursuant to the Court's Pretrial Order dated September 12, 2022, the Court bifurcated the determination of fair value from any determination of expenses, payment plan, post-judgment interest rate, or security interest.

20540838_3

payments. The Final Order stated that it "triggers Defendants' 10-day deadline under D.C. Code §

29-312.24(g)."

6.      D.C. Code § 29-312.24(g) provides a two-part process relating to dissolution as

follows:

> The purchase ordered pursuant to subsection (e) of this section shall be made within 10 days after the date the order becomes final **unless before that time the corporation files with the Superior Court a notice of its intention to adopt articles of dissolution pursuant to §§ 29-312.02 and 29-312.03, which articles shall then be adopted and filed within 50 days thereafter. Upon filing of such articles of dissolution,** the corporation is dissolved in accordance with §§ 29-312.05 through 29-312.07, and the order entered pursuant to subsection (e) of this section shall no longer be of any force or effect, except that the court may award the petitioning shareholder expenses in accordance with the last sentence of subsection (e) of this section and the petitioner may continue to pursue any claims previously asserted on behalf of the corporation.

(Emphasis added).

7.      On October 16, 2023, Defendant Corporations filed the Notice, thereby expressing

their intentions to adopt articles of dissolution pursuant to §§ 29-312.02 and 29-312.03 within 50

days (i.e., by December 5, 2023). *See* D.C. Code § 29-312.24(g).

8.      D.C. Code §§ 29-312.02 provides, in pertinent part, as follows:

(b) For a proposal to dissolve to be adopted:

> (1) The board of directors shall recommend dissolution to the shareholders
> . . .

> (2) The shareholders entitled to vote must approve the proposal to dissolve as provided in subsection (e) of this section.

(c) The board of directors may condition its submission of the proposal for dissolution on any basis.

(d) The corporation shall notify each shareholder, whether or not entitled to vote, of the proposed shareholders' meeting. The notice shall also state that the purpose, or one of the purposes, of the meeting is to consider dissolving the corporation.

(e) Unless the articles of incorporation or the board of directors acting pursuant to subsection (c) of this section require a greater vote, a greater number of shares to

be present, or a vote by voting groups, **adoption of the proposal to dissolve requires the approval of the shareholders at a meeting at which a quorum consisting of at least a majority of the votes entitled to be cast exists**.

(Emphasis added).

9.      Thereafter, at 11:47 a.m. on Friday, December 1, 2023, Steve sent an email to, among others, Plaintiffs, stating: "Attached is a notice to Shareholders of [TI] and [OI], given by orders of the Board of Directors of such corporations." The email contained two PDF attachments titled "Notice to Shareholders [TI]" and "Notice to Shareholders [OI]."[2] A copy of the email, and the attached PDFs, is attached hereto and incorporated herein as Exhibit 1.

10.      The body of both notices states identically as follows:

NOTICE OF ACTION WITHOUT A MEETING OF SHAREHOLDERS BY
WRITTEN CONSENT
Proposed to be taken on December 1, 2023

TO THE SHAREHOLDERS OF [TI OR OI] (the "***Corporation***"):

NOTICE IS HEREBY GIVEN pursuant to Section 29-312.02 of the District of Columbia Business Corporation of 2010 (the "***Act***") that an action without a meeting by written consent is proposed to be taken on December 1, 2023 to adopt a Plan of Dissolution and Distribution for the dissolution of the Corporation and the liquidation and winding up of its affair (the "***Written Action***").

Section 29-312.02 of the Act requires that notice of a proposed meeting to consider dissolving the Corporation be given to all shareholders of the Corporation, whether or not entitled to vote.

Only shareholders of the Corporation entitled to vote on December 1, 2023 will be signing the Written Action.

Exhibit 1. Five minutes later at 11:52 a.m., the office of counsel for Defendant Corporations forwarded the said email to counsel for Plaintiffs.

---

[2] The delivery of the "notice to shareholders" to Plaintiffs by Steve was consistent with the fact that Plaintiffs became shareholders again by operation of law once the Notice was filed, as more fully described below. This admission by Steve that Plaintiffs were shareholders of Defendant Corporations should foreclose him and/or Defendant Corporations from ever disputing that from the period of time between the filing of the Notice and the deadline for the adoption of articles of dissolution, Plaintiffs were indisputably shareholders of Defendant Corporations.

4

11.    At 3:42 p.m. on the same day, counsel for Plaintiffs emailed counsel for

Defendants, stating as follows:

> My clients are in receipt of your office's email of December 1, 2023 at 11:52 AM.
>
> My clients object to the surprise of the communication mid-day on a Friday; misplaced allegations both factual and legal; alleged timing asserted therein in all respects; generally and specifically lack of proper notice; lack of proper and full disclosure as to what alleged 'Plan of Dissolution and Distribution' is being reference as it is undisclosed; and overall improper attempt to take unilateral action in this matter.
>
> As you know, my clients remain Shareholders, Officers and Directors of Tsintolas Investments, Inc. and Olympia Investments, Inc. As Shareholders and Directors and in light of the rulings of the Court in the pending litigation and other associated proceedings, any and all action taken by the Corporations is categorically improper. We intend to bring to Judge Williams' attention this attempt at further improper action and the continuing pattern of oppression.

A copy of the December 1, 2023 3:42 p.m. email is attached hereto and incorporated herein as

Exhibit 2.

12.    Then on the very same day, on December 1, 2023, Steve improperly signed and

submitted the Inaccurate Articles of Dissolution to the government of District of Columbia. A copy

of the Inaccurate Articles of Dissolution for TI and OI is attached hereto and incorporated herein

as Exhibits 3 and 4, respectively. To be clear, there was *no* proper call for a shareholders' meeting

to vote for the filing of articles of dissolution and *no* "approval of the shareholders at a meeting at

which a quorum consisting of at least a majority of the votes entitled to be cast exists." *See* D.C.

Code § 29-312.02(e).

13.    In both Inaccurate Articles of Dissolutions, Steve incorrectly and falsely

represented that "[t]he date dissolution was authorized" was December 1, 2023 and in a misleading

fashion stated that "[t]he proposal to dissolve was duly approved by the shareholders in the manner

required by § 29-312.03 and by the articles of incorporation." Exhibits 3 and 4. The form used for

the Inaccurate Articles of Dissolution expressly provides that "[i]f you sign this form you agree

that anyone who makes a false statement can be punished by criminal penalties of a fine up to $1000; imprisonment up to 180 days, or both, under DCOC §§ 22-2405." *Id.*

14.    Further, in the Inaccurate Articles of Dissolution for TI, Steve lists Chris, Fotini, and himself under "Name of the Governor or Authorized Person" and inaccurately represented that the Articles of Dissolution for TI were signed by the "Governor or Authorized Person" listed. *See* Exhibit 3. To be clear, Chris and Fotini did not authorize their signature on the Articles of Dissolution for TI.

## III.    ARGUMENT

### A.    The Court's Final Order remains in place.

i.    The Filing of the Notice Caused Plaintiffs to Regain their Status as Shareholders of Defendant Corporations.

After the filing of the Notice, Plaintiffs regained their status as shareholders of Defendant Corporations. D.C. Code §29-312.24(f) in its totality states:

> Upon entry of an order under subsection (c) or (e) of this section, the Superior Court shall dismiss the petition to dissolve the corporation under §29-312.20(a)(2), and the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation, except the right to receive the amounts awarded by the order of the court which enforceable in the same manner as any other judgment.

Plaintiffs do not dispute that this Court entered a Final Order on October 5, 2023 under subsection (e) of D.C. Code §29-312.24 and, if that was the end of the story, Plaintiffs would have never regained their shareholder status. However, as this Court is aware, that is not the end of the story. On October 16, 2023, Defendant Corporations filed the Notice. As a result, subsection (g) of D.C. Code §29-312.24 is triggered which states, in pertinent part, that: "Upon filing of such articles of dissolution, the corporation is dissolved in accordance with §§ 29-312.05 through 29-312.07, and the order entered pursuant to subsection (e) of this section **shall no longer be of any force or effect [. . .] and petitioner may continue to pursue any claims previously asserted on behalf**

20540838_3

**of the corporation.**" (Emphasis added). Thus, as the only logical interpretation of D.C. Code §29-312.24, Plaintiffs permanently lose their status of shareholders *only* if Defendant Corporations choose not to dissolve and continue with their election to purchase Plaintiffs' shares. Defendant Corporations filed the Notice with a purported intention to proceed with dissolution and as such, after the Notice was filed, there was no basis for Plaintiffs to lose their status as shareholders of Defendant Corporations.

Although there is no reported case in the District of Columbia addressing this issue, other Courts have decided this issue and agreed with Plaintiffs' interpretation that Plaintiffs regained their status as shareholders of Defendant Corporations as soon as the Notice was filed, since the legal predicate for their losing their status as shareholders is "no longer [] of any force or effect[.]" *See* D.C. Code §29-312.24(g). The Supreme Court of New Hampshire previously stated as follows:

> Since our election statute is nearly identical to the like provision in the Model Business Corporation Act, see Model Bus. Corp. Act Annotated § 14.34 (4th ed. 2011), 'we look to the official comments of the model act for guidance on the intended meaning of the election statute.' *Bendetson*, 154 N.H. at 643, 913 A.2d 756. One comment states that, '[i]n addition to the usual rights of appeal available to any party under the laws of the local jurisdiction, subsection (g) affords the alternative of voluntary dissolution after entry of an order under subsection (e).' Model Bus. Corp. Act Annotated § 14.34 cmt. 4D, at 14–172. The comment explains, in relevant part, that:

>> If the corporation elects to dissolve, the petitioning shareholder will receive his or her pro rata share of the liquidating proceeds distributed to shareholders without reference to the 'value' of the shares as determined by the court under subsection (e). By virtue of subsection (f), the petitioning shareholder would not be entitled to vote on a proposal to adopt articles of dissolution under section 14.02. **Once articles of dissolution are filed**, however, subsection (g) provides that the order under subsection (e) is 'no longer of any force or effect.' Accordingly, **subsection (f) no longer applies, the petitioner resumes shareholder status** and will be entitled to a pro rata share of any liquidating distribution to shareholders.

> *Id.* at 14–173.

7

20540838_3

Applying this interpretation to this case, **once the articles of dissolution** were filed under RSA 293–A:14.34(g), the trial court's order under RSA 293–A:14.34(e), directing the terms and conditions of the purchase of Carleton, LLC's shares, no longer had any force or effect. *See* RSA 293–A:14.34(g). Moreover, RSA 293–A:14.34(f), providing that 'the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation,' no longer applied and Carleton, LLC 'resume[d] shareholder status and will be entitled to a pro rata share of any liquidating distribution to shareholders.' Model Bus. Corp. Act Annotated § 14.34 cmt. 4D, at 14–173.

*Carleton, LLC v. Balagur*, 164 N.H. 471, 476–77 (2012) (emphasis added). In that same case, the

court further made clear that there is "no question that the filing of an intention to adopt articles of

dissolution at that time automatically nullifies the order [under subsection (e)] and triggers the

dissolution process without further order of the court." *Id.* at 478 (quoting *Fierro v. Templeton*,

857 So.2d 931, 933 (Fla. Dist. Ct. App. 2003) (analyzing nearly identical subsection in Florida's

election to purchase statute)). This Court should similarly find that the Notice restored Plaintiffs'

status as shareholders of Defendant Corporations throughout the 50-day period after the Notice

was filed and had the articles of dissolution been properly adopted and filed—which was not the

case here—Plaintiffs would have continued to be shareholders in Defendant Corporations during

the dissolution process.

    ii.    Defendant Corporations' Failure to Strictly Comply with the Express Requirements D.C. Code § 29-312.24(g) Eliminated their Ability to Avoid the Final Order.

As the result of Defendant Corporations' failure to lawfully adopt and file articles of

dissolution in accordance with D.C. Code § 29-312.02 within 50 days of filing the Notice,

Defendant Corporations have forfeited their election to dissolve in lieu of purchasing Plaintiffs'

shares in accordance with the terms of the Final Order. Defendant Corporations failed to lawfully

and strictly satisfy the necessary, express, and only conditions[3]—i.e., filing a notice of the intention

---

[3] In the Final Order at P.9, this Court noted that: "[o]nce the Court enters a final order, each Corporation may elect to dissolve within 10 days instead of going through with its election to purchase. D.C. Code § 29-312.24(g). The Court is **greatly concerned** that after forcing Plaintiffs to litigate an election to purchase i[n] lieu of dissolution, Defendants

8

to adopt articles of dissolution within 10 days of the Final Order and adopting and filing articles of dissolution within 50 days thereafter—that could nullify their obligations to purchase Plaintiffs' shares as directed in the Final Order. *See* D.C. Code § 29-312.24(g) ("The purchase ordered pursuant to subsection (e) of this section shall be made . . . **unless** . . . ." (emphasis added)). It is only upon the lawful adoption and filing of articles of dissolution by December 5, 2023—which never took place—that "the corporation is dissolved . . . , and the order entered pursuant to subsection (e) of this section shall no longer be of any force or effect[.]" *Id.*

Instead, Steve—while acknowledging that Plaintiffs were shareholders of Defendant Corporations by sending them Exhibit 1—proceeded to exclude Plaintiffs from any discussions, meetings, and votes on Defendant Corporations' determination of whether or not to adopt articles of dissolution. As such, Steve unlawfully used an informal resolution to dissolve that did not provide for the proper notice, quorum, and resolution as required under D.C. Code § 29-312.02 and filed documents with the government of District of Columbia which were unauthorized and materially inaccurate because they represented that the corporations had properly acted to vote to dissolve the corporations. In addition, Steve's unlawful informal resolution references the adoption of a Plan of Dissolution and Distribution ("Plan") that Plaintiffs did not vote on and was not properly adopted (the assumption being that whatever Steve's Plan is favors Steve) or disclosed. Therefore, because Defendant Corporations did not comply with the strict requirements in D.C. Code § 29-312.24(g), the Court's Final Order and Defendant Corporations' obligation to purchase Plaintiffs' shares have now become binding and unavoidable.[4]

---

will simply choose to dissolve." (Emphasis added). Significant effort and expense went into the proceedings that led to the Final Order, and the statute provides a very clear and precise process for how to undo the massive amount of work by the Parties and the Court that led to the Final Order. The only reasonable outcome for failure to strictly comply with the requirements contained in D.C. Code § 29-312.24(g) is the Final Order remaining in full force and effect.

[4] In the event that this Honorable Court disagrees that the Final Order remains in full force and effect due to the noncompliance with the strict requirements of D.C. Code § 29-312.24(g), Plaintiffs would maintain their previously expressed position that they are shareholders. Moreover, Plaintiffs would respectfully request that this Honorable

* * *

WHEREFORE, in consideration of the foregoing grounds and the record herein, Plaintiffs

respectfully request that this Honorable Court

     a.     Grant their Motion; and thereby

     b.     Order that the Final Order remains in full force and effect and that Defendant

Corporations are not permitted to avoid liability by seeking dissolution; and

     c.     Grant in favor of Plaintiffs such other and further relief as this Honorable Court

deems just and proper.

Respectfully submitted,

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

By:     _/s/ Matthew J. Pavlides_
Matthew J. Pavlides (D.C. Bar # 424573)
Eduardo Garcia (D.C. Bar # 1028040)
1101 Wootton Parkway, Suite 700
Rockville, MD 20852
(301) 340-2020
(301) 354-8113 (facsimile)

*Attorneys for Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust*

---

Court take into consideration Steve's continuing failure to follow the necessary formalities of corporations and his continuing efforts to exclude Plaintiffs from their rightful part in decision-making as further evidence for the need to appoint a receiver to manage the orderly dissolution of Defendant Corporations.

20540838_3

## RULE 12-I(a) CERTIFICATION

On December 19, 2023, via electronic mail, counsel for Plaintiffs communicated with Counsel for Defendant Corporations and Interested Parties to determine whether they would consent to the relief requested herein. Defendant Corporations and the Interested Parties did not consent to the relief requested herein.

_/s/ Matthew J. Pavlides_
Matthew J. Pavlides

11

20540838_3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of December, 2023, a copy of the foregoing was served via the court's e-filing system on each of the following counsel of record:

Jonathan C. Windle
Law Office of Jonathan C. Windle, P.C.
8300 Wisconsin Avenue, Suite 416
Bethesda, Maryland 20814

Richard S. Basile
Law Office of Richard S. Basile
6305 Ivy Lane, Suite 510
Greenbelt, MD 20770

Michael J. Bramnick
Joseph M. Creed
Bramnick Creed, LLC
4520 East West Highway, Suite 700
Bethesda, Maryland 20814

Douglas C. Boggs
Benjamin S. Boyd
DLA Piper LLP
500 8th St., NW
Washington, DC 20004

Glenn C. Etelson
John Troost
Shulman, Rogers, et. al.
12505 Park Potomac Avenue
Sixth Floor
Potomac, Maryland 20854


_/s/ Matthew J. Pavlides_
Matthew J. Pavlides

20540838_3

12

# EXHIBIT 1

**From:** tsintolas@aol.com
**Date:** December 1, 2023 at 11:48:04 AM EST
**To:** Cassandra Johnson <greekkitt@gmail.com>, Smtesq <smtesq@aol.com>, CHRIS T
<4cet@comcast.net>, Fotini Economides <feconomides51@aol.com>, debgt@comcast.net
**Subject: Olympia Investments, Inc. and Tsintolas Investments, Inc.**


Attached is a notice to Shareholders of Tsintolas Investments, Incorporated and Olympia
Investments, Inc. given by order of the Boards of Directors of such corporations.

**E. D. Tsintolas, President**
Olympia Investments, Inc.
Tsintolas Investments, inc.
<Notice to Shareholders Tsintolas Investments, Incorporated.pdf>
<Notice to Shareholders Olympia Investments, Inc..pdf>

**TSINTOLAS INVESTMENTS, INCORPORATED**
3520 Connecticut Avenue, N.W.
Washington, D.C. 20008

NOTICE OF ACTION WITHOUT A MEETING OF SHAREHOLDERS BY WRITTEN CONSENT
Proposed to be taken on December 1, 2023

TO THE SHAREHOLDERS OF TSINTOLAS INVESTMENTS, INCORPORATED (the "*Corporation*"):

NOTICE IS HEREBY GIVEN pursuant to Section 29-312.02 of the District of Columbia Business Corporation Act of 2010 (the "*Act*") that an action without a meeting by written consent is proposed to be taken on December 1, 2023 to adopt a Plan of Dissolution and Distribution for the dissolution of the Corporation and the liquidation and winding up of its affairs (the "*Written Action*").

Section 29-312.02 of the Act requires that notice of a proposed meeting to consider dissolving the Corporation be given to all shareholders of the Corporation, whether or not entitled to vote.

Only shareholders of the Corporation entitled to vote on December 1, 2023 will be signing the Written Action.

By order of the Board of Directors
Tsintolas Investments, Incorporated

**OLYMPIA INVESTMENTS, INC.**
3520 Connecticut Avenue, N.W.
Washington, D.C. 20008

NOTICE OF ACTION WITHOUT A MEETING OF SHAREHOLDERS BY WRITTEN CONSENT
Proposed to be taken on December 1, 2023

TO THE SHAREHOLDERS OF OLYMPIA INVESTMENTS, INC. (the "*Corporation*"):

NOTICE IS HEREBY GIVEN pursuant to Section 29-312.02 of the District of Columbia Business Corporation Act of 2010 (the "*Act*") that an action without a meeting by written consent is proposed to be taken on December 1, 2023 to adopt a Plan of Dissolution and Distribution for the dissolution of the Corporation and the liquidation and winding up of its affairs (the "*Written Action*").

Section 29-312.02 of the Act requires that notice of a proposed meeting to consider dissolving the Corporation be given to all shareholders of the Corporation, whether or not entitled to vote.

Only shareholders of the Corporation entitled to vote on December 1, 2023 will be signing the Written Action.


By order of the Board of Directors
Olympia Investments, Inc.

# EXHIBIT 2

| From: | Eduardo S. Garcia |
|---|---|
| To: | Glenn Etelson |
| Cc: | Matthew J. Pavlides; Boyd, Benjamin; jcreed@bramnickcreed.com; FKushnir@shulmanrogers.com |
| Bcc: | Christofilos E Tsintolas DDS MS Deborah G Tsintolas Business Controversy E mail 2141114 00002 |
| Subject: | RE: Olympia Investments, Inc. and Tsintolas Investments, Inc. [SS-LEGAL.FID1056793] |
| Date: | Friday, December 1, 2023 3:41:29 PM |

Mr. Etelson,

My clients are in receipt of your office's email of December 1, 2023 at 11:52 AM.

My clients object to the surprise of the communication mid-day on a Friday; misplaced allegations both factual and legal; alleged timing asserted therein in all respects; generally and specifically lack of proper notice; lack of proper and full disclosure as to what alleged "Plan of Dissolution and Distribution" is being reference as it is undisclosed; and overall improper attempt to take unilateral action in this matter.

As you know, my clients remain Shareholders, Officers and Directors of Tsintolas Investments, Inc. and Olympia Investments, Inc. As Shareholders and Directors and in light of the rulings of the Court in the pending litigation and other associated proceedings, any and all action taken by the Corporations is categorically improper. We intend to bring to Judge Williams' attention this attempt at further improper action and the continuing pattern of oppression.

**EDUARDO S. GARCIA**
ATTORNEY AT LAW
Stein Sperling Bennett De Jong Driscoll PC



**1101 Wootton Parkway · Suite 700 · Rockville, MD 20852**
**301-838-3326** direct · **301-340-2020** main · 301-354-8326 direct fax
egarcia@steinsperling.com · vCard
www.steinsperling.com · LinkedIn
admitted in MD, DC, VA

This message contains information from the law firm of Stein Sperling Bennett De Jong Driscoll PC that may be privileged, confidential or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message. Thank you very much.

> **From:** Marilyn Sonnie <MSonnie@shulmanrogers.com>
> **Date:** December 1, 2023 at 11:52:28 AM EST
> **To:** "Matthew J. Pavlides" <MPavlides@steinsperling.com>, Benjamin Boyd <benjamin.boyd@us.dlapiper.com>, Joe Creed <jcreed@bramnickcreed.com>

**Cc:** Glenn Etelson <GEtelson@shulmanrogers.com>, Felix Kushnir
<FKushnir@shulmanrogers.com>
**Subject: FW: Olympia Investments, Inc. and Tsintolas Investments, Inc.**


Please see the attached notice.

MARILYN SONNIE
COUNSEL
Licensed only in New York
MSonnie@shulmanrogers.com **| T** (301) 945-9254 **| M** (917) 885-8641 **| F** (301) 230-
2891

12505 PARK POTOMAC AVENUE, 6TH FLOOR, POTOMAC, MD 20854

*A Professional Association*


**From:** tsintolas@aol.com <tsintolas@aol.com>
**Sent:** Friday, December 1, 2023 11:48 AM
**To:** Marilyn Sonnie <MSonnie@shulmanrogers.com>
**Subject:** Fw: Olympia Investments, Inc. and Tsintolas Investments, Inc.



----- Forwarded Message -----
**From:** tsintolas@aol.com <tsintolas@aol.com>
**To:** Cassandra Johnson <greekkitt@gmail.com>; Smtesq <smtesq@aol.com>; CHRIS T
<4cet@comcast.net>; Fotini Economides <feconomides51@aol.com>; debgt@comcast.net
<debgt@comcast.net>
**Sent:** Friday, December 1, 2023 at 11:47:57 AM EST
**Subject:** Olympia Investments, Inc. and Tsintolas Investments, Inc.

Attached is a notice to Shareholders of Tsintolas Investments, Incorporated and
Olympia Investments, Inc. given by order of the Boards of Directors of such
corporations.

**E. D. Tsintolas, President**
Olympia Investments, Inc.
Tsintolas Investments, inc.

The information contained in this electronic message and any attached documents
is privileged, confidential, and protected from disclosure. It may be an attorney-
client communication and, as such, is privileged and confidential. If you are not
the intended recipient, note that any review, disclosure, copying, distribution, or
use of the contents of this electronic message or any attached documents is
prohibited. If you have received this communication in error, please destroy it and
notify us immediately by telephone (1-301-230-5200) or by electronic mail
(LawFirm@ShulmanRogers.com). Thank you.

# EXHIBIT 3



## DEPARTMENT OF LICENSING AND CONSUMER PROTECTION
### District of Columbia Government
### Corporations Division

### Articles of Dissolution of Domestic For-Profit Corporation
### Form DBU-7, Version 4, August 2023

This form will allow a domestic business corporation to dissolve and wind down its business. A corporation shall be dissolved upon the effective date its articles of dissolution.

| ENTITY TYPE | FILING FEE |
|---|---|
| Domestic Filing Entity | Refer to Corporate Fee Schedule posted online; |

**Under the provisions of the Title 29 of D.C. Code (Business Organizations Act), the domestic filing entity listed below hereby applies for a Certificate of Dissolution and for that purpose submits the statement below.**

1. The name of the corporation.
TSINTOLAS INVESTMENTS Incorporated

2. The date dissolution was authorized.
December 01, 2023

**3. The proposal to dissolve was duly approved by the shareholders in the manner required by § 29-312.03 and by the articles of incorporation.**

**If you sign this form you agree that anyone who makes a false statement can be punished by criminal penalties of a fine up to $1000, imprisonment up to 180 days, or both, under DCOC § 22-2405;**

| 4. Name of the Governor or Authorized Person: | 4A. Signature of the Governor or Authorized Person |
|---|---|
| Chris Tsintolas | 12/1/2023    **ESIGNED** |
| Fotini Economides | |
| E. D. Tsintolas | |

| Mail all forms and required payment to: | Corporate Online Services Information: |
|---|---|
| Department of Licensing and Consumer Protection | Many corporate filings are available by using CorpOnline Service, |
| Corporations Division | Go to CorpOnline site at **https://corp.dlcp.dc.gov**, create a profile, |
| PO Box 712300 | access the online services main page and proceed. Online filers |
| Philadelphia, PA 19171-2300 | must pay by using a credit card. |

Please check dlcp.dc.gov to view organizations required to register, to search business names, to get step-by-step guidlines to register an organization, to search registered organizations, and to download forms and documents. Just click on "Corporate Registration."

# EXHIBIT 4



## DEPARTMENT OF LICENSING AND CONSUMER PROTECTION
### District of Columbia Government
### Corporations Division

### Articles of Dissolution of Domestic For-Profit Corporation
### Form DBU-7, Version 4, August 2023

This form will allow a domestic business corporation to dissolve and wind down its business. A corporation shall be dissolved upon the effective date its articles of dissolution.

| ENTITY TYPE | FILING FEE |
|---|---|
| Domestic Filing Entity | Refer to Corporate Fee Schedule posted online; |

**Under the provisions of the Title 29 of D.C. Code (Business Organizations Act), the domestic filing entity listed below hereby applies for a Certificate of Dissolution and for that purpose submits the statement below.**

1. The name of the corporation.
OLYMPIA INVESTMENTS Inc.

2. The date dissolution was authorized.
December 01, 2023

**3. The proposal to dissolve was duly approved by the shareholders in the manner required by § 29-312.03 and by the articles of incorporation.**

**If you sign this form you agree that anyone who makes a false statement can be punished by criminal penalties of a fine up to $1000, imprisonment up to 180 days, or both, under DCOC § 22-2405;**

| 4. Name of the Governor or Authorized Person: | 4A. Signature of the Governor or Authorized Person |
|---|---|
| E. D. Tsintolas | 12/1/2023    **ESIGNED** |

Mail all forms and required payment to:
Department of Licensing and Consumer Protection
Corporations Division
PO Box 712300
Philadelphia, PA 19171-2300

**Corporate Online Services Information:**
Many corporate filings are available by using CorpOnline Service,
Go to CorpOnline site at **https://corp.dlcp.dc.gov**, create a profile, access the online services main page and proceed. Online filers must pay by using a credit card.

Please check dlcp.dc.gov to view organizations required to register, to search business names, to get step-by-step guidlines to register an organization, to search registered organizations, and to download forms and documents. Just click on "Corporate Registration."

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

CHRISTOFILOS TSINTOLAS, et al,

        Plaintiffs,

    v.

TSINTOLAS INVESTMENTS, INC., et. al,

        Defendants/Interested Parties.

C.A. No.:  2019 CA 007057 B

Judge Yvonne M. Williams

CHRISTOFILOS TSINTOLAS et al,

        Plaintiffs,

    v.

OLYMPIA INVESTMENTS, INC., et al.,

        Defendants.

Consolidated Case No.: 2019 CA 007059 B

Next event: None

### <u>ORDER</u>

UPON CONSIDERATION OF Plaintiffs' Motion for Judicial Determination of Non-Compliance with D.C. Code § 29-312.24(g) and Resulting Reinstitution of October 5, 2023 Final Order for Purchase of Plaintiffs' Shares (the "Motion"), any opposition thereto, any hearing thereon, and the record herein, it is on this _____ day of _____, 2024,

ORDERED, by the Superior Court of the District of Columbia, that the Motion be and hereby is GRANTED; and therefore it is further,

ORDERED, that the Court's Final Order dated October 5, 2023 remains in full force and effect, and Defendants Tsintolas Investments, Inc. and Olympia investments, Inc. are not permitted to avoid liability by seeking dissolution.

 

                              _____
                              YVONNE M. WILLIAMS, JUDGE
                              Superior Court of the District of Columbia
                              (Civil Division)

<u>Copies to</u>:

All counsel of record

# EXHIBIT 7

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

Case 24-00158-ELG    Doc 16    Filed 05/21/24    Entered 05/21/24 21:04:27    Desc Main
Document    Page 252 of 548

eFiled
11/06/2023 5:18:10 PM
Superior Court
of the District of Columbia

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| CHRISTOFILOS TSINTOLAS,<br>DEBORAH TSINTOLAS,<br>and<br>FOTINI TSINTOLAS ECONOMIDES<br>REVOCABLE TRUST, | |
| Plaintiffs,<br>v. | C.A. No.:  2019 CA 007057 B<br><br>Judge Yvonne M. Williams |
| TSINTOLAS INVESTMENTS, INC., et. al, | |
| Defendants/Interested Parties. | |

| | |
|---|---|
| CHRISTOFILOS TSINTOLAS et al, | Consolidated Case No.: 2019 CA<br>007059 B |
| Plaintiffs,<br>v. | Next event: None |
| OLYMPIA INVESTMENTS, INC., et al., | |
| Defendants. | |

## OPPOSED MOTION TO DISQUALIFY THE LAW FIRM OF SHULMAN ROGERS AND ITS ATTORNEYS FROM <u>REPRESENTING THE DEFENDANT CORPORATIONS</u>
### (HEARING REQUESTED)

Plaintiffs Christofilos Tsintolas ("Chris"), Deborah Tsintolas ("Deborah"), and Fotini Tsintolas Economides Revocable Trust's ("Fotini") (collectively "Plaintiffs"), move to disqualify Glenn C. Etelson, John Troost and the law firm of Shulman, Rogers, Gandal, Pordy & Ecker, P.A. (the "Shulman Rogers Attorneys") from representing the Defendant Corporations Tsintolas Investments, Inc. and Olympia Investments, Inc. (the "Motion"), and in support thereof, states as follows:

### I.     <u>INTRODUCTION</u>

The hiring of the Shulman Rogers Attorneys purportedly on behalf of Defendants Tsintolas Investments, Inc. and Olympia Investments, Inc. (the "Defendant Corporations") was unauthorized

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

20428117_2

and represents a non-waived conflict of interest as the Shulman Rogers Attorneys, upon information and belief, previously represented Interested Party Efstratios Tsintolas ("Steve"), as well as. other individuals and entities in collateral matters associated with this case.

From the start of these proceedings, Plaintiffs have raised concerns about the Interested Parties, principally Steve, using counsel for the Defendant Corporations as merely an extension of their efforts to continue to maximize the costs on the Plaintiffs and delay these proceedings. This Court has previously rejected this type of conduct and granted a motion to disqualify when Steve tried to add Joe Creed (who currently represents The Interested Party Cassandra Tsintolas Johnson Revocable Trust ("Sandy") from representing the Defendant Corporations.

Further, at this point, the Defendant Corporations have elected to be dissolved and the focus by statute is only on the Defendant Corporations marshalling all of its asset to winddown its business affairs and is not to spend the limited resources of the Defendant Corporations on Steve's efforts to thwart and delay this process. This Court should once again disqualify the unauthorized attorneys that the Interested Parties have unilaterally and impermissibly installed. This Court should further require that the Interested Parties fully reimburse the Defendant Corporations for all attorneys' fees and litigation costs that have been paid to the Shulman Rogers Attorneys from the Defendant Corporations.

## II.    **PERTINENT BACKGROUND**

1.    From the outset of the litigation, Plaintiffs emphasized to this Honorable Court that a fair resolution requires Counsel for the Defendant Corporations to be independent and to appropriately represent the interests of the corporation and not its members of management or employees.  Plaintiffs felt so strongly that independent Counsel for the Corporations was needed that it immediately disputed that Jonathan C. Windle was an appropriate and impartial attorney to serve on behalf of the Corporations and Plaintiffs filed a motion to disqualify him.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

2

2.      This Honorable Court denied Plaintiffs' motion to disqualify Mr. Windle stating in

large part Mr. Windle had represented the Corporations over a number of years and that he was

familiar with the role of representing the Corporations rather than individual shareholders.

3.      On Friday May 7, 2021, Joseph M. Creed and the law firm of Bramnick Creed,

LLC (collectively "Mr. Creed") filed a "Praecipe of Entry of Counsel" purporting to enter his and

his firm's appearance as co-counsel on behalf of the Corporations.  Prior to May 7, 2021, Mr.

Creed exclusively represented Interested Party Cassandra Tsintolas Johnson Revocable Trust

("Sandy").

4.      On May 18, 2023, Plaintiffs filed the Opposed Motion to Disqualify Counsel for

Interested Party Cassandra Tsintolas Johnson Revocable Trust from Representing the Defendant

Corporations (the "Motion to Disqualify Mr. Creed").

5.      At the June 3, 2021 hearing, the Court granted the Motion to Disqualify Mr. Creed

stating as follows:

> This is an objection by the corporate board, and we have a deadlock
> corporation. And so, under those circumstances, without corporate action
> and their being deadlocked, that would not be permissible. I do see a
> conflict, and I think about it as imagine being Sandy. And my corporation
> is going to purchase my shares from me. And by the way, let me have my
> attorney sit on that side there, too, so that I can get the best possible price.
>
> The attorney may not violate his code of ethics, but it just doesn't look right.
> The appearances are just not appropriate. And as indicated by [Plaintiffs'
> counsel], when in doubt, the law favors [dis]qualifying. So for all those
> reasons stated by the plaintiffs, the Motion to Disqualify is granted.

A copy of the pertinent portions of the June 3, 2021 hearing transcript is attached hereto and

incorporated herein as Exhibit 1.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

3

20428117_2

6.  Notwithstanding this Court's prior ruling and instruction, Steve has attempted to again put his thumb on the scale by engaging the Shulman Rogers Attorneys to advocate his positions under the guise of the Defendant Corporations.[1]

7.  In fact, during the pendency of this litigation the Shulman Rogers Attorneys represented Steve in his personal capacity. Counsel for Turner, Leins & Gold, LLC ("TLG") stated as follows:

> Please note that TLG is also producing close to 5,000 documents to counsel for Efstratios D. Tsintolas at Shulman, Rogers, Gandal, Pordy & Ecker, P.A. contemporaneously herewith. I understand that Efstratios Tsintolas is a defendant in both 7057 case and the 7059 case, so he should be able to grant you access to some or all of the documents TLG is producing to his counsel at Shulman, Rogers, Gandal, Pordy & Ecker, P.A.

A copy of the January 5, 2021 letter from Stephen Charnoff is attached hereto and incorporated herein as Exhibit 2.

8.  Plaintiffs are not aware of any evidence that the Shulman Rogers Attorneys have ceased their representation of Steve in his individual capacity or others.[2]

9.  As is evident from the above facts, the instant situation presents much of the same problems that were present when the Interested Parties attempted to install Mr. Creed as one of the attorneys for the Defendant Corporations the similarities include, but are not limited to, the following:

a.  The Shulman Rogers Attorneys are not independent lawyers.  The Shulman Rogers Attorneys have been engaged by Steve and others related to Steve in his personal capacity during the pendency of this litigation.

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

---

[1] As detailed in Plaintiffs' Motion to Appoint A Receiver, this conduct is further evidence of the imperative need to place the management and operation of the Defendant Corporations into the hands of a disinterested third-party that will act in a fashion that has the best interest of ALL the shareholders of the Defendant Corporations in mind.
[2] Even if Steve and others are merely former clients of the Shulman Rogers Attorneys, they would still owe Steve certain fiduciary duties, which reinforces the unwaived and persistent conflict of interest that results from the Shulman Rogers Attorneys acting as counsel for the Defendant Corporations.

4

20428117_2

b. The Shulman Rogers Attorneys have no prior experience representing the Defendant Corporations.

c. There is no evidence that the Defendant Corporations have waived or could waive any conflict of interest which would allow the Shulman Rogers Attorneys to represent both Steve (as well as others) and the Defendant Corporations.

d. There is no evidence that the Shulman Rogers Attorneys could fairly and impartially distinguish his role as an advocate from Steve versus that of the Defendant Corporations.

e. There is no evidence that the Shulman Rogers Attorneys could fairly and impartially distinguish his billings for work performed on behalf of Steve and the Defendant Corporations.

f. There is no evidence that the work of Shulman Rogers Attorneys is intended to assist in the utilization of the limited resources of the Defendant Corporations in their obligation to efficiently and timely wind down the affairs of the Defendant Corporations.

**III.    ARGUMENT**

A. There is a Conflict of Interest due to the Shulman Rogers Attorneys' Previous and/or Current Representation of Steve and others.

The law is clear that "'[a] lawyer employed or retained by a corporation or similar entity owes his [or her] allegiance to the entity' and not to any of its constituent members." *Griva v. Davison*, 637 A.2d 830, 837 (D.C. 1994) (citation omitted). In this instance, the Shulman Rogers Attorneys role would be inherently in conflict.

The District of Columbia Rules of Professional Conduct further state that:

A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

5

20428117_2

provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

Rule 1.13(d). The present deadlocked condition of the Directors and shareholders make obtaining a consent to the dual representation inappropriate.

Further, a foundational prerequisite for joint representation of a corporation and one of its individual shareholders is contained in the District of Columbia Rules of Professional Conduct which states: "[a] lawyer **shall** not advance two or more adverse positions in the same matter." Rule 1.7(a) (emphasis added). *See In re Robbins*, 192 A.3d 558 (2018) (finding the attorney violated professional conduct rule prohibiting a lawyer from representing a client with respect to a matter likely to adversely affect representation of another client). As a result, the Shulman Rogers Attorneys would be ethically precluded from taking any stance on behalf of the Corporations that would be adverse to Steve and others.

### B. The Corporations Lack Authority to Retain the Shulman Rogers Attorneys.

As this Court is well aware, Plaintiffs and the Interested Parties are in a deadlock as it pertains to the Corporations.[3] Despite the findings of this Court in the October 5, 2023 Final Order, the deadlock facing the Defendant Corporations and Plaintiffs' objection, a unilateral and improper decision was made by Steve to retain the Shulman Rogers Attorneys as co-counsel for the Defendant Corporations.

This Court previously denied Plaintiffs' Motion to Disqualify Mr. Windle and stated as follows:

> On June 30, 2020, the Court held a status hearing and denied Plaintiffs' Motion to Disqualify attorney Windle. The court determined that at the time attorney Windle

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

---

[3] Fifty percent (50%) of the shareholders and Directors of the Defendant Corporations are Plaintiffs. As this Court has acknowledged, the Defendant Corporations have failed to hold annual elections for member of the Board of Directors and for Officers for years.

6

was retained it was based on dully authorized corporate action, the year was 2001. From that time through the present he has been corporate counsel retained by the dully authorized Corporate agent, Efstratios Tsintolas. There is no evidence that in all these years the corporation has changed or attempted to change the status quo. Therefore, the court does not believe it has the authority to change the accepted corporate practice at this point in the proceedings.

A copy of the July 1, 2020 Court Order is attached hereto and incorporated herein as <u>Exhibit 3</u>.

The situation in this case is markedly different than it was with Mr. Windle and is in fact more similar to the situation with Mr. Creed. There was never a prior duly authorized corporate action that had previously authorized the Shulman Rogers Attorneys to act as counsel on behalf of the Defendant Corporations. In addition, the excuse given by the Defendant Corporations to hire Richard Basile on behalf of the Defendant Corporations was that Mr. Windle needed assistance and Mr. Basile also had experience representing the Defendant Corporations in Landlord Tenant Court. Plaintiffs are now promptly notifying this Court of their objection to the change in the status quo and the addition of two new costly lawyers.

Albeit in a different legal posture, the District of Columbia Court of Appeals recognized the general proposition of law that in "a disqualification situation, any doubt is to be resolved in favor of disqualification." *Derrickson v. Derrickson*, 541 A.2d 149, 152 (D.C. 1988) (citation omitted); *see also In re Sofaer*, 728 A.2d 625, 651 (D.C. 1999). This Court should adhere to the general guidance in favor of disqualification and disqualify the Shulman Rogers Attorneys.

C. <u>The Actions of the Shulman Rogers Attorneys Are Inconsistent with the Dissolution Posture</u>.

On October 16, 2023, the Defendant Corporations filed a Notice of Intent to Dissolve pursuant to D.C. Code Ann. §§ 29-312.02 & 29-312.03. The law is clear that a dissolved entity "shall not carry on any activities except that appropriate to wind up and liquidate its business and affairs." D.C. Code Ann. § 29-312.05. Since the Notice of Intent to Dissolve was filed, the actions of the Shulman Rogers Attorneys have been inconsistent with only engaging in activities to wind

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

7

up and liquidate the business affairs of the Defendant Corporations. These improper acts include the attempts to relitigate Plaintiffs' entitlement to attorneys' fees,[4] the propriety of the October 5, 2023 Order being a "Final Order",[5] and the filing of a Notice of Intent.[6] Since the acts by the Shulman Rogers Attorneys are inconsistent with the requirements under D.C. Code Ann. § 29-312.05, this Court can infer that the actions of the Shulman Rogers Attorneys are actually being done on behalf of Steve rather than on behalf of the Defendant Corporations. Thus, this Court should disqualify the Shulman Rogers Attorneys.

## IV.  **CONCLUSION**

Plaintiffs request that this Honorable Court disqualify the Shulman Rogers Attorneys from representing the Defendant Corporations. Additionally, this Court should require that the Interested Parties fully reimburse the Defendant Corporations for all attorneys' fees and litigation costs that have been paid to the Shulman Rogers Attorneys from the Defendant Corporations.

Respectfully submitted,

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC


By:      /s/ *Eduardo S. Garcia*
Matthew J. Pavlides (D.C. Bar # 424573)
Eduardo Garcia (D.C. Bar # 1028040)
1101 Wootton Parkway, Suite 700
Rockville, MD 20852
(301) 340-2020
(301) 354-8113 (facsimile)

*Attorneys for the Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust*

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

---

[4] On October 25, 2023, the Shulman Rogers Attorneys filed the "Defendants' Motion for Reconsideration of the Court's October 5, 2023 Valuation Order to Strike Attorney's Fees and Limit the Award."
[5] On October 25, 2023, the Shulman Rogers Attorneys filed "Defendants' Motion for Reconsideration of the Court's Order Denying as Moot the Defendants' Emergency Motion for Addition to or Revision of October 5, 2023 Order."
[6] Plaintiffs reserve the right to argue that the Defendant Corporations lost any appellate rights relating to the Final Order and the "Fair Value" determinations because they elected to dissolve.

20428117_2

## ORAL HEARING REQUESTED

Plaintiffs request a hearing on this matter.

/s/ *Eduardo S. Garcia*
Eduardo S. Garcia

## RULE 12-I(a) CERTIFICATION

On November 6, 2023 at 2:40 p.m. via electronic mail, the undersigned counsel communicated with Counsel for the Defendant Corporations and the Interested Parties to determine whether they would consent to the relief requested herein. The Defendant Corporations and the Interested Parties did not consent to the relief requested herein.

/s/ *Eduardo S. Garcia*
Eduardo S. Garcia

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

9

20428117_2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of November, 2023, a copy of the foregoing was served via *CasefileXpress* on each of the following counsel of record:

Jonathan C. Windle
Law Office of Jonathan C. Windle, P.C.
8300 Wisconsin Avenue, Suite 416
Bethesda, Maryland 20814

Richard S. Basile
Law Office of Richard S. Basile
6305 Ivy Lane, Suite 510
Greenbelt, MD 20770

Michael J. Bramnick
Joseph M. Creed
Bramnick Creed, LLC
4520 East West Highway, Suite 700
Bethesda, Maryland 20814

Douglas C. Boggs
Benjamin S. Boyd
DLA Piper LLP
500 8th St., NW
Washington, DC 20004

Glenn C. Etelson
John Troost
Shulman, Rogers, et. al.
12505 Park Potomac Avenue
Sixth Floor
Potomac, Maryland 20854


　　　　　　　　　　　　　　　 /s/ *Eduardo S. Garcia*　　　　　　　
　　　　　　　　　　　　　　　 Eduardo S. Garcia

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

10

20428117_2

# EXHIBIT 1

1            SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                          CIVIL DIVISION

3     ------------------------------x
                                     )
4     FOTINI TSINTOLAS ECONOMIDES    )
      REVOCABLE TRUST, ET AL.,       )
5                                    )
                   PLAINTIFFS,       )
6                                    )
         vs.                         )    2019 CAB 7057
7                                    )
                                     )
8     TSINTOLAS INVESTMENTS, INC.,   )
      ET AL.,                        )
9                                    )
                   DEFENDANTS.       )
10    ------------------------------x

11

12

13                               Washington, D.C.
                                 Thursday,
14                               June 3, 2021

15

16            The above-entitled action came on regularly for a
      Motions Hearing before the Honorable JOSÉ M. LÓPEZ, Associate
17    Judge, in courtroom number 212-R, commencing at the hour of
      2:30 p.m.

18            THIS TRANSCRIPT REPRESENTS THE PRODUCT
              OF AN OFFICIAL REPORTER, ENGAGED BY THE
19            COURT, WHO HAS PERSONALLY CERTIFIED THAT
              IT REPRESENTS TESTIMONY AND PROCEEDINGS
20            OF THE CASE AS REPORTED.

21

22

23

24

25

                                                                     1

1    APPEARANCES:

2

3            On Behalf of the Plaintiffs:
         Stein Sperling, PC
         By:  Matthew Pavlides, Esq.
4            Eduardo Garcia, Esq.
         1101 Wootton Parkway, Suite 700
5        Rockville, Maryland  20852
         301.340.2020
6
         On Behalf of the Defendants:
7        Law Offices of Jonathan Windle, Esq.
         By:  Jonathan Windle, Esq.
8        4401 East-West Highway, Suite 208
         Bethesda, Maryland  20814
9        301.587.5500

10           On Behalf of the Cassandra Tsintolas Johnson
         Revocable Trust and the Defendants:
11       Bramnick Creed
         By:  Joseph Creed, Esq.
12       4520 East-West Highway, Suite 700
         Bethesda, Maryland 20814
13       301.945.7800

14           On Behalf of the Efstratios Tsintolas Trust:
         DLA Piper
15       By:  Benjamine Boyd, Esq.
         500 Eighth Street NW
16       Washington, D.C.  20004
         202.799.4000

17

18

19

20

21

22

23

24

25

                                                            2

1         THE COURT:  Thank you.

2         Very well.  I have both sides of the argument.  I'll

3   begin by indicating that when the corporate admitted

4   Mr. Windle to remain as corporate counsel, I said then we

5   were dealing with the status quo, as Mr. Garcia indicated,

6   when there be no objection throughout those years.  And this

7   is a different situation.  I agree with Mr. Garcia.

8         This is an objection by the corporate board, and we

9   have a deadlocked corporation.  And so, under those

10  circumstances, without that corporate action and their being

11  deadlocked, that would just not be permissible.  I do see a

12  conflict, and I think about it as imagine me being Sandy.

13  And my corporation is going to purchase my shares from me.

14  And by the way, let me have my attorney sit on that side

15  there, too, so that I can get the best possible price.

16        The attorney may not violate his code of ethics, but

17  it just doesn't look right.  The appearances are just not

18  appropriate.  And as indicated by Mr. Garcia, when in doubt,

19  the law favors qualifying.  So for all of those reasons

20  stated by the plaintiffs, the Motion to Disqualify is

21  granted.  However, let me make something else clear:  That

22  does not mean that Mr. Windle is not permitted to have legal

23  assistance.

24        It would be totally unjust to not permit the

25  corporation to have the legal counsel that it believes it

49

1    needs to have in order to appropriately prosecute this merit,

2    but it would have to be someone outside of the realm of

3    Mr. Creed.  It'll have to be someone that would have to be

4    not apparently in conflict, as it would seem here.  Any

5    questions on that?

6              MR. GARCIA:  Thank you, Your Honor.

7              THE COURT:  Very well.  I think my time is up.  I

8    have other matters.  The parties are now in the posture to

9    proceed to those depositions, I believe; is that correct?

10              MR. WINDLE:  Yes, Your Honor.

11              THE COURT:  If there's nothing further, I will

12    excuse the parties.  There may be down the road further

13    motions, hearings, or status hearings.  But, at this point,

14    I'm not going to schedule anything; and we'll come back at a

15    later time.  Thank you very much, everyone.

16              (Proceedings concluded at 4:02 p.m.)

17

18

19

20

21

22

23

24

25

50

```
 1                    CERTIFICATE OF REPORTER

 2

 3

 4            I, GARY BOND, an Official Court Reporter

 5    in and for the Superior Court of the District of Columbia,

 6    hereby certify that at said time and place I reported in

 7    my official capacity by means of machine shorthand all

 8    testimony adduced and other oral proceedings had in the

 9    matter of FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST, ET AL.

10    vs. TSINTOLAS INVESTMENTS, INC., ET AL., case number 2019 CAB

11    7057, in said court on the 3rd day of June, 2021.

12            I further certify that the foregoing pages, 1

13    through 50, constitute the official transcript of said

14    proceedings, as taken from my shorthand notes, and that

15    it is a correct and accurate record of said proceedings.

16            WITNESS my hand at Washington, D.C., this 9th day

17    of June, 2021.

18

19

20

21

22    _____

23    Gary Bond
      Official Court Reporter

24

25
```

51

# EXHIBIT 2

# RB    REES BROOME, PC

—————————————ATTORNEYS AT LAW———————————

1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182
Phone: (703) 790-1911
Fax: (703) 848-2530
www.reesbroome.com

FOUNDERS
Joel M. Birken
Jonathan J. Broome, Jr.
James M. Rees (1941-1986)

Stephen D. Charnoff
Shareholder
Admitted: VA, DC, MD

(703) 790-6233
scharnoff@reesbroome.com

January 5, 2021

**By Federal Express**
Jonathan C. Windle, Esq.
The Law Offices of Jonathan C. Windle
471 H Street NW
Washington, D.C. 20001

> **Re:**   **Tsintolas, et al. v. Tsintolas Investments, Inc., et al.,** case no. 2019 CA 007057 B
> **Tsintolas, et al. v. Olympia Investments, Inc., et al.,** case no. 2019 CA 007059 B

Dear Jonathan:

As you know, Rees Broome, PC represents Turner, Leins & Gold, LLC ("TLG") in connection with Tsintolas, et al. v. Tsintolas Investments, Inc., et al., Case No. 2019 CA 007057 B (the "7057 case") and Tsintolas, et al. v. Olympia Investments, Inc., et al., Case No. 2019 CA 007059 B (the "7059 case"). TLG was, in January, 2020, served with subpoenas issued by the plaintiffs in the 7057 case and the 7059 case. TLG, per the direction of Tsintolas Investments and Olympia Investments, thereafter objected to the plaintiffs' subpoenas, including, without limitation, based on the accountant-client privilege. The plaintiffs, on September 28, 2020, moved to compel, and TLG, per the direction Tsintolas Investments and Olympia Investments, timely opposed the motion to compel. Tsintolas Investments and Olympia Investments, despite having standing to do so, did not bother to oppose the motion to compel or otherwise convey objections to the subpoenas. To my knowledge, the Court has not ruled on the plaintiffs' motion to compel.

You issued a subpoena duces tecum to TLG which was served on December 18, 2020 (the "Subpoena"). I am, by this letter, producing certain documents and setting forth TLG's objections to the Subpoena. The thumb drive enclosed herewith contains documents Bates-labeled TLG 0001-02306. These documents are responsive to the subpoenas issued to TLG by the plaintiffs in January, 2020 as well as to the Subpoena.

Please note that TLG is also producing close to 5,000 documents to counsel for Efstratios D. Tsintolas at Shulman, Rogers, Gandal, Pordy & Ecker, P.A. contemporaneously herewith. I understand that Efstratios Tsintolas is a defendant in both the 7057 case and the 7059 case, so he should be able to grant you access to some or all of the documents TLG is producing to his counsel at Shulman, Rogers, Gandal, Pordy & Ecker, P.A.

RB   REES BROOME, PC
——————— ATTORNEYS AT LAW ———————

Letter to Windle
January 5, 2021
Page 2 of 3

Regarding any document that TLG is not producing pursuant to the Subpoena, TLG objects. The District of Columbia Superior Court Rules of Civil Procedure state as follows:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

Sup. Ct. Civ. R. 45(c)(1).

The Subpoena imposes both undue burden on TLG and an undue expense on TLG, and TLG objects to the Subpoena on these bases and others set forth below. The Subpoena is extraordinarily overbroad, both temporally and in scope, such that it appears that whomever drafted it was not at all concerned with causing a third party undue burden and expense, a matter I intend to raise with the Court if given the opportunity.

For example, and not by way of limitation, the Subpoena seeks "[t]he originals and any copies of all documents referencing or related to all accounting work provided by You on behalf of both Corporations since 1993." Neither Tsintolas Investments nor Olympia Investments requires over a quarter-century worth of documents in order to conduct "discovery associated with the determination of the fair value of the Plaintiffs' shares of stock in the Corporation," which is the limits of discovery based on the Court's December 16, 2020 Order. (I note, based on pleadings in the case, that your clients specifically sought to circumscribe discovery to that limited issue, and I wonder how you will explain to the judge why you served a subpoena duces tecum on December 18, 2020 that plainly exceeds the scope of discovery in the case. You certainly had the opportunity to withdraw and revise an unserved subpoena.) Similarly, I am at a loss as to how Requests Nos. 2, 3, or 4 relate to the current valuation of the plaintiffs' shares in either entity.

Regarding Request No. 5, I assume you know, based on having practiced law for any period of time, that my client does not have to generate a new document (e.g., a "list") based on a subpoena duces tecum, and TLG is not going to do so.

Request No. 6 is plainly overbroad and not at all designed to narrowly seek only those documents your clients require in order to proceed with the narrowed scope of the litigation. The same is true as to Request Nos. 7-10 and 12-18. Also, as an overarching objection, please note that a demand for "any and all documents" that "discuss, refer to, or relate to" a subject is inherently imprecise and lacking in particularity, which needlessly increases the burden and expense on TLG, which, again, is a third party. *See, e.g.*, *Perez v. El Tequila LLC*, No. 12–CV–588, 2014 WL 5341766, at *1 (N.D. Okla. Oct. 20, 2014) ("omnibus discovery requests seeking 'all documents referring to, concerning, relating to ....' are generally too vague and overbroad on their face ....").

**RB** REES BROOME, PC

————————— ATTORNEYS AT LAW —————————

Letter to Windle
January 5, 2021
Page 3 of 3

Request Nos. 11 and 31-35 are objected to for all the same reasons. Further, these requests are particularly objectionable, as they are not at all limited in time.

Request Nos. 19-28 and 30 suffer from the same issues identified above, save that the temporal scope (in and after 2014) is not as likely to create undue burden and expense for TLG. That said, the breadth and phrasing of these requests still create undue burden and expense. And, in any event, this may be academic. TLG believes that the documents it is producing today either respond to these requests or demonstrate that TLG does not have responsive documents, as TLG is not withholding documents dated in or after 2014 based on its overbreadth objections.

Request No. 21 is objected to on the bases of undue burden and expense, both because of its phrasing and because of the requested time period (twenty years).

Finally, please note that TLG maintains that your clients are contractually obligated to indemnify TLG for all fees and expenses incurred in connection with asserting privileges and protections pursuant to the direction of Olympia Investments and Tsintolas Investments to do so, and TLG will, if your clients decline to indemnify TLG, assert the indemnification claims either affirmatively or, as appropriate, as counterclaims.

Thank you.

Sincerely,

REES BROOME, PC

By: _____
Stephen D. Charnoff

Enclosure

# EXHIBIT 3

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | |
|---|---|
| **CHRISTOFILOS TSINTOLAS et al,** | **Consolidated matters of:** |
| **Plaintiffs,** | |
| **v.** | **Case No. 2019 CA 007057 B** |
| **TSINTOLAS INVESTMENTS, INC.** **et al.** | |
| **Defendants.** | |
| **CHRISTOFILOS TSINTOLAS et al,** | **Case No.: 2019 CA 007059 B** |
| **Plaintiffs,** | |
| **v.** | **Judge José M. López** |
| **OLYMPIA INVESTMENTS, INC.,** **et al.,** | |
| **Defendants.** | |

## <u>ORDER</u>

Before the Court is Plaintiffs' Opposed Motion to Strike Defendant Tsintolas Investments Inc.'s Motion to Dismiss and Defendant Olympia Investments, Inc.'s Motion to Dismiss filed on January 14, 2020. The Plaintiffs move to strike Defendant Tsintolas Investments Inc's Motion to Dismiss and Defendant Olympia Investments, Inc.'s Motion to Dismiss on the contention that defendants' counsel does not have the authority to be appointed by the deadlocked board of directors and based upon Plaintiffs' Motion to Disqualify defendant Tsintolas Investments Inc.'s and defendant Olympia Investments, Inc.'s counsel, attorney Jonathan C. Windle.

On June 30, 2020, the court held a status hearing and denied Plaintiffs' Motion to Disqualify attorney Windle. The court determined that at the time attorney Windle was retained it was based on dully authorized corporate action, the year was 2001. From that time through the

1

present he has been corporate counsel retained by the dully authorized Corporate agent, Efstratios Tsintolas.  There is no evidence that in all these years the corporation has changed or attempted to change the status quo.  Therefore, the court does not believe it has authority to change the accepted corporate practice at this point in the proceedings.

Plaintiffs' Motion to Strike relies upon the legitimacy of attorney Windle's appointment as corporate counsel for Defendant Tsintolas Investments Inc. and Defendant Olympia Investments, Inc. and the outcome of the Plaintiffs' motion to disqualify. Since the court has denied Plaintiffs' motion to disqualify and determined that attorney Windle is properly retained as corporate counsel for Tsintolas Investments Inc. and Olympia Investments, Inc. it is appropriate to deny the Plaintiffs' Motion to Strike. Defendant Tsintolas Investments Inc. and Defendant Olympia Investments, Inc.'s motions to dismiss were properly filed by corporate counsel. Accordingly, it is this 1st day of July, 2020, hereby

**ORDERED**, that the Plaintiffs' Opposed Motion to Strike Defendant Tsintolas Investments Inc's Motion to Dismiss and Defendant Olympia Investments, Inc.'s Motion to Dismiss is **DENIED.**

Judge, José M. López
Superior Court for the District of Columbia

2

<u>Copies via CaseFileXpress</u>:

Matthew J. Pavlides (D.C. Bar No.: 424573)
Micah L. Kanters (D.C. Bar No.: 198563)
    Attorneys for Plaintiffs
    *Christofilos Tsintolas, Deborah Tsintolas and*
Fotini *Tsintolas Economides Revocable Trust*

Jonathan C. Windle (D.C. Bar No.: 471987)
    Attorney for Defendants
    *Tsintolas Investments, Inc.*
    *Olympia Investments, Inc.*

Benjamin S. Boyd (D.C. Bar No.: 413698)
    Attorneys for Defendant/Interested Party
    *Efstratios Tsintolas and Non-Party/Interested*
    *Party Suzanne M. Tsintolas*

Michael J. Bramnick (D.C. Bar No.: 500756)
Joseph M. Creed (D.C. Bar No.: 1032456)
    Attorneys for Defendant
    *Cassandra Tsintolas Johnson Revocable Trust*

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

CHRISTOFILOS TSINTOLAS, et al,

        Plaintiffs,

   v.

TSINTOLAS INVESTMENTS, INC., et. al,

        Defendants/Interested Parties.

C.A. No.:  2019 CA 007057 B

Judge Yvonne M. Williams

CHRISTOFILOS TSINTOLAS et al,

        Plaintiffs,

   v.

OLYMPIA INVESTMENTS, INC., et al.,

        Defendants.

Consolidated Case No.: 2019 CA 007059 B

Next event: None

## ORDER

UPON CONSIDERATION of Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust's ("Plaintiffs") Opposed Motion to Disqualify the Law Firm of Shulman Rogers and its Attorneys from Representing the Defendant Corporations (the "Motion to Disqualify"), any Opposition thereto, any hearing thereon, and the record herein, it is this _____ day of _____, 2023,

ORDERED, by the Superior Court of the District of Columbia, Civil Division, that the Motion to Disqualify be and hereby is GRANTED, and therefore it is further

ORDERED, that Glenn C. Etelson, John Troost and the law firm of Shulman, Rogers, Gandal, Pordy & Ecker, P.A. (the "Shulman Rogers Attorneys") be, and hereby are, DISQUALIFIED from representing Defendants Olympia Investments, Inc. and Tsintolas

Investments, Inc. (the "Defendant Corporations") as co-counsel, and their appearance is STRICKEN from appearing as same; it is further

ORDERED, that Interested Parties Efstratios Tsintolas and the Cassandra Tsintolas Johnson Revocable Trust reimburse the Defendant Corporations for all amounts paid to the Shulman Rogers Attorneys within ten (10) days of the entry of this Court's Order.

_____
YVONNE M. WILLIAMS, JUDGE
Superior Court of the District of Columbia
(Civil Division)

Copies to:

All counsel of record

2

20430164_1

# **EXHIBIT 8**

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN ALTERNATIVE, ABSTAIN**

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| CHRISTOFILOS TSINTOLAS, *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>TSINTOLAS INVESTMENTS, INC., *et al.*,<br>    **Defendants.** | **2019  CA  007057 B**<br><br>**2019  CA  007059 B**<br><br>**Judge Yvonne Williams** |
| CHRISTOFILOS TSINTOLAS, *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>OLYMPIA INVESTMENTS, INC., *et al.*,<br>    **Defendants.** | |

## ORDER GRANTING PLAINTIFFS' MOTION TO DISQUALIFY THE LAW FIRM OF SHULMAN ROGERS AND ITS ATTORNEYS FROM REPRESENTING THE DEFENDANT CORPORATIONS

Before the Court is Plaintiffs' Motion to Disqualify the Law Firm of Shulman Rogers and its Attorneys from Representing the Defendant Corporations (the "Motion"), filed on November 6, 2023. Defendants filed an Opposition on November 20, 2023. Plaintiffs filed their Reply on November 27, 2023. Defendants filed a Surreply without requesting leave of the Court on December 4, 2023. For the reasons set forth below, the instant Motion is **GRANTED.**

This is an action for dissolution of two closely-held corporations: Tsintolas Investments ("TI"); and Olympia Investments ("OI") (collectively, the "Corporations"). Plaintiffs Christofilos ("Chris") Tsintolas and Deborah Tsintolas ("Deborah") collectively own 25% of the shares of each Corporation. Plaintiff Fotini Tsintolas Economides ("Fotini"), through the Fotini Tsintolas Economides Revocable Trust, also owns 25% of the shares of each Corporation. Their siblings, Efstratios D. Tsintolas ("Steve"), and Cassandra Tsintolas Johnson ("Cassandra"), through the

1

Cassandra Tsintolas Johnson Revocable Trust, intervened as Interested Parties (collectively, the Corporations and Interested Parties are the "Defendants").

In October 2019, Plaintiffs filed these two actions to dissolve each Corporation. Pursuant to D.C. Code § 29-312.24(a), the Corporations elected to purchase Plaintiffs' shares in lieu of dissolving. On September 26-27, 2022, November 14-15, 2022, and January 9-10, 2023, the Court held a Non-Jury Trial ("Trial"). On May 22, 2023, the Court entered a Trial Order finding the fair value of Tsintolas Investments, Inc. to be $1,722,642 and the fair value of Olympia Investments, Inc. to $13,851,614.57. On July 1, 2020, the Court entered an Order rejecting Plaintiffs' Motion to Disqualify Defendants' Counsel Jonathan C. Windle. Order (July 1, 2020) at 1. On June 3, 2021, the Court held a Motion Hearing, at which, the Court granted Plaintiffs' Motion to Disqualify, and thereby disqualified Defendants' Counsel Joseph M. Creed.

On October 5, 2023, the Court entered a Final Order (the "Valuation Order") ordering: (i) that the Fair Value of Olympia Investments, Inc. is adjudged to be $1,722,642; (ii) that the Fair Value of Tsintolas Investments, Inc. is adjudged to be $13,851,614.57; (iii) that within 30 days of October 5, 2023, Plaintiffs shall file evidence and argument demonstrating the value of their reasonable attorney's fees and costs; (iv) that oppositions and replies to Plaintiffs' demands for attorney's fees may be filed pursuant to Rule 12 I; (v) that pre- and post-judgment interest and a security interest are granted; (vi) that a payment plan is in effect; and (vii) that Defendants' 10-day period to elect to dissolve or continue with the purchase under D.C. Code § 29.312.24(g) is triggered. *See* Order (Oct. 5, 2023) at 12-13.

Plaintiffs filed the instant Motion on November 6, 2023. On November 20, 2023, The Corporations filed their Opposition to the instant Motion. Plaintiffs filed their Reply on November

27, 2023. The Corporations filed a Surreply without requesting leave of the Court on December 4, 2023.

Through the instant Motion, Plaintiffs submit that Glenn C. Etelson, John Trosst, and the law firm of Shulman, Rogers, Gandal, Pordy & Ecker, P.A. ("Shulman Rogers Attorneys") currently represent the Corporations pursuant to a unilateral decision made by Steve Tsintolas. Mot. at 2, 6. Plaintiffs further submit, and the Corporations concede, that the Shulman Rogers Attorneys previously represented Defendant Steve Tsintolas. *Id.* at 2; Surreply at 5. Plaintiffs, therefore, request that the Court disqualify the Shulman Rogers Attorneys because they were retained unilaterally and improperly given that: (i) Plaintiffs' instant Motion constitutes an objection by the boards of the Corporations; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the Shulman Rogers Attorneys. *See* Mot. at 5-7. The Court agrees.

At issue is whether the Corporations here may retain new representation where: (i) 50% of their shareholders object to the counsel retained; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the counsel retained. The record of this case provides the answer. At this matter's June 3, 2021 Motion Hearing, the Court orally granted Plaintiffs' Motion to Disqualify Joseph M. Creed as Counsel for the Corporations. Mot. at Ex. 1. The Court reasoned that, "[the Motion to Disqualify] is an objection by the corporate board, and we have a deadlocked corporation. And so, under those circumstances, without corporate action and their being deadlocked," the Corporations retaining Joseph M. Creed as counsel "would not be permissible." *Id.*

The Corporations, however, contend that the Court's June 3, 2021 oral ruling is not binding in this instance. They submit that at this matter's June 20, 2020 hearing, "the Court held that

3

[Steve Tsintolas] had the right to choose whomever he wanted as counsel to represent the Defendant Corporations." Opp'n. at 5. The Court, however, now affirms that Steve Tsintolas does not have the right to choose whomever he pleases as counsel to represent the Corporations. That the Court did not intend so is evident from its June 3, 2021 oral disqualification of Joseph M. Creed as Counsel for the Corporations.

Moreover, the facts of this case remain materially unchanged since June 3, 2021. As the Court opined in its October 5, 2023 Order, the Corporations remain deadlocked because "Plaintiffs owned 50% of the shares of each Corporation." Order (Oct. 5, 2023) at 9. On November 11, 2023, Plaintiffs filed the instant Motion objecting to the Shulman Rogers Attorneys serving as Counsel for the Corporations. Additionally, the Corporations proffer no evidence that they were authorized by their boards to retain the Shulman Rogers Attorneys. The Court, therefore, finds no reason to deviate from the logic of the June 3, 2021 oral ruling. Accordingly, the Court concludes that the Corporations currently lack the authority to retain the Shulman Rogers Attorneys given that: (i) Plaintiffs' instant Motion constitutes an objection by the boards of the Corporations; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the Shulman Rogers Attorneys.

The Corporations nevertheless contend that because they filed their Notice of Intent to Dissolve on October 16, 2023, pursuant to D.C. Code § 29-312.24(f), Plaintiffs lack standing to pursue the instant Motion given Plaintiffs have "no rights or status as a shareholder of the [Corporations.]" Opp'n. at 3. The Court disagrees. D.C Code § 29-312.24(g) provides, "[u]pon filing of such articles of dissolution, the corporation is dissolved [...] and petitioner may continue to pursue any claims previously asserted on behalf of the corporation." The Court concludes that under D.C Code § 29-312.24(g), a petitioner retains its status as a shareholder upon the

corporation's filing a Dissolution Notice.  Accordingly, Plaintiffs maintain standing to file the

instant Motion given the Corporations filed their Notice of Intent to Dissolve on October 16, 2023.

As such, the Shulman Rogers Attorneys are disqualified from representing the Corporations at this

juncture.

Accordingly, it is on this 7th day of February, 2024, hereby,

**ORDERED** that Plaintiffs' Plaintiffs' Motion to Disqualify the Law Firm of Shulman

Rogers and its Attorneys from Representing the Defendant Corporations is **GRANTED**; and it is

further

**ORDERED** that Glenn C. Etelson, John Trosst, and the law firm of Shulman, Rogers,

Gandal, Pordy & Ecker, P.A. are **DISQUALIFIED** from representing the Corporations in this

matter.

**IT IS SO ORDERED**.

Judge Yvonne Williams

Date: February 7, 2024

Copies to:

Matthew J. Pavlides
*Counsel for Plaintiffs*

Kyle A. Paulson
*Counsel for Defendant Efstratios "Steve" Tsintolas*

Glenn C. Etelson
John Troost
*Counsel for Defendants Tsintolas Investments, Inc. and Olympia Investments, Inc.*

5

# EXHIBIT 9

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| CHRISTOFILOS TSINTOLAS, *et al.* | |
| Petitioners, | |
| v. | C.A. No.:  2019 CA 007057 B |
| | Judge Yvonne Williams |
| TSINTOLAS INVESTMENTS, INC., *et al.*, | Next Event: Motions Hearing, 04/25/24 |
| Defendants/Interested Parties. | |

| | |
|---|---|
| CHRISTOFILOS TSINTOLAS, *et al.*, | |
| Petitioners, | |
| v. | Consolidated Case No.: 2019 CA 007059 B |
| OLYMPIA INVESTMENTS, INC., *et al.*, | |
| Defendants. | |

**DEFENDANTS MOTION FOR RECONSIDERATION AND REVISION**
**OF THE COURT'S ORDER DISQUALIFYING SHULMAN ROGERS ATTORNEYS**

Defendants Olympia Investments, Inc. ("**OII**") and Tsintolas Investments, Inc. ("**TII**") (collectively the "**Defendant Corporations**"), by counsel, hereby request that the Court reconsider and revise its Order Granting Plaintiffs' Motion to Disqualify the Law Firm of Shulman Rogers and its Attorneys From Representing the Defendant Corporations ("**Order Disqualifying Shulman Rogers Attorneys**").  In support, the Defendant Corporations state as follows

**BACKGROUND**

A.    <u>**Defendant Corporations Management Agreements with Efstratious D. Tsintolas**</u>

On January 1, 1995, Tsintolas Investments, Inc. and Efstratious D. Tsintolas ("**Mr.**

1

Tsintolas") entered into a Property Management Agreement ("**Tsintolas Investments Property Management Agreement**"), **Exhibit ("Ex.") 1**, that authorized Mr. Tsintolas "to hire and supervise all employees, independent contractors, consultants and other professionals as needed." *See* §2(D).  On March 1, 1997, Olympia Investments, Inc. executed a Property Management Agreement ("**Olympia Investments Property Management Agreement**" or "**Ex. 2**") (jointly "**Property Management Agreements**") that authorized Mr. Tsintolas "to hire and supervise all employees, independent contractors, consultants and other professionals as needed." *See* § 2(D).

**B.      Motion and Order to Disqualify Attorney Creed of June 3, 2021**

On June 3, 2021, the Court ruled orally from the bench that Attorney Creed was disqualified from representing Defendant Corporations because that representation would conflict with his current representation of Cassandra Tsintolas Johnson ("**Order to Disqualify Attorney Creed**").

As counsel for the Petitioners' argued at the hearing, the Petitioners' "central premise on this motion is that Mr. Creed is an improper person to serve as co-counsel on behalf of the corporations, ***because he's not independent. He's counsel for Cassandra Tsintolas Johnson***." *See* June 3, 2021 Hearing Transcript, **Ex. 3**, p. 35:5-8 (emphasis added).  The Petitioners' second argument was that the Defendant Corporations did not have "the authority to consent to this [dual] representation [because] . . . [t]here's a complete deadlock in this case. *Id*. at p. 38.  There cannot be a corporate act, given the 50/50 deadlock that ***would authorize the consent for this dual representation***." *Id*. at p. 38:2-6 (emphasis added).  The Petitioners argued in that hearing that Mr. Tsintolas could not select counsel on behalf of the Defendant Corporations solely because the Defendant Corporations' were unable to consent to the dual representation of Attorney Creed as both counsel for Cassandra Tsintolas Johnson and counsel for the Defendant Corporations.  *See*

2

*id*. The Petitioners' advanced this argument because at the time of the hearing, ownership and the directors of the boards of the Defendant Corporations ("**Boards**") were split 50/50 between the Petitioners and Defendants and the Boards were deadlocked. *Id*.

In its ruling, the Court expressly stated, that the motion was "an objection by the corporate board, and we have a deadlocked corporation. And so, under those circumstances, without that corporate action and they are [sic] being deadlocked, that would just not be permissible. ***I do see a conflict*** [to the dual representation]. . ." *Id.* at 49:8-23 (emphasis added). However, the Court expressly carved out a broad exception for Mr. Tsintolas to retain counsel stating, "[i]t would be totally unjust to not permit the corporation to have the legal counsel that it believes it needs to have in order to appropriately prosecute this action [sic], but it would have to be someone outside of the realm of Mr. Creed. It'll have to be someone that would have to be not apparently in conflict, as it would seem here." *Id*. at 49:24-50:4. In other words, the Court expressly permitted the Defendant Corporations to retain whomever Mr. Tsintolas elected as counsel, so long as the representation did not create a conflict between any interested parties before the Court.

**D.  Valuation Order of October 5, 2023**

On October 5, 2023, the Court entered an Order ("**Valuation Order**") regarding the value of the Corporation. In its Order Disqualifying Shulman Rogers Attorneys, this Court has ruled that pursuant to the Valuation Order, D.C. Code § 29.312.24(g) is triggered to invalidate the Valuation Order; and thus, the Valuation Order is an Order pursuant to D.C. Code § 29-312.24(e).

**E.  Board Consent Actions of October 13, 2023**

On October 13, 2023, the shareholders of the Defendant Corporations, who had rights and status as shareholders of the Defendant Corporations (excluding the Petitioners whose rights and status as Shareholders were suspended by statute), voted to remove the Petitioners as members of

3

the Boards and appoint Mr. Tsintolas, Cassandra Johnson, and Suzanne Tsintolas to the Boards. *See* Olympia Investments, Inc., Written Consent of the Shareholders dated as of October 13, 2023 (**Ex. 4**); Tsintolas Investments, Inc., Written Consent of the Shareholders dated as of October 13, 2023 (**Ex. 5**).  On October 13, 2023, the newly elected Boards then appointed Mr. Tsintolas as President of the Defendant Corporations.  The authorized President has the authority to supervise the business and other duties incident to the office of the President.  *See* Bylaws § 4.03, Olympia Investments, Inc., Written Consent of the Board of Directors dated as of October 13, 2023 (**Ex. 6**); Bylaws § 4.03 Tsintolas Investments, Inc. Written Consent of the Board of Directors dated as of October 13, 2023, (**Ex. 7**).

**F.      Notice of Intent to Dissolve Defendant Corporations**

On October 16, 2023, as authorized and directed by the Boards and approved by shareholders with rights and status as shareholders, the Defendant Corporations filed a Notice of Intent to Dissolve the Defendant Corporations pursuant to D.C. § 29-312.24 ("**Notice of Intent to Dissolve**").

**G.      Defendant Corporations Articles of Dissolution**

On December 1, 2023, pursuant to the mandate of the statute and as authorized by the Boards and the shareholders with rights and status as shareholders, Mr. Tsintolas signed and directed the filling of the Articles of Dissolution of Defendant Corporations ("**Articles of Dissolution**") with the District of Columbia**.**

**H.      Order to Disqualify Law Firm Shulman Rogers**

The Petitioners' filed the Motion to Disqualify Shulman Rogers on November 6, 2023 ("**Motion**").  On November 20, 2023, the Defendant Corporations filed their Opposition to the Motion ("**Opposition**").  On November 27, 2023, the Petitioners filed their Reply ("**Reply**").  On

4

December 4, 2023, the Corporate Defendants filed their Surreply.

On February 7, 2024, the Court issued an Order granting the Petitioners' Motion ("**Order to Disqualify Shulman Rogers Attorneys**").  The Court's Order set forth both the facts it relied upon and the reasoning it applied to reach its decision.  Importantly, the Court posited the question to be answered as "whether the Corporations may retain new representation where: (i) 50% of their shareholders object to the counsel retained; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the counsel retained." *See id.* at p. 3.

To answer that question, the court expressly stated "this matter's June 3, 2021 Motion Hearing [that] orally granted Petitioners' Motion to Disqualify Joseph M. Creed as Counsel for the Corporations" as one basis for its' ruling.  The Court further stated that the "facts of this case remain materially unchanged since June 3, 2021" because "(i) Petitioners' instant Motion constitutes an objection by the boards of the Corporations; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did not authorize the retention of the Shulman Rogers attorneys." *See id.*  Further, the Order to Disqualify Shulman Rogers Attorneys interpreted the Order to Disqualify Attorney Creed to prohibit Mr. Tsintolas from selecting the counsel for the Corporate Defendants.  *See id.* ("The Court, however, now affirms that Steve Tsintolas does not have the right to choose whomever he pleases as counsel to represent the Corporations").

In its Order Disqualifying Shulman Rogers Attorneys, the Court disagreed with the Defendant Corporations contention that the Petitioners did not have standing as petitioners at the time the Motion (November 6, 2023) and Opposition (November 20, 2023) were filed because the Defendant Corporations "filed their Notice of Intent to Dissolve on October 16, 2023 and D.C. Code § 29-312.24(f)." *See id.*  In support of the Court's position, the Order quotes D.C. Code § 29-312.24(g), which states "[u]pon filing of such articles of dissolution, the corporation is

dissolved […] and petitioner may continue to pursue any claims previously asserted on behalf of the corporation."  The Court appears to imply that the statute contradicts the Defendant Corporations position and that the Petitioners could continue to pursue any claims previously asserted on behalf of the corporations.  But as the statute states, the Petitioners did not regain their status and rights as shareholders, if at all, any earlier than "the *filing of such articles of dissolution*" which the Defendant Corporations filed on December 1, 2023, well after the instant Motion was filed.

More importantly for purposes of the reasoning of the Order Disqualifying Shulman Rogers Attorneys, as set forth below, the Petitioners do not have a basis for objecting to the Defendant Corporations retaining Shulman Rogers on October 11, 2023.

## I.    Written Consent of the Boards

While actions of the Boards and President in retaining Shulman Rogers were proper and with authority when done.  The Boards, nevertheless, in an abundance of caution, also ratified and approved the engagement of Shulman Rogers, P.A. effective as of October 11, 2023.  *See* Olympia Investments, Inc., Written Consent of the Board of Directors effective as of October 11, 2023, (**Ex. 8**); Tsintolas Investments, Inc., Written Consent of the Board of Directors effective  as of October 11, 2023 (**Ex. 9**).  Boards may ratify prior acts and here, the act of ratification when the Boards were not in deadlock, clearly permits the engagement of Shulman Rogers.

## STANDARD OF REVIEW

Pursuant to D.C. Supreme Ct. R. 59(e), "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  "A trial court may grant a Rule 59(e) motion in order to correct manifest errors of law or fact."  *In re Estate of Derricotte*, 885 A.2d 320, 324 (D.C. 2005).  Such motions "are committed to the court's broad discretion."  *Deutsche Bank*

6

*Trust Co. Ams. v. Lynch*, 2017 D.C. Super. LEXIS 53, *3 (*quoting Wallace v. Warehouse Emps.*

*Union # 730*, 482 A.2d 801, 810 (D.C. 1984)).  Pursuant to D.C. Sup. Ct. R. 60(b), "on motion and

just terms, the court may relieve a party or its legal representative from a final judgment, order, or

proceeding . . ." for the following reasons: "(1) mistake, inadvertence, surprise, or excusable

neglect; . . .(2) newly discovered evidence [or] (6) any other reason that justifies relief."

**ARGUMENT**

The Court's reliance on the Order to Disqualify Attorney Creed as the basis for the Order

to Disqualify Shulman Rogers Attorneys is misplaced.  The Order Disqualifying Shulman Rogers

Attorneys held that the Defendant Corporations had no authority to retain Shulman Rogers

attorneys based on the three conditions ("**Conditions**") it found in the Order to Disqualify Attorney

Creed of June 3, 2021: "(i) Plaintiffs' instant Motion "constitutes an objection by the boards of the

Corporations; (ii) the Corporations remain deadlocked; and (iii) the boards of the Corporations did

not authorize the retention of the Shulman Rogers attorneys."  *See* Order Disqualifying Shulman

Rogers Attorneys. at p. 4.

The Court cannot use the Order to Disqualify Attorney Creed as a basis for its decision

because the facts underlying the disqualification of Attorney Creed are materially different from

the Motion to Disqualify Shulman Rogers for the following reasons: 1) Shulman Rogers is not

representing another litigant in this matter; 2) Shulman Rogers does not have a conflict or an

appearance of a conflict to represent the Defendant Corporations; 3) none of the Conditions are

present in the Motion; and 4) Mr. Tsintolas is duly authorized to represent the Defendant

Corporations by the management agreements and bylaws of the Defendant Corporations.

I.      <u>**Shulman Rogers Does Not Have a Conflict in Representing the Corporate
        Defendants.**</u>

As is evident from the oral argument and the ruling from the bench, the Order to Disqualify

7

Attorney Creed was based solely on the premise that Attorney Creed had a conflict in representing both Casandra Tsintolas Johnson and the Defendant Corporations.  In that motion, the question posited by the Petitioners to the Court was whether the Defendant Corporations had the authority to waive a purported conflict of interest between Attorney Creed's current client, Cassandra Tsintolas Johnson, and a prospective client—the Defendant Corporations.  There is no such conflict of interest present here to support the instant Motion to Disqualify Shulman Rogers.

In their Motion to Disqualify Shulman Rogers, the Petitioners' attempted to raise a similar question—arguing that Shulman Rogers previously represented Mr. Tsintolas on an incidental matter of representation.  *See* Motion at p. 5-6.  But the Defendant Corporations response refuted that issue, stating their previous representation of Mr. Tsintolas was extremely limited, remote in time, unrelated to the merits of the underlying case, and thus did not create a conflict of interest with the representation of the Defendant Corporations in this matter.  *See* Opposition at p. 4. Further, Mr. Tsintolas was represented in the above-captioned case by different counsel.  *See id*. The Order Disqualifying Shulman Rogers does not identify any conflict of interest or perception of conflict between Shulman Rogers' previous limited representations of Mr. Tsintolas and the Defendant Corporations as a basis for its ruling.  Nor would the Court be able to identify any conflict or perception of conflict of interest because there is none.  That difference alone between Order to Disqualify Attorney Creed and the instant Motion is significant, and the Court should reverse its prior ruling to disqualify on that basis alone.

II.    **For All Relevant Times, the Petitioners Were Not Board Members and Have No Right to Object to the Defendant Corporations.**

The October 5, 2023 Valuation Order was an Order entered pursuant to D.C. Code. § 29-312.24(e).  *See* Order Disqualifying Shulman Rogers' Attorneys, p. 4.  Pursuant to D.C. Code.

8

§ 29-312.24(f), the Petitioners lost their rights and status as shareholders "except the right to receive the amounts awarded by the order of the court. . ." D.C. Code. § 29-312.24(f).[1]

Thus, as of October 5, 2023, the Petitioners lost their rights as shareholders to vote as shareholders regarding any decisions made by the Defendant Corporations or to take any position as shareholders regarding a board vote.  On October 13, 2023, the shareholders of the Defendant Corporations, who had the right to vote, executed their respective Written Consent of the Shareholders to remove the Petitioners as board members of the Boards.  *See* Exs. 4 & 5.  These actions were proper under the code, as the then voting shareholders were empowered to take such action.  Thus, the instant Motion filed on November 6, 2023 is not a valid challenge to the retention of Shulman Rogers by the Boards and the President because the Petitioners had no rights as board members to object (as they were not then on the Boards) and no rights as shareholders pursuant to the code.

It is not until the Defendant Corporations filed their articles of dissolution on December 1, 2023, that the Valuation Order of October 5, 2023 (that divested the Petitioners of their shareholder rights and status) was no longer "of any force or effect."  *See* Order p. 4 (*citing* D.C. Code. § 29-312.24(g)).  Therefore, the earliest that the petitioners could arguably regain any status as shareholders to vote on board members or object to corporate actions would have been December 1, 2023. After December 1, 2023, the Defendant Corporation shareholders have not taken additional votes.  Assuming, *arguendo*, a vote was taken after December 1, 2023, the Petitioners could not regain their position as board members of the Defendant Corporations.  Because if the Petitioners regained their voting interest as shareholders, a vote to change the board would require

---

[1] (f) Upon entry of an order under subsections (c) or (e) of this section, the Superior Court shall dismiss the petition to dissolve the corporation under § 29-312.20(a)(2), and the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation, except the right to receive the amounts awarded by the order of the court which is enforceable in the same manner as any other judgment.  D.C. Code § 29-312.24.

a majority vote and the Petitioners do not and have never had a majority vote.  At best, the Petitioners would hold a 50% vote, which is insufficient to unilaterally approve new boards.

Contrary to the Order Disqualifying Shulman Rogers Attorneys, the Order to Disqualify Attorney Creed expressly allowed Mr. Tsintolas to retain any counsel he wanted to represent the Defendant Corporations provided there was no valid objection and no conflict of interest as is the case here.  *See* June 3, 2021 Order at 49:24-50:4.

Defendant Corporations note the Court should scrutinize whether the Petitioners have raised a "valid objection" at all.  As noted above, the Petitioners did not have standing as voting shareholders to vote on the Boards when the Boards were elected.  Thus, the instant Motion — filed when the Petitioners were not members of the Boards and without full rights and status as a shareholder—should not be construed as a valid objection by the Boards because it is not.

The Court should note originally, the Petitioners filed this very action to force a dissolution of the Defendant Corporations.  Petitioners cannot credibly claim—as they attempt here—that if they had a vote on the Boards and the Boards held a vote now, they would vote against the filing of the articles of dissolution.  Such an objection would be in bad faith and invalid.  The Petitioners cannot petition the Court for dissolution of the Defendant Corporations and then object to the very relief they sought, the filing of articles of dissolution.  It is absurd.

**III.**     **The Boards of Are Not Deadlocked.**

In the District of Columbia, a dissolution is only justified if there is a deadlock the shareholders are "unable to break" the deadlock.  *See* D.C. Code § 29-312.20(a)(2)(A).  As set forth above, the directors were not deadlocked, as defined by law, in a way that the shareholders of the Defendant Corporations were unable to break at the time that Shulman Rogers was retained, because the Petitioners had no rights or status as shareholders at that time.  The Written Consent

of the Shareholders dated October 13, 2023 removed the Petitioners from the Boards. *See* Exs. 4 & 5. Thus, since October 13, 2023, the Boards have not been deadlocked. The respective Boards were also not deadlocked at the time that the Boards ratified Mr. Tsintolas' already authorized action to retain Shulman Rogers. Thus, both actions were and continue to be valid and binding.

**IV.**    **Mr. Tsintolas Was Authorized to Hire Counsel on Behalf of the Corporations.**

The Boards delegated the authority to Mr. Tsintolas as both an agent and as a President of the Defendant Corporations to retain counsel on behalf of the Defendant Corporations. Pursuant to § 2(D) of the Property Management Agreements (Exs. 1 & 2), Olympia Investments, Inc. and Tsintolas Investments, Inc. delegated Mr. Tsintolas the authority as an agent of those respective corporations "to hire and supervise all employees, independent contractors, consultants and other professionals as needed." *See id*.

Mr. Tsintolas' authority to retain counsel on behalf of the Defendant Corporations was validated again in § 4.03 of the bylaws attached to the Written Consent of the Board of Directors dated as of October 13, 2023 for Olympia Investments, Inc., (Ex. 6) and Tsintolas Investments, Inc., (Ex. 7).

The Boards confirmed Mr. Tsintolas' authority to retain counsel on behalf of the Defendant Corporations in the Written Consent of the Board of Directors effective as of October 11, 2023 for Olympia Investments, Inc., (Ex. 8) and Tsintolas Investments, Inc., (Ex. 9). The Boards authorized their respective companies to retain Shulman Rogers Attorneys and did not object to Mr. Tsintolas' actions to retain Shulman Rogers as counsel for the Defendant Corporations at the time it was done.

In essence, Shulman Rogers was properly retained by the Boards as it was constituted, because Petitioners were removed from the Boards by valid shareholder vote of the then voting

shareholders.

**V.      Petitioners Are Deliberately Misusing the Procedure of the Court to Violate the Purpose of the Statute.**

The actions to remove the Petitioners as members of the Boards is a process expressly contemplated by the statute to achieve the result for which the statute was designed. The Petitioners' Motion to Disqualify Shulman Rogers is yet another example of the Petitioners' attempts to disrupt the dissolution process by filing motions that fundamentally violate the conceptual framework of the statute and force the very result the statute was meant to preclude.

The concept behind the statute is for the orderly dissolution of deadlocked corporations using a judicial process whereby 1) petitioners (shareholders of a corporation) file for dissolution; 2) after a hearing, the Court issues an order that assigns a value to the corporation and its assets (as it did here on October 5, 2023); and 3) defendants are provided the opportunity to either purchase the petitioners' interest at the value assigned by the Court's order of value, or file for dissolution to sell the assets at market value and distribute the proceeds to the shareholders according to the ownership percentage of each shareholder.  In other words, the statute gives the non-petitioning shareholders the choice between buying petitioners' interest at the value set by the Court or dissolve the corporations, sell the assets at the market price, and distribute the proceeds to the shareholders.

The core reason the statute removes a petitioner's rights and status as a shareholder between the order of value and the filing of the articles of dissolution (preserving only an economic interest for Petitioners) is to avoid exactly what Petitioners are attempting to do here — obstruct the orderly dissolution of the Defendant Corporations.  The statute mandates that after articles of dissolution are filed, the Petitioners lose their rights and status as shareholders to allow the corporation to make the election to file for dissolution, as the Defendant Corporations did here.

12

The Petitioners are attempting to induce the Court to violate the statutory provision allowing for a dissolution and market sale of the Defendant Corporations and instead re-impose the October 5 Valuation Order to force the Defendants to buy out the Petitioners at the price set in the Valuation Order.

The Petitioners are effectively attempting to deprive the non-Petitioning shareholders of the option the statute expressly allows⎯to elect between the buyout at the value set by the Court or dissolving at market value without the Petitioners ability to obstruct or influence that process. The statute prevents this twisted result by removing the petitioning shareholders rights and status, so that the non-petitioning shareholders have the control to make these decisions.  Here, the Petitioners filed an action for dissolution, and then suggest they can stop the dissolution by voting against it through motions in the Court, and as a result, reinstate the October 5 Valuation Order. This the Petitioners cannot do.

Not only is the Petitioners suggestion that they would vote against dissolution contrary to the very relief they sought in the Petition for dissolution, but their entire approach lacks merit. Petitioners suggest the Defendant Corporations should be sold in the market, but are objecting to Defendant Corporations filing the articles of dissolution (the very relief they sought), because the Petitioners should receive the proceeds according to the value set by the Court's October 5 Order instead of the actual market price.

The patent unfairness of this position is that the value set by the October 5 Valuation Order, by statute, only applies if the non-petitioning shareholders elect to buy the petitioning shareholders interest.  If the non-petitioning shareholders do not purchase the petitioning shareholder's interest, the Defendant Corporations are dissolved and sold at market value, and the Petitioners are paid their *pro-rata* share from the sale.  There is no provision in the statute that provides for a

13

dissolution at the value (price) set by the market, while preserving the Court's valuation order as the calculation of proceeds the petitioning shareholders are entitled to from the dissolution. Yet, that is the unfair and absurd result the Petitioners seek. The choice is statutory, binary and for the non-petitioning shareholders to make. The choice is either the court sets a value for a voluntary buyout price of petitioning shareholders' interest or the corporations are dissolved and the shareholders are paid based on their *pro rata* interest in the net proceeds of the market sale.

Here, the process followed by the non-petitioning shareholders to remove the petitioning shareholders is the process contemplated by the statute. The process by which, the Petitioners were removed from the Boards and unable to object to corporate actions as of October 13, 2023. In the time the Petitioners were removed, the Board's hiring of Shulman Rogers was permitted and effectuated. Thus, the Boards had the authority to retain Shulman Rogers when it did so, did not receive a valid objection to the decision to retain Shulman Rogers, and have not been deadlocked since the October 13, 2023. To eliminate any doubt, after the Petitioners removal, the Boards ratified Mr. Tsintolas' decision to retain Shulman Rogers, which validates the hiring.

To be sure, the Petitioners, previously removed by a unanimous vote of the voting shareholders at that time, cannot be reinstated to the Boards without a majority vote of the shareholders, which they do not have. Thus, even if the Petitioners arguably regained their rights and status as shareholders after the filing of the articles of dissolution—the Petitioners could not and did not regain their status as members of the Boards.

## CONCLUSION

As set forth above, the Order to Disqualify Shulman Rogers Attorneys should be reversed because 1) the Petitioners cannot establish there is a conflict of interest between any current and former clients of Shulman Rogers and any interested parties in this litigation; 2) the Conditions

14

cited by the Court's Order to Disqualify Shulman Rogers Attorneys that were present in the Order

to Disqualify Attorney Creed are not present here; 3) the Defendant Corporations authorized Mr.

Tsintolas to retain Shulman Rogers pursuant to the Property Management Agreements, applicable

bylaws and board resolutions; and 4) the Petitioners are deliberately misusing the statutory

dissolution process to violate the purpose of the statute.

WHEREFORE, for the foregoing reasons, Defendant Corporations respectfully request

that the Court reverse its prior Order to Disqualify Shulman Rogers Attorneys.

Respectfully submitted,

SHULMAN ROGERS, P.A.

By: _____ */s/ Glenn C. Etelson* _____
Glenn C. Etelson, Esq., Bar No. 426246
getelson@shulmanrogers.com
12505 Park Potomac Avenue
Sixth Floor
Potomac, Maryland  20854
Tel:  (301) 230-5200
Fax:  (301) 230-2891
*Attorneys for Defendants Olympia Investments, Inc.*
*and Tsintolas Investments, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of February 2024, I caused a true and correct copy of

the foregoing to be served on All Counsel of Record via the Court's electronic filing system.


　　　　　　　　　 */s/ Glenn C. Etelson*
　　　　　　　　　 Glenn C. Etelson, Esq., Bar No. 426246

# EXHIBIT 1

# PROPERTY MANAGEMENT AGREEMENT

**THIS AGREEMENT**, is made this 1st day of **January 1995** , by and between **TSINTOLAS INVESTMENTS, INC.** ("Owner") and **EFSTRATIOS D. TSINTOLAS** ("Agent").

**WHEREAS** Owner is the owner of certain property located in the District of Columbia ; and

**WHEREAS** it is understood that the Agent and Owner will abide by federal, state and local laws, ordinances and regulations governing fair housing rules and practices regarding discrimination, as well as all other pertinent laws. The property listed herein shall be shown and made available to all persons without regard to race, color, religion, national origin, age, sex, handicap or material status;

**WHEREAS** Owner desires to retain Agent as the sole and exclusive property management agent for certain property located in the District of Columbia;

**WHEREAS** the parties recognize that the Agent began providing continuous property management services to the benefit of Owner, including maintenance of the property identified herein, since 1990;

**WHEREAS** the parties recognize that the Agent has not been reimbursed for monies advanced to the benefit of Owner (including monies advanced by the Agent and by entities owned by Agent from December 1981 to May 1990), or paid any compensation for services provided that benefited Owner; and,

**WHEREAS** Owner desires to compensate the Agent for fees earned for services rendered on Owner's behalf and benefit from January 1990 to present;

**NOW, THEREFORE**, in consideration of the covenants herein contained, Owner and Agent hereby agree as follows:

**1. PROPERTY AND TERM**. Owner contracts with Agent as an independent contractor as his exclusive agent to rent and manage the property know as **4020 - 4040 Livingston Road, S.E., located in Washington DC.** (the "premises") for the term beginning on the 1st day of **January, 1995** and ending on the **31st** day of **December, 2004.**

This agreement shall thereafter automatically be renewed (and extended) for successive like period of time unless terminated in writing by mutual consent of the parties at any time.

**2. MANAGEMENT.** Agent hereby agrees:

(A) To accept management of Premises for the period and upon the terms set forth herein and to provide the services of its organization to rent, operate, and manage the Premises;

(B) To maintain business records, including receipts, disbursements, correspondence, and government compliance records;

(C) To inspect the Premises periodically as to condition and maintenance, arrange, supervise and make needed repairs; and

(D) To hire and supervise all employees, independent contractors, consultants and other professionals as needed.

**3. AUTHORITY.** Owner hereby grants to Agent the following authority:

(A) To advertise any part of the Premises, to display signs thereon, to rent the Premises, and (when appropriate) to execute leases as agent for Owner;

(B) To collect rents and other charges due or to become due and give receipts therefore; said moneys to be deposited in a bank or disbursed as Owner may specify in writing;

(C) When possible, to institute and prosecute at the Owner's expense actions in the D.C. Superior Court to recover possession of the premises and to recovery rent and other sums due; and, when expedient, to settle, compromise, and release any such action or suit, and to employ legal counsel at Owner's expense when necessary to affect same;

(D) To cause mechanics and vendors to maintain and repair the Premises; and

(E) To pay out of collected rents the following: annual taxes and any special assessments which may be levied against the Premises; insurance premium covering the Premises against fire, extended coverage and other risks; installments of principle and/or interest or any mortgage, deed of trust, or other encumbrance on the Premises; and any other expense maintaining and operating the Premises.

**4.    INFORMATION AND EXPENSES.** Owner hereby agrees:

(A) To deliver to Agent a completed checklist of information necessary for managing the Premises ("Management information Sheet") as soon as practical after the execution of this Agreement;

(B) To promptly respond to Agent's inquiries;

(C) To communicate with all tenants, prospective tenants, contractors, consultants, legal counsel, employees and vendors exclusively through Agent;

(D) To assume responsibility for all expenses incurred in connection with the management of the Premises (including, without limitation, in connection with the activities described in section 3 above);

(E) At the request of Agent, give Agent a provision of funds sufficient to cover mortgage payments, taxes, repairs and other expenses in connection with the operation and management of the Premises;

(F) To reimburse Agent for any advances made within thirty (30) days from the date of Agent's statement and to pay a service fee of 1-1/2% per month on any balance not paid within thirty (30) days, and;

(G) To carry, at Owner's expense, public liability and steam boiler insurance adequate to protect the interest of the parties here to (which policies shall be written so as to protect the Agent in the same manner and to the same extent as the Owner and which shall include a limit of liability protection of at least $1,000,000).

**5.    COMPENSATION.** The Owner agrees to pay the Agent, for the term of this Agreement and any extension thereof:

(A) A leasing fee of 3/4 of one month's rent out of the first month's rent collected upon renting the premises or any part thereof to a new tenant; $4,000.00 per month for services rendered with an annual increase of one (1%) percent beginning in January 1996, for the term of the Agreement and any subsequent extension;

(B) Reasonable fees charged for time and expenses made necessary in order to comply with government laws or regulations and/or requirements of government agencies or utilities, or excessive time spent in protecting Owner's interest in any way, such as legal actions, rehabilitations, preparing hardship petitions etc.; and

(C) Interest as per statement to the Owner or any deficit amount which is outstanding for more than thirty (30) days.

(D) All monies collected from any coin-operated laundry equipment on the Premises.

**6.    PRIOR SERVICES.** The Owner shall compensate the Agent for fees earned from property management services rendered by Agent to the benefit of the Owner from January 1990 to the date of this agreement at the base rate of Four Thousand Dollars ($4,000) per month at the time this agreement terminates, pursuant to paragraph 7.

**7.    TERMINATION.** This agreement may only be terminated in writing by mutual agreement of the parties at any time. In the event of termination, the parties agree Owner shall make payment in full of any unpaid balance due Agent, pursuant to paragraph(s) 5 and 6 within sixty (60)days.

(page 2 of 3)

**8.    SALE OR ENCUMBRANCE**. It is further understood and agreed that if the Premises are put on the market for sale during the term of this Agreement or any extension thereof or within ninety (90) days thereafter Efstratios D. Tsintolas shall be appointed exclusive agent and a sales commission in the amount of three percent (3%) shall be paid to said Agent. In the event the Owner sells the premises, the parties agree all monies owed to the Agent pursuant to this Agreement shall be paid in full to Agent at the time of the property settlement.

In the event Owner choses to encumber the premises in any way, including mortgaging or placing a lien against the premises, Owner agrees to pay Agent all monies owed in full within 30 days prior to said encumbrance.

**9.    INDEMNITY**. The Owner shall indemnify, defend and save the Agent harmless from and against all claims, losses, costs, and liabilities arising out of damage to property or injury to or death of persons (including the property and persons of the parties hereto and their agents, subcontractors and employees) occasioned by or in connection with the use, management, operation, ownership, maintenance, disbursement of funds, or control of the Premises.

The Owner shall indemnify, defend and save the Agent harmless from and against all legal fees incurred by Agent in protecting the interests of the Owner under this contract including but not limited to legal fees incurred in a suit by a tenant related to the tenancy.

**10.    LIMITATIONS**. The Agent will not be responsible for:

(A) any loss of money through the failure of, or other action by, any bank or other financial institution in which the funds of the Owner are deposited;

(B) advancing any of its funds in order to meet obligations of the Owner;

(C) any loss resulting from the failure of a tenant to pay sums due under a lease or other agreement.

**11.    MISCELLANEOUS**. This Agreement shall be binding upon the heirs, administrators, executors, successors, and assigns of the parties hereto and shall be governed by the District of Columbia law. Headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. This Agreement contains the entire agreement of the parties hereto and no representations, promises or agreements, oral or otherwise, between parties not contained in this Agreement shall be of any force and effect. Neither this Agreement nor any provision hereof may be charged, waived, discharged or terminated except in a writing executed by Owner and Agent.

WITNESS the following signature as of the date written above.

**OWNER:** Tsintolas Investments, Inc.

By: _Demetrios E. Tsintolas_

By: _Helen D. Tsintolas_

**AGENT:** Efstratios D. Tsintolas

By:

*Reviewed and affirmed as indicated*

*Helen D. Tsintolas*

# EXHIBIT 2

## PROPERTY MANAGEMENT AGREEMENT

**THIS AGREEMENT**, is made this **1st** day of **March 1997**, by and between **OLYMPIA INVESTMENTS, INC.** ("Owner') and **EFSTRATIOS D. TSINTOLAS** ("Agent").

**WHEREAS** Owner is the owner of certain property located in the District of Columbia ; and

**WHEREAS** it is understood that the Agent and Owner will abide by federal, state and local laws, ordinances and regulations governing fair housing rules and practices regarding discrimination, as well as all other pertinent laws. The property listed herein shall be shown and made available to all persons without regard to race, color, religion, national origin, age, sex, handicap or material status;

**WHEREAS** Owner desires to retain Agent as the sole and exclusive property management agent for certain property located in the District of Columbia;

**WHEREAS** the parties recognize that the Agent began providing continuous property management services to the benefit of Owner, including maintenance of the property identified herein, since 1990;

**WHEREAS** the parties recognize that the Agent has not been reimbursed for monies advanced to the benefit of Owner (including monies advanced by the Agent and by entities owned by Agent from December 1981 to May 1990), or paid any compensation for services provided that benefited Owner; and,

**WHEREAS** Owner desires to compensate the Agent for fees earned for services rendered on Owner's behalf and benefit from January 1990 to present;

**NOW, THEREFORE**, in consideration of the covenants herein contained, Owner and Agent hereby agree as follows:

**1. PROPERTY AND TERM**. Owner contracts with Agent as an independent contractor as his exclusive agent to rent and manage the property(s) know as **810 Kennedy Street, N.W., 829 Rock Creek Church Road, N.W., 1010 G Street, N.E., 1521 E Street, S.E., 5400 7th Street, N.W., .,** located in **Washington DC, 3901 53rd Street, Bladensburg, Maryland and 8212 Flower Avenue, Takoma Park, Maryland** (the "premises") for the term beginning on the **1st** day of **March, 1997** and ending on the **28th** day of **February, 2007.**

This agreement shall thereafter automatically be renewed (and extended) for successive like period of time unless terminated in writing by mutual consent of the parties at any time.

**2. MANAGEMENT**. Agent hereby agrees:

(A) To accept management of Premises for the period and upon the terms set forth herein and to provide the services of its organization to rent, operate, and manage the Premises;

(B) To maintain business records, including receipts, disbursements, correspondence, and government compliance records;

(C) To inspect the Premises periodically as to condition and maintenance, arrange, supervise and make needed repairs; and

(D) To hire and supervise all employees, independent contractors, consultants and other professionals as needed.

**3. AUTHORITY**. Owner hereby grants to Agent the following authority:

(A) To advertise any part of the Premises, to display signs thereon, to rent the Premises, and (when appropriate) to execute leases as agent for Owner;

(B) To collect rents and other charges due or to become due and give receipts therefore; said moneys to be deposited in a bank or disbursed as Owner may specify in writing;

(C) When possible, to institute and prosecute at the Owner's expense actions in the D.C. Superior Court to recover possession of the premises and to recovery rent and other sums due; and, when expedient, to settle, compromise, and release any such action or suit, and to employ legal counsel at Owner's expense when necessary to affect same;

(D) To cause mechanics and vendors to maintain and repair the Premises; and

(E) To pay out of collected rents the following: annual taxes and any special assessments which may be levied against the Premises; insurance premium covering the Premises against fire, extended coverage and other risks; installments of principle and/or interest or any mortgage, deed of trust, or other encumbrance on the Premises; and any other expense maintaining and operating the Premises.

**4.**   **INFORMATION AND EXPENSES.** Owner hereby agrees:

(A) To deliver to Agent a completed checklist of information necessary for managing the Premises ("Management information Sheet") as soon as practical after the execution of this Agreement;

(B) To promptly respond to Agent's inquiries;

(C) To communicate with all tenants, prospective tenants, contractors, consultants, legal counsel, employees and vendors exclusively through Agent;

(D) To assume responsibility for all expenses incurred in connection with the management of the Premises (including, without limitation, in connection with the activities described in section 3 above);

(E) At the request of Agent, give Agent a provision of funds sufficient to cover mortgage payments, taxes, repairs and other expenses in connection with the operation and management of the Premises;

(F) To reimburse Agent for any advances made within thirty (30) days from the date of Agent's statement and to pay a service fee of 1-1/2% per month on any balance not paid within thirty (30) days, and;

(G) To carry, at Owner's expense, public liability and steam boiler insurance adequate to protect the interest of the parties here to (which policies shall be written so as to protect the Agent in the same manner and to the same extent as the Owner and which shall include a limit of liability protection of at least $1,000,000).

**5.**   **COMPENSATION.** The Owner agrees to pay the Agent, for the term of this Agreement and any extension thereof:

(A) A leasing fee of 3/4 of one month's rent out of the first month's rent collected upon renting the premises or any part thereof to a new tenant and, in addition, during each month for management services eight percent (8%) of the gross amount of money received from the operation of the Premises;

(B) Reasonable fees charged for time and expenses made necessary in order to comply with government laws or regulations and/or requirements of government agencies or utilities, or excessive time spent in protecting Owner's interest in any way, such as legal actions, rehabilitations, preparing hardship petitions etc.; and

(C) Interest as per statement to the Owner or any deficit amount which is outstanding for more than thirty (30) days.

(D) All monies collected from any coin-operated laundry equipment on the Premises.

**6.**   **PRIOR SERVICES.** The Owner shall compensate the Agent for fees earned from property management services rendered by Agent to the benefit of the Owner from January 1990 to the date of this agreement at eight percent (8%) of the gross amount of money received from the operation of the Premises per month at the time this agreement terminates, pursuant to paragraph 7.

**7.**   **TERMINATION.** This agreement may only be terminated in writing by mutual agreement of the parties at any time. In the event of termination, the parties agree Owner shall make payment in full of any unpaid balance due Agent, pursuant to paragraph(s) 5 and 6 within sixty (60)days.

**8.    SALE OR ENCUMBRANCE**. It is further understood and agreed that if the Premises are put on the market for sale during the term of this Agreement or any extension thereof or within ninety (90) days thereafter Efstratios D. Tsintolas shall be appointed exclusive agent and a sales commission in the amount of three percent (3%) shall be paid to said Agent. In the event the Owner sells the premises, the parties agree all monies owed to the Agent pursuant to this Agreement shall be paid in full to Agent at the time of the property settlement.

In the event Owner choses to encumber the premises in any way, including mortgaging or placing a lien against the premises, Owner agrees to pay Agent all monies owed in full within 30 days prior to said encumbrance.

**9.    INDEMNITY**. The Owner shall indemnify, defend and save the Agent harmless from and against all claims, losses, costs, and liabilities arising out of damage to property or injury to or death of persons (including the property and persons of the parties hereto and their agents, subcontractors and employees) occasioned by or in connection with the use, management, operation, ownership, maintenance, disbursement of funds, or control of the Premises.

The Owner shall indemnify, defend and save the Agent harmless from and against all legal fees incurred by Agent in protecting the interests of the Owner under this contract including but not limited to legal fees incurred in a suit by a tenant related to the tenancy.

**10.    LIMITATIONS**. The Agent will not be responsible for:

(A) any loss of money through the failure of, or other action by, any bank or other financial institution in which the funds of the Owner are deposited;

(B) advancing any of its funds in order to meet obligations of the Owner;

(C) any loss resulting from the failure of a tenant to pay sums due under a lease or other agreement.

**11.    MISCELLANEOUS**. This Agreement shall be binding upon the heirs, administrators, executors, successors, and assigns of the parties hereto and shall be governed by the District of Columbia law. Headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. This Agreement contains the entire agreement of the parties hereto and no representations, promises or agreements, oral or otherwise, between parties not contained in this Agreement shall be of any force and effect. Neither this Agreement nor any provision hereof may be charged, waived, discharged or terminated except in a writing executed by Owner and Agent.

WITNESS the following signature as of the date written above.

**OWNER:** Olympia Investments, Inc.

By: _____

By: _____

Reviewed and affirmed
as indicated
(Helen D. Tsintolas)

**AGENT:** Efstratios D. Tsintolas

By: _____

(page 3 of 3)

# EXHIBIT 3

1          SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                        CIVIL DIVISION

3    ------------------------------x
                                   )
4    FOTINI TSINTOLAS ECONOMIDES   )
     REVOCABLE TRUST, ET AL.,      )
5                                  )
                 PLAINTIFFS,       )
6                                  )
        vs.                        )     2019 CAB 7057
7                                  )
                                   )
8    TSINTOLAS INVESTMENTS, INC.,  )
     ET AL.,                       )
9                                  )
                 DEFENDANTS.       )
10   ------------------------------x

11

12

13                               Washington, D.C.
                                 Thursday,
14                               June 3, 2021

15

16          The above-entitled action came on regularly for a
     Motions Hearing before the Honorable JOSÉ M. LÓPEZ, Associate
17   Judge, in courtroom number 212-R, commencing at the hour of
     2:30 p.m.

18          THIS TRANSCRIPT REPRESENTS THE PRODUCT
            OF AN OFFICIAL REPORTER, ENGAGED BY THE
19          COURT, WHO HAS PERSONALLY CERTIFIED THAT
            IT REPRESENTS TESTIMONY AND PROCEEDINGS
20          OF THE CASE AS REPORTED.

21

22

23

24

25

                                                              1

1    APPEARANCES:

2

3            On Behalf of the Plaintiffs:
             Stein Sperling, PC
             By:  Matthew Pavlides, Esq.
4                 Eduardo Garcia, Esq.
             1101 Wootton Parkway, Suite 700
5            Rockville, Maryland  20852
             301.340.2020
6
             On Behalf of the Defendants:
7            Law Offices of Jonathan Windle, Esq.
             By:  Jonathan Windle, Esq.
8            4401 East-West Highway, Suite 208
             Bethesda, Maryland  20814
9            301.587.5500

10           On Behalf of the Cassandra Tsintolas Johnson
             Revocable Trust and the Defendants:
11           Bramnick Creed
             By:  Joseph Creed, Esq.
12           4520 East-West Highway, Suite 700
             Bethesda, Maryland 20814
13           301.945.7800

14           On Behalf of the Efstratios Tsintolas Trust:
             DLA Piper
15           By:  Benjamine Boyd, Esq.
             500 Eighth Street NW
16           Washington, D.C.  20004
             202.799.4000

17

18

19

20

21

22

23

24

25

                                                        2

1            P R O C E E D I N G S

2            THE CLERK:  Calling from Your Honor's motions

3    hearing calendar, Fotini Tsintolas Economides Revocable

4    Trust, et al., v. Tsintolas Investments, Inc., and Olympia

5    Investments, Inc., Case Number 2019 CAB 7057.  Parties,

6    please state your names for the record, starting with counsel

7    for the plaintiffs.

8            MR. PAVLIDES:  Good afternoon, Your Honor.

9    Matthew Pavlides on behalf of plaintiffs.  Also with me is

10   Eduardo Garcia.

11           THE COURT:  Good afternoon, gentlemen.  And for

12   the defense?

13           MR. WINDLE:  Jonathan Windle, Your Honor, for

14   Olympia Investments and Tsintolas Investments, the two named

15   defendant corporations.

16           THE COURT:  Thank you, sir.  Next person in line?

17           MR. BOYD:  It's Benjamin Boyd on behalf of

18   Defendant Efstratios Tsintolas.  Joe, you may be on mute.

19   I'm not sure.

20           THE COURT:  Go ahead and give your name.

21           MR. CREED:  Thank you, Your Honor.  Joseph Creed

22   on behalf of the Cassandra Tsintolas Johnson Revocable Trust,

23   as well as the defendant corporations.

24           THE COURT:  Good afternoon, Mr. Creed.  Let me

25   begin by just reminding the parties that this is a virtual

3

1   hearing.  We are on the record.  We are being recorded, and

2   we have a court reporter.

3          Now, under these circumstances, it becomes even more

4   important that we speak one person at a time in order to be

5   sure that the recording is clear and that the record is

6   clear, considering the work of the court reporter.  When you

7   do speak, first identify yourself by name and then make your

8   statement.  That way, the record can keep better track of who

9   the speaker may be.

10         Now, the last time, we did not reach the particular

11  motion, which was Plaintiffs' Post-Motion to Strike Portions

12  of Defendants' and Interested Parties' Expert Designations

13  for Failure to Provide 2020 Documents Used by These Experts

14  in Rendering Their Opinions and to Completely Strike Certain

15  Hybrid Witness/Experts for Failure to Adhere to D.C. Rule

16  26(a)(2)(C), as in "Charlie."

17         Before we venture into that matter, I just want to

18  just check for each party to see if any new developments have

19  arisen that will be important for the Court to hear about

20  before we move with the motion.  I'll start just randomly

21  with the plaintiffs.

22         Mr. Pavlides, any new developments on your end of

23  things?

24         MR. PAVLIDES:  No, Your Honor, not as to this

25  particular motion.

                                                              4

1                    THE COURT:  Thank you.  And I'll go then to

2    Mr. Windle.

3              Any new developments on your side?

4                    MR. WINDLE:  My understanding, Your Honor, is that

5    the 2020 documents that Mr. Pavlides was complaining of have

6    all been delivered to him.

7                    THE COURT:  We're going to argue that motion, I

8    would imagine.  So there are no new developments otherwise?

9                    MR. WINDLE:  Not in that matter, Your Honor.

10                   THE COURT:  Thank you, sir.  Mr. Creed, any new

11   developments that we need to know before we go into that

12   motion?

13                   MR. CREED:  Not as to that motion, Your Honor.

14                   THE COURT:  Thank you.  Mr. Boyd?

15                   MR. BOYD:  Well, Your Honor, there was one matter

16   that I was going to raise as regards that motion.  And it's

17   just Mr. Pavlides filed a Supplemental Expert Report on April

18   5th, which, of course, is about two months after the

19   deadline for him to file expert reports.  But I do think it's

20   relevant, because he's argued that there should be a strict

21   interpretation of the rules here; and that our experts should

22   be thrown out or their opinions thrown out for fairly minor

23   potential discrepancies under the rules.

24              So, anyway, I just was going to mention that during

25   the hearing.  But since you've asked for it now, I'll go

5

1  ahead and mention it now.

2         THE COURT:  Thank you.  One second, please.  Very

3  well then.  Why don't we move ahead?

4         Again, Mr. Pavlides, I'll give you an opportunity to

5  make a brief argument on your motion.

6         MR. PAVLIDES:  Yes.  Thank you, Your Honor.  This

7  is Matthew Pavlides on behalf of the plaintiffs.  There are

8  only two parts to the Motion to Strike.  The first part has

9  to do with primary with Rule 12(f), and I'll give you

10  background on that.  The second part of that has to do with,

11  as it says, Rule 26(a)(2)(C), and that has to do with the

12  purported hybrid facts/expert witnesses.

13         So let me just address first the first part of it

14  and give you a little bit of background as to where we are.

15  As the Court is aware, in January of 2020, the corporations

16  elected to purchase, in lieu of the Complaint for

17  Dissolution.  Now, when you go to that section of the

18  Election to Purchase -- and that's under 29312.24, Subsection

19  D -- if the parties were not able to resolve the purchase

20  price on their own, then at that point in time later, upon

21  request from the Court, the Court would determine the fair

22  value of the shares at issue.

23         And that's important.  The initial request for

24  Election to Purchase was in January of 2020.  In August of

25  2020 is when the election occurred to have the Court make

6

1   that decision as to what "fair value" is.  And under that

2   section that has previously been cited -- under D -- it says

3   that "The date for the fair value of the petitioner's shares

4   shall be the day before the date on which the petition was

5   filed."  So that would have been October 23rd of 2019.  And

6   then it goes on to say "or as of such other date as the Court

7   deems appropriate under the circumstances."  So that's an

8   opportunity for the Court, if the Court decides that it wants

9   to use a different date.

10          So then, fast-forward in time to September of 2020.

11  Throughout 2020, the defendants and interested parties took

12  the position that the 2020 financial information and other

13  information was not relevant to the case.  And there were

14  many Motions to Compel related to the 2020 information and

15  many arguments, but that position continued in the case.

16          And the reason why they said that is that it wasn't

17  relevant.  So, you fast-forward again to January of 2011, and

18  there was a witness exchange deadline.  And then on February

19  of 2021, the plaintiffs' expert disclosures passed.  And at

20  that time, the experts that we disclosed for both business

21  valuation and for appraisal were using the date of the date

22  before the petition was filed, which was October 23rd of

23  2019, which is what the statute requires.

24          Now, only in March of 2021 -- March 1st, 2021 -- did

25  the defendants/interested parties then offer their experts.

7

1    And in their experts' opinions -- and that's their reason to

2    strike -- did they then refer to the fact that they would now

3    like to use a different date for fair value.  And they

4    provided fair value opinions based on business valuation

5    based on both the October 23rd, 2019 date; but then they

6    selected randomly the date of December 31st, 2020.

7         Now that date is not a date that the Court has ever

8    provided any of the parties.  That would be a date for the

9    determination under the statute of fair value.  The defense

10   and interested parties made no motion before this Court,

11   either at any time during 2020, or at any time in which there

12   was a Scheduling Order before this Court or at any time since

13   in which they have asked this Court to use another date other

14   than October 23rd of 2019.

15        So when we received the designation of the

16   defendants/interested parties' experts -- which are a

17   gentlemen by the name of Walter Pennington and another

18   gentlemen, Mr. Riley (phonetic), who's the appraiser -- we

19   were surprised to find that they would suggest that there is

20   another date that they would like the Court to consider for

21   purposes of the fair value of the shares; and that's not

22   compliant with the statute.

23        Not only did they provide a date that was

24   noncompliant with the statute, but they also had not provided

25   the underlying documents associated with 2020.  So there

8

1    really are two aspects of prejudice that are going on here:

2    One, the plaintiffs have spent thousands of dollars to have

3    their experts provide the date that's required.  And the date

4    for valuation and for appraisal -- it's in the statute -- of

5    October 23rd, 2019.

6          The Court has already seen and has received a very

7    large stack of appraisals that went with that analysis.  And

8    there's a tremendous amount of prejudice by now allowing the

9    defendants/interested parties from now providing which is, as

10   opposed to the 12(f) argument, which are immaterial and

11   impertinent opinions by these experts related to a business

12   valuation and appraisal that go to a different date.  And

13   that's as random as if I was to pick today's date and have my

14   experts opine because I felt like those were the optimal

15   value dates for the shares.

16         Why not wait until the day before this hearing in

17   this matter, because the market has gone up?  And it's

18   dissipating.  And now, values are risen.  In fact, there's

19   inflation in the marketplace.  And I'm being told that the

20   values of the properties are now significantly higher than

21   going back to October 23rd of 2019.  So, not having the

22   documents and not having the order of the Court to say that

23   this information should be considered by the Court as to

24   these new business valuation days or these new appraisals

25   creates a issue was prejudice and now requires, if it is to

9

1   go forward as alternative dates before this Court.

2          And now, we have to do two sets of discovery in this

3   case.  So not only do we have to depose these individuals for

4   purposes of determining business valuation.  I now have to

5   ask questions related to dates and data that go back into

6   every aspect of the fair value for a date of October 23rd,

7   2019, but also a date of December 21st, 2020.

8          Now that would mean that there would have to be

9   inquiry as to cash on those two different dates; accounts

10  receivable; fair values of properties; the debts that are

11  heavily in dispute.  And so, I'm not disagreeing that they

12  cannot provide the opinions that go along with the statute,

13  which are for October 23rd, 2019; but they have no court

14  order or authority from the Court in order to put before the

15  Court any data or information for purposes of "fair value" or

16  for appraisals for a date of December 31st of 2020, no more

17  than I would to put forth before the Court whatever date I

18  would like to randomly select as most beneficial to my

19  client.

20         Now, you're to hear that COVID has changed things.

21  But If you look at the timing of this, COVID was known about

22  not only in the beginning part of 2020, but certainly in

23  August of 2020, at which time, we both jointly asked the

24  Court to make a determination as to value.  So the idea that

25  COVID is an excuse for a change in value is really of no

10

1   moment, because the truthful answer is they should have filed

2   a motion or allowed for argument to suggest that the Court

3   should change the date for consideration under the statute.

4         That's never been made.  And it was made, at this

5   time, I would argue that the date that I would prefer is a

6   date that actually is more close to the present, which would

7   be a higher value then the 2023/2019 dates.  So, as a

8   procedural matter and as a matter of not providing the

9   documents in a timely fashion for 2020, when they took the

10  position that they weren't relevant, irrespective of the fact

11  that they've now decided that they were willing to produce

12  those 2020 documents, that portion of their expert

13  designations -- and, again, specifically related to the use

14  of a date that is not a statutory date and for which there's

15  no court order of December 31st, 2020, should be stricken.

16        Now, with respect to the second part of the motion,

17  that really falls under D.C. Rule 26(a)(2)(C).  And what

18  transpired with respect to the portion of the designation was

19  that there are a number of individuals that were listed as

20  hybrid fact and experts.  And those individuals -- and I'll

21  list them so the Court has a sense of who they are -- one is

22  a gentlemen by the name of Andy Cooper (phonetic), who is the

23  current accountant for the corporate defendants.

24        The second was a gentleman by the name of Charles

25  Rines (phonetic), who was the former account.  The third

11

1   individual was Steve Tsintolas himself, who is an interested

2   party; and you're familiar with that name as well saying that

3   he had expert opinions to render.  The fourth was a gentlemen

4   by the name of Gene Stanstomarino.  Mr. Stanstomarino was a

5   vendor who provides services for compliance with government

6   regulations related to housing.  And the fifth gentleman was

7   a gentlemen by the name of Brandon Scanlon (phonetic), who

8   they say is a real finance expert.

9        And the issue with that -- and you can look at it at

10  either one of two ways -- they should either be struck or

11  they should be supplemented.  Let's go take it one step back.

12  If you're looking at an individual who might have a testimony

13  as a fact witness who's going to offer opinions and the

14  applicable D.C. *Rules of Evidence* would be 701, which allows

15  laypeople to give opinions, but it's a very specific narrow

16  area, which is rationally based on the witness' perception

17  and also to have a clear understanding of their testimony.

18  But it's not based on scientific information, which is really

19  702.  702 is a pure expert.

20       And if you really look at what these designations

21  were, these gentlemen, all with whom are listed, really fall

22  under the designation of a 702 expert, which is really the

23  experts that are referenced by D.C. Rule 26(a)(2)(C), which

24  are, when you have an expert who has an area of expertise

25  that is something outside that a layperson would know and

12

1   they intend to offer an opinion in the case and they don't

2   have a report, then, Rule 26(c) indicates that they're

3   supposed to provide the subject matter on which they're going

4   to testify.

5          And they're supposed to provide a summary of the

6   facts and opinions to which the witness is expected to

7   testify.  And the issue that I took with on behalf of the

8   plaintiffs was for each of these gentlemen, as they were

9   listed, they did not provide what Rule 26(a)C requires.  And

10  so, they can either not provide it, which they haven't done

11  anything to supplement it, and they should be stricken,

12  because they haven't complied with the rule, or they should

13  be required to supplement these particular individuals and

14  explain what it is that they are prepared to offer them for

15  purposes of what their expert testimony would be.

16         So, for Mr. Cooper -- and I'll use him as an

17  example -- for Mr. Cooper, what they said that he was going

18  to provide was, and it says "Mr. Cooper" -- and this is an

19  example -- "may offer opinions regarding the applicability

20  and usefulness of the 2019 and 2020 financial statements he

21  prepared for business value purposes.  Mr. Cooper may also

22  offer opinions on the scope, limitations, and purposes of the

23  tax returns prepared by the corporation's former accounting

24  firm, Turner, Leins & and Gold, particularly the

25  applicability of the uselessness or lack of applicability and

13

1    usefulness of the tax returns for the purposes of valuation

2    of the shares of the corporation."

3            And I know that's a mouthful.  But, basically, what

4    they say is he may offer some opinions about something being

5    applicable and useful.  But what they don't say is whether or

6    not his opinions will be that they are applicable and useful

7    or his opinion will be that they are not applicable and

8    useful and why, factually and based on his opinion as an

9    expert, such is the case.

10           And so, Rule 26(c) provides to the party who's

11   receiving that designation the opportunity to decide, first,

12   whether or not that designation provides them with enough

13   information to determine whether that person might say, if

14   they testified.  And then, two, it also provides them with

15   information that, should they decide to depose this

16   individual, that they have information that they need in

17   order to make that deposition a meaningful one.

18           Now, each one of these individuals, we've already

19   discussed at a prior hearing, because they are individuals

20   that I was going to be deposing; and they were listed before.

21   And all I've asked them to do is, "Would you please provide

22   me with exactly what you intend will be" their opinions and

23   what the basis of those opinions will be, so I can have a

24   deposition knowing what these expert opinions will be?  These

25   are insufficient responses.  There is an insufficient

14

1  response that, "Oh, Mr. Pavlides knows what they're going to

2  say."  You know, while I appreciate the thought that I

3  am capable of calculating what my adversaries' position might

4  be, that's not what the rule requires.

5        And two, the other one is, "You can just take their

6  deposition and ask them what they have to say and then

7  they'll tell you."  That's also not fair, because I'm not

8  allowed the opportunity to prepare in order for me to take a

9  meaningful deposition.

10        And so what I've asked with respect to those five

11  gentlemen is that they either be struck or, in the

12  alternative, that there be compliance under Rule

13  2626(a)(2)(C); and that they provide what an appropriate

14  designation should provide.

15        And then, finally, I think counsel is confused.  He

16  raised an issue, which is related to the supplementation that

17  I did for my experts.  And I think that counsel may be

18  mistaken.  Under the rules for purposes of expert

19  designations, when information comes into the possession of

20  your experts that they should supplement their designation,

21  that, under the rules, you're required to supplement.

22        In fact, the rule actually -- and I referenced it

23  before -- you're actually required up until the time for the

24  pretrial to actively supplement the designations of your

25  experts consistent with whatever they may say.  And that

15

1   really is the section that provides relief for a party to

2   provide rebuttal information or additional information as

3   part of the process.

4        So the first part of my argument is very different.

5   It's not about supplementation of expert designations.  The

6   first part of my argument is about the fact that two experts

7   have offered testimony that's not supported by statute and

8   should be removed, because it's impertinent, because there's

9   not a court order supporting the statute that allows them to

10   give an opinion on business valuation and appraisal outside

11   of what the statute affords.

12        But the second part of that is really the part that

13   says that you have to provide appropriate designations.  The

14   part that's being argued about "supplementation" I think is

15   an obligation, no matter what, that every party has

16   independent of that.

17        So that's my argument with respect to why the Motion

18   to Strike was filed and why the mere providing of 2020

19   documents, especially with respect to the experts new

20   designations as of December 31st of 2020, is something that

21   cannot be fixed by way of merely amendment.

22        I think the proper procedure, if they wanted the

23   Court to select a new date for purposes of "fair value" under

24   the statute is that they would have to file before this Court

25   a motion and explain why to the Court they believe the date

16

1  of fair value under the statute should change, at which time,

2  I would be able to address why that is unfair under the rules

3  and the statute.

4        And then, two, it would also afford me the

5  opportunity to likewise ask for different dates if we're

6  shopping dates for purposes of enhanced value under the

7  statute.  Thank you, Your Honor.

8        THE COURT:  Thank you.  Very well.  I'd like to

9  see if we can keep two significant things separated, as I can

10 hear it, and that is the date that needs to be selected as

11 the valuation date per Mr. Pavlides' argument under the

12 statute, that would be October 23rd, 2019.  Can we approach

13 that first to keep things separate?

14        MR. BOYD:  I'd be happy to, Your Honor.  It's

15 Benjamin Boyd.  I'll argue this on behalf of the defendants.

16        THE COURT:  Thank you, Mr. Boyd.

17        MR. BOYD:  So, I'll just start with that issue,

18 Your Honor, and then you, perhaps, can tell me where you want

19 me to go from there.  I do need to remind Your Honor that

20 they filed a motion which you read verbatim at the beginning

21 of this hearing where they moved to exclude the December

22 2020, opinions on valuation on the grounds that they didn't

23 get documents that the experts relied upon.  And I'll address

24 that particular misinformation in a moment.

25        I will, though, right now address the topic that you

17

1   raised, which is this date as to what the valuation date

2   shall be under the statute.  As Mr. Pavlides read to you, the

3   Court has two choices, really, under the statute.  Number

4   one, the Court can say, "I am going to value the shares as of

5   the day before the petition was filed."  That's set forth

6   explicitly.  Right after that in the statute, it says "or

7   such other date as the Court decides is more appropriate in

8   its discretion."

9          So that's the extent of the statute.  And in a

10  situation such as this or any other situation, Your Honor,

11  the parties would be able to argue to you that you should

12  select another date, rather than the day before the petition

13  was filed.  In this case, if we get into specifics, we timely

14  identified our experts' opinions as to valuation of December

15  31st, 2020, because we are going to argue to Your Honor

16  that, because of the pandemic, which is nobody's fault that

17  are parties to this case, has reduced the value of the

18  buildings; and, therefore, two out of the four plaintiffs

19  should not have to bear that loss and the other two benefit

20  from that loss.

21         Your Honor may reject or accept that argument at

22  trial.  This idea that Mr. Pavlides has just now come up

23  with, which does not appear in any of the papers that he has

24  set before Your Honor that we somehow need to file a motion

25  to ask the Court to use its discretion when it's set forth

18

1    exactly in the statute is without any support whatsoever.

2    This is the first time that I've heard it.  So we timely

3    identified these opinions that have a different date for the

4    reasons that I just identified for Your Honor.  The statute

5    doesn't require us to have an order or a motion or say

6    anything about that.  The Scheduling Order just says

7    "Identify your expert opinions by a certain date."  So I can

8    stop there, Your Honor, if that has made it more clear to

9    you.

10        THE COURT:  Thank you.  I think the question

11   raised by Mr. Pavlides is now that we're struggling with two

12   different dates, then we have to relate them with data and

13   information regarding those two different dates to present to

14   the Court as to what would be the value for the October date

15   and the value for the December date.

16        What is your response to that?

17        MR. BOYD:  I mean it's just a part of the case,

18   Your Honor.  We've had this tremendous pandemic event that we

19   would, again, like to argue to Your Honor has reduced the

20   values in these properties through no fault of our own or any

21   fault of the plaintiff.  We have already produced to

22   Mr. Pavlides appraisals that are both key to both dates, and

23   we have already produced business valuations that are key to

24   both dates.

25        So, it is not too much trouble to do this.  And,

19

1   again, it's allowed under the statute.  So to say, "Oh, it's

2   too much trouble to have two different dates," the statute

3   explicitly allows for different dates to be considered by the

4   Court.  So we, of course, want to present evidence that

5   supports this alternative date that takes into account the

6   reduction of value of these buildings that the pandemic has

7   wrought.

8        Again, Your Honor can accept or reject those

9   opinions.  But to throw us out completely, I don't think is,

10  you, know, it's just simply what Mr. Pavlides says about it

11  being not relevant or that we have to file some motion, it's

12  not supported by any case law or anything that I've seen.

13  And he didn't raise it in his motion.

14       THE COURT:  Now Mr. Pavlides is threatening that

15  he wants to pick even a third different date, and you'll have

16  to argue that as well.

17       MR. BOYD:  Well, Your Honor, you know, he

18  understood the statute when he filed his expert opinions in

19  February of this year.  So if the Court wants to allow him to

20  select another date, I mean I'm not going to take a position

21  now, because I haven't seen anything from him.  We may oppose

22  that.  He, as you can see from what he's saying today and the

23  point that I'm raising now, he's a stickler for dates.

24       That argument about he's supplementing his expert

25  opinion, the expert wrote a new report, Your Honor.  I guess

20

1  if you want to call it "supplementing opinions," I don't see

2  that.  And he's got entirely new opinions related to our

3  experts' reports.  So I mean the Scheduling Order doesn't

4  allow for that, but we have filed anything to strike that,

5  Your Honor.  Again, it's sort of more of the bigger picture

6  of this case.  We're trying to get to a hearing date for

7  valuation.

8         And, you know, I mean we can check the file.

9  Mr. Pavlides has filed, you know, a dozen or two dozen

10  Motions to Strike, to enjoin, to compel.  I mean constantly

11  complaining about what's going on in the case.  And today is

12  a great example.  He raises entirely new grounds for his

13  motion that he didn't set forth in his papers, and they

14  aren't supported by the statute or any case law.

15         THE COURT:  Thank you.  Anyone wants to add

16  anything to this argument?  Mr. Creed?

17         MR. CREED:  Your Honor, I have nothing to add to

18  Mr. Boyd's argument.

19         THE COURT:  Thank you.  One second, please.

20  Mr. Windle, anything new that you wish to add?

21         MR. WINDLE:  I'd just like to point out that the

22  defendant corporations have never taken the position that

23  2020 financial documents were not relevant.  Mr. Pavlides, in

24  fact, filed a Motion to Compel delivery of them.  And we've

25  asserted all along that, as soon as they came available, we'd

21

1    produce them.  In the preparation of 2020 taxes, these

2    documents became available and were provided to Mr. Pavlides,

3    though it's not like he doesn't have them.

4         The tax returns are not completed at this point.

5    The accountant has filed the necessary extensions.  And as

6    soon as they're available, those will be provided to

7    Mr. Pavlides' office also.  But if Washington sank into the

8    ocean tomorrow or a week from now, I don't believe that

9    nobody could reasonably come back and say, "Jeez, Your Honor.

10   This may have affected the value of the properties."  It's

11   constantly a fluid thing.

12        MR. BOYD:  I just wanted to finish.  I just wanted

13   to make one more point, Your Honor.  Again, going back to

14   this being a new item that Mr. Pavlides has pulled out of his

15   hat right now, I mean if you're considering that there is

16   some merit to this argument, then, I certainly would ask for

17   an opportunity to brief it, because I'm really not sure of

18   what the position is, based on the argument that I've heard.

19   So, again, based on what I've said, I hope you find that it

20   has no merit whatsoever.  But, you know, if we want to take

21   up that particular issue that somehow we have to file a

22   motion or somehow having two dates is not allowed under the

23   statute, then I certainly would like a chance to brief it.

24        THE COURT:  Thank you.  Do you want a last

25   opportunity to comment on that, Mr. Pavlides?

22

1    MR. PAVLIDES:  Yes, I would.  I mean I do think

2  COVID record is very clear, and it has been referenced in

3  prior motions wherein the defendants and interested parties

4  took the position even including September and the motions

5  filed and the oppositions filed in September of 2020, where

6  they said that the information that I was requesting related

7  to the 2020 financials for the conflict corporations was not

8  relevant and was not applicable.  It's not only in the

9  pleadings themselves, but it's also in correspondence that

10  was received from counsel from the defendants.

11    But the issue is one of timing.  You know,

12  throughout 2020, they did not take the position that they

13  were going to be making an argument before the Court for a

14  date other than the statute.  Not in any of the discovery and

15  not in any of their communications with the Court.  So, to do

16  it by way of an expert designation after March of 2021, and

17  after the plaintiffs' designation based on the statute, I

18  think is basically a sandbag.

19    It's basically a sandbag so that they can argue

20  something that they haven't ever raised before that there

21  should be a different date for fair value.  I think they have

22  an obligation to be forthright.  If they want to make that

23  argument, they have an obligation to raise that issue by way

24  of motion or something before the Court to say that they

25  would like the Court to entertain a value different than the

23

1    one that's provided by the statute.  I think that has to be

2    addressed, and it would have been addressed naturally by

3    doing that before we had commenced or during the time at

4    which we had commenced discovery.

5         Because here you are doing all of this discovery

6    related to all of the data and all of this focused on a

7    statutory date.  And, now, at the last minute, you know, in

8    March of 2021, you pull up and say you've picked December

9    31st of 2020.  And there is no explanation as to why that's

10   the date that the defense has selected or that their experts

11   have selected.  It sounds like it's just the year-end date.

12   But that there's really no nexus between that and COVID and

13   anything else.

14        So if Mr. Boyd wants to back up and now wants to

15   have a hearing on what dates the Court should consider for

16   purposes of -- and that's what I do think COVID statute

17   contemplates.  If you want to raise something, you can raise

18   it to the Court so the Court can make a determination as to

19   what it believes -- that should have been, you know, right

20   when you knew about it or you were going to raise that issue

21   and not as an afterthought, so you can kind of argue out of

22   both sides, because you control all of the data.  So I don't

23   think that's fair or appropriate under the circumstances.

24        And, certainly, with respect to that position by the

25   experts, the fact that you're now raising a second date, I

24

1  already hear it coming, "Well, your experts should have."

2  How can my experts rebut a date that is provided by

3  defendant?  So my experts designate based on the statute.

4  The defendants give new dates.  I have no idea what that

5  random date was going to be until they designated it as of

6  March 1st.  So they get to pick a magic date.

7           And now, I can hear counsel saying that because my

8  dates for designating experts has passed, I'm not going to be

9  able to rebut whatever new ideas are raised in their March

10  1st pleading.  I don't think that's either consistent with

11  the rules or consistent with the statute.

12           MR. BOYD:  Your Honor, if I may?  I wanted to

13  correct a factual matter and just make things hopefully

14  easier for you.  It's Benjamin Boyd on behalf of the

15  defendants in this motion.

16           Just to be clear:  We started producing 2020

17  financial documents to Mr. Pavlides before the end of 2020.

18  I had documents up to July of 2020 in his hands.  Now, did we

19  argue things and motions ultimately?  Maybe we did.  I don't

20  remember the exact wording, but we produce those documents.

21           And then in March of this year, Your Honor, we've

22  produced the rest of the 2020 documents.  So Mr. Pavlides'

23  position that we somehow continued to claim they aren't

24  relevant is wrong.  He's had the first half of 2020 in his

25  hands since, you know, six months ago.  And for the last two

1   months, he's had the rest of the documents in his hands.  And

2   as far as Mr. Pavlides on the law, I don't think that he's

3   really providing you anything to say that the statute doesn't

4   mean what the statute means.  You know, you can take whatever

5   discretion to pick another date.

6           So we have the obligation or the opportunity to

7   present on another date.  We picked December of 2020 because

8   our expert disclosures were due in March.  So we really

9   couldn't pick a later date.  If Mr. Pavlides wants to start

10  putting in different dates, you know, again, we'll look at

11  that.  I don't take a position right now as to, you know,

12  whether we would object to that.  You want the Court to make

13  the best decision possible on all of the evidence.  And

14  Mr. Pavlides seems to, you know, want to exclude evidence and

15  misread the statute.  Now, I do have other arguments on his

16  motion, but I was just addressing this date issue for you

17  first.

18           THE COURT:  Thank you.

19           MR. PAVLIDES:  Your Honor, just very limited on

20  the one item.  The documents that he produced to me, they

21  produced to me on March 25th, 2021.  These are documents

22  that I had not received before.  And this is a letter from

23  Mr. Boyd.  It's a three-page letter.

24           The documents that were produced were eight items

25  plus some other ones that I had to wait even longer.  2020

1    Rent Rules.  Okay?  Just produced.  2020 Income and Expenses,

2    just produced.  Detail Summary of Unpaid Job Tickets, just

3    produced.  Two sets of those.  Two sets of check registers,

4    just produced.  A check register from Tsintolas Realty.

5    Another check register from Arcadian Construction Company.

6    Then they said they had to go offices to take a look at

7    additional documents, which I did, which were 2020 paid

8    invoices, 2020 lease agreements, 2020 bank statements, 2020

9    check registers, and other documents.

10           And all of this goes to the information that was

11   being used not for purposes of the October 23rd, 2019,

12   date, but these are all of the documents that they now

13   provide, you know, hundreds of pages of documents that now go

14   to a different fair value of December 31st, 2020.  And so,

15   there's a real problem with that.

16           THE COURT:  Thank you.  Just one second, please.

17   So here's my ruling on that score.  The statute provides that

18   the date of the determination is one day before the filing of

19   the lawsuit, which would be October 23, 2019.  And that's

20   what the Court is going to go by.

21           Now, the statute also provides that the Court does

22   have discretion to determine a different date.  I'll let you

23   try to persuade the Court with a different date and see what

24   arguments there are and see how we proceed under those

25   circumstances.  Thank you.  Now, just one second, please.

Case 24-00158-ELG   Doc 16   Filed 05/21/24   Entered 05/21/24 21:04:27   Desc Main
Document     Page 337 of 548

1        Now, there was another argument based on the point

2    that the experts, or was there an argument regarding the two

3    experts?  Mr. Pavlides argued that they did not have the 2020

4    documents, and the parties arguing that they have all been

5    turned over.  Do we need to get into that argument to the

6    extent that the documents have apparently already have been

7    turned over?

8        MR. BOYD:  Not as far as I'm concerned, Your

9    Honor.  And I'll defer to Mr. Pavlides on that.

10        MR. PAVLIDES:  And I'll take the representations

11    for counsel for the defendants that they've turned over all

12    of the 2020 documents that they represent that they have.

13        THE COURT:  Thank you.  So I will take it on the

14    record all of the 2020 documents have been turned over.  Now,

15    this takes us now to the second part of the argument -- the

16    Rule 26(a)(2)(C) argument regarding those four or is it five

17    hybrid experts?

18        Mr. Pavlides has made the argument that, under Rule

19    26(a)(2)(C), they're required to provide a report indicating

20    what is going to be the opinion of these witnesses and not

21    merely what they would have or maybe testifying to but,

22    rather, what will they be testifying to?  Mr. Pavlides, is

23    that your argument?

24        MR. PAVLIDES:  Yes, it is, Your Honor.

25        THE COURT:  And Mr. Boyd?

28

1      MR. BOYD:  Oh, thank you, Your Honor.  So just to

2  go back to this motion to put it in the right context, today,

3  Mr. Pavlides is taking the position that we can supplement

4  these experts.  But, of course, he moved to strike their

5  opinions.  When we identified these experts on March, 1st

6  he came to us on March 11th and said, "I'm filing a motion

7  this afternoon.  And, you know, I assume that you're not

8  going to consent."  And I wrote back to him, and we attached

9  this e-mail.

10     And I think it's important for context, Your Honor.

11  We said, "What are your grounds for the motion?"  And

12  Mr. Pavlides basically said, "You didn't provide me

13  information on the day it was supposed to be provided in the

14  Scheduling Order, and you can't correct it now."  And he

15  didn't tell us what those deficiencies were and made no

16  effort to do so and filed his motion at 4:00 p.m. that

17  afternoon.  So we only got the grounds for these hybrid

18  witnesses after he filed the motion.  And, again, Your Honor,

19  this was back in March.  We now have most if not all of these

20  witnesses scheduled for depositions.

21     In regard to the disclosures that we gave to

22  Mr. Pavlides, I will just say, Your Honor, my practice as a

23  defense counsel is to basically copy the plaintiffs'

24  designations and use the same language that the plaintiff

25  does, so that there won't be these problems.  And, indeed, if

29

1  you go back and look at the sentences and the wording of both

2  designations, you'll find that they're virtually identical.

3  Now should I have said more?  He used Andy Cooper.  That's

4  the accountant for the corporation.

5         And, basically, our disclosure for him was he's

6  going to comment on applicability of the financial statements

7  that he prepared or the usefulness in determinating

8  valuation.  I did say that that's what his opinion is going

9  to be on.  Now, did I say, "He is going to have the opinion

10 that it's very useful"?  I didn't say that, Your Honor.  And

11 that's what I said:  "This can be taken care of in a

12 deposition."  So, I gave him the subject matter.  I gave him

13 the opinions.  And, again, as I set forth in our opposition,

14 Mr. Pavlides wants you to believe that he's ignorant about

15 the bigger context of this case.

16        He says that we didn't give him the facts Mr. Andy

17 Cooper is going to rely on, but we produced all of the

18 financial statements that Mr. Andy Cooper prepared.  And,

19 indeed, Your Honor, the reason we identified these hybrid

20 fact expert witnesses is because of the approach that

21 Mr. Pavlides has taken to this case where he objects to

22 everything that we do.  And these are fact witnesses, Your

23 Honor.  Andy Cooper will talk about how he produced the

24 financial statements.

25        But I thought, you know, he may be asked by

30

1   somebody, well, are those useful to be used by a valuation

2   expert?  And he'll say "yes."  and I could just imagine

3   Mr. Pavlides standing up and saying, "Well, that's an

4   opinion, and you should exclude that, Your Honor."  So we did

5   these disclosures to try to avoid just the situation that we

6   find ourselves in today.  And so, I think they're identical.

7   They're virtually identical to plaintiffs' disclosures.

8   Could they be more specific?  I admit that they could be.  I

9   think the motion should be denied.

10        Alternatively, I can give more -- excuse me --

11   specific sentences in regard to Mr. Cooper, for instance,

12   that, you know, he is going to say that they're useful for

13   preparing a valuation report.  And also another point that he

14   makes is the plaintiffs' expert rely not on the financial

15   statements but tax returns.  And tax returns don't set forth

16   all of the asserts and liabilities of the corporation for

17   valuation purposes.  So Mr. Cooper is going to testify and

18   it's laid out in there that the tax returns are not useful

19   for valuation purposes.

20        So, Your Honor, it seems like a tempest in a teapot

21   to me.  You can always find that I should have or someone

22   should have said additional things, but it's virtually

23   identical to plaintiffs' disclosures.  And I'll supplement,

24   if the Court finds merit in that argument.

25        THE COURT:  Thank you, sir.  And anybody wants to

31

1   take a shot at that other than Mr. Pavlides?  I hear none.

2   Mr. Pavlides, did you want a response?

3           MR. PAVLIDES:  No.  I'm not going to address

4   counsel's reflection as to what the character of my

5   objections would be in the future.  I think it's really not

6   productive.  The real issue is if Mr. Cooper only has two

7   things, and those two things that Mr. Boyd says that he's

8   going to say, if he would be so kind as to indicate what

9   those two things are that he has to say that he believes

10  that, you know, X is useful, and Y is not useful, and that's

11  the limitation, that's terrific.

12          I'll know that when I go into his deposition, that

13  those are the two things.  Having open-ended individuals who

14  are listed as experts that they can talk about or whatever or

15  opine whatever they want to opine, you know, in the moment is

16  not fair.  And as to the characterization of my client's

17  designations, you know, if he has an issue with them, I'm

18  happy to address it.  But I believe that mine are different

19  in character then as counsel has reflected.  And I would

20  appreciate it very much if he would provide me with what

21  they're going to say.

22          MR. BOYD:  Your Honor, if I may?  Benjamin Boyd.

23  Just one thing?

24          THE COURT:  Yes, Mr. Boyd.

25          MR. BOYD:  I apologize, Your Honor.  I did provide

32

1  them with what they're going to say.  Again, did I leave out

2  a word or two?  But he understands what the subject matter is

3  and what their opinions are.  But, finally, I do want to talk

4  about this one expert that sort of harkens back to the motion

5  that you denied when we were trying to limit the scope of the

6  case.

7        There are these real estate finance experts.  One of

8  the five experts that Mr. Pavlides talked about is

9  Mr. Scanlon.  And, you know, if you order me to supplement,

10  Mr. Scanlon can testify that, as of today, here are financing

11  terms that may be available.  But that's really not relevant

12  to this case.  And Mr. Pavlides' expert said certain

13  financing terms were available.  But as we all know, the real

14  date that matters is when Your Honor decides how much the

15  shares are worth.

16        Then we really should address the terms -- the

17  financing -- as of that date.  And, you know, the experts

18  can't opine as to what the financing terms will be available,

19  you know, if we do the hearing early next year or late this

20  year.  So I just wanted to point that out that's one expert,

21  Your Honor, that will be difficult to give specifics.

22  Mr. Pavlides gave us specifics, but they'll be out of date at

23  the time, you know, that it matters.

24        THE COURT:  Thank you.  Let me just comment:  I

25  don't want this particular situation to be prolonged with

33

1 | additional motions and additional briefings or filings.  I

2 | think it's obvious from the argument of both sides that the

3 | plaintiff has a legitimate point that he should have received

4 | when this was filed with these experts more precise and

5 | specific information as to what they were going to testify

6 | about.

7 |      And I think Mr. Boyd feels a sense that, "Yes, I

8 | could have done this a little more or a better or a little

9 | differently."  When I was looking at the motion, I felt the

10 | same way.  But when I saw the opposition, I said, "Oh, I see

11 | it all now."  The opposition makes it clear, I think, so

12 | clearly sufficiently that I do not need to require

13 | supplementation or further clarification.  I think it stands

14 | quite clear to the plaintiff these witnesses are going to

15 | testify about.  So, because of that, I am denying the Motion

16 | to Strike these witnesses.

17 |      I have one other question:  How's timing?  I have a

18 | little bit of time.  The Motion to Disqualify Counsel.  Are

19 | the parties in a position to make their arguments at this

20 | point?

21 |      MR. GARCIA:  Yes, Your Honor.

22 |      MR. CREED:  Yes, Your Honor.

23 |      THE COURT:  It's your motion, Mr. Pavlides.  Do

24 | you want to proceed?

25 |      MR. GARCIA:  Your Honor, if I may?  Eduardo

34

1   Garcia.  I'm actually going to argue that motion on behalf of

2   the plaintiffs.

3            THE COURT:  Thank you, Mr. Garcia.  You may

4   proceed.

5            MR. GARCIA:  Sure.  Your Honor, our central

6   premise on this motion is that Mr. Creed is an improper

7   person to serve as co-counsel on behalf of the corporations,

8   because he's not independent.  He's counsel for Cassandra

9   Tsintolas Johnson.  Even today when Your Honor asked him to

10  identify himself and who he's representing and the court

11  reporter did as well, you heard Mr. Creed answer "Cassandra

12  Tsintolas Johnson Revocable Trust."

13           And he sort of murmured "and the defendant

14  corporations."  That's part of the problem that we have here

15  with an attorney who currently represents an interested party

16  who is at issue in this lawsuit who has advocated to that

17  issue in this lawsuit and to be involved in this lawsuit now

18  turning the tables and serving on behalf of the corporation

19  as some type of potentially neutral arbiter, which he would

20  not be.

21           This is very simple by looking at the Rules of

22  Professional Conduct, Your Honor.  I think that he should be

23  the starting and ending point for this discussion.  If we

24  look at Rule 1.13, it talks about the representation of

25  corporations, and it essentially has two components.  The

35

Case 24-00158-ELG   Doc 16   Filed 05/21/24   Entered 05/21/24 21:04:27   Desc Main
Document     Page 345 of 548

1   first component is a requirement that there's compliance with
2   Rule 1.7, and the second component is that if the
3   organization is going to be represented by an attorney who
4   represents the organization and an individual, it needs to
5   obtain consent from an appropriate official of the
6   organization to do that.
7        So, if we begin with the first one, Rule 1.7, it
8   states "A lawyer shall not advance two or more diverse
9   positions in the same matter."  In this case, as Your Honor
10  is aware, that plaintiffs' counsel and the plaintiffs moved
11  to say that the interested party should be excluded from this
12  lawsuit; that there was no need for them to be in the lawsuit
13  because it wasn't provided by the statute; and, therefore, it
14  would be inappropriate for them to participate.
15       However, Your Honor heard from them and they made a
16  filing -- the interested parties -- Mr. Creed as counsel for
17  Cassandra Tsintolas Johnson and specifically stating, and I
18  quote, "It is only fair and equitable that the Tsintolas
19  defendants be treated equally to their siblings and through
20  representation by their counsel have the opportunity to
21  present the Court their evidence and argument regarding
22  valuation."
23       Necessarily, that implies that the interested
24  parties had some position that they needed to advocate for
25  that was distinct from that of the corporations.  Your Honor

36

1   accepted that position over plaintiffs' objections, and

2   that's the law of the case.  There is an adverse position.

3   There's a voice that needs to be heard for Cassandra

4   Tsintolas Johnson as an interested party, and she's going to

5   be heard about it through his counsel, Mr. Creed, and his law

6   firm.  That alone should be sufficient to justify the

7   disqualification based on judicial estoppel.

8          The Court has accepted a position by a party.  And

9   now, the party wants the Court to accept a position that

10  would essentially be contradictory to that previously

11  accepted position.  This would open a whole new can of worms

12  as to "do we have to go back to this interested party

13  arguments?"  They are now saying that Cassandra Tsintolas

14  Johnson and Efstratios Tsintolas and the corporations are

15  aligned.  They're all on the same page.  So if that is true,

16  Your Honor, that is a reversal of their previous position and

17  would warrant the interested parties being stricken from this

18  case and just the corporations proceeding.  At this point, we

19  think that the Court should stick with its ruling that the

20  defendants should be judicially estopped from saying that

21  they don't have an adverse position from the corporations.

22          The second component of that, Your Honor, is quite

23  simple:  They don't have the authority to consent to this

24  representation.  As Your Honor is well-aware, these

25  corporations are deadlocked.  Plaintiffs won 50 percent of

37

1    the shares of this company.  The defendants own 50 percent of

2    the shares of this company.  Plaintiffs are 50 percent of the

3    directors.  Defendants are 50 percent of the directors.

4    There's a complete deadlock in this case.  There cannot be a

5    corporate act, given the 50/50 deadlock that would authorize

6    the consent for this dual representation.

7          There's no operating agreement before the Court that

8    would justify that Efstratios Tsintolas is the appropriate

9    person to justify this type of corporation act, and that's

10   because it doesn't exist, Your Honor.  He is not the

11   appropriate person to justify the corporate act.  This is a

12   50/50 deadlocked corporation.  We immediately objected to

13   this representation.  We were not previously consulted to

14   this representation.  And, as such, the second component of

15   Rule 1.13 cannot be met, which justifies the disqualification

16   of Mr. Creed.

17         And as cited in our motion, Your Honor, when there

18   is a doubt as to disqualification, the law favors that the

19   Court lean towards disqualification, as opposed to allowing

20   this type of conduct to proceed.  And I'll reserve for a

21   potential rebuttal, Your Honor.

22         THE COURT:  Thank you.  One second, please.  Who

23   wishes to respond?

24         MR. WINDLE:  Your Honor, may I make a very brief

25   statement before Mr. Creed opposes this motion?

38

1          THE COURT:  Just for the record, give your name,

2    please.

3          MR. WINDLE:  Jonathan Windle for the two defendant

4    corporations.

5          THE COURT:  Very well, Mr. Windle.

6          MR. WINDLE:  Your Honor, in April, I was

7    hospitalized with a medical condition.  It kept me in the

8    hospital for the better part of a week.  The entire month of

9    May was filled with one doctor's visit and evaluation after

10   another.  It was becoming apparent to me that I was going to

11   need help in the representation of my client corporations.

12         And I'm a sole practitioner.  I don't have a staff

13   of people that I can hand things off to.  I asked for

14   Mr. Creed's assistance, pursuant to my retainer agreement

15   that gives me the authority to hire co-counsel when it's

16   necessary, and I believed it to be necessary.  I also

17   believed that it was to the plaintiffs' benefits that I did

18   that because, alternatively, I'd be constantly asking to

19   postpone things.  And given the deposition schedule we've got

20   coming up here in June, you know, I believed that taking on

21   an attorney that already had extensive knowledge of the case

22   that my client didn't have to pay to get up to speed was the

23   most responsible decision that could be made here.

24         And I will defer now to Mr. Creed to oppose the

25   motion.

1          THE COURT:  Thank you, Mr. Windle.  Mr. Creed?

2          MR. CREED:  Your Honor, first of all, in

3     disclosing or identifying who I represent today, I hope I

4     didn't murmur to the Court.  And that wasn't my intention,

5     although I've been having some audio issues here today.  As

6     the Court knows, I represent the Cassandra Johnson Trust, an

7     interested party, and have now entered my appearance on

8     behalf of both of the defendant corporations.

9          The issue before the Court is whether counsel should

10    be disqualified from representing the corporations, and it's

11    a very narrow issue.  Because the role of the Court is to

12    determine whether this is a conflict of interest or other

13    violation of the Rules of Professional Conduct that would

14    warrant disqualifying an attorney.  Not that there may be a

15    conflict or there could be a conflict.  The Court would have

16    to find that there is a conflict or other violation of the

17    Rules of Professional Conduct.

18         Now, first of all, Rule 1.13 specifically allows for

19    an attorney to represent both an entity and a shareholder,

20    officer, or director.  As noted, there's not a conflict of

21    interest, and if there's required to be informed consent,

22    that that's obtained by someone other than the individual

23    shareholder, officer, or director.  And that's exactly what

24    the case is here:  There's no conflict of interest.

25         There's certainly no conflict pertaining to the

**40**

1    plaintiffs, which is typically how this issue comes up is

2    when a lawyer represents a shareholder and then later

3    represents the entity adversely to that shareholder.  And

4    that obviously is not the case here, because I have never

5    represented any of the plaintiffs.  I have never even met any

6    of the plaintiffs.  So there's no conflict of interest that

7    the plaintiffs can raise on their own behalf.  There's no

8    conflict of interest between the trust and the corporations,

9    because they haven't taken any positions adverse to one

10   another; and they don't anticipate taking positions adversely

11   to one another.

12           Now, Mr. Garcia has cited Rule 1.7(a), which

13   pertains to the case in which a lawyer has taken adverse

14   positions in the same case, and that hasn't occurred here

15   either.  When the plaintiffs moved to exclude the two

16   remaining shareholders as parties in this case, the trust

17   position was that it was asking the Court to exercise

18   discretion to allow the trust to participate in the hearing

19   and to have its own counsel; to be present at the hearing;

20   and to participate in this case.

21           At no point in time did the trust indicate that it

22   intends to or is taking the position that is adverse to that

23   of the corporation, which is a very, very different

24   situation.  Mr. Garcia represents multiple parties in this

25   case as well.  And those parties may have interests.  They

41

1  may have points to raise in this case that are different from

2  one another and distinct from one another.  That doesn't make

3  them adverse to one another, and the same is true in this

4  case as to the defendants.

5          The trust simply took the position that it wanted to

6  continue in the case, and it had been sued originally and

7  wanted to continue in the case as a party and to be able to

8  participate in the hearing.  But at no point has it taken a

9  position adverse to the corporations.  And in opposing the

10 plaintiffs' motion, we never indicated that there was an

11 adverse position; and there hasn't been an adverse position

12 taken.

13         As the Court has seen in the various filings in the

14 hearings, the trust has joined in a number of motions by the

15 corporations, and the trust is joined in the expert

16 designation that was subject of the motion that the Court

17 heard earlier today.  And so, the positions taken by the

18 trust have been consistent with those of the corporations to

19 date; and there's no reason to think that that would change.

20 And I have not and I'm not here today and I don't anticipate

21 taking any adverse positions in the same matter, which is

22 where a Rule 1.7(a) is directed to.

23         Now, given that there's not a conflict and there

24 hasn't been any adverse positions taken, the plaintiffs

25 really don't have standing to come before this Court and ask

42

1    Your Honor to disqualify an attorney that was chosen by the

2    defendants.  Absent a conflict of interest or other violation

3    of the rules, any party is entitled to retain the counsel of

4    its choice and doesn't have to seek permission from its

5    opposing party and doesn't have to seek permission from the

6    Court.

7         What the plaintiffs are really attempting to do here

8    is decide or have a say in or veto of a lawyer who's going to

9    represent their opposing party, and there's simply no basis

10   for that in the law.  And in terms of Steve Tsintolas'

11   authority to retain counsel and to sign an informed consent,

12   what he's done is consistent with what he's done throughout

13   the history of these corporations.  In fact, Your Honor

14   already considered this matter when the plaintiffs tried to

15   disqualify Mr. Windle as counsel.  And the Court ruled that

16   Steve Tsintolas had validly retained Mr. Windle as counsel

17   for the corporations.  And based on the same authority that

18   he hired Mr. Windle is the same authority by which he's

19   retained additional counsel and co-counsel for the

20   corporations and signed an informed consent.

21        Now, Your Honor, this is consistent with the history

22   and the practice of these corporations.  For decades now,

23   Steve Tsintolas has operated both of these corporations on a

24   daily basis.  He hired over 14 defendant lawyers to represent

25   him.  Some of those were in landlord-tenant matters.  Some

43

1  were other civil litigation matters.  And he's retained other

2  professionals:  Accountants, tax preparers, consultants.

3  He's hired vendors.

4          He's hired contractors.  He's signed all of the tax

5  returns, and he signed the distribution checks that were

6  issued to the plaintiffs that they cashed.  He has acted on

7  behalf of these corporations and made hiring decisions and

8  signed contracts on behalf of these entities now for 20 plus

9  years.  That's the history.  That's the course of conduct.

10  And not one time, until this lawsuit, have the plaintiffs

11  ever objected or raised any issue with Steve Tsintolas'

12  authority to do that.

13          Now, that course of conduct is also consistent with

14  the Property Management Agreements that we've provided to the

15  Court in our opposition, which were signed by the

16  corporations and appointed Steve Tsintolas as property

17  manager and gave him broad authority to hire professionals

18  and others as necessary for the operation of these

19  corporations.  Those agreements are still in place.  They've

20  never been rescinded, and that's an additional basis on which

21  he has authority to make decisions about retaining counsel.

22          You also have not been provided with any corporate

23  document from the plaintiffs saying that they have a right to

24  veto the lawyer for participating in the decision to hire a

25  lawyer on behalf of these corporations.  And I think, more

44

1    broadly, there's not been any authority cited that when a

2    shareholder sues a corporation for dissolution and makes

3    himself or herself an adverse party to that corporation, that

4    they then have a right to participate in the decision to hire

5    a lawyer that's going to represent their adversary in that

6    litigation.

7          The argument has been made today that I'm not able

8    to present myself as a neutral arbiter or that I'm not a

9    independent person or an appropriate lawyer who can represent

10   these corporations.  And, frankly, I really don't understand

11   their argument, and I haven't seen any basis for it.  A

12   lawyer is not an independent or neutral person.  The lawyer

13   has an obligation to zealously advocate on behalf of their

14   client.  And so, the point that I was making, Your Honor, is

15   that I don't really understand the argument that counsel is

16   supposed to be a neutral arbiter or somehow independent.

17         Mr. Windle and myself have an obligation to advocate

18   on behalf of the corporations in this valuation proceeding;

19   to advocate on behalf of the corporations as to the fair

20   value that the Court is going to decide to purchase the

21   shares from the departing shareholders.  And Mr. Windle and

22   myself would have no obligation to be neutral or independent

23   or take the position or consider the interests or advocate on

24   behalf of the interests of the plaintiffs that have sued

25   these corporations.

45

1    And so, there's no basis under the rules for the

2  Court to disqualify counsel, just as there is no basis for

3  the Court to disqualify Mr. Windle.  It's a very high

4  standard to a disqualify an attorney, and the Court would

5  have to find that there's been an actual conflict or

6  violation of the rules, which there's simply no basis for in

7  this case.

8    Absent any conflict or violation of the rules and

9  given the history and the course of conduct in terms of Steve

10  Tsintolas' role in the corporations, I mean, in fact, he's

11  going to testify as the corporate designee for these

12  corporations that he is the person who makes decisions and

13  acts on behalf of these corporations.  And so, in light of

14  those facts, we would ask the Court to deny the motion and

15  allow me to represent both the trust and the corporations in

16  this case, which do not have adverse positions, and to assist

17  Mr. Windle as co-counsel in that role.

18    THE COURT:  Thank you.  Mr. Pavlides, final word,

19  please, or Mr. Garcia?

20    MR. GARCIA:  Yes, yes.  First, Your Honor, I would

21  begin with Mr. Windle's statement -- and, first of all, I do

22  wish Mr. Windle good health -- but second of all he

23  referenced his retainer agreement.  Your Honor, that has

24  never been produced.  So I'd ask Your Honor to pay no

25  deference to those statements.  And regardless of what this

46

1  purported retainer agreement says, it can't overcome what the

2  D.C. Rules of Professional Conduct states.

3          Regardless of whether there is a conflict -- which,

4  Your Honor, we allege that there is because of the previous

5  statement that the Cassandra Tsintolas Johnson Revocable

6  Trust has made -- the corporate act is the real issue here.

7  As Mr. Creed just testified, Miss Cassandra Tsintolas Johnson

8  is an interested party in this specific transaction.  She

9  would have to abstain from that decision-making.

10         Therefore, it's even more of an issue through a

11  25-percent shareholder in this business alone could make a

12  decision that's objected to by 50-percent shareholders of

13  this corporation.  Mr. Creed referenced Your Honor's prior

14  ruling with regards to Mr. Windle, and the situation before

15  us is remarkably distinct.  In your July 1st, 2020, order,

16  Your Honor stated, "The Court determined that, at the time

17  Attorney Windle was retained, it was duly-authorized

18  corporate action.  The year was 2001.  From that time through

19  the present, he has been corporate counsel retained by the

20  duly-authorized corporate agent, Efstratios Tsintolas."

21         There's no evidence in all of these years that the

22  corporation has changed or attempted to change the status

23  quo.  So, Mr. Creed is correct:  There has been other

24  attorneys retained by the corporation, and

25  Mr. Steve Tsintolas may have made those elections to retain

47

1   those.  But he also identified an important caveat:  All of

2   those were done without the objection of plaintiffs.  And in

3   this case, there was an immediate objection of the

4   plaintiffs.

5           So we have a situation that is distinct from all of

6   those previous representations when they were engaged.  Now

7   we have a situation where we have a deadlocked board.

8   There's no corporate documents.  So this Court must assume

9   the default rules.  The majority, as necessary, in order to

10  do a valid, corporate act.  You don't have that.  There

11  cannot be an authorization to waive the conflict of interest

12  for this dual representation by the corporations.  It is

13  distinct from what has happened in the past.

14          One more thing, if I may, Your Honor?

15          THE COURT:  Yes, you may.

16          MR. GARCIA:  Okay.  The reference to the Property

17  Management Agreement is an entire red herring.  There is no

18  issue with regards to the management of the property itself,

19  which is what that entails.  This is a corporate business

20  issue.  This would deal with the operating agreements of the

21  business and whether Mr. Steve Tsintolas is authorized over

22  the objection of 50 percent of the shareholders to retain a

23  return to the corporation.  So, therefore, since there is no

24  authorized corporate act, Mr. Creed cannot be retained as

25  co-counsel for the corporations.

48

1       THE COURT:   Thank you.

2             Very well.   I have both sides of the argument.   I'll

3    begin by indicating that when the corporate admitted

4    Mr. Windle to remain as corporate counsel, I said then we

5    were dealing with the status quo, as Mr. Garcia indicated,

6    when there be no objection throughout those years.   And this

7    is a different situation.   I agree with Mr. Garcia.

8             This is an objection by the corporate board, and we

9    have a deadlocked corporation.   And so, under those

10   circumstances, without that corporate action and their being

11   deadlocked, that would just not be permissible.   I do see a

12   conflict, and I think about it as imagine me being Sandy.

13   And my corporation is going to purchase my shares from me.

14   And by the way, let me have my attorney sit on that side

15   there, too, so that I can get the best possible price.

16            The attorney may not violate his code of ethics, but

17   it just doesn't look right.   The appearances are just not

18   appropriate.   And as indicated by Mr. Garcia, when in doubt,

19   the law favors qualifying.   So for all of those reasons

20   stated by the plaintiffs, the Motion to Disqualify is

21   granted.   However, let me make something else clear:   That

22   does not mean that Mr. Windle is not permitted to have legal

23   assistance.

24            It would be totally unjust to not permit the

25   corporation to have the legal counsel that it believes it

49

1   needs to have in order to appropriately prosecute this merit,

2   but it would have to be someone outside of the realm of

3   Mr. Creed.  It'll have to be someone that would have to be

4   not apparently in conflict, as it would seem here.  Any

5   questions on that?

6              MR. GARCIA:  Thank you, Your Honor.

7              THE COURT:  Very well.  I think my time is up.  I

8   have other matters.  The parties are now in the posture to

9   proceed to those depositions, I believe; is that correct?

10             MR. WINDLE:  Yes, Your Honor.

11             THE COURT:  If there's nothing further, I will

12  excuse the parties.  There may be down the road further

13  motions, hearings, or status hearings.  But, at this point,

14  I'm not going to schedule anything; and we'll come back at a

15  later time.  Thank you very much, everyone.

16             (Proceedings concluded at 4:02 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3

 4            I, GARY BOND, an Official Court Reporter

 5  in and for the Superior Court of the District of Columbia,

 6  hereby certify that at said time and place I reported in

 7  my official capacity by means of machine shorthand all

 8  testimony adduced and other oral proceedings had in the

 9  matter of FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST, ET AL.

10  vs. TSINTOLAS INVESTMENTS, INC., ET AL., case number 2019 CAB

11  7057, in said court on the 3rd day of June, 2021.

12            I further certify that the foregoing pages, 1

13  through 50, constitute the official transcript of said

14  proceedings, as taken from my shorthand notes, and that

15  it is a correct and accurate record of said proceedings.

16            WITNESS my hand at Washington, D.C., this 9th day

17  of June, 2021.

18

19

20

21

22         _____

23         Gary Bond
           Official Court Reporter
24

25
```

# EXHIBIT 4

**Olympia Investments, Inc.**

**Written Consent of the Shareholders**

Dated as of October 13, 2023

Pursuant to the provisions of Section 29-305.04(a) of the District of Columbia Business Corporation Act of 2010 (the "***Act***"), the undersigned holders (the "***Shareholders***") of all of the outstanding shares of Olympia Investments, Inc., a District of Columbia corporation (the "***Company***") having the right to vote as shareholders of the Company, do hereby vote for, adopt, approve, ratify and consent to the adoption of the following actions and resolutions by written consent (this "***Written Consent***") in lieu of a meeting of the Shareholders of the Company and direct that this Written Consent be filed in the minute books of the Company:

## I.     <u>Removal and Appointment of Directors</u>

**WHEREAS**, prior to the entry of the Order (defined below), the shareholders of the Company consisted of: (1) Christofilos Elias Tsintolas and Deborah Gargani Tsintolas, as tenants by the entirety ("***Chris***"), (2) the Fotini Tsintolas Economides Revocable Trust ("***Fotini***" and together with Chris, "***Petitioners***"), (3) Efstratios D. Tsintolas and Suzanne Marie Tsintolas as tenants by the entirety ("***Steve***"), and (4) the Cassandra Tsintolas Johnson Revocable Trust (the "***Cassandra Trust***");

**WHEREAS**, on October 24, 2019, the Petitioners filed a petition for judicial dissolution of the Company pursuant to Section 29-312.20 of the Act;

**WHEREAS**, on January 21, 2020 the Company elected to purchase the shares of Petitioners instead of dissolving the Company in accordance with Section 29-312.24 of the Act;

**WHEREAS**, the Company and Petitioners were not able to reach an agreement about the fair value of the Petitioners' shares and as a result, pursuant to Section 29-312.24(d) of the Act, the Superior Court of the District of Columbia, Civil Division (the "***Court***"), began a proceeding to determine the fair value of the Petitioner's shares;

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division, issued an order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Company in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, effective upon the issuance of the Order, due to the operation of Section 29-312.24(f) of the Act, the Petitioners no longer had any rights or status as shareholders of the Company and Steve and the Sandy Trust became the sole shareholders having rights or status as shareholders of the Company;

**WHEREAS**, the Shareholders desire to exercise their rights under Section 29-306.08(a) to remove Christofilos Elias Tsintolas and Fotini Tsintolas Economides from the board of directors (the "***Board***") of the Company;

**WHEREAS**, after the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, the remaining directors on the Board will be Steve and Cassandra Johnson; and

**WHEREAS**, the Shareholders desire elect Suzanne Tsintolas as director to fill one of the vacancies created by the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, with Ms. Tsintolas to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death.

**NOW, THEREFORE, BE IT RESOLVED**, that the Shareholders hereby remove Fotini Tsintolas Economides and Christofilos Tsintolas from the Board;

**FURTHER RESOLVED**, that the Shareholders hereby appoint Suzanne Tsintolas as a director to serve on the Board, to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death;

**FURTHER RESOLVED**, that after the appointment of Suzanne Tsintolas to the Board, the individuals serving on the Board shall consist of:

Efstratios Tsintolas
Cassandra Johnson
Suzanne Tsintolas

## II.    <u>Enabling Resolutions</u>

**FURTHER RESOLVED**, that officers of the Company, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Company;

**FURTHER RESOLVED,** that all actions taken by the Company and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Company to the same extent as if taken subsequent to the adoption of the above resolutions; and

DocuSign Envelope ID: 9B44A026-5127-4B43-8F04-83EFBB26C0A1

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent effective on and as of the date first written above.

**SHAREHOLDERS:**

As tenants by the entirety:

_Efstratios Tsintolas_
_____
Efstratios Tsintolas

_Suzanne Tsintolas_
_____
Suzanne Marie Tsintolas


THE CASSANDRA TSINTOLAS JOHNSON REVOCABLE TRUST

_Cassandra Tsintolas Johnson_
By: _____
Cassandra Tsintolas Johnson, Trustee

*[Written consent of the Shareholders of Olympia Investments, Inc.]*

# EXHIBIT 5

**Tsintolas Investments, Incorporated**

**Written Consent of the Shareholders**

Dated as of October 13, 2023

Pursuant to the provisions of Section 29-305.04(a) of the District of Columbia Business Corporation Act of 2010 (the "***Act***"), the undersigned holders (the "***Shareholders***") of all of the outstanding shares of Tsintolas Investments, Incorporated, a District of Columbia corporation (the "***Company***") having the right to vote as shareholders of the Company, do hereby vote for, adopt, approve, ratify and consent to the adoption of the following actions and resolutions by written consent (this "***Written Consent***") in lieu of a meeting of the Shareholders of the Company and direct that this Written Consent be filed in the minute books of the Company:

## I.    Removal and Appointment of Directors

**WHEREAS**, prior to the entry of the Order (defined below), the shareholders of the Company consisted of: (1) Christofilos Elias Tsintolas and Deborah Gargani Tsintolas, as tenants by the entirety ("***Chris***"), (2) the Fotini Tsintolas Economides Revocable Trust ("***Fotini***" and together with Chris, "***Petitioners***"), (3) Efstratios D. Tsintolas and Suzanne Marie Tsintolas as tenants by the entirety ("***Steve***"), and (4) the Cassandra Tsintolas Johnson Revocable Trust (the "***Cassandra Trust***");

**WHEREAS**, on October 24, 2019, the Petitioners filed a petition for judicial dissolution of the Company pursuant to Section 29-312.20 of the Act;

**WHEREAS**, on January 21, 2020 the Company elected to purchase the shares of Petitioners instead of dissolving the Company in accordance with Section 29-312.24 of the Act;

**WHEREAS**, the Company and Petitioners were not able to reach an agreement about the fair value of the Petitioners' shares and as a result, pursuant to Section 29-312.24(d) of the Act, the Superior Court of the District of Columbia, Civil Division (the "***Court***"), began a proceeding to determine the fair value of the Petitioner's shares;

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division, issued an order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Company in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, effective upon the issuance of the Order, due to the operation of Section 29-312.24(f) of the Act, the Petitioners no longer had any rights or status as shareholders of the Company and Steve and the Sandy Trust became the sole shareholders having rights or status as shareholders of the Company;

**WHEREAS**, the Shareholders desire to exercise their rights under Section 29-306.08(a) to remove Christofilos Elias Tsintolas and Fotini Tsintolas Economides from the board of directors (the "***Board***") of the Company;

DocuSign Envelope ID: 9B44A92E-5127-4B43-8E04-83EEBB26C0A1

**WHEREAS**, after the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, the remaining directors on the Board will be Steve and Cassandra Johnson; and

**WHEREAS**, the Shareholders desire elect Suzanne Tsintolas as director to fill one of the vacancies created by the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, with Ms. Tsintolas to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death.

**NOW, THEREFORE, BE IT RESOLVED**, that the Shareholders hereby remove Fotini Tsintolas Economides and Christofilos Tsintolas from the Board;

**FURTHER RESOLVED**, that the Shareholders hereby appoint Suzanne Tsintolas as a director to serve on the Board, to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death;

**FURTHER RESOLVED**, that after the appointment of Suzanne Tsintolas to the Board, the individuals serving on the Board shall consist of:

Efstratios Tsintolas
Cassandra Tsintolas Johnson
Suzanne Tsintolas

## II.    <u>Enabling Resolutions</u>

**FURTHER RESOLVED**, that officers of the Company, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Company;

**FURTHER RESOLVED,** that all actions taken by the Company and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Company to the same extent as if taken subsequent to the adoption of the above resolutions; and

     **FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent effective on and as of the date first written above.

**SHAREHOLDERS:**

As tenants by the entirety:

*Efstratios Tsintolas*
Efstratios Tsintolas

*Suzanne Tsintolas*
Suzanne Marie Tsintolas


THE CASSANDRA TSINTOLAS JOHNSON REVOCABLE TRUST

By: *Cassandra Tsintolas Johnson*
Cassandra Tsintolas Johnson, Trustee

*[Written consent of the Shareholders of Tsintolas Investments, Incorporated]*

# EXHIBIT 6

## Olympia Investments, Inc.

### Written Consent of the Board of Directors

Dated as of October 13, 2023

The undersigned, constituting the members of the board of directors (the **"Board"**) of Olympia Investments, Inc., a District of Columbia corporation (the **"Corporation"**), hereby take the following actions and adopt the following resolutions by unanimous written consent (this **"Written Consent"**), without a meeting, pursuant to Section 29-306.21 of the District of Columbia Business Corporation Act of 2010 (the **"Act"**), and hereby waive all notice of a meeting and the holding of any meeting to act upon such resolutions:

### I.    Appointment of Officers

**WHEREAS**, the Board desires to elect officers of the Corporation,

**NOW THEREFORE, BE IT RESOLVED**, that each of the following persons are hereby elected by the Board to the offices of the Corporation set forth opposite their respective names below, with each such person to serve in such offices until his or her successor is duly elected and qualified or until his or her death, resignation, or removal:

| | |
|---|---|
| President | Efstratios Tsintolas |
| Treasurer | Cassandra Tsintolas Johnson |
| Secretary | Suzanne Tsintolas |

### II.    Bylaws

**WHEREAS**, there has been presented to the Board a form of Bylaws for the regulation of the affairs of the Corporation, a copy of which is attached hereto as Exhibit A; and

**WHEREAS**, it is deemed to be in the best interests of the Corporation that said Bylaws be adopted by this Board as the Bylaws of the Corporation.

**NOW, THEREFORE, BE IT RESOLVED**, that Bylaws in the form presented to the Board and attached hereto as Exhibit A are adopted and approved as the Bylaws of the Corporation until amended or repealed in accordance with applicable law; and

**IT IS FURTHER RESOLVED**, that the Secretary of the Corporation is authorized and directed to execute a certificate of the adoption of said Bylaws, to enter said Bylaws as so certified in the Minute Book of the Corporation, and to see that a copy of said Bylaws is kept at the principal executive or business office of the Corporation.

### III.  **Dissolution**

**WHEREAS**, prior to the entry of the Order (as defined below), the shareholders of the Corporation consisted of: (1) Christofilos Tsintolas and Deborah Tsintolas as tenants by the entirety (collectively, "**Chris**"), (2) the Fotini Tsintolas Economides Revocable Trust ("***Fotini Trust***" and together with Chris, the "***Petitioners***"), (3) Efstratios Tsintolas and Suzanne Tsintolas, as tenants by the entirety ("***Steve***"), and (4) the Cassandra Tsintolas Johnson Revocable Trust (the "***Cassandra Trust***");

**WHEREAS**, on October 24, 2019, the Petitioners filed a petition for judicial dissolution of the Corporation pursuant to Section 29-312.20 of the Act;

**WHEREAS**, on January 21, 2020 the Corporation elected to purchase the Petitioners' shares instead of dissolving the Corporation in accordance with Section 29-312.24 of the Act;

**WHEREAS**, the Corporation and Petitioners were not able to reach an agreement about the fair value of the Petitioners' shares and as a result, pursuant to Section 29-312.24(d) of the Act, the Superior Court of the District of Columbia, Civil Division (the "***Court***"), began a proceeding to determine the fair value of the Petitioner's shares;

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division ("**Judge Williams**") completed the order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Corporation in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, effective immediately upon the issuance of the Order, due to the operation of Section 29-312.24(f) of the Act, the Petitioners no longer had any rights or status as shareholders of the Corporation and Steve and the Sandy Trust became the sole shareholders having rights or status as shareholders of the Corporation;

**WHEREAS**, pursuant to Section 29-312.24(g) of the Act, the Corporation is required to pay the Petitioners the fair value for their shares within 10 days after the date the Court's order becomes final unless before that time the Corporation files with the Superior Court a notice of its intention to adopt articles of dissolution pursuant to Sections 29-312.02 and 29-312.03;

**WHEREAS**, the Board has determined it to be in the best interests of the Corporation and its shareholders to declare its intent to adopt articles of dissolution for the Corporation pursuant to Section 29-312.24(g) of the Act in lieu of paying the fair value of the shares to the Petitioners;

**NOW, THEREFORE, BE IT RESOLVED**, that, upon approval from the requisite shareholders, the Board authorizes any officer of the Corporation to file the notice attached hereto as <u>Exhibit B</u> with the Superior Court of its intention to adopt articles of dissolution pursuant to Sections 29-312.02 and 29-312.03;

IV.     **Enabling Resolutions**

**FURTHER RESOLVED**, that officers of the Corporation, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation;

**FURTHER RESOLVED,** that all actions taken by the Corporation and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Corporation to the same extent as if taken subsequent to the adoption of the above resolutions; and

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent effective on and as of the date first written above.

**DIRECTORS:**

Efstratios Tsintolas

Cassandra Tsintolas Johnson

Suzanne Tsintolas

*[Written consent of the Board of Directors of Olympia Investments, Inc.]*

**<u>EXHIBIT A</u>**

Bylaws

*[Written consent of the Board of Directors of Olympia Investments, Inc.]*

**BYLAWS**
**OF**
**OLYMPIA INVESTMENTS, INC.**

**ARTICLE I**
**OFFICES**

     **Section 1.01 Offices.** The address of the registered office of Olympia Investments, Inc. (hereinafter called the "**Corporation**") in the District of Columbia shall be at 3520 Connecticut Avenue, NW, Washington, DC 20008. The Corporation may have other offices, both within and without the District of Columbia, as the board of directors of the Corporation (the "**Board of Directors**") from time to time shall determine or the business of the Corporation may require.

     **Section 1.02 Books and Records.** Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be maintained on any information storage device or method; *provided that* the records so kept can be converted into clearly legible paper form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

**ARTICLE II**
**MEETINGS OF THE STOCKHOLDERS**

     **Section 2.01 Place of Meetings.** All meetings of the stockholders shall be held at such place, if any, either within or without the District of Columbia, as shall be designated from time to time by resolution of the Board of Directors and stated in the notice of meeting.

     **Section 2.02 Annual Meeting.** The annual meeting of the stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held at such date, time and place, if any, as shall be determined by the Board of Directors and stated in the notice of the meeting.

     **Section 2.03 Special Meetings.** Special meetings of stockholders for any purpose or purposes shall be called pursuant to a resolution approved by the Board of Directors and may not be called by any other person or persons. The only business which may be conducted at a special meeting shall be the matter or matters set forth in the notice of such meeting.

     **Section 2.04 Adjournments.** Any meeting of the stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time, place, if any, thereof and the means of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date is fixed for stockholders entitled to vote at the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting

and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

**Section 2.05 Notice of Meetings.** Notice of the place, if any, date, hour, the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and means of remote communication, if any, of every meeting of stockholders shall be given by the Corporation not less than ten (10) days nor more than sixty (60) days before the meeting (unless a different time is specified by law) to every stockholder entitled to vote at the meeting as of the record date for determining the stockholders entitled to notice of the meeting. Notices of special meetings shall also specify the purpose or purposes for which the meeting has been called. Except as otherwise provided herein or permitted by applicable law, notice to stockholders shall be in writing and delivered personally or mailed to the stockholders at their address appearing on the books of the Corporation. Without limiting the manner by which notice otherwise may be given effectively to stockholders, notice of meetings may be given to stockholders by means of electronic transmission in accordance with applicable law. Notice of any meeting need not be given to any stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

**Section 2.06 List of Stockholders.** The officer of the Corporation who has charge of the stock ledger shall prepare a complete list of the stockholders entitled to vote at any meeting of stockholders (*provided, however*, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares of each class of capital stock of the Corporation registered in the name of each stockholder at least ten (10) days before any meeting of the stockholders. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network if the information required to gain access to such list was provided with the notice of the meeting or during ordinary business hours, at the principal place of business of the Corporation for a period of at least ten (10) days before the meeting. If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting the whole time thereof and may be inspected by any stockholder who is present. If the meeting is held solely by means of remote communication, the list shall also be open for inspection by any stockholder during the whole time of the meeting as provided by applicable law. Except as provided by applicable law, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

**Section 2.07 Quorum.** Unless otherwise required by law, the Corporation's Articles of Incorporation (the "**Articles of Incorporation**") or these Bylaws, at each meeting of the stockholders, a majority in voting power of the shares of the Corporation entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power, by the

affirmative vote of a majority in voting power thereof, to adjourn the meeting from time to time, in the manner provided in <u>Section 2.04</u>, until a quorum shall be present or represented. A quorum, once established, shall not be broken by the subsequent withdrawal of enough votes to leave less than a quorum. At any such adjourned meeting at which there is a quorum, any business may be transacted that might have been transacted at the meeting originally called.

**Section 2.08 Conduct of Meetings.** The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of the stockholders as it shall deem appropriate. At every meeting of the stockholders, the Chairman of the Board, when present, or in his or her absence or inability to act, the Chief Executive Officer or President, or in his or her absence or inability to act, the person whom the Chief Executive Officer or President shall appoint, shall act as chairman of, and preside at, the meeting. The Secretary or, in his or her absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting, shall act as secretary of the meeting and keep the minutes thereof. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (c) rules and procedures for maintaining order at the meeting and the safety of those present; (d) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (e) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (f) limitations on the time allotted to questions or comments by participants.

**Section 2.09 Voting; Proxies.** Unless otherwise required by law or the Articles of Incorporation the election of directors shall be decided by a plurality of the votes cast at a meeting of the stockholders by the holders of stock entitled to vote in the election. Unless otherwise required by law, the Articles of Incorporation or these Bylaws, any matter, other than the election of directors, brought before any meeting of stockholders shall be decided by the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the matter. Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot.

**Section 2.10 Inspectors at Meetings of Stockholders.** The Board of Directors, in advance of any meeting of stockholders, may, and shall if required by law, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and

make a written report thereof. The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting, the existence of a quorum and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties. Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the District of Columbia upon application by a stockholder shall determine otherwise. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for office at an election may serve as an inspector at such election.

**Section 2.11 Written Consent of Stockholders Without a Meeting.** Any action to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered (by hand, by certified, by registered mail, return receipt requested, or by facsimile, e-mail or by other means of electronic transmission) to the Corporation by delivery to its registered office in the District of Columbia, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded, or to facsimile number or e-mail address specified by the Corporation. Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section 2.11, written consents signed by a sufficient number of holders to take action are delivered to the Corporation as aforesaid. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall, to the extent required by applicable law, be given to those stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

**Section 2.12 Fixing the Record Date.**

(a)    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the

4

record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,* that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote therewith at the adjourned meeting.

(b)   In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting: (i) when no prior action by the Board of Directors is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery (by hand, or by certified or registered mail, return receipt requested) to its registered office in the District of Columbia, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded and (ii) if prior action by the Board of Directors is required by law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)   In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**ARTICLE III**
**BOARD OF DIRECTORS**

**Section 3.01 General Powers.** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The Board of Directors may adopt such rules and procedures, not inconsistent with the Articles of Incorporation, these Bylaws or

applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

**Section 3.02 Number; Term of Office.** The authorized number of directors of the Corporation shall be fixed by the Board of Directors from time to time. Directors need not be stockholders unless so required by the Articles of Incorporation. If for any cause, the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient. The Board of Directors shall initially consist of three (3) directors. Each Director shall hold office until a successor is duly elected and qualified or until the Director's earlier death, resignation, disqualification or removal.

**Section 3.03 Newly Created Directorships and Vacancies.** Any newly created directorships resulting from an increase in the authorized number of directors and any vacancies occurring in the Board of Directors, not otherwise filled pursuant to a Voting Agreement, if any, may be filled by the affirmative votes of a majority of the remaining members of the Board of Directors, although less than a quorum, or by a sole remaining director. A director so elected shall be elected to hold office until the earlier of the expiration of the term of office of the director whom he or she has replaced, a successor is duly elected and qualified or the earlier of such director's death, resignation or removal.

**Section 3.04 Resignation.** Any director may resign at any time by notice given in writing or by electronic transmission to the Corporation. Such resignation shall take effect at the date of receipt of such notice by the Corporation or at such later time as is therein specified.

**Section 3.05 Removal.** Except as prohibited by applicable law, the Articles of Incorporation, or a Voting Agreement, if any, the stockholders entitled to vote in an election of directors may remove any director from office at any time, with or without cause, by the affirmative vote of a majority in voting power thereof.

**Section 3.06 Fees and Expenses.** Directors shall receive such fees and expenses as the Board of Directors shall from time to time prescribe.

**Section 3.07 Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such times and at such places as may be determined from time to time by the Board of Directors or its chairman.

**Section 3.08 Special Meetings.** Special meetings of the Board of Directors may be held at such times and at such places as may be determined by the chairman or the Chief Executive Officer or President on at least 24 hours' notice to each director given by one of the means specified in Section 3.11 hereof other than by mail or on at least three (3) days' notice if given by mail. Special meetings shall be called by the chairman or the Chief Executive Officer or President in like manner and on like notice on the written request of any two or more directors.

**Section 3.09 Meetings by Electronic Communications Equipment.** Board of Directors or Board of Directors committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other and be heard. Participation by a director in a meeting pursuant to this Section 3.09 shall constitute presence in person at such meeting.

DocuSign Envelope ID: 5B44C026-E127-4B43-8E04-83EEBB26C0A1

**Section 3.10 Adjourned Meetings.** A majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place. At least 24 hours' notice of any adjourned meeting of the Board of Directors shall be given to each director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in Section 3.11 hereof other than by mail, or at least three (3) days' notice if by mail. Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

**Section 3.11 Notices.** Subject to Section 3.08, Section 3.10 and Section 3.12 hereof, whenever notice is required to be given to any director by applicable law, the Articles of Incorporation or these Bylaws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such director at such director's address as it appears on the records of the Corporation, facsimile, e-mail or by other means of electronic transmission.

**Section 3.12 Waiver of Notice.** Whenever notice to directors is required by applicable law, the Articles of Incorporation or these Bylaws, a waiver thereof, in writing signed by, or by electronic transmission by, the director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice. Attendance by a director at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special Board of Directors or committee meeting need be specified in any waiver of notice.

**Section 3.13 Organization.** At each meeting of the Board of Directors, the chairman or, in his or her absence, the Chief Executive Officer or President of the Corporation, if also a director of the Corporation or, in his or her absence, another director selected by the Board of Directors shall preside. The Secretary shall act as secretary at each meeting of the Board of Directors. If the Secretary is absent from any meeting of the Board of Directors, an assistant secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all assistant secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

**Section 3.14 Quorum of Directors.** The presence of a majority of the Board of Directors shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board of Directors.

**Section 3.15 Action by Majority Vote.** Except as otherwise expressly required by these Bylaws, the Articles of Incorporation or by applicable law, the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 3.16 Action Without Meeting.** Unless otherwise restricted by the Articles of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all directors or members of such committee, as the case may be, consent thereto in writing or by electronic

transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee in accordance with applicable law.

**Section 3.17 Committees of the Board of Directors.** The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board of Directors. Unless the Board of Directors provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Each committee shall keep regular minutes of its meetings. Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III.

## ARTICLE IV
## OFFICERS

**Section 4.01 Positions and Election.** The officers of the Corporation shall be elected by the Board of Directors and shall include a Chief Executive Officer and/or President, a Treasurer and a Secretary. The Board of Directors, in its discretion, may also elect a chairman (who must be a director), one or more vice chairmen (who must be directors) and one or more vice presidents, assistant treasurers, assistant secretaries and other officers. Any two or more offices may be held by the same person.

**Section 4.02 Term.** Each officer of the Corporation shall hold office until such officer's successor is elected and qualified or until such officer's earlier death, resignation or removal. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors at any time with or without cause by the majority vote of the members of the Board of Directors then in office. The removal of an officer shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer shall not of itself create contract rights. Any officer of the Corporation may resign at any time by giving written notice of his or her resignation to the Chief Executive Officer or President or the Secretary. Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Should any vacancy occur among the officers, the position shall be filled for the unexpired portion of the term by appointment made by the Board of Directors.

**Section 4.03 The Chief Executive Officer and/or President.** The Chief Executive Officer and/or President shall have general supervision over the business of the Corporation and other duties incident to the office of Chief Executive Officer and/or President, and any other duties as may be from time to time assigned to the Chief Executive Officer and/or President by the Board of Directors and subject to the control of the Board of Directors in each case. For purposes of clarity, if the Corporation has a separate Chief Executive Officer and President, the Chief Executive Officer shall be first-in-command and the President shall be second-in-command.

**Section 4.04 Vice Presidents.** Each Vice President shall have such powers and perform such duties as may be assigned to him or her from time to time by the chairman of the Board of Directors or the Chief Executive Officer or President.

**Section 4.05 The Secretary.** The Secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform like duties for committees when required. He or she shall give, or cause to be given, notice of all meetings of the stockholders and meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the Chief Executive Officer or President. The Secretary shall keep in safe custody the seal of the Corporation and have authority to affix the seal to all documents requiring it and attest to the same.

**Section 4.06 The Treasurer.** The Treasurer shall have the custody of the corporate funds and securities, except as otherwise provided by the Board of Directors, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer or President and the directors, at the regular meetings of the Board of Directors, or whenever they may require it, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation.

**Section 4.07 Duties of Officers May Be Delegated.** In case any officer is absent, or for any other reason that the Board of Directors may deem sufficient, the Chief Executive Officer or President or the Board of Directors may delegate for the time being the powers or duties of such officer to any other officer or to any director.

## ARTICLE V
## STOCK CERTIFICATES AND THEIR TRANSFER

**Section 5.01 Certificates Representing Shares.** The shares of stock of the Corporation shall be represented by certificates (which certificates may be delivered and maintained electronically); provided that the Board of Directors may provide by resolution or resolutions that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock. If shares are represented by certificates, such certificates shall be in the form, other than bearer form, approved by the Board of Directors. The certificates representing shares of stock of each class shall be signed by, or in the name of, the Corporation by the chairman, any vice chairman, the Chief Executive Officer or President or any

Vice President, and by the Secretary, any assistant secretary, the Treasurer or any assistant treasurer. Any or all such signatures may be facsimiles. Although any officer, transfer agent or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were still such at the date of its issue.

   **Section 5.02 Transfers of Stock.** Stock of the Corporation shall be transferable in the manner prescribed by law, in these Bylaws and in either the Company's Stockholders Agreement, or the Company's Voting Agreement, Investors' Rights Agreement and Right of First Refusal and Co-Sale Agreement, if any. Transfers of stock shall be made on the books of the Corporation, if any, only by the holder of record thereof, by such person's attorney lawfully constituted in writing and, in the case of certificated shares, upon the surrender of the certificate thereof, which shall be cancelled before a new certificate or uncertificated shares shall be issued. No Transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred. To the extent designated by the Chief Executive Officer or President or any Vice President or the Treasurer of the Corporation, the Corporation may recognize the Transfer of fractional uncertificated shares, but shall not otherwise be required to recognize the Transfer of fractional shares.

   **Section 5.03 Transfer Agents and Registrars.** The Board of Directors may appoint, or authorize any officer or officers to appoint, one or more transfer agents and one or more registrars.

   **Section 5.04 Lost, Stolen or Destroyed Certificates.** The Board of Directors may direct a new certificate or uncertificated shares to be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed upon the making of an affidavit of that fact by the owner of the allegedly lost, stolen or destroyed certificate. When authorizing such issue of a new certificate or uncertificated shares, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of the lost, stolen or destroyed certificate, or the owner's legal representative to give the Corporation a bond sufficient to indemnify it against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed or the issuance of such new certificate or uncertificated shares.

   **Section 5.05 Restrictions on Transfer.**

   (a) *General Restriction*. No holder of any of the shares of Common Stock of the Corporation may sell, transfer, assign, pledge, or otherwise dispose of or encumber any of the shares of Common Stock of the Corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise (each, a "**Transfer**") without the prior written consent of the Corporation, upon duly authorized action of its Board of Directors. The Corporation may withhold consent for any legitimate corporate purpose, as determined by the Board of Directors. Examples of the basis for the Corporation to withhold its consent include, without limitation, (i) if such Transfer to individuals, companies or any other form of entity identified by the Corporation as a potential competitor or considered by the Corporation to be unfriendly; or (ii) if such Transfer increases the risk of the Corporation having a class of security held of record by two thousand (2,000) or more persons, or five hundred (500) or more persons who are not

accredited investors (as such term is defined by the SEC), as described in Section 12(g) of the 1934 Act and any related regulations, or otherwise requiring the Corporation to register any class of securities under the 1934 Act; or (iii) if such Transfer would result in the loss of any federal or state securities law exemption relied upon by the Corporation in connection with the initial issuance of such shares or the issuance of any other securities; or (iv) if such Transfer is facilitated in any manner by any public posting, message board, trading portal, internet site, or similar method of communication, including without limitation any trading portal or internet site intended to facilitate secondary transfers of securities; or (v) if such Transfer is to be effected in a brokered transaction; or (vi) if such Transfer represents a Transfer of less than all of the shares then held by the stockholder and its affiliates or is to be made to more than a single transferee.

(b)      *Consequences of Purported Transfer.* Any Transfer, or purported Transfer, of shares of Common Stock not made in strict compliance with this Section shall be null and void, shall not be recorded on the books of the Corporation and shall not be recognized by the Corporation.

(c)      *Termination of Transfer Restriction.* The foregoing restriction on Transfer shall terminate upon the date securities of the Corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by, the SEC under the Securities Act of 1933, as amended.

(d)      *Legend.* The certificates representing shares of stock of the Corporation shall bear on their face the following legend so long as the foregoing Transfer restrictions are in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

## ARTICLE VI
## GENERAL PROVISIONS

**Section 6.01 Seal.** The seal of the Corporation shall be in such form as shall be approved by the Board of Directors. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise, as may be prescribed by law or custom or by the Board of Directors.

**Section 6.02 Fiscal Year.** The fiscal year of the Corporation shall begin on January 1 and end on December 31 of each year.

**Section 6.03 Checks, Notes, Drafts, Etc.** All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

**Section 6.04 Dividends.** Subject to applicable law and the Articles of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting of the Board of Directors. Dividends may be paid in

cash, in property or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Articles of Incorporation.

**Section 6.05 Conflict with Applicable Law or Articles of Incorporation.** These Bylaws are adopted subject to any applicable law and the Articles of Incorporation. Whenever these Bylaws may conflict with any applicable law or the Articles of Incorporation, such conflict shall be resolved in favor of such law or the Articles of Incorporation.

**Section 6.06 Governing Law.** All questions concerning the construction, validity and interpretation of these Bylaws, and all acts, transactions, rights and obligations pursuant hereto shall be governed, construed and interpreted in accordance with the laws of the District of Columbia, without giving effect to principles of conflicts of law.

# ARTICLE VII
# INDEMNIFICATION

**Section 7.01 Indemnification of Directors, Executive Officers, Other Officers, Employees and Other Agents**.

(a)    *Directors and Executive Officers*. The Corporation shall indemnify its directors and executive officers (for the purposes of this Article VII, "*executive officers*" shall have the meaning defined in Rule 3b-7 promulgated under the Securities Exchange Act of 1934, as amended) to the fullest extent not prohibited by the Code of the District of Columbia ("**DC Code**") or any other applicable law; *provided, however*, that the Corporation may modify the extent of such indemnification by individual contracts with its directors and executive officers; and, provided, further, that the Corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the Corporation, (iii) such indemnification is provided by the Corporation, in its sole discretion, pursuant to the powers vested in the Corporation under the DC Code or any other applicable law or (iv) such indemnification is required to be made under Section 7.01(d).

(b)    *Other Officers, Employees and Other Agents*. The Corporation shall have power to indemnify its other officers, employees and other agents as set forth in the DC Code or any other applicable law. The Board of Directors shall have the power to delegate the determination of whether indemnification shall be given to any such person except executive officers to such officers or other persons as the Board of Directors shall determine.

(c)    *Expenses*. The Corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director or executive officer, of the Corporation, or is or was serving at the request of the Corporation as a director or executive officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or executive officer in connection with such proceeding; *provided, however*, that, if the DC Code requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other

DocuSign Envelope ID: 9B44A5926-5127-4B43-8F04-83EFBB26C9A1

capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section or otherwise.

Notwithstanding the foregoing, unless otherwise determined pursuant to Section 7.01(e), no advance shall be made by the Corporation to an executive officer of the Corporation (except by reason of the fact that such executive officer is or was a director of the Corporation, in which event this paragraph shall not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i) by a majority vote of a quorum consisting of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the Corporation.

(d)    *Enforcement.* Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and executive officers under this Bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the Corporation and the director or executive officer. Any right to indemnification or advances granted by this Bylaw to a director or executive officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the Corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under DC Code any other applicable law for the Corporation to indemnify the claimant for the amount claimed. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DC Code or any other applicable law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct. No Director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 29-306.31 of the DC Code, or (iv) for any transaction from which the Director derived any improper personal benefit.

(e)     *Non-Exclusivity of Rights*. The rights conferred on any person by this Bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Articles of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by DC Code or any other applicable law.

(f)     *Survival of Rights*. The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a director, or executive officer and shall inure to the benefit of the heirs, executors and administrators of such a person.

(g)     *Insurance*. To the fullest extent permitted by the DC Code, or any other applicable law, the Corporation, upon approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Bylaw.

(h)     *Amendments*. Any repeal or modification of this Bylaw shall only be prospective and shall not affect the rights under this Bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the Corporation.

(i)     *Saving Clause*. If this Bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each director and executive officer to the full extent not prohibited by any applicable portion of this Bylaw that shall not have been invalidated, or by any other applicable law. If this paragraph shall be invalid due to the application of the indemnification provisions of another jurisdiction, then the Corporation shall indemnify each director and executive officer to the full extent under applicable law.

(j)     *Certain Definitions*. For the purposes of this Bylaw, the following definitions shall apply:

(1)     The term "proceeding" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

(2)     The term "expenses" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

(3)     The term the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another

DocuSign Envelope ID: 9B44A926-5127-4B43-8E04-83EFBB28C0A1

corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Bylaw with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

(4)     References to a "director," "executive officer," "officer," "employee," or "agent" of the Corporation shall include, without limitation, situations where such person is serving at the request of the Corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

(5)     References to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Bylaw.

**ARTICLE VIII**
**AMENDMENTS**

**Section 8.01 Amendments.** These Bylaws may be amended, altered, changed, adopted and repealed or new bylaws adopted by the Board of Directors. The stockholders may make additional bylaws and may alter and repeal any bylaws whether such bylaws were originally adopted by them or otherwise by the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

### CERTIFICATE OF SECRETARY OF
### OLYMPIA INVESTMENTS, INC.

    The undersigned, Suzanne Tsintolas, hereby certifies that she is the duly elected and acting Secretary of Olympia Investments, Inc., a District of Columbia corporation (the "**Corporation**"), and that the Bylaws attached hereto constitute the Bylaws of said Corporation as duly adopted by Action by Written Consent by the Directors as of October 13, 2023.

    **IN WITNESS WHEREOF**, the undersigned has hereunto subscribed her name as of this 13th day of October, 2023.

DocuSigned by:

*Suzanne Tsintolas*

By: _____
B469706D78584FD

Suzanne Tsintolas, Secretary

**EXHIBIT B**
**NOTICE OF INTENT**

*[Written consent of the Board of Directors of Olympia Investments, Inc.]*

# EXHIBIT 7

## Tsintolas Investments, Incorporated

## Written Consent of the Board of Directors

Dated as of October 13, 2023

The undersigned, constituting the members of the board of directors (the **"Board"**) of Tsintolas Investments, Incorporated, a District of Columbia corporation (the **"Corporation"**), hereby take the following actions and adopt the following resolutions by unanimous written consent (this **"Written Consent"**), without a meeting, pursuant to Section 29-306.21 of the District of Columbia Business Corporation Act of 2010 (the **"Act"**), and hereby waive all notice of a meeting and the holding of any meeting to act upon such resolutions:

### I.    Appointment of Officers

**WHEREAS**, the Board desires to elect officers of the Corporation,

**NOW THEREFORE, BE IT RESOLVED**, that each of the following persons are hereby elected by the Board to the offices of the Corporation set forth opposite their respective names below, with each such person to serve in such offices until his or her successor is duly elected and qualified or until his or her death, resignation, or removal:

| | |
|---|---|
| President | Efstratios Tsintolas |
| Treasurer | Cassandra Tsintolas Johnson |
| Secretary | Suzanne Tsintolas |

### II.    Bylaws

**WHEREAS**, there has been presented to the Board a form of Bylaws for the regulation of the affairs of the Corporation, a copy of which is attached hereto as Exhibit A; and

**WHEREAS**, it is deemed to be in the best interests of the Corporation that said Bylaws be adopted by this Board as the Bylaws of the Corporation.

**NOW, THEREFORE, BE IT RESOLVED**, that Bylaws in the form presented to the Board and attached hereto as Exhibit A are adopted and approved as the Bylaws of the Corporation until amended or repealed in accordance with applicable law; and

**IT IS FURTHER RESOLVED**, that the Secretary of the Corporation is authorized and directed to execute a certificate of the adoption of said Bylaws, to enter said Bylaws as so certified in the Minute Book of the Corporation, and to see that a copy of said Bylaws is kept at the principal executive or business office of the Corporation.

### III.   <u>Dissolution</u>

**WHEREAS**, prior to the entry of the Order (as defined below), the shareholders of the Corporation consisted of: (1) Christofilos Tsintolas and Deborah Tsintolas as tenants by the entirety (collectively, "**Chris**"), (2) the Fotini Tsintolas Economides Revocable Trust ("***Fotini Trust***" and together with Chris, the "***Petitioners***"), (3) Efstratios Tsintolas and Suzanne Tsintolas, as tenants by the entirety ("***Steve***"), and (4) the Cassandra Tsintolas Johnson Revocable Trust (the "***Cassandra Trust***");

**WHEREAS**, on October 24, 2019, the Petitioners filed a petition for judicial dissolution of the Corporation pursuant to Section 29-312.20 of the Act;

**WHEREAS**, on January 21, 2020 the Corporation elected to purchase the Petitioners' shares instead of dissolving the Corporation in accordance with Section 29-312.24 of the Act;

**WHEREAS**, the Corporation and Petitioners were not able to reach an agreement about the fair value of the Petitioners' shares and as a result, pursuant to Section 29-312.24(d) of the Act, the Superior Court of the District of Columbia, Civil Division (the "***Court***"), began a proceeding to determine the fair value of the Petitioner's shares;

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division ("**Judge Williams**") completed the order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Corporation in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, effective immediately upon the issuance of the Order, due to the operation of Section 29-312.24(f) of the Act, the Petitioners no longer had any rights or status as shareholders of the Corporation and Steve and the Sandy Trust became the sole shareholders having rights or status as shareholders of the Corporation;

**WHEREAS**, pursuant to Section 29-312.24(g) of the Act, the Corporation is required to pay the Petitioners the fair value for their shares within 10 days after the date the Court's order becomes final unless before that time the Corporation files with the Superior Court a notice of its intention to adopt articles of dissolution pursuant to Sections 29-312.02 and 29-312.03;

**WHEREAS**, the Board has determined it to be in the best interests of the Corporation and its shareholders to declare its intent to adopt articles of dissolution for the Corporation pursuant to Section 29-312.24(g) of the Act in lieu of paying the fair value of the shares to the Petitioners;

**NOW, THEREFORE, BE IT RESOLVED**, that, upon approval from the requisite shareholders, the Board authorizes any officer of the Corporation to file the notice attached hereto as <u>Exhibit B</u> with the Superior Court of its intention to adopt articles of dissolution pursuant to Sections 29-312.02 and 29-312.03;

### IV.   <u>Enabling Resolutions</u>

DocuSign Envelope ID: 8B44A026-5127-4B43-8F04-83EFBB26C9A4

**FURTHER RESOLVED**, that officers of the Corporation, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation;

**FURTHER RESOLVED,** that all actions taken by the Corporation and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Corporation to the same extent as if taken subsequent to the adoption of the above resolutions; and

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent effective on and as of the date first written above.

**DIRECTORS:**

_Efstratios Tsintolas_
EE0461EF48FF456...

Efstratios Tsintolas

_Cassandra Tsintolas Johnson_
ED64F9C217D247C...

Cassandra Tsintolas Johnson

_Suzanne Tsintolas_
B469706D785B4ED...

Suzanne Tsintolas

*[Written consent of the Board of Directors of Tsintolas Investments, Incorporated]*

## EXHIBIT A

Bylaws

*[Written consent of the Board of Directors of Tsintolas Investments, Incorporated]*

DocuSign Envelope ID: 5B44A5026-5127-4B43-8E04-83EFBB26C0A1

# BYLAWS
## OF
## TSINTOLAS INVESTMENTS INCORPORATED

## ARTICLE I
## OFFICES

**Section 1.01 Offices.** The address of the registered office of Tsintolas Investments Incorporated (hereinafter called the "**Corporation**") in the District of Columbia shall be at 3520 Connecticut Avenue, NW, Washington, DC 20008. The Corporation may have other offices, both within and without the District of Columbia, as the board of directors of the Corporation (the "**Board of Directors**") from time to time shall determine or the business of the Corporation may require.

**Section 1.02 Books and Records.** Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be maintained on any information storage device or method; *provided that* the records so kept can be converted into clearly legible paper form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

## ARTICLE II
## MEETINGS OF THE STOCKHOLDERS

**Section 2.01 Place of Meetings.** All meetings of the stockholders shall be held at such place, if any, either within or without the District of Columbia, as shall be designated from time to time by resolution of the Board of Directors and stated in the notice of meeting.

**Section 2.02 Annual Meeting.** The annual meeting of the stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held at such date, time and place, if any, as shall be determined by the Board of Directors and stated in the notice of the meeting.

**Section 2.03 Special Meetings.** Special meetings of stockholders for any purpose or purposes shall be called pursuant to a resolution approved by the Board of Directors and may not be called by any other person or persons. The only business which may be conducted at a special meeting shall be the matter or matters set forth in the notice of such meeting.

**Section 2.04 Adjournments.** Any meeting of the stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time, place, if any, thereof and the means of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date is fixed for stockholders entitled to vote at the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting

DocuSign Envelope ID: 8B44C926-5127-4B43-8E04-83EEBB26C9A1

and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

**Section 2.05 Notice of Meetings.** Notice of the place, if any, date, hour, the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and means of remote communication, if any, of every meeting of stockholders shall be given by the Corporation not less than ten (10) days nor more than sixty (60) days before the meeting (unless a different time is specified by law) to every stockholder entitled to vote at the meeting as of the record date for determining the stockholders entitled to notice of the meeting. Notices of special meetings shall also specify the purpose or purposes for which the meeting has been called. Except as otherwise provided herein or permitted by applicable law, notice to stockholders shall be in writing and delivered personally or mailed to the stockholders at their address appearing on the books of the Corporation. Without limiting the manner by which notice otherwise may be given effectively to stockholders, notice of meetings may be given to stockholders by means of electronic transmission in accordance with applicable law. Notice of any meeting need not be given to any stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

**Section 2.06 List of Stockholders.** The officer of the Corporation who has charge of the stock ledger shall prepare a complete list of the stockholders entitled to vote at any meeting of stockholders (*provided, however*, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares of each class of capital stock of the Corporation registered in the name of each stockholder at least ten (10) days before any meeting of the stockholders. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network if the information required to gain access to such list was provided with the notice of the meeting or during ordinary business hours, at the principal place of business of the Corporation for a period of at least ten (10) days before the meeting. If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting the whole time thereof and may be inspected by any stockholder who is present. If the meeting is held solely by means of remote communication, the list shall also be open for inspection by any stockholder during the whole time of the meeting as provided by applicable law. Except as provided by applicable law, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

**Section 2.07 Quorum.** Unless otherwise required by law, the Corporation's Articles of Incorporation (the "**Articles of Incorporation**") or these Bylaws, at each meeting of the stockholders, a majority in voting power of the shares of the Corporation entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power, by the

affirmative vote of a majority in voting power thereof, to adjourn the meeting from time to time, in the manner provided in <u>Section 2.04</u>, until a quorum shall be present or represented. A quorum, once established, shall not be broken by the subsequent withdrawal of enough votes to leave less than a quorum. At any such adjourned meeting at which there is a quorum, any business may be transacted that might have been transacted at the meeting originally called.

**Section 2.08 Conduct of Meetings.** The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of the stockholders as it shall deem appropriate. At every meeting of the stockholders, the Chairman of the Board, when present, or in his or her absence or inability to act, the Chief Executive Officer or President, or in his or her absence or inability to act, the person whom the Chief Executive Officer or President shall appoint, shall act as chairman of, and preside at, the meeting. The Secretary or, in his or her absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting, shall act as secretary of the meeting and keep the minutes thereof. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (c) rules and procedures for maintaining order at the meeting and the safety of those present; (d) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (e) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (f) limitations on the time allotted to questions or comments by participants.

**Section 2.09 Voting; Proxies.** Unless otherwise required by law or the Articles of Incorporation the election of directors shall be decided by a plurality of the votes cast at a meeting of the stockholders by the holders of stock entitled to vote in the election. Unless otherwise required by law, the Articles of Incorporation or these Bylaws, any matter, other than the election of directors, brought before any meeting of stockholders shall be decided by the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the matter. Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot.

**Section 2.10 Inspectors at Meetings of Stockholders.** The Board of Directors, in advance of any meeting of stockholders, may, and shall if required by law, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and

make a written report thereof. The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting, the existence of a quorum and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties. Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the District of Columbia upon application by a stockholder shall determine otherwise. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for office at an election may serve as an inspector at such election.

**Section 2.11 Written Consent of Stockholders Without a Meeting.** Any action to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action to be so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered (by hand, by certified, by registered mail, return receipt requested, or by facsimile, e-mail or by other means of electronic transmission) to the Corporation by delivery to its registered office in the District of Columbia, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded, or to facsimile number or e-mail address specified by the Corporation. Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this <u>Section 2.11</u>, written consents signed by a sufficient number of holders to take action are delivered to the Corporation as aforesaid. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall, to the extent required by applicable law, be given to those stockholders who have not consented in writing, and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation.

**Section 2.12 Fixing the Record Date.**

(a)     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the

record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,* that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote therewith at the adjourned meeting.

(b)      In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting: (i) when no prior action by the Board of Directors is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery (by hand, or by certified or registered mail, return receipt requested) to its registered office in the District of Columbia, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded and (ii) if prior action by the Board of Directors is required by law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)      In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

## ARTICLE III
## BOARD OF DIRECTORS

**Section 3.01 General Powers.** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The Board of Directors may adopt such rules and procedures, not inconsistent with the Articles of Incorporation, these Bylaws or

applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

**Section 3.02 Number; Term of Office.** The authorized number of directors of the Corporation shall be fixed by the Board of Directors from time to time. Directors need not be stockholders unless so required by the Articles of Incorporation. If for any cause, the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient. The Board of Directors shall initially consist of three (3) directors. Each Director shall hold office until a successor is duly elected and qualified or until the Director's earlier death, resignation, disqualification or removal.

**Section 3.03 Newly Created Directorships and Vacancies.** Any newly created directorships resulting from an increase in the authorized number of directors and any vacancies occurring in the Board of Directors, not otherwise filled pursuant to a Voting Agreement, if any, may be filled by the affirmative votes of a majority of the remaining members of the Board of Directors, although less than a quorum, or by a sole remaining director. A director so elected shall be elected to hold office until the earlier of the expiration of the term of office of the director whom he or she has replaced, a successor is duly elected and qualified or the earlier of such director's death, resignation or removal.

**Section 3.04 Resignation.** Any director may resign at any time by notice given in writing or by electronic transmission to the Corporation. Such resignation shall take effect at the date of receipt of such notice by the Corporation or at such later time as is therein specified.

**Section 3.05 Removal.** Except as prohibited by applicable law, the Articles of Incorporation, or a Voting Agreement, if any, the stockholders entitled to vote in an election of directors may remove any director from office at any time, with or without cause, by the affirmative vote of a majority in voting power thereof.

**Section 3.06 Fees and Expenses.** Directors shall receive such fees and expenses as the Board of Directors shall from time to time prescribe.

**Section 3.07 Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such times and at such places as may be determined from time to time by the Board of Directors or its chairman.

**Section 3.08 Special Meetings.** Special meetings of the Board of Directors may be held at such times and at such places as may be determined by the chairman or the Chief Executive Officer or President on at least 24 hours' notice to each director given by one of the means specified in Section 3.11 hereof other than by mail or on at least three (3) days' notice if given by mail. Special meetings shall be called by the chairman or the Chief Executive Officer or President in like manner and on like notice on the written request of any two or more directors.

**Section 3.09 Meetings by Electronic Communications Equipment.** Board of Directors or Board of Directors committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other and be heard. Participation by a director in a meeting pursuant to this Section 3.09 shall constitute presence in person at such meeting.

**Section 3.10 Adjourned Meetings.** A majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place. At least 24 hours' notice of any adjourned meeting of the Board of Directors shall be given to each director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in Section 3.11 hereof other than by mail, or at least three (3) days' notice if by mail. Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

**Section 3.11 Notices.** Subject to Section 3.08, Section 3.10 and Section 3.12 hereof, whenever notice is required to be given to any director by applicable law, the Articles of Incorporation or these Bylaws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such director at such director's address as it appears on the records of the Corporation, facsimile, e-mail or by other means of electronic transmission.

**Section 3.12 Waiver of Notice.** Whenever notice to directors is required by applicable law, the Articles of Incorporation or these Bylaws, a waiver thereof, in writing signed by, or by electronic transmission by, the director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice. Attendance by a director at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special Board of Directors or committee meeting need be specified in any waiver of notice.

**Section 3.13 Organization.** At each meeting of the Board of Directors, the chairman or, in his or her absence, the Chief Executive Officer or President of the Corporation, if also a director of the Corporation or, in his or her absence, another director selected by the Board of Directors shall preside. The Secretary shall act as secretary at each meeting of the Board of Directors. If the Secretary is absent from any meeting of the Board of Directors, an assistant secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all assistant secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

**Section 3.14 Quorum of Directors.** The presence of a majority of the Board of Directors shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board of Directors.

**Section 3.15 Action by Majority Vote.** Except as otherwise expressly required by these Bylaws, the Articles of Incorporation or by applicable law, the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 3.16 Action Without Meeting.** Unless otherwise restricted by the Articles of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all directors or members of such committee, as the case may be, consent thereto in writing or by electronic

transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee in accordance with applicable law.

    **Section 3.17 Committees of the Board of Directors.** The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board of Directors. Unless the Board of Directors provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Each committee shall keep regular minutes of its meetings. Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III.

**ARTICLE IV**
**OFFICERS**

    **Section 4.01 Positions and Election.** The officers of the Corporation shall be elected by the Board of Directors and shall include a Chief Executive Officer and/or President, a Treasurer and a Secretary. The Board of Directors, in its discretion, may also elect a chairman (who must be a director), one or more vice chairmen (who must be directors) and one or more vice presidents, assistant treasurers, assistant secretaries and other officers. Any two or more offices may be held by the same person.

    **Section 4.02 Term.** Each officer of the Corporation shall hold office until such officer's successor is elected and qualified or until such officer's earlier death, resignation or removal. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors at any time with or without cause by the majority vote of the members of the Board of Directors then in office. The removal of an officer shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer shall not of itself create contract rights. Any officer of the Corporation may resign at any time by giving written notice of his or her resignation to the Chief Executive Officer or President or the Secretary. Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Should any vacancy occur among the officers, the position shall be filled for the unexpired portion of the term by appointment made by the Board of Directors.

**Section 4.03 The Chief Executive Officer and/or President.** The Chief Executive Officer and/or President shall have general supervision over the business of the Corporation and other duties incident to the office of Chief Executive Officer and/or President, and any other duties as may be from time to time assigned to the Chief Executive Officer and/or President by the Board of Directors and subject to the control of the Board of Directors in each case. For purposes of clarity, if the Corporation has a separate Chief Executive Officer and President, the Chief Executive Officer shall be first-in-command and the President shall be second-in-command.

**Section 4.04 Vice Presidents.** Each Vice President shall have such powers and perform such duties as may be assigned to him or her from time to time by the chairman of the Board of Directors or the Chief Executive Officer or President.

**Section 4.05 The Secretary.** The Secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform like duties for committees when required. He or she shall give, or cause to be given, notice of all meetings of the stockholders and meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the Chief Executive Officer or President. The Secretary shall keep in safe custody the seal of the Corporation and have authority to affix the seal to all documents requiring it and attest to the same.

**Section 4.06 The Treasurer.** The Treasurer shall have the custody of the corporate funds and securities, except as otherwise provided by the Board of Directors, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Chief Executive Officer or President and the directors, at the regular meetings of the Board of Directors, or whenever they may require it, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation.

**Section 4.07 Duties of Officers May Be Delegated.** In case any officer is absent, or for any other reason that the Board of Directors may deem sufficient, the Chief Executive Officer or President or the Board of Directors may delegate for the time being the powers or duties of such officer to any other officer or to any director.

## ARTICLE V
## STOCK CERTIFICATES AND THEIR TRANSFER

**Section 5.01 Certificates Representing Shares.** The shares of stock of the Corporation shall be represented by certificates (which certificates may be delivered and maintained electronically); provided that the Board of Directors may provide by resolution or resolutions that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock. If shares are represented by certificates, such certificates shall be in the form, other than bearer form, approved by the Board of Directors. The certificates representing shares of stock of each class shall be signed by, or in the name of, the Corporation by the chairman, any vice chairman, the Chief Executive Officer or President or any

Vice President, and by the Secretary, any assistant secretary, the Treasurer or any assistant treasurer. Any or all such signatures may be facsimiles. Although any officer, transfer agent or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were still such at the date of its issue.

Section 5.02 **Transfers of Stock.** Stock of the Corporation shall be transferable in the manner prescribed by law, in these Bylaws and in either the Company's Stockholders Agreement, or the Company's Voting Agreement, Investors' Rights Agreement and Right of First Refusal and Co-Sale Agreement, if any. Transfers of stock shall be made on the books of the Corporation, if any, only by the holder of record thereof, by such person's attorney lawfully constituted in writing and, in the case of certificated shares, upon the surrender of the certificate thereof, which shall be cancelled before a new certificate or uncertificated shares shall be issued. No Transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred. To the extent designated by the Chief Executive Officer or President or any Vice President or the Treasurer of the Corporation, the Corporation may recognize the Transfer of fractional uncertificated shares, but shall not otherwise be required to recognize the Transfer of fractional shares.

Section 5.03 **Transfer Agents and Registrars.** The Board of Directors may appoint, or authorize any officer or officers to appoint, one or more transfer agents and one or more registrars.

Section 5.04 **Lost, Stolen or Destroyed Certificates.** The Board of Directors may direct a new certificate or uncertificated shares to be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed upon the making of an affidavit of that fact by the owner of the allegedly lost, stolen or destroyed certificate. When authorizing such issue of a new certificate or uncertificated shares, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of the lost, stolen or destroyed certificate, or the owner's legal representative to give the Corporation a bond sufficient to indemnify it against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed or the issuance of such new certificate or uncertificated shares.

Section 5.05 **Restrictions on Transfer.**

(a)    *General Restriction*. No holder of any of the shares of Common Stock of the Corporation may sell, transfer, assign, pledge, or otherwise dispose of or encumber any of the shares of Common Stock of the Corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise (each, a "**Transfer**") without the prior written consent of the Corporation, upon duly authorized action of its Board of Directors. The Corporation may withhold consent for any legitimate corporate purpose, as determined by the Board of Directors. Examples of the basis for the Corporation to withhold its consent include, without limitation, (i) if such Transfer to individuals, companies or any other form of entity identified by the Corporation as a potential competitor or considered by the Corporation to be unfriendly; or (ii) if such Transfer increases the risk of the Corporation having a class of security held of record by two thousand (2,000) or more persons, or five hundred (500) or more persons who are not

10

DocuSign Envelope ID: 3B44A026-5127-4B43-8E04-83EFBB26C9A1

accredited investors (as such term is defined by the SEC), as described in Section 12(g) of the 1934 Act and any related regulations, or otherwise requiring the Corporation to register any class of securities under the 1934 Act; or (iii) if such Transfer would result in the loss of any federal or state securities law exemption relied upon by the Corporation in connection with the initial issuance of such shares or the issuance of any other securities; or (iv) if such Transfer is facilitated in any manner by any public posting, message board, trading portal, internet site, or similar method of communication, including without limitation any trading portal or internet site intended to facilitate secondary transfers of securities; or (v) if such Transfer is to be effected in a brokered transaction; or (vi) if such Transfer represents a Transfer of less than all of the shares then held by the stockholder and its affiliates or is to be made to more than a single transferee.

(b)    *Consequences of Purported Transfer.* Any Transfer, or purported Transfer, of shares of Common Stock not made in strict compliance with this Section shall be null and void, shall not be recorded on the books of the Corporation and shall not be recognized by the Corporation.

(c)    *Termination of Transfer Restriction.* The foregoing restriction on Transfer shall terminate upon the date securities of the Corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by, the SEC under the Securities Act of 1933, as amended.

(d)    *Legend.* The certificates representing shares of stock of the Corporation shall bear on their face the following legend so long as the foregoing Transfer restrictions are in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A TRANSFER RESTRICTION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

## ARTICLE VI
## GENERAL PROVISIONS

**Section 6.01 Seal.** The seal of the Corporation shall be in such form as shall be approved by the Board of Directors. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise, as may be prescribed by law or custom or by the Board of Directors.

**Section 6.02 Fiscal Year.** The fiscal year of the Corporation shall begin on January 1 and end on December 31 of each year.

**Section 6.03 Checks, Notes, Drafts, Etc.** All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

**Section 6.04 Dividends.** Subject to applicable law and the Articles of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting of the Board of Directors. Dividends may be paid in

cash, in property or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Articles of Incorporation.

**Section 6.05 Conflict with Applicable Law or Articles of Incorporation.** These Bylaws are adopted subject to any applicable law and the Articles of Incorporation. Whenever these Bylaws may conflict with any applicable law or the Articles of Incorporation, such conflict shall be resolved in favor of such law or the Articles of Incorporation.

**Section 6.06 Governing Law.** All questions concerning the construction, validity and interpretation of these Bylaws, and all acts, transactions, rights and obligations pursuant hereto shall be governed, construed and interpreted in accordance with the laws of the District of Columbia, without giving effect to principles of conflicts of law.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.01 Indemnification of Directors, Executive Officers, Other Officers, Employees and Other Agents**.

(a)  *Directors and Executive Officers*. The Corporation shall indemnify its directors and executive officers (for the purposes of this Article VII, "**executive officers**" shall have the meaning defined in Rule 3b-7 promulgated under the Securities Exchange Act of 1934, as amended) to the fullest extent not prohibited by the Code of the District of Columbia ("**DC Code**") or any other applicable law; *provided, however*, that the Corporation may modify the extent of such indemnification by individual contracts with its directors and executive officers; and, provided, further, that the Corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the Corporation, (iii) such indemnification is provided by the Corporation, in its sole discretion, pursuant to the powers vested in the Corporation under the DC Code or any other applicable law or (iv) such indemnification is required to be made under Section 7.01(d).

(b)  *Other Officers, Employees and Other Agents*. The Corporation shall have power to indemnify its other officers, employees and other agents as set forth in the DC Code or any other applicable law. The Board of Directors shall have the power to delegate the determination of whether indemnification shall be given to any such person except executive officers to such officers or other persons as the Board of Directors shall determine.

(c)  *Expenses*. The Corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director or executive officer, of the Corporation, or is or was serving at the request of the Corporation as a director or executive officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or executive officer in connection with such proceeding; *provided, however*, that, if the DC Code requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other

12

capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section or otherwise.

Notwithstanding the foregoing, unless otherwise determined pursuant to Section 7.01(e), no advance shall be made by the Corporation to an executive officer of the Corporation (except by reason of the fact that such executive officer is or was a director of the Corporation, in which event this paragraph shall not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i) by a majority vote of a quorum consisting of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the Corporation.

(d)    *Enforcement*. Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and executive officers under this Bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the Corporation and the director or executive officer. Any right to indemnification or advances granted by this Bylaw to a director or executive officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the Corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under DC Code any other applicable law for the Corporation to indemnify the claimant for the amount claimed. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DC Code or any other applicable law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct. No Director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 29-306.31 of the DC Code, or (iv) for any transaction from which the Director derived any improper personal benefit.

(e)    *Non-Exclusivity of Rights*. The rights conferred on any person by this Bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Articles of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by DC Code or any other applicable law.

(f)    *Survival of Rights*. The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a director, or executive officer and shall inure to the benefit of the heirs, executors and administrators of such a person.

(g)    *Insurance*. To the fullest extent permitted by the DC Code, or any other applicable law, the Corporation, upon approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Bylaw.

(h)    *Amendments*. Any repeal or modification of this Bylaw shall only be prospective and shall not affect the rights under this Bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the Corporation.

(i)    *Saving Clause*. If this Bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each director and executive officer to the full extent not prohibited by any applicable portion of this Bylaw that shall not have been invalidated, or by any other applicable law. If this paragraph shall be invalid due to the application of the indemnification provisions of another jurisdiction, then the Corporation shall indemnify each director and executive officer to the full extent under applicable law.

(j)    *Certain Definitions*. For the purposes of this Bylaw, the following definitions shall apply:

(1)    The term "proceeding" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

(2)    The term "expenses" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

(3)    The term the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another

corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Bylaw with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

(4)    References to a "director," "executive officer," "officer," "employee," or "agent" of the Corporation shall include, without limitation, situations where such person is serving at the request of the Corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

(5)    References to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Bylaw.

## ARTICLE VIII
## AMENDMENTS

**Section 8.01 Amendments.** These Bylaws may be amended, altered, changed, adopted and repealed or new bylaws adopted by the Board of Directors. The stockholders may make additional bylaws and may alter and repeal any bylaws whether such bylaws were originally adopted by them or otherwise by the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

DocuSign Envelope ID: 5B44A5926-5127-4B43-8F04-83EFBB26C9A1

## CERTIFICATE OF SECRETARY OF
## TSINTOLAS INVESTMENTS INCORPORATED

The undersigned, Suzanne Tsintolas, hereby certifies that she is the duly elected and acting Secretary of Tsintolas Investments Incorporated, a District of Columbia corporation (the "**Corporation**"), and that the Bylaws attached hereto constitute the Bylaws of said Corporation as duly adopted by Action by Written Consent by the Directors as of October 13, 2023.

**IN WITNESS WHEREOF**, the undersigned has hereunto subscribed her name as of this 13th day of October, 2023.

By: _____
Suzanne Tsintolas, Secretary

**<u>EXHIBIT B</u>**

Notice of Intent

*[Written consent of the Board of Directors of Tsintolas Investments, Incorporated]*

# EXHIBIT 8

DocuSign Envelope ID: 553DD1F8-7131-4BB9-A8FC-B50SE75SB1EE

### Olympia Investments, Inc.

### Written Consent of the Board of Directors

Effective as of October 11, 2023

The undersigned, constituting the members of the board of directors (the **"Board"**) of Olympia Investments, Inc., a District of Columbia corporation (the **"Corporation"**), hereby take the following actions and adopt the following resolutions by unanimous written consent (this **"Written Consent"**), without a meeting, pursuant to Section 29-306.21 of the District of Columbia Business Corporation Act of 2010 (the **"Act"**), and hereby waive all notice of a meeting and the holding of any meeting to act upon such resolutions:

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division completed the order (the *"Order"*) in which she made a judicial determination of the fair value of the shares of the Corporation in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, Efstratios Tsintolas, as President of the Corporation and pursuant to his Management Agreement with the Corporation had engaged the law firm of Shulman Rogers, P.A. on October 11, 2023 to represent the Corporation in any further proceedings with respect to the Order and related cases in the Superior Court of the District of Columbia, Civil Division (the *"Cases"*);

**WHEREAS**, Board wishes to approve such engagement of Shulman Rogers, P.A., effective as of October 11, 2023, and confirm and ratify the actions of the President and any other officers of the Corporation in connection therewith;

**NOW, THEREFORE, BE IT RESOLVED**, that the engagement of Shulman Rogers, P.A. to represent the Corporation in the Cases be, and it hereby is, approved effective as of October 11, 2023;

**FURTHER RESOLVED**, that officers of the Corporation, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation;

**FURTHER RESOLVED,** that all actions taken by the Corporation and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Corporation to the same extent as if taken subsequent to the adoption of the above resolutions; and

*[Written consent of the Board of Directors of Olympia Investments, Inc.]*

DocuSign Envelope ID: 553D91F8-2132-4BB9-A8EC-B50E75C81FE

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**IN WITNESS WHEREOF**, the undersigned have executed this Written Consent on the date written below, effective as of the date first written above.

**DIRECTORS:**

*Efstratios Tsintolas*
Efstratios Tsintolas

*Cassandra Tsintolas Johnson*
Cassandra Tsintolas Johnson

*Suzanne Tsintolas*
Suzanne Tsintolas

February 13, 2024

*[Written consent of the Board of Directors of Olympia Investments, Inc.]*

# EXHIBIT 9

**Tsintolas Investments, Incorporated**

**Written Consent of the Board of Directors**

Effective as of October 11, 2023

The undersigned, constituting the members of the board of directors (the **"Board"**) of Tsintolas Investments, Incorporated, a District of Columbia corporation (the **"Corporation"**), hereby take the following actions and adopt the following resolutions by unanimous written consent (this **"Written Consent"**), without a meeting, pursuant to Section 29-306.21 of the District of Columbia Business Corporation Act of 2010 (the "**Act**"), and hereby waive all notice of a meeting and the holding of any meeting to act upon such resolutions:

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division completed the order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Corporation in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, Efstratios Tsintolas, as President of the Corporation and pursuant to his Management Agreement with the Corporation had engaged the law firm of Shulman Rogers, P.A. on October 11, 2023 to represent the Corporation in any further proceedings with respect to the Order and related cases in the Superior Court of the District of Columbia, Civil Division (the "***Cases***");

**WHEREAS**, Board wishes to approve such engagement of Shulman Rogers, P.A., effective as of October 11, 2023, and confirm and ratify the actions of the President and any other officers of the Corporation in connection therewith;

**NOW, THEREFORE, BE IT RESOLVED**, that the engagement of Shulman Rogers, P.A. to represent the Corporation in the Cases be, and it hereby is, approved effective as of October 11, 2023;

**FURTHER RESOLVED**, that officers of the Corporation, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation;

**FURTHER RESOLVED,** that all actions taken by the Corporation and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Corporation to the same extent as if taken subsequent to the adoption of the above resolutions; and

*[Written consent of the Board of Directors of Tsintolas Investments, Incorporated]*

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**IN WITNESS WHEREOF**, the undersigned have executed this Written Consent on the date written below, effective as of the date first written above.

DIRECTORS:

Efstratios Tsintolas

Cassandra Tsintolas Johnson

Suzanne Tsintolas

February 13, 2024

*[Written consent of the Board of Directors of Tsintolas Investments, Incorporated]*

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

CHRISTOFILOS TSINTOLAS, *et al.*

      Petitioners,

    v.

TSINTOLAS INVESTMENTS, INC., *et al.*,

      Defendants/Interested Parties.

C.A. No.:  2019 CA 007057 B
Judge Yvonne Williams
Next Event: Motions Hearing, 04/25/24

---

CHRISTOFILOS TSINTOLAS, *et al.*,

      Petitioners,

    v.

OLYMPIA INVESTMENTS, INC., *et al*.,

      Defendants.

Consolidated Case No.: 2019 CA 007059 B

**ORDER**

UPON CONSIDERATION of the Defendant Corporations' Motion for Reconsideration of the Court's February 7, 2024 Order and any opposition thereto, the Motion is hereby GRANTED.

**WHEREFORE**, it is, by the Superior Court for the District of Columbia

**ORDERED** that the Court's Order of February 7, 2024 be and hereby is REVERSED,

**ORDERED** that the firm Shulman Rogers, P.A. is NOT DISQUALIFIED from representing the Defendant Corporations in this matter.

**IT IS SO ORDERED.**

Date: _____, 2024          _____
                                                    Judge Yvonne Williams

# EXHIBIT 10

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN ALTERNATIVE, ABSTAIN**

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| **CHRISTOFILOS TSINTOLAS**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **TSINTOLAS INVESTMENTS, INC.**, *et al.*, <br> **Defendants.** | **2019  CA  007057 B** <br><br> **2019  CA  007059 B** <br><br> **Judge Yvonne Williams** |
| **CHRISTOFILOS TSINTOLAS**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **OLYMPIA INVESTMENTS, INC.**, *et al.*, <br> **Defendants.** | |

<u>**ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION AND
REVISION OF THE COURT'S ORDER DISQUALIFYING SHULMAN ROGERS
ATTORNEYS**</u>

Before the Court is Defendants' Motion for Reconsideration and Revision of the Court's

Order Disqualifying Shulman Rogers Attorneys (the "Motion"), filed on February 27, 2024.

Plaintiffs filed their Opposition to Defendants' Motion on March 12, 2024. For the reasons set

forth below, the instant Motion is **DENIED**.

**I.     BACKGROUND**

This is an action for dissolution of two closely-held corporations: Tsintolas Investments;

and Olympia Investments (collectively, the "Corporations"). Plaintiffs Christofilos ("Chris")

Tsintolas and Deborah Tsintolas ("Deborah") collectively own 25% of the shares of each

Corporation. Plaintiff Fotini Tsintolas Economides ("Fotini"), through the Fotini Tsintolas

Economides Revocable Trust, also owns 25% of the shares of each Corporation. Their siblings,

Efstratios D. Tsintolas ("Steve"), and Cassandra Tsintolas Johnson ("Cassandra"), through the

1

Cassandra Tsintolas Johnson Revocable Trust, intervened as Interested Parties (collectively, the Corporations and Interested Parties are the "Defendants").

In October 2019, Plaintiffs filed these two actions to dissolve each Corporation. On July 1, 2020, the Court entered an Order rejecting Plaintiffs' Motion to Disqualify Defendants' Counsel Jonathan C. Windle. Order (July 1, 2020) at 1. On June 3, 2021, the Court held a Motion Hearing, at which the Court granted Plaintiffs' Motion to Disqualify, and thereby disqualified Defendants' Counsel Joseph M. Creed.

Pursuant to D.C. Code § 29-312.24(a), the Corporations elected to purchase Plaintiffs' shares in lieu of dissolving. On September 26-27, 2022, November 14-15, 2022, and January 9-10, 2023, the Court held a Non-Jury Trial ("Trial"). On May 22, 2023, the Court entered a Trial Order finding the fair value of Tsintolas Investments, Inc. to be $1,722,642 and the fair value of Olympia Investments, Inc. to $13,851,614.57. On October 5, 2023, the Court entered a Final Order (the "Valuation Order") ordering: (i) that the Fair Value of Olympia Investments, Inc. is adjudged to be $1,722,642; (ii) that the Fair Value of Tsintolas Investments, Inc. is adjudged to be $13,851,614.57; (iii) that within 30 days of October 5, 2023, Plaintiffs shall file evidence and argument demonstrating the value of their reasonable attorney's fees and costs; (iv) that oppositions and replies to Plaintiffs' demands for attorney's fees may be filed pursuant to Rule 12 I; (v) that pre- and post-judgment interest and a security interest are granted; (vi) that a payment plan is in effect; and (vii) that Defendants' 10-day period to elect to dissolve or continue with the purchase under D.C. Code § 29.312.24(g) is triggered. *See* Order (Oct. 5, 2023) at 12-13.

On November 6, 2023, Plaintiffs filed an Opposed Motion to Disqualify the Law Firm of Shulman Rogers and its Attorneys from Representing the Defendant Corporations ("Motion to Disqualify"), which the Court granted on February 7, 2024 ("Disqualification Order"). Defendants

2

filed the instant Motion on February 27, 2024. On March 12, 2024, Plaintiffs filed their Opposition to Defendants' Motion. The Motion is, therefore, ripe for adjudication.

## II.    LEGAL STANDARD

Defendants base their Motion on Rules 59(e) and 60(b). "A trial court may grant a Rule 59(e) motion in order to correct manifest errors of law or fact." *In re Estate of Derricotte*, 885 A.2d 320, 324 (D.C. 2005). The "manifest error" standard is extremely high and defined as "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir.). Only extraordinary circumstances warrant the grant of a motion to alter or amend judgment under Rule 59(e). *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004). Pursuant to Rule 59(e), "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Generally, "[a] timely motion asserting that the court committed an error of law is normally treated under Rule 59 (e)[.]" *District No. 1 – Pacific Coast District v. Travelers Casualty & Surety Co.*, 782 A.2d 269, 278 (D.C. 2001) (internal citations and quotations omitted).

Rule 60(b)(1), (4), and (6) provides that "[o]n a motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;…(4) judgment is void;…or (6) any other reason that justifies relief." "A 'mistake' under Rule 60(b)(1) includes judicial errors, but such an error must be a 'fundamental misconception of the law,' and not merely an erroneous ruling." *Webb v. Davis*, 940 F.3d 892, 899 (5th Cir. 2019).

Reconsideration is warranted if, for example, moving parties "present newly discovered evidence, show that there has been an intervening change in the law, or demonstrate that the original decision was based on a manifest error of law or was clearly unjust." *See Bernal v. United*

3

*States*, 162 A.3d 128, 133 (D.C. 2017) (quotation, ellipsis, and brackets omitted).  Motions under either Rule 59(e) or 60(b), however, "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (internal quotation marks omitted) (Rule 59(e)); *Munoz v. Bd. of Trustees of Univ. of D.C.*, 730 F. Supp. 2d 62, 66 (D.D.C. 2010) (Rule 60(b)).  Moreover, motions under both Rule 59(e) and 60(b) are "disfavored," and the movant bears the heavy burden of showing that the appropriate criteria have been met.  *See Niedermeier v. Off. of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001) (Rule 59(e)); *Owens*, 864 F.3d at 819 (Rule 60(b)).  The disposition of a Rule 59(e) or Rule 60(b) motion, including questions of timeliness, is within the trial court's discretion.  *Starling v. Jephunneh Lawrence & Assoc.*, 495 A.2d 1157, 1159 (D.C. 1985) (internal citations omitted).

## III.    DISCUSSION

The Court will deny the instant Motion.  Defendants' Motion begins by asserting that the Shulman Rogers Attorneys do not maintain a conflict of interest in representing the Corporations.  Mot. at 7.  The Court reiterates the basis of its Disqualification Order as follows.  D.C Code § 29-312.24(g) provides that "[u]pon filing of such articles of dissolution, the corporation is dissolved [...] and petitioner may continue to pursue any claims previously asserted on behalf of the corporation."  Order (Feb. 7, 2024) at 4.  Under D.C. Code § 29-312.24(g), a petitioner retains its status as a shareholder upon the corporation's filing of a Dissolution Notice.  *Id.* at 4-5.  Accordingly, Plaintiffs maintained standing to file their Motion to Disqualify on November 6, 2023 given that the Corporations filed their Notice of Intent to Dissolve on October 16, 2023.  *Id.* at 5.  As such, the Court concluded that the Corporations lacked the authority to retain the Shulman Rogers Attorneys because: (i) Plaintiffs' Motion to Disqualify served as an objection by the Boards

4

of the Corporations; (ii) the Corporations remain deadlocked;[1] and (iii) the Boards of the Corporations did not authorize the retention of the Shulman Rogers Attorneys. *See generally id.* In granting Plaintiffs' Motion to Disqualify, however, the Court did not need to reach the issue of whether the Shulman Rogers Attorneys maintain a conflict of interest in representing the Corporations. *Id.* The Court, therefore, will not now consider whether such a conflict of interest exists within the instant Motion.

What remains of Defendants' Motion can be summarized as follows. First, Defendants contend that the Corporations legitimately retained the Shulman Rogers Attorneys pursuant to real-time authorization by the Boards of the Corporations ("Real-Time Authorization Argument"). Second, Defendants in the alternative contend that even if there was no real-time authorization, on February 13, 2024, the Corporations' retaining the Shulman Rogers Attorneys "was validated again" when the Boards ratified the Corporations' prior act of hiring the Shulman Rogers Attorneys, retroactively effective to October 11, 2023 ("Prior Act Argument"). *See* Mot. at 8-11; Ex. 8; Ex. 9. Accordingly, Defendants contend that the Court erred when it disqualified the Shulman Rogers Attorneys. *See generally id.* The Court will address each of Defendants' arguments in turn.

### a. Defendants' Real-Time Authorization Argument

Defendants' Real-Time Authorization Argument can be summarized as follows. Defendants contend that when Plaintiffs temporarily lost their rights as shareholders under D.C. Code § 29.312.24(g) pursuant to the Court's October 5, 2023 final Valuation Order, on October 13, 2023, the remaining voting-eligible shareholders removed Plaintiffs from the Boards of the

---

[1] From the Court's perspective, the Corporations remain deadlocked as to the hiring of the Shulman Rogers Attorneys. Should the Parties provide evidence that they have agreed to the retainer of counsel for the Corporations, the deadlock would be broken. Defendants, however, may not unilaterally retain counsel for the Corporations in the face of Plaintiffs' opposition.

Corporations by Written Consent and the remaining members of the Boards of the Corporations thereafter authorized Steve Tsintolas to retain the Shulman Rogers Attorneys. *See generally* Mot. Accordingly, Defendants contend that the Court erred in disqualifying the Shulman Rogers Attorneys because the Corporations retained the Shulman Rogers Attorneys pursuant to valid real-time authorization by the Boards. *Id.*

Defendants' Real-Time Authorization Argument is, therefore, merely a motion to reconsider Court's interpretation of D.C. Code § 29.312.24(g) dressed up as a motion to reconsider the Court's Disqualification Order. By the Court's count, this is Defendants' fifth request that the Court reconsider or reverse its interpretation of D.C. Code § 29.312.24. The Court entered its final Valuation Order on October 5, 2023, which triggered Defendants' 10-day deadline under D.C. Code § 29.312.24(g). Order (Oct. 5, 2023) at 13. On October 12, 2023, Defendants filed their Opposed Emergency Motion for Addition to or Revision of October 5, 2023 Order, which argued that the Court failed to properly dismiss Plaintiffs' Petitions for Dissolution in accordance with D.C. Code § 29.312.24(f)-(g). *See* Mot. (Oct. 12, 2023) at ¶ 8. On October 25, 2023, Defendants filed their Motion for Reconsideration of the Court's Order Denying as Moot the Defendants' Emergency Motion for Addition to or Revision of October 5, 2023 Order, which again argued that the Court failed to properly dismiss Plaintiffs' Petitions for Dissolution in accordance with D.C. Code § 29.312.24(f)-(g). *See* Mot. (Oct. 25, 2024) at 7. On October 25, 2023, Defendants filed their Motion for Reconsideration of the Court's October 5, 2023 Valuation Order to Strike Attorney's Fees and Limit the Award, which argued that the Court erred in concluding that D.C. Code § 29.312.24(e) permits a court to award attorney's fees. Mot. (Oct. 25, 2023) at 3. On January 25, 2024, Defendants filed their Motion for Reconsideration and Revision of the Court's December 18, 2023 Order, which again argued that the Court erred in concluding that D.C. Code

§ 29.312.24(e) permits a court to award attorney's fees. Mot. (Jan. 25, 2024) at 8. Through their

Real-Time Authorization Argument, Defendants yet again request that the Court reconsider its

interpretation of D.C. Code § 29.312.24, this time as to whether Plaintiffs were permitted to pursue,

and the Court properly granted, the disqualification of the Shulman Rogers Attorneys under D.C.

Code § 29.312.24(g). *See generally* Mot.

At every turn, the Court has affirmed that: (i) the Court's October 5, 2023 final Valuation

Order permitted Plaintiffs to seek attorney's fees and triggered Defendants' 10-day deadline

pursuant to D.C. Code § 29.312.24; (ii) upon the Court's entering its October 5, 2023 final

Valuation Order, Plaintiffs temporarily lost their rights and status as shareholders pursuant to D.C.

Code § 29.312.24(f); and (iii) upon Defendants' filing their Notice of Intent to Dissolve on October

16, 2023, Plaintiffs retained their ability to pursue any claims previously asserted on behalf of the

Corporations pursuant to D.C. Code § 29.312.24(g), including the disqualification of the Shulman

Rogers Attorneys. *See* Order (Oct. 19, 2023); Order (Dec. 18, 2023); Order (Dec. 18, 2023); Order

(Feb. 7, 2024); Order (Feb. 26, 2024).    Through their Real-Time Authorization Argument,

Defendants now request that the Court reconsider its interpretation of D.C. Code § 29.312.24(g)

and disqualification of the Shulman Rogers Attorneys but proffer neither a change in fact[2] or law

---

[2] After repeatedly contending that the Court's October 5, 2023 Valuation Order does not constitute a final order for
the purposes of D.C. Code § 29.312.24, Defendants now imply that between October 5, 2023 and October 13, 2023,
they were treating the October 5, 2023 Valuation Order as final when they held a shareholder vote to oust Plaintiffs
as members of the Boards of the Corporations. *See* Mot. at 9.  Specifically, Defendants argue that on October 13,
2024—when Plaintiffs temporarily lost their voting rights as shareholders under D.C. Code § 29.312.24 pursuant to
the October 5, 2023 Valuation Order—the remaining shareholders of the Corporations removed Plaintiffs as Board
members of the Corporations by executing their Written Consent of the Shareholders. *Id.* At Ex. 4; Ex. 5. Defendants
now contend that Plaintiffs cannot challenge the Corporations' hiring of the Shulman Rogers Attorneys because the
Shulman Rogers Attorneys were hired pursuant to authorization of the new Boards of the Corporations, upon which,
Plaintiffs no longer sat after their alleged ouster on October 13, 2023.  Without opining on the legality of such a
corporate ouster under D.C. Code § 29.312.24, the Court notes that: (i) elsewhere within their Motion, Defendants
contend that the Corporations retained the Shulman Rogers Attorneys on October 11, 2023; and (ii) the Shulman
Rogers Attorneys filed their Notice of Appearance in this matter on October 12, 2023, before any alleged shareholder
Written Consent vote ended Plaintiffs' membership on the Boards of the Corporations. *See* Mot. at Ex. 8; Ex. 9; Not.
of Appearance (Oct. 12, 2023).  Accordingly, pursuant to Defendants' own filings, the Shulman Rogers Attorneys

nor a manifest error that would warrant such a reconsideration.[3]  *See generally* Mot.; *see also*

*Bernal*, 162 A.3d at 133.  As such, the Court will not now re-litigate the issue of whether Plaintiffs

were entitled to pursue, or the Court properly granted, the disqualification of the Shulman Rogers

Attorneys as counsel for the Corporations pursuant to D.C. Code § 29.312.24(g).  *See Exxon*

*Shipping Co. v. Baker*, 554 U.S. at 485 n.5 (Rule 59(e)); *Munoz v. Bd. of Trustees of Univ. of D.C.*,

730 F. Supp. 2d at 66 (Rule 60(b)) (Motions for reconsideration "*may not be used to re-litigate old*

*matters.*") (emphasis added).  Defendants' Real-Time Authorization Argument, therefore, fails

within the instant Motion.

### b. Defendants' Prior Act Argument

Defendants' Prior Act Argument can be summarized as follows.  Defendants contend that

when the Court entered its Valuation Order on October 5, 2024, Plaintiffs lost their rights and

status as shareholders pursuant to D.C. Code § 29.312.24(f), which resolved the deadlock of the

Boards of the Corporations because Plaintiffs no longer maintained voting rights on the Boards of

the Corporations.  *See* Mot. at 8-9.  Defendants further submit that once the Boards of the

Corporations were no longer deadlocked, on February 13, 2024, the Boards ratified the

Corporations' prior act of hiring the Shulman Rogers Attorneys, retroactively effective to October

11, 2023.  *Id.* at 9-11; Ex. 8; Ex. 9.  Accordingly, Defendants contend that the Court erred in

disqualifying the Shulman Rogers Attorneys because the Corporations retained them pursuant to

valid retroactive authorization by the Boards.  *See id.*

In their opposition brief to the underlying Motion to Disqualify, however, Defendants

failed to present any evidence that: (i) the Corporations, through Steve Tsintolas, retained the

---

impermissibly represented Defendants in this matter as early as October 11, 2023, while Plaintiffs remained Board
members and, therefore, while the Boards of the Corporations remained deadlocked.

[3] The Corporations continue to be represented by Mr. Richard S. Basile.

Shulman Rogers Attorneys on October 11, 2023; (ii) the voting-eligible shareholders by Written

Consent voted to oust the Plaintiffs from the Boards of the Corporations on October 13, 2023; and

(iii) once the Boards were no longer deadlocked, on February 13, 2024, the Boards ratified the

Corporations' prior act of hiring the Shulman Rogers Attorneys, retroactively effective to October

11, 2023.[4] *See generally* Opp'n. (Nov. 20, 2023); Reply to Opp'n. (Dec. 4, 2023). As noted *supra*,

motions under either Rule 59(e) or 60(b) "may not be used to relitigate old matters, or to *raise*

*arguments or present evidence that could have been raised prior to the entry of judgment*." *See*

*Exxon Shipping Co. v. Baker*, 554 U.S. at 485 n.5 (emphasis added). The Court finds no reason to

allow Defendants to raise new arguments and evidence in a motion for reconsideration that they

could and should have raised in opposition briefing to the original Motion to Disqualify.

Accordingly, Defendants' Prior Act Argument fails within the instant Motion. The Court,

therefore, will deny Defendants' Motion.

Accordingly, it is on this 9th day of April, 2024, hereby,

**ORDERED** that Defendants' Motion for Reconsideration and Revision of the Court's

Order Disqualifying Shulman Rogers Attorneys is **DENIED**.

**IT IS SO ORDERED**.

Judge Yvonne Williams

Date: April 9, 2024

Copies to:

Matthew J. Pavlides
*Counsel for Plaintiffs*

---

[4] Indeed, Defendants could not have presented evidence that the Boards ratified the Corporations' prior act of hiring the Shulman Rogers Attorneys while briefing their opposition to the original Motion to Disqualify, which the Court granted on February 7, 2024, because the Written Consent of the Board of Directors were not created for either Corporation until February 13, 2024. *See* Mot. at Ex. 8; Ex. 9.

9

Kyle A. Paulson
*Counsel for Defendant Efstratios "Steve" Tsintolas*

Glenn C. Etelson
John Troost
Richard S. Basile
*Counsel for Defendants Tsintolas Investments, Inc. and Olympia Investments, Inc.*

Joseph M. Creed
*Counsel for Defendant Cassandra Tsintolas Johnson Revocable Trust*

10

# **EXHIBIT 11**

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN ALTERNATIVE, ABSTAIN**

**Olympia Investments, Inc.**

**Written Consent of the Shareholders**

Dated as of October 13, 2023

Pursuant to the provisions of Section 29-305.04(a) of the District of Columbia Business Corporation Act of 2010 (the "***Act***"), the undersigned holders (the "***Shareholders***") of all of the outstanding shares of Olympia Investments, Inc., a District of Columbia corporation (the "***Company***") having the right to vote as shareholders of the Company, do hereby vote for, adopt, approve, ratify and consent to the adoption of the following actions and resolutions by written consent (this "***Written Consent***") in lieu of a meeting of the Shareholders of the Company and direct that this Written Consent be filed in the minute books of the Company:

## I.    Removal and Appointment of Directors

**WHEREAS**, prior to the entry of the Order (defined below), the shareholders of the Company consisted of: (1) Christofilos Elias Tsintolas and Deborah Gargani Tsintolas, as tenants by the entirety ("***Chris***"), (2) the Fotini Tsintolas Economides Revocable Trust ("***Fotini***" and together with Chris, "***Petitioners***"), (3) Efstratios D. Tsintolas and Suzanne Marie Tsintolas as tenants by the entirety ("***Steve***"), and (4) the Cassandra Tsintolas Johnson Revocable Trust (the "***Cassandra Trust***");

**WHEREAS**, on October 24, 2019, the Petitioners filed a petition for judicial dissolution of the Company pursuant to Section 29-312.20 of the Act;

**WHEREAS**, on January 21, 2020 the Company elected to purchase the shares of Petitioners instead of dissolving the Company in accordance with Section 29-312.24 of the Act;

**WHEREAS**, the Company and Petitioners were not able to reach an agreement about the fair value of the Petitioners' shares and as a result, pursuant to Section 29-312.24(d) of the Act, the Superior Court of the District of Columbia, Civil Division (the "***Court***"), began a proceeding to determine the fair value of the Petitioner's shares;

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division, issued an order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Company in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, effective upon the issuance of the Order, due to the operation of Section 29-312.24(f) of the Act, the Petitioners no longer had any rights or status as shareholders of the Company and Steve and the Sandy Trust became the sole shareholders having rights or status as shareholders of the Company;

**WHEREAS**, the Shareholders desire to exercise their rights under Section 29-306.08(a) to remove Christofilos Elias Tsintolas and Fotini Tsintolas Economides from the board of directors (the "***Board***") of the Company;

**WHEREAS**, after the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, the remaining directors on the Board will be Steve and Cassandra Johnson; and

**WHEREAS**, the Shareholders desire elect Suzanne Tsintolas as director to fill one of the vacancies created by the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, with Ms. Tsintolas to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death.

**NOW, THEREFORE, BE IT RESOLVED**, that the Shareholders hereby remove Fotini Tsintolas Economides and Christofilos Tsintolas from the Board;

**FURTHER RESOLVED**, that the Shareholders hereby appoint Suzanne Tsintolas as a director to serve on the Board, to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death;

**FURTHER RESOLVED**, that after the appointment of Suzanne Tsintolas to the Board, the individuals serving on the Board shall consist of:

Efstratios Tsintolas
Cassandra Johnson
Suzanne Tsintolas

## II.    <u>Enabling Resolutions</u>

**FURTHER RESOLVED**, that officers of the Company, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Company;

**FURTHER RESOLVED,** that all actions taken by the Company and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Company to the same extent as if taken subsequent to the adoption of the above resolutions; and

DocuSign Envelope ID: 9B44A6826-8127-4B43-8E04-83EFBB26C9A1

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent effective on and as of the date first written above.

**SHAREHOLDERS:**

As tenants by the entirety:

_Efstratios Tsintolas_

Efstratios Tsintolas

_Suzanne Tsintolas_

Suzanne Marie Tsintolas

THE CASSANDRA TSINTOLAS JOHNSON REVOCABLE TRUST

By: _Cassandra Tsintolas Johnson_

Cassandra Tsintolas Johnson, Trustee

*[Written consent of the Shareholders of Olympia Investments, Inc.]*

# EXHIBIT 12

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY CASES, OR IN ALTERNATIVE, ABSTAIN**

**Tsintolas Investments, Incorporated**

**Written Consent of the Shareholders**

Dated as of October 13, 2023

Pursuant to the provisions of Section 29-305.04(a) of the District of Columbia Business Corporation Act of 2010 (the "***Act***"), the undersigned holders (the "***Shareholders***") of all of the outstanding shares of Tsintolas Investments, Incorporated, a District of Columbia corporation (the "***Company***") having the right to vote as shareholders of the Company, do hereby vote for, adopt, approve, ratify and consent to the adoption of the following actions and resolutions by written consent (this "***Written Consent***") in lieu of a meeting of the Shareholders of the Company and direct that this Written Consent be filed in the minute books of the Company:

## I.  Removal and Appointment of Directors

**WHEREAS**, prior to the entry of the Order (defined below), the shareholders of the Company consisted of: (1) Christofilos Elias Tsintolas and Deborah Gargani Tsintolas, as tenants by the entirety ("***Chris***"), (2) the Fotini Tsintolas Economides Revocable Trust ("***Fotini***" and together with Chris, "***Petitioners***"), (3) Efstratios D. Tsintolas and Suzanne Marie Tsintolas as tenants by the entirety ("***Steve***"), and (4) the Cassandra Tsintolas Johnson Revocable Trust (the "***Cassandra Trust***");

**WHEREAS**, on October 24, 2019, the Petitioners filed a petition for judicial dissolution of the Company pursuant to Section 29-312.20 of the Act;

**WHEREAS**, on January 21, 2020 the Company elected to purchase the shares of Petitioners instead of dissolving the Company in accordance with Section 29-312.24 of the Act;

**WHEREAS**, the Company and Petitioners were not able to reach an agreement about the fair value of the Petitioners' shares and as a result, pursuant to Section 29-312.24(d) of the Act, the Superior Court of the District of Columbia, Civil Division (the "***Court***"), began a proceeding to determine the fair value of the Petitioner's shares;

**WHEREAS**, on October 5, 2023, the Honorable Judge Yvonne Williams of the Superior Court of the District of Columbia, Civil Division, issued an order (the "***Order***") in which she made a judicial determination of the fair value of the shares of the Company in accordance with Section 29-312.24(e) of the Act;

**WHEREAS**, effective upon the issuance of the Order, due to the operation of Section 29-312.24(f) of the Act, the Petitioners no longer had any rights or status as shareholders of the Company and Steve and the Sandy Trust became the sole shareholders having rights or status as shareholders of the Company;

**WHEREAS**, the Shareholders desire to exercise their rights under Section 29-306.08(a) to remove Christofilos Elias Tsintolas and Fotini Tsintolas Economides from the board of directors (the "***Board***") of the Company;

**WHEREAS**, after the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, the remaining directors on the Board will be Steve and Cassandra Johnson; and

**WHEREAS**, the Shareholders desire elect Suzanne Tsintolas as director to fill one of the vacancies created by the removal of Christofilos Elias Tsintolas and Fotini Tsintolas Economides, with Ms. Tsintolas to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death.

**NOW, THEREFORE, BE IT RESOLVED**, that the Shareholders hereby remove Fotini Tsintolas Economides and Christofilos Tsintolas from the Board;

**FURTHER RESOLVED**, that the Shareholders hereby appoint Suzanne Tsintolas as a director to serve on the Board, to serve in such role until such time as her successor has been duly elected and qualified or until her earlier resignation, removal from office or death;

**FURTHER RESOLVED**, that after the appointment of Suzanne Tsintolas to the Board, the individuals serving on the Board shall consist of:

Efstratios Tsintolas
Cassandra Tsintolas Johnson
Suzanne Tsintolas

## II.    <u>Enabling Resolutions</u>

**FURTHER RESOLVED**, that officers of the Company, or any of them, be and they hereby are authorized, empowered and directed to take any and all other action which may be necessary, appropriate, incidental, and/or desirable to effectuate the transactions approved by the foregoing preambles, resolutions, and actions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Company;

**FURTHER RESOLVED,** that all actions taken by the Company and its officers, employees, and agents prior to the date hereof, which actions would have been approved by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, and approved in all respects, and that such actions shall be binding upon the Company to the same extent as if taken subsequent to the adoption of the above resolutions; and

DocuSign Envelope ID: 9B44A692C-512714B43-8E04-83EFBB26C0A1

**FURTHER RESOLVED**, that this Written Consent may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Written Consent and all of which, when taken together, will be deemed to constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[signatures appear on following page]

IN WITNESS WHEREOF, the undersigned have executed this Written Consent effective on and as of the date first written above.

**SHAREHOLDERS:**

As tenants by the entirety:

*Efstratios Tsintolas*
Efstratios Tsintolas

*Suzanne Tsintolas*
Suzanne Marie Tsintolas

THE CASSANDRA TSINTOLAS JOHNSON REVOCABLE TRUST

By: *Cassandra Tsintolas Johnson*
Cassandra Tsintolas Johnson, Trustee

*[Written consent of the Shareholders of Tsintolas Investments, Incorporated]*

# EXHIBIT 13

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

eFiled
11/06/2023 1:15:18 PM
Superior Court
of the District of Columbia

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

CHRISTOFILOS TSINTOLAS,
DEBORAH TSINTOLAS,
and
FOTINI TSINTOLAS ECONOMIDES
REVOCABLE TRUST,

        Plaintiffs,

    v.

TSINTOLAS INVESTMENTS, INC., et. al,

        Defendants/Interested Parties.

C.A. No.:  2019 CA 007057 B

Judge Yvonne M. Williams

---

CHRISTOFILOS TSINTOLAS et al,

        Plaintiffs,

    v.

OLYMPIA INVESTMENTS, INC., et al.,

        Defendants.

Consolidated Case No.: 2019 CA
007059 B

Next event: None

**PLAINTIFFS' MOTION TO APPOINT A RECEIVER**

Plaintiffs Christofilos Tsintolas ("Chris"), Deborah Tsintolas ("Debbie") and the Fotini

Tsintolas Economides Revocable Trust ("Fotini") (collectively "Plaintiffs"), by and through their

attorneys, respectfully submit this Motion to Appoint a Receiver, stating as follow:

I.    **INTRODUCTION**

In the October 5, 2023 Final Order entered in this consolidated action, the Court had

prudently stated: "Once the Court enters a final order, each Corporation may elect to dissolve

within 10 days instead of going through with its election to purchase. D.C. Code Ann. § 29-

312.24(g). The Court is *greatly concerned* that after forcing Plaintiffs to litigate an election to

purchase i[n] lieu of dissolution, Defendants will simply choose to dissolve." October 5, 2023

Final Order at p. 9 (emphasis added). Unfortunately, the Court's reasonable concern proved to be

accurate. On October 16, 2023, Defendants Tsintolas Investments, Inc. ("TI") and Olympia

STEIN SPERLING BENNETT
DE JONG DRISCOLL PC

ATTORNEYS AT LAW
1101 Wootton Parkway, Suite 700
ROCKVILLE, MARYLAND 20852

TELEPHONE 301-340-2020

20419651_4

investments, Inc. ("OI") (collectively "Defendant Corporations") filed a Notice of Intent to Dissolve (the "Notice"), stating their intention to adopt and file articles of dissolution within 50 days from October 16, 2023.

Given the history of the case, the continuing wasteful litigious conduct and the Court's extensive findings of misconduct by Defendant Corporations and their President Efstratios D. Tsintolas ("Steve"), who have *de facto* control of all corporate functions of the Defendant Corporations, Defendant Corporations and Steve should not be trusted to fairly direct the Defendant Corporations' wind-up processes. Thus, as shareholders of Defendant Corporations, Plaintiffs move the Court, pursuant to D.C. Code Ann. § 29-307.50, to appoint a receiver to wind up and settle the affairs of Defendant Corporations in a fair and just manner.

## II.   **PERTINENT BACKGROUND**

1.      On October 24, 2019, Plaintiffs filed the instant suits seeking, *inter alia*, judicial dissolution of Defendants Corporations and included Steve and Cassandra Tsintolas Johnson through the Cassandra Tsintolas Johnson Revocable Trust as Interested Parties (collectively, Defendant Corporations and Interested Parties are the "Defendants").[1]

2.      On January 21, 2020, pursuant to D.C. Code Ann. § 29-312.24(a), Defendant Corporations elected to purchase Plaintiffs' shares at fair value in lieu of dissolving, which set in motion a very specific set of statutory procedures that guide the Court to a prescribed methodology and entry of judgment.

3.      On March 30, 2020, the Court granted a Consent Motion to Consolidate the two cases.

---

[1] The Plaintiffs stated three Counts in each Complaint: (i) judicial dissolution; (ii) inspection of corporate records; and (iii) appointment of a receiver.

20419651_4

4.      After a contentious discovery process and unsuccessful negotiations and mediation between Plaintiffs and Defendants to buy out Plaintiffs' shares, the Court held a non-jury trial on September 26-27, 2022, November 14-15, 2022, and January 9-10, 2023.

5.      On May 22, 2023, the Court entered a Trial Order, wherein it held the fair value of TI to be $1,722,642 and the fair value of OI to be $13,851,614.57. Pursuant to the Court's Pretrial Order dated September 12, 2022, the Court bifurcated the determination of fair value from any determination of expenses, payment plan, post-judgment interest rate, or security interest.

6.      On August 21, 2023, the Court held an additional hearing and heard testimony from Plaintiffs' business valuation expert, Defendants' commercial real estate expert, and Defendants' accounting and business valuation and taxation expert.

7.      On October 5, 2023, this Court entered an Order, which it made clear was a "Final Order," establishing the fair value of Plaintiffs' shares in Defendant Corporations, awarding pre- and post-judgment interests and attorney's fees and costs, setting a security for payment in full, and assigning a schedule for payments (the "Final Order"). The Final Order stated that it "triggers Defendants' 10-day deadline under D.C. Code § 29-312.24(g)."

8.      The Final Order contains, *inter alia,* the Court's extensive findings that there was "ample evidence" of gross, fraudulent misconduct, mismanagement and oppression by Defendant Corporations and Steve, which have caused irreparable injury to Defendant Corporations. By way of illustration, the Court found:

> Plaintiffs reasonably expected that they had a right to dissolve both corporations because of mismanagement. D.C. Code § 29-312.20(a)(2)(D) permits a shareholder to force dissolution of a corporation if 'corporate assets are being misapplied or wasted.' There is ample evidence that . . . Steve failed to adequately manage the Corporations. . . . Expert witnesses on both sides acknowledged that OI's and TI's net operating incomes were far below industry standards. Defendants' own expert, Mr. Tangney, testified that a commercial lender would be willing to loan the Corporations money only if the properties were going to change ownership and be run such that NOI would be closer to the industry standard. *Defendants' own*

*evidence shows that the Corporations have been grossly mismanaged.* If Steve were to use his position as President of the corporations to pay himself hundreds of thousands of dollars—as he planned to do—that would constitute a further gross mismanagement or waste of funds. . . .

Plaintiffs also had probable grounds for relief under D.C. Code § 29-312.20(a)(2)(B), which prohibits corporate officers or directors from engaging in *'illegal, oppressive, [or] fraudulent' behavior. Both Corporations operated unlawfully when they consistently failed to hold shareholder meetings over the course of several years and falsified records of meetings that never existed.* Furthermore, Steve, in his capacity as President, unlawfully refused to allow Fotini and Chris, who were both corporate officers, to review corporate financial documents or learn the details of Steve's exclusive and lucrative property management agreement with both Corporations. Both Steve and Fotini testified that Steve became angry with Fotini when he learned that she went behind his back to request financial documentation from the Corporations' accountant after Steve denied her access to those documents. . . .

There is also evidence that *Steve oppressively used his powers as President.* 'Oppression' is the use of one's corporate power to leverage how or whether another exercises their rights within the corporation. . . . There was undisputed testimony that Steve withheld Chris' dividend check in 2019 until Chris would acquiesce to meeting with Steve in person and approve certain corporate actions. Steve did not deny withholding the check and said that he did it because he felt that Chris needed to meet with him about corporate business. This is textbook oppression. Steve used his corporate power to try to leverage how Chris exercised his rights as a shareholder and officer. . . .

Final Order at pp. 6-8 (emphasis added).

9.    The history of this case also reveals a bad-faith mindset of Defendant Corporations[2] and Steve that have led everyone involved to "waste" more than four years of time and expenses litigating this case upon the Defendant Corporations' election to purchase Plaintiff's shares in lieu of dissolving, only for the Defendant Corporations to simply choose to dissolve after the Court's entry of the Final Order directing the purchase upon the terms and conditions that it considered appropriate. As the Court tellingly remarked in its Final Order,

---

[2] During the course of this litigation, and predominantly while the case was before Judge Lopez, Plaintiffs raised concerns about the fact that counsel for Defendant Corporations were not acting in a disinterested manner and were instead simply operating as extensions of Steve at the expense of the Defendant Corporations. That approach is significantly more problematic and untenable now that this matter is in a dissolution posture.

20419651_4

> At the August 21, 2023, Hearing, the Court asked Defendants what their plan was to complete the purchase. They had none. Defendants elected to purchase Plaintiffs' shares over three years ago. They should have been preparing to have at least $5 million ready to complete the purchase and a plan to further liquidate assets as necessary based on the Court's finding of fair value. Once the Court enters a final order, each Corporation may elect to dissolve within 10 days instead of going through with its election to purchase. D.C. Code § 29-312.24(g). *The Court is greatly concerned that after forcing Plaintiffs to litigate an election to purchase in lieu of dissolution, Defendants will simply choose to dissolve.*

*Id.* at p. 9 (emphasis added).

10.     On October 16, 2023, Defendant Corporations filed the Notice, giving notice of "their intention to adopt the articles of dissolution pursuant to D.C. Code § 29-312.02 and 29-312.03" and to "adopt and file, within 50 days hereinafter, articles of dissolution."

11.     Plaintiffs are presently fifty percent (50%) shareholders of the Defendant Corporations. *See* D.C. Code § 29-312.24(g).

12.     Since the entry of the Final Order, Steve has caused Defendant Corporations to hire new counsel for Defendant Corporations in an effort to waste more of the funds of the Defendant Corporations with baseless efforts to cause further delay and relitigate matters this Court has already decided.

13.     Presently, many of the gross, fraudulent misconduct or mismanagement that the Court found in its Final Order continue. For example, the gross mismanagement practices of the Defendant Corporations that have caused net operating incomes to fall far below industry standards have not changed. The "illegal, oppressive, [or] fraudulent" behaviors that the Court pointed out regarding the failure to hold shareholder meetings, unlawful refusal to allow Fotini and Chris, who are both corporate officers, to review corporate financial documents or learn the details of Steve's exclusive and lucrative property management agreement and payment to his own entities with both Corporate Defendants also continue. In addition, Plaintiffs request for basic financial documents including 2022 financial documents such as income and expense reports by property by year for

2022; check ledger for 2022; financial statements such as balance sheet and income statement for 2022 and tax returns for 2022 have been requested since March of 2023 and Defendant Corporations and Steve provided only old bank statements and none of the financial documents requested. A copy of the Plaintiffs' request for 2022 financial documents is attached hereto and incorporated herein as <u>Exhibit 1</u>. Thus, irreparable injury to Plaintiffs will continue if the Defendant Corporations remain in the full and oppressive control of Steve.

## III.    <u>ARGUMENT</u>

### a.    <u>Legal standards for appointment of a receiver</u>

D.C. Code §29-305.70 ("Shareholder action to appoint custodian or receiver), based on the Model Business Corporation § 7.48 with the same title, provides that this Court

> may appoint one or more persons to be custodians or, if the corporation is insolvent, to be receivers, of and for a corporation in a proceeding by a shareholder if it is established that: . . . [t]he directors or those in control of the corporation are acting fraudulently and irreparable injury to the corporation is threatened or being suffered.

D.C. Code §29-305.70(a)(2). In such a circumstance, the Court "[m]ay issue injunctions, appoint a temporary custodian or temporary receiver with all the powers and duties the court directs, take other action to preserve the corporate assets wherever located, and carry on the business of the corporation until a full hearing is held." D.C. Code §29-305.70(b)(1). After giving a proper notice to all parties and interested persons designated by the court and conducting a full hearing, the Court may appoint a liquidating receiver with powers to, *inter alia*, "[d]ispose of all or any part of the assets of the corporation wherever located, at a public or private sale, if authorized by the court" and "[s]ue and defend in the receiver's own name as receiver." D.C. Code §29-305.70(d)(2).

Additionally, aside from the statutory authority, "a court of equity has inherent power to appoint a receiver to liquidate a corporation . . . where fraud, mismanagement or abuse of trust is present whether or not insolvency is likewise present." *Bailey v. Proctor*, 160 F.2d 78, 81 (1st Cir.

1947) (citing *Tower Hill-Connellsville Coke Co. of West Virginia v. Piedmont Coal Co.*, 64 F.2d 817, 825-827 (4th Cir. 1933), *certiorari denied*, 290 U.S. 675, 54 (1993)); *see also Bellevue Gardens, Inc. v. Hill*, 297 F.2d 185, 187 (D.C. Cir. 1961). Because the officers of the corporation in the management of its properties and assets stand in a fiduciary relationship, if properties or assets are being mismanaged and are in imminent danger of being lost to the shareholders or creditors through the collusion and fraud of such officers, equity will not hesitate to assume charge and control of the properties or assets through a receiver. *Macon Lumber Co. v. Bishop & Collins*, 229 F.2d 305, 307 (6th Cir. 1956). In general, "[t]he decision of whether to appoint a receiver is within the court's discretion." *District of Columbia v. Jerry M.*, 738 A.2d 1206 (D.C. 1999).

b. **The appointment of a receiver in this case is appropriate, necessary, and long overdue.**

In the case at bar, it is appropriate and necessary to appoint a neutral, competent receiver to direct the winding up of the Defendant Corporations, in order to avoid further fraudulent or preferential transfers and save the assets of the Defendant Corporations from being lost, removed, or materially injured. This Court has already made unequivocal, extensive findings of gross, fraudulent misconduct or mismanagement by Steve and the corresponding irreparable damage to Defendant Corporations. *See, e.g.*, Final Order at pp. 6-8. Through the continuation of many of the same problematic conduct by Defendant Corporations and Steve, irreparable injury to Defendant Corporations continue to present day. In fact, since the issuance of the Final Order, Steve and the Defendant Corporations have doubled down on their improper efforts by hiring new counsel[3] in

---

[3] The hiring of the law firm of Shulman Rogers and attorney's Glenn C. Etelson and John Troost was done without consultation of the Plaintiffs and without authority. This was not the first time that the Interested Parties attempted to improperly engage additional counsel on behalf of the Defendant Corporations. On May 18, 2021, Plaintiffs filed the Opposed Motion to Disqualify Counsel for Interested Party Cassandra Tsintolas Johnson Revocable Trust from Representing the Defendant Corporations (the "Motion to Disqualify"). In the Motion to Disqualify, Plaintiffs argued in part that there was a clear conflict of interest and that the Defendant Corporations lacked authority to hire new counsel without Plaintiffs' consent, since they are equal shareholders of the Defendant Corporations. The Court agreed with Plaintiffs and disqualified Mr. Creed as an attorney for the Defendant Corporations. If Steve wanted to engage new counsel, he certainly had that right to do so at his own expense. However, his action to employ new counsel at

order to cause further delay and to relitigate matters that have long been settled in this case. Defendant Corporations' actions of first electing to purchase Plaintiffs' shares in lieu of dissolving and then electing to dissolve after all instead of purchasing Plaintiff's shares in accordance with the Court's Final Order are also telling. The Court should exercise its discretion to appoint a neutral, competent receiver to direct the wind-up processes of the Defendant Corporations.

Based on the Model Business Corporation Act, comparable statutory provisions, and/or principles of equity, many other courts have appointed a receiver where there were similarly gross, fraudulent misconduct or mismanagement of corporations or directors causing or threatening irreparable injury to the corporations. *See* § 7714. Mismanagement, 16 Fletcher Cyc. Corp. § 7714. For example, in *Bellevue Gardens*, 297 F.2d at 187, the United States Court of Appeals for the District of Columbia Circuit upheld the appointment of a receiver when the district court had found "a pattern of conduct by the dominant stockholders, and a disposition on their part to continue the pattern, which was seriously prejudicial to the rights and interests" of the other shareholders. "[W]here it is necessary to preserve assets from irreparable loss through mismanagement of its officers or otherwise, a receiver may be appointed to administer its assets for the benefit of its creditors or its stockholders." *Macon Lumber Co.*, 229 F.2d at 307. Particularly in a voluntary dissolution, it is proper to appoint a disinterested person as receiver instead of permitting the directors to act as trustees where mismanagement by such directors have been shown. *See, e.g.*, *Merchants' & Insurers' Reporting Co v. Jones*, 220 F. 791 (C.C.A. 9th Cir. 1915). As in these cases, appointing a receiver is appropriate and necessary in the case at hand to prevent further fraud and to save Defendant Corporations' properties and assets from injury.

---

the Defendant Corporations' expense to further his goals is patently improper and demonstrates the real and continuing risks of harm with continuing to allow Steve to "run" the Defendant Corporations. Plaintiffs' reserve the right to move to disqualify Shulman Rogers and attorney's Glenn C. Etelson and John Troost.

8

Courts have a great deal of discretion in selecting and appointing a proper receiver. *See Jenkins v. Purcell*, 29 App. D.C. 209, 213 (App. D.C. 1907) ("[T]he wisdom of appointing a receiver and the selection of a proper person as receiver are both largely discretionary with the court having jurisdiction of the parties and the subject-matter."). Movers for a receivership typically nominate potential receivers for the Court to assess and choose from. § 45:2. Receivership process, Strat. Alt. Dis. Bus. § 45:2. Purely for the convenience of the Court, Plaintiffs suggest below a few candidates from the list of individuals who are approved Chapter 7 and Chapter 11 Trustees in the District of Columbia:

> **Marc E. Albert** (Chapter 7 Trustee)
> 1775 Pennsylvania Ave, NW, Suite 800
> Washington, DC 20006
> (202) 785-9100 (phone)
> marc.albert@stinson.com
> https://www.stinson.com/people-MarcAlbert

> **Lawrence A Katz**
> 8270 Greensboro Drive, Suite 700
> Tysons, VA 22102
> (703) 584-8362 (phone)
> lkatz@hirschlerlaw.com
> https://www.hirschlerlaw.com/team-larry-katz

> **Stephen Metz** (Subchapter V Chapter 11 Trustee)
> 7501 Wisconsin Avenue, Suite 1000W
> Bethesda, MD 20814
> (240) 507-1723 (phone)
> smetz@offitkurman.com
> https://offitkurman.com/attorney/stephen-metz

To be clear, Plaintiffs believe that any individual who is approved to serve as Chapter 7 or Chapter 11 Trustees in the District of Columbia would be able to effectively serve as a neutral, competent receiver for Defendant Corporations and leave the selection entirely to the Court's discretion.

* * *

9

20419651_4

WHEREFORE, in consideration of the foregoing grounds and the record herein, Plaintiffs respectfully request that this Honorable Court

     a.     Grant their Motion to Appoint a Receiver; and thereby

     b.     Immediately appoint a qualified neutral individual as a temporary receiver for Defendant Corporations in the form of the Order attached hereto;

     c.     Grant the receiver the powers set forth therein;

     d.     Schedule a full hearing on the Motion; and

     e.     Grant in favor of Plaintiffs such other and further relief as this Honorable Court deems just and proper.

                      Respectfully submitted,

                      STEIN SPERLING BENNETT
                      DE JONG DRISCOLL PC

By:     */s/ Matthew J. Pavlides*
                      Matthew J. Pavlides (D.C. Bar # 424573)
                      Eduardo Garcia (D.C. Bar # 1028040)
                      1101 Wootton Parkway, Suite 700
                      Rockville, MD 20852
                      (301) 340-2020
                      (301) 354-8113 (facsimile)

                      *Attorneys for the Plaintiffs Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust*

## POINTS AND AUTHORITIES

- D.C. Code § 29-312.24

- D.C. Code Ann. § 29-307.50

- § 45:2. Receivership process, Strat. Alt. Dis. Bus.

- § 7714 Mismanagement, 16 Fletcher Cyc. Corp.

- *District of Columbia v. Jerry M.*, 738 A.2d 1206 (D.C. 1999)

- *Jenkins v. Purcell*, 29 App. D.C. 209 (App. D.C. 1907)

- *Bellevue Gardens, Inc. v. Hill*, 297 F.2d 185 (D.C. Cir. 1961)

- *Tower Hill-Connellsville Coke Co. of West Virginia v. Piedmont Coal Co.*, 64 F.2d 817 (4th Cir. 1933)

- *Bailey v. Proctor*, 160 F.2d 78 (1st Cir. 1947)

- *Macon Lumber Co. v. Bishop & Collins*, 229 F.2d 305 (6th Cir. 1956).

- *Merchants' & Insurers' Reporting Co v. Jones*, 220 F. 791 (C.C.A. 9th Cir. 1915).

_____*/s/ Matthew J. Pavlides*_____
Matthew J. Pavlides

## RULE 12-I(a) CERTIFICATION

On November 6, 2023 at 9:14 a.m. via electronic mail, counsel for the Plaintiffs communicated with Counsel for the Defendant Corporations and Interested Parties to determine whether they would consent to the relief requested herein. The Defendant Corporations and the Interested Parties did not consent to the relief requested herein.

_____*/s/ Matthew J. Pavlides*_____
Matthew J. Pavlides

20419651_4

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of November, 2023, a copy of the foregoing was served via *CasefileXpress* on each of the following counsel of record:

> Jonathan C. Windle
> Law Office of Jonathan C. Windle, P.C.
> 8300 Wisconsin Avenue, Suite 416
> Bethesda, Maryland 20814
>
> Richard S. Basile
> Law Office of Richard S. Basile
> 6305 Ivy Lane, Suite 510
> Greenbelt, MD 20770
>
> Michael J. Bramnick
> Joseph M. Creed
> Bramnick Creed, LLC
> 4520 East West Highway, Suite 700
> Bethesda, Maryland 20814
>
> Douglas C. Boggs
> Benjamin S. Boyd
> DLA Piper LLP
> 500 8th St., NW
> Washington, DC 20004
>
> Glenn C. Etelson
> John Troost
> Shulman, Rogers, et. al.
> 12505 Park Potomac Avenue
> Sixth Floor
> Potomac, Maryland 20854

/s/ *Matthew J. Pavlides*
Matthew J. Pavlides

20419651_4

12

# EXHIBIT 1

## Matthew J. Pavlides

| | |
|---|---|
| **From:** | Matthew J. Pavlides <MPavlides@steinsperling.com> |
| **Sent:** | Friday, March 10, 2023 1:35 PM |
| **To:** | Richard Basile |
| **Cc:** | Boyd, Benjamin; jcreed@bramnickcreed.com; Eduardo S. Garcia |
| **Subject:** | Tsintolas/Olympia [SS-LEGAL.FID1456994] |

Hi Richard,

I hope your day is going well.

Please provide the Plaintiffs with the following financial documents for each of the Corporations.

1. Income and Expense Reports by Property for year ended 2022.
2. Check ledger and general ledger for year ended 2022.
3. Financial Statements - Compilation Reports for year ended 2022.
4. Tax Returns for 2022.
5. Bank statements for the each of the Corporations' bank accounts for year end 2022, as well as, the current bank statements.

Many thanks,

Matt

**MATTHEW J. PAVLIDES**
ATTORNEY AT LAW

1101 Wootton Parkway · Suite 700 · Rockville, MD 20852
301-838-3213 direct · 301-340-2020 main · 301-354-8113 direct fax
mpavlides@steinsperling.com · vCard · Bio
www.steinsperling.com · Facebook
admitted in MD, DC, FL, SC

This message contains information from the law firm of Stein Sperling Bennett De Jong Driscoll PC that may be privileged, confidential or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message. Thank you very much.

**Matthew J. Pavlides**

| | |
|---|---|
| **From:** | Matthew J. Pavlides <MPavlides@steinsperling.com> |
| **Sent:** | Friday, March 24, 2023 4:25 PM |
| **To:** | Richard Basile |
| **Cc:** | Boyd, Benjamin; jcreed@bramnickcreed.com; Eduardo S. Garcia |
| **Subject:** | RE: Tsintolas/Olympia - Second Request [SS-LEGAL.FID1456994] |

Hi Richard,

Hope your doing well.

It has been <u>two weeks</u> since my request below for the following documents for each of the Corporations.

1. Income and Expense Reports by Property for year ended 2022.
2. Check ledger and general ledger for year ended 2022.
3. Financial Statements - Compilation Reports for year ended 2022.
4. Tax Returns for 2022.
5. Bank statements for the each of the Corporations' bank accounts for year end 2022, as well as, the current bank statements.

Please advise me as to the status of these documents.

Many thanks in advance,

Matt

**MATTHEW J. PAVLIDES**
ATTORNEY AT LAW



1101 Wootton Parkway · Suite 700 · Rockville, MD 20852
301-838-3213 direct · 301-340-2020 main · 301-354-8113 direct fax
mpavlides@steinsperling.com · vCard · Bio
www.steinsperling.com · Facebook
admitted in MD, DC, FL, SC

This message contains information from the law firm of Stein Sperling Bennett De Jong Driscoll PC that may be privileged, confidential or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message. Thank you very much.

**From:** Matthew J. Pavlides <MPavlides@steinsperling.com>
**Sent:** Friday, March 10, 2023 1:35 PM
**To:** Richard Basile <rearsb@gmail.com>

1

2

**Cc:** Boyd, Benjamin <benjamin.boyd@us.dlapiper.com>; jcreed@bramnickcreed.com; Eduardo S. Garcia <EGarcia@steinsperling.com>
**Subject:** Tsintolas/Olympia [SS-LEGAL.FID1456994]

Hi Richard,

I hope your day is going well.

Please provide the Plaintiffs with the following financial documents for each of the Corporations.

1. Income and Expense Reports by Property for year ended 2022.
2. Check ledger and general ledger for year ended 2022.
3. Financial Statements - Compilation Reports for year ended 2022.
4. Tax Returns for 2022.
5. Bank statements for the each of the Corporations' bank accounts for year end 2022, as well as, the current bank statements.

Many thanks,

Matt

**MATTHEW J. PAVLIDES**
ATTORNEY AT LAW



1101 Wootton Parkway · Suite 700 · Rockville, MD 20852
301-838-3213 direct · 301-340-2020 main · 301-354-8113 direct fax
mpavlides@steinsperling.com · vCard · Bio
www.steinsperling.com · Facebook
admitted in MD, DC, FL, SC

This message contains information from the law firm of Stein Sperling Bennett De Jong Driscoll PC that may be privileged, confidential or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message. Thank you very much.

## Matthew J. Pavlides

| | |
|---|---|
| **From:** | Richard Basile <rearsb@gmail.com> |
| **Sent:** | Wednesday, March 29, 2023 10:00 AM |
| **To:** | Matthew J. Pavlides |
| **Subject:** | 2022 Financials |

Dear Matt,

Thank you for your recent email regarding 2022 financials. The Corporations have filed for an extension of time to file their tax returns for 2022. The due date is mid-September 2023. The Income and Expense reports have not been finalized, nor have the check ledgers been reconciled. There is no general ledger as you know. There are no finalized Financial Statements or Compilation Reports for 2022.

--
Richard S. Basile
The Law Office of Richard S. Basile, P.A.
6305 Ivy Lane
Suite 510
Greenbelt, MD. 20770
ph (301) 441-4900
rearsb@gmail.com
www.richardbasilelaw.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for cooperation.

1

4

**Matthew J. Pavlides**

| | |
|---|---|
| **From:** | Matthew J. Pavlides |
| **Sent:** | Monday, April 17, 2023 3:51 PM |
| **To:** | Richard Basile |
| **Cc:** | Boyd, Benjamin; jcreed@bramnickcreed.com; Eduardo S. Garcia |
| **Subject:** | RE: 2022 Financials -  Tsintolas/Olympia  Follow-up [SS-LEGAL.FID1456994] |

Dear Richard,

It has been another couple of weeks since your email of March 29, 2024 and my clients are still looking for the following documents from each of the Corporations.

1. Income and Expense Reports by Property for year ended 2022.
2. Check ledger for year ended 2022.
3. Financial Statements - Compilation Reports for year ended 2022.
4. Tax Returns for 2022 – (please provide a time estimate as to when these will be provided due to the extension).
5. Bank statements for the each of the Corporations' bank accounts for year end 2022, as well as, the current bank statements – (no reason was given in your prior email as to why these were not furnished).

Please advise me as to the status of these documents.

Many thanks in advance,

Matt

**MATTHEW J. PAVLIDES**
ATTORNEY AT LAW



1101 Wootton Parkway · Suite 700 · Rockville, MD 20852
301-838-3213 direct · 301-340-2020 main · 301-354-8113 direct fax
mpavlides@steinsperling.com · vCard · Bio
www.steinsperling.com · Facebook
admitted in MD, DC, FL, SC

This message contains information from the law firm of Stein Sperling Bennett De Jong Driscoll PC that may be privileged, confidential or otherwise protected from disclosure. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail, and delete the message. Thank you very much.

5

**From:** Richard Basile <rearsb@gmail.com>
**Sent:** Wednesday, March 29, 2023 10:00 AM
**To:** Matthew J. Pavlides <MPavlides@steinsperling.com>
**Subject:** 2022 Financials

Dear Matt,

Thank you for your recent email regarding 2022 financials. The Corporations have filed for an extension of time to file their tax returns for 2022. The due date is mid-September 2023. The Income and Expense reports have not been finalized, nor have the check ledgers been reconciled. There is no general ledger as you know. There are no finalized Financial Statements or Compilation Reports for 2022.

--
Richard S. Basile
The Law Office of Richard S. Basile, P.A.
6305 Ivy Lane
Suite 510
Greenbelt, MD. 20770
ph (301) 441-4900
rearsb@gmail.com
www.richardbasilelaw.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for cooperation.

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

CHRISTOFILOS TSINTOLAS, et al,

        Plaintiffs,

    v.

TSINTOLAS INVESTMENTS, INC., et. al,

        Defendants/Interested Parties.

C.A. No.:   2019 CA 007057 B

Judge Yvonne M. Williams

CHRISTOFILOS TSINTOLAS et al,

        Plaintiffs,

    v.

OLYMPIA INVESTMENTS, INC., et al.,

        Defendants.

Consolidated Case No.: 2019 CA
007059 B

Next event: None

### <u>ORDER</u>

UPON CONSIDERATION OF Plaintiffs' Motion to Appoint a Receiver (the "Motion"), any opposition thereto, any hearing thereon, and the record herein, it is on this _____ day of _____, 2023,

ORDERED, by the Superior Court of the District of Columbia, that the Motion be and hereby is GRANTED; and therefore it is further,

ORDERED, that _____ is appointed as a temporary receiver for Defendants Tsintolas Investments, Inc. ("TI") and Olympia investments, Inc. ("OI"); it is further

ORDERED, that the temporary receiver is granted with the powers

(i)      to take actions to preserve the corporate assets of TI and OI wherever located until a full hearing on the Motion is held;

(ii)     dispose of all or any part of the assets of TI and OI wherever located, at a public or private sale, if specifically authorized by the Court upon request; and

20420123_1

(iii)    to sue defend in the receiver's own name as receiver; and it is further

ORDERED, that a full hearing on the Motion is scheduled for _____ day of

_____, 2023, at _____.

_____
YVONNE M. WILLIAMS, JUDGE
Superior Court of the District of Columbia
(Civil Division)

Copies to:

All counsel of record

# **EXHIBIT 14**

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| **CHRISTOFILOS TSINTOLAS,** *et al.,*<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**TSINTOLAS INVESTMENTS, INC.,** *et al.,*<br>       **Defendants.** | **2019  CA  007057 B**<br><br>**2019  CA  007059 B**<br><br>**Judge Yvonne Williams** |
| **CHRISTOFILOS TSINTOLAS,** *et al.,*<br>       **Plaintiffs,**<br><br>**v.**<br><br>**OLYMPIA INVESTMENTS, INC.,** *et al.,*<br>       **Defendants.** | |

## ORDER

Before the Court are the following motions filed by Defendants Olympia Investments, Inc.

and Tsintolas Investments, Inc. (collectively, the "Corporations"): (i) Defendants' Opposed

Motion for Judicial Determination (the "Corporations' Motion for Judicial Determination"), filed

on April 3, 2024; and (ii) Defendants' Motion for Expedited Briefing Schedule for Defendants'

Opposed Motion for Judicial Determination (the "Corporations' Motion for Expedited Briefing

Schedule"), filed on April 3, 2024 (collectively, the "Corporations' Motions"). Plaintiffs have not

filed a responsive pleading to either motion. For the reasons set forth below, the Corporations'

Motions are **DENIED AS MOOT**.

On November 6, 2024, Plaintiffs filed their Motion to Appoint a Receiver. On November

6, 2023, Plaintiffs filed their Motion for Judicial Determination of Non-Compliance with D.C.

Code § 29-312.24(g) and Resulting Reinstitution of October Final Order for Purchase of Plaintiffs'

Shares ("Plaintiffs' Motion for Judicial Determination"), through which, Plaintiffs request that the

1

Court void the Corporations' October 16, 2023 Notice of Intent to Dissolve and require the Corporations' to purchase Plaintiffs' shares pursuant to the Court's October 5, 2023 final Valuation Order. Pls.' Mot. J. Deter. at 1-2.

On February 7, 2024, the Court entered an Order Granting Plaintiffs' Motion to Disqualify the Law Firm of Shulman Rogers and its Attorneys from Representing the Defendant Corporations ("February 7, 2024 Order"). The Court entered an Order Setting Motion Hearing on February 8, 2024 and ordered the Parties to appear before the Court for consideration of: (i) Plaintiffs' Motion to Appoint a Receiver; and (ii) Plaintiffs' Motion for Judicial Determination. On April 9, 2024, the Court entered an Order Denying Defendants' Motion for Reconsideration of the Court's February 7, 2024 Order. On April 10, 2024, the Court rescheduled this matter's Motion Hearing to April 15, 2024 at 10:00 a.m.

It is inappropriate for the Court to "record [its] views concerning a controversy which no longer exists and to rule on a question which has become moot." *Banks v. Ferrell*, 411 A.2d 54, 56 (D.C. 1979). Through their Motion for Judicial Determination, the Corporations request that the Court "advise the [] Corporations how to proceed in matters concerning the dissolution of the company or retaining counsel in response to its Order Granting Plaintiffs' Motion to Disqualify the Law Firm of Shulman Rogers and its Attorneys from Representing the Defendant Corporations." Corps.' Mot. J. Deter. at 1. Further, through their Motion for Expedited Briefing Schedule, the Corporations request that the Court "direct an accelerated briefing schedule for the [Corporations'] Opposed Motion for Judicial Determination." Mot. Exp. Brief. Sched. at 1.

On February 8, 2024, the Court entered an Order Setting Motion Hearing and ordered the Parties to appear before the Court for consideration of: (i) Plaintiffs' Motion to Appoint a Receiver; and (ii) Plaintiffs' Motion for Judicial Determination. At the Motion Hearing, the Court intends

to hear representations from the Parties about Plaintiffs' Motion for Judicial Determination and, accordingly, the status and viability of the Corporations' dissolution.  On April 9, 2024, the Court entered an Order Denying the Corporations' Motion for Reconsideration, through which, the Court ruled that: (i) the Shulman Rogers Attorneys are disqualified from representing the Corporations; and (ii) the Boards of the Corporations are not "deadlocked" *per se*, but instead, "deadlocked" as to the hiring of the Shulman Rogers Attorneys.   As such, the Court denies as moot the Corporations' Motion for Judicial Determination because the Court has already addressed the relief requested therein.   Given that the Corporations' Motion for Expedited Briefing Schedule solely concerns the briefing schedule of the Corporations' mooted Motion for Judicial Determination, the Corporations' Motion for Expedited Briefing Schedule is also denied as moot.

Accordingly, it is this 11th day of April, 2024, hereby,

**ORDERED** that Defendants' Opposed Motion for Judicial Determination is **DENIED AS MOOT**; and it is further

**ORDERED** that Defendants' Motion for Expedited Briefing Schedule for Defendants' Opposed Motion for Judicial Determination is **DENIED AS MOOT**; and it is further

**ORDERED** that this matter's Motion Hearing on April 15, 2024 at 10:00 a.m. is **VACATED**; and it is further

**ORDERED** that the Parties shall appear before the Court for a Motion Hearing on May 3, 2024 at 2:00 p.m.; and it is further

**ORDERED** that all Parties shall physically appear before the Court for the Motion Hearing and be prepared to make representations concerning: (i) Plaintiffs' Motion to Appoint a Receiver; and (ii) Plaintiffs' Motion for Judicial Determination.

3

**IT IS SO ORDERED**.

Judge Yvonne Williams

Date: April 11, 2024

Copies to:

Eduardo S. Garcia
Matthew J. Pavlides
*Counsel for Plaintiffs*

Richard S. Basile
*Counsel for Defendants*
*Olympia /Investments, Inc.*;
*Tsintolas Investments, Inc.*

Benjamin S. Boyd
Joseph M. Creed
*Counsel for Defendant*
*Cassandra Tsintolas Johnson*
*Revocable Trust*

4

# **EXHIBIT 15**

**CHRISTOFILOS TSINTOLAS, DEBORAH TSINTOLAS, AND FOTINI TSINTOLAS
ECONOMIDES REVOCABLE TRUST'S MOTION TO DIMISS THE BANKRUPTCY
CASES, OR IN ALTERNATIVE, ABSTAIN**

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### (Civil Division)

| | |
|---|---|
| **Christofilos Tsintolas,** ) | |
| ) | |
| And ) | |
| ) | |
| **Deborah Tsintolas,** ) | |
| ) | |
| And ) | |
| ) | |
| **Fotini Tsintolas Economides Revocable Trust,** ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | Case Number: 2019-CA-007059-B |
| ) | |
| **Olympia Investments, Inc.,** ) | |
| ) | |
| Defendant ) | |
| ) | |
| And ) | |
| ) | |
| **Efstratios Tsintolas,** ) | |
| ) | |
| Interested Party ) | |
| ) | |
| And ) | |
| ) | |
| **Cassandra Tsintolas Johnson Revocable Trust** ) | |
| ) | |
| Interested Party ) | |

SECOND SUPPLEMENTAL EXPERT REPORT OF

JOSEPH S. ESTABROOK, CPA/ABV/CFF, ASA

July 18, 2022

**EXHIBIT**

3 4

TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 3

II.  QUALIFICATIONS .................................................................................................... 3

III. DATA AND OTHER INFORMATION CONSIDERED .................................................. 4

IV.  BACKGROUND .......................................................................................................... 5

V.   STOUT VALUATION ................................................................................................ 6

VI.  ADJUSTED BOOK VALUE METHOD ....................................................................... 9

   a.   Overview of the Adjusted Book Value Method .................................................. 9

   b.   Cash and Cash Equivalents ................................................................................ 9

   c.   Accounts Receivable ......................................................................................... 10

   d.   Excess Security Deposits Retained .................................................................. 10

   e.   Steve Tsintolas Receivable .............................................................................. 11

   f.   Shareholder Loans ........................................................................................... 12

VII. FINANCING OF BUY-OUT .................................................................................... 12

VIII. CONCLUSION ........................................................................................................ 13

Exhibits

Exhibit 1 – Biography of Joseph S. Estabrook, CPA/ABV/CFF, ASA
Exhibit 2 – Trial and Deposition Testimony Last Four Years
Exhibit 3 – List of Publications Last Ten Years
Exhibit 4 – Information Considered
Exhibit 5 – Assumptions and Limiting Conditions
Exhibit 6 – Certification

2

## I.    INTRODUCTION

1.    I have been retained by counsel for Christofilos Tsintolas, Deborah Tsintolas and Fotini Tsintolas Economides Revocable Trust (collectively "Plaintiffs") to provide consulting services concerning the valuation of Olympia Investments, Inc. ("Olympia Investments" or the "Company"). I previously issued a reports on February 2, 2021 (the "Original Report") and August 31, 2021 (the "Supplemental Report") in which I expressed an opinion as to the fair value of a 25% interest in Olympia Investments as of October 23, 2019. Since the date of the Supplemental Report, additional documents have been made available for my review. I have been asked to update my opinions from the Supplemental Report to reflect this new information. In this second supplemental report, I will only address the fair value of a 25% interest in Olympia Investments as of October 23, 2019 (the "Valuation Date").

## II.    QUALIFICATIONS

2.    I, Joseph S. Estabrook, am a Managing Director of Stout Risius Ross, Inc. ("Stout"). I have over 35 years of experience as a Certified Public Accountant and consultant in the areas of business valuation, litigation, and dispute resolution services, providing both expert witness and consulting services.  I have been qualified as an expert witness concerning business valuations, damages, tax and financial issues. I have been qualified in U.S. District Court for Alexandria, Federal Bankruptcy Court, in Superior Court for the District of Columbia and in Maryland and Virginia Circuit Courts. I have also been engaged to investigate and analyze numerous losses

3

and improprieties, including inventory losses, misappropriation of funds, searches for hidden assets, undervalued assets, and financial fraud.

3.    I have had extensive litigation and valuation experience, including expert testimony relative to valuations on behalf of plaintiffs and defendants, in federal and state courts. My curriculum vitae, a list of previous testimony, and a list of articles published are attached as Exhibits 1, 2, and 3.

4.    My business address is 1015 15th Street, N.W., Suite 1050, Washington, DC 20005.

5.    My billing rate is $490 per hour for services performed in connection with this matter. Others working under my direction bill at lower rates. In addition, I will be reimbursed for all reasonable out-of-pocket expenses incurred in connection with my analyses and testimony in this case. Neither my compensation, nor Stout's compensation, is dependent on the outcome of this matter or the opinions expressed in this report.

## III.    DATA AND OTHER INFORMATION CONSIDERED

6.    In arriving at the conclusions outlined below, I have based my opinions on my expertise in accounting, business valuation, auditing, financial and damage analysis, independent research of publicly available information, and my review of various documents and pleadings produced to date. The documents and information I considered in forming the opinions expressed in this report are identified in Exhibit 4.

7.    I may supplement or amend this report to the extent additional documents, exhibits, or other materials are disclosed. With respect to my anticipated trial testimony in this case, I may use as exhibits certain documents produced, or testimony given in

4

this action, which I have reviewed or relied upon in this report. I also may create certain demonstrative exhibits, including summary charts, to assist me in presenting my trial testimony.

## IV.    BACKGROUND

8.    Olympia Investments is a corporation formed in the District of Columbia.[1] The Company owns seven apartment buildings that are located around the District and in Maryland.

9.    Christofilos Tsintolas ("Chris") and Deborah Tsintolas ("Deborah") are a married couple residing in Montgomery County, Maryland. They own a 25% interest in the Company.[2]

10.    Fotini Tsintolas Economides Revocable Trust is a revocable trust established for the benefit of Fotini Tsintolas Economides ("Fotini"). The trust owns a 25% interest in the Company.[3]

11.    Efstratios Tsintolas ("Steve") is an individual residing in Montgomery County, Maryland. Steve and his wife, Suzanne Tsintolas, own a 25% interest in the Company.[4]

12.    Cassandra Tsintolas Johnson Revocable Trust is a revocable trust established for the benefit of Cassandra Tsintolas Johnson ("Sandy"). The trust owns a 25% interest in the Company.[5]

---

[1] Complaint dated October 24, 2019, pg. 2.
[2] Complaint dated October 24, 2019, pg. 2.
[3] Complaint dated October 24, 2019, pg. 2.
[4] Complaint dated October 24, 2019, pg. 3.
[5] Complaint dated October 24, 2019, pg. 3.

13.   Chris, Fotini, Steve and Sandy are the children of Mr. and Mrs. Demetrios Tsintolas, who established the Company in 1955 and managed it until approximately October 2002.[6] In or around October 2002, Steve became President of Olympia Investments.[7]

14.   After becoming President in 2002, Steve allegedly began to engage in various activities that were detrimental to the shareholders of the Company. Amongst other things, Steve allegedly made undisclosed contracts with companies that he owned personally, began to collect an undisclosed salary as an employee of the Company, and began to use corporate assets to pay for personal expenses and for expenses of other businesses he controlled.[8]

15.   Concerns were raised about these practices and a request was made to review various documents.[9] Steve has refused to produce many of the requested documents.[10]

16.   The Company now finds itself in a deadlock. Therefore, the Plaintiffs filed the aforementioned Complaints.

## V.    STOUT VALUATION

17.   As part of my engagement, I have been asked to determine the Fair Value of the Company and the Fair Value of a 25% interest in the equity of Olympia Investments on a marketable, controlling interest basis (the "Subject Interest"), as of October

---

[6] Complaint dated October 24, 2019, pg. 3.
[7] Complaint dated October 24, 2019, pg. 3.
[8] Complaint dated October 24, 2019, pg. 4.
[9] Complaint dated October 24, 2019, pgs. 5 and 7.
[10] Complaint dated October 24, 2019, pg. 8.

23, 2019.[11]  I understand the results of my analysis will be used in this judicial

matter.

18.  For purposes of my valuation, the standard of value is Fair Value. Fair Value is

defined as "the value of the corporation's shares determined: (A) Immediately

before the effectuation of the corporate action to which the shareholder objects; (B)

Using customary and current valuation concepts and techniques generally

employed for similar businesses in the context of the transaction requiring

appraisal; and (C) Without discounting for lack of marketability or minority status,

except, if appropriate, for amendments to the articles pursuant to § 29-

311.02(a)(5)."[12]

19.  I conducted my analysis of the Company under a going-concern premise, meaning

that the underlying assets of the Company are presumed to attain their highest

values as integral components of a business entity in continued operations.

20.  My analysis considered the valuation guidelines references in Revenue Ruling 59-

60, 1959-1 C.B. 237, which include consideration of the following factors:

- the nature of the business and the history of the Company from its inception;

- the economic outlook in general and the condition and outlook of the industry

  in which the Company operates;

- the book value of the stock and the financial condition of the Company;

- the earnings capacity of the Company;

---

[11] Per §29-312.24(a) and §29-312.24(d), it is my understanding the standard of value should be "Fair Value" and the valuation date should October 23, 2019, which is the day prior to the date of the original Complaint for Judicial Dissolution and Other Relief. I have also been asked to opine as to the Fair Value of the Company as of December 31, 2020, which is provided in a separate supplemental report.
[12] DC ST §29-311.01(4)

- the dividend-paying capacity of the Company;

- whether goodwill or other intangible value exists within the Company;

- previous sales of the Company's stock and the size and block of stock to be valued; and

- the market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

21.    The objective of a valuation is to express an unambiguous opinion as to the value of the business, business ownership interest, or security, which is supported by all procedures that the valuator deems to be relevant to the valuation.

22.    A valuation has the following qualities:

- Its conclusion of value is expressed as a single dollar amount or a range.

- It considers all relevant information as of the valuation date available to the valuator at the time of performance of the valuation.

- The valuator conducts appropriate procedures to collect and analyze all information expected to be relevant to the valuation.

- The valuation considers all conceptual approaches deemed to be relevant by the valuator.

23.    For my valuation, I used standard valuation approaches and methodologies. The financial information in this valuation, including the accompanying schedules, is presented solely to assist in the development of my conclusion of value, and it should not be used for any other purpose. Because of the limited purpose of this

8

information, it may contain departures from generally accepted accounting principles (GAAP).

24.  My valuation analysis is presented in Schedules A – D to this report.

25.  As presented in Schedule A.1, I determined the Fair Value of Olympia Investments, as of October 23, 2019, to be $15,657,000 and the Fair Value of a 25% equity interest in the Company to be $3,914,000. Therefore, the total of the Fair Value of the Plaintiffs' combined 50% interest is $7,828,000.

## VI.    ADJUSTED BOOK VALUE METHOD

### a.  Overview of the Adjusted Book Value Method

26.  I valued Olympia Investments using the adjusted book value method, which adjusts the Company's reported and unreported assets and liabilities to derive an indication of value for stockholders' equity. These adjustments are described on Schedule C.1 of my analysis.

### b.  Cash and Cash Equivalents

27.  As of the date of this report, the Company's general ledger has not been made available.[13] Additionally, no workpapers have been provided reconciling the Company's cash balance to its bank statements and no statements have yet been produced for a certificate of deposit at SunTrust bank with a balance of approximately $150,000.

28.  For purposes of this analysis, I have adjusted the Company's cash balance to reflect the balances on its bank statements on the Valuation Date, which bank accounts include SunTrust Checking x2539, SunTrust Checking x4065 and Sandy Spring

---

[13] A check ledger has been produced. However, the check ledger does not reflect any balances or activity in any non-cash accounts.

Checking x4001. I have subtracted from that total the amount of $10,728, which is the total of checks written in the month prior to the Valuation Date that were still outstanding as of the Valuation Date.

29.    I have assumed the value of the certificate of deposit is equal to (a) the $152,904 balance on December 31, 2018 reported on the 2018 tax return plus (b) the pro-rated amount of the $1,537 in interest income reported on the 2019 return corresponding to the period through the Valuation Date.

**c.  Accounts Receivable**

30.    The value of Accounts Receivable has been adjusted to reflect the total amounts identified by Olympia Investments as outstanding on its past due reminder notices to tenants in October 2019.

**d.  Excess Security Deposits Retained**

31.    Defendant has produced a document showing that Tsintolas Realty, Inc. ("Tsintolas Realty") retained a total of $12,798 in security deposits over a five-year period on behalf of Olympia Investments.[14] These security deposits were withheld from tenants at the termination of their leases and there is no longer any obligation to repay them to the former tenants. The retained security deposits remain in Tsintolas Realty's bank accounts but are an asset of Olympia Investments.

32.    I have been asked by counsel to assume that Tsintolas Realty retained excess security deposits over a twenty-year period at the annualized average rate of $2,560 indicated in Defendant's analysis. Accordingly, I have included an asset of $51,192 for excess retained security deposits in my analysis.

---

[14] TRC 000268

10

### e. Steve Tsintolas Receivable

33.     This asset consists of $481,537 due from Steve resulting from (a) Steve classifying himself as an employee rather than as a subcontractor and from (b) improper credit card charges and check payments.

34.     I understand that Steve receives management fees for management of the Company's properties subject to a Property Management Agreement dated March 1, 1997. This agreement identifies Steve as an independent contractor.[15] However, Steve has paid himself wages as an employee of the Company of $60,000 per year or more since at least 2014.[16] Receiving payment as an employee has caused the Company to incur the employer share of payroll taxes on all of the wages paid. As shown on Schedule D.2, I have calculated the amount of employer payroll taxes incurred by multiplying the wages reported on Steve's W-2's by 7.65%.[17] For 2019, I have pro-rated the total wages reported on the W-2 to reflect only the period through the Valuation Date. The total excess employer payroll taxes for 2014 through the Valuation Date are $29,872.

35.     In addition to the excess payroll taxes, the Plaintiffs have identified a number of improper credit card charges and check payments listed in the Company's check ledgers and on various statements and invoices produced in discovery. A detailed listing of these transactions is included as Schedule D.3. Altogether, these charges total to $451,665 from 2014 through the Valuation Date.

---

[15] Property Management Agreement dated March 1, 1997, p. 1.

[16] Schedule D.2

[17] The employer payroll taxes consist of 6.2% for the employer share of social security tax and 1.45% for the employer share of Medicare. In addition to these amounts, the wages would likely have been subject to state and federal unemployment tax. However, insufficient documentation has been provided for me to determine what these amounts would have been. Therefore, no amount is currently included for those taxes in this analysis.

**f.  Shareholder Loans**

36.    The Company's 2018 tax return reports $65,400 in shareholder loans as a liability.[18]
As of the date of this report, no documents have yet been produced which detail the
history of any such loans, to whom the loans are owed or how the amount of the
loans was determined. I note that the Company has not historically reported any
interest expense, as would usually be paid on a loan. I also note that the amount of
the loan has remained constant from 2014 through 2018. Therefore, Company's tax
returns do not corroborate the existence of shareholder loans. Accordingly, I have
not included any amount for shareholder loans as a liability in this analysis.

## VII.  FINANCING OF BUY-OUT

37.    I have also been asked to determine if it possible to finance a buy-out of the
Plaintiffs' combined 50% interest in the Company. The Company does not
currently have any outstanding mortgages on its properties. Therefore, it could take
a mortgage out on its properties to finance a buy-out. Since mortgages are
collateralized, this approach would allow for funds to be borrowed at a low interest
rate. Based on my conversations with financiers, Olympia Investments could easily
obtain a mortgage on its portfolio of properties that could finance all of the 50%
buy-out.

38.    Mortgage underwriters are interested in a property's net operating income ("NOI")
when determining how much they are willing to lend. I understand that underwriters
typically seek for a property to have a multiple of at least 125% of NOI to annual
debt service requirements. The Company currently generates NOI that is more than

---

[18] Schedule B.1

sufficient to cover 125% of the annual debt service of a loan that fully finances a 50% buy-out (see Schedule E.1). Therefore, in my opinion, Olympia Investments could finance a buy-out of the Plaintiffs' combined 50% interest in the Company.

## VIII.   CONCLUSION

39.     In my opinion, within a reasonable degree of accounting certainty, the Fair Value of Olympia Investments, as of October 23, 2019, is $15,657,000 and the Fair Value of a 25% equity interest in the Company is $3,914,000 (Schedule A.1). Therefore, the total of the Fair Value of the Plaintiffs' combined 50% interest is $7,828,000.

40.     I hereby certify that this report is a complete and accurate statement of all of my opinions, and the basis and reasons for them, to which I will testify under oath. The opinions expressed herein are based on the information made available to me as of the date of this report.  I reserve the right to review such information disclosed by the parties subsequent to the date of this report and update this report as necessary to reflect any additional analysis and conclusions.

**STOUT RISIUS ROSS, INC.**

Joseph S. Estabrook, CPA/ABV/CFF, ASA
Managing Director

13

## **Exhibit 1**

**Biography of Joseph S. Estabrook, CPA/ABV/CFF, ASA**

## Joseph Estabrook
Managing Director





**Washington, DC USA**
**Office:** +1.202.370.9977
**Mobile:** +1.301.814.7648
jestabrook@stout.com

### Education

B.S., Accounting
University of Maryland

### Designations

Certified Public Accountant (CPA)
Accredited in Business Valuation (ABV)
Certified in Financial Forensics (CFF)
Accredited Senior Appraiser, Business
Valuation (ASA)

### Practice Areas

Valuation Disputes
Complex Business Litigation
High-Stakes Marital Dissolution
Shareholder Disputes
Transaction Disputes
Investigations
Trust & Estate

Joseph Estabrook is responsible for the performance and oversight of engagements in complex litigation and consulting matters involving valuation, damages, tax and financial issues.

Mr. Estabrook has more than 35 years of consulting experience and has been qualified as an expert witness in business valuations, damages, tax and financial issues, and has valued numerous businesses in a variety of industries that span the economic spectrum. Mr. Estabrook has also been engaged to investigate and analyze numerous losses and improprieties, including inventory losses, misappropriation of funds, searches for hidden assets, undervalued assets, and financial fraud. His experience also includes a number of investigations for hidden assets and tracing relating to separate property issues in domestic cases where he and his team have provided consulting services or he has acted as a testifying expert. He provides attorney case assistance to facilitate the discovery process, develop case strategy, and analyzes experts' positions.

Mr. Estabrook has performed hundreds of valuations of closely held business interests, intellectual property, and other ownership interests. The majority of his valuations are performed in the context of litigation, which includes shareholder disputes, domestic relation matters, and dissenting shareholder actions. He also has extensive experience in providing business valuations for estate and gift tax purposes.

### Professional Memberships

- AAML Foundation Forensic and Business Valuation Division
- American Institute of Certified Public Accountants
- American Society of Appraisers
- Maryland Association of Certified Public Accountants
- Washington, DC Estate Planning Council

## **Exhibit 2**

**Trial and Deposition Testimony Last Four Years**

# JOSEPH S. ESTABROOK, CPA/ABV/CFF, ASA
# TRIAL & DEPOSITION TESTIMONY - Last 4 Years

Deposition testimony provided in the matter of MARK RICHARDSON v. CELESTE RICHARDSON, Case No. 145231-FL, Circuit Court for Montgomery County, Maryland; Jul-18. Provided deposition testimony related to forensic accounting, income and income taxes.

Deposition testimony provided in the matter of SAUL v. SAUL, Case No. 144554-FL, Circuit Court for Montgomery County, Maryland; Jul-18. Provided deposition testimony related to business valuation and forensic accounting.

Arbitration testimony provided in the matter of CARS DB1, LLC v. GENEVA ENTERPRISES, INC. Case No.01-18-0001-0347, in the American Arbitration Association Proceeding, Washington, D.C.; Jul18. Provided testimony related to lost profit damages.

Trial testimony provided in the matter of SAUL v. SAUL, Case No. 144554-FL, Circuit Court for Montgomery County, Maryland; Judge David W. Lease; Aug-18. Provided trial testimony related to business valuation and income taxation.

Trial testimony provided in the matter of SIZOV v. SIZOV, Alexandria Circuit Court, Virginia; Judge Nolan B. Dawkins; Sept-18. Provided trial testimony related to business valuation.

Trial testimony provided in the matter of SMURZYNSKI v. MATHEWS, Case No. 145699-FL, Circuit Court for Montgomery County, Maryland; Judge Jeannie Eun Kyung Cho; Sept-18. Provided trial testimony related to forensic accounting, investment rate of return and income and income taxes.

Deposition testimony provided in the matter of O'HAGAN v. O'HAGAN, Case No. 149646-FL, Circuit Court for Montgomery County, Maryland; Nov-18. Provided deposition testimony related to forensic accounting.

Trial testimony provided in the matter of UMANZOR v. UMANZOR, Case No. 145003-FL, Circuit Court for Montgomery County, Maryland; Judge Cynthia Callahan; Dec-18. Provided trial testimony related to business valuation and forensic accounting.

Deposition testimony provided in the matter of GERDING v. GERDING, Case No. 2017-13122, Circuit Court for the county of Fairfax; Feb-19. Provided deposition testimony related to business valuation.

Trial testimony provided in the matter of KERN v. RAPP, Case No. 2018 DRB 00802, Superior Court of the District of Columbia, Maryland; Judge Jennifer A. DiToro; Aug-18. Provided trial testimony related to business valuation and accounting.

Deposition testimony provided in the matter ATLANTIC COAST PIPELINE V. FENTON FAMILY HOLDINGS, LLC, Case No. 3: 18cv00006 - NKM, US District Court for the Western District of Virginia, Charlottesville Division; March-19. Provided deposition testimony related to lost profit damages.

Trial testimony provided in the matter of HELFER v. LINO, Case No. 2014 DRB 003402, Superior Court of the District of Columbia, Maryland; Judge Krauthamer; May-19. Provided trial testimony related to forensic accounting, income tax and income issues.

Trial testimony provided in the matter of GOICOCHEA v. GOICOCHEA, Case No. 157200-FL, Circuit Court for Montgomery County, Maryland; Judge Sharon V. Burrell; June-19. Provided trial testimony related to forensic accounting, business valuation, income issues and income tax.

Trial testimony provided in the matter of KELLY v. KELLY, Case CL 2018-13031, Circuit Court of Fairfax County, Virginia; Judge Robert J. Smith. Deemed an expert in forensic accounting, investment rate of return, income tax, and income.

Deposition testimony provided in the matter of VOGEL v. HILLMAN, ET AL., Case No. CAE 17-17655, Circuit Court for Prince George's County, Maryland; Jul-19. Provided deposition testimony related to lost profit damages and business valuation.

Trial testimony provided in the matter of ODERO v. PALACIOS-THOMAS, Case No. 151616-FL, Circuit Court for Montgomery County, Maryland; Judge Christopher C. Fogleman; Oct-19. Provided trial testimony related to Forensic Accounting and Asset Tracing.

Deposition testimony provided in the matter of THE WHARF, INC, et al. v. DISTRICT OF COLUMBIA, HOFFMAN-MADISON WATERFRONT, et al., Case FL 1:15-cv-01198-CKK in the U.S. District Court for the District of Columbia; Oct-19. Provided deposition testimony related to lost profit damages.

Deposition testimony provided in the matter of DAVID LOOSE v. CSRA, INC., Case FL 2019-00926, Fairfax County Circuit Court, Virginia; Jan-20. Provided deposition testimony related to lost profit damages.

Trial testimony provided in the matter of SHOUHAYIB v. SHOUHAYIB, Case No. 2017 DRB 002843, Superior Court for the District of Columbia; Judge Peter A. Krauthamer; Feb-20. Provided trial testimony related to business valuation, forensic accounting, and income issues.

Trial testimony provided in the matter of DAVID LOOSE v. CSRA, INC. et al., Case No. 2019-00926, Circuit Court for Fairfax County; Judge Richard E. Gardiner; Mar-20. Provided trial testimony related to lost profit damages.

Trial testimony provided in the matter of GOICOCHEA v. GOICOCHEA, Case No. 157200 - FL, Circuit Court for Montgomery County, Maryland; Judge Christopher C. Fogleman; Mar-20. Provided trial testimony related to business valuation, forensic accounting, asset tracing, income and income tax.

Hearing testimony provided in the matter of KATHERINE BROWN v. JAMES F. BROWN, Case No. C-02-FM-19-004403, Circuit Court for Anne Arundel County, Maryland; Magistrate Erin E. McCarthy; Jun-20. Provided hearing testimony related to forensic accounting, income and income tax.

Deposition testimony provided in the matter of CLOUGH v. RYAN, Case No. 101576-F, 300th Judicial District Court for Brazoria County, Texas; Aug-20. Provided deposition testimony related to income taxes.

Deposition testimony provided in the matter of SHAPIRO v. SHAPIRO, Case No. 158748-FL, Circuit Court for Montgomery County, Maryland; Sep-20. Provided deposition testimony related to forensic accounting, income, and income taxes.

Trial testimony provided in the matter of SHAPIRO v. SHAPIRO, Case No. 158748-FL, Circuit Court for Montgomery County, Maryland; Judge James Bonifant; Sep-20. Provided trial testimony related to forensic accounting, income, income taxes, and investment rate of return.

Trial testimony provided in the matter of NOURI v. DADGAR, Case No. 134588-FL, Circuit Court for Montgomery County, Maryland; Judge Cheryl A. McCally; Sep-20. Provided trial testimony related to forensic accounting.

Deposition testimony provided in the matter of SCHWARTZ v. REALE, Case No. 158072-FL, Circuit Court for Montgomery County, Maryland; Nov-20. Provided deposition testimony related to forensic accounting and investment rate of return.

Deposition testimony provided in the matter of BERMAN v. BERMAN, Case No. 156713-FL, Circuit Court for Montgomery County, Maryland; Dec-20. Provided deposition testimony related to business valuation and forensic accounting.

Trial testimony provided in the matter of GREENBERG v. GREENBERG, Case No. 162287-FL, Circuit Court for Montgomery County, Maryland; Judge Bibi M. Berry; Dec-20. Provided trial testimony related to business valuation.

Trial testimony provided in the matter of SCHWARTZ v. REALE, Case No. 158072-FL, Circuit Court for Montgomery County, Maryland; Judge Jill R. Cummins; Jan-21. Provided trial testimony related to forensic accounting, investment rate of return, and income taxes.

Deposition testimony provided in the matter of SMITH AND KMIEC v. BRIAN MARTIN, Case No. 01-20-0000-0146, American Arbitration Association, Washington, DC; Feb-21. Provided deposition testimony related to business valuation and damages.

Trial testimony provided in the matter of BRASHER v. BRASHER, Case No. C-02-FM-19-003210, Circuit Court for Anne Arundel County, Maryland; Judge Elizabeth S. Morris, Apr-21. Provided trial testimony related to Business Valuation, Income Taxes, Asset Tracing, and Internal Rate of Return.

Deposition testimony provided in the matter of GREEN ANALYTICS MD, LLC, ET AL. v. PINNACLE CT, INC., ET AL., Case No. 24-C-000699 CN, Circuit Court for Baltimore City, Maryland; Jun-21. Provided deposition testimony related to Lost profit damages.

Deposition testimony provided in the matter of CHRISTOFILOS TSINTOLAS, ET AL. v. TSINTOLAS INVESTMENTS, INC., ET AL., Case No. 2019 CA 007057 B, Superior Court for the District of Columbia, District of Columbia; Jul-21. Provided deposition testimony related to business valuation and forensic accounting.

Deposition testimony provided in the matter of GAGOLIN v. MAYZEL, Case No. 163571 FL, Circuit Court for Montgomery County, Maryland; Jul-21. Provided deposition testimony related to business valuation and income taxes.

Trial testimony provided in the matter of DAHLGAARD v. SCHOENFELD, Case No. 2019 DRB 003037, Superior Court for the District of Columbia; Judge Elizabeth C. Wingo; Oct-21. Provided trial testimony related to forensic accounting, business valuation, and internal rate of return.

Trial testimony provided in the matter of TORNILLO v. TORNILLO, Case No. 2019 DRB 001544, Superior Court for the District of Columbia; Judge Carmen G. McLean; Oct-21. Provided trial testimony related to accounting.

Trial testimony provided in the matter of TENNEBAUM V. TENNEBAUM, Case No. 27-FA-19-8540, Hennepin County District Court, Minnesota, Judge Richard A. Stebbins; Feb-22. Provided trial testimony related to business valuation.

Trial testimony provided in the matter of GIL GIRO V. CLAIRE GIRO, Case FL 158729, Circuit Court for Montgomery County, Maryland; Judge Rachel McGuckian; March 2022. Deemed an expert in business valuation.

Trial testimony provided in the matter of HERBERT V. JOUBERT, Case CL2015-8284, Circuit Court for Fairfax County, Virginia; Grace Burke Carroll; May-22. Deemed an expert in forensic accounting.

## **Exhibit 3**

**List of Publications**

**JOSEPH S. ESTABROOK, CPA/ABV/CFF, ASA**
**ALL PUBLICATIONS – Last Ten Years**

- "What You Need to Know When a Valuation Expert Uses the Market Approach," *Litigation Perspectives*, Summer 2013, co-author.

- "A CPA's Guide to Family Law Services", 2nd Edition – American Institute of Certified Public Accountants, Forensics and Valuation Services Section, contributing author, May 2013.

- "Disputes in M&A Transactions," Invotex Litigation Perspectives, April, 2013, co-author.

- "Nothing is Certain but Death and Estate Taxes" – Invotex Litigation Perspectives, Summer 2012.

**<u>Exhibit 4</u>**

**Information Considered**

### List of Documents Considered

1. Complaint for Judicial Dissolution and Other Relief dated October 24, 2019
2. Plaintiffs' Opposed Second Motion to Compel Discovery from Defendants, 09/14/20
3. DEF 0001-9930; DEF 10000-10358; DEF 11350-11453
4. ACC 000089-000127
5. DEN 000012-000040
6. TRC 000140-000268
7. Plaintiff 000001-006212
8. Tax Returns, 2014-2019
9. Compiled Financial Statements, 2015-2020
10. Internal Financial Statements and Workpapers, 2005-2020
11. Sapperstein Appraisal Report for 4020-4030-4040 Livingston Road SE Property, 01/27/21 (as of 10/23/19)
12. Sapperstein Appraisal Report for 1010 G Street NE Property, 01/27/21 (as of 10/23/19)
13. Sapperstein Appraisal Report for 1521 E Street NE Property, 01/27/21 (as of 10/23/19)
14. Sapperstein Appraisal Report for 3901 53rd Street Property, 01/28/21 (as of 10/23/19)
15. Sapperstein Appraisal Report for 5400 7th Street NW Property, 01/27/21 (as of 10/23/19)
16. Sapperstein Appraisal Report for 810 Kennedy Street NE Property, 01/27/21 (as of 10/23/19)
17. Sapperstein Appraisal Report for 8212 Flower Ave Property, 01/27/21 (as of 10/23/19)
18. Sapperstein Appraisal Report for 829 Rock Creek Church Road NW Property, 01/27/21 (as of 10/23/19)
19. Riley Appraisal Reports for 4020-4030-4040 Livingston Road SE Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
20. Riley Appraisal Reports for 1010 G Street NE Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
21. Riley Appraisal Reports for 1521 E Street NE Property, 12/20/19 (as of 11/11/19)
22. Riley Appraisal Reports for 3901 53rd Street Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
23. Riley Appraisal Reports for 5400 7th Street NW Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
24. Riley Appraisal Reports for 810 Kennedy Street NE Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
25. Riley Appraisal Reports for 8212 Flower Ave Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
26. Riley Appraisal Reports for 829 Rock Creek Church Road NW Property, 12/20/19 (as of 11/11/19); 02/12/21 (as of 10/23/19); and 02/12/21 (as of 12/31/20)
27. Property Management Agreements dated January 1, 1995 and March 1, 1997
28. Agreement re Life Insurance and Prior Debts Owed dated June 3, 1995
29. 1099's and W-2's of Steve Tsintolas
30. CV of Steve Tsintolas

31. Partial List of Capital Projects and Improvements Performed
32. Transcript of Deposition of Steve Tsintolas, 06/28/21, 06/29/21 & 06/30/21
33. Transcript of Deposition of Walter Pennington, 04/25/22
34. Other public information as footnoted in this report

## <u>Exhibit 5</u>

**Assumptions and Limiting Conditions**

## Assumptions and Limiting Conditions

This valuation report is subject to the following assumptions and limiting conditions:

- In performing my analysis, I used various financial and other information provided to me by management or its representatives, and relied on the accuracy and completeness of this information. I have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, I do not express an opinion or any other form of assurance thereon.

- Public information and industry and statistical information have been obtained from sources I believe to be reliable. However, I make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

- For the purpose of this engagement and report, I make no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- My conclusion of value assumes the assets and liabilities presented in the Company's December 31, 2018 balance sheet were intact as of that date and were not materially different than on the Valuation Date, other than what was adjusted. Any change in the level of assets or liabilities could cause a change in the value I estimated. Furthermore, I assume there are no hidden or unexpected conditions that would adversely affect the value I estimated.

- I do not provide assurance on the achievability of the results forecasted in this report. Differences between actual and expected results may be material and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

- My conclusion of value is applicable to the Subject Interest for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- My services, this report (which reflects a Restricted Appraisal Report as defined by Standard 10, "Business Appraisal, Reporting" of the Uniform Standards of Professional Appraisal Practice and a Summary Report as defined by the American Institute of Certified Public Accountants Statement on Standards for Valuation Services), and the opinions expressed herein are provided exclusively for the use of the addressee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without my prior written consent. Further, the rationale for how I arrived at the opinions and conclusions expressed herein may not be understood properly without additional information contained in my internal work papers.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" or a "solvency opinion" regarding any contemplated present or future transaction.

- None of my employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, my compensation is neither based nor contingent on the results of my analysis.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and I have no obligation to update my report for such events and conditions.

- I have performed a valuation engagement, as that term is defined in the Statement on Standards for Valuation Services of the American Institute of Certified Public Accountants. The estimate of value that results from a valuation engagement is expressed as a conclusion of value.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.

## **Exhibit 6**

**Certification**

## Certification

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report, on which the analysis, opinions, and conclusions expressed herein are based, are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- The data used in this report was obtained from sources believed to be reliable. All facts known to me that have bearing on the values presented in this report have been considered, and no facts of importance have been intentionally omitted.

- I have no present or prospective interest in the business that is the subject of this report, and I have no personal interest with respect to the parties involved.

- I have no bias with respect to the business that is the subject of this report or the parties involved with this assignment.

- My engagement in this assignment was not contingent on developing or reporting predetermined results.

- My compensation for completing this assignment is fee-based and is not contingent on the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions are developed, and this report is prepared, with the intent of being in conformity with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation, the Principles of Appraisal Practice and Code of Ethics of the American Society of Appraisers, and the American Institute of Certified Public Accountants Statement on Standards for Valuation Services.

- The American Society of Appraisers has a mandatory reaccreditation program for all of its Accredited Senior Appraisers. The undersigned Accredited Senior Appraiser(s) are in compliance with the requirements of that program.

- Stout Risius Ross, LLC has performed no services, as an appraiser or in any other capacity, regarding the business that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Joseph S. Estabrook, CPA/ABV/CFF, ASA
Managing Director

**Olympia Investments, Inc.**
**October 23, 2019**
**Conclusion of Value**                                                                 Schedule A.1

*In U.S. Dollars*

| | | |
|---|---|---|
| 1 | Adjusted Book Value Method | $ 15,657,482 |
| 2 | Concluded Equity Value | $ 15,657,482 |
| 3 | Fair Value of Equity - 100% Interest (Rounded) | $ 15,657,000 |
| 4 | Fair Value of Equity - 25% Interest (Rounded) | 25% $ 3,914,000 |

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Reported Balance Sheets**                                                                      **Schedule B.1**
*In U.S. Dollars*

|   |   | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
|---|---|---|---|---|---|---|
| 1 | Cash | $ 153,855 | $ 209,627 | $ 218,228 | $ 74,738 | $ 112,357 |
| 2 | Certificate of Deposit | 0 | 0 | 0 | 151,383 | 152,904 |
| 3 | Accounts Receivable | 51,169 | 51,169 | 51,169 | 51,169 | 51,169 |
| 4 | Total Current Assets | 205,024 | 260,796 | 269,397 | 277,290 | 316,430 |
| | | | | | | |
| 5 | Buildings and Other Depreciable Assets | 779,980 | 761,655 | 770,795 | 770,795 | 770,795 |
| 6 | Land | 71,639 | 71,639 | 71,639 | 71,639 | 71,639 |
| 7 | Less: Accumulated Depreciation | (779,396) | (761,305) | (763,215) | (765,159) | (766,987) |
| 8 | Net Property and Equipment | 72,223 | 71,989 | 79,219 | 77,275 | 75,447 |
| | | | | | | |
| 9 | Total Assets | $ 277,247 | $ 332,785 | $ 348,616 | $ 354,565 | $ 391,877 |
| | | | | | | |
| 10 | Accounts Payable | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| 11 | Payroll Taxes Payable | 0 | 0 | 3,192 | 3,192 | 3,192 |
| 12 | Total Current Liabilities | 0 | 0 | 3,192 | 3,192 | 3,192 |
| | | | | | | |
| 13 | Loans from Shareholders | 65,400 | 65,400 | 65,400 | 65,400 | 65,400 |
| 14 | Total Long-Term Liabilities | 65,400 | 65,400 | 65,400 | 65,400 | 65,400 |
| | | | | | | |
| 15 | Total Liabilities | 65,400 | 65,400 | 68,592 | 68,592 | 68,592 |
| | | | | | | |
| 16 | Capital Stock | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| 17 | Retained Earnings | 221,985 | 207,847 | 263,385 | 276,024 | 281,973 |
| 18 | Net Income | 101,462 | 148,968 | 141,607 | 147,556 | 183,485 |
| 19 | Distributions | (115,600) | (93,430) | (128,968) | (141,607) | (146,173) |
| 20 | Total Stockholders' Equity | 211,847 | 267,385 | 280,024 | 286,973 | 323,285 |
| | | | | | | |
| 21 | Total Liabilities & Stockholders' Equity | $ 277,247 | $ 332,785 | $ 348,616 | $ 354,565 | $ 391,877 |

Source: Federal tax returns for the fiscal year periods.

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Reported Income Statements**                                        **Schedule B.2**

*In U.S. Dollars*

|   |   | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
|---|---|---|---|---|---|---|
| 1 | Total Net Sales | $ 1,046,871 | $ 1,039,295 | $ 1,024,005 | $ 1,107,278 | $ 1,128,629 |
| 2 | *Growth Rate* | *n/a* | *-0.7%* | *-1.5%* | *8.1%* | *1.9%* |
| | | | | | | |
| 3 | Management Fee | 59,133 | 9,522 | 23,452 | 13,391 | 9,189 |
| 4 | Other Operating Expenses | 885,887 | 880,571 | 857,036 | 945,770 | 935,648 |
| 5 | Depreciation | 389 | 234 | 1,910 | 1,944 | 1,828 |
| 6 | **Total Operating Expenses** | 945,409 | 890,327 | 882,398 | 961,105 | 946,665 |
| | | | | | | |
| 7 | **Operating Income** | 101,462 | 148,968 | 141,607 | 146,173 | 181,964 |
| | | | | | | |
| 8 | Interest Income | 0 | 0 | 0 | 1,383 | 1,521 |
| | | | | | | |
| 9 | **Earnings Before Taxes** | 101,462 | 148,968 | 141,607 | 147,556 | 183,485 |
| | | | | | | |
| 10 | Income Tax Benefit (Expense) | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| 11 | **Net Income (Loss)** | $   101,462 | $   148,968 | $   141,607 | $   147,556 | $   183,485 |
| | | | | | | |
| 12 | **EBIT** | $   101,462 | $   148,968 | $   141,607 | $   146,173 | $   181,964 |
| 13 | EBIT Margin | 9.7% | 14.3% | 13.8% | 13.2% | 16.1% |
| 14 | **EBITDA** | $   101,851 | $   149,202 | $   143,517 | $   148,117 | $   183,792 |
| 15 | EBITDA Margin | 9.7% | 14.4% | 14.0% | 13.4% | 16.3% |

Source:  Federal tax returns for the fiscal year periods.

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Adjusted Book Value Method**                                              Schedule C.1

*In U.S. Dollars*

|    |                                       | Book Value as of 12/31/18 | Fair Value as of 10/23/19 | Explanation of Fair Value |
|----|---------------------------------------|---------------------------|---------------------------|---------------------------|
| 1  | Cash                                  | $    112,357              | $    199,362              | [a]                       |
| 2  | Certificate of Deposit                | 152,904                   | 154,150                   | [b]                       |
| 3  | Accounts Receivable                   | 51,169                    | 2,433                     | [c]                       |
| 4  | Prepaid Expenses                      | 0                         | 5,000                     | [d]                       |
| 5  | Excess Security Deposits Retained     | 0                         | 51,192                    | [e]                       |
| 6  | Steve Tsintolas Receivable            | 0                         | 481,537                   | [f]                       |
| 7  | **Total Current Assets**              | 316,430                   | 893,674                   |                           |
|    |                                       |                           |                           |                           |
| 8  | 810 Kennedy Street NW                 | 0                         | 2,230,000                 | [g]                       |
| 9  | 829 Rock Creek Church Road NW         | 0                         | 883,000                   | [g]                       |
| 10 | 1010 G Street NE                      | 0                         | 2,996,000                 | [g]                       |
| 11 | 1521 E Street SE                      | 0                         | 897,000                   | [g]                       |
| 12 | 3901 53rd Street                      | 0                         | 2,889,000                 | [g]                       |
| 13 | 8212 Flower Avenue                    | 0                         | 1,886,000                 | [g]                       |
| 14 | 5400 7th Street NW                    | 0                         | 2,986,000                 | [g]                       |
| 15 | Buildings and Other Depreciable Assets| 770,795                   | 0                         | n/a                       |
| 16 | Land                                  | 71,639                    | 0                         | n/a                       |
| 17 | Less: Accumulated Depreciation        | (766,987)                 | 0                         | n/a                       |
| 18 | **Net Property and Equipment**        | 75,447                    | 14,767,000                |                           |
|    |                                       |                           |                           |                           |
| 19 | **Total Assets**                      | $    391,877              | $ 15,660,674              |                           |

Refer to the last page of this exhibit for a description of the footnotes.

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Adjusted Book Value Method**                                                      Schedule C.1

*In U.S. Dollars*

|    |                                        | Book Value as of 12/31/18 | Fair Value as of 10/23/19 | Explanation of Fair Value |
|----|----------------------------------------|---------------:|---------------:|:---:|
| 20 | Accounts Payable                       | $        0     | $        0     | [h] |
| 21 | Payroll Taxes Payable                  | 3,192          | 3,192          | [h] |
| 22 | **Total Current Liabilities**          | **3,192**      | **3,192**      |     |
|    |                                        |                |                |     |
| 23 | Loans from Shareholders                | 65,400         | 0              | [i] |
| 24 | **Total Long-Term Liabilities**        | **65,400**     | **0**          |     |
|    |                                        |                |                |     |
| 25 | **Total Liabilities**                  | **68,592**     | **3,192**      |     |
|    |                                        |                |                |     |
| 26 | Capital Stock                          | 4,000          | n/a            |     |
| 27 | Retained Earnings                      | 281,973        | n/a            |     |
| 28 | Net Income                             | 183,485        | n/a            |     |
| 29 | Distributions                          | (146,173)      | n/a            |     |
| 30 | **Total Stockholders' Equity**         | **323,285**    | **15,657,482** | [j] |
|    |                                        |                |                |     |
| 31 | **Total Liabilities & Stockholders' Equity** | $  391,877 | $ 15,660,674 |     |
|    |                                        |                |                |     |
|    |                                        |                |                |     |
| 32 | **Fair Value of Equity**               |                | $ 15,657,482   |     |

Refer to the last page of this exhibit for a description of the footnotes.

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Explanation of Fair Market Value**                                              Schedule C.1

[a] Cash has been adjusted to reflect the cash balances in each of the Company's bank accounts at the Valuation Date less the amount of outstanding checks at that date, calculated as follows:

| | | |
|---|---:|---|
| SunTrust Checking x2539 | $    159,990 | DEF_144 |
| SunTrust Checking x4065 | 1,000 | DEF_2732 |
| Sandy Spring Checking x4001 | 49,100 | DEF_11351 |
| Less: Outstanding Checks | (10,728) | |
| **Total Cash** | **$    199,362** | |

[b] No documents have yet been produced which show the balance of the SunTrust CD at 10/23/19. Accordingly, I have estimated the value of this asset by adding the pro-rated amount of 2019 interest income earned through 10/23/19 to the balance of the CD on the Company's 2018 tax return.

[c] The value of accounts receivable has been adjusted to reflect the total unpaid rent shown on the Company's October past due reminders.

[d] Prepaid Expenses consist of a $5,000 payment to DLA Piper, LLP.

[e] Defendant has produced documents showing that over a five-year period a total of $12,798 in security deposits was retained by Tsintolas Realty, Inc. on the Company's behalf (TRC 000268). I have adjusted this asset to reflect the sum total of the annual average security deposits retained by Tsintolas Realty over a twenty-year period.

[f] Schedule D.1

[g] The fair market value of each property is based on real estate appraisal reports prepared by Gary Lee Sapperstein, MAI, SRPA, MRICS and Jodi Orr, MBA of Sapperstein & Associates, LLC dated January 27, 2021 with an effective date of October 23, 2019.

[h] The value of this liability is estimated to be equal to book value as represented on the Company's 2018 tax returns.

[i] The amount of this liability has remained constant for the last several years of historical data and no documents have yet been produced which detail what this liability consists of. Accordingly, the value of this liability has been adjusted to zero.

[j] The resulting value of stockholders' equity is the difference between the Fair Value of the assets and the Fair Value of the liabilities.

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Steve Tsintolas Receivable**                                    Schedule D.1

| | | | | |
|---|---|---|---|---|
| 1 | Excess Employer Payroll Taxes | [a] | $ | 29,872 |
| 2 | Improper Credit Card Charges and Checks | [b] | | 451,665 |
| 3 | **Total Steve Tsintolas Receivable** | | $ | 481,537 |

[a]  Schedule D.2
[b]  Schedule D.3

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Excess Employer Payroll Taxes Incurred**                                                      Schedule D.2

| | | | 2014 | 2015 | 2016 | 2017 | 2018 | [b] 2019 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Steve Tsintolas W-2 Income | [a] | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 77,500 | $ 72,990 | $ 390,490 |
| 2 | Times:  Employer Payroll Tax Rate | | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% |
| 3 | **Excess Employer Payroll Taxes** | | $ 4,590 | $ 4,590 | $ 4,590 | $ 4,590 | $ 5,929 | $ 5,584 | $ 29,872 |

[a]  See DEF_230-231, DEF_609-610, DEF_616, 646, 654, 685, 691, 702, 720, 726, 760, and 795.
[b]  Assumes that payroll expense is recognized evenly throughout the year, such that Steve Tsintolas would have earned 81.1% of the
$90,000 reported in 2019 through October 23, 2019.

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                     Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 1 | Bank of America Credit Card | 09/19/16 | | AAA Mid-Atl | $ 259.78 | $ 259.78 |
| 2 | Bank of America Credit Card | 07/14/17 | | AAA Mid-Atl | 1,148.06 | 1,148.06 |
| 3 | Bank of America Credit Card | 07/25/17 | | AAA Mid-Atl | 289.35 | 289.35 |
| 4 | SunTrust Checking x2539 | 12/05/15 | 38355 | AAA POTOMAC | 62.92 | 62.92 |
| 5 | Bank of America Credit Card | 01/14/19 | | Advance Auto Parts | 14.83 | 14.83 |
| 6 | Bank of America Credit Card | 05/09/19 | | Advance Auto Parts | 25.43 | 25.43 |
| 7 | SunTrust Checking x2539 | 02/26/16 | 38535 | ANTONIO POZO | 221.00 | 221.00 |
| 8 | SunTrust Checking x2539 | 03/01/19 | 41799 | ANTONIO POZO | 640.00 | 640.00 |
| 9 | Bank of America Credit Card | 01/07/16 | | Automotive Services | 141.40 | 141.40 |
| 10 | Bank of America Credit Card | 02/23/15 | | Autozone | 163.23 | 163.23 |
| 11 | Bank of America Credit Card | 03/09/15 | | Autozone | 11.60 | 11.60 |
| 12 | Bank of America Credit Card | 04/20/15 | | Autozone | 11.65 | 11.65 |
| 13 | Bank of America Credit Card | 12/24/15 | | Autozone | 11.65 | 11.65 |
| 14 | Bank of America Credit Card | 01/07/16 | | Autozone | 11.62 | 11.62 |
| 15 | Bank of America Credit Card | 01/20/16 | | Autozone | 13.75 | 13.75 |
| 16 | Bank of America Credit Card | 01/22/16 | | Autozone | 16.95 | 16.95 |
| 17 | Bank of America Credit Card | 12/26/16 | | Autozone | 35.93 | 35.93 |
| 18 | Bank of America Credit Card | 01/13/17 | | Autozone | 6.35 | 6.35 |
| 19 | Bank of America Credit Card | 02/07/18 | | Autozone | 38.05 | 38.05 |
| 20 | Bank of America Credit Card | 03/30/18 | | Autozone | 39.19 | 39.19 |
| 21 | Bank of America Credit Card | 04/03/18 | | Autozone | 44.50 | 44.50 |
| 22 | Bank of America Credit Card | 04/27/18 | | Autozone | 23.24 | 23.24 |
| 23 | Bank of America Credit Card | 05/01/18 | | Autozone | 4.76 | 4.76 |
| 24 | Bank of America Credit Card | 10/12/18 | | Autozone | 7.94 | 7.94 |
| 25 | Bank of America Credit Card | 11/26/18 | | Autozone | 33.89 | 33.89 |
| 26 | Bank of America Credit Card | 11/28/18 | | Autozone | 27.54 | 27.54 |
| 27 | Bank of America Credit Card | 12/03/18 | | Autozone | 27.54 | 27.54 |
| 28 | Bank of America Credit Card | 07/25/19 | | Autozone | 26.50 | 26.50 |
| 29 | SunTrust Checking x2539 | 05/05/17 | 39821 | Bank of America | 942.67 | 942.67 |
| 30 | SunTrust Checking x2539 | 06/19/17 | 39958 | Bank of America | 103.40 | 103.40 |
| 31 | SunTrust Checking x2539 | 08/21/17 | 40143 | Bank of America | 622.12 | 622.12 |
| 32 | SunTrust Checking x2539 | 10/16/17 | 40342 | Bank of America | 569.19 | 569.19 |
| 33 | SunTrust Checking x2539 | 12/12/17 | 40542 | Bank of America | 1,088.16 | 1,088.16 |
| 34 | SunTrust Checking x2539 | 04/20/18 | 40877 | Bank of America | 553.77 | 553.77 |
| 35 | SunTrust Checking x2539 | 07/20/18 | 41156 | Bank of America | 781.05 | 781.05 |
| 36 | SunTrust Checking x2539 | 09/20/18 | 41330 | Bank of America | 1,411.05 | 1,411.05 |
| 37 | SunTrust Checking x2539 | 10/18/18 | 41412 | Bank of America | 1,213.89 | 1,213.89 |

Stout
Page 1 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 38 | SunTrust Checking x2539 | 11/17/18 | 41501 | Bank of America | 1,029.13 | 1,029.13 |
| 39 | SunTrust Checking x2539 | 12/03/18 | 41597 | Bank of America | 1,722.18 | 1,722.18 |
| 40 | SunTrust Checking x2539 | 01/17/19 | 41687 | Bank of America | 1,220.44 | 1,220.44 |
| 41 | SunTrust Checking x2539 | 03/18/19 | 41853 | Bank of America | 778.33 | 778.33 |
| 42 | SunTrust Checking x2539 | 06/22/19 | 42144 | Bank of America | 506.55 | 506.55 |
| 43 | SunTrust Checking x2539 | 07/22/19 | 42233 | Bank of America | 1,178.22 | 1,178.22 |
| 44 | SunTrust Checking x2539 | 10/21/19 | 42527 | Bank of America | 731.89 | 731.89 |
| 45 | Bank of America Credit Card | 04/18/19 | | BOA DDA | 900.00 | 900.00 |
| 46 | SunTrust Checking x2539 | 12/07/16 | 39430 | BRAD BOLINO | 50.00 | 50.00 |
| 47 | SunTrust Checking x2539 | 12/06/17 | 40557 | BRAD BOLINO | 500.00 | 500.00 |
| 48 | SunTrust Checking x2539 | 01/23/18 | 40639 | BRANDON AGNEW | 700.00 | 700.00 |
| 49 | SunTrust Checking x2539 | 06/19/18 | 41052 | BRANDON AGNEW | 150.00 | 150.00 |
| 50 | SunTrust Checking x2539 | 10/16/18 | 41405 | BRANDON AGNEW | 250.00 | 250.00 |
| 51 | Bank of America Credit Card | 03/04/19 | | Brentwood Rd Valero | 20.00 | 20.00 |
| 52 | SunTrust Checking x2539 | 03/24/15 | 37488 | CARLOS CASTILLO | 1,000.00 | 1,000.00 |
| 53 | SunTrust Checking x2539 | 07/31/15 | 37873 | CARLOS CASTILLO | 300.00 | 300.00 |
| 54 | SunTrust Checking x2539 | 09/01/15 | 37971 | CARLOS CASTILLO | 500.00 | 500.00 |
| 55 | SunTrust Checking x2539 | 09/28/15 | 38051 | CARLOS CASTILLO | 500.00 | 500.00 |
| 56 | SunTrust Checking x2539 | 10/29/15 | 38154 | CARLOS CASTILLO | 500.00 | 500.00 |
| 57 | SunTrust Checking x2539 | 11/24/15 | 38244 | CARLOS CASTILLO | 500.00 | 500.00 |
| 58 | SunTrust Checking x2539 | 12/03/15 | 38329 | CARLOS CASTILLO | 700.00 | 700.00 |
| 59 | SunTrust Checking x2539 | 12/07/16 | 39427 | CARLOS CASTILLO | 850.00 | 850.00 |
| 60 | SunTrust Checking x2539 | 12/03/15 | 38331 | CHRISTIAN BORDA | 500.00 | 500.00 |
| 61 | SunTrust Checking x2539 | 12/07/16 | 39429 | CHRISTIAN BORDA | 400.00 | 400.00 |
| 62 | SunTrust Checking x2539 | 11/30/17 | 40531 | CHRISTIAN BORDA | 500.00 | 500.00 |
| 63 | SunTrust Checking x2539 | 12/05/18 | 41609 | CHRISTIAN BORDA | 500.00 | 500.00 |
| 64 | SunTrust Checking x2539 | 11/21/17 | 40479 | CLEMENTE GUANDIQUE | 2,000.00 | 2,000.00 |
| 65 | SunTrust Checking x2539 | 11/25/17 | 40511 | CLEMENTE GUANDIQUE | 1,000.00 | 1,000.00 |
| 66 | SunTrust Checking x2539 | 11/30/17 | 40535 | CLEMENTE GUANDIQUE | 1,500.00 | 1,500.00 |
| 67 | SunTrust Checking x2539 | 12/01/17 | 40550 | CLEMENTE GUANDIQUE | 2,800.00 | 2,800.00 |
| 68 | SunTrust Checking x2539 | 12/19/17 | 40574 | CLEMENTE GUANDIQUE | 450.00 | 450.00 |
| 69 | SunTrust Checking x2539 | 12/09/14 | 37186 | CRAIG CONNOR | 775.00 | 775.00 |
| 70 | SunTrust Checking x2539 | 12/01/16 | 39372 | CRAIG CONNOR | 785.00 | 785.00 |
| 71 | SunTrust Checking x2539 | 12/21/17 | 40581 | CRAIG CONNOR | 785.00 | 785.00 |
| 72 | SunTrust Checking x2539 | 12/08/18 | 41617 | CRAIG CONNOR | 830.00 | 830.00 |
| 73 | SunTrust Checking x2539 | 08/20/19 | 42324 | CRISOLOGO CANCHA | 550.00 | 550.00 |
| 74 | SunTrust Checking x2539 | 06/18/14 | 36663 | CUNNINGHAM & ASSOCIATES P Stout | 2,673.38 | 2,673.38 |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 75 | SunTrust Checking x2539 | 07/16/14 | 36742 | CUNNINGHAM & ASSOCIATES P | 3,713.22 | 3,713.22 | |
| 76 | SunTrust Checking x2539 | 08/20/14 | 36847 | CUNNINGHAM & ASSOCIATES P | 2,767.99 | 2,767.99 | |
| 77 | SunTrust Checking x2539 | 09/26/14 | 36952 | CUNNINGHAM & ASSOCIATES P | 3,288.97 | 3,288.97 | |
| 78 | SunTrust Checking x2539 | 10/16/14 | 37008 | CUNNINGHAM & ASSOCIATES P | 4,609.01 | 4,609.01 | |
| 79 | SunTrust Checking x2539 | 11/20/14 | 37112 | CUNNINGHAM & ASSOCIATES P | 6,101.86 | 6,101.86 | |
| 80 | SunTrust Checking x2539 | 12/08/14 | 37168 | CUNNINGHAM & ASSOCIATES P | 7,000.00 | 7,000.00 | |
| 81 | SunTrust Checking x2539 | 12/10/14 | 37202 | CUNNINGHAM & ASSOCIATES P | 7,080.24 | 7,080.24 | |
| 82 | SunTrust Checking x2539 | 07/27/15 | 37844 | CUNNINGHAM & ASSOCIATES P | 550.44 | 550.44 | |
| 83 | Bank of America Credit Card | 05/27/19 | | Darcars Chrysler Jeep | 356.78 | 356.78 | |
| 84 | SunTrust Checking x2539 | 08/22/16 | 39078 | DC Treasurer | 100.00 | 100.00 | |
| 85 | SunTrust Checking x2539 | 02/11/14 | 36281 | DEER PARK | 104.00 | 104.00 | |
| 86 | SunTrust Checking x2539 | 03/13/14 | 36382 | DEER PARK | 67.00 | 67.00 | |
| 87 | SunTrust Checking x2539 | 04/09/14 | 36455 | DEER PARK | 120.08 | 120.08 | |
| 88 | SunTrust Checking x2539 | 05/07/14 | 36536 | DEER PARK | 70.26 | 70.26 | |
| 89 | SunTrust Checking x2539 | 06/11/14 | 36641 | DEER PARK | 69.16 | 69.16 | |
| 90 | SunTrust Checking x2539 | 09/10/14 | 36907 | DEER PARK | 105.39 | 105.39 | |
| 91 | SunTrust Checking x2539 | 10/06/14 | 36979 | DEER PARK | 122.44 | 122.44 | |
| 92 | SunTrust Checking x2539 | 11/04/14 | 37064 | DEER PARK | 88.61 | 88.61 | |
| 93 | SunTrust Checking x2539 | 12/05/14 | 37154 | DEER PARK | 102.64 | 102.64 | |
| 94 | SunTrust Checking x2539 | 12/16/14 | 37265 | DEER PARK | 313.81 | 313.81 | |
| 95 | SunTrust Checking x2539 | 04/16/15 | 37558 | DEER PARK | 48.13 | 48.13 | |
| 96 | SunTrust Checking x2539 | 05/05/15 | 37616 | DEER PARK | 73.87 | 73.87 | |
| 97 | SunTrust Checking x2539 | 06/02/15 | 37706 | DEER PARK | 124.66 | 124.66 | |
| 98 | SunTrust Checking x2539 | 07/27/15 | 37843 | DEER PARK | 84.73 | 84.73 | |
| 99 | SunTrust Checking x2539 | 04/14/17 | 39762 | EDGAR CASTILLO | 284.00 | 284.00 | |
| 100 | SunTrust Checking x2539 | 09/07/17 | 40203 | EDGAR CASTILLO | 650.00 | 650.00 | |
| 101 | SunTrust Checking x2539 | 05/07/18 | 40918 | EDGAR CASTILLO | 375.00 | 375.00 | |
| 102 | SunTrust Checking x2539 | 12/14/16 | 39482 | Exclusive Awnings & Canopies | 2,800.00 | 1,400.00 | [a] |
| 103 | SunTrust Checking x2539 | 04/29/14 | 36506 | EXXON | 351.93 | 351.93 | |
| 104 | SunTrust Checking x2539 | 05/28/14 | 36589 | EXXON | 323.90 | 323.90 | |
| 105 | SunTrust Checking x2539 | 06/30/14 | 36695 | EXXON | 452.65 | 452.65 | |
| 106 | SunTrust Checking x2539 | 07/28/14 | 36777 | EXXON | 607.70 | 607.70 | |
| 107 | SunTrust Checking x2539 | 09/02/14 | 36875 | EXXON | 172.52 | 172.52 | |
| 108 | SunTrust Checking x2539 | 09/26/14 | 36948 | EXXON | 273.54 | 273.54 | |
| 109 | SunTrust Checking x2539 | 10/28/14 | 37045 | EXXON | 388.49 | 388.49 | |
| 110 | SunTrust Checking x2539 | 12/03/14 | 37140 | EXXON | 224.29 | 224.29 | |
| 111 | SunTrust Checking x2539 | 12/12/14 | 37237 | EXXON | 428.70 | 428.70 | |

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                           Schedule D.3

| | Account | Date | Ck. No. | | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|---|
| 112 | SunTrust Checking x2539 | 01/30/15 | 37331 | EXXON | | 487.44 | 487.44 |
| 113 | SunTrust Checking x2539 | 03/30/15 | 37507 | EXXON | | 150.80 | 150.80 |
| 114 | SunTrust Checking x2539 | 04/27/15 | 37593 | EXXON | | 349.22 | 349.22 |
| 115 | SunTrust Checking x2539 | 06/01/15 | 37695 | EXXON | | 219.41 | 219.41 |
| 116 | SunTrust Checking x2539 | 06/26/15 | 37762 | EXXON | | 264.94 | 264.94 |
| 117 | SunTrust Checking x2539 | 07/30/15 | 37870 | EXXON | | 150.56 | 150.56 |
| 118 | SunTrust Checking x2539 | 08/31/15 | 37963 | EXXON | | 259.25 | 259.25 |
| 119 | SunTrust Checking x2539 | 09/29/15 | 38058 | EXXON | | 296.67 | 296.67 |
| 120 | SunTrust Checking x2539 | 10/30/15 | 38158 | EXXON | | 235.48 | 235.48 |
| 121 | SunTrust Checking x2539 | 11/24/15 | 38233 | EXXON | | 204.53 | 204.53 |
| 122 | SunTrust Checking x2539 | 12/05/15 | 38365 | EXXON | | 461.04 | 461.04 |
| 123 | SunTrust Checking x2539 | 02/29/16 | 38540 | EXXON | | 24.93 | 24.93 |
| 124 | SunTrust Checking x2539 | 03/29/16 | 38625 | EXXON | | 198.38 | 198.38 |
| 125 | SunTrust Checking x2539 | 05/02/16 | 38721 | EXXON | | 139.20 | 139.20 |
| 126 | SunTrust Checking x2539 | 05/31/16 | 38808 | EXXON | | 154.80 | 154.80 |
| 127 | SunTrust Checking x2539 | 06/27/16 | 38899 | EXXON | | 326.44 | 326.44 |
| 128 | SunTrust Checking x2539 | 08/01/16 | 39005 | EXXON | | 577.74 | 577.74 |
| 129 | SunTrust Checking x2539 | 08/30/16 | 39096 | EXXON | | 254.32 | 254.32 |
| 130 | SunTrust Checking x2539 | 09/29/16 | 39177 | EXXON | | 100.19 | 100.19 |
| 131 | SunTrust Checking x2539 | 11/01/16 | 39269 | EXXON | | 185.63 | 185.63 |
| 132 | SunTrust Checking x2539 | 11/28/16 | 39339 | EXXON | | 109.12 | 109.12 |
| 133 | SunTrust Checking x2539 | 12/10/16 | 39459 | EXXON | | 588.67 | 588.67 |
| 134 | SunTrust Checking x2539 | 02/24/17 | 39611 | EXXON | | 86.49 | 86.49 |
| 135 | SunTrust Checking x2539 | 03/29/17 | 39716 | EXXON | | 184.73 | 184.73 |
| 136 | SunTrust Checking x2539 | 04/28/17 | 39790 | EXXON | | 208.55 | 208.55 |
| 137 | SunTrust Checking x2539 | 07/31/17 | 40073 | EXXON | | 478.48 | 478.48 |
| 138 | SunTrust Checking x2539 | 08/29/17 | 40166 | EXXON | | 244.35 | 244.35 |
| 139 | SunTrust Checking x2539 | 09/27/17 | 40263 | EXXON | | 177.83 | 177.83 |
| 140 | SunTrust Checking x2539 | 10/26/17 | 40381 | EXXON | | 130.35 | 130.35 |
| 141 | SunTrust Checking x2539 | 11/21/17 | 40477 | EXXON | | 414.53 | 414.53 |
| 142 | SunTrust Checking x2539 | 01/29/18 | 40647 | EXXON | | 96.54 | 96.54 |
| 143 | SunTrust Checking x2539 | 02/26/18 | 40722 | EXXON | | 85.23 | 85.23 |
| 144 | SunTrust Checking x2539 | 03/28/18 | 40795 | EXXON | | 219.28 | 219.28 |
| 145 | SunTrust Checking x2539 | 04/30/18 | 40891 | EXXON | | 93.89 | 93.89 |
| 146 | SunTrust Checking x2539 | 05/30/18 | 40995 | EXXON | | 226.71 | 226.71 |
| 147 | SunTrust Checking x2539 | 06/29/18 | 41083 | EXXON | | 368.48 | 368.48 |
| 148 | SunTrust Checking x2539 | 07/30/18 | 41178 | EXXON | | 486.63 | 486.63 |

Stout
Page 4 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 149 | SunTrust Checking x2539 | 08/28/18 | 41265 | EXXON | 197.39 | 197.39 | |
| 150 | SunTrust Checking x2539 | 10/01/18 | 41362 | EXXON | 346.27 | 346.27 | |
| 151 | SunTrust Checking x2539 | 11/01/18 | 41444 | EXXON | 400.01 | 400.01 | |
| 152 | SunTrust Checking x2539 | 11/23/18 | 41528 | EXXON | 214.13 | 214.13 | |
| 153 | SunTrust Checking x2539 | 12/17/18 | 41637 | EXXON | 432.64 | 432.64 | |
| 154 | SunTrust Checking x2539 | 01/29/19 | 41709 | EXXON | 67.07 | 67.07 | |
| 155 | SunTrust Checking x2539 | 02/26/19 | 41791 | EXXON | 83.36 | 83.36 | |
| 156 | SunTrust Checking x2539 | 04/02/19 | 41897 | EXXON | 125.87 | 125.87 | |
| 157 | SunTrust Checking x2539 | 04/26/19 | 41986 | EXXON | 118.81 | 118.81 | |
| 158 | SunTrust Checking x2539 | 05/30/19 | 42070 | EXXON | 66.60 | 66.60 | |
| 159 | SunTrust Checking x2539 | 06/28/19 | 42161 | EXXON | 362.29 | 362.29 | |
| 160 | SunTrust Checking x2539 | 07/29/19 | 42250 | EXXON | 522.94 | 522.94 | |
| 161 | SunTrust Checking x2539 | 08/28/19 | 42351 | EXXON | 225.47 | 225.47 | |
| 162 | SunTrust Checking x2539 | 09/27/19 | 42453 | EXXON | 317.31 | 317.31 | |
| 163 | Bank of America Credit Card | 07/30/15 | | Exxon Mobil | 304.03 | 304.03 | |
| 164 | SunTrust Checking x2539 | 05/11/15 | 37639 | FEDEX | 49.35 | 49.35 | |
| 165 | SunTrust Checking x2539 | 06/08/15 | 37719 | FEDEX | 74.28 | 74.28 | |
| 166 | SunTrust Checking x2539 | 10/16/15 | 38123 | FEDEX | 83.00 | 83.00 | |
| 167 | SunTrust Checking x2539 | 06/27/17 | 39973 | FEDEX | 19.50 | 19.50 | |
| 168 | SunTrust Checking x2539 | 11/13/17 | 40426 | FEDEX | 150.06 | 150.06 | |
| 169 | SunTrust Checking x2539 | 02/12/18 | 40689 | FEDEX | 28.84 | 28.84 | |
| 170 | SunTrust Checking x2539 | 02/02/15 | 37333 | FELIPE SANCHEZ | 525.00 | 525.00 | |
| 171 | SunTrust Checking x2539 | 03/24/15 | 37489 | FELIPE SANCHEZ | 1,100.00 | 1,100.00 | |
| 172 | SunTrust Checking x2539 | 08/07/15 | 37899 | FELIPE SANCHEZ | 600.00 | 600.00 | |
| 173 | SunTrust Checking x2539 | 09/08/16 | 39125 | FELIPE SANCHEZ | 625.00 | 625.00 | |
| 174 | SunTrust Checking x2539 | 02/27/17 | 39613 | FELIPE SANCHEZ | 275.00 | 275.00 | |
| 175 | SunTrust Checking x2539 | 04/12/17 | 39756 | FELIPE SANCHEZ | 900.00 | 900.00 | |
| 176 | SunTrust Checking x2539 | 09/07/17 | 40202 | FELIPE SANCHEZ | 775.00 | 775.00 | |
| 177 | SunTrust Checking x2539 | 03/01/18 | 40733 | FELIPE SANCHEZ | 1,550.00 | 1,550.00 | |
| 178 | SunTrust Checking x2539 | 07/31/18 | 41179 | FELIPE SANCHEZ | 550.00 | 550.00 | |
| 179 | SunTrust Checking x2539 | 04/24/19 | 41980 | FELIPE SANCHEZ | 350.00 | 350.00 | |
| 180 | SunTrust Checking x2539 | 06/06/19 | 42100 | FELIPE SANCHEZ | 260.00 | 260.00 | |
| 181 | SunTrust Checking x2539 | 09/23/19 | 42435 | FELIPE SANCHEZ | 175.00 | 175.00 | |
| 182 | SunTrust Checking x2539 | 10/04/19 | 42480 | FELIPE SANCHEZ | 175.00 | 175.00 | |
| 183 | SunTrust Checking x2539 | 08/04/16 | 39018 | Galliher & Huguely | 58.93 | 10.36 | [a] |
| 184 | SunTrust Checking x2539 | 11/04/16 | 39275 | Galliher & Huguely | 19.88 | 19.88 | |
| 185 | SunTrust Checking x2539 | 10/25/15 | 38139 | GCAAR | 1,348.00 | 1,348.00 | |

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                              **Schedule D.3**

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 186 | Bank of America Credit Card | 06/28/17 | | Giant | 14.82 | 14.82 |
| 187 | Bank of America Credit Card | 07/11/19 | | Giant | 6.77 | 6.77 |
| 188 | Bank of America Credit Card | 10/14/19 | | Giant | 10.60 | 10.60 |
| 189 | Bank of America Credit Card | 09/03/14 | | Giant Food Inc | 14.79 | 14.79 |
| 190 | Bank of America Credit Card | 08/27/14 | | Glen A Kan DDS | 128.00 | 128.00 |
| 191 | SunTrust Checking x2539 | 04/15/14 | 36469 | Harford Mutual | 6,701.50 | 6,701.50 |
| 192 | SunTrust Checking x2539 | 06/16/14 | 36656 | Harford Mutual | 6,701.50 | 6,701.50 |
| 193 | SunTrust Checking x2539 | 10/14/14 | 37006 | Harford Mutual | 6,707.50 | 6,707.50 |
| 194 | SunTrust Checking x2539 | 04/16/15 | 37550 | Harford Mutual | 7,043.75 | 7,043.75 |
| 195 | SunTrust Checking x2539 | 06/16/15 | 37734 | Harford Mutual | 7,049.75 | 7,049.75 |
| 196 | SunTrust Checking x2539 | 08/14/15 | 37917 | Harford Mutual | 7,043.75 | 7,043.75 |
| 197 | SunTrust Checking x2539 | 10/20/15 | 38134 | Harford Mutual | 7,049.75 | 7,049.75 |
| 198 | SunTrust Checking x2539 | 04/14/16 | 38671 | Harford Mutual | 7,288.25 | 7,288.25 |
| 199 | SunTrust Checking x2539 | 06/14/16 | 38859 | Harford Mutual | 7,294.25 | 7,294.25 |
| 200 | SunTrust Checking x2539 | 06/14/16 | 38860 | Harford Mutual | 16.00 | 16.00 |
| 201 | SunTrust Checking x2539 | 08/19/16 | 39069 | Harford Mutual | 7,294.25 | 7,294.25 |
| 202 | SunTrust Checking x2539 | 10/17/16 | 39224 | Harford Mutual | 7,294.25 | 7,294.25 |
| 203 | SunTrust Checking x2539 | 04/18/17 | 39771 | Harford Mutual | 7,424.00 | 7,424.00 |
| 204 | SunTrust Checking x2539 | 05/18/17 | 39859 | Harford Mutual | 31.00 | 31.00 |
| 205 | SunTrust Checking x2539 | 06/23/17 | 39966 | Harford Mutual | 7,461.00 | 7,461.00 |
| 206 | SunTrust Checking x2539 | 08/22/17 | 40150 | Harford Mutual | 7,461.00 | 7,461.00 |
| 207 | SunTrust Checking x2539 | 09/14/17 | 40223 | Harford Mutual | 81.00 | 81.00 |
| 208 | SunTrust Checking x2539 | 10/16/17 | 40336 | Harford Mutual | 7,461.00 | 7,461.00 |
| 209 | Home Depot Credit Line | 12/02/14 | | Home Depot | 11.55 | 11.55 |
| 210 | Home Depot Credit Line | 12/03/14 | | Home Depot | 204.12 | 204.12 |
| 211 | Home Depot Credit Line | 12/08/14 | | Home Depot | 8.68 | 8.68 |
| 212 | Home Depot Credit Line | 12/10/14 | | Home Depot | 31.24 | 31.24 |
| 213 | Home Depot Credit Line | 12/10/14 | | Home Depot | 73.26 | 73.26 |
| 214 | Home Depot Credit Line | 12/11/14 | | Home Depot | 351.58 | 351.58 |
| 215 | Home Depot Credit Line | 12/12/14 | | Home Depot | 339.04 | 339.04 |
| 216 | Home Depot Credit Line | 12/13/14 | | Home Depot | 33.70 | 33.70 |
| 217 | Home Depot Credit Line | 12/15/14 | | Home Depot | 2.00 | 2.00 |
| 218 | Home Depot Credit Line | 12/15/14 | | Home Depot | 96.70 | 96.70 |
| 219 | Home Depot Credit Line | 12/16/14 | | Home Depot | 105.56 | 105.56 |
| 220 | Home Depot Credit Line | 12/16/14 | | Home Depot | 196.97 | 196.97 |
| 221 | Home Depot Credit Line | 12/21/14 | | Home Depot | 156.01 | 156.01 |
| 222 | Home Depot Credit Line | 12/21/14 | | Home Depot | 187.46 | 187.46 |

Stout
Page 6 of 38

Olympia Investments, Inc.
October 23, 2019
Historical Improper Credit Card Charges and Checks                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 223 | Home Depot Credit Line | 12/21/14 | | Home Depot | 530.85 | 530.85 |
| 224 | Home Depot Credit Line | 08/29/15 | | Home Depot | 35.25 | 35.25 |
| 225 | Home Depot Credit Line | 09/02/15 | | Home Depot | 330.67 | 330.67 |
| 226 | Home Depot Credit Line | 09/07/15 | | Home Depot | 148.08 | 148.08 |
| 227 | Home Depot Credit Line | 09/07/15 | | Home Depot | 224.40 | 224.40 |
| 228 | Home Depot Credit Line | 09/08/15 | | Home Depot | 40.03 | 40.03 |
| 229 | Home Depot Credit Line | 09/11/15 | | Home Depot | 15.27 | 15.27 |
| 230 | Home Depot Credit Line | 09/17/15 | | Home Depot | 108.53 | 108.53 |
| 231 | Home Depot Credit Line | 09/18/15 | | Home Depot | 100.00 | 100.00 |
| 232 | Home Depot Credit Line | 09/20/15 | | Home Depot | 65.26 | 65.26 |
| 233 | Home Depot Credit Line | 09/20/15 | | Home Depot | 309.55 | 309.55 |
| 234 | Bank of America Credit Card | 01/06/17 | | Jiffy Lube | 73.51 | 73.51 |
| 235 | Bank of America Credit Card | 12/18/17 | | Jiffy Lube | 79.65 | 79.65 |
| 236 | Bank of America Credit Card | 10/17/18 | | Jiffy Lube | 82.37 | 82.37 |
| 237 | Bank of America Credit Card | 01/29/19 | | Jiffy Lube | 195.38 | 195.38 |
| 238 | Bank of America Credit Card | 05/23/19 | | Jiffy Lube | 55.65 | 55.65 |
| 239 | Bank of America Credit Card | 07/01/19 | | Jiffy Lube | 95.81 | 95.81 |
| 240 | Bank of America Credit Card | 08/19/19 | | Jiffy Lube | 90.41 | 90.41 |
| 241 | SunTrust Checking x2539 | 02/22/16 | 38516 | KELLY GENERATOR | 645.00 | 645.00 |
| 242 | SunTrust Checking x2539 | 07/02/19 | 42172 | KELLY GENERATOR | 295.00 | 295.00 |
| 243 | SunTrust Checking x2539 | 05/30/14 | 36594 | KOLLINS LAWN | 347.00 | 347.00 |
| 244 | SunTrust Checking x2539 | 07/16/14 | 36749 | KOLLINS LAWN | 2,426.00 | 2,426.00 |
| 245 | SunTrust Checking x2539 | 01/14/15 | 37295 | KOLLINS LAWN | 255.00 | 255.00 |
| 246 | SunTrust Checking x2539 | 06/14/16 | 38862 | KOLLINS LAWN | 238.00 | 238.00 |
| 247 | SunTrust Checking x2539 | 08/30/16 | 39099 | KOLLINS LAWN | 170.00 | 170.00 |
| 248 | SunTrust Checking x2539 | 12/06/16 | 39422 | KOLLINS LAWN | 227.00 | 227.00 |
| 249 | SunTrust Checking x2539 | 05/11/17 | 39839 | KOLLINS LAWN | 207.00 | 207.00 |
| 250 | SunTrust Checking x2539 | 10/11/17 | 40325 | KOLLINS LAWN | 136.00 | 136.00 |
| 251 | SunTrust Checking x2539 | 10/11/17 | 40326 | KOLLINS LAWN | 267.00 | 267.00 |
| 252 | SunTrust Checking x2539 | 01/11/18 | 40608 | KOLLINS LAWN | 311.00 | 311.00 |
| 253 | SunTrust Checking x2539 | 07/06/16 | 38927 | KUHN'S TREE SERVICE, INC | 2,750.00 | 2,750.00 |
| 254 | SunTrust Checking x2539 | 04/01/14 | 36430 | MARVIN VAIL | 1,070.00 | 1,070.00 |
| 255 | SunTrust Checking x2539 | 03/31/15 | 37513 | MARVIN VAIL | 1,070.00 | 1,070.00 |
| 256 | SunTrust Checking x2539 | 03/04/16 | 38561 | MARVIN VAIL | 442.00 | 442.00 |
| 257 | SunTrust Checking x2539 | 03/04/16 | 38562 | MARVIN VAIL | 1,430.00 | 1,430.00 |
| 258 | SunTrust Checking x2539 | 02/21/17 | 39600 | MARVIN VAIL | 1,200.00 | 1,200.00 |
| 259 | SunTrust Checking x2539 | 03/06/18 | 40746 | MARVIN VAIL | 500.00 | 500.00 |

Stout
Page 7 of 38

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 260 | SunTrust Checking x2539 | 05/07/19 | 42018 | MARVIN VAIL | 250.00 | 250.00 |
| 261 | SunTrust Checking x2539 | 09/29/17 | 40264 | MATHEW GONZALEZ | 2,410.00 | 2,410.00 |
| 262 | SunTrust Checking x2539 | 08/04/17 | 40089 | McCormick Paint Works | 78.42 | 78.42 |
| 263 | SunTrust Checking x2539 | 12/26/17 | 40585 | McCormick Paint Works | 865.87 | 865.87 |
| 264 | SunTrust Checking x2539 | 02/16/15 | 37369 | MOTOR VEHICLE ADMINISTRAT | 117.50 | 117.50 |
| 265 | SunTrust Checking x2539 | 01/31/14 | 36234 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 266 | SunTrust Checking x2539 | 02/28/14 | 36336 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 267 | SunTrust Checking x2539 | 03/31/14 | 36428 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 268 | SunTrust Checking x2539 | 05/01/14 | 36518 | NATHANIEL GLOVER | 280.00 | 280.00 |
| 269 | SunTrust Checking x2539 | 05/30/14 | 36601 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 270 | SunTrust Checking x2539 | 06/30/14 | 36686 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 271 | SunTrust Checking x2539 | 08/01/14 | 36797 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 272 | SunTrust Checking x2539 | 09/02/14 | 36864 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 273 | SunTrust Checking x2539 | 09/30/14 | 36961 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 274 | SunTrust Checking x2539 | 10/30/14 | 37052 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 275 | SunTrust Checking x2539 | 12/01/14 | 37137 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 276 | SunTrust Checking x2539 | 12/10/14 | 37203 | NATHANIEL GLOVER | 150.00 | 150.00 |
| 277 | SunTrust Checking x2539 | 12/12/14 | 37247 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 278 | SunTrust Checking x2539 | 01/30/15 | 37326 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 279 | SunTrust Checking x2539 | 02/27/15 | 37394 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 280 | SunTrust Checking x2539 | 04/01/15 | 37517 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 281 | SunTrust Checking x2539 | 05/01/15 | 37603 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 282 | SunTrust Checking x2539 | 05/29/15 | 37692 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 283 | SunTrust Checking x2539 | 07/14/15 | 37811 | NATHANIEL GLOVER | 300.00 | 300.00 |
| 284 | SunTrust Checking x2539 | 12/30/13 | 36190 | Office Depot | 212.20 | 212.20 |
| 285 | SunTrust Checking x2539 | 11/17/14 | 37091 | Office Depot | 54.74 | 54.74 |
| 286 | SunTrust Checking x2539 | 11/30/15 | 38309 | Office Depot | 542.40 | 542.40 |
| 287 | Bank of America Credit Card | 11/19/18 | | Office Depot | 13.86 | 13.86 |
| 288 | SunTrust Checking x2539 | 01/31/14 | 36235 | OSIEL CASTILLO | 350.00 | 350.00 |
| 289 | SunTrust Checking x2539 | 02/28/14 | 36333 | OSIEL CASTILLO | 350.00 | 350.00 |
| 290 | SunTrust Checking x2539 | 04/02/14 | 36432 | OSIEL CASTILLO | 350.00 | 350.00 |
| 291 | SunTrust Checking x2539 | 04/07/14 | 36449 | OSIEL CASTILLO | 500.00 | 500.00 |
| 292 | SunTrust Checking x2539 | 05/01/14 | 36519 | OSIEL CASTILLO | 350.00 | 350.00 |
| 293 | SunTrust Checking x2539 | 05/30/14 | 36600 | OSIEL CASTILLO | 350.00 | 350.00 |
| 294 | SunTrust Checking x2539 | 06/30/14 | 36687 | OSIEL CASTILLO | 350.00 | 350.00 |
| 295 | SunTrust Checking x2539 | 07/31/14 | 36784 | OSIEL CASTILLO | 350.00 | 350.00 |
| 296 | SunTrust Checking x2539 | 09/02/14 | 36865 | OSIEL CASTILLO | 350.00 | 350.00 |

Olympia Investments, Inc.
October 23, 2019
Historical Improper Credit Card Charges and Checks                                        Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 297 | SunTrust Checking x2539 | 09/30/14 | 36960 | OSIEL CASTILLO | 350.00 | 350.00 |
| 298 | SunTrust Checking x2539 | 10/30/14 | 37051 | OSIEL CASTILLO | 350.00 | 350.00 |
| 299 | SunTrust Checking x2539 | 12/01/14 | 37136 | OSIEL CASTILLO | 350.00 | 350.00 |
| 300 | SunTrust Checking x2539 | 12/12/14 | 37243 | OSIEL CASTILLO | 350.00 | 350.00 |
| 301 | SunTrust Checking x2539 | 01/30/15 | 37325 | OSIEL CASTILLO | 350.00 | 350.00 |
| 302 | SunTrust Checking x2539 | 02/27/15 | 37395 | OSIEL CASTILLO | 350.00 | 350.00 |
| 303 | SunTrust Checking x2539 | 03/03/15 | 37407 | OSIEL CASTILLO | 300.00 | 300.00 |
| 304 | SunTrust Checking x2539 | 03/13/15 | 37453 | OSIEL CASTILLO | 175.00 | 175.00 |
| 305 | SunTrust Checking x2539 | 04/01/15 | 37516 | OSIEL CASTILLO | 350.00 | 350.00 |
| 306 | SunTrust Checking x2539 | 05/01/15 | 37605 | OSIEL CASTILLO | 350.00 | 350.00 |
| 307 | SunTrust Checking x2539 | 05/29/15 | 37691 | OSIEL CASTILLO | 350.00 | 350.00 |
| 308 | SunTrust Checking x2539 | 06/26/15 | 37759 | OSIEL CASTILLO | 350.00 | 350.00 |
| 309 | SunTrust Checking x2539 | 07/31/15 | 37872 | OSIEL CASTILLO | 350.00 | 350.00 |
| 310 | SunTrust Checking x2539 | 08/31/15 | 37966 | OSIEL CASTILLO | 350.00 | 350.00 |
| 311 | SunTrust Checking x2539 | 09/28/15 | 38052 | OSIEL CASTILLO | 350.00 | 350.00 |
| 312 | SunTrust Checking x2539 | 10/29/15 | 38155 | OSIEL CASTILLO | 350.00 | 350.00 |
| 313 | SunTrust Checking x2539 | 11/24/15 | 38243 | OSIEL CASTILLO | 350.00 | 350.00 |
| 314 | SunTrust Checking x2539 | 12/03/15 | 38330 | OSIEL CASTILLO | 150.00 | 150.00 |
| 315 | SunTrust Checking x2539 | 12/05/15 | 38363 | OSIEL CASTILLO | 350.00 | 350.00 |
| 316 | SunTrust Checking x2539 | 12/10/15 | 38368 | OSIEL CASTILLO | 350.00 | 350.00 |
| 317 | SunTrust Checking x2539 | 02/02/16 | 38444 | OSIEL CASTILLO | 350.00 | 350.00 |
| 318 | SunTrust Checking x2539 | 02/26/16 | 38532 | OSIEL CASTILLO | 350.00 | 350.00 |
| 319 | SunTrust Checking x2539 | 04/04/16 | 38634 | OSIEL CASTILLO | 350.00 | 350.00 |
| 320 | SunTrust Checking x2539 | 04/29/16 | 38716 | OSIEL CASTILLO | 350.00 | 350.00 |
| 321 | SunTrust Checking x2539 | 05/27/16 | 38802 | OSIEL CASTILLO | 350.00 | 350.00 |
| 322 | SunTrust Checking x2539 | 06/30/16 | 38907 | OSIEL CASTILLO | 350.00 | 350.00 |
| 323 | SunTrust Checking x2539 | 07/29/16 | 38996 | OSIEL CASTILLO | 350.00 | 350.00 |
| 324 | SunTrust Checking x2539 | 08/26/16 | 39083 | OSIEL CASTILLO | 350.00 | 350.00 |
| 325 | SunTrust Checking x2539 | 09/29/16 | 39178 | OSIEL CASTILLO | 350.00 | 350.00 |
| 326 | SunTrust Checking x2539 | 10/28/16 | 39252 | OSIEL CASTILLO | 350.00 | 350.00 |
| 327 | SunTrust Checking x2539 | 11/18/16 | 39320 | OSIEL CASTILLO | 350.00 | 350.00 |
| 328 | SunTrust Checking x2539 | 12/10/16 | 39455 | OSIEL CASTILLO | 350.00 | 350.00 |
| 329 | SunTrust Checking x2539 | 01/27/17 | 39537 | OSIEL CASTILLO | 350.00 | 350.00 |
| 330 | SunTrust Checking x2539 | 02/28/17 | 39615 | OSIEL CASTILLO | 350.00 | 350.00 |
| 331 | SunTrust Checking x2539 | 03/29/17 | 39713 | OSIEL CASTILLO | 350.00 | 350.00 |
| 332 | SunTrust Checking x2539 | 04/28/17 | 39792 | OSIEL CASTILLO | 350.00 | 350.00 |
| 333 | SunTrust Checking x2539 | 05/25/17 | 39878 | OSIEL CASTILLO | 350.00 | 350.00 |

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**        Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 334 | SunTrust Checking x2539 | 06/16/17 | 39943 | OSIEL CASTILLO | 350.00 | 350.00 |
| 335 | SunTrust Checking x2539 | 07/27/17 | 40064 | OSIEL CASTILLO | 350.00 | 350.00 |
| 336 | SunTrust Checking x2539 | 08/28/17 | 40163 | OSIEL CASTILLO | 350.00 | 350.00 |
| 337 | SunTrust Checking x2539 | 09/18/17 | 40240 | OSIEL CASTILLO | 350.00 | 350.00 |
| 338 | SunTrust Checking x2539 | 10/16/17 | 40332 | OSIEL CASTILLO | 350.00 | 350.00 |
| 339 | SunTrust Checking x2539 | 11/21/17 | 40482 | OSIEL CASTILLO | 350.00 | 350.00 |
| 340 | SunTrust Checking x2539 | 12/03/17 | 40554 | OSIEL CASTILLO | 350.00 | 350.00 |
| 341 | SunTrust Checking x2539 | 01/15/18 | 40620 | OSIEL CASTILLO | 350.00 | 350.00 |
| 342 | SunTrust Checking x2539 | 03/02/18 | 40737 | OSIEL CASTILLO | 350.00 | 350.00 |
| 343 | SunTrust Checking x2539 | 12/05/18 | 41608 | OSIEL CASTILLO | 500.00 | 500.00 |
| 344 | SunTrust Checking x2539 | 02/24/14 | 36316 | PEACHTREE BUSINESS FORMS | 68.74 | 68.74 |
| 345 | SunTrust Checking x2539 | 05/01/14 | 36517 | PEACHTREE BUSINESS FORMS | 186.13 | 186.13 |
| 346 | SunTrust Checking x2539 | 05/30/14 | 36595 | PEACHTREE BUSINESS FORMS | 71.91 | 71.91 |
| 347 | SunTrust Checking x2539 | 07/01/14 | 36704 | PEACHTREE BUSINESS FORMS | 2,115.00 | 2,115.00 |
| 348 | SunTrust Checking x2539 | 11/04/14 | 37063 | PEACHTREE BUSINESS FORMS | 251.69 | 251.69 |
| 349 | SunTrust Checking x2539 | 12/01/14 | 37130 | PEACHTREE BUSINESS FORMS | 518.18 | 518.18 |
| 350 | Bank of America Credit Card | 03/24/16 | | Pepboys | 26.49 | 26.49 |
| 351 | Bank of America Credit Card | 11/28/14 | | Popeye's | 23.52 | 23.52 |
| 352 | Bank of America Credit Card | 11/28/14 | | Popeye's | 24.57 | 24.57 |
| 353 | Bank of America Credit Card | 11/27/15 | | Popeye's | 46.37 | 46.37 |
| 354 | Bank of America Credit Card | 12/05/16 | | Popeye's | 90.61 | 90.61 |
| 355 | SunTrust Checking x2539 | 01/22/14 | 36216 | POSTMASTER | 460.00 | 460.00 |
| 56 | SunTrust Checking x2539 | 06/10/14 | 36636 | POSTMASTER | 245.00 | 245.00 |
| 57 | SunTrust Checking x2539 | 08/11/14 | 36822 | POSTMASTER | 245.00 | 245.00 |
| 8 | SunTrust Checking x2539 | 11/24/14 | 37123 | POSTMASTER | 245.00 | 245.00 |
| 9 | SunTrust Checking x2539 | 12/08/14 | 37167 | POSTMASTER | 29.40 | 29.40 |
| 1 | SunTrust Checking x2539 | 01/16/15 | 37299 | POSTMASTER | 245.00 | 245.00 |
| | SunTrust Checking x2539 | 04/14/15 | 37547 | POSTMASTER | 245.00 | 245.00 |
| | SunTrust Checking x2539 | 06/16/15 | 37739 | POSTMASTER | 490.00 | 490.00 |
| | SunTrust Checking x2539 | 10/27/15 | 38148 | POSTMASTER | 245.00 | 245.00 |
| | SunTrust Checking x2539 | 11/24/15 | 38228 | POSTMASTER | 115.00 | 115.00 |
| | SunTrust Checking x2539 | 11/25/15 | 38274 | POSTMASTER | 73.50 | 73.50 |
| | SunTrust Checking x2539 | 02/03/16 | 38463 | POSTMASTER | 245.00 | 245.00 |
| | SunTrust Checking x2539 | 02/05/16 | 38472 | POSTMASTER | 129.00 | 129.00 |
| | SunTrust Checking x2539 | 04/07/16 | 38648 | POSTMASTER | 490.00 | 490.00 |
| | SunTrust Checking x2539 | 06/10/16 | 38850 | POSTMASTER | 129.00 | 129.00 |
| | SunTrust Checking x2539 | 08/19/16 | 39064 | POSTMASTER | 235.00 | 235.00 |

Stout
Page 10 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 371 | SunTrust Checking x2539 | 09/14/16 | 39142 | POSTMASTER | 129.00 | 129.00 |
| 372 | SunTrust Checking x2539 | 11/08/16 | 39291 | POSTMASTER | 235.00 | 235.00 |
| 373 | SunTrust Checking x2539 | 12/05/16 | 39406 | POSTMASTER | 65.80 | 65.80 |
| 374 | SunTrust Checking x2539 | 01/12/17 | 39518 | POSTMASTER | 235.00 | 235.00 |
| 375 | SunTrust Checking x2539 | 03/28/17 | 39708 | POSTMASTER | 235.00 | 235.00 |
| 376 | SunTrust Checking x2539 | 04/06/17 | 39738 | POSTMASTER | 133.20 | 133.20 |
| 377 | SunTrust Checking x2539 | 06/13/17 | 39933 | POSTMASTER | 245.00 | 245.00 |
| 378 | SunTrust Checking x2539 | 08/04/17 | 40083 | POSTMASTER | 133.00 | 133.00 |
| 379 | SunTrust Checking x2539 | 08/21/17 | 40138 | POSTMASTER | 245.00 | 245.00 |
| 380 | SunTrust Checking x2539 | 11/14/17 | 40428 | POSTMASTER | 490.00 | 490.00 |
| 381 | SunTrust Checking x2539 | 12/01/17 | 40546 | POSTMASTER | 133.00 | 133.00 |
| 382 | SunTrust Checking x2539 | 03/01/18 | 40732 | POSTMASTER | 500.00 | 500.00 |
| 383 | SunTrust Checking x2539 | 05/04/18 | 40911 | POSTMASTER | 134.00 | 134.00 |
| 384 | SunTrust Checking x2539 | 07/12/18 | 41128 | POSTMASTER | 500.00 | 500.00 |
| 385 | SunTrust Checking x2539 | 11/26/18 | 41553 | POSTMASTER | 500.00 | 500.00 |
| 386 | SunTrust Checking x2539 | 02/04/19 | 41716 | POSTMASTER | 147.00 | 147.00 |
| 387 | SunTrust Checking x2539 | 04/16/19 | 41957 | POSTMASTER | 275.00 | 275.00 |
| 388 | SunTrust Checking x2539 | 07/10/19 | 42191 | POSTMASTER | 147.00 | 147.00 |
| 389 | Bank of America Credit Card | 05/15/17 | | Precision Tune Auto Care | 43.49 | 43.49 |
| 390 | Bank of America Credit Card | 05/22/19 | | Precision Tune Auto Care | 200.00 | 200.00 |
| 391 | Bank of America Credit Card | 04/15/16 | | Quality Auto Care & Body | 960.00 | 960.00 |
| 392 | Bank of America Credit Card | 01/11/17 | | Quality Auto Care & Body | 180.00 | 180.00 |
| 393 | Bank of America Credit Card | 02/07/18 | | Quality Auto Care & Body | 160.00 | 160.00 |
| 394 | Bank of America Credit Card | 04/02/18 | | Quality Auto Care & Body | 320.00 | 320.00 |
| 395 | Bank of America Credit Card | 04/17/19 | | Quality Auto Care & Body | 40.00 | 40.00 |
| 396 | Bank of America Credit Card | 05/08/19 | | Quality Auto Care & Body | 230.00 | 230.00 |
| 397 | Bank of America Credit Card | 11/12/14 | | Quick Lube | 81.46 | 81.46 |
| 398 | Bank of America Credit Card | 07/13/15 | | Quick Lube | 81.46 | 81.46 |
| 399 | Bank of America Credit Card | 12/03/15 | | Quick Lube | 81.46 | 81.46 |
| 400 | Bank of America Credit Card | 04/13/16 | | Quick Lube | 81.46 | 81.46 |
| 401 | Bank of America Credit Card | 07/30/18 | | Raymond Automotive | 198.04 | 198.04 |
| 402 | SunTrust Checking x2539 | 09/21/15 | 38030 | READY REFRESH | 100.75 | 100.75 |
| 403 | SunTrust Checking x2539 | 10/05/15 | 38075 | READY REFRESH | 81.72 | 81.72 |
| 404 | SunTrust Checking x2539 | 01/11/16 | 38420 | READY REFRESH | 83.77 | 83.77 |
| 405 | SunTrust Checking x2539 | 02/04/16 | 38466 | READY REFRESH | 93.02 | 93.02 |
| 406 | SunTrust Checking x2539 | 04/07/16 | 38650 | READY REFRESH | 95.71 | 95.71 |
| 407 | SunTrust Checking x2539 | 05/05/16 | 38736 | READY REFRESH | 97.24 | 97.24 |

Stout
Page 11 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**               **Schedule D.3**

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 408 | SunTrust Checking x2539 | 06/09/16 | 38846 | READY REFRESH | 400.00 | 400.00 | |
| 409 | SunTrust Checking x2539 | 09/06/16 | 39120 | READY REFRESH | 110.01 | 110.01 | |
| 410 | SunTrust Checking x2539 | 11/07/16 | 39288 | READY REFRESH | 189.94 | 189.94 | |
| 411 | SunTrust Checking x2539 | 12/01/16 | 39360 | READY REFRESH | 94.46 | 94.46 | |
| 412 | SunTrust Checking x2539 | 01/09/17 | 39513 | READY REFRESH | 90.61 | 90.61 | |
| 413 | SunTrust Checking x2539 | 03/28/17 | 39712 | READY REFRESH | 335.07 | 335.07 | |
| 414 | SunTrust Checking x2539 | 09/01/17 | 40188 | READY REFRESH | 103.82 | 103.82 | |
| 415 | SunTrust Checking x2539 | 10/02/17 | 40275 | READY REFRESH | 114.98 | 114.98 | |
| 416 | SunTrust Checking x2539 | 11/01/17 | 40390 | READY REFRESH | 56.42 | 56.42 | |
| 417 | SunTrust Checking x2539 | 11/24/17 | 40485 | READY REFRESH | 117.13 | 117.13 | |
| 418 | SunTrust Checking x2539 | 12/21/17 | 40579 | READY REFRESH | 133.74 | 133.74 | |
| 419 | SunTrust Checking x2539 | 01/30/18 | 40656 | READY REFRESH | 84.08 | 84.08 | |
| 420 | SunTrust Checking x2539 | 03/01/18 | 40735 | READY REFRESH | 128.35 | 128.35 | |
| 421 | SunTrust Checking x2539 | 04/30/18 | 40895 | READY REFRESH | 83.60 | 83.60 | |
| 422 | SunTrust Checking x2539 | 05/30/18 | 40992 | READY REFRESH | 102.61 | 102.61 | |
| 423 | SunTrust Checking x2539 | 06/29/18 | 41087 | READY REFRESH | 153.16 | 153.16 | |
| 424 | SunTrust Checking x2539 | 07/31/18 | 41185 | READY REFRESH | 158.68 | 158.68 | |
| 425 | SunTrust Checking x2539 | 09/06/18 | 41286 | READY REFRESH | 105.55 | 105.55 | |
| 426 | SunTrust Checking x2539 | 10/01/18 | 41363 | READY REFRESH | 67.37 | 67.37 | |
| 427 | SunTrust Checking x2539 | 10/26/18 | 41435 | READY REFRESH | 180.23 | 180.23 | |
| 428 | SunTrust Checking x2539 | 11/23/18 | 41536 | READY REFRESH | 147.82 | 147.82 | |
| 429 | SunTrust Checking x2539 | 12/20/18 | 41639 | READY REFRESH | 180.91 | 180.91 | |
| 430 | SunTrust Checking x2539 | 02/06/19 | 41730 | READY REFRESH | 65.29 | 65.29 | |
| 431 | SunTrust Checking x2539 | 02/18/19 | 41771 | READY REFRESH | 65.29 | 65.29 | |
| 432 | SunTrust Checking x2539 | 03/05/19 | 41820 | READY REFRESH | 45.97 | 45.97 | |
| 433 | SunTrust Checking x2539 | 03/29/19 | 41885 | READY REFRESH | 118.75 | 118.75 | |
| 434 | SunTrust Checking x2539 | 05/06/19 | 42005 | READY REFRESH | 121.85 | 121.85 | |
| 435 | SunTrust Checking x2539 | 06/03/19 | 42086 | READY REFRESH | 150.12 | 150.12 | |
| 436 | SunTrust Checking x2539 | 06/28/19 | 42165 | READY REFRESH | 132.44 | 132.44 | |
| 437 | SunTrust Checking x2539 | 07/29/19 | 42251 | READY REFRESH | 228.00 | 228.00 | |
| 438 | SunTrust Checking x2539 | 09/03/19 | 42362 | READY REFRESH | 94.15 | 94.15 | |
| 439 | SunTrust Checking x2539 | 02/06/14 | 36261 | Rent Control Consultants | 306.10 | 75.70 | [a] |
| 440 | SunTrust Checking x2539 | 03/06/14 | 36351 | Rent Control Consultants | 324.34 | 93.86 | [a] |
| 441 | SunTrust Checking x2539 | 04/24/14 | 36494 | Rent Control Consultants | 306.24 | 68.52 | [a] |
| 442 | SunTrust Checking x2539 | 05/06/14 | 36528 | Rent Control Consultants | 302.62 | 72.14 | [a] |
| 443 | SunTrust Checking x2539 | 06/04/14 | 36614 | Rent Control Consultants | 324.34 | 90.24 | [a] |
| 444 | SunTrust Checking x2539 | 07/01/14 | 36701 | Rent Control Consultants | 288.14 | 72.14 | [a] |

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 445 | SunTrust Checking x2539 | 08/07/14 | 36803 | Rent Control Consultants | 346.06 | 93.86 | [a] |
| 446 | SunTrust Checking x2539 | 09/03/14 | 36891 | Rent Control Consultants | 299.00 | 64.90 | [a] |
| 447 | SunTrust Checking x2539 | 10/07/14 | 36981 | Rent Control Consultants | 324.34 | 90.24 | [a] |
| 448 | SunTrust Checking x2539 | 12/03/14 | 37141 | Rent Control Consultants | 313.48 | 93.86 | [a] |
| 449 | SunTrust Checking x2539 | 12/12/14 | 37242 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 450 | SunTrust Checking x2539 | 12/24/14 | 37122 | Rent Control Consultants | 280.90 | 64.90 | [a] |
| 451 | SunTrust Checking x2539 | 02/03/15 | 37338 | Rent Control Consultants | 325.38 | 88.90 | [a] |
| 452 | SunTrust Checking x2539 | 03/03/15 | 37413 | Rent Control Consultants | 329.00 | 81.66 | [a] |
| 453 | SunTrust Checking x2539 | 04/01/15 | 37515 | Rent Control Consultants | 314.52 | 78.04 | [a] |
| 454 | SunTrust Checking x2539 | 05/05/15 | 37620 | Rent Control Consultants | 307.28 | 78.04 | [a] |
| 455 | SunTrust Checking x2539 | 06/02/15 | 37702 | Rent Control Consultants | 325.38 | 74.62 | [a] |
| 456 | SunTrust Checking x2539 | 07/01/15 | 37772 | Rent Control Consultants | 307.28 | 81.66 | [a] |
| 457 | SunTrust Checking x2539 | 08/25/15 | 37950 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 458 | SunTrust Checking x2539 | 09/03/15 | 37975 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 459 | SunTrust Checking x2539 | 10/06/15 | 38092 | Rent Control Consultants | 357.96 | 92.52 | [a] |
| 460 | SunTrust Checking x2539 | 11/03/15 | 38170 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 461 | SunTrust Checking x2539 | 11/24/15 | 38240 | Rent Control Consultants | 300.04 | 78.04 | [a] |
| 462 | SunTrust Checking x2539 | 01/13/16 | 38421 | Rent Control Consultants | 296.42 | 70.80 | [a] |
| 463 | SunTrust Checking x2539 | 03/02/16 | 38550 | Rent Control Consultants | 383.30 | 117.86 | [a] |
| 464 | SunTrust Checking x2539 | 03/10/16 | 38577 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 465 | SunTrust Checking x2539 | 03/29/16 | 38626 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 466 | SunTrust Checking x2539 | 05/03/16 | 38727 | Rent Control Consultants | 343.48 | 87.78 | [a] |
| 467 | SunTrust Checking x2539 | 05/31/16 | 38806 | Rent Control Consultants | 336.24 | 81.66 | [a] |
| 468 | SunTrust Checking x2539 | 07/06/16 | 38920 | Rent Control Consultants | 318.14 | 81.66 | [a] |
| 469 | SunTrust Checking x2539 | 08/04/16 | 39021 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 470 | SunTrust Checking x2539 | 08/30/16 | 39097 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 471 | SunTrust Checking x2539 | 10/06/16 | 39195 | Rent Control Consultants | 379.68 | 107.00 | [a] |
| 472 | SunTrust Checking x2539 | 11/01/16 | 39264 | Rent Control Consultants | 296.42 | 74.42 | [a] |
| 473 | SunTrust Checking x2539 | 12/03/16 | 39400 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 474 | SunTrust Checking x2539 | 12/12/16 | 39470 | Rent Control Consultants | 300.34 | 70.80 | [a] |
| 475 | SunTrust Checking x2539 | 02/01/17 | 39546 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 476 | SunTrust Checking x2539 | 03/01/17 | 39618 | Rent Control Consultants | 360.66 | 100.96 | [a] |
| 477 | SunTrust Checking x2539 | 03/30/17 | 39717 | Rent Control Consultants | 311.65 | 78.34 | [a] |
| 478 | SunTrust Checking x2539 | 05/10/17 | 39833 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 479 | SunTrust Checking x2539 | 06/02/17 | 39895 | Rent Control Consultants | 345.58 | 82.11 | [a] |
| 480 | SunTrust Checking x2539 | 06/07/17 | 39910 | Rent Control Consultants | 41.47 | 18.85 | [a] |
| 481 | SunTrust Checking x2539 | 07/03/17 | 39993 | Rent Control Consultants | 292.80 | 70.80 | [a] |

Stout
Page 13 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 482 | SunTrust Checking x2539 | 07/31/17 | 40071 | Rent Control Consultants | 307.88 | 82.11 | [a] |
| 483 | SunTrust Checking x2539 | 09/05/17 | 40192 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 484 | SunTrust Checking x2539 | 10/02/17 | 40274 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 485 | SunTrust Checking x2539 | 10/03/17 | 40278 | Rent Control Consultants | 109.33 | 45.24 | [a] |
| 486 | SunTrust Checking x2539 | 10/31/17 | 40388 | Rent Control Consultants | 296.80 | 74.57 | [a] |
| 487 | SunTrust Checking x2539 | 11/24/17 | 40492 | Rent Control Consultants | 311.65 | 85.88 | [a] |
| 488 | SunTrust Checking x2539 | 12/19/17 | 40575 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 489 | SunTrust Checking x2539 | 01/30/18 | 40653 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 490 | SunTrust Checking x2539 | 01/31/18 | 40658 | Rent Control Consultants | 11.31 | 3.77 | [a] |
| 491 | SunTrust Checking x2539 | 02/27/18 | 40727 | Rent Control Consultants | 330.50 | 97.19 | [a] |
| 492 | SunTrust Checking x2539 | 04/02/18 | 40806 | Rent Control Consultants | 322.96 | 78.34 | [a] |
| 493 | SunTrust Checking x2539 | 05/01/18 | 40897 | Rent Control Consultants | 326.73 | 93.42 | [a] |
| 494 | SunTrust Checking x2539 | 05/29/18 | 40983 | Rent Control Consultants | 319.19 | 70.80 | [a] |
| 495 | SunTrust Checking x2539 | 07/03/18 | 41101 | Rent Control Consultants | 296.57 | 70.80 | [a] |
| 496 | SunTrust Checking x2539 | 07/31/18 | 41180 | Rent Control Consultants | 300.34 | 78.34 | [a] |
| 497 | SunTrust Checking x2539 | 08/31/18 | 41275 | Rent Control Consultants | 304.11 | 70.80 | [a] |
| 498 | SunTrust Checking x2539 | 10/02/18 | 41369 | Rent Control Consultants | 304.11 | 112.27 | [a] |
| 499 | SunTrust Checking x2539 | 10/30/18 | 41443 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 500 | SunTrust Checking x2539 | 11/06/18 | 41468 | Rent Control Consultants | 75.40 | 70.80 | [a] |
| 501 | SunTrust Checking x2539 | 11/13/18 | 41521 | Rent Control Consultants | 326.73 | 82.11 | [a] |
| 502 | SunTrust Checking x2539 | 12/26/18 | 41645 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 503 | SunTrust Checking x2539 | 01/29/19 | 41706 | Rent Control Consultants | 311.65 | 78.34 | [a] |
| 504 | SunTrust Checking x2539 | 03/05/19 | 41819 | Rent Control Consultants | 365.00 | 112.60 | [a] |
| 505 | SunTrust Checking x2539 | 04/01/19 | 41891 | Rent Control Consultants | 353.60 | 97.40 | [a] |
| 506 | SunTrust Checking x2539 | 04/29/19 | 41992 | Rent Control Consultants | 323.20 | 89.80 | [a] |
| 507 | SunTrust Checking x2539 | 06/03/19 | 42083 | Rent Control Consultants | 323.20 | 70.80 | [a] |
| 508 | SunTrust Checking x2539 | 07/02/19 | 42173 | Rent Control Consultants | 292.80 | 70.80 | [a] |
| 509 | SunTrust Checking x2539 | 08/01/19 | 42264 | Rent Control Consultants | 304.20 | 82.20 | [a] |
| 510 | SunTrust Checking x2539 | 09/03/19 | 42358 | Rent Control Consultants | 323.20 | 82.20 | [a] |
| 511 | SunTrust Checking x2539 | 09/30/19 | 42458 | Rent Control Consultants | 372.60 | 108.80 | [a] |
| 512 | SunTrust Checking x2539 | 02/03/14 | 36252 | ROBERT FITZPATRICK PLLC | 1,629.19 | 1,629.19 | |
| 513 | SunTrust Checking x2539 | 02/03/14 | 36254 | ROBERT FITZPATRICK PLLC | 7,460.00 | 7,460.00 | |
| 514 | Bank of America Credit Card | 07/02/18 | | Safeway | 8.44 | 8.44 | |
| 515 | Bank of America Credit Card | 09/13/19 | | Safeway | 14.82 | 14.82 | |
| 516 | SunTrust Checking x2539 | 04/21/15 | 37571 | Sears | 162.92 | 162.92 | |
| 517 | SunTrust Checking x2539 | 04/21/15 | 37572 | Sears | 1,573.53 | 1,573.53 | |
| 518 | SunTrust Checking x2539 | 06/22/15 | 37741 | Sears | 1,024.13 | 1,024.13 | |

Stout
Page 14 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 519 | SunTrust Checking x2539 | 06/22/15 | 37746 | Sears | 1,493.02 | 1,493.02 |
| 520 | SunTrust Checking x2539 | 08/24/15 | 37945 | Sears | 858.52 | 858.52 |
| 521 | SunTrust Checking x2539 | 12/23/15 | 38225 | Sears | 364.19 | 364.19 |
| 522 | SunTrust Checking x2539 | 08/26/16 | 39090 | Sears | 2,061.15 | 2,061.15 |
| 523 | SunTrust Checking x2539 | 11/21/16 | 39323 | Sears | 1,013.63 | 1,013.63 |
| 524 | SunTrust Checking x2539 | 02/20/19 | 41773 | Sears | 104.94 | 104.94 |
| 525 | SunTrust Checking x2539 | 10/21/19 | 42528 | Sears | 138.37 | 138.37 |
| 526 | Bank of America Credit Card | 07/08/16 | | Sears Auto Center | 59.19 | 59.19 |
| 527 | SunTrust Checking x2539 | 01/27/14 | 36230 | SHELL OIL COMPANY | 1,464.26 | 1,464.26 |
| 528 | SunTrust Checking x2539 | 02/21/14 | 36312 | SHELL OIL COMPANY | 1,699.12 | 1,699.12 |
| 529 | SunTrust Checking x2539 | 03/24/14 | 36409 | SHELL OIL COMPANY | 1,954.54 | 1,954.54 |
| 530 | SunTrust Checking x2539 | 04/22/14 | 36483 | SHELL OIL COMPANY | 1,059.77 | 1,059.77 |
| 531 | SunTrust Checking x2539 | 05/23/14 | 36585 | SHELL OIL COMPANY | 974.03 | 974.03 |
| 532 | SunTrust Checking x2539 | 06/24/14 | 36682 | SHELL OIL COMPANY | 1,416.01 | 1,416.01 |
| 533 | SunTrust Checking x2539 | 07/28/14 | 36776 | SHELL OIL COMPANY | 1,680.96 | 1,680.96 |
| 534 | SunTrust Checking x2539 | 08/22/14 | 36861 | SHELL OIL COMPANY | 1,123.92 | 1,123.92 |
| 535 | SunTrust Checking x2539 | 09/23/14 | 36943 | SHELL OIL COMPANY | 1,016.24 | 1,016.24 |
| 536 | SunTrust Checking x2539 | 10/24/14 | 37036 | SHELL OIL COMPANY | 1,444.38 | 1,444.38 |
| 537 | SunTrust Checking x2539 | 11/24/14 | 37121 | SHELL OIL COMPANY | 871.34 | 871.34 |
| 538 | SunTrust Checking x2539 | 12/11/14 | 37229 | SHELL OIL COMPANY | 834.98 | 834.98 |
| 539 | SunTrust Checking x2539 | 02/24/15 | 37387 | SHELL OIL COMPANY | 714.98 | 714.98 |
| 540 | SunTrust Checking x2539 | 03/27/15 | 37500 | SHELL OIL COMPANY | 942.14 | 942.14 |
| 541 | SunTrust Checking x2539 | 04/24/15 | 37582 | SHELL OIL COMPANY | 707.34 | 707.34 |
| 542 | SunTrust Checking x2539 | 05/26/15 | 37676 | SHELL OIL COMPANY | 855.64 | 855.64 |
| 543 | SunTrust Checking x2539 | 06/26/15 | 37758 | SHELL OIL COMPANY | 849.66 | 849.66 |
| 544 | SunTrust Checking x2539 | 07/27/15 | 37856 | SHELL OIL COMPANY | 1,040.84 | 1,040.84 |
| 545 | SunTrust Checking x2539 | 08/25/15 | 37947 | SHELL OIL COMPANY | 1,089.46 | 1,089.46 |
| 546 | SunTrust Checking x2539 | 09/25/15 | 38041 | SHELL OIL COMPANY | 719.68 | 719.68 |
| 547 | SunTrust Checking x2539 | 10/26/15 | 38144 | SHELL OIL COMPANY | 713.91 | 713.91 |
| 548 | SunTrust Checking x2539 | 11/24/15 | 38232 | SHELL OIL COMPANY | 784.64 | 784.64 |
| 549 | SunTrust Checking x2539 | 12/05/15 | 38350 | SHELL OIL COMPANY | 736.47 | 736.47 |
| 550 | SunTrust Checking x2539 | 02/02/16 | 38448 | SHELL OIL COMPANY | 719.51 | 719.51 |
| 551 | SunTrust Checking x2539 | 02/23/16 | 38521 | SHELL OIL COMPANY | 633.11 | 633.11 |
| 552 | SunTrust Checking x2539 | 03/28/16 | 38617 | SHELL OIL COMPANY | 696.02 | 696.02 |
| 553 | SunTrust Checking x2539 | 04/26/16 | 38702 | SHELL OIL COMPANY | 540.89 | 540.89 |
| 554 | SunTrust Checking x2539 | 05/27/16 | 38800 | SHELL OIL COMPANY | 953.96 | 953.96 |
| 555 | SunTrust Checking x2539 | 06/24/16 | 38892 | SHELL OIL COMPANY | 906.08 | 906.08 |

Stout
Page 15 of 38

Olympia Investments, Inc.
October 23, 2019
Historical Improper Credit Card Charges and Checks                              Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 556 | SunTrust Checking x2539 | 07/26/16 | 38984 | SHELL OIL COMPANY | 1,113.31 | 1,113.31 |
| 557 | SunTrust Checking x2539 | 08/26/16 | 39089 | SHELL OIL COMPANY | 867.57 | 867.57 |
| 558 | SunTrust Checking x2539 | 09/23/16 | 39166 | SHELL OIL COMPANY | 720.42 | 720.42 |
| 559 | SunTrust Checking x2539 | 10/25/16 | 39247 | SHELL OIL COMPANY | 784.30 | 784.30 |
| 560 | SunTrust Checking x2539 | 11/28/16 | 39341 | SHELL OIL COMPANY | 699.01 | 699.01 |
| 561 | SunTrust Checking x2539 | 12/09/16 | 39446 | SHELL OIL COMPANY | 1,802.64 | 1,802.64 |
| 562 | SunTrust Checking x2539 | 02/22/17 | 39603 | SHELL OIL COMPANY | 666.25 | 666.25 |
| 563 | SunTrust Checking x2539 | 03/27/17 | 39707 | SHELL OIL COMPANY | 828.03 | 828.03 |
| 564 | SunTrust Checking x2539 | 04/25/17 | 39781 | SHELL OIL COMPANY | 674.13 | 674.13 |
| 565 | SunTrust Checking x2539 | 05/24/17 | 39874 | SHELL OIL COMPANY | 711.03 | 711.03 |
| 566 | SunTrust Checking x2539 | 07/03/17 | 39991 | SHELL OIL COMPANY | 732.08 | 732.08 |
| 567 | SunTrust Checking x2539 | 07/25/17 | 40060 | SHELL OIL COMPANY | 689.75 | 689.75 |
| 568 | SunTrust Checking x2539 | 08/25/17 | 40159 | SHELL OIL COMPANY | 780.33 | 780.33 |
| 569 | SunTrust Checking x2539 | 09/25/17 | 40255 | SHELL OIL COMPANY | 571.98 | 571.98 |
| 570 | SunTrust Checking x2539 | 10/24/17 | 40376 | SHELL OIL COMPANY | 688.48 | 688.48 |
| 571 | SunTrust Checking x2539 | 11/21/17 | 40472 | SHELL OIL COMPANY | 1,681.49 | 1,681.49 |
| 572 | SunTrust Checking x2539 | 01/25/18 | 40643 | SHELL OIL COMPANY | 301.76 | 301.76 |
| 573 | SunTrust Checking x2539 | 02/23/18 | 40719 | SHELL OIL COMPANY | 752.13 | 752.13 |
| 574 | SunTrust Checking x2539 | 03/28/18 | 40797 | SHELL OIL COMPANY | 700.13 | 700.13 |
| 575 | SunTrust Checking x2539 | 04/27/18 | 40887 | SHELL OIL COMPANY | 731.21 | 731.21 |
| 576 | SunTrust Checking x2539 | 05/29/18 | 40981 | SHELL OIL COMPANY | 774.18 | 774.18 |
| 577 | SunTrust Checking x2539 | 06/25/18 | 41074 | SHELL OIL COMPANY | 870.74 | 870.74 |
| 578 | SunTrust Checking x2539 | 07/30/18 | 41177 | SHELL OIL COMPANY | 968.28 | 968.28 |
| 579 | SunTrust Checking x2539 | 08/27/18 | 41259 | SHELL OIL COMPANY | 962.36 | 962.36 |
| 580 | SunTrust Checking x2539 | 09/28/18 | 41347 | SHELL OIL COMPANY | 815.03 | 815.03 |
| 581 | SunTrust Checking x2539 | 10/26/18 | 41434 | SHELL OIL COMPANY | 482.76 | 482.76 |
| 582 | SunTrust Checking x2539 | 11/23/18 | 41518 | SHELL OIL COMPANY | 681.81 | 681.81 |
| 583 | SunTrust Checking x2539 | 12/11/18 | 41629 | SHELL OIL COMPANY | 1,647.33 | 1,647.33 |
| 584 | SunTrust Checking x2539 | 02/25/19 | 41787 | SHELL OIL COMPANY | 147.04 | 147.04 |
| 585 | SunTrust Checking x2539 | 03/28/19 | 41880 | SHELL OIL COMPANY | 507.26 | 507.26 |
| 586 | SunTrust Checking x2539 | 07/18/14 | 36751 | SPOK, INC. | 19.33 | 19.33 |
| 587 | SunTrust Checking x2539 | 08/19/14 | 36840 | SPOK, INC. | 19.33 | 19.33 |
| 588 | SunTrust Checking x2539 | 09/22/14 | 36939 | SPOK, INC. | 19.33 | 19.33 |
| 589 | SunTrust Checking x2539 | 10/20/14 | 37015 | SPOK, INC. | 19.34 | 19.34 |
| 590 | SunTrust Checking x2539 | 11/21/14 | 37113 | SPOK, INC. | 19.34 | 19.34 |
| 591 | SunTrust Checking x2539 | 12/10/14 | 37206 | SPOK, INC. | 19.34 | 19.34 |
| 592 | SunTrust Checking x2539 | 01/20/15 | 37305 | SPOK, INC. | 19.35 | 19.35 |

Stout
Page 16 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    **Schedule D.3**

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 593 | SunTrust Checking x2539 | 02/23/15 | 37381 | SPOK, INC. | 19.35 | 19.35 |
| 594 | SunTrust Checking x2539 | 03/20/15 | 37479 | SPOK, INC. | 19.35 | 19.35 |
| 595 | SunTrust Checking x2539 | 04/21/15 | 37570 | SPOK, INC. | 19.36 | 19.36 |
| 596 | SunTrust Checking x2539 | 05/19/15 | 37660 | SPOK, INC. | 19.36 | 19.36 |
| 597 | SunTrust Checking x2539 | 06/23/15 | 37742 | SPOK, INC. | 19.36 | 19.36 |
| 598 | SunTrust Checking x2539 | 07/20/15 | 37838 | SPOK, INC. | 19.36 | 19.36 |
| 599 | SunTrust Checking x2539 | 08/25/15 | 37951 | SPOK, INC. | 19.36 | 19.36 |
| 600 | SunTrust Checking x2539 | 09/21/15 | 38026 | SPOK, INC. | 19.36 | 19.36 |
| 601 | SunTrust Checking x2539 | 10/20/15 | 38130 | SPOK, INC. | 19.35 | 19.35 |
| 602 | SunTrust Checking x2539 | 11/24/15 | 38226 | SPOK, INC. | 19.35 | 19.35 |
| 603 | SunTrust Checking x2539 | 11/30/15 | 38319 | SPOK, INC. | 19.35 | 19.35 |
| 604 | SunTrust Checking x2539 | 01/21/16 | 38429 | SPOK, INC. | 29.93 | 29.93 |
| 605 | SunTrust Checking x2539 | 02/19/16 | 38511 | SPOK, INC. | 19.37 | 19.37 |
| 606 | SunTrust Checking x2539 | 03/18/16 | 38595 | SPOK, INC. | 19.37 | 19.37 |
| 607 | SunTrust Checking x2539 | 04/25/16 | 38695 | SPOK, INC. | 19.37 | 19.37 |
| 608 | SunTrust Checking x2539 | 05/23/16 | 38784 | SPOK, INC. | 19.37 | 19.37 |
| 609 | SunTrust Checking x2539 | 06/20/16 | 38871 | SPOK, INC. | 19.37 | 19.37 |
| 610 | SunTrust Checking x2539 | 07/22/16 | 38968 | SPOK, INC. | 19.27 | 19.27 |
| 611 | SunTrust Checking x2539 | 08/19/16 | 39066 | SPOK, INC. | 19.37 | 19.37 |
| 612 | SunTrust Checking x2539 | 09/20/16 | 39159 | SPOK, INC. | 19.37 | 19.37 |
| 613 | SunTrust Checking x2539 | 10/21/16 | 39239 | SPOK, INC. | 19.36 | 19.36 |
| 614 | SunTrust Checking x2539 | 11/21/16 | 39325 | SPOK, INC. | 19.36 | 19.36 |
| 615 | SunTrust Checking x2539 | 12/06/16 | 39421 | SPOK, INC. | 19.36 | 19.36 |
| 616 | SunTrust Checking x2539 | 01/20/17 | 39531 | SPOK, INC. | 19.35 | 19.35 |
| 617 | SunTrust Checking x2539 | 02/20/17 | 39594 | SPOK, INC. | 19.35 | 19.35 |
| 618 | SunTrust Checking x2539 | 03/21/17 | 39685 | SPOK, INC. | 19.35 | 19.35 |
| 619 | SunTrust Checking x2539 | 04/21/17 | 39778 | SPOK, INC. | 19.36 | 19.36 |
| 620 | SunTrust Checking x2539 | 05/22/17 | 39866 | SPOK, INC. | 19.36 | 19.36 |
| 621 | SunTrust Checking x2539 | 06/20/17 | 39963 | SPOK, INC. | 19.36 | 19.36 |
| 622 | SunTrust Checking x2539 | 07/21/17 | 40047 | SPOK, INC. | 27.79 | 27.79 |
| 623 | SunTrust Checking x2539 | 08/21/17 | 40139 | SPOK, INC. | 19.36 | 19.36 |
| 624 | SunTrust Checking x2539 | 09/19/17 | 40241 | SPOK, INC. | 19.36 | 19.36 |
| 625 | SunTrust Checking x2539 | 10/23/17 | 40356 | SPOK, INC. | 35.23 | 35.23 |
| 626 | SunTrust Checking x2539 | 11/21/17 | 40457 | SPOK, INC. | 119.38 | 119.38 |
| 627 | SunTrust Checking x2539 | 01/22/18 | 40634 | SPOK, INC. | 11.75 | 11.75 |
| 628 | SunTrust Checking x2539 | 02/21/18 | 40711 | SPOK, INC. | 19.40 | 19.40 |
| 629 | SunTrust Checking x2539 | 03/22/18 | 40786 | SPOK, INC. | 19.40 | 19.40 |

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 630 | SunTrust Checking x2539 | 04/23/18 | 40882 | SPOK, INC. | 19.38 | 19.38 |
| 631 | SunTrust Checking x2539 | 05/22/18 | 40969 | SPOK, INC. | 19.38 | 19.38 |
| 632 | SunTrust Checking x2539 | 06/20/18 | 41059 | SPOK, INC. | 19.38 | 19.38 |
| 633 | SunTrust Checking x2539 | 07/23/18 | 41164 | SPOK, INC. | 19.37 | 19.37 |
| 634 | SunTrust Checking x2539 | 08/21/18 | 41251 | SPOK, INC. | 19.37 | 19.37 |
| 635 | SunTrust Checking x2539 | 09/25/18 | 41342 | SPOK, INC. | 19.37 | 19.37 |
| 636 | SunTrust Checking x2539 | 10/22/18 | 41424 | SPOK, INC. | 19.42 | 19.42 |
| 637 | SunTrust Checking x2539 | 11/20/18 | 41509 | SPOK, INC. | 19.42 | 19.42 |
| 638 | SunTrust Checking x2539 | 12/08/18 | 41621 | SPOK, INC. | 119.42 | 119.42 |
| 639 | SunTrust Checking x2539 | 06/24/19 | 42148 | SPOK, INC. | 16.40 | 16.40 |
| 640 | SunTrust Checking x2539 | 07/19/19 | 42220 | SPOK, INC. | 19.49 | 19.49 |
| 641 | SunTrust Checking x2539 | 08/21/19 | 42327 | SPOK, INC. | 19.49 | 19.49 |
| 642 | SunTrust Checking x2539 | 09/20/19 | 42423 | SPOK, INC. | 19.49 | 19.49 |
| 643 | Bank of America Credit Card | 03/10/15 | | Sport Chevrolet Servic | 473.81 | 473.81 |
| 644 | SunTrust Checking x2539 | 01/22/14 | 36217 | SPRINT | 17.69 | 17.69 |
| 645 | SunTrust Checking x2539 | 02/03/14 | 36244 | SPRINT | 284.45 | 284.45 |
| 646 | SunTrust Checking x2539 | 02/24/14 | 36314 | SPRINT | 16.36 | 16.36 |
| 647 | SunTrust Checking x2539 | 03/05/14 | 36348 | SPRINT | 284.77 | 284.77 |
| 648 | SunTrust Checking x2539 | 03/25/14 | 36414 | SPRINT | 16.60 | 16.60 |
| 649 | SunTrust Checking x2539 | 04/02/14 | 36433 | SPRINT | 275.00 | 275.00 |
| 650 | SunTrust Checking x2539 | 04/23/14 | 36490 | SPRINT | 12.21 | 12.21 |
| 651 | SunTrust Checking x2539 | 05/06/14 | 36524 | SPRINT | 278.64 | 278.64 |
| 652 | SunTrust Checking x2539 | 05/23/14 | 36584 | SPRINT | 15.40 | 15.40 |
| 653 | SunTrust Checking x2539 | 06/03/14 | 36609 | SPRINT | 273.59 | 273.59 |
| 654 | SunTrust Checking x2539 | 06/24/14 | 36681 | SPRINT | 20.27 | 20.27 |
| 655 | SunTrust Checking x2539 | 07/07/14 | 36711 | SPRINT | 279.86 | 279.86 |
| 656 | SunTrust Checking x2539 | 07/28/14 | 36766 | SPRINT | 12.09 | 12.09 |
| 657 | SunTrust Checking x2539 | 08/04/14 | 36801 | SPRINT | 277.57 | 277.57 |
| 658 | SunTrust Checking x2539 | 09/02/14 | 36869 | SPRINT | 14.98 | 14.98 |
| 659 | SunTrust Checking x2539 | 09/03/14 | 36887 | SPRINT | 280.08 | 280.08 |
| 660 | SunTrust Checking x2539 | 09/23/14 | 36942 | SPRINT | 12.09 | 12.09 |
| 661 | SunTrust Checking x2539 | 10/06/14 | 36975 | SPRINT | 277.36 | 277.36 |
| 662 | SunTrust Checking x2539 | 10/24/14 | 37037 | SPRINT | 12.47 | 12.47 |
| 663 | SunTrust Checking x2539 | 11/04/14 | 37059 | SPRINT | 279.80 | 279.80 |
| 664 | SunTrust Checking x2539 | 11/25/14 | 37124 | SPRINT | 13.38 | 13.38 |
| 665 | SunTrust Checking x2539 | 12/08/14 | 37174 | SPRINT | 284.40 | 284.40 |
| 666 | SunTrust Checking x2539 | 12/11/14 | 37224 | SPRINT | 18.28 | 18.28 |

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 667 | SunTrust Checking x2539 | 01/05/15 | 37286 | SPRINT | 286.58 | 286.58 |
| 668 | SunTrust Checking x2539 | 01/21/15 | 37308 | SPRINT | 15.14 | 15.14 |
| 669 | SunTrust Checking x2539 | 02/03/15 | 37337 | SPRINT | 284.93 | 284.93 |
| 670 | SunTrust Checking x2539 | 03/01/15 | 37399 | SPRINT | 18.14 | 18.14 |
| 671 | SunTrust Checking x2539 | 03/09/15 | 37436 | SPRINT | 289.15 | 289.15 |
| 672 | SunTrust Checking x2539 | 03/27/15 | 37498 | SPRINT | 29.84 | 29.84 |
| 673 | SunTrust Checking x2539 | 04/06/15 | 37526 | SPRINT | 287.88 | 287.88 |
| 674 | SunTrust Checking x2539 | 04/22/15 | 37576 | SPRINT | 12.24 | 12.24 |
| 675 | SunTrust Checking x2539 | 05/08/15 | 37631 | SPRINT | 286.21 | 286.21 |
| 676 | SunTrust Checking x2539 | 06/01/15 | 37697 | SPRINT | 12.24 | 12.24 |
| 677 | SunTrust Checking x2539 | 06/08/15 | 37716 | SPRINT | 306.74 | 306.74 |
| 678 | SunTrust Checking x2539 | 06/23/15 | 37754 | SPRINT | 13.00 | 13.00 |
| 679 | SunTrust Checking x2539 | 07/09/15 | 37783 | SPRINT | 366.15 | 366.15 |
| 680 | SunTrust Checking x2539 | 07/27/15 | 37850 | SPRINT | 19.87 | 19.87 |
| 681 | SunTrust Checking x2539 | 08/05/15 | 37887 | SPRINT | 224.09 | 224.09 |
| 682 | SunTrust Checking x2539 | 08/12/15 | 37913 | SPRINT | 224.69 | 224.69 |
| 683 | SunTrust Checking x2539 | 08/24/15 | 37932 | SPRINT | 12.50 | 12.50 |
| 684 | SunTrust Checking x2539 | 09/22/15 | 38033 | SPRINT | 12.22 | 12.22 |
| 685 | SunTrust Checking x2539 | 10/22/15 | 38135 | SPRINT | 11.60 | 11.60 |
| 686 | SunTrust Checking x2539 | 02/06/14 | 36258 | STAPLES | 39.17 | 39.17 |
| 687 | SunTrust Checking x2539 | 03/05/14 | 36349 | STAPLES | 208.39 | 208.39 |
| 688 | SunTrust Checking x2539 | 05/06/14 | 36533 | STAPLES | 277.77 | 277.77 |
| 689 | SunTrust Checking x2539 | 06/05/14 | 36621 | STAPLES | 340.31 | 340.31 |
| 690 | Bank of America Credit Card | 07/24/14 | | Staples | 2.92 | 2.92 |
| 691 | Bank of America Credit Card | 07/24/14 | | Staples | 17.96 | 17.96 |
| 692 | SunTrust Checking x2539 | 08/07/14 | 36804 | STAPLES | 304.33 | 304.33 |
| 693 | SunTrust Checking x2539 | 09/10/14 | 36908 | STAPLES | 507.40 | 507.40 |
| 694 | SunTrust Checking x2539 | 10/08/14 | 36980 | STAPLES | 424.78 | 424.78 |
| 695 | SunTrust Checking x2539 | 12/05/14 | 37155 | STAPLES | 146.49 | 146.49 |
| 696 | SunTrust Checking x2539 | 12/16/14 | 37263 | STAPLES | 566.59 | 566.59 |
| 697 | SunTrust Checking x2539 | 04/06/15 | 37525 | STAPLES | 231.56 | 231.56 |
| 698 | SunTrust Checking x2539 | 05/05/15 | 37619 | STAPLES | 197.52 | 197.52 |
| 699 | SunTrust Checking x2539 | 06/08/15 | 37717 | STAPLES | 263.99 | 263.99 |
| 700 | SunTrust Checking x2539 | 07/09/15 | 37793 | STAPLES | 238.24 | 238.24 |
| 701 | SunTrust Checking x2539 | 09/04/15 | 37988 | STAPLES | 552.56 | 552.56 |
| 702 | SunTrust Checking x2539 | 10/06/15 | 38090 | STAPLES | 143.85 | 143.85 |
| 703 | Bank of America Credit Card | 10/19/15 | | Staples | 21.20 | 21.20 |

Stout
Page 19 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                        Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 704 | SunTrust Checking x2539 | 11/06/15 | 38180 | STAPLES | 35.33 | 35.33 |
| 705 | SunTrust Checking x2539 | 11/25/15 | 38272 | STAPLES | 138.77 | 138.77 |
| 706 | Bank of America Credit Card | 12/14/15 | | Staples | 22.02 | 22.02 |
| 707 | SunTrust Checking x2539 | 12/18/15 | 38372 | STAPLES | 1,329.34 | 1,329.34 |
| 708 | SunTrust Checking x2539 | 02/12/16 | 38497 | STAPLES | 73.95 | 73.95 |
| 709 | SunTrust Checking x2539 | 03/07/16 | 38563 | STAPLES | 752.47 | 752.47 |
| 710 | SunTrust Checking x2539 | 04/05/16 | 38643 | STAPLES | 256.73 | 256.73 |
| 711 | SunTrust Checking x2539 | 06/07/16 | 38828 | STAPLES | 222.23 | 222.23 |
| 712 | SunTrust Checking x2539 | 07/06/16 | 38926 | STAPLES | 21.50 | 21.50 |
| 713 | SunTrust Checking x2539 | 08/15/16 | 39053 | STAPLES | 476.99 | 476.99 |
| 714 | SunTrust Checking x2539 | 10/07/16 | 39200 | STAPLES | 257.87 | 257.87 |
| 715 | SunTrust Checking x2539 | 11/07/16 | 39284 | STAPLES | 119.52 | 119.52 |
| 716 | SunTrust Checking x2539 | 12/01/16 | 39366 | STAPLES | 309.94 | 309.94 |
| 717 | SunTrust Checking x2539 | 12/17/16 | 39489 | STAPLES | 399.44 | 399.44 |
| 718 | Bank of America Credit Card | 12/19/16 | | Staples | 29.14 | 29.14 |
| 719 | SunTrust Checking x2539 | 02/06/17 | 39553 | STAPLES | 84.02 | 84.02 |
| 720 | SunTrust Checking x2539 | 07/06/17 | 39999 | STAPLES | 694.77 | 694.77 |
| 721 | SunTrust Checking x2539 | 09/06/17 | 40197 | STAPLES | 382.88 | 382.88 |
| 722 | SunTrust Checking x2539 | 10/06/17 | 40306 | STAPLES | 231.79 | 231.79 |
| 723 | SunTrust Checking x2539 | 11/07/17 | 40413 | STAPLES | 18.39 | 18.39 |
| 724 | SunTrust Checking x2539 | 12/09/17 | 40561 | STAPLES | 500.00 | 500.00 |
| 725 | SunTrust Checking x2539 | 01/09/18 | 40605 | STAPLES | 607.06 | 607.06 |
| 726 | Bank of America Credit Card | 02/01/18 | | Staples | 21.18 | 21.18 |
| 727 | SunTrust Checking x2539 | 02/06/18 | 40679 | STAPLES | 423.17 | 423.17 |
| 728 | Bank of America Credit Card | 03/20/18 | | Staples | 60.27 | 60.27 |
| 729 | SunTrust Checking x2539 | 05/04/18 | 40913 | STAPLES | 179.35 | 179.35 |
| 730 | SunTrust Checking x2539 | 07/09/18 | 41115 | STAPLES | 118.10 | 118.10 |
| 731 | Bank of America Credit Card | 08/06/18 | | Staples | 35.48 | 35.48 |
| 732 | SunTrust Checking x2539 | 11/07/18 | 41470 | STAPLES | 234.72 | 234.72 |
| 733 | SunTrust Checking x2539 | 11/26/18 | 41567 | STAPLES | 350.05 | 350.05 |
| 734 | SunTrust Checking x2539 | 12/28/18 | 41653 | STAPLES | 400.82 | 400.82 |
| 735 | SunTrust Checking x2539 | 02/11/19 | 41746 | STAPLES | 207.72 | 207.72 |
| 736 | SunTrust Checking x2539 | 03/11/19 | 41836 | STAPLES | 320.97 | 320.97 |
| 737 | Bank of America Credit Card | 03/18/19 | | Staples | 21.19 | 21.19 |
| 738 | SunTrust Checking x2539 | 05/07/19 | 42017 | STAPLES | 199.45 | 199.45 |
| 739 | SunTrust Checking x2539 | 08/06/19 | 42279 | STAPLES | 668.34 | 668.34 |
| 740 | Bank of America Credit Card | 09/23/19 | | Staples | 10.59 | 10.59 |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 741 | SunTrust Checking x2539 | 02/18/14 | 36289 | SUNOCO | 330.97 | 330.97 |
| 742 | SunTrust Checking x2539 | 03/17/14 | 36388 | SUNOCO | 334.32 | 334.32 |
| 743 | SunTrust Checking x2539 | 04/14/14 | 36465 | SUNOCO | 350.91 | 350.91 |
| 744 | SunTrust Checking x2539 | 05/15/14 | 36559 | SUNOCO | 626.60 | 626.60 |
| 745 | SunTrust Checking x2539 | 06/11/14 | 36645 | SUNOCO | 204.91 | 204.91 |
| 746 | SunTrust Checking x2539 | 07/16/14 | 36743 | SUNOCO | 199.70 | 199.70 |
| 747 | SunTrust Checking x2539 | 08/14/14 | 36830 | SUNOCO | 290.05 | 290.05 |
| 748 | SunTrust Checking x2539 | 09/15/14 | 36921 | SUNOCO | 381.90 | 381.90 |
| 749 | SunTrust Checking x2539 | 10/14/14 | 37005 | SUNOCO | 280.35 | 280.35 |
| 750 | SunTrust Checking x2539 | 11/17/14 | 37092 | SUNOCO | 354.66 | 354.66 |
| 751 | SunTrust Checking x2539 | 12/09/14 | 37191 | SUNOCO | 258.27 | 258.27 |
| 752 | SunTrust Checking x2539 | 01/19/15 | 37301 | SUNOCO | 149.86 | 149.86 |
| 753 | SunTrust Checking x2539 | 02/16/15 | 37370 | SUNOCO | 151.53 | 151.53 |
| 754 | SunTrust Checking x2539 | 03/17/15 | 37469 | SUNOCO | 181.48 | 181.48 |
| 755 | SunTrust Checking x2539 | 04/14/15 | 37546 | SUNOCO | 85.53 | 85.53 |
| 756 | SunTrust Checking x2539 | 05/15/15 | 37647 | SUNOCO | 258.28 | 258.28 |
| 757 | SunTrust Checking x2539 | 06/15/15 | 37733 | SUNOCO | 388.22 | 388.22 |
| 758 | SunTrust Checking x2539 | 07/20/15 | 37834 | SUNOCO | 99.42 | 99.42 |
| 759 | SunTrust Checking x2539 | 08/14/15 | 37915 | SUNOCO | 160.87 | 160.87 |
| 760 | SunTrust Checking x2539 | 09/16/15 | 38015 | SUNOCO | 255.90 | 255.90 |
| 761 | SunTrust Checking x2539 | 10/16/15 | 38120 | SUNOCO | 137.05 | 137.05 |
| 762 | SunTrust Checking x2539 | 11/16/15 | 38204 | SUNOCO | 295.51 | 295.51 |
| 763 | SunTrust Checking x2539 | 11/28/15 | 38302 | SUNOCO | 326.12 | 326.12 |
| 764 | SunTrust Checking x2539 | 01/21/16 | 38428 | SUNOCO | 171.07 | 171.07 |
| 765 | SunTrust Checking x2539 | 02/12/16 | 38496 | SUNOCO | 139.00 | 139.00 |
| 766 | SunTrust Checking x2539 | 03/14/16 | 38589 | SUNOCO | 255.77 | 255.77 |
| 767 | SunTrust Checking x2539 | 04/18/16 | 38676 | SUNOCO | 276.99 | 276.99 |
| 768 | SunTrust Checking x2539 | 05/16/16 | 38763 | SUNOCO | 449.37 | 449.37 |
| 769 | SunTrust Checking x2539 | 06/14/16 | 38857 | SUNOCO | 222.30 | 222.30 |
| 770 | SunTrust Checking x2539 | 07/19/16 | 38956 | SUNOCO | 223.46 | 223.46 |
| 771 | SunTrust Checking x2539 | 08/19/16 | 39065 | SUNOCO | 151.23 | 151.23 |
| 772 | SunTrust Checking x2539 | 09/19/16 | 39153 | SUNOCO | 259.95 | 259.95 |
| 773 | SunTrust Checking x2539 | 10/17/16 | 39227 | SUNOCO | 171.59 | 171.59 |
| 774 | SunTrust Checking x2539 | 11/16/16 | 39312 | SUNOCO | 141.48 | 141.48 |
| 775 | SunTrust Checking x2539 | 12/08/16 | 39418 | SUNOCO | 126.52 | 126.52 |
| 776 | SunTrust Checking x2539 | 01/18/17 | 39523 | SUNOCO | 371.24 | 371.24 |
| 777 | SunTrust Checking x2539 | 02/16/17 | 39579 | SUNOCO | 85.69 | 85.69 |

Stout
Page 21 of 38

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable |
|---|---|---|---|---|---|---|
| 778 | SunTrust Checking x2539 | 03/17/17 | 39670 | SUNOCO | 235.86 | 235.86 |
| 779 | SunTrust Checking x2539 | 04/17/17 | 39764 | SUNOCO | 144.89 | 144.89 |
| 780 | SunTrust Checking x2539 | 05/18/17 | 39854 | SUNOCO | 147.15 | 147.15 |
| 781 | SunTrust Checking x2539 | 06/14/17 | 39940 | SUNOCO | 261.01 | 261.01 |
| 782 | SunTrust Checking x2539 | 07/17/17 | 40030 | SUNOCO | 143.07 | 143.07 |
| 783 | SunTrust Checking x2539 | 08/15/17 | 40121 | SUNOCO | 171.92 | 171.92 |
| 784 | SunTrust Checking x2539 | 09/15/17 | 40231 | SUNOCO | 152.00 | 152.00 |
| 785 | SunTrust Checking x2539 | 10/18/17 | 40345 | SUNOCO | 199.83 | 199.83 |
| 786 | SunTrust Checking x2539 | 11/15/17 | 40438 | SUNOCO | 201.79 | 201.79 |
| 787 | SunTrust Checking x2539 | 12/01/17 | 40539 | SUNOCO | 816.69 | 816.69 |
| 788 | SunTrust Checking x2539 | 03/16/18 | 40773 | SUNOCO | 215.91 | 215.91 |
| 789 | SunTrust Checking x2539 | 04/16/18 | 40859 | SUNOCO | 142.42 | 142.42 |
| 790 | SunTrust Checking x2539 | 05/16/18 | 40952 | SUNOCO | 238.02 | 238.02 |
| 791 | SunTrust Checking x2539 | 05/16/18 | 40953 | SUNOCO | 75.00 | 75.00 |
| 792 | SunTrust Checking x2539 | 06/19/18 | 41058 | SUNOCO | 195.42 | 195.42 |
| 793 | SunTrust Checking x2539 | 07/17/18 | 41147 | SUNOCO | 295.53 | 295.53 |
| 794 | SunTrust Checking x2539 | 08/21/18 | 41243 | SUNOCO | 318.89 | 318.89 |
| 795 | SunTrust Checking x2539 | 09/17/18 | 41320 | SUNOCO | 362.55 | 362.55 |
| 796 | SunTrust Checking x2539 | 10/16/18 | 41395 | SUNOCO | 125.38 | 125.38 |
| 797 | SunTrust Checking x2539 | 11/16/18 | 41496 | SUNOCO | 152.04 | 152.04 |
| 798 | SunTrust Checking x2539 | 12/02/18 | 41595 | SUNOCO | 325.31 | 325.31 |
| 799 | SunTrust Checking x2539 | 01/16/19 | 41681 | SUNOCO | 242.12 | 242.12 |
| 800 | SunTrust Checking x2539 | 02/14/19 | 41760 | SUNOCO | 192.63 | 192.63 |
| 801 | SunTrust Checking x2539 | 03/19/19 | 41857 | SUNOCO | 163.28 | 163.28 |
| 802 | SunTrust Checking x2539 | 04/15/19 | 41946 | SUNOCO | 142.24 | 142.24 |
| 803 | SunTrust Checking x2539 | 05/20/19 | 42048 | SUNOCO | 208.51 | 208.51 |
| 804 | SunTrust Checking x2539 | 06/17/19 | 42123 | SUNOCO | 265.71 | 265.71 |
| 805 | SunTrust Checking x2539 | 07/16/19 | 42213 | SUNOCO | 211.45 | 211.45 |
| 806 | SunTrust Checking x2539 | 08/19/19 | 42315 | SUNOCO | 305.80 | 305.80 |
| 807 | SunTrust Checking x2539 | 09/16/19 | 42417 | SUNOCO | 143.87 | 143.87 |
| 808 | SunTrust Checking x2539 | 10/16/19 | 42511 | SUNOCO | 240.55 | 240.55 |
| 809 | Bank of America Credit Card | 09/03/14 | | The Doctors Next Door | 145.00 | 145.00 |
| 810 | SunTrust Checking x2539 | 03/01/19 | 41801 | Thos. Sommerville Co. | 601.83 | 601.83 |
| 811 | SunTrust Checking x2539 | 04/01/19 | 41892 | Thos. Sommerville Co. | 380.71 | 380.71 |
| 812 | SunTrust Checking x2539 | 05/01/19 | 41997 | Thos. Sommerville Co. | 38.08 | 38.08 |
| 813 | SunTrust Checking x2539 | 06/03/19 | 42081 | Thos. Sommerville Co. | 368.85 | 368.85 |
| 814 | Bank of America Credit Card | 05/07/15 | | Tires of Silver Spring | 93.04 | 93.04 |
| | | | | Stout | | |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                        Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 815 | Bank of America Credit Card | 08/06/15 | | Tires of Silver Spring | 773.72 | 773.72 | |
| 816 | Bank of America Credit Card | 01/08/16 | | Tires of Silver Spring | 391.10 | 391.10 | |
| 817 | Bank of America Credit Card | 07/11/16 | | Tires of Silver Spring | 341.34 | 341.34 | |
| 818 | Bank of America Credit Card | 06/12/19 | | Tires of Silver Spring | 392.38 | 392.38 | |
| 819 | SunTrust Checking x2539 | 11/07/16 | 39289 | TOWN OF COTTAGE CITY | 75.00 | 75.00 | |
| 820 | Bank of America Credit Card | 07/08/19 | | Trick Trucks | 59.98 | 59.98 | |
| 821 | SunTrust Checking x2539 | 06/20/19 | 42136 | US POSTAL SERVICE | 275.00 | 275.00 | |
| 822 | SunTrust Checking x2539 | 09/10/19 | 42385 | US POSTAL SERVICE | 275.00 | 275.00 | |
| 823 | SunTrust Checking x2539 | 02/28/14 | 36332 | VECTOR | 206.54 | 206.54 | |
| 824 | SunTrust Checking x2539 | 06/11/14 | 36640 | VECTOR | 206.54 | 206.54 | |
| 825 | SunTrust Checking x2539 | 12/23/14 | 37276 | VECTOR | 588.36 | 588.36 | |
| 826 | SunTrust Checking x2539 | 09/01/15 | 37972 | VECTOR | 413.08 | 413.08 | |
| 827 | SunTrust Checking x2539 | 12/30/15 | 38385 | VECTOR | 438.36 | 438.36 | |
| 828 | SunTrust Checking x2539 | 02/26/16 | 38536 | VECTOR | 413.08 | 413.08 | |
| 829 | SunTrust Checking x2539 | 08/22/16 | 39080 | VECTOR | 206.54 | 206.54 | |
| 830 | SunTrust Checking x2539 | 11/28/16 | 39344 | VECTOR | 826.16 | 826.16 | |
| 831 | SunTrust Checking x2539 | 12/17/16 | 39490 | VECTOR | 699.08 | 699.08 | |
| 832 | SunTrust Checking x2539 | 04/07/17 | 39744 | VECTOR | 418.17 | 418.17 | |
| 833 | SunTrust Checking x2539 | 10/09/17 | 40313 | VECTOR | 587.52 | 587.52 | |
| 834 | SunTrust Checking x2539 | 01/05/19 | 41666 | VECTOR | 144.69 | 144.69 | |
| 835 | SunTrust Checking x2539 | 04/09/19 | 41930 | VECTOR | 144.69 | 144.69 | |
| 836 | SunTrust Checking x2539 | 10/08/19 | 42490 | VECTOR | 607.76 | 607.76 | |
| 837 | SunTrust Checking x2539 | 01/08/14 | 36195 | VERIZON | 72.59 | 32.67 | [b] |
| 838 | SunTrust Checking x2539 | 01/10/14 | 36201 | VERIZON | 69.94 | 31.47 | [b] |
| 839 | SunTrust Checking x2539 | 01/13/14 | 36203 | VERIZON | 160.23 | 72.10 | [b] |
| 840 | SunTrust Checking x2539 | 01/25/14 | 36229 | VERIZON | 238.92 | 107.51 | [b] |
| 841 | SunTrust Checking x2539 | 01/31/14 | 36237 | VERIZON | 55.02 | 24.76 | [b] |
| 842 | SunTrust Checking x2539 | 02/07/14 | 36263 | VERIZON | 34.74 | 15.63 | [b] |
| 843 | SunTrust Checking x2539 | 02/10/14 | 36271 | VERIZON | 75.77 | 34.10 | [b] |
| 844 | SunTrust Checking x2539 | 02/10/14 | 36272 | VERIZON | 160.69 | 72.31 | [b] |
| 845 | SunTrust Checking x2539 | 02/10/14 | 36273 | VERIZON | 324.01 | 145.80 | [b] |
| 846 | SunTrust Checking x2539 | 02/20/14 | 36305 | VERIZON | 244.16 | 109.87 | [b] |
| 847 | SunTrust Checking x2539 | 03/04/14 | 36338 | VERIZON | 18.58 | 8.36 | [b] |
| 848 | SunTrust Checking x2539 | 03/04/14 | 36339 | VERIZON | 55.02 | 24.76 | [b] |
| 849 | SunTrust Checking x2539 | 03/05/14 | 36345 | VERIZON | 86.03 | 38.71 | [b] |
| 850 | SunTrust Checking x2539 | 03/13/14 | 36377 | VERIZON | 34.74 | 15.63 | [b] |
| 851 | SunTrust Checking x2539 | 03/13/14 | 36378 | VERIZON | 73.54 | 33.09 | [b] |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 852 | SunTrust Checking x2539 | 03/13/14 | 36379 | VERIZON | 158.38 | 71.27 | [b] |
| 853 | SunTrust Checking x2539 | 03/13/14 | 36380 | VERIZON | 324.23 | 145.90 | [b] |
| 854 | SunTrust Checking x2539 | 03/24/14 | 36411 | VERIZON | 238.04 | 107.12 | [b] |
| 855 | SunTrust Checking x2539 | 03/24/14 | 36412 | VERIZON | 186.08 | 83.74 | [b] |
| 856 | SunTrust Checking x2539 | 03/26/14 | 36416 | VERIZON | 13.97 | 6.29 | [b] |
| 857 | SunTrust Checking x2539 | 03/31/14 | 36424 | VERIZON | 34.80 | 15.66 | [b] |
| 858 | SunTrust Checking x2539 | 03/31/14 | 36425 | VERIZON | 59.02 | 26.56 | [b] |
| 859 | SunTrust Checking x2539 | 04/08/14 | 36450 | VERIZON | 35.26 | 15.87 | [b] |
| 860 | SunTrust Checking x2539 | 04/08/14 | 36451 | VERIZON | 323.85 | 145.73 | [b] |
| 861 | SunTrust Checking x2539 | 04/11/14 | 36462 | VERIZON | 76.95 | 34.63 | [b] |
| 862 | SunTrust Checking x2539 | 04/11/14 | 36463 | VERIZON | 156.69 | 70.51 | [b] |
| 863 | SunTrust Checking x2539 | 04/18/14 | 36478 | VERIZON | 187.84 | 84.53 | [b] |
| 864 | SunTrust Checking x2539 | 04/28/14 | 36500 | VERIZON | 28.26 | 12.72 | [b] |
| 865 | SunTrust Checking x2539 | 04/29/14 | 36504 | VERIZON | 34.81 | 15.66 | [b] |
| 866 | SunTrust Checking x2539 | 05/07/14 | 36537 | VERIZON | 377.20 | 169.74 | [b] |
| 867 | SunTrust Checking x2539 | 05/08/14 | 36538 | VERIZON | 150.98 | 67.94 | [b] |
| 868 | SunTrust Checking x2539 | 05/08/14 | 36539 | VERIZON | 76.37 | 34.37 | [b] |
| 869 | SunTrust Checking x2539 | 05/08/14 | 36540 | VERIZON | 35.26 | 15.87 | [b] |
| 870 | SunTrust Checking x2539 | 05/19/14 | 36570 | VERIZON | 243.41 | 109.53 | [b] |
| 871 | SunTrust Checking x2539 | 05/30/14 | 36593 | VERIZON | 28.26 | 12.72 | [b] |
| 872 | SunTrust Checking x2539 | 06/03/14 | 36608 | VERIZON | 34.81 | 15.66 | [b] |
| 873 | SunTrust Checking x2539 | 06/09/14 | 36630 | VERIZON | 77.08 | 34.69 | [b] |
| 874 | SunTrust Checking x2539 | 06/09/14 | 36633 | VERIZON | 35.26 | 15.87 | [b] |
| 875 | SunTrust Checking x2539 | 06/09/14 | 36634 | VERIZON | 334.20 | 150.39 | [b] |
| 876 | SunTrust Checking x2539 | 06/10/14 | 36635 | VERIZON | 147.01 | 66.15 | [b] |
| 877 | SunTrust Checking x2539 | 06/12/14 | 36650 | VERIZON | 111.27 | 50.07 | [b] |
| 878 | SunTrust Checking x2539 | 06/18/14 | 36667 | VERIZON | 241.52 | 108.68 | [b] |
| 879 | SunTrust Checking x2539 | 06/18/14 | 36668 | VERIZON | 263.10 | 118.40 | [b] |
| 880 | SunTrust Checking x2539 | 06/30/14 | 36690 | VERIZON | 28.25 | 12.71 | [b] |
| 881 | SunTrust Checking x2539 | 06/30/14 | 36691 | VERIZON | 34.81 | 15.66 | [b] |
| 882 | SunTrust Checking x2539 | 07/09/14 | 36721 | VERIZON | 80.05 | 36.02 | [b] |
| 883 | SunTrust Checking x2539 | 07/09/14 | 36722 | VERIZON | 154.89 | 69.70 | [b] |
| 884 | SunTrust Checking x2539 | 07/09/14 | 36723 | VERIZON | 342.62 | 154.18 | [b] |
| 885 | SunTrust Checking x2539 | 07/09/14 | 36726 | VERIZON | 35.46 | 15.96 | [b] |
| 886 | SunTrust Checking x2539 | 07/18/14 | 36757 | VERIZON | 258.12 | 116.15 | [b] |
| 887 | SunTrust Checking x2539 | 07/18/14 | 36760 | VERIZON | 243.85 | 109.73 | [b] |
| 888 | SunTrust Checking x2539 | 07/28/14 | 36765 | VERIZON | 28.39 | 12.78 | [b] |

Olympia Investments, Inc.
October 23, 2019
Historical Improper Credit Card Charges and Checks                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 889 | SunTrust Checking x2539 | 07/29/14 | 36779 | VERIZON | 35.21 | 15.84 | [b] |
| 890 | SunTrust Checking x2539 | 08/08/14 | 36812 | VERIZON | 327.44 | 147.35 | [b] |
| 891 | SunTrust Checking x2539 | 08/08/14 | 36813 | VERIZON | 35.46 | 15.96 | [b] |
| 892 | SunTrust Checking x2539 | 08/08/14 | 36814 | VERIZON | 80.71 | 36.32 | [b] |
| 893 | SunTrust Checking x2539 | 08/08/14 | 36815 | VERIZON | 147.76 | 66.49 | [b] |
| 894 | SunTrust Checking x2539 | 08/21/14 | 36855 | VERIZON | 261.10 | 117.50 | [b] |
| 895 | SunTrust Checking x2539 | 08/21/14 | 36857 | VERIZON | 245.40 | 110.43 | [b] |
| 896 | SunTrust Checking x2539 | 08/31/14 | 36862 | VERIZON | 56.03 | 25.21 | [b] |
| 897 | SunTrust Checking x2539 | 09/02/14 | 36867 | VERIZON | 28.06 | 12.63 | [b] |
| 898 | SunTrust Checking x2539 | 09/02/14 | 36868 | VERIZON | 35.03 | 15.76 | [b] |
| 899 | SunTrust Checking x2539 | 09/26/14 | 36945 | VERIZON | 28.06 | 12.63 | [b] |
| 900 | SunTrust Checking x2539 | 09/26/14 | 36951 | VERIZON | 59.00 | 26.55 | [b] |
| 901 | SunTrust Checking x2539 | 09/30/14 | 36954 | VERIZON | 35.03 | 15.76 | [b] |
| 902 | SunTrust Checking x2539 | 10/01/14 | 36966 | VERIZON | 226.92 | 102.11 | [b] |
| 903 | SunTrust Checking x2539 | 10/08/14 | 36984 | VERIZON | 71.40 | 32.13 | [b] |
| 904 | SunTrust Checking x2539 | 10/10/14 | 36987 | VERIZON | 669.80 | 301.41 | [b] |
| 905 | SunTrust Checking x2539 | 10/10/14 | 36991 | VERIZON | 291.78 | 131.30 | [b] |
| 906 | SunTrust Checking x2539 | 10/10/14 | 36992 | VERIZON | 162.81 | 73.26 | [b] |
| 907 | SunTrust Checking x2539 | 10/12/14 | 36996 | VERIZON | 410.05 | 184.52 | [b] |
| 908 | SunTrust Checking x2539 | 10/21/14 | 37022 | VERIZON | 246.16 | 110.77 | [b] |
| 909 | SunTrust Checking x2539 | 10/21/14 | 37024 | VERIZON | 362.15 | 162.97 | [b] |
| 910 | SunTrust Checking x2539 | 10/27/14 | 37039 | VERIZON | 28.08 | 12.64 | [b] |
| 911 | SunTrust Checking x2539 | 10/28/14 | 37048 | VERIZON | 602.30 | 271.04 | [b] |
| 912 | SunTrust Checking x2539 | 10/31/14 | 37053 | VERIZON | 35.07 | 15.78 | [b] |
| 913 | SunTrust Checking x2539 | 11/07/14 | 37072 | VERIZON | 35.49 | 15.97 | [b] |
| 914 | SunTrust Checking x2539 | 11/10/14 | 37075 | VERIZON | 337.76 | 151.99 | [b] |
| 915 | SunTrust Checking x2539 | 11/10/14 | 37076 | VERIZON | 149.73 | 67.38 | [b] |
| 916 | SunTrust Checking x2539 | 11/10/14 | 37077 | VERIZON | 78.97 | 35.54 | [b] |
| 917 | SunTrust Checking x2539 | 11/19/14 | 37110 | VERIZON | 238.08 | 107.14 | [b] |
| 918 | SunTrust Checking x2539 | 11/20/14 | 37111 | VERIZON | 14.91 | 6.71 | [b] |
| 919 | SunTrust Checking x2539 | 11/25/14 | 37127 | VERIZON | 92.85 | 41.78 | [b] |
| 920 | SunTrust Checking x2539 | 12/01/14 | 37129 | VERIZON | 35.06 | 15.78 | [b] |
| 921 | SunTrust Checking x2539 | 12/08/14 | 37169 | VERIZON | 35.49 | 15.97 | [b] |
| 922 | SunTrust Checking x2539 | 12/08/14 | 37170 | VERIZON | 42.33 | 19.05 | [b] |
| 923 | SunTrust Checking x2539 | 12/08/14 | 37171 | VERIZON | 78.83 | 35.47 | [b] |
| 924 | SunTrust Checking x2539 | 12/08/14 | 37172 | VERIZON | 150.41 | 67.68 | [b] |
| 925 | SunTrust Checking x2539 | 12/08/14 | 37173 | VERIZON | 340.36 | 153.16 | [b] |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                        **Schedule D.3**

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 926 | SunTrust Checking x2539 | 12/08/14 | 37185 | VERIZON | 740.86 | 333.39 | [b] |
| 927 | SunTrust Checking x2539 | 12/09/14 | 37199 | VERIZON | 260.93 | 117.42 | [b] |
| 928 | SunTrust Checking x2539 | 12/10/14 | 37201 | VERIZON | 245.63 | 110.53 | [b] |
| 929 | SunTrust Checking x2539 | 12/12/14 | 37238 | VERIZON | 28.05 | 12.62 | [b] |
| 930 | SunTrust Checking x2539 | 12/12/14 | 37239 | VERIZON | 35.06 | 15.78 | [b] |
| 931 | SunTrust Checking x2539 | 12/12/14 | 37240 | VERIZON | 42.13 | 18.96 | [b] |
| 932 | SunTrust Checking x2539 | 12/12/14 | 37241 | VERIZON | 311.39 | 140.13 | [b] |
| 933 | SunTrust Checking x2539 | 12/19/14 | 37268 | VERIZON | 296.42 | 133.39 | [b] |
| 934 | SunTrust Checking x2539 | 12/22/14 | 37269 | VERIZON | 669.48 | 301.27 | [b] |
| 935 | SunTrust Checking x2539 | 12/22/14 | 37275 | VERIZON | 1,838.84 | 827.48 | [b] |
| 936 | SunTrust Checking x2539 | 01/07/15 | 37288 | VERIZON | 75.25 | 33.86 | [b] |
| 937 | SunTrust Checking x2539 | 01/07/15 | 37289 | VERIZON | 35.55 | 16.00 | [b] |
| 938 | SunTrust Checking x2539 | 01/20/15 | 37307 | VERIZON | 246.63 | 110.98 | [b] |
| 939 | SunTrust Checking x2539 | 01/27/15 | 37314 | VERIZON | 28.08 | 12.64 | [b] |
| 940 | SunTrust Checking x2539 | 01/30/15 | 37329 | VERIZON | 37.38 | 16.82 | [b] |
| 941 | SunTrust Checking x2539 | 01/30/15 | 37330 | VERIZON | 44.30 | 19.94 | [b] |
| 942 | SunTrust Checking x2539 | 02/09/15 | 37353 | VERIZON | 37.65 | 16.94 | [b] |
| 943 | SunTrust Checking x2539 | 02/09/15 | 37354 | VERIZON | 1.75 | 0.79 | [b] |
| 944 | SunTrust Checking x2539 | 02/10/15 | 37358 | VERIZON | 79.63 | 35.83 | [b] |
| 945 | SunTrust Checking x2539 | 02/23/15 | 37385 | VERIZON | 306.30 | 137.84 | [b] |
| 946 | SunTrust Checking x2539 | 03/03/15 | 37408 | VERIZON | 28.08 | 12.64 | [b] |
| 947 | SunTrust Checking x2539 | 03/03/15 | 37409 | VERIZON | 37.38 | 16.82 | [b] |
| 948 | SunTrust Checking x2539 | 03/06/15 | 37426 | VERIZON | 44.30 | 19.94 | [b] |
| 949 | SunTrust Checking x2539 | 03/11/15 | 37441 | VERIZON | 37.65 | 16.94 | [b] |
| 950 | SunTrust Checking x2539 | 03/11/15 | 37442 | VERIZON | 80.09 | 36.04 | [b] |
| 951 | SunTrust Checking x2539 | 03/11/15 | 37443 | VERIZON | 145.56 | 65.50 | [b] |
| 952 | SunTrust Checking x2539 | 03/11/15 | 37444 | VERIZON | 336.34 | 151.35 | [b] |
| 953 | SunTrust Checking x2539 | 03/24/15 | 37490 | VERIZON | 244.10 | 109.85 | [b] |
| 954 | SunTrust Checking x2539 | 03/24/15 | 37491 | VERIZON | 199.52 | 89.78 | [b] |
| 955 | SunTrust Checking x2539 | 03/26/15 | 37497 | VERIZON | 28.08 | 12.64 | [b] |
| 956 | SunTrust Checking x2539 | 03/27/15 | 37502 | VERIZON | 336.78 | 151.55 | [b] |
| 957 | SunTrust Checking x2539 | 03/30/15 | 37504 | VERIZON | 37.79 | 17.01 | [b] |
| 958 | SunTrust Checking x2539 | 03/30/15 | 37508 | VERIZON | 44.30 | 19.94 | [b] |
| 959 | SunTrust Checking x2539 | 04/09/15 | 37531 | VERIZON | 38.10 | 17.15 | [b] |
| 960 | SunTrust Checking x2539 | 04/09/15 | 37532 | VERIZON | 343.92 | 154.76 | [b] |
| 961 | SunTrust Checking x2539 | 04/10/15 | 37534 | VERIZON | 149.48 | 67.27 | [b] |
| 962 | SunTrust Checking x2539 | 04/10/15 | 37536 | VERIZON | 80.11 | 36.05 | [b] |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 963 | SunTrust Checking x2539 | 04/22/15 | 37575 | VERIZON | 253.88 | 114.25 | [b] |
| 964 | SunTrust Checking x2539 | 04/24/15 | 37584 | VERIZON | 59.00 | 26.55 | [b] |
| 965 | SunTrust Checking x2539 | 04/27/15 | 37594 | VERIZON | 28.90 | 13.01 | [b] |
| 966 | SunTrust Checking x2539 | 04/27/15 | 37595 | VERIZON | 37.83 | 17.02 | [b] |
| 967 | SunTrust Checking x2539 | 05/04/15 | 37608 | VERIZON | 44.34 | 19.95 | [b] |
| 968 | SunTrust Checking x2539 | 05/08/15 | 37627 | VERIZON | 38.10 | 17.15 | [b] |
| 969 | SunTrust Checking x2539 | 05/08/15 | 37628 | VERIZON | 345.26 | 155.37 | [b] |
| 970 | SunTrust Checking x2539 | 05/08/15 | 37629 | VERIZON | 148.23 | 66.70 | [b] |
| 971 | SunTrust Checking x2539 | 05/08/15 | 37630 | VERIZON | 80.26 | 36.12 | [b] |
| 972 | SunTrust Checking x2539 | 05/19/15 | 37655 | VERIZON | 243.80 | 109.71 | [b] |
| 973 | SunTrust Checking x2539 | 05/21/15 | 37664 | VERIZON | 258.84 | 116.48 | [b] |
| 974 | SunTrust Checking x2539 | 05/26/15 | 37675 | VERIZON | 158.00 | 71.10 | [b] |
| 975 | SunTrust Checking x2539 | 05/27/15 | 37686 | VERIZON | 28.40 | 12.78 | [b] |
| 976 | SunTrust Checking x2539 | 06/02/15 | 37700 | VERIZON | 44.34 | 19.95 | [b] |
| 977 | SunTrust Checking x2539 | 06/02/15 | 37701 | VERIZON | 37.83 | 17.02 | [b] |
| 978 | SunTrust Checking x2539 | 06/09/15 | 37722 | VERIZON | 38.10 | 17.15 | [b] |
| 979 | SunTrust Checking x2539 | 06/09/15 | 37723 | VERIZON | 80.26 | 36.12 | [b] |
| 980 | SunTrust Checking x2539 | 06/09/15 | 37724 | VERIZON | 145.11 | 65.30 | [b] |
| 981 | SunTrust Checking x2539 | 06/09/15 | 37725 | VERIZON | 347.21 | 156.24 | [b] |
| 982 | SunTrust Checking x2539 | 06/23/15 | 37755 | VERIZON | 260.06 | 117.03 | [b] |
| 983 | SunTrust Checking x2539 | 07/02/15 | 37774 | VERIZON | 28.40 | 12.78 | [b] |
| 984 | SunTrust Checking x2539 | 07/02/15 | 37775 | VERIZON | 37.91 | 17.06 | [b] |
| 985 | SunTrust Checking x2539 | 07/09/15 | 37784 | VERIZON | 44.34 | 19.95 | [b] |
| 986 | SunTrust Checking x2539 | 07/13/15 | 37799 | VERIZON | 38.46 | 17.31 | [b] |
| 987 | SunTrust Checking x2539 | 07/13/15 | 37800 | VERIZON | 80.50 | 36.23 | [b] |
| 988 | SunTrust Checking x2539 | 07/13/15 | 37801 | VERIZON | 154.87 | 69.69 | [b] |
| 989 | SunTrust Checking x2539 | 07/13/15 | 37802 | VERIZON | 350.10 | 157.55 | [b] |
| 990 | SunTrust Checking x2539 | 07/14/15 | 37812 | VERIZON | 182.96 | 82.33 | [b] |
| 991 | SunTrust Checking x2539 | 07/27/15 | 37841 | VERIZON | 232.21 | 104.49 | [b] |
| 992 | SunTrust Checking x2539 | 07/27/15 | 37847 | VERIZON | 262.77 | 118.25 | [b] |
| 993 | SunTrust Checking x2539 | 07/31/15 | 37875 | VERIZON | 28.51 | 12.83 | [b] |
| 994 | SunTrust Checking x2539 | 08/03/15 | 37876 | VERIZON | 38.34 | 17.25 | [b] |
| 995 | SunTrust Checking x2539 | 08/06/15 | 37893 | VERIZON | 42.26 | 19.02 | [b] |
| 996 | SunTrust Checking x2539 | 08/11/15 | 37903 | VERIZON | 38.80 | 17.46 | [b] |
| 997 | SunTrust Checking x2539 | 08/11/15 | 37904 | VERIZON | 81.74 | 36.78 | [b] |
| 998 | SunTrust Checking x2539 | 08/11/15 | 37905 | VERIZON | 150.75 | 67.84 | [b] |
| 999 | SunTrust Checking x2539 | 08/11/15 | 37906 | VERIZON | 357.46 | 160.86 | [b] |

Stout

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,000 | SunTrust Checking x2539 | 08/11/15 | 37908 | VERIZON | 212.21 | 95.49 | [b] |
| 1,001 | SunTrust Checking x2539 | 08/15/15 | 37929 | VERIZON | 232.21 | 104.49 | [b] |
| 1,002 | SunTrust Checking x2539 | 08/15/15 | 37931 | VERIZON | 260.43 | 117.19 | [b] |
| 1,003 | SunTrust Checking x2539 | 08/31/15 | 37961 | VERIZON | 28.51 | 12.83 | [b] |
| 1,004 | SunTrust Checking x2539 | 09/01/15 | 37968 | VERIZON | 44.83 | 20.17 | [b] |
| 1,005 | SunTrust Checking x2539 | 09/01/15 | 37969 | VERIZON | 38.12 | 17.15 | [b] |
| 1,006 | SunTrust Checking x2539 | 09/09/15 | 37996 | VERIZON | 38.38 | 17.27 | [b] |
| 1,007 | SunTrust Checking x2539 | 09/09/15 | 37997 | VERIZON | 82.83 | 37.27 | [b] |
| 1,008 | SunTrust Checking x2539 | 09/09/15 | 37998 | VERIZON | 146.52 | 65.93 | [b] |
| 1,009 | SunTrust Checking x2539 | 09/09/15 | 37999 | VERIZON | 369.41 | 166.23 | [b] |
| 1,010 | SunTrust Checking x2539 | 09/18/15 | 38025 | VERIZON | 227.40 | 102.33 | [b] |
| 1,011 | SunTrust Checking x2539 | 09/21/15 | 38031 | VERIZON | 711.42 | 320.14 | [b] |
| 1,012 | SunTrust Checking x2539 | 09/25/15 | 38045 | VERIZON | 268.39 | 120.78 | [b] |
| 1,013 | SunTrust Checking x2539 | 10/01/15 | 38063 | VERIZON | 28.51 | 12.83 | [b] |
| 1,014 | SunTrust Checking x2539 | 10/05/15 | 38076 | VERIZON | 38.12 | 17.15 | [b] |
| 1,015 | SunTrust Checking x2539 | 10/06/15 | 38085 | VERIZON | 46.87 | 21.09 | [b] |
| 1,016 | SunTrust Checking x2539 | 10/09/15 | 38100 | VERIZON | 38.36 | 17.26 | [b] |
| 1,017 | SunTrust Checking x2539 | 10/12/15 | 38106 | VERIZON | 188.15 | 84.67 | [b] |
| 1,018 | SunTrust Checking x2539 | 10/15/15 | 38109 | VERIZON | 80.78 | 36.35 | [b] |
| 1,019 | SunTrust Checking x2539 | 10/15/15 | 38110 | VERIZON | 368.00 | 165.60 | [b] |
| 1,020 | SunTrust Checking x2539 | 10/15/15 | 38111 | VERIZON | 148.86 | 66.99 | [b] |
| 1,021 | SunTrust Checking x2539 | 10/19/15 | 38124 | VERIZON | 268.47 | 120.81 | [b] |
| 1,022 | SunTrust Checking x2539 | 10/30/15 | 38157 | VERIZON | 28.19 | 12.69 | [b] |
| 1,023 | SunTrust Checking x2539 | 11/03/15 | 38168 | VERIZON | 38.10 | 17.15 | [b] |
| 1,024 | SunTrust Checking x2539 | 11/05/15 | 38175 | VERIZON | 46.85 | 21.08 | [b] |
| 1,025 | SunTrust Checking x2539 | 11/09/15 | 38186 | VERIZON | 190.46 | 85.71 | [b] |
| 1,026 | SunTrust Checking x2539 | 11/16/15 | 38197 | VERIZON | 38.36 | 17.26 | [b] |
| 1,027 | SunTrust Checking x2539 | 11/16/15 | 38198 | VERIZON | 83.08 | 37.39 | [b] |
| 1,028 | SunTrust Checking x2539 | 11/16/15 | 38199 | VERIZON | 150.89 | 67.90 | [b] |
| 1,029 | SunTrust Checking x2539 | 11/16/15 | 38200 | VERIZON | 376.11 | 169.25 | [b] |
| 1,030 | SunTrust Checking x2539 | 11/20/15 | 38216 | VERIZON | 232.23 | 104.50 | [b] |
| 1,031 | SunTrust Checking x2539 | 11/24/15 | 38229 | VERIZON | 44.84 | 20.18 | [b] |
| 1,032 | SunTrust Checking x2539 | 11/25/15 | 38260 | VERIZON | 272.24 | 122.51 | [b] |
| 1,033 | SunTrust Checking x2539 | 11/25/15 | 38267 | VERIZON | 28.19 | 12.69 | [b] |
| 1,034 | SunTrust Checking x2539 | 11/25/15 | 38268 | VERIZON | 38.10 | 17.15 | [b] |
| 1,035 | SunTrust Checking x2539 | 11/25/15 | 38269 | VERIZON | 46.85 | 21.08 | [b] |
| 1,036 | SunTrust Checking x2539 | 11/26/15 | 38287 | VERIZON | 192.01 | 86.40 | [b] |

Stout
Page 28 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,037 | SunTrust Checking x2539 | 11/28/15 | 38292 | VERIZON | 81.40 | 36.63 | [b] |
| 1,038 | SunTrust Checking x2539 | 11/28/15 | 38293 | VERIZON | 148.23 | 66.70 | [b] |
| 1,039 | SunTrust Checking x2539 | 11/28/15 | 38294 | VERIZON | 379.70 | 170.87 | [b] |
| 1,040 | SunTrust Checking x2539 | 11/28/15 | 38295 | VERIZON | 38.36 | 17.26 | [b] |
| 1,041 | SunTrust Checking x2539 | 11/30/15 | 38321 | VERIZON | 833.15 | 374.92 | [b] |
| 1,042 | SunTrust Checking x2539 | 11/30/15 | 38323 | VERIZON | 44.84 | 20.18 | [b] |
| 1,043 | SunTrust Checking x2539 | 12/03/15 | 38326 | VERIZON | 3,804.95 | 1,712.23 | [b] |
| 1,044 | SunTrust Checking x2539 | 12/05/15 | 38342 | VERIZON | 550.95 | 247.93 | [b] |
| 1,045 | SunTrust Checking x2539 | 12/05/15 | 38343 | VERIZON | 607.93 | 273.57 | [b] |
| 1,046 | SunTrust Checking x2539 | 12/05/15 | 38349 | VERIZON | 972.32 | 437.54 | [b] |
| 1,047 | SunTrust Checking x2539 | 12/18/15 | 38371 | VERIZON | 984.01 | 442.80 | [b] |
| 1,048 | SunTrust Checking x2539 | 12/24/15 | 38379 | VERIZON | 996.99 | 448.65 | [b] |
| 1,049 | SunTrust Checking x2539 | 01/05/16 | 38398 | VERIZON | 28.19 | 12.69 | [b] |
| 1,050 | SunTrust Checking x2539 | 01/05/16 | 38404 | VERIZON | 38.10 | 17.15 | [b] |
| 1,051 | SunTrust Checking x2539 | 01/08/16 | 38406 | VERIZON | 46.85 | 21.08 | [b] |
| 1,052 | SunTrust Checking x2539 | 01/11/16 | 38411 | VERIZON | 38.46 | 17.31 | [b] |
| 1,053 | SunTrust Checking x2539 | 01/11/16 | 38412 | VERIZON | 83.50 | 37.58 | [b] |
| 1,054 | SunTrust Checking x2539 | 01/11/16 | 38413 | VERIZON | 145.71 | 65.57 | [b] |
| 1,055 | SunTrust Checking x2539 | 02/02/16 | 38445 | VERIZON | 28.26 | 12.72 | [b] |
| 1,056 | SunTrust Checking x2539 | 02/02/16 | 38446 | VERIZON | 39.33 | 17.70 | [b] |
| 1,057 | SunTrust Checking x2539 | 02/02/16 | 38447 | VERIZON | 48.00 | 21.60 | [b] |
| 1,058 | SunTrust Checking x2539 | 02/04/16 | 38467 | VERIZON | 106.95 | 48.13 | [b] |
| 1,059 | SunTrust Checking x2539 | 02/05/16 | 38481 | VERIZON | 39.51 | 17.78 | [b] |
| 1,060 | SunTrust Checking x2539 | 02/08/16 | 38482 | VERIZON | 84.25 | 37.91 | [b] |
| 1,061 | SunTrust Checking x2539 | 02/08/16 | 38483 | VERIZON | 149.57 | 67.31 | [b] |
| 1,062 | SunTrust Checking x2539 | 02/22/16 | 38514 | VERIZON | 8.21 | 3.69 | [b] |
| 1,063 | SunTrust Checking x2539 | 02/26/16 | 38537 | VERIZON | 32.92 | 14.81 | [b] |
| 1,064 | SunTrust Checking x2539 | 03/01/16 | 38542 | VERIZON | 28.26 | 12.72 | [b] |
| 1,065 | SunTrust Checking x2539 | 03/07/16 | 38564 | VERIZON | 39.33 | 17.70 | [b] |
| 1,066 | SunTrust Checking x2539 | 03/07/16 | 38565 | VERIZON | 48.00 | 21.60 | [b] |
| 1,067 | SunTrust Checking x2539 | 03/08/16 | 38567 | VERIZON | 39.51 | 17.78 | [b] |
| 1,068 | SunTrust Checking x2539 | 03/11/16 | 38581 | VERIZON | 82.38 | 37.07 | [b] |
| 1,069 | SunTrust Checking x2539 | 03/11/16 | 38582 | VERIZON | 147.07 | 66.18 | [b] |
| 1,070 | SunTrust Checking x2539 | 03/11/16 | 38583 | VERIZON | 155.70 | 70.07 | [b] |
| 1,071 | SunTrust Checking x2539 | 03/29/16 | 38622 | VERIZON | 28.26 | 12.72 | [b] |
| 1,072 | SunTrust Checking x2539 | 04/01/16 | 38630 | VERIZON | 39.85 | 17.93 | [b] |
| 1,073 | SunTrust Checking x2539 | 04/05/16 | 38636 | VERIZON | 48.00 | 21.60 | [b] |

Stout

Olympia Investments, Inc.
October 23, 2019
__Historical Improper Credit Card Charges and Checks__                                   Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,074 | SunTrust Checking x2539 | 04/07/16 | 38651 | VERIZON | 323.41 | 145.53 | [b] |
| 1,075 | SunTrust Checking x2539 | 04/08/16 | 38652 | VERIZON | 40.01 | 18.00 | [b] |
| 1,076 | SunTrust Checking x2539 | 04/12/16 | 38661 | VERIZON | 82.83 | 37.27 | [b] |
| 1,077 | SunTrust Checking x2539 | 04/12/16 | 38662 | VERIZON | 380.66 | 171.30 | [b] |
| 1,078 | SunTrust Checking x2539 | 04/18/16 | 38674 | VERIZON | 73.36 | 33.01 | [b] |
| 1,079 | SunTrust Checking x2539 | 04/26/16 | 38707 | VERIZON | 271.62 | 122.23 | [b] |
| 1,080 | SunTrust Checking x2539 | 04/28/16 | 38709 | VERIZON | 28.70 | 12.92 | [b] |
| 1,081 | SunTrust Checking x2539 | 05/02/16 | 38717 | VERIZON | 47.98 | 21.59 | [b] |
| 1,082 | SunTrust Checking x2539 | 05/02/16 | 38718 | VERIZON | 39.83 | 17.92 | [b] |
| 1,083 | SunTrust Checking x2539 | 05/05/16 | 38738 | VERIZON | 274.22 | 123.40 | [b] |
| 1,084 | SunTrust Checking x2539 | 05/09/16 | 38740 | VERIZON | 40.01 | 18.00 | [b] |
| 1,085 | SunTrust Checking x2539 | 05/09/16 | 38741 | VERIZON | 389.78 | 175.40 | [b] |
| 1,086 | SunTrust Checking x2539 | 05/09/16 | 38742 | VERIZON | 82.97 | 37.34 | [b] |
| 1,087 | SunTrust Checking x2539 | 05/09/16 | 38743 | VERIZON | 306.28 | 137.83 | [b] |
| 1,088 | SunTrust Checking x2539 | 05/10/16 | 38750 | VERIZON | 133.66 | 60.15 | [b] |
| 1,089 | SunTrust Checking x2539 | 05/16/16 | 38766 | VERIZON | 76.36 | 34.36 | [b] |
| 1,090 | SunTrust Checking x2539 | 05/18/16 | 38772 | VERIZON | 94.78 | 42.65 | [b] |
| 1,091 | SunTrust Checking x2539 | 05/23/16 | 38794 | VERIZON | 272.16 | 122.47 | [b] |
| 1,092 | SunTrust Checking x2539 | 06/01/16 | 38811 | VERIZON | 28.70 | 12.92 | [b] |
| 1,093 | SunTrust Checking x2539 | 06/01/16 | 38812 | VERIZON | 39.83 | 17.92 | [b] |
| 1,094 | SunTrust Checking x2539 | 06/01/16 | 38813 | VERIZON | 47.98 | 21.59 | [b] |
| 1,095 | SunTrust Checking x2539 | 06/07/16 | 38826 | VERIZON | 40.01 | 18.00 | [b] |
| 1,096 | SunTrust Checking x2539 | 06/09/16 | 38839 | VERIZON | 85.32 | 38.39 | [b] |
| 1,097 | SunTrust Checking x2539 | 06/09/16 | 38840 | VERIZON | 173.68 | 78.16 | [b] |
| 1,098 | SunTrust Checking x2539 | 06/09/16 | 38842 | VERIZON | 376.38 | 169.37 | [b] |
| 1,099 | SunTrust Checking x2539 | 06/10/16 | 38848 | VERIZON | 218.41 | 98.28 | [b] |
| 1,100 | SunTrust Checking x2539 | 06/20/16 | 38874 | VERIZON | 272.16 | 122.47 | [b] |
| 1,101 | SunTrust Checking x2539 | 06/27/16 | 38893 | VERIZON | 28.70 | 12.92 | [b] |
| 1,102 | SunTrust Checking x2539 | 07/01/16 | 38909 | VERIZON | 39.86 | 17.94 | [b] |
| 1,103 | SunTrust Checking x2539 | 07/01/16 | 38910 | VERIZON | 47.92 | 21.56 | [b] |
| 1,104 | SunTrust Checking x2539 | 07/07/16 | 38928 | VERIZON | 269.99 | 121.50 | [b] |
| 1,105 | SunTrust Checking x2539 | 07/14/16 | 38937 | VERIZON | 40.06 | 18.03 | [b] |
| 1,106 | SunTrust Checking x2539 | 07/14/16 | 38938 | VERIZON | 82.69 | 37.21 | [b] |
| 1,107 | SunTrust Checking x2539 | 07/14/16 | 38939 | VERIZON | 178.25 | 80.21 | [b] |
| 1,108 | SunTrust Checking x2539 | 07/14/16 | 38940 | VERIZON | 380.85 | 171.38 | [b] |
| 1,109 | SunTrust Checking x2539 | 07/14/16 | 38946 | VERIZON | 218.46 | 98.31 | [b] |
| 1,110 | SunTrust Checking x2539 | 07/30/16 | 38998 | VERIZON | 375.87 | 169.14 | [b] |

Stout

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,111 | SunTrust Checking x2539 | 08/01/16 | 39001 | VERIZON | 28.72 | 12.92 | [b] |
| 1,112 | SunTrust Checking x2539 | 08/02/16 | 39008 | VERIZON | 47.96 | 21.58 | [b] |
| 1,113 | SunTrust Checking x2539 | 08/02/16 | 39009 | VERIZON | 39.89 | 17.95 | [b] |
| 1,114 | SunTrust Checking x2539 | 08/15/16 | 39037 | VERIZON | 175.71 | 79.07 | [b] |
| 1,115 | SunTrust Checking x2539 | 08/15/16 | 39038 | VERIZON | 82.52 | 37.13 | [b] |
| 1,116 | SunTrust Checking x2539 | 08/15/16 | 39039 | VERIZON | 403.90 | 181.76 | [b] |
| 1,117 | SunTrust Checking x2539 | 08/15/16 | 39040 | VERIZON | 40.06 | 18.03 | [b] |
| 1,118 | SunTrust Checking x2539 | 08/15/16 | 39045 | VERIZON | 218.46 | 98.31 | [b] |
| 1,119 | SunTrust Checking x2539 | 08/22/16 | 39081 | VERIZON | 252.28 | 113.53 | [b] |
| 1,120 | SunTrust Checking x2539 | 09/01/16 | 39103 | VERIZON | 28.71 | 12.92 | [b] |
| 1,121 | SunTrust Checking x2539 | 09/02/16 | 39106 | VERIZON | 307.17 | 138.23 | [b] |
| 1,122 | SunTrust Checking x2539 | 09/02/16 | 39108 | VERIZON | 39.88 | 17.95 | [b] |
| 1,123 | SunTrust Checking x2539 | 09/06/16 | 39114 | VERIZON | 47.94 | 21.57 | [b] |
| 1,124 | SunTrust Checking x2539 | 09/12/16 | 39129 | VERIZON | 180.51 | 81.23 | [b] |
| 1,125 | SunTrust Checking x2539 | 09/12/16 | 39130 | VERIZON | 396.14 | 178.26 | [b] |
| 1,126 | SunTrust Checking x2539 | 09/12/16 | 39131 | VERIZON | 85.92 | 38.66 | [b] |
| 1,127 | SunTrust Checking x2539 | 09/12/16 | 39132 | VERIZON | 40.06 | 18.03 | [b] |
| 1,128 | SunTrust Checking x2539 | 09/12/16 | 39138 | VERIZON | 218.46 | 98.31 | [b] |
| 1,129 | SunTrust Checking x2539 | 09/26/16 | 39174 | VERIZON | 28.71 | 12.92 | [b] |
| 1,130 | SunTrust Checking x2539 | 10/03/16 | 39186 | VERIZON | 39.88 | 17.95 | [b] |
| 1,131 | SunTrust Checking x2539 | 10/03/16 | 39187 | VERIZON | 47.94 | 21.57 | [b] |
| 1,132 | SunTrust Checking x2539 | 10/07/16 | 39198 | VERIZON | 40.03 | 18.01 | [b] |
| 1,133 | SunTrust Checking x2539 | 10/11/16 | 39207 | VERIZON | 86.18 | 38.78 | [b] |
| 1,134 | SunTrust Checking x2539 | 10/11/16 | 39208 | VERIZON | 184.32 | 82.94 | [b] |
| 1,135 | SunTrust Checking x2539 | 10/11/16 | 39209 | VERIZON | 395.80 | 178.11 | [b] |
| 1,136 | SunTrust Checking x2539 | 10/13/16 | 39216 | VERIZON | 213.72 | 96.17 | [b] |
| 1,137 | SunTrust Checking x2539 | 10/18/16 | 39230 | VERIZON | 524.44 | 236.00 | [b] |
| 1,138 | SunTrust Checking x2539 | 10/25/16 | 39251 | VERIZON | 211.21 | 95.04 | [b] |
| 1,139 | SunTrust Checking x2539 | 10/28/16 | 39256 | VERIZON | 28.69 | 12.91 | [b] |
| 1,140 | SunTrust Checking x2539 | 11/01/16 | 39259 | VERIZON | 39.85 | 17.93 | [b] |
| 1,141 | SunTrust Checking x2539 | 11/01/16 | 39260 | VERIZON | 47.91 | 21.56 | [b] |
| 1,142 | SunTrust Checking x2539 | 11/07/16 | 39280 | VERIZON | 86.18 | 38.78 | [b] |
| 1,143 | SunTrust Checking x2539 | 11/07/16 | 39281 | VERIZON | 401.22 | 180.55 | [b] |
| 1,144 | SunTrust Checking x2539 | 11/07/16 | 39282 | VERIZON | 185.87 | 83.64 | [b] |
| 1,145 | SunTrust Checking x2539 | 11/07/16 | 39283 | VERIZON | 40.03 | 18.01 | [b] |
| 1,146 | SunTrust Checking x2539 | 11/11/16 | 39300 | VERIZON | 213.72 | 96.17 | [b] |
| 1,147 | SunTrust Checking x2539 | 11/22/16 | 39328 | VERIZON | 275.64 | 124.04 | [b] |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,148 | SunTrust Checking x2539 | 11/28/16 | 39338 | VERIZON | 28.69 | 12.91 | [b] |
| 1,149 | SunTrust Checking x2539 | 12/01/16 | 39354 | VERIZON | 39.85 | 17.93 | [b] |
| 1,150 | SunTrust Checking x2539 | 12/01/16 | 39355 | VERIZON | 47.91 | 21.56 | [b] |
| 1,151 | SunTrust Checking x2539 | 12/03/16 | 39383 | VERIZON | 805.19 | 362.34 | [b] |
| 1,152 | SunTrust Checking x2539 | 12/03/16 | 39384 | VERIZON | 210.03 | 94.51 | [b] |
| 1,153 | SunTrust Checking x2539 | 12/03/16 | 39385 | VERIZON | 86.53 | 38.94 | [b] |
| 1,154 | SunTrust Checking x2539 | 12/03/16 | 39386 | VERIZON | 580.38 | 261.17 | [b] |
| 1,155 | SunTrust Checking x2539 | 12/03/16 | 39405 | VERIZON | 216.04 | 97.22 | [b] |
| 1,156 | SunTrust Checking x2539 | 12/06/16 | 39420 | VERIZON | 441.99 | 198.90 | [b] |
| 1,157 | SunTrust Checking x2539 | 12/10/16 | 39451 | VERIZON | 28.69 | 12.91 | [b] |
| 1,158 | SunTrust Checking x2539 | 12/12/16 | 39468 | VERIZON | 47.91 | 21.56 | [b] |
| 1,159 | SunTrust Checking x2539 | 12/12/16 | 39469 | VERIZON | 139.85 | 62.93 | [b] |
| 1,160 | SunTrust Checking x2539 | 12/19/16 | 39491 | VERIZON | 813.60 | 366.12 | [b] |
| 1,161 | SunTrust Checking x2539 | 12/19/16 | 39492 | VERIZON | 890.64 | 400.79 | [b] |
| 1,162 | SunTrust Checking x2539 | 01/09/17 | 39510 | VERIZON | 87.37 | 39.32 | [b] |
| 1,163 | SunTrust Checking x2539 | 02/01/17 | 39541 | VERIZON | 28.67 | 12.90 | [b] |
| 1,164 | SunTrust Checking x2539 | 02/01/17 | 39543 | VERIZON | 50.44 | 22.70 | [b] |
| 1,165 | SunTrust Checking x2539 | 02/09/17 | 39565 | VERIZON | 86.50 | 38.93 | [b] |
| 1,166 | SunTrust Checking x2539 | 03/01/17 | 39617 | VERIZON | 28.67 | 12.90 | [b] |
| 1,167 | SunTrust Checking x2539 | 03/06/17 | 39628 | VERIZON | 50.44 | 22.70 | [b] |
| 1,168 | SunTrust Checking x2539 | 03/09/17 | 39656 | VERIZON | 128.79 | 57.96 | [b] |
| 1,169 | SunTrust Checking x2539 | 03/09/17 | 39657 | VERIZON | 85.14 | 38.31 | [b] |
| 1,170 | SunTrust Checking x2539 | 03/27/17 | 39703 | VERIZON | 28.67 | 12.90 | [b] |
| 1,171 | SunTrust Checking x2539 | 03/31/17 | 39720 | VERIZON | 50.44 | 22.70 | [b] |
| 1,172 | SunTrust Checking x2539 | 03/31/17 | 39721 | VERIZON | 22.79 | 10.26 | [b] |
| 1,173 | SunTrust Checking x2539 | 04/10/17 | 39745 | VERIZON | 87.48 | 39.37 | [b] |
| 1,174 | SunTrust Checking x2539 | 04/10/17 | 39746 | VERIZON | 175.93 | 79.17 | [b] |
| 1,175 | SunTrust Checking x2539 | 04/10/17 | 39747 | VERIZON | 350.49 | 157.72 | [b] |
| 1,176 | SunTrust Checking x2539 | 04/11/17 | 39751 | VERIZON | 75.70 | 34.07 | [b] |
| 1,177 | SunTrust Checking x2539 | 04/28/17 | 39789 | VERIZON | 28.77 | 12.95 | [b] |
| 1,178 | SunTrust Checking x2539 | 05/01/17 | 39800 | VERIZON | 40.98 | 18.44 | [b] |
| 1,179 | SunTrust Checking x2539 | 05/04/17 | 39813 | VERIZON | 25.70 | 11.57 | [b] |
| 1,180 | SunTrust Checking x2539 | 05/08/17 | 39823 | VERIZON | 34.54 | 15.54 | [b] |
| 1,181 | SunTrust Checking x2539 | 05/11/17 | 39834 | VERIZON | 85.94 | 38.67 | [b] |
| 1,182 | SunTrust Checking x2539 | 05/11/17 | 39835 | VERIZON | 184.32 | 82.94 | [b] |
| 1,183 | SunTrust Checking x2539 | 05/11/17 | 39837 | VERIZON | 451.39 | 203.13 | [b] |
| 1,184 | SunTrust Checking x2539 | 05/11/17 | 39838 | VERIZON | 232.85 | 104.78 | [b] |

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,185 | SunTrust Checking x2539 | 05/30/17 | 39883 | VERIZON | 30.95 | 13.93 | [b] |
| 1,186 | SunTrust Checking x2539 | 05/31/17 | 39886 | VERIZON | 36.71 | 16.52 | [b] |
| 1,187 | SunTrust Checking x2539 | 05/31/17 | 39887 | VERIZON | 41.34 | 18.60 | [b] |
| 1,188 | SunTrust Checking x2539 | 06/09/17 | 39916 | VERIZON | 41.44 | 18.65 | [b] |
| 1,189 | SunTrust Checking x2539 | 06/09/17 | 39917 | VERIZON | 179.86 | 80.94 | [b] |
| 1,190 | SunTrust Checking x2539 | 06/09/17 | 39918 | VERIZON | 416.93 | 187.62 | [b] |
| 1,191 | SunTrust Checking x2539 | 06/09/17 | 39927 | VERIZON | 239.79 | 107.91 | [b] |
| 1,192 | SunTrust Checking x2539 | 06/13/17 | 39935 | VERIZON | 86.61 | 38.97 | [b] |
| 1,193 | SunTrust Checking x2539 | 06/29/17 | 39976 | VERIZON | 30.95 | 13.93 | [b] |
| 1,194 | SunTrust Checking x2539 | 06/30/17 | 39980 | VERIZON | 36.71 | 16.52 | [b] |
| 1,195 | SunTrust Checking x2539 | 06/30/17 | 39981 | VERIZON | 41.34 | 18.60 | [b] |
| 1,196 | SunTrust Checking x2539 | 07/11/17 | 40007 | VERIZON | 40.37 | 18.17 | [b] |
| 1,197 | SunTrust Checking x2539 | 07/11/17 | 40008 | VERIZON | 84.63 | 38.08 | [b] |
| 1,198 | SunTrust Checking x2539 | 07/11/17 | 40009 | VERIZON | 191.43 | 86.14 | [b] |
| 1,199 | SunTrust Checking x2539 | 07/11/17 | 40010 | VERIZON | 428.07 | 192.63 | [b] |
| 1,200 | SunTrust Checking x2539 | 07/11/17 | 40012 | VERIZON | 217.66 | 97.95 | [b] |
| 1,201 | SunTrust Checking x2539 | 07/18/17 | 40041 | VERIZON | 49.13 | 22.11 | [b] |
| 1,202 | SunTrust Checking x2539 | 07/28/17 | 40068 | VERIZON | 31.09 | 13.99 | [b] |
| 1,203 | SunTrust Checking x2539 | 08/01/17 | 40075 | VERIZON | 39.50 | 17.78 | [b] |
| 1,204 | SunTrust Checking x2539 | 08/14/17 | 40096 | VERIZON | 40.37 | 18.17 | [b] |
| 1,205 | SunTrust Checking x2539 | 08/14/17 | 40097 | VERIZON | 85.50 | 38.48 | [b] |
| 1,206 | SunTrust Checking x2539 | 08/14/17 | 40098 | VERIZON | 187.09 | 84.19 | [b] |
| 1,207 | SunTrust Checking x2539 | 08/14/17 | 40099 | VERIZON | 423.71 | 190.67 | [b] |
| 1,208 | SunTrust Checking x2539 | 08/14/17 | 40102 | VERIZON | 219.98 | 98.99 | [b] |
| 1,209 | SunTrust Checking x2539 | 08/29/17 | 40164 | VERIZON | 31.04 | 13.97 | [b] |
| 1,210 | SunTrust Checking x2539 | 08/29/17 | 40165 | VERIZON | 40.30 | 18.14 | [b] |
| 1,211 | SunTrust Checking x2539 | 09/11/17 | 40206 | VERIZON | 40.37 | 18.17 | [b] |
| 1,212 | SunTrust Checking x2539 | 09/11/17 | 40207 | VERIZON | 91.51 | 41.18 | [b] |
| 1,213 | SunTrust Checking x2539 | 09/11/17 | 40208 | VERIZON | 186.24 | 83.81 | [b] |
| 1,214 | SunTrust Checking x2539 | 09/11/17 | 40209 | VERIZON | 426.57 | 191.96 | [b] |
| 1,215 | SunTrust Checking x2539 | 09/12/17 | 40216 | VERIZON | 221.54 | 99.69 | [b] |
| 1,216 | SunTrust Checking x2539 | 09/26/17 | 40256 | VERIZON | 49.11 | 22.10 | [b] |
| 1,217 | SunTrust Checking x2539 | 09/29/17 | 40266 | VERIZON | 31.04 | 13.97 | [b] |
| 1,218 | SunTrust Checking x2539 | 10/02/17 | 40271 | VERIZON | 40.20 | 18.09 | [b] |
| 1,219 | SunTrust Checking x2539 | 10/09/17 | 40308 | VERIZON | 40.51 | 18.23 | [b] |
| 1,220 | SunTrust Checking x2539 | 10/09/17 | 40309 | VERIZON | 188.14 | 84.66 | [b] |
| 1,221 | SunTrust Checking x2539 | 10/10/17 | 40315 | VERIZON | 424.79 | 191.16 | [b] |

Stout
Page 33 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,222 | SunTrust Checking x2539 | 10/11/17 | 40327 | VERIZON | 223.00 | 100.35 | [b] |
| 1,223 | SunTrust Checking x2539 | 10/26/17 | 40379 | VERIZON | 31.11 | 14.00 | [b] |
| 1,224 | SunTrust Checking x2539 | 11/01/17 | 40391 | VERIZON | 40.35 | 18.16 | [b] |
| 1,225 | SunTrust Checking x2539 | 11/07/17 | 40412 | VERIZON | 40.51 | 18.23 | [b] |
| 1,226 | SunTrust Checking x2539 | 11/10/17 | 40419 | VERIZON | 99.72 | 44.87 | [b] |
| 1,227 | SunTrust Checking x2539 | 11/10/17 | 40420 | VERIZON | 220.56 | 99.25 | [b] |
| 1,228 | SunTrust Checking x2539 | 11/10/17 | 40421 | VERIZON | 330.57 | 148.76 | [b] |
| 1,229 | SunTrust Checking x2539 | 11/10/17 | 40422 | VERIZON | 201.16 | 90.52 | [b] |
| 1,230 | SunTrust Checking x2539 | 11/21/17 | 40470 | VERIZON | 31.11 | 14.00 | [b] |
| 1,231 | SunTrust Checking x2539 | 11/24/17 | 40490 | VERIZON | 140.34 | 63.15 | [b] |
| 1,232 | SunTrust Checking x2539 | 11/25/17 | 40515 | VERIZON | 929.32 | 418.19 | [b] |
| 1,233 | SunTrust Checking x2539 | 11/27/17 | 40521 | VERIZON | 499.98 | 224.99 | [b] |
| 1,234 | SunTrust Checking x2539 | 11/27/17 | 40522 | VERIZON | 240.51 | 108.23 | [b] |
| 1,235 | SunTrust Checking x2539 | 11/27/17 | 40523 | VERIZON | 673.04 | 302.87 | [b] |
| 1,236 | SunTrust Checking x2539 | 12/15/17 | 40565 | VERIZON | 31.11 | 14.00 | [b] |
| 1,237 | SunTrust Checking x2539 | 01/15/18 | 40614 | VERIZON | 71.79 | 32.31 | [b] |
| 1,238 | SunTrust Checking x2539 | 01/22/18 | 40632 | VERIZON | 29.87 | 13.44 | [b] |
| 1,239 | SunTrust Checking x2539 | 01/26/18 | 40645 | VERIZON | 112.97 | 50.84 | [b] |
| 1,240 | SunTrust Checking x2539 | 01/30/18 | 40651 | VERIZON | 31.14 | 14.01 | [b] |
| 1,241 | SunTrust Checking x2539 | 02/13/18 | 40691 | VERIZON | 89.51 | 40.28 | [b] |
| 1,242 | SunTrust Checking x2539 | 02/13/18 | 40692 | VERIZON | 100.18 | 45.08 | [b] |
| 1,243 | SunTrust Checking x2539 | 02/15/18 | 40693 | VERIZON | 371.33 | 167.10 | [b] |
| 1,244 | SunTrust Checking x2539 | 02/20/18 | 40707 | VERIZON | 46.38 | 20.87 | [b] |
| 1,245 | SunTrust Checking x2539 | 02/27/18 | 40726 | VERIZON | 31.14 | 14.01 | [b] |
| 1,246 | SunTrust Checking x2539 | 03/05/18 | 40739 | VERIZON | 21.10 | 9.50 | [b] |
| 1,247 | SunTrust Checking x2539 | 03/12/18 | 40763 | VERIZON | 369.47 | 166.26 | [b] |
| 1,248 | SunTrust Checking x2539 | 03/13/18 | 40767 | VERIZON | 196.38 | 88.37 | [b] |
| 1,249 | SunTrust Checking x2539 | 03/13/18 | 40768 | VERIZON | 99.58 | 44.81 | [b] |
| 1,250 | SunTrust Checking x2539 | 03/13/18 | 40770 | VERIZON | 40.77 | 18.35 | [b] |
| 1,251 | SunTrust Checking x2539 | 03/28/18 | 40796 | VERIZON | 33.78 | 15.20 | [b] |
| 1,252 | SunTrust Checking x2539 | 03/29/18 | 40801 | VERIZON | 40.38 | 18.17 | [b] |
| 1,253 | SunTrust Checking x2539 | 04/10/18 | 40842 | VERIZON | 384.46 | 173.01 | [b] |
| 1,254 | SunTrust Checking x2539 | 04/10/18 | 40849 | VERIZON | 218.07 | 98.13 | [b] |
| 1,255 | SunTrust Checking x2539 | 04/11/18 | 40853 | VERIZON | 200.15 | 90.07 | [b] |
| 1,256 | SunTrust Checking x2539 | 04/12/18 | 40857 | VERIZON | 104.19 | 46.89 | [b] |
| 1,257 | SunTrust Checking x2539 | 04/30/18 | 40890 | VERIZON | 33.71 | 15.17 | [b] |
| 1,268 | SunTrust Checking x2539 | 05/01/18 | 40898 | VERIZON | 40.31 | 18.14 | [b] |

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,259 | SunTrust Checking x2539 | 05/08/18 | 40924 | VERIZON | 2.61 | 1.17 | [b] |
| 1,260 | SunTrust Checking x2539 | 05/08/18 | 40925 | VERIZON | 282.55 | 127.15 | [b] |
| 1,261 | SunTrust Checking x2539 | 05/10/18 | 40932 | VERIZON | 103.83 | 46.72 | [b] |
| 1,262 | SunTrust Checking x2539 | 05/10/18 | 40933 | VERIZON | 201.68 | 90.76 | [b] |
| 1,263 | SunTrust Checking x2539 | 05/14/18 | 40943 | VERIZON | 225.04 | 101.27 | [b] |
| 1,264 | SunTrust Checking x2539 | 05/29/18 | 40979 | VERIZON | 33.71 | 15.17 | [b] |
| 1,265 | SunTrust Checking x2539 | 05/30/18 | 40996 | VERIZON | 40.31 | 18.14 | [b] |
| 1,266 | SunTrust Checking x2539 | 06/11/18 | 41025 | VERIZON | 103.50 | 46.58 | [b] |
| 1,267 | SunTrust Checking x2539 | 06/11/18 | 41026 | VERIZON | 382.49 | 172.12 | [b] |
| 1,268 | SunTrust Checking x2539 | 06/11/18 | 41027 | VERIZON | 198.08 | 89.14 | [b] |
| 1,269 | SunTrust Checking x2539 | 06/11/18 | 41028 | VERIZON | 40.48 | 18.22 | [b] |
| 1,270 | SunTrust Checking x2539 | 06/12/18 | 41031 | VERIZON | 218.29 | 98.23 | [b] |
| 1,271 | SunTrust Checking x2539 | 06/18/18 | 41043 | VERIZON | 51.78 | 23.30 | [b] |
| 1,272 | SunTrust Checking x2539 | 07/03/18 | 41089 | VERIZON | 33.71 | 15.17 | [b] |
| 1,273 | SunTrust Checking x2539 | 07/03/18 | 41090 | VERIZON | 40.31 | 18.14 | [b] |
| 1,274 | SunTrust Checking x2539 | 07/10/18 | 41116 | VERIZON | 102.47 | 46.11 | [b] |
| 1,275 | SunTrust Checking x2539 | 07/10/18 | 41117 | VERIZON | 209.08 | 94.09 | [b] |
| 1,276 | SunTrust Checking x2539 | 07/12/18 | 41125 | VERIZON | 382.50 | 172.13 | [b] |
| 1,277 | SunTrust Checking x2539 | 07/12/18 | 41126 | VERIZON | 40.48 | 18.22 | [b] |
| 1,278 | SunTrust Checking x2539 | 07/12/18 | 41132 | VERIZON | 217.59 | 97.92 | [b] |
| 1,279 | SunTrust Checking x2539 | 07/30/18 | 41173 | VERIZON | 40.32 | 18.14 | [b] |
| 1,280 | SunTrust Checking x2539 | 07/30/18 | 41174 | VERIZON | 33.79 | 15.21 | [b] |
| 1,281 | SunTrust Checking x2539 | 08/13/18 | 41199 | VERIZON | 40.51 | 18.23 | [b] |
| 1,282 | SunTrust Checking x2539 | 08/13/18 | 41200 | VERIZON | 102.41 | 46.08 | [b] |
| 1,283 | SunTrust Checking x2539 | 08/13/18 | 41201 | VERIZON | 210.93 | 94.92 | [b] |
| 1,284 | SunTrust Checking x2539 | 08/13/18 | 41202 | VERIZON | 384.35 | 172.96 | [b] |
| 1,285 | SunTrust Checking x2539 | 08/13/18 | 41220 | VERIZON | 219.92 | 98.96 | [b] |
| 1,286 | SunTrust Checking x2539 | 08/28/18 | 41262 | VERIZON | 33.76 | 15.19 | [b] |
| 1,287 | SunTrust Checking x2539 | 09/06/18 | 41277 | VERIZON | 40.54 | 18.24 | [b] |
| 1,288 | SunTrust Checking x2539 | 09/10/18 | 41298 | VERIZON | 102.53 | 46.14 | [b] |
| 1,289 | SunTrust Checking x2539 | 09/10/18 | 41299 | VERIZON | 203.30 | 91.49 | [b] |
| 1,290 | SunTrust Checking x2539 | 09/10/18 | 41300 | VERIZON | 40.46 | 18.21 | [b] |
| 1,291 | SunTrust Checking x2539 | 09/10/18 | 41301 | VERIZON | 380.67 | 171.30 | [b] |
| 1,292 | SunTrust Checking x2539 | 09/10/18 | 41306 | VERIZON | 226.87 | 102.09 | [b] |
| 1,293 | SunTrust Checking x2539 | 09/24/18 | 41337 | VERIZON | 145.54 | 65.49 | [b] |
| 1,294 | SunTrust Checking x2539 | 09/28/18 | 41348 | VERIZON | 33.76 | 15.19 | [b] |
| 1,295 | SunTrust Checking x2539 | 10/01/18 | 41360 | VERIZON | 40.54 | 18.24 | [b] |

Olympia Investments, Inc.
October 23, 2019
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,296 | SunTrust Checking x2539 | 10/10/18 | 41380 | VERIZON | 382.64 | 172.19 | [b] |
| 1,297 | SunTrust Checking x2539 | 10/10/18 | 41381 | VERIZON | 40.56 | 18.25 | [b] |
| 1,298 | SunTrust Checking x2539 | 10/12/18 | 41387 | VERIZON | 222.88 | 100.30 | [b] |
| 1,299 | SunTrust Checking x2539 | 10/16/18 | 41393 | VERIZON | 102.93 | 46.32 | [b] |
| 1,300 | SunTrust Checking x2539 | 10/16/18 | 41394 | VERIZON | 203.20 | 91.44 | [b] |
| 1,301 | SunTrust Checking x2539 | 10/30/18 | 41437 | VERIZON | 33.82 | 15.22 | [b] |
| 1,302 | SunTrust Checking x2539 | 10/30/18 | 41438 | VERIZON | 40.63 | 18.28 | [b] |
| 1,303 | SunTrust Checking x2539 | 11/08/18 | 41472 | VERIZON | 40.56 | 18.25 | [b] |
| 1,304 | SunTrust Checking x2539 | 11/14/18 | 41485 | VERIZON | 102.43 | 46.09 | [b] |
| 1,305 | SunTrust Checking x2539 | 11/14/18 | 41486 | VERIZON | 208.34 | 93.75 | [b] |
| 1,306 | SunTrust Checking x2539 | 11/14/18 | 41487 | VERIZON | 376.45 | 169.40 | [b] |
| 1,307 | SunTrust Checking x2539 | 11/14/18 | 41491 | VERIZON | 218.20 | 98.19 | [b] |
| 1,308 | SunTrust Checking x2539 | 11/23/18 | 41537 | VERIZON | 34.17 | 15.38 | [b] |
| 1,309 | SunTrust Checking x2539 | 11/26/18 | 41559 | VERIZON | 40.64 | 18.29 | [b] |
| 1,310 | SunTrust Checking x2539 | 11/26/18 | 41560 | VERIZON | 302.98 | 136.34 | [b] |
| 1,311 | SunTrust Checking x2539 | 11/26/18 | 41561 | VERIZON | 605.86 | 272.64 | [b] |
| 1,312 | SunTrust Checking x2539 | 11/26/18 | 41562 | VERIZON | 878.88 | 395.50 | [b] |
| 1,313 | SunTrust Checking x2539 | 11/30/18 | 41575 | VERIZON | 39.31 | 17.69 | [b] |
| 1,314 | SunTrust Checking x2539 | 11/30/18 | 41582 | VERIZON | 418.20 | 188.19 | [b] |
| 1,315 | SunTrust Checking x2539 | 12/26/18 | 41644 | VERIZON | 34.17 | 15.38 | [b] |
| 1,316 | SunTrust Checking x2539 | 01/04/19 | 41661 | VERIZON | 40.64 | 18.29 | [b] |
| 1,317 | SunTrust Checking x2539 | 01/11/19 | 41672 | VERIZON | 16.06 | 7.23 | [b] |
| 1,318 | SunTrust Checking x2539 | 01/14/19 | 41676 | VERIZON | 36.80 | 16.56 | [b] |
| 1,319 | SunTrust Checking x2539 | 02/01/19 | 41713 | VERIZON | 40.64 | 18.29 | [b] |
| 1,320 | SunTrust Checking x2539 | 02/01/19 | 41715 | VERIZON | 33.97 | 15.29 | [b] |
| 1,321 | SunTrust Checking x2539 | 02/11/19 | 41740 | VERIZON | 10.97 | 4.94 | [b] |
| 1,322 | SunTrust Checking x2539 | 02/11/19 | 41741 | VERIZON | 12.12 | 5.45 | [b] |
| 1,323 | SunTrust Checking x2539 | 02/11/19 | 41742 | VERIZON | 40.56 | 18.25 | [b] |
| 1,324 | SunTrust Checking x2539 | 02/11/19 | 41743 | VERIZON | 256.72 | 115.52 | [b] |
| 1,325 | SunTrust Checking x2539 | 02/12/19 | 41756 | VERIZON | 262.50 | 118.13 | [b] |
| 1,326 | SunTrust Checking x2539 | 02/26/19 | 41790 | VERIZON | 33.97 | 15.29 | [b] |
| 1,327 | SunTrust Checking x2539 | 03/04/19 | 41811 | VERIZON | 40.64 | 18.29 | [b] |
| 1,328 | SunTrust Checking x2539 | 03/08/19 | 41826 | VERIZON | 40.56 | 18.25 | [b] |
| 1,329 | SunTrust Checking x2539 | 03/11/19 | 41838 | VERIZON | 377.97 | 170.09 | [b] |
| 1,330 | SunTrust Checking x2539 | 03/12/19 | 41847 | VERIZON | 109.49 | 49.27 | [b] |
| 1,331 | SunTrust Checking x2539 | 03/12/19 | 41848 | VERIZON | 208.52 | 93.83 | [b] |
| 1,332 | SunTrust Checking x2539 | 03/12/19 | 41849 | VERIZON | 229.03 | 103.06 | [b] |

Stout
Page 36 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                                    **Schedule D.3**

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,333 | SunTrust Checking x2539 | 04/01/19 | 41889 | VERIZON | 33.97 | 15.29 | [b] |
| 1,334 | SunTrust Checking x2539 | 04/01/19 | 41890 | VERIZON | 40.64 | 18.29 | [b] |
| 1,335 | SunTrust Checking x2539 | 04/08/19 | 41919 | VERIZON | 378.28 | 170.23 | [b] |
| 1,336 | SunTrust Checking x2539 | 04/09/19 | 41928 | VERIZON | 207.11 | 93.20 | [b] |
| 1,337 | SunTrust Checking x2539 | 04/09/19 | 41929 | VERIZON | 110.63 | 49.78 | [b] |
| 1,338 | SunTrust Checking x2539 | 04/10/19 | 41933 | VERIZON | 40.49 | 18.22 | [b] |
| 1,339 | SunTrust Checking x2539 | 04/12/19 | 41940 | VERIZON | 251.67 | 113.25 | [b] |
| 1,340 | SunTrust Checking x2539 | 04/29/19 | 41989 | VERIZON | 33.92 | 15.26 | [b] |
| 1,341 | SunTrust Checking x2539 | 05/03/19 | 42000 | VERIZON | 40.57 | 18.26 | [b] |
| 1,342 | SunTrust Checking x2539 | 05/09/19 | 42022 | VERIZON | 40.49 | 18.22 | [b] |
| 1,343 | SunTrust Checking x2539 | 05/10/19 | 42024 | VERIZON | 382.24 | 172.01 | [b] |
| 1,344 | SunTrust Checking x2539 | 05/13/19 | 42032 | VERIZON | 109.59 | 49.32 | [b] |
| 1,345 | SunTrust Checking x2539 | 05/13/19 | 42033 | VERIZON | 206.76 | 93.04 | [b] |
| 1,346 | SunTrust Checking x2539 | 05/13/19 | 42035 | VERIZON | 239.00 | 107.55 | [b] |
| 1,347 | SunTrust Checking x2539 | 05/24/19 | 42060 | VERIZON | 33.92 | 15.26 | [b] |
| 1,348 | SunTrust Checking x2539 | 05/30/19 | 42073 | VERIZON | 40.57 | 18.26 | [b] |
| 1,349 | SunTrust Checking x2539 | 06/07/19 | 42102 | VERIZON | 376.41 | 169.38 | [b] |
| 1,350 | SunTrust Checking x2539 | 06/10/19 | 42104 | VERIZON | 109.59 | 49.32 | [b] |
| 1,351 | SunTrust Checking x2539 | 06/10/19 | 42105 | VERIZON | 40.49 | 18.22 | [b] |
| 1,352 | SunTrust Checking x2539 | 06/10/19 | 42106 | VERIZON | 204.87 | 92.19 | [b] |
| 1,353 | SunTrust Checking x2539 | 06/12/19 | 42115 | VERIZON | 237.10 | 106.70 | [b] |
| 1,354 | SunTrust Checking x2539 | 06/28/19 | 42160 | VERIZON | 33.92 | 15.26 | [b] |
| 1,355 | SunTrust Checking x2539 | 07/02/19 | 42168 | VERIZON | 40.57 | 18.26 | [b] |
| 1,356 | SunTrust Checking x2539 | 07/08/19 | 42185 | VERIZON | 40.74 | 18.33 | [b] |
| 1,357 | SunTrust Checking x2539 | 07/12/19 | 42198 | VERIZON | 383.78 | 172.70 | [b] |
| 1,358 | SunTrust Checking x2539 | 07/12/19 | 42199 | VERIZON | 245.72 | 110.57 | [b] |
| 1,359 | SunTrust Checking x2539 | 07/16/19 | 42202 | VERIZON | 109.53 | 49.29 | [b] |
| 1,360 | SunTrust Checking x2539 | 07/16/19 | 42203 | VERIZON | 208.99 | 94.05 | [b] |
| 1,361 | SunTrust Checking x2539 | 07/29/19 | 42248 | VERIZON | 35.34 | 15.90 | [b] |
| 1,362 | SunTrust Checking x2539 | 07/29/19 | 42249 | VERIZON | 34.21 | 15.39 | [b] |
| 1,363 | SunTrust Checking x2539 | 08/09/19 | 42285 | VERIZON | 40.48 | 18.22 | [b] |
| 1,364 | SunTrust Checking x2539 | 08/16/19 | 42300 | VERIZON | 248.10 | 111.65 | [b] |
| 1,365 | SunTrust Checking x2539 | 08/27/19 | 42340 | VERIZON | 34.19 | 15.39 | [b] |
| 1,366 | SunTrust Checking x2539 | 08/28/19 | 42346 | VERIZON | 391.80 | 176.31 | [b] |
| 1,367 | SunTrust Checking x2539 | 08/28/19 | 42347 | VERIZON | 213.28 | 95.98 | [b] |
| 1,368 | SunTrust Checking x2539 | 08/30/19 | 42356 | VERIZON | 37.34 | 16.80 | [b] |
| 1,369 | SunTrust Checking x2539 | 09/09/19 | 42376 | VERIZON | 36.71 | 16.52 | [b] |

Stout
Page 37 of 38

**Olympia Investments, Inc.**
**October 23, 2019**
**Historical Improper Credit Card Charges and Checks**                    Schedule D.3

| | Account | Date | Ck. No. | Payee | Transaction Amount | Amount Receivable | |
|---|---|---|---|---|---|---|---|
| 1,370 | SunTrust Checking x2539 | 09/12/19 | 42395 | VERIZON | 112.29 | 50.53 | [b] |
| 1,371 | SunTrust Checking x2539 | 09/12/19 | 42396 | VERIZON | 206.97 | 93.14 | [b] |
| 1,372 | SunTrust Checking x2539 | 09/12/19 | 42397 | VERIZON | 384.64 | 173.09 | [b] |
| 1,373 | SunTrust Checking x2539 | 09/13/19 | 42402 | VERIZON | 251.25 | 113.06 | [b] |
| 1,374 | SunTrust Checking x2539 | 09/30/19 | 42454 | VERIZON | 34.19 | 15.39 | [b] |
| 1,375 | SunTrust Checking x2539 | 09/30/19 | 42455 | VERIZON | 40.82 | 18.37 | [b] |
| 1,376 | SunTrust Checking x2539 | 10/11/19 | 42496 | VERIZON | 205.95 | 92.68 | [b] |
| 1,377 | SunTrust Checking x2539 | 10/11/19 | 42497 | VERIZON | 382.88 | 172.30 | [b] |
| 1,378 | SunTrust Checking x2539 | 10/11/19 | 42498 | VERIZON | 109.32 | 49.19 | [b] |
| 1,379 | SunTrust Checking x2539 | 10/11/19 | 42499 | VERIZON | 40.81 | 18.36 | [b] |
| 1,380 | SunTrust Checking x2539 | 10/11/19 | 42504 | VERIZON | 419.18 | 188.63 | [b] |
| 1,381 | SunTrust Checking x2539 | 12/10/16 | 39452 | Waste Management of Maryland, Inc. | 5,639.86 | 207.61 | [a] |
| 1,382 | SunTrust Checking x2539 | 03/25/19 | 41870 | WEX BANK (SHELL OIL) | 77.99 | 77.99 | |
| 1,383 | SunTrust Checking x2539 | 04/25/19 | 41984 | WEX BANK (SHELL OIL) | 637.58 | 637.58 | |
| 1,384 | SunTrust Checking x2539 | 06/24/19 | 42149 | WEX BANK (SHELL OIL) | 685.51 | 685.51 | |
| 1,385 | SunTrust Checking x2539 | 07/25/19 | 42244 | WEX BANK (SHELL OIL) | 691.90 | 691.90 | |
| 1,386 | SunTrust Checking x2539 | 08/27/19 | 42343 | WEX BANK (SHELL OIL) | 594.50 | 594.50 | |
| 1,387 | SunTrust Checking x2539 | 09/23/19 | 42428 | WEX BANK (SHELL OIL) | 420.36 | 420.36 | |
| 1,388 | Total | | | | $ 524,662.46 | $ 451,665.08 | |

Note:  Transactions included above span from January 1, 2014 through October 23, 2019 and have been identified by the Plaintiffs as not relating, in whole or in part, to the Company's operations.

[a]   A portion of this expense has been identified as a receivable.

[b]   Nine of the 20 phone and cell phone lines included in the Verizon bills have been identified by the Plaintiffs as related to other businesses. Therefore, 9/20 (45%) of all Verizon charges have been included as a receivable.

**Olympia Investments, Inc. & Tsintolas Investments, Inc.**
**October 23, 2019**
**Hypothetical Financing of Buy-Out**                                    Schedule E.1

| | | [a] Sapperstein | [b] Riley |
|---|---|---|---|
| | **Combined NOI** | | |
| 1 | 4020-4030-4040 Livingston Road SE | $ 109,410 | $ 126,703 |
| 2 | 810 Kennedy Street NW | 115,309 | 92,185 |
| 3 | 829 Rock Creek Church Road NW | 42,708 | 40,254 |
| 4 | 1010 G Street NE | 142,470 | 124,694 |
| 5 | 1521 E Street SE | 42,574 | 40,323 |
| 6 | 3901 53rd Street | 173,807 | 132,178 |
| 7 | 8212 Flower Avenue | 119,681 | 87,042 |
| 8 | 5400 7th Street NW | 146,513 | 118,343 |
| 9 | **Combined NOI** | $ 892,472 | $ 761,722 |
| | | | |
| | **Annual Debt Service Requirement** | | |
| 10 | Tsintolas Investments - 25% Interest | $ 526,000 | 526,000 |
| 11 | Tsintolas Investments - 25% Interest | 526,000 | 526,000 |
| 12 | Olympia Investments - 25% Interest | 3,914,000 | 3,914,000 |
| 13 | Olympia Investments - 25% Interest | 3,914,000 | 3,914,000 |
| 14 | **Total Buy-Out** | $ 8,880,000 | $ 8,880,000 |
| | | | |
| 15 | Loan Principal | $ 8,880,000 | $ 8,880,000 |
| 16 | Interest Rate | [c] 4.00% | 4.00% |
| 17 | Loan Term | 30 | 30 |
| 18 | Monthly Amortization | $ 42,394 | $ 42,394 |
| 19 | Annual Debt Service Required | $ 508,728 | $ 508,728 |
| | | | |
| 20 | Debt Service Coverage Ratio | 1.75 x | 1.50 x |

[a]  The net operating income (NOI) of each property is based on real estate appraisal reports
     prepared by Gary Lee Sapperstein, MAI, SRPA, MRICS and Jodi Orr, MBA of Sapperstein &
     Associates, LLC dated January 27, 2021 with an effective date of October 23, 2019.
[b]  The net operating income (NOI) of each property is based on real estate appraisal reports
     prepared by Alfred B. Riley, Jr., SRA of Riley & Associates, LLC dated February 12, 2021 with an
     effective date of October 23, 2019.
[c]  The interest rate assumes the debt would be collateralized by the properties and financed through
     a commercial lender. In the event the debt is collateralized by a non-commercial lender, the rate
     would be higher.

Stout