Stephen A. Metz, Esq. (Bar No. 463044)
Offit Kurman, P.A.
7501 Wisconsin Avenue, Suite 1000W
Bethesda, MD 20814
(240) 507-1723
smetz@offitkurman.com
*Counsel for Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **OLYMPIA INVESTMENTS, INC.** | ) | **Case No. 24-00158** |
| | ) | **Chapter 11** |
| **Debtor** | ) | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **TSINTOLAS INVESTMENTS, INC.** | ) | **Case No. 24-00159** |
| | ) | **Chapter 11** |
| **Debtor** | ) | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## DEBTORS' OPPOSITION TO MOTION TO DISMISS
## THE BANKRUPTCY CASES, OR IN THE ALTERNATIVE, ABSTAIN

Olympia Investments, Inc. ("OII") and Tsintolas Investments, Inc. ("TII," collectively, the "Debtors"), by and through their undersigned counsel, hereby oppose the Motion to Dismiss the Bankruptcy Cases, or in the Alternative, Abstain (the "Motion") filed by Christofilos Tsintolas, Deborah Tsintolas, and Fotini Tsintolas Economides Revocable Trust (together, the "Movants"), and in support state:

### Preliminary Statement

Debtors filed these bankruptcy cases for the benefit of their creditors and shareholders. Debtors filed these bankruptcy cases with the intention of selling their assets, which in these cases consist of eight multi-family buildings; six of which are located in the District of Columbia. These cases were absolutely filed in good faith and with the proper corporate authority. Debtors did not file these cases for any improper purpose. The filing of the cases was not part of an alleged effort

to harm and oppress Movants.  If Movants were not so fixated on simply getting their way through scorched earth litigation, they might realize that the filing of these cases will actually benefit them by, *inter alia*, (i) allowing the Debtors to sell Debtors' real estate much sooner than a sale by a receiver appointed by the D.C. Superior Court ("Superior Court"); (ii) allowing Debtors to sell Debtors' real estate without having to comply with D.C.'s complex Tenant Opportunity to Purchase Act ("TOPA") because TOPA includes an exclusion for bankruptcy sales, likely resulting in more interested purchasers and higher sales prices; (iii) allowing Debtors to sell Debtors' real estate in a more cost-effective manner; (iv) allowing Debtors to save additional administrative expense by selling Debtors' real estate pursuant to a confirmed plan and thus allowing Debtors to take advantage of the exemption for certain transfer taxes under 11 U.S.C. § 1146; and (v) allowing Movants to take advantage of the transparency that is required of debtors in possession.

At its core, Movants' Motion is yet another example of their own hypocrisy.  Movants commenced an action in the Superior Court in 2019 to dissolve Debtors.  The parties litigated over several years concerning the value of Movants' interests in Debtors because Debtors initially elected to buy Movants' shares in lieu of dissolution.  After the Superior Court made a final value determination and instructed Debtors as to how they should pay Movants, Debtors properly and timely determined dissolution was a better option.  Instead of moving forward with dissolution – which Movants themselves requested in 2019 – Movants changed their minds and filed a motion seeking certain relief from the Superior Court within which Movants alleged Debtors did not comply with certain of the dissolution provisions of the D.C. Code.  Movants also filed a motion with the Superior Court for the appointment of a receiver to sell Debtors' properties.  Had the Superior Court granted the motion to appoint a receiver, which was scheduled for a hearing the day after Debtors filed their bankruptcy cases, the sale process would have been more costly, more

complex, would take far longer than in these bankruptcy cases and would attract fewer potential purchasers.  To be clear, Debtors' plan is to sell all of their real estate through these bankruptcy cases pursuant to liquidating chapter 11 plans.  Debtors do not intend to attempt to confirm chapter 11 plans of reorganization.

As stated, one of the motions pending in the Superior Court was for the appointment of a receiver to sell Debtors' property.[1]  The very same result (*i.e.*, the sale of Debtors' property) will occur in these chapter 11 cases, only with less cost and much more efficiency.  Movants did not ask Debtors, or Debtors' counsel, what the "plan" was in these bankruptcy cases prior to filing their Motion.  Had they asked, perhaps they would have realized the filing of these cases was not so bad for them after all.  At least they should have realized that.

## I.    Factual and Procedural Background and Specific Responses to Certain of the Movants' Allegations

### A.    The Bankruptcy Cases

On May 7, 2024 (the "Petition Date"), Debtors filed separate voluntary petitions under Chapter 11.  Debtors are District of Columbia corporations with their principal place of business located at 3520 Connecticut Ave NW, Washington, DC 20008.  Debtors are small business debtors as defined in 11 U.S.C. § 101(51D).  TII owns single asset real estate pursuant to 11 U.S.C. § 101(51B).   Debtors owns C class multi-family real property, often referred to as "work force housing" leased to low to moderate income residential tenants.  On May 21, 2024, Debtors filed their Schedules and Statements of Financial Affairs.  On May 21, 2024, the U.S. Trustee conducted the Initial Debtor Interviews.

---

[1] Interestingly, and unbeknownst to Debtors' undersigned counsel until after the Petition Date, the Receiver Motion (attached as Exhibit 13 to the Motion) proposed three individuals for appointment as a receiver, one of which was Debtors' undersigned counsel.

OII owns real property located at the following locations with the following approximate number of residential rental units:

- 810 Kennedy Street, NW, Washington DC 20011 (14 units);

- 829 Rock Creek Church Road, NW, Washington, DC 20010 (6 units);

- 1010 G Street, NE, Washington, DC 20002 (14 units);

- 1521 E Street, SE, Washington, DC 20003 (6 units);

- 5400 7th Street, NW, Washington, DC 20011 (22 units);

- 3901 53rd Street, Bladensburg, MD 20710 (28 units); and

- 8212 Flower Avenue, Takoma Park, MD (20 units).

TII owns real property located at 4020 – 4040 Livingston Road, SE, Washington, DC 20032 consisting of approximately 31 residential rental units.  Debtors' properties are older properties, with the majority of the buildings having been constructed in the late 1950s to mid-1960s and have no amenities.  As a result, the rents are lower than rent rates for newer and modernized buildings.  However, Debtors – through the able management of Efstratios Tsintolas ("Steve") – have maintained their buildings and generally have high occupancy rates.

The Debtors were initially formed and operated by the parents of Movants, Steve, and Cassandra Tsintolas Johnson.  Their parents' names are Helen D. Tsintolas ("Helen") and Demetrios E. Tsintolas ("Mimis").  Helen is still living and is currently 101 years old.  Mimis passed away in 2005.  Since Movants began preparing to file their Complaints in Superior Court, Movants and their families have purposely and intentionally estranged themselves from Helen (their 101-year-old mother) and have chosen not to have any relationship with her.  Of the four siblings, Steve has been the only sibling involved in the day-to-day management of the Debtors'

properties.  A summary of the history of the Debtors and the siblings' roles is contained in an

Affidavit executed by Helen on July 9, 2020 and is attached hereto as **Exhibit A**.

### B.    The D.C. Superior Court Cases

Movants devote pages 7-18 of their Motion to the Superior Court litigation history leading

up to these bankruptcy filings.  Some of Movants' statements concerning the Superior Court

litigation history are not in dispute.  However, other parts are in dispute and some of those disputes

are worth mentioning at this juncture.

Before addressing specific allegations, an overview – from Debtors' perspective – of the

Superior Court matter is appropriate.  It is undisputed that on October 24, 2019, Movants filed

actions in the Superior Court for judicial dissolution.  Motion, ¶ 13.  In the Superior Court action,

Debtors initially elected (as was their right) to buy out the petitioning shareholders (*i.e.*, Movants).

The parties were unable to agree on buy-out amounts, so the Superior Court had to value Movants'

shares as of the filing of the dissolution actions.  The Superior Court issued an order determining

the value of Movants' shares on October 5, 2023 (the "Valuation Order").  Movants' refer to the

Valuation Order as the Final Order and attached it as Exhibit 5 to their Motion.  In addition to

establishing values, the Superior Court, in its Valuation Order, also awarded attorneys' fees to

Movants, but did not establish an amount; set a payment plan for the buy outs; purported to grant

Movants a security interest; and, stated that the Debtors had ten (10) days to elect to dissolve or

continue with the purchase of Movants' shares.[2]

---

[2] The Superior Court purported to grant "a lien on both Corporations for the value of any award (including fair value and all interest, fees, and expenses) which shall be senior to any interest held by the Corporations themselves or by the Interested Parties.  In the event of dissolution or bankruptcy, Plaintiffs' entitlement to payment under this order shall be senior to Defendants'."  Valuation Order, p. 9.  Presumably, the Superior Court based its decision to award security pursuant to D.C. Code § 29-312.24(e), which permits the Superior Court to include a "provision for security to assure payment of the purchase price and any additional expenses as may have been awarded" after determining the value of petitioners' shares after a corporation opts to buy out petitioners.  To be clear, Movants do not have a secured claim in these cases.  For starters, the Valuation Order is no longer of any force or effect because pursuant to D.C. Code § 29-312.24(g), Debtors subsequently filed articles of dissolution, and that section of the D.C. Code

On October 12, 2023, Debtors filed their Opposed Emergency Motion for Addition to or Revision of October 5, 2023, Order (the "Motion to Revise"), a true and correct copy of which is attached hereto as **Exhibit B**.  On October 16, 2023, Debtors filed their Notice of Intent to Dissolve Pursuant to D.C. Code § 29-312.24(g) (the "Notice of Intent to Dissolve"), a true and correct copy of which is attached hereto as **Exhibit C**.  On October 19, 2023, the Superior Court denied the Motion to Revise (the "Order Denying Motion to Revise").

### 1.    Debtors Appealed the Valuation Order and Related Orders

Movants fail to inform this Court that Debtors noted an appeal to the D.C. Court of Appeals of the Valuation Order and the Order Denying Motion to Revise.  A true and correct copy of their Notice of Appeal is attached hereto as **Exhibit D**.  The D.C. Court of Appeals docketed that appeal as Appeal Number 23-CV-0928.  Debtors also noted an appeal (the "Second Notice of Appeal") of two additional orders entered by the Superior Court on December 18, 2023: (i) the Order Denying Defendants' Motion for Reconsideration, of the Superior Court's Order Denying as Moot Defendants' Opposed Emergency Motion for Addition to or Revision of October 5, 2023 Order; and (ii) Order Denying Defendants' Motion for Reconsideration, of the Superior Court's October 5, 2023 Valuation Order to Strike Attorney's Fees and Limit the Award.  A true and correct copy of the Second Notice of Appeal is attached hereto as **Exhibit E**.  The D.C. Court of Appeals consolidated the appeals.  A true and correct copy of the docket in the consolidated appeal is attached hereto as **Exhibit F**.

Debtors noted the appeals because Debtors assert the Superior Court erred in many respects, both as to certain factual findings and as to certain legal conclusions and directives.  Of

---

expressly states that "[u]pon filing of such articles of dissolution", the Valuation Order "shall no longer be of any force or effect . . ."  Moreover, Movants did not record the Valuation Order with the D.C. Recorder of Deeds in order to perfect any asserted security interest or lien.  *See* 11 U.S.C. § 544(a); *Sovran Bank/DC National v. U.S. (In re Aumiller)*, 168 B.R. 811 (Bankr. D.D.C. 1994).

course, Debtors are not suggesting this Court should act as an appellate court in possible contravention of the *Rooker-Feldman* doctrine. *See MP PPH LLC v. District of Columbia (In re MP PPH LLC)*, 2024 WL 1087492, at *6 (Bankr. D.D.C. March 12, 2024) (discussing the scope of the *Rooker-Feldman* doctrine, including that it applies only to "final state court judgments, not interlocutory orders."). However, Debtors noted meritorious appeals and are confident that the D.C. Court of Appeals will reverse the Superior Court's erroneous findings on certain issues, including but not limited to the Superior Court's finding that Steve failed to adequately manage the corporations; the corporations operated unlawfully by supposedly failing to hold shareholder meetings; Steve prevented Movants from reviewing corporate financial documents; Steve had oppressively used his powers as President; and, Movants are entitled to attorneys' fees.[3] Assuming this Court does not dismiss these cases, Debtors intend to move for relief from the automatic stay to allow the appeals to proceed at least to the extent the matters on appeal may impact Debtors' estates, including for example, the Superior Court's order awarding Movants their attorneys' fees.[4] The attorneys' fee issue is determinative as to whether Movants' have a claim against Debtors' estates, or at least the extent of such claim. Debtors' Schedules disclose a disputed, contingent and unliquidated claim for Movants in the amount of $1,485,584.

---

[3] As mentioned above, Movants were never involved in the day-to-day management of the Debtors' businesses. However, after they commenced litigation, Movants were the ones who acted contrary to the Debtors' best interest. For example, when Steve sought Movants' approval to obtain a PPP loan in 2020 (which they would not need to guaranty and which would not need to be secured by any collateral), Movants attempted to leverage an agreement on the value of Movants' shares, in exchange for approving the Debtors' PPP loan application. An email exchange from April 1-2, 2020 is attached hereto as **Exhibit G**.

[4] The Superior Court had not liquidated Movants' attorneys' fee claim as of the Petition Date. Debtors contend the Superior Court erred when it awarded Movants their attorneys' fees because the D.C. Code does not authorize an award of attorneys' fees. D.C. Code § 29-312.24(e) refer to an award of "expenses," not attorneys' fees. D.C. Code § 29-312.24(e) refers back to D.C. Code § 29-312.20(a)(2)(B) as a basis for awarding "expenses" in the event the court finds that "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." Debtors also take issue with that finding.

## 2. <u>Debtors Properly and Timely Adopted and Filed Articles of Dissolution</u>

Movants further contend that Debtors improperly adopted and filed articles of dissolution. Motion, p. 11-14. Not so. Under D.C. Code § 29-312.24(f), "[u]pon entry of an order under subsections (c) or (e) of this section, the Superior Court shall dismiss the petition to dissolve the corporation under § 29-312.20(a)(2), and **the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation**, except the right to receive the amounts awarded by the order of the court which is enforceable in the same manner as any other judgment." (emphasis added).

The plain meaning of how the statute operates is clear. The words "shall no longer have any rights or status as a shareholder" have an unequivocal meaning. As much as the Movants wish to ignore those words—it is what the statute provides, and it is clear on its face—the "petitioning shareholders" (here, the Movants) "no longer have any rights" and importantly no longer hold a "status as a shareholder".

Thus, when the Superior Court entered the Valuation Order, Movants were dispossessed of their shareholder rights by operation of the statute. The statute is clear: "the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation." D.C. Code § 29-312.24(f). From there, D.C. Code § 29-312.24(g) applies. That statute states:

> (g) The purchase ordered pursuant to subsection (e) of this section shall be made within 10 days after the date the order becomes final unless before that time the corporation files with the Superior Court a notice of its intention to adopt articles of dissolution pursuant to §§ 29-312.02 and 29-312.03, which articles shall then be adopted and filed within 50 days thereafter. Upon filing of such articles of dissolution, the corporation is dissolved in accordance with §§ 29-312.05 through 29-312.07, and the order entered pursuant to subsection (e) of this section shall no longer be of any force or effect, except that the court may award the petitioning shareholder expenses in accordance with the last sentence of subsection (e) of this section and the petitioner may continue to pursue any claims previously asserted on behalf of the corporation.

8

On October 16, 2023, the Debtors timely filed a Notice of Intent to Dissolve Pursuant to D.C. § 29-312.24 ("Notice of Intent to Dissolve").  After filing the Notice of Intent to Dissolve, the Debtors were required to file articles of dissolution "no later than 50 days thereafter."  *See id.*  Thus, by any interpretation of the statute, the Movants had no rights as shareholders when the Articles of Dissolution were filed on December 1, 2023.

Even assuming *arguendo* that Movants (as shareholders with no rights or status as shareholders) were entitled to notice of the meeting in which the only shareholders with voting rights (i.e., Steve and Suzanne Tsintolas as tenants by the entirety and The Cassandra Tsintolas Johnson Revocable Trust) would vote to dissolve, Movants did in fact receive notice of that proposed shareholder action.

Finally, Movants argue that Steve listed Chris, Fotini and himself under "Name of the Governor of Authorized Person" and inaccurately represented that the Articles of Dissolution for TII were signed by the "Governor or Authorized Person" listed.  Chris and Fotini argue they did not authorize their signatures on the Articles of Dissolution for TII.  As the Debtors explained in the Superior Court, the Articles of Dissolution filed by Steve (for TII) (a true and correct copy of which is attached hereto as **Exhibit H**) are materially different than the Articles of Dissolution attached to the Movants' Judicial Determination Motion as Exhibit 3.  Debtors believe the discrepancy is due to the formatting of the automated process applied by the "CorpOnline" website maintained by the D.C. Business and Professional Licensing Corporation.

### 3.    The Orders Regarding Shulman Rogers' Disqualification Are Not Determinative of the Proper Authority to File These Bankruptcy Cases

Movants also argue that the Superior Court's rulings in connection with the disqualification of Shulman Rogers have some sort of impact on Debtors' authority to file these bankruptcy cases.

Not so.  To cut to the point, the Superior Court never analyzed the impact of the documents explained in Section A of Debtors' Argument Section below.  In fact, the Superior Court expressly refused to consider the impact and timing of those documents in conjunction with Debtors' Motion for Reconsideration and Revision of the Superior Court's Order Disqualifying Shulman Rogers Attorneys.

## II.    Argument

### A.    The Debtors' Board of Directors Properly Authorized the Filing of the Chapter 11 Cases

Debtors agree with Movants that state law determines who has the power to authorize the filing of a bankruptcy case.  *Price v. Gurney*, 324 U.S. 100, 106-07 (1945).  In the Motion, Movants focus on the status of shareholders, and argue that although they are shareholders, they were supposedly not provided with notice of a meeting to authorize the filing of these bankruptcy cases.

Movants' focus on their alleged rights as shareholders is misplaced and irrelevant.  That is because under District of Columbia law, a corporation's board of directors is the body that must authorize the filing of a bankruptcy case.  Pursuant to D.C. Code § 29-306.01(b),

> [a]ll corporate powers shall be exercised by or under the authority of the board of directors of the corporation and the activities and affairs of the corporation shall be managed by or under the direction, and subject to the oversight, of its board of directors, subject to any limitation set forth in the articles of incorporation or in an agreement authorized under § 29-305.42.

D.C. Code § 29-306.01(b).

OII was formed as a District of Columbia corporation pursuant to Articles of Incorporation dated April 1, 1955 as filed with the District of Columbia Office of Superintendent of Corporations on April 22, 1955 (the "OII Articles of Incorporation"), a true and correct copy of which is attached hereto as **Exhibit I**.  The OII Articles of Incorporation do not set any limitations on the board's powers.

TII was formed as a District of Columbia corporation pursuant to Articles of Incorporation dated September 21, 1961, as filed with the District of Columbia Office of Superintendent of Corporations on September 21, 1961 (the "TII Articles of Incorporation"), a true and correct copy of which is attached hereto as **Exhibit J**.  The TII Articles of Incorporation do not set any limitations on the board's powers.

The next issue is: who were the Debtors' board members when the boards authorized the bankruptcy filings?  This issue requires an analysis of the proceedings in the D.C. Superior Court, combined with the plain language of the D.C. Code.  Movants correctly state that on October 24, 2019, they filed actions in the D.C. Superior Court for judicial dissolution.  Motion, ¶ 13.  Movants also correctly state that Movants each own a 25% share of each Debtor and that the other 50% of the shares of each Debtor are owned by Efstratios and Suzanne Tsintolas, as tenants by the entirety, as to 25%, and The Cassandra Tsintolas Johnson Revocable Trust, as to the remaining 25%.  See Motion, ¶ 14.  The Debtors also agree that the Debtors are currently deadlocked at the shareholder level.

However, the Debtors are not deadlocked at the board level.  On October 5, 2023, the D.C. Superior Court entered a final order establishing the fair value of Movants' shares in the Debtors (i.e., the Valuation Order).  That order, which Movants refer to as the "Final Order" and which Movants attached as Exhibit 5 to their Motion to Dismiss, was entered pursuant to D.C. Code § 29-312.24.  As summarized by the D.C. Superior Court, "[w]hen a group of shareholders brings an action under D.C. Code § 29-312.20(a)(2) to dissolve a corporation, the corporation may elect to purchase the shareholder-plaintiffs' shares at fair value instead of dissolving.  D.C. Code § 29-312.24(a).  This is called an 'election to purchase in lieu of dissolution.'"  Final Order, p. 4.  On January 21, 2020, the Debtors elected to purchase Movants' shares.  However, the Debtors and

Movants were not able to reach an agreement about the fair value of Movants' shares and, as a result, the D.C. Superior Court had to determine the fair value of Movants' shares.  That occurred pursuant to the Final Order.

Importantly, D.C. Code § 29-312.24(f) expressly states:

> (f) Upon entry of an order under subsections (c) or (e) of this section, the Superior Court shall dismiss the petition to dissolve the corporation under § 29-312.20(a)(2), **and the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation**, except the right to receive the amounts awarded by the order of the court which is enforceable in the same manner as any other judgment.

D.C. Code § 29-312.24(f) (emphasis added).

The Final Order was "an order" entered under subsection (e) of D.C. Code § 29-312.24. As such, upon entry of that Final Order on October 5, 2023, the petitioning shareholders (i.e., Movants) **no longer had any rights or status as shareholders of the corporations**, except the right to receive certain amounts awarded to them.

Following entry of the Final Order on October 5, 2023, the non-petitioning shareholders (*i.e.*, Efstratios and Suzanne Tsintolas, as tenants by the entirety, and The Cassandra Tstintolas Johnson Revocable Trust) – the only shareholders with voting rights at that time – executed a Written Consent of the Shareholders of OII, a true and correct copy of which is attached hereto as **Exhibit K**, and a Written Consent of the Shareholders of TII, a true and correct copy of which is attached hereto as **Exhibit L** (together, the "October 13, 2023 Written Consents of Shareholders"). The October 13, 2023 Written Consents of Shareholders removed Movants from the boards of directors of the Debtors.  The October 13, 2023 Written Consents of Shareholders also appointed Suzanne Tsintolas as a director.  As a result, the boards of each Debtor consisted of – and still consist of – the following members:  Efstratios Tsintolas, Cassandra Tsintolas and Suzanne

Tsintolas.  Those are the individuals who properly executed the Actions by Unanimous Written Consent of Directors, dated April 27, 2024, authorizing the filing of these cases.

Even assuming *arguendo* that D.C. Code § 29-312.24(g) applies, the above analysis still applies.  D.C. Code § 29-312.24(g) provides, in part, that "[u]pon filing of such articles of dissolution [*i.e.*, the articles filed after the Superior Court's valuation order], the corporation is dissolved . . . and the order entered pursuant to subsection (e) of this section shall no longer be of any force or effect."  Recall that D.C. Code § 29-312.24(f) provides that upon entry of the valuation order under D.C. Code § 29-312.24(e), "the petitioning shareholders shall no longer have any rights or status as a shareholder of the corporation."

The question is whether – upon the filing of articles of dissolution pursuant to D.C. Code § 29-312.24(g) – the petitioning shareholders somehow regain their "rights or status as a shareholder."  If the answer is yes, a related question is whether the petitioning shareholders regain their "rights or status as a shareholder" retroactively to the date they lost those rights (*i.e.*, as of October 5, 2023).

There is nothing in the plain language of the D.C. Code that suggests petitioning shareholders regain their "rights or status as a shareholder."  All it says is that the Valuation Order "shall no longer be of any force or effect."  D.C. Code § 29-312.24(g) **does not** say that the petitioning shareholders regain their "rights or status as a shareholder."  Even if petitioning shareholders do somehow regain their "rights or status a shareholder," it remains unclear whether they gain those rights retroactively with the result that actions taken by the non-petitioning shareholders after the petitioning shareholders lost their rights, are somehow voided.  There is nothing in the D.C. Code that supports that conclusion.  Why does this matter?  This matters because it is undisputed that after the Movants (as petitioning shareholders) lost their "rights or

status as a shareholder" on October 5, 2023, pursuant to D.C. statute the non-petitioning shareholders validly executed the October 13, 2023 Written Consents of Shareholders; thereby lawfully removing Movants as board members.  Movants, as petitioning shareholders decided to file petitions for dissolution pursuant to the D.C. Code.  They cannot now ignore the plain language of the same D.C. Code which stripped them of their "rights or status as a shareholder" and what followed, including a valid shareholder vote to reconstitute the board; the same board that later authorized the filing of these chapter 11 bankruptcy cases.

### B.      Movants Cannot Establish Cause Under 11 U.S.C. § 1112(b)

#### 1.      Applicable Standard

Section 1112(b) of the Bankruptcy Code (the "Code") provides for dismissal of a chapter 11 case "for cause" upon the "request of a party in interest" and enumerates a list of sixteen "causes" for dismissal. *See* 11 U.S.C. § 1112(b)(4)(A)–(P). Bad faith is not one of the enumerated grounds for the dismissal under the Code. Similarly, the Code contains no requirement that bankruptcy petitions must be filed in good faith. Nonetheless, most courts have expressly interpreted §1112(b) to include dismissal of a chapter 11 case due to "the lack of good faith in its filing or found that the courts have the implicit authority to dismiss a chapter 11 petition filed in bad faith." *La Trinidad Elderly LP SE,* 627 B.R. 779, 800 (B.A.P. 1st Cir. 2021); *Baker v. Latham Sparrowbush Assoc.* (*In re Cohoes Indus. Terminal, Inc.*), 931 F.2d 222, 227–28 (2d Cir.1991); *In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir.1999); *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071 (5th Cir.1986); *In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 130–31 (6th Cir. 1995); *In re James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992); *In re Marsch,*

36 F.3d 825, 828 (9th Cir. 1994); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).

Relying on Third Circuit law, Movants assert that the chapter 11 cases are subject to dismissal under § 1112(b), unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith. *See* Movants' Brief, p. 22 *citing NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004)). This reliance, however, is misplaced. The D.C. Circuit for the Court of Appeals has not adopted the Third Circuit standard. In fact, the Third Circuit employs a very different test than any other circuit. Under the standard employed in the Third Circuit, a petition is filed in good faith if it (i) serves a valid bankruptcy purpose and, (ii) is not filed merely to obtain a tactical litigation advantage. *15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009); *see also In re Integrated Telecom Express, Inc.* at 119-20. A "valid bankruptcy purpose assumes a debtor in financial distress" such that under Third Circuit law, "good faith necessarily requires some degree of financial distress on the part of a debtor." *In re LTL Mgmt., LLC*. 64 F.4th 84 at 101 (3d Cir. 2023) (internal quotations omitted). Most recently, the Third Circuit made a debtor's "immediate" and "apparent" financial distress a gating requirement for a chapter 11 entry. *In re LTL Mgmt., LLC*. 64 F.4th 84 at 101, 102 (3d Cir. 2023).

Although the Third Circuit places the burden on the debtor, the majority of other Circuits apply a burden shifting framework and totality of circumstances analysis. "The burden to establish grounds for conversion or dismissal of a Chapter 11 case is on the party seeking conversion or dismissal under 11 U.S.C.A. § 1112(b)." Bankruptcy Evid. Manual § 301:99 (2023 ed.); *La Trinidad Elderly LP SE*, 627 B.R. 779, 798 (B.A.P. 1st Cir. 2021); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) ("[t]he moving party has the burden of demonstrating

cause for dismissal"); *In re Roman Cath. Church of Archdiocese of New Orleans*, 632 B.R. 593, 600 (Bankr. E.D. La. 2021) citing *In re Little Creek*, 779 F.2d at 1073; *In re N.R. Guaranteed Ret., Inc.*, 112 B.R. 263, 273 (Bankr. N.D. Ill.), *aff'd,* 119 B.R. 149 (N.D. Ill. 1990); *In re Eighty South Lake, Inc.,* 63 B.R. 501, 508 (Bankr. C.D.Cal.1986), *aff'd,* 81 B.R. 580 (9th Cir. BAP 1987).

The Fourth Circuit applies a more restrictive two-prong test that requires the movant to demonstrate both the objective futility of the case and the subjective bad faith of the petitioner. *Carolin Corp. v. Miller*, 886 F.2d 693, 694, 700 - 701 (4th Cir. 1989). In *Carolin*, the Fourth Circuit held that in examining the totality of the circumstances involved in a bankruptcy filing, the bankruptcy court should dismiss cases sparingly and with great care and caution. *Id.* at 700. "Decisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly made." *Id.* at 700. The Fourth Circuit adopted this standard based on the belief "that such a stringent test is necessary to accommodate the various and conflicting interests of debtors, creditors, and the courts that are at stake in deciding whether to deny threshold access to Chapter 11 proceedings for want of good faith in filing." *Id.* at 701.

Other Circuits apply totality of circumstances tests that fall in-between the Third Circuit and Fourth Circuit standards. The Fifth Circuit looks at "the debtor's financial condition, motives, and the local financial realities." *In re Little Creek Development Company*. 779 F.2d 1068 (5th Cir. 1986). In the Fifth Circuit's view Chapter 11 is not proper "where there is no equity to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according

to the debtor's terminal euphoria."[5] *Id.* at 1073. The Sixth Circuit held that good faith is an amorphous notion, largely defined by factual inquiry. *In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir. 1995). While no single fact is dispositive, the following factors were found to be meaningful in evaluating an organizational debtor's good faith: (1) the debtor has one asset; (2) the pre-petition conduct of the debtor has been improper; (3) there are only a few unsecured creditors; (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court; (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford; (6) the filing of the petition effectively allows the debtor to evade court orders; (7) the debtor has no ongoing business or employees; and, (8) the lack of possibility of reorganization.

Likewise, the Ninth Circuit and the Eleventh Circuits consider any factors which evidence "an intent to abuse the judicial process of the reorganization provisions" or, in particular, factors which evidence that the case was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th

---

[5] The Court considered the following specific circumstances as relevant:
    1. The debtor owns only one encumbered asset;
    2. The debtor lacks employees other than its principals;
    3. The debtor has "little or no cash flow and no available sources of income to sustain a plan of reorganization;"
    4. The debtor has few, if any, unsecured creditors;
    5. A foreclosure is in process, which the debtor has tried to prevent by defenses on the merits or by posting a bond;
    6. There are sometimes allegations of wrongdoing by the debtor.

Cir.1988)[6]. The Seventh Circuit "has offered some broad suggestions as to the term's meaning but has not articulated a definitive standard." *In re Aearo Techs. LLC,* No. 22-02890-JJG-11, 2023 WL 3938436, at *10 (Bankr. S.D. Ind. June 9, 2023).

The standard for motions to dismiss based on bad faith remains unsettled in the District of Columbia Circuit also. *In re 1210-1216 Massachusetts Ave. Assocs.*, 1992 WL 158637 (D.D.C. 1992). However, the Bankruptcy Courts have consistently applied the framework used in the Fourth, Fifth, Ninth and Eleventh Circuits. *In re Fay Associates Ltd. Partnership*, 225 B.R. 1 (Bankr. D.C. 1998); *In re Franklin Mortg. & Inv. Co., Inc.*, 143 B.R. 295 (Bankr. D.C. 1992). In *Fay*, this Court found that the debtor's management's desire to avoid adverse tax consequences to themselves individually and the ability to pay unsecured creditors were not sufficient to find the chapter 11 was filed in bad faith. This Court embraced a Ninth Circuit BAP reasoning that good faith was lacking only when the debtor's actions are clear abuse of the bankruptcy priced. *Fay* at 5, *citing In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983). It further emphasized: If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist.

> But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization, on a feasible basis ... good faith cannot be denied.

---

[6] The Eleventh Circuit affirmed the finding of bad faith based on the presence of many circumstantial factors which may be indicative of a bad faith filing:
(i) *The Debtor has only one asset,* the Property, in which it does not hold legal title;
(ii) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;
(iii) The Debtor has few employees;
(iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;
(v) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action; and
(vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

*Fay* at 5 quoting *Thirtieth Place, Inc.* at 505.

In *Franklin*, the Court granted a motion to dismiss based on application of the factors established by the Fifth Circuit in *Little Creek Development*. *In re Franklin Mortg. & Inv. Co.*, Inc, at 299 *citing Little Creek Development Co.*, 779 F.2d at 1073. The Court focused on whether there was "an intent to abuse the judicial process and the purposes of the reorganization provisions or, in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Franklin Mortg. & Inv. Co.*, Inc, at 299 *citing In Phoenix–Piccadilly, Ltd.,* 849 F.2d at 1394. The debtor in Franklin was a single asset real estate company that for the three years before the filing had no assets and operations. The only asset it held was transferred to Franklin by its president and shareholder on the eve a foreclosure in Florida. Accordingly, the Court held the case had the earmarking of a "new debtor syndrome" and the debtor had failed to demonstrate any legitimate, good faith business reason for the revitalization of Franklin or the transfer to Franklin of the property. *Id.* at 301.

As illustrated above, the courts in this jurisdiction and the vast majority of the courts in the country apply a flexible standard looking at the objective futility of the filing or indicia of subjective bad faith or both. Applying *Carolin* or a flexible totality of circumstances approach is consistent with the Bankruptcy Code, legislative history, and Supreme Court precedent. *In re Victoria Ltd. Partnership*, 187 B.R. 54 (Bankr. D. Mass. 1995) ("Good faith, like apple pie, is difficult to oppose. The good faith of this doctrine, however, has nothing to do with honesty. When its true content is revealed, the doctrine is exposed in conflict with the Bankruptcy Code, its legislative history, Supreme Court precedent, and logic."). The *Victoria* court thoroughly analyzed the genesis of the good faith doctrine and the pre-Code explicit statutory requirement of good faith in Chapter X of the Bankruptcy Act, entitled "Corporate Reorganizations." Bankruptcy Act of

1898, 11 U.S.C. §§ 501–676 (repealed 1978) (the "Act"). The Act required each bankruptcy petition to affirmatively state that (a) the debtor was "insolvent or unable to pay its debts as they mature," (b) the debtor has a "need for relief under this chapter," and (c) the petition was "filed in good faith." §§ 530(1)-(7), 541, 546. "After the Act was repealed, certain courts found that there was an implicit requirement of good faith even though the Bankruptcy Code did not include such a requirement. *In re Victory Const. Co.*, Inc., 9 B.R. 549 (Bankr.C.D.Cal.1981), vacated on other grounds, 37 B.R. 222 (9th Cir. BAP 1984). Introducing the good faith requirement for chapter 11 proceedings under the Code was inconsistent with the wording and the legislative history of Section 1112(b) of the Code. *In re Victoria Ltd. Partnership* at 59-61. "The Commission on the Bankruptcy Laws of the United States believed a requirement of good faith in the filing led to fruitless litigation with secured creditors early in the case." *Id.* at 60.

"[T]he real test that still remains is the presence of honest intention of the Debtor and some real need and real ability to effectuate the aim of the reorganization even if this involves the total liquidation of assets." *Fay* quoting *Phoenix Piccadilly*. In evaluating a § 1112(b) motion to dismiss, all doubts are to be resolved in favor of a debtor." *In re Chris-Marine U.S.A., Inc*., 262 B.R. 118, 124 (Bankr. M.D. Fla. 2001); *In re G.S. Distrib., Inc*., 331 B.R. 552, 566 (Bankr. S.D.N.Y. 2005) ("[C]ourts should dismiss on bad faith grounds sparingly, 'with great caution....'").

## 2.    <u>There is a Real Need and Ability to Effectuate a Plan</u>

The Debtors' intent in reorganization is to maximize the value of their estates and to effectuate a sale of the properties at market prices and distribute sale proceeds through a liquidation plan. Preserving going concern and maximizing property available to satisfy creditors are considered to be valid bankruptcy purposes. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 No. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  Chapter 11 can involve both reorganization and liquidations;

chapter 11 "reorganizations include total liquidations pursuant to a confirmed plan." *In re Deer Park, Inc.,* 10 F.3d 1478, 1481 (9th Cir.1993) ("Chapter 11 of the Bankruptcy Code provides that liquidation may be a form of reorganization, as opposed to a straight liquidation under Chapter 7."); *see also* 11 U.S.C. § 1129(a)(11) (stating that a court can confirm a plan under chapter 11 that includes a proposed liquidation).

As set forth above, between the two of the entities, the Debtors own eight multi-family residential properties with over a hundred tenant units. For the last almost five years, the Movants burdened the Debtors with malevolent and superfluous litigation, seeking exactly what Debtors now essentially deliver: the Debtors' dissolution.[7] Although the Debtors' preferred path was to buy out Movants as described above, the companies neither generate sufficient revenue to pay the amounts fixed with the Valuation Order nor have sufficient cash flow to qualify for a loan (in today's high interest environment) in the amount that was necessary to buy out the Movants. The Movants' goal is to have a receiver appointed to sell the properties. The cost of the receiver and the administration delays would put further strain on the limited cash flow of the Debtors and would necessarily diminish the proceeds available to creditors and shareholders due to the costs.

On the other hand, the bankruptcy filing would facilitate the sale of the properties at going concern values and provide efficiency by eliminating potential transfer taxes and burdensome restrictions under the Tenant Opportunity to Purchase Act (TOPA). Generally, TOPA offers

---

[7] D.C. Code § 29-312.05 (which governs dissolution), provides that a dissolving corporation carries out the following activities:

    (1) Collecting its assets;
    (2) Disposing of its properties that will not be distributed in kind to its shareholders;
    (3) Discharging or making provision for discharging its liabilities;
    (4) Distributing its remaining property among its shareholders according to their interests; and
    (5) Doing every other act necessary to wind up and liquidate its activities and affairs.

D.C. Code § 29-312.05.  These activities are similar to what will occur in these chapter 11 cases.

residents renting within the District of Columbia the opportunity to purchase or assign their right to purchase their housing accommodation whenever a multifamily property owner sells. Within the statute there are requirements that directly affect the disposition process and lead to an extended escrow period. Compliance with TOPA would require a lengthy sale process, approximately 12-18 months. *See* Affidavit of W. Kyle Tangney (the "Tangney Affidavit"), attached hereto as **Exhibit M**.[8] A bankruptcy sale is exempted from compliance with TOPA. D.C. Code § 42–3404.2(c)(2)(E). "TOPA expressly provides that a bankruptcy sale does not constitute a 'sale' under TOPA." *In re 315 Franklin, LLC*, 2017 WL 6371342 at *3 n 6 (Bankr. D.D.C. Dec. 12. 2017).

Not only will the Debtors be able to sell the properties sooner through bankruptcy, but also – and importantly – the Debtors expect to attract and receive more interest from potential purchasers, including "out-of-market" investors, because the sale process will not be constrained by TOPA.[9] This should result in higher sales prices.  The Movants' ultimate goal should be to get paid for their interest in the company. This goal is not better accomplished in state court through the receivership Movants want to impose. Hence, effectuating a sale of all assets and distributions of proceeds to all constituents through a chapter 11 proceedings is in the best interest of everyone, including the Movants.

### 3.    An Analysis of Relevant Factors Weighs in Favor of the Debtors

Looking at the factors applied by the Bankruptcy Court in this Circuit, dismissal based upon bad faith is not warranted. *In re Fay Associates Ltd. Partnership*, 225 B.R. 1; *In re Franklin*

---

[8] The Tangney Affidavit was attached as Exhibit A to Defendants' and Interested Parties' Proposed Findings of Fact and Conclusions of Law filed with the Superior Court.

[9] "Out-of-market" investors refer to investors from outside of the area who typically shy away from D.C. because of TOPA.

*Mortg. & Inv. Co., Inc*., 143 B.R. 295. This is not a case involving one asset or a fight with one or more secured creditors with no remaining equity in the assets and accordingly no value to maximize. The Movants did not make a showing that a plan could not be confirmed and the effort to prevent the appointment of a receiver is not an indication of bad faith. In *Fay Associates Ltd*, the Bankruptcy Court held that the petition was not filed in bad faith even if the sole motivation was to avoid adverse tax consequences to limited partners from foreclosure and that the ability to pay creditors did not indicate the filing was in bad faith.  *Fay Associates Ltd*, 225 B.R. at 5-7.

The Schedules show that the Debtors have a number of unsecured creditors with liquidated debts in the range of $5,000,000. Although the amount of assets exceeds the liabilities, balance sheet solvency is not a pre-requisite for seeking bankruptcy protection. *LTL Management*, 64 F.4th at 102 *citing SGL Carbon*, 200 F.3d at 163; *Integrated Telecom*, 384 F.3d at 121. The assets are C-class mutli-family properties often referred to as work force housing, leased to low-to-moderate income residential tenants. The Debtors' assets generate enough cash flow to facilitate efficient bankruptcy process but are not sufficient to meet Movants' demands and obligations to existing creditors. The conclusory assertion that Movants were "already wronged greatly" is not supported by the record; nor is the allegation of misconduct, as the Valuation Order is currently subject to appeal.

Contrary to Movants' assertion, the filing of these chapter 11 proceeding is not a litigation tactic. The cases cited by Movants are inapposite. There is no regulatory action or regulatory scheme that the Debtors are trying to avoid. See Movants' Brief, ¶ 66 *In re NRA of Am.*, 682 B.R. 262, 277-78, 280-82 (Bankr. N.D. Tex. 2021) (dismissing case that the NRA concededly filed in response to regulatory actions by New York Attorney General seeking its dissolution; debtor had no financial need to file bankruptcy but saw case as way to obtain a "fair, level playing field;"

court held that using bankruptcy to take that remedy off the table was an attempt to obtain unfair litigation advantage), *In re Outta Control Sportfishing, Inc.*, 642 B.R. 180, 186 (Bankr. S.D. Fla. 2022).

Movants' attempt to extort a settlement to their liking initially deprived the Debtors of the opportunity to get favorable financing under COVID-programs to cover payroll. The COVID epidemic and its long-term impact has added nothing but further strain on the companies in an economic environment that puts under significant pressure valuation of real estate assets. The filing of these cases allows the Debtors to take advantage of chapter 11 tools in monetizing their assets. A chapter 11 liquidating plan will allow Debtors and all other stakeholders to negotiate a consensual resolution to the allocation and distribution of estate proceeds and the implementation of the liquidation. Keeping existing management in place preserves institutional knowledge and facilitates effecting orderly and prompt liquidation. Pursuing this process is hardly a litigation tactic to avoid or stall the pending state court case. To the contrary, it would accomplish what Movants ultimately want – payment for their equity interest.

"If it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization, on a feasible basis ... good faith cannot be denied." *Fay* at 5 citing *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983). This is exactly what the Debtors are doing - they are trying to avoid long delays in the administration of winding down and resorting to bankruptcy tools that would benefit the estates.

### A.   The Movants Failed to Establish Grounds for the Extraordinary Remedy of Abstention

Movants ask this Court, in the alternative, to abstain from exercising its jurisdiction over this matter. However, abstention under § 305 of the Bankruptcy Code is an "extraordinary remedy." *In re Skybridge Spectrum Found*., No. 21-00005-ELG, 2021 WL 2326595, at *17 (Bankr. D.D.C. June 3, 2021), *appeal denied, judgment aff'd*, No. 21-BK-5-ELG, 2023 WL 5561105 (D.D.C. Aug. 29, 2023) *citing In re General Aeronautics Corp.*, 594 B.R. 442, 480 (Bankr. D. Utah 2018). A court may abstain and dismiss a bankruptcy case, at any time, if the interests of the creditors and the debtor would be better served by dismissal. 11 U.S.C. § 305(a). The party seeking relief under Section 305(a) bears the burden of proof. *In re RHTC Liquidating Co.*, 424 B.R. 714, 720 (Bankr. W.D. Pa. 2010).

Courts consider different sets of factors when determining whether to abstain. Some courts look at "(1) the presence of unsettled issues of non-bankruptcy law; (2) the availability of another forum to decide those issues; (3) economy and efficiency of administration; (4) any prejudice to the parties; and (5) the purpose of the bankruptcy." *See In re Int'l Zinc Coatings & Chems. Corp.*, 355 B.R. at 82 (citations omitted). The court may also assess the estate's assets and the parties' motivations. *Id.* Recent cases have expanded the number of factors to gauge the overall best interests of the creditors and debtor, but they are not given equal weight in each case and the courts are not to engage in a strict balancing. *In re AMC Invs., LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) These factors include:

(1) the economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

*In re AMC Invs., LLC* at 488 citing *In re Paper I Partners*, L.P., 283 B.R. 661, 679 (Bankr.S.D.N.Y.2002). The same factors are analyzed by the Movants, but they rely on *In re Korean Radio Broad., Inc.*, No. 19-46322-ESS, 2020 WL 2047990, at *7 (Bankr. E.D.N.Y. Mar. 31, 2020).

Proper application of the factors to the circumstances in this case actually tips the scale against abstention. As explained above, the bankruptcy forum provides some unique advantages, including eliminating compliance with TOPA in liquidating the assets that would facilitate faster administration and maximize proceeds by taking advantage of the exemption for certain transfer taxes.  The state court is simply not the better venue to efficiently liquidate the assets and distribute proceeds to the stakeholders. Despite the state court litigation pending for a number of years, the process of liquidation did not begin because Movants refused to cooperate; instead preferring to steadfastly hold onto the "deadlocked" moniker. The only dispute that was resolved was the potential valuation of Movants' equity interests (as of 2019) and that has no bearing on how much the properties can be sold for today. Accordingly, the first, second, third, fourth, fifth, sixth and seventh factors weigh against abstention.

**WHEREFORE**, for these reasons, the Debtors respectfully pray that this Court enter an order denying the Motion to Dismiss and granting the Debtors such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Stephen A. Metz
Stephen A. Metz, Esq. (463044)
Offit Kurman, P.A.
7501 Wisconsin Avenue, Suite 1000W
Bethesda, Maryland 20814
(240) 507-1723
smetz@offitkurman.com
*Counsel for Debtors*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of June, 2024, a copy of this Opposition and proposed Order was served on the following via CM/ECF:

**Kristen S. Eustis**    Kristen.S.Eustis@usdoj.gov, Robert.W.Ours@usdoj.gov
**Rosa J. Evergreen**    rosa.evergreen@aporter.com, ecf-a6608983ebb8@ecf.pacerpro.com,maousbccourts@arnoldporter.com,edocketscalendaring@arnoldporter.com
**Stephen A. Metz**    smetz@offitkurman.com, mmargulies@offitkurman.com
**U. S. Trustee for Region Four**    USTPRegion04.DC.ECF@USDOJ.GOV

/s/ Stephen A. Metz
Stephen A. Metz

4866-6463-6354, v. 1